UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 11651 RGS

MAGISTRATE JUDGE Cohen

| | |
|---|---|
| CYNTHIA A. BENNETT and GUY E. MILLER, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) CIVIL ACTION |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | ) NO. ) RECEIPT # ) AMOUNT $ 150 ) SUMMONS ISSUED yes ) LOCAL RULE 4.1 ) WAIVER FORM |
| Defendants. | ) MCF ISSUED ) BY DPTY. CLK. TOM ) DATE 7/23/04 |

## COMPLAINT

Plaintiffs Cynthia A. Bennett and Guy E. Miller file this Complaint against Defendants Fidelity Management & Research Company ("FMR") and FMR Co., Inc. ("FMRC") and allege as follows:

### I.   INTRODUCTION

1.   Plaintiffs are shareholders in five of the largest mutual funds (technically known as open-end registered investment companies) in the country. These funds, each of which has assets under management *in excess of $20 billion*, were formed and are distributed, advised and managed by Defendants (Fidelity is one of the largest investment advisors in the world).

2.   Plaintiffs own shares in the Fidelity Contrafund (over $34 billion in assets under management), the Fidelity Growth & Income Fund (almost $30 billion in assets under management), the Fidelity Magellan Fund (over $60 billion in assets under management), the Fidelity Blue Chip Growth Fund (over $21 billion in assets under management) and the Fidelity

Low-Priced Stock Fund (over $23 billion in assets under management) (individually a "Fund" or collectively the "Funds").

3.  Defendants are part of the Fidelity organization and are registered investment advisers (or affiliated persons of investment advisers) to the Funds and 272 other (and smaller) mutual fund and additional institutional client portfolios. Defendants owed (and continue to owe) fiduciary duties to the Funds, Plaintiffs and all shareholders of the Funds.

4.  The Funds pay Defendants significant fees for managing the Funds. In percentage terms, those fees may look benign, yet in dollar terms, or in comparison to fees charged to comparable institutional portfolios, they are staggering.

5.  Management includes selecting securities for the Funds to buy, sell or hold (the "Portfolio Selection Services") and administrative services associated with such advice. The management fees paid by the Funds include a flat fee based on assets under management in each Fund, a variable fee based on assets under management in all Fidelity mutual funds, and a performance fee adjustment.

6.  In the money management business, investment advisors (including Defendants) routinely offer their services to institutional clients with "breakpoints" (lower fees as assets increase) because of extraordinary "economies of scale" inherent in this industry. Once an adviser has sufficient assets to reach a critical mass, each additional dollar of revenue is almost pure profit: "By definition, if you cut management fees [payable to a mutual fund investment adviser], that falls just about dollar for dollar to the bottom line," according to the money management consulting firm Casey, Quirk & Acito.

7. The "pure profits" generated by these economies of scale are routinely shared with other institutional clients. Although required by law to also be similarly shared with mutual fund clients (including the Funds), Defendants have failed to do so.

8. These economies of scale are realized quickly as assets under management grow. Fidelity offers breakpoints to other (non-mutual fund) investors with as little as $500,000 under management.

9. The Funds are gargantuan, each in excess of $20 billion in assets under management and collectively in excess of $170 billion (the Fidelity Magellan Fund is believed to be the largest mutual fund in the world). The larger a portfolio, the greater the benefits from economies of scale and the less it costs to provide investment advisory services. Eventually, when portfolios become as large as those of the Funds, the cost of providing Portfolio Selection Services for each additional dollar of assets under management approaches zero.

10. The Portfolio Selection Services that Defendants provide to the Funds are identical to the portfolio selection services that Defendants provide other institutional clients. Unlike the advisory contracts with the Funds, however, the contracts negotiated with other Fidelity institutional clients are the product of arms' length negotiations and result in far lower fees even though those clients' portfolios are *far* smaller than those of the Funds.

11. These much higher fees that Defendants receive for Portfolio Selection Services for the Funds (the "Portfolio Selection Fees"), for the same services provided to other institutional clients with much smaller portfolios, could not have resulted from arms' length negotiations. This is even more evident when adding to the Portfolio Selection Fees all other benefits ("fallout benefits") received by Defendants by virtue of their relationship with the Funds.

