decade closed on December 31, 1999, the Dow was at 11,497 (more than a four-fold increase). If a mutual fund merely held the stocks that comprise the Dow, and did nothing, the Portfolio Selection Fees would have quadrupled absent meaningful breakpoints (not the case with the Funds) or unless the advisers dramatically reduced their fees (also not the case with Defendants).

61.    Today, even following three years of market declines, the Dow Jones Industrial Average is near 10,000, representing a three-and-one-half times increase from the levels of 1990. This growth has created enormous "free" economies of scale for the Funds, the benefits of which were wrongfully retained by Defendants who incurred no additional costs in providing Portfolio Selection Services for the additional assets generated in the Funds by such market growth.

62.    Another simple example of benefits arising through no effort on the part of Defendants, yet creating considerable economies of scale, occurs when the Funds' assets under management grow because of additional investments by current shareholders. Once again, economies of scale are created by the shareholders of the Funds, economies required to be shared with the Funds. Still, Defendants have failed to meaningfully reduce the Portfolio Selection Fees in either percentage or dollar terms.

63.    These facts regarding economies of scale produced by market appreciation are confirmed by the GAO and by the Freeman and Brown Study. *See* GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by a growth in costs) (Ex. C); Freeman & Brown Study at 619-21 (Ex. A).

64.    The assets in the Funds have grown dramatically over the past dozen years along with the growth generally in the stock market. As of late 1993 to early 1994 (depending on the end of the individual Funds' fiscal year), total assets for the Funds amounted to about $52

billion. As most recently reported, assets in the Funds now exceed $ 150 billion, roughly three times more.

65.    Portfolio Selection Fees have also grown as the Funds increased in size, with Plaintiffs and the other shareholders receiving little or no benefit from the economies of scale generated by the Funds' dramatic growth. As of late 1993 to early 1994 (depending on the end of the Funds' fiscal year) management fees totaled $275 million for the Funds. As of the most recent reporting period, annual management fees for the Funds exceed $861 million. This represents roughly a three-fold increase in fees, an increase directly proportional to the increase in size of the Funds rather than some small fraction of that growth in light of the dramatic economies of scale caused by the tremendous growth in the Funds' total assets.

66.    In other words, Defendants have retained all of the benefits resulting from economies of scale, benefits that are owned by, and should have been paid to, the Funds.

67.    The sharing of these economies of scale with Plaintiffs is required by § 36(b) yet Defendants failed to do so. As a result, the Portfolio Selection Fees paid to Defendants are grossly disproportionate to the Portfolio Selection Services, are excessive, could not have been the product of an arms' length bargain, and violate § 36(b).

68.    Acceptance of the excessive Portfolio Selection Fees by Defendants was (and remains) a breach of Defendants' fiduciary and other duties to the Funds.

(2) Comparative Fee Structures

69.    A mutual fund is a single client relationship for Defendants, as with any other institutional client. Accordingly, with respect to the Portfolio Selection Services and the Portfolio Selection Fees, a mutual fund is no different from any other institutional investor.

70.    The fees charged by Defendants to other institutional investors for Portfolio Selection Services clearly establish that Defendants are charging Portfolio Selection Fees to the Funds that are excessive and disproportionate to the value of the services rendered.

71.    Section 36(b) was enacted in response to excessive fees being charged by investment advisers and is legally applicable to all types of mutual funds, including money market funds. Most cases interpreting § 36(b), including *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982), involved money market funds. Money market funds have a completely different cost structure than equity funds, rendering money market funds incomparable to actively managed funds (including the Funds) that invest in securities held for longer periods of time with the potential for significant fluctuation in value. *See* SEC Report at 18 (excluding money market funds from study because of different cost structure) (Ex. B). Thus, the Portfolio Selection Fees (and their evaluation under § 36(b)) should be compared not with money market funds but with other institutional client portfolios with comparable investment objectives.

72.    As noted by the Freeman & Brown Study, "[n]one of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower." Freeman & Brown Study at 653 (Ex. A). While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at

627–28 (Ex. A). The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." Freeman & Brown Study at 671-72 (Ex. A).

73.    Defendants provide advisory services to other institutional clients for substantially lower fees. The Freeman & Brown Study explains:

> Strong analogies . . . can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower. [Freeman & Brown Study at 653 (Ex. A)]. [A] mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." [Freeman & Brown Study at 629 n. 93 (Ex. A)].