3

12. The receipt by Defendants of the Portfolio Selection Fees from the Funds constitutes a breach of Defendants' fiduciary duties. Accordingly, Plaintiffs seek to rescind the advisory contracts in place between Defendants and the Funds and to recover the Portfolio Selection Fees paid by the Funds to Defendants during the period commencing one year prior to the filing of this Complaint through the date of final judgment after trial.

### The Investment Company Act of 1940

13. In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers such as Defendants. In the 1960s, it became clear to Congress that investment advisers to equity mutual funds were gouging those funds with excessive fees. As a result, § 36(b) was added to the ICA in 1970 (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs) and created a federal cause of action for breach of fiduciary duty by investment advisers such as Defendants. The statute provides for quasi-derivative claims (with no demand requirement) and, to the extent permitted by that statute, Plaintiffs reserve the right to assert claims on behalf of a class of similarly situated shareholders (or derivatively on behalf of a class of similarly situated Fidelity mutual funds).

14. Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or

4

payments paid by such registered investment company or by the security holders thereof to such investment adviser or person . . . .

### Economies of Scale

15.     Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services (such as the Portfolio Selection Services) to clients such as the Funds. Economies of scale are created when (as with the Funds) assets under management increase more quickly than the cost of advising and managing those assets. At some point (exceeded by the Funds because of their huge size), the additional cost to advise each additional dollar in the Funds (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches zero.

16.     For example, the cost of providing Portfolio Selection Services to the Funds may be $X for the first $100 million of assets under management, but the cost for providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's portfolio investment objectives are set forth in their offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities. In addition, when assets under management increase in value over time as markets rise or existing shareholders purchase additional shares (with no change in the composition of the Funds' portfolios or number of shareholders), there are no additional Portfolio Selection Services' costs incurred by Defendants.

17.     These economies of scale belong to the Funds and Plaintiffs, not Defendants.

18.     Recognizing the existence of these economies of scale, virtually all investment advisors offer "breakpoints" to some clients. These breakpoints specifically reflect that costs decline dramatically as assets under management increase by, for example, lowering the management and other fees (as a percentage of assets but *not* in total dollars) as assets grow.

The agreements between Defendants and the Funds do *not* incorporate breakpoints even though Defendants offer breakpoints to other institutional clients.

19. In addition, technology has lowered the costs to Defendants of providing the Portfolio Selection Services. For example, it has become far easier and less expensive for Defendants to obtain research about potential investments, and to communicate with the Funds and their shareholders, than regulators and courts in the early days of § 36(b) could ever have imagined. Defendants benefit from the widespread use of computers with exponentially greater computing power today than those of twenty years ago, company and stock research is readily and instantly available on the Internet, and Defendants are able to transact business with current and potential shareholders on the Internet. All of this dramatically lowers Defendants' costs and should also have resulted in significantly lower Portfolio Selection Fees over time. Unfortunately, those fees (in both percentage and dollar terms) have not declined as they should have but increased because of Defendants' violation of their fiduciary duties.

20. Notable academic research confirms the longstanding existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders. *See* John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest, 26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study") (attached hereto as Exhibit A).

21. Furthermore, both the Securities and Exchange Commission (the "SEC") and the Government Accounting Office (the "GAO") also confirmed in 2000 that economies of scale exist in the provision of Portfolio Selection Services. *See* Securities and Exchange Commission, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) (the "SEC Report"), at 30-31 (attached hereto as Exhibit B); Government Accounting Office, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous

Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 (attached hereto as <u>Exhibit C</u>).

22. The assets under management in the Funds have grown dramatically in the past decade, even accounting for the stock market declines experienced in recent years. For example:

    a. At the close of 1993, the Fidelity Contrafund had just over $6 billion in assets under management, and Defendants received almost $26 million in management fees. According to recent regulatory filings, by the end of 2003, this Fund's assets had jumped to over $30 billion, and fees had soared to over $175 million per year.

    b. In early 1994, the Fidelity Magellan Fund already had $33 billion in assets under management, and Defendants were paid approximately $186 million in management fees. From the September 2003 semi-annual report (the most recent data available), Fidelity Magellan Fund assets increased further to over $62 billion while fees increased to *over $357 million in a single year for a single fund portfolio.*

    c. In 1994, the Fidelity Growth & Income Fund had just under $9 billion in assets under management, and Defendants received approximately $40 million in management fees. According to recent regulatory filings, by September of 2003, this Fund's assets had jumped to over $28 billion while fees paid to Defendants soared to over $129 million in a single year.