74.    The Freeman and Brown study is correct in its explanation of the similarity between the provision of Portfolio Selection Services to a mutual fund, like the Funds, and other institutional investors with similar investment objectives.

75.    The highly respected mutual fund analyst firm *Morningstar* has concluded that there should be no difference between management fees charged to mutual funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added costs of servicing small accounts, those expenses needn't show up in the management fees.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

76.    Defendants' retail products' (including the Funds') management fees differ materially from their other institutional offerings even though the added costs of servicing small accounts are fully recovered through "other costs" charged separately by and paid to Defendants by the Funds. This violates § 36(b).

77.    Fidelity Management Trust Company is a wholly owned subsidiary of FMR Corp., the corporate parent of Defendants, and provides Portfolio Selection Services for other institutional clients.  Fidelity Management Trust Company shares assets, including space, resources and advisory personnel with Defendants and provides identical portfolio management services.  The management fees charged by Fidelity Management Trust Company to institutional investors are therefore properly compared to the fees charged by Defendants to the Funds.

78.    For example, the Fidelity Management Trust Company manages a stock portfolio for the Massachusetts Pension Reserves Investment Management Board (the "Massachusetts Pension Board").  This portfolio has approximately $580 million in assets managed by Defendants' affiliate (as of 2002, the most recent data available).  Although $580 million is a significant sum of money, it is a tiny fraction of the size of any single Fund.

79.    The Fidelity Contrafund is roughly 50 times larger, the Fidelity Growth & Income Fund 48 times larger, the Fidelity Blue Chip Growth Fund is roughly 34 times larger, the Fidelity Low-Priced Stock Fund 33 times larger, and the Fidelity Magellan Fund over 100 times larger. However, despite its significantly smaller size, the base management fee charged by Fidelity Management Trust Company to the Massachusetts Pension Board utilizes breakpoints (unlike the Funds) and, for assets in excess of just $200 million, the fee is "only" 20 basis points (.20%).

80.    Moreover, the overcharging of the Funds by Defendants is understated more because the fee charged to the Massachusetts Pension Board includes not only Portfolio Selection Services, but also *all* administrative expenses incurred by Fidelity.  By comparison, the total expense burden for the Fidelity Magellan Fund is 0.76 percent (76 basis points), 0.73 percent (73 basis points) for the Growth & Income Fund, 0.99 percent (99 basis points) for the Contrafund, 0.69 percent (69 basis points) for the Blue Chip Growth Fund, 1.01 percent (101

basis points) for the Low-Priced Stock Fund. Clearly, by definition, the portion of the fee

charged to the Massachusetts Pension Board for pure Portfolio Selection Services is *less* than 20

basis points, far less than that charged to the Funds -- despite the huge size of their portfolios.

81.    In short, Defendants' Portfolio Selection Fees (as a percentage of assets) charged

to the Funds are more than *double* those charged to much *smaller* institutional clients for the

same advisory services. When considered in dollar terms (rather than percentage), the Portfolio

Selection Fees are hundreds of times larger for the Funds' portfolios than other institutional

clients' portfolios. For example, the Fidelity Magellan Fund paid Defendants $1.6 billion in

management fees for the last three fiscal years while the Massachusetts Pension Board paid less

than $4 million for the same services (the additional costs for servicing numerous small Fund

shareholder accounts is recovered by Defendants through other fees paid by the Funds and their

shareholders and does *not* need to be recovered through Portfolio Selection Fees).

82.    As another example, Defendants offer an Annual Advisory Fee Schedule to small

investors that includes a maximum annual net advisory fee of 110 basis points (1.10%) for the

first $500,000 in assets but quickly declines to a maximum annual net advisory fee of 30 basis

points (.30%) for assets in excess of $8 million. Larger investors are offered fee schedules with

even lower fees.

83.    The significant economies of scale created solely by virtue of Plaintiffs' and other

shareholders' investment dollars have been pilfered by Defendants, and not shared with the

Funds, in violation of § 36(b).

### (3) Fallout Benefits (Indirect Profits) to Defendants Attributable to the Funds

84.    Defendants also indirectly profit further because of "fallout benefits" attributable

to the Funds. Fallout benefits are often not quantified by Defendants or shared with the board of

trustees even though the board cannot determine the fairness of any fee without having this information.

85.     Fallout benefits include the attraction of new customers for other funds or products offered by Defendants, cross selling Defendants' other funds and services to current Fund shareholders, and other benefits associated generally with the development of goodwill and the creation and growth of a client base for Defendants.