    d. For the year ending July 1994, the Fidelity Blue Chip Growth Fund had just over $2 billion in assets under management while Defendants received over $8.5 million in management fees. According to recent regulatory filings, by mid-

2003, this Fund's assets had jumped to almost $20 billion while fees soared to over $101 million per year, again for a single portfolio.

e. In 1994, the Fidelity Low-Priced Stock Fund had just over $2 billion in assets under management and Defendants received almost $14 million in management fees. According to recent regulatory filings, by mid- 2003, this Fund's assets had jumped to almost $20 billion while fees soared to almost $100 million for another single portfolio.

23. While the size of the Funds has grown dramatically, the nature and quality of the Portfolio Selection Services rendered by Defendants has not changed. Indeed, the number of securities in each of the Funds' portfolios remained relatively constant, suggesting that the research associated with providing the Portfolio Selection Services was unchanged as the size of the Funds' portfolios grew dramatically and could have been provided for the same dollar fee with no percentage or dollar increase.

24. Despite this, the Portfolio Selection Fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) have grown dramatically and are disproportionately large in relationship to the services rendered to Plaintiffs.

25. Although owned by and owed to the Funds, the benefits created by economies of scale have been (and continue to be) kept by Defendants and are not being passed on to the Funds and their shareholders. This violates § 36(b).

### Defendants' Portfolio Selection Services to Other Clients

26. The gross disproportionality of the fees paid to Defendants for Portfolio Selection Services is also demonstrated by a comparison of the fees they receive from other clients for the same services. In some cases, Defendants charged (and continue to charge) the Funds fees two

times or more higher in percentage terms and *hundreds of times higher* in dollar terms compared to those charged to other clients with much smaller portfolios for the very same services.

27. In particular, Defendants charge these other clients as little as 20 basis points (0.20% of assets) for identical Portfolio Selection Services *including* all administrative costs. Plaintiffs are charged at least 40 basis points (.40%) for Portfolio Selection Services that include only a portion of the Funds' administrative expenses (significant additional charges for administration, trading and other expenses are also paid for separately by the Funds to Defendants and lumped together as "other expenses").

### The Funds' Conflicted Board of Trustees

28. The fees paid to Defendants are technically approved by the Funds' board of directors (referred to as the "board of trustees" by Fidelity). Each of the Funds is governed by a common board of trustees. A majority of the Funds' boards must be comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA.

29. There is a lack of independence and conscientiousness by the trustees in reviewing the Portfolio Selection Fees paid by each of the Funds. The trustees' lack of independence and conscientiousness establishes Defendants' violation of § 36 of the ICA, regardless of whether the trustees are presumed "independent" by § 10 of the ICA. The trustees are in all practical respects dominated and unduly influenced by Defendants in reviewing fees paid by the Funds.

30. Each of the statutorily presumed "disinterested" directors or trustees serves on the boards of 277 different Fidelity mutual funds, and are paid approximately $263,000 annually for attending approximately eleven meetings per year. Further, Defendants do not provide the

trustees with sufficient information for them to fulfill their obligations, and, when information is supplied, it is cursorily reviewed and not meaningfully considered.

**Nature of Relief Requested**

31.     Although the Portfolio Selection Fees challenged may appear to be very small on a shareholder-by-shareholder basis, they are huge in absolute terms and, even on a shareholder-by-shareholder basis, cause a dramatic decrease in Plaintiffs' investment returns over time. Arthur Levitt, past Chairman of the SEC, has observed this and is critical of what he calls the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly small fees can, over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001) (attached hereto as Exhibit D).

32.     The actual fees paid by the Fidelity Magellan Fund to Defendants make this point. For the three fiscal years ended March 31, 2003, investors paid management fees of $1.6 billion despite a loss of 24 percent in 2001, a loss in 2002, and a loss of 25 percent in 2003. Over the last decade, investors in Magellan have paid $4 billion in management fees, yet Defendants' advice has led to a significant underperformance compared to the Standard & Poor's 500 stock index (performance that can be purchased at a significantly lower cost). In dollar terms, the fees paid by the Funds to Defendants are staggering.