86.     Brokerage commissions payable by the Funds to Defendants (or their affiliates) constitute another fallout benefit. These commissions are paid as securities are bought and sold at Defendants' direction for the Funds.

87.     Another particularly secret and profitable fallout benefit to Defendants are "soft dollar" payments. Essentially, "soft dollars" are credits to Defendants from broker-dealers and other securities industry firms in exchange for Defendants' routing securities transaction orders and other business to the broker-dealers.

88.     In breach of duties owed to the Funds, Defendants pay excessive commissions to these persons to execute trades for the Funds in exchange for which Defendants receive a form of rebate or kickback called soft-dollars. These soft-dollars are paid for by the Funds and Plaintiffs -- with their hard earned dollars -- yet are consumed by Defendants much like frequent flier miles are accumulated by air passengers. These soft-dollars can amount to payments surpassing the total Portfolio Selection Fees paid to Defendants, a critical fact withheld from the Funds' board of trustees.

89.     According to the SEC, "[s]oft-dollar arrangements create incentives for fund advisers to (i) direct fund brokerage based on the research provided to the adviser rather than the quality of execution provided to the fund, (ii) forego opportunities to recapture brokerage costs

for the benefit of the fund, and (iii) cause the fund to overtrade its portfolio to fulfill the adviser's soft-dollar commitments to brokers." Memorandum from Paul F. Roye, director of the SEC Division of Investment Management, June 2003.

90.    As noted by the SEC, institutional investors other than mutual funds can negotiate "soft dollar" or commission recapture programs and directly participate in the "frequent flyer" type of benefits wrongfully enjoyed by Defendants at the Funds' and Plaintiffs' expense. The Funds could, but do not, so negotiate because Defendants have usurped that opportunity for their benefit at the expense of the Funds.

91.    Defendants or their affiliates also receive other benefits or "kickbacks," either directly or indirectly, such as transfer agency and custodian fees. These fees automatically increase as the assets under management and the number of shareholders in the Funds increases. Transfer agency fees alone add up annually to an additional 20 basis points (.20%) in revenues for Defendants and their affiliate, Fidelity Service Company, Inc. The profit from these and other fallout benefits is required to be thoroughly disclosed and vigorously debated by the trustees in determining whether the Portfolio Selection Fee is fair to Plaintiffs and the Funds; such requirement has not been satisfied by the Funds and Defendants.

92.    Defendants also benefit from securities lending arrangements where they "loan" out securities owned by the Funds (e.g., to short sellers) for a fee.

93.    These and other fallout benefits are required to be disclosed to the Funds' board of trustees as part of the total mix of information necessary to determine the reasonableness of the Portfolio Selection Fee. Even without considering the fallout benefits, the Portfolio Selection Fee is excessive in both percentage and dollar terms. After considering the fallout benefits, the Portfolio Selection Fee is obscene and its payment and receipt violates § 36(b).

**(4) The Nature and Quality of the Services Provided to the Funds' Shareholders**

94.    The nature of the Portfolio Selection Services provided to the Funds is straightforward: Defendants select (buy, sell or hold), at their discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants' other institutional clients even though the Funds are charged a dramatically higher Portfolio Selection Fee as a percentage of assets under management and even higher in dollar terms.

95.    The quality of the Portfolio Selection Services provided to the Funds by Defendants is also precisely the same (because the services are the same) as the quality of the Portfolio Selection Services provided to Defendants' other institutional clients. However, Plaintiffs pay Defendants dramatically higher percentage and absolute dollar fees (and generate enormous additional fallout benefits) because the Portfolio Selection Fees are not even close to the range of fees produced by the arms' length negotiations with Defendants' other institutional clients.

96.    Moreover, the nature of the Portfolio Selection Services provided to the Fidelity Low-Priced Stock Fund (or any other Fund) does not justify a higher Portfolio Selection Fee; it is the size of the fund, not its specialized nature, that determines a fair fee:

> We disagree with the premise that specialized fund strategies should result in higher expense ratios. Though we will make accommodations to reflect the higher costs inherent in running a smaller fund, we don't think funds of the same size ought to be charging materially different expenses.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

97.    No accommodations need be made for Defendants based on the "higher costs inherent in running a smaller fund," since the Funds are among the largest in the world. The reverse is true: accommodations for the benefit of the shareholders must be made to reflect the far lower costs in running larger funds. No such accommodations were made by Defendants.