33.     In this action, Plaintiffs seek to rescind the advisory agreements and to recover all Portfolio Selection Fees paid by the Funds to Defendants or, alternatively, to recover all fees paid to and received by Defendants in violation of § 36(b), including a recovery of all benefits

resulting from economies of scale created by the Funds but wrongfully benefiting (and retained by) Defendants. In addition, Plaintiffs seek to recover all other excessive compensation received by Defendants in breach of their fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b).

## II. PARTIES

34. Plaintiff Guy E. Miller ("Miller") is a resident of O'Fallon, Illinois, and is a shareholder in the Fidelity Growth & Income Fund, the Fidelity Magellan Fund, the Fidelity Blue Chip Fund, and the Fidelity Low-Priced Stock Fund.

35. Plaintiff Cynthia A. Bennett ("Bennett") is a resident of Naples, Florida and is a shareholder in the Fidelity Contrafund.

36. Defendant Fidelity Management & Research Company ("FMR") is a Delaware corporation with its principal place of business in Boston, Massachusetts. FMR is registered as an investment adviser under the Investment Advisers Act of 1940 and is the investment adviser to the Funds, the Fidelity Four-In-One Index Fund, and other Fidelity funds.

37. Defendant FMR Co., Inc. ("FMRC") is a Delaware corporation with its principal place of business in Boston, Massachusetts. FMRC is also registered as an investment adviser under the Investment Advisers Act of 1940 and is an investment sub-adviser to the Funds and other Fidelity funds.

## III. JURISDICTION AND VENUE

38. This action is brought pursuant to § 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b).

39. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

40. Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3). Defendants are inhabitants of and transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

## IV.   GENERAL ALLEGATIONS

### The Investment Advisory Fees Charged by Defendants

41. As set forth in their Annual and Semi-Annual Reports, each of the Funds pays a "management" fee to Defendants. The management fee compensates Defendants for Portfolio Selection Services and certain "administrative" expenses.

42. The management fees paid to Defendants are paid as a percentage of assets under management. Although industry standard, this ensures payment of an unfair fee in very large portfolios such as those of the Funds because, as portfolios grow, they quickly create economies of scale and eventually the cost of servicing additional assets nears zero. A flat fee (in dollars, not percentages) or a breakpoint of near zero for very large portfolios would allow the Funds to capture their economies of scale while also allowing Defendants to earn a fair and competitive profit for their services.

43. The method of Defendants reporting of fees is intended to, and does, obfuscate the total amount of fees received for pure Portfolio Selection Services. Defendants fail to break out this information in detail because shareholders, regulators and others would then be able to more easily determine the egregious price-gouging engaged in by Defendants. This lack of transparency is compounded by Defendants' private ownership and the resulting lack of public reporting of Defendants' financial condition.

44. Defendants have a duty to report on the Portfolio Selection Fees received from the Funds to the Funds' trustees and to the shareholders (including Plaintiffs). Defendants' reports are not sufficient to properly inform either the trustees or the shareholders as to the true nature and amount of fees and other benefits paid to and received by Defendants for Portfolio Selection Services.

45. Despite the lack of clear and adequate reporting, the actual amount of fees paid to Defendants for pure Portfolio Selection Services can be accurately estimated. As explained above, the management fee paid by each Fund to Defendants consists of both an administrative services component and a pure Portfolio Selection Fee (i.e., investment advice) component. Subtracting the estimated administrative services component from the total management fee for each Fund leaves the fee charged for pure Portfolio Selection Services for each Fund.

46. The portion of the management fee paid by the Funds to Defendants attributable to administrative costs is no more than 0.08 percent (8 basis points) of total Fund assets because the much smaller Fidelity mutual fund known as the Fidelity Four-In-One Index Fund pays Defendants (or their affiliates) an administrative management fee of only 8 basis points (0.08%) of assets under management.