26

**(5) The Profitability of the Fund to the Adviser-Manager**

98.     The profitability to Defendants of managing the Funds is a factor that this Court may consider.   Intuitively, it is obvious that the fees charged to others in arms' length negotiations represent profitable transactions; otherwise, investment managers (such as Defendants) intending to stay in business would be required to charge a higher fee.  Accordingly, it is obvious that the management of the Funds (paying much higher Portfolio Selection Fees than other institutional clients) is highly profitable to Defendants.

99.     "Profitability" is a function of revenues minus the costs of providing services. Although simple in definition, it is very problematic in practice in the mutual fund industry because of bogus accounting.   For example, Defendants arbitrarily allocate costs incurred in managing the Funds', other mutual funds', and other institutional and retail clients' portfolios in order to "manage" profitability and mislead the board of trustees.  With such allocations, the true profitability cannot be determined by reference only to Defendants' financial statements -- precisely their goal.

100.     In addition, Defendants are privately held, and precise information regarding the actual or claimed profitability of the Funds to Defendants would not be available except through discovery even if it was maintained in an accurate and useable format. *See Krantz v. Fidelity Mgt. & Research Co.*, 92 F. Supp. 2d 150, 159 (D. Mass 2000).

101.     One thing that is clear, however, is that size matters.   There are higher costs inherent in running a smaller fund and, conversely, lower costs in running a larger fund.  The Funds are among the largest in the world and, accordingly, should be among the least expensive in the world to advise.

102.    Even without complete data, it is clear that these giant Funds are tremendously profitable to Defendants. For example, the Fidelity Contrafund paid approximately $175 million in management fees during its most recent fiscal year. Of that, at least $151 million (annually) is for pure Portfolio Selection Services. In contrast, in 1993, the management fee (even before deducting administrative expenses reported together with management fees) amounted to less than $26 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

103.    The Fidelity Growth & Income Fund (for the year ended July 31, 2003) paid $129 million in management fees to Defendants. Of that, as much as $103 million was for pure Portfolio Selection Services. In contrast, in 1993, the management fee (even before deducting administrative expenses reported together with management fees) was $41 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

104.    The Fidelity Magellan Fund paid over $357 million in management fees during its recently ended fiscal year. Of that, as much as $307 million  was for pure Portfolio Selection Services. In contrast, in 1993, the management fee (even before deducting administrative expenses reported together with management fees) was "only" $186 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (fees totaling almost $4 billion over the last decade in the face of dramatic economies of scale) while

managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

105.    The Fidelity Blue Chip Growth Fund paid over $101 million in management fees during its recently ended fiscal year. Of that, as much as $88 million was for pure Portfolio Selection Services. In contrast, in 1993, the management fee (even before deducting administrative expenses reported together with management fees) amounted to only $8.5 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

106.    The Fidelity Low-Priced Stock Fund paid over $98 million in management fees during its recently ended fiscal year. Of that, as much as $87 million was for pure Portfolio Selection Services. In contrast, in 1993, the management fee (even before deducting administrative expenses reported together with management fees) was only $13 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

107.    In addition, as discussed above under "comparative fee structures," Defendants have entered into advisory agreements with other institutional clients where Defendants accept *total* management fees (including both Portfolio Selection Fees and payment of all administrative, distribution and other costs) of 20 basis points (.20%) to manage portfolios that are but a fraction of the size of the Funds' portfolios. Even if one were to conservatively assume

that *all* of the other institutional clients' fee was for Portfolio Selection Services, it is still dramatically smaller in percentage terms (and obscenely so in dollar terms) than that charged to the (significantly larger) Funds and is not within the range established by Defendants with its other customers when negotiating at arms' length.    Because Defendants would not agree to provide advisory services for a fee of 20 basis points or less if it were not profitable to do so, the immense profitability to Defendants of (massive) Funds (over *$170 billion in assets* under management) paying *at least* twice as much in percentage terms (and far more in dollar terms) for Portfolio Selection Services as (modestly-sized) institutional clients for the same services is self-evident.

### (6) The Independence and Conscientiousness of the Trustees (or Directors)

108.    As the GAO Report noted, the "external management" structure of most mutual funds (including the Funds) creates a potential conflict of interest between a fund's shareholders and its adviser.  (Ex. C).  The United States Supreme Court has stated that the disinterested director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

109.    The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Funds.  As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the Portfolio Selection Fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. *See* GAO Report at 14 (Ex. C).  These responsibilities necessarily require the directors to rely on information provided by Defendants.  Defendants, in turn, have a

fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

110.    At least 40 percent of the Funds' directors must be "disinterested" as defined in § 10 of the Investment Company Act. The ICA contains a presumption that the disinterested directors are in fact disinterested. However, even in connection with so-called disinterested directors, the lack of conscientiousness in reviewing the fees paid by the Funds, the lack of adequate information provided by Defendants to the board in connection with its approvals of the advisory agreements, and the control of management over the board in reviewing the fees paid by the Funds are *not* presumed. Rather, they are all relevant factors in determining whether Defendants have breached their fiduciary duties to Plaintiffs and the Funds.