47. The Fidelity Four-In-One Fund requires little investment advice by virtue of its investment objective, namely, holding four pre-selected Fidelity funds in targeted proportions. For that reason, it pays Defendants (or their affiliates) only 2 basis points (.02%) for Portfolio Selection Services. However, the Four-In-One Index Fund has administrative costs that are similar in kind (but greater as a percentage of assets because it is smaller than the Funds) to those incurred by the Funds. Thus, its 8 basis point (.08%) administrative fee expense is a valid

assumption for the maximum administrative fee that the Funds could incur within the disclosed management fee for cost comparison purposes.

48. The administrative costs portion of the total management fee charged by Defendants to the Funds is probably less than 8 basis points (0.08% of assets under management) because the Funds are dramatically larger than the Four-In-One-Index Fund. At least one other large equity mutual fund separately reported that portion of the total management fee attributable to administrative costs as less than 10 basis points (0.10% of assets under management) and as little as 4 basis points (.04%).

49. Plaintiffs are confident that the administration expense component of the management fee charged to the Funds is less than 8 basis points for the additional reason, as evidenced by certain funds breaking out this detail, that there are also economies of scale created in this area as assets grow (although these economies of scale may not grow as quickly as those associated with the Portfolio Selection Fees).

50. The chart below sets forth the estimated amount of the Portfolio Selection Fee (i.e., the fee for pure securities selection and investment advice) charged by Defendants during the most recent reported periods (annualized where based upon semi-annual data and excluding performance adjustments) assuming that 8 basis points (0.08% of assets under management) covers administrative costs included in that fee:

| Fund | Total Management Fee (percentage) | Less Administrative Component (percentage) | Estimated Pure Portfolio Selection Fee (percentage) | Estimated Pure Portfolio Selection Fee ($ in millions) |
|---|---|---|---|---|
| Contrafund | 0.58% | 0.08% | 0.50% | $151 |
| Magellan | 0.58% | 0.08% | 0.50% | $307 |

| Growth & Income | 0.48% | 0.08% | 0.40% | $103 |
| Blue Chip Growth | 0.58% | 0.50% | 0.50% | $88 |
| Low-Priced Stock | 0.63% | 0.08% | 0.55% | $87 |

51. The total fees paid by the Funds over time for Portfolio Selection Services are staggering. Over the past decade, the Fidelity Magellan Fund *alone* has paid well over $3.3 billion in fees for pure Portfolio Selection Services for that Fund's single (underperforming) portfolio. Similarly, over the past decade, the Fidelity Contrafund has paid almost $1.3 billion in fees for pure Portfolio Selection Services, the Growth & Income Fund has paid almost $1.2 billion for pure Portfolio Selection Services, the Fidelity Blue Chip Growth Fund has paid over $750 million in fees for pure Portfolio Selection Services, and the Fidelity Low-Priced Stock Fund has paid over $426 million in fees for pure Portfolio Selection Services.

52. Although Defendants claim to be lower cost advisors than some competitors, they charge on average nearly *three times more* in percentage terms than Vanguard Funds (Vanguard averages 28 basis points while Fidelity averages 82 basis points) (source: Lipper and Morningstar) and *four times more* than Fidelity's own other institutional clients. When considering the size of the Funds' portfolios, such a claim only misleads Plaintiffs and other Fund shareholders and becomes unfair and deceptive when viewing these fees in absolute dollar terms rather than percentages (again, because of the Funds' massive size).

53. Defendants' acceptance of these fees for pure Portfolio Selection Services is a breach of Defendants' fiduciary and other duties.

## The Gartenberg Test

54. As set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* at 928. Stated differently, to be liable for a violation of § 36(b) "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

55. As a threshold matter, it is clear that Defendants cannot pass this test because there is already a universe of Fidelity contracts for Portfolio Selection Services. On information and belief, that universe establishes that the range of Portfolio Selection Fees negotiated with other institutional clients (other than the Funds and other Fidelity funds) for comparable size portfolios never even comes close to the level of Portfolio Selection Fees paid by the Funds. Thus, in determining whether the Funds' "fee schedule represents a charge within the range of what would have been negotiated at arm's-length," in practice, the Funds' fee schedule has never been within such a range. Moreover, this information has been withheld by Defendants from the Funds' board of trustees and from the shareholders, including Plaintiffs.