111.    The SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser. For example, in the related context of distribution fees, "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980). Here, no such benefits were received by the disinterested directors.

112.    Despite the structural protections of independent directors envisioned by the Investment Company Act, the Funds' trustees have been subverted by Defendants and no longer serve in their "watchdog" role. This subversion was (and remains) a breach by Defendants of the fiduciary duties owed to the Funds.

113.    Further, Defendants have failed to satisfy their fiduciary duty under the Investment Company Act to provide the Funds' trustees with all information reasonably

necessary for them to do their jobs, including determining the fairness of the Portfolio Selection

Fee.

114.    Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund

complexes in the world, commented during an interview on the failure of mutual fund boards of

directors to meet their duties under the Act:

Q:    We've talked about how the [mutual fund] industry could do a better job.
How about the fund directors?

A:    Well, fund directors are, or at least to a very major extent, sort of a bad
joke. They've watched industry fees go up year after year, they've added 12b-1
fees. I think they've forgotten, maybe they've never been told, that the law, the
Investment Company Act, says they're required to put the interest of the fund
shareholders ahead of the interest of the fund adviser. It's simply impossible for
me to see how they could have ever measured up to that mandate, or are
measuring up to it.

115.    Similarly, a United States District Court Judge recently quoted Warren Buffet, the

"legendary investor and chairman of the Berkshire Hathaway Group," on the lack of

independence and diligence of mutual fund boards of directors:

I think independent directors have been anything but independent.    The
Investment Company Act, in 1940, made these provisions for independent
directors on the theory that they would be the watchdogs for all these people
pooling their money. The behavior of independent directors in aggregate since
1940 has been to rubber stamp every deal that's come along from management –
whether management was good, bad or indifferent.    Not negotiate for fee
reductions and so on. A long time ago, an attorney said that in selecting directors,
the management companies were looking for Cocker Spaniels and not
Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

116.    The dependence of the Funds' disinterested directors (trustees) on Defendants,

and the domination and undue influence exerted on them by Defendants, are evidenced by the

following facts:

32

a.  Each of the Funds is governed by a common and interlocking board of directors initially selected (and constantly dominated by) Defendants.

b.  All 277 different Fidelity mutual funds are "overseen" by *one common board* of 14 directors, 10 of whom are considered "disinterested." These "disinterested" directors earn an average salary of $263,000 annually for approximately eleven board meetings each year. Defendants have de facto control over compensation, nature and duration of meetings and other aspects of the Funds' corporate governance, thereby depriving the Funds of the independence owed to them by the trustees.

c.  Each of the Funds, and all funds within the Fidelity family of equity mutual funds, share common fiduciary advisers (*i.e.,* Defendants or their affiliates). Defendants created these relationships and continue to dominate in their execution.

d.  Each of the Funds, and all funds within the Fidelity family of equity mutual funds, share a common distributor affiliated with Defendants (*i.e.*, the Funds' shares are sold by an affiliate of Defendants).

e.  The trustees rely wholly on Defendants to provide them with what is known in the industry as a "Lipper Package." The Lipper Package includes information about what other mutual fund investment advisors charge their mutual fund clients but does not include data about other institutional clients (that data is withheld by Defendants from the trustees). Defendants use the data in the Lipper Package to ensure that their fees fall within the range of fees charged by their "competitors," an industry of price gougers, rather than to ensure that the Portfolio Selection Fees are independently fair to the Funds.

f.    Each of the Funds, and all funds within the Fidelity family of mutual funds, have access to a common line of credit arranged by Defendants to assist in managing money flows in the Funds (*e.g.*, to meet shareholder redemptions). The fees pertaining to such credit facility are shared equally by the Funds and all other funds within the Fidelity family of mutual funds (thereby also again demonstrating benefits from economies of scale).

g.    It appears that the Funds use the same auditor as Defendants. The selection of a common auditor (one of the most important aspects of a disinterested director's responsibilities) is evidence of the domination and control of the disinterested directors by Defendants. Each of the Funds is audited by PriceWaterhouseCoopers LLP, as are all of the Fidelity mutual funds. Further, PriceWaterhouseCoopers LLP identifies "Fidelity Investments" as a client, suggesting that it audits Defendants' books as well as the Funds' books. Such a common auditor creates clear potential conflicts of interest yet demonstrates the control asserted by Defendants over the Funds.