56. In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b). The *Gartenberg* court, and this Court, have specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship

to the services rendered and could not have been negotiated at arms' length. A review of these factors and the facts in this case demonstrate that receipt of the Portfolio Selection Fees by Defendants violated (and continues to violate) § 36(b):

**(1) Economies of Scale**

57. As discussed in the introduction, there are significant economies of scale in the money management and investment advisory business. These economies of scale exist at the individual fund level (including the Funds) and at the complex or family of funds level (meaning all funds advised by Defendants considered together as a "complex" or "family of funds"). They also exist on a more comprehensive basis, encompassing Defendants' entire scope of operations, including administrative expenses and advisory services provided to other institutional clients.

58. Courts, academic researchers, and the United States government have uniformly found that these economies of scale exist. *See Migdal v. Rowe Price Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001); Freeman & Brown Study at 621 n. 62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)) (Ex. A), SEC Report at 30-31 (Ex. B); GAO Report at 9 (Ex. C). Thus, extensive and significant economies of scale exist in the provision of investment advisory services, in particular Portfolio Selection Services, by advisers such as Defendants to mutual funds such as the Funds.

59. One simple example of economies of scale is when total assets under management increase due purely to market forces. In that event, it is possible for Defendants to service the additional assets at *zero* additional variable cost: there is no change in the securities held in the portfolios or the number of shareholders in the Funds.

60. Defendants have benefited from economies of scale resulting from pure market appreciation. On January 1, 1990, the Dow Jones Industrial Average was at 2753. When the

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Bennett, Cynthia A.
Miller, Guy E.

**DEFENDANTS**

Fidelity Management & Research Company
FMR Co., Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Collier County, Florida**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

See Attachment

ATTORNEYS (IF KNOWN)

04 11651 RGS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS |  | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug |  | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability |  | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |  | ☐ 365 Personal Injury — Product Liability |  |  | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander |  | ☐ 630 Liquor Laws |  | ☐ 460 Deportation |
|  |  | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability |  | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) |  | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 850 Securities/Commodities/ Exchange |
|  | ☐ 340 Marine | ☐ 370 Other Fraud |  | ☐ 840 Trademark |  |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 875 Customer Challenge 12 USC 3410 |
|  |  | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** |  |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle |  |  |  | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury |  |  | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
|  |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** |  | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) |  |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land |  | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |  |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other |  |  | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 |  |
|  |  | ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is a suit for breach of fiduciary duty pursuant to the Investment Company Act of 1940, 15 U.S.C. Sec. 80a-1 et seq.

**VII. REQUESTED IN COMPLAINT:**  CHECK IF THIS IS A **CLASS ACTION**  ☐ UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☐ YES  ☐ NO

**VIII. RELATED CASE(S)** (See instructions):
**IF ANY**

JUDGE _____  DOCKET NUMBER _____

DATE  July 23, 2004

SIGNATURE OF ATTORNEY OF RECORD
*Matthew Tuttle*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

PLAINTIFFS' COUNSEL:

Harry S. Miller, BBO# 346946
Matthew J. Tuttle, BBO# 562758
Sara B. Davis, BBO# 648002
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA 02108
(617) 854-4000


*Of Counsel:*
Thomas R. Grady
THOMAS R. GRADY, P.A.
720 Fifth Avenue South
Suite 200
Naples, Florida 34102
(239) 261-6555

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) <u>Cynthia A. Bennett V. Fidelity Management & Research Company</u>

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

   ___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   X    II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

   ___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

   ___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

   ___  V.    150, 152, 153.

   04-11651 RGS

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

   <u>None.</u>

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?

   YES    NO (X)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC §2403)

   YES    NO (X)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?

   YES    NO (X)

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?

   YES    NO (X)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).

   YES (X)    NO

   A.   IF YES, IN WHICH DIVISION DO <u>ALL</u> OF THE NON-GOVERNMENTAL PARTIES RESIDE?

        EASTERN DIVISION    CENTRAL DIVISION    WESTERN DIVISION

   B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

        EASTERN DIVISION    ~~CENTRAL DIVISION~~    ~~WESTERN DIVISION~~

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  <u>Matthew J. Tuttle</u>
ADDRESS <u>Perkins Smith & Cohen LLP, One Beacon St., 30th Floor, Boston, MA 02108</u>
TELEPHONE NO. <u>617-854-4000</u>

(Cover sheet local.wpd - 11/27/00)