117.    Finally, the trustees do not receive adequate information regarding fees paid to Defendants by the Funds or other institutional clients so as to allow them to meet their fiduciary duty to determine the reasonableness of those fees. This is in part because Defendants have failed to provide that information and in part because the board has failed to request it. In doing so, the board and Defendants have breached their fiduciary duty to the Funds.

## COUNT I
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Fees from Economies of Scale)

118.    Plaintiffs repeat and reallege paragraphs 1 through 117, inclusive, of this complaint.

119.    Defendants have received and continue to receive excessive Portfolio Selection Fees attributable to the extraordinary economies of scale created by Plaintiffs and the Funds.

120.    Defendants have breached and continue to breach their ICA § 36(b) fiduciary duty to the Funds by charging and retaining these excessive fees.

121.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including the "amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

122.    Plaintiffs repeat and reallege paragraphs 1 through 117, 119 and 120, inclusive, of this complaint.

123.    The Portfolio Selection Fees charged by Defendants are and continue to be disproportionate to the services rendered and not within the range of what would have been negotiated at arms' length in light of all the surrounding circumstances (or the range of what has been negotiated at arms' length with Defendants' other institutional clients). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arms' length negotiation.

124.    In charging and receiving excessive advisory fees, and failing to put the interests of the Funds, Plaintiffs and the Funds' other shareholders ahead of their own interests, Defendants breached their statutory fiduciary duties to the Funds and Plaintiffs.

125.    Defendants have breached and continue to breach those statutory ICA § 36(b) fiduciary duties to the Funds by accepting excessive and inappropriate compensation. Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including "the amount of compensation or payments received from" the Funds.

**WHEREFORE,** Plaintiffs demand judgment as follows:

a.    Declaring that Defendants violated and continue to violate § 36(b) of the ICA and that any advisory agreements entered into between them and the Funds are void *ab initio*;

b.    Preliminarily and permanently enjoining Defendants from further violations of the ICA;

c.    Awarding damages against Defendants in an amount including all Portfolio Selection Fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

d.    Awarding prospective relief in the form of reduced Portfolio Selection Fees in the future based not simply upon a percentage of assets formula but also based upon the reasonableness of those fees in absolute dollar terms when considering the assets under management in the Funds;  and

e.     Such other and further relief as may be proper and just.

Dated:  July 23, 2004

Respectfully submitted,

CYNTHIA A. BENNETT and
GUY E. MILLER,

By their attorneys,

Harry S. Miller,  BBO# 346946
Matthew J. Tuttle,  BBO# 562758
Sara B. Davis,  BBO# 648002
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA  02108
(617) 854-4000

*Of Counsel:*
Thomas R. Grady
THOMAS R. GRADY, P.A.
720 Fifth Avenue South
Suite 200
Naples, Florida 34102
(239) 261-6555

77.    By using HOF's trademarks and/or confusingly similar designations in connection with the sale, offering for sale, and/or advertising of goods and/or services to the general public, GoldenMine has intentionally and knowingly used HOF's trademarks.  Accordingly, HOF is entitled to a judgment of three times its damages, together with reasonable attorney's fees, pursuant to Mass. Gen. Laws ch. 93A, § 11.

**WHEREFORE**, HOF respectfully requests that this Court:

1.    Issue a preliminary injunction and permanent injunction preventing GoldenMine from using HOF's marks and any confusingly similar designations and requiring GoldenMine to discontinue its current infringing practices.

2.    Enter judgment in favor of HOF on the counts asserted herein and award damages in an amount to be determined at trial, including damages in the amount of GoldenMine's profits from its willful infringement of HOF's marks, doubled or trebled where appropriate;

3.    Award HOF the costs incurred in bringing this action, including attorneys' fees;

4.    Order GoldenMine to certify the destruction of all materials, and the removal of references on its website, that refer to confusingly similar designations to the marks Hearts On Fire®, Dream®, Dream™, Dream Cut®, and Dream By Hearts On Fire®; and

5.    Award HOF such further relief as it deems just, proper and equitable.

## JURY DEMAND

HOF demands a trial by jury on all issues so triable.