**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES GILLIAM, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-cv-11600-NG |
| FIDELITY MANAGEMENT & RESEARCH COMPANY et al., | ) ) ) | |
| Defendants. | ) ) | |
| BOGATIN FAMILY TRUST, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-cv-11642-NG |
| FIDELITY MANAGEMENT & RESEARCH COMPANY et al., | ) ) ) | |
| Defendants. | ) ) | |
| CYNTHIA A. BENNETT and GUY E. MILLER, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | CIVIL ACTION NO. 04-cv-11651-MLW |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | ) ) ) ) | |
| Defendants. | ) ) | |

[Caption continues on next page]

| | |
|---|---|
| GHASSAN J. AWALI, Individually And On Behalf Of All Others Similarly Situated,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>FIDELITY MANAGEMENT & RESEARCH COMPANY et al.,  )<br>)<br>Defendants.  ) | CIVIL ACTION<br>NO. 04-cv-11709-MLW |
| WILLIAM S. GROESCHEL, Individually And On Behalf Of All Others Similarly Situated,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>FIDELITY MANAGEMENT & RESEARCH COMPANY, et al.,  )<br>)<br>Defendants.  ) | CIVIL ACTION<br>NO. 04-cv-11735-GAO |
| NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, ROSE M. IANNACCONE, PRESELEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SHURGIN, for the use and benefit of FIDELITY MAGELLAN and FIDELITY CONTRAFUND,  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,  )<br>)<br>Defendants.  ) | CIVIL ACTION<br>NO. 04-cv-11756-MLW |

[Caption continues on next page]

2

| | |
|---|---|
| DAVID O. FALLERT, Individually And On Behalf Of All Others Similarly Situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FIDELITY MANAGEMENT & RESEARCH COMPANY et al., )<br>)<br>Defendants. ) | CIVIL ACTION<br>NO. 04-cv-11812-MLW |

**THE BENNETT PLAINTIFFS' PROPOSED SURREPLY
IN OPPOSITION TO THE CLASS ACTION
!!!!!!PLAINTIFFS' MOTION FOR CONSOLIDATION!!!!!!**

Cynthia A. Bennett and Guy E. Miller (the "Bennett Plaintiffs"), plaintiffs in *Bennett v. Fidelity Management and Research Co. et al.*, No. 04-11651-MLW (the "Bennett Action"), hereby submit this memorandum of law in further opposition to the Motion for Consolidation filed by the plaintiffs in the following actions: *Gilliam v. Fidelity Management & Research Co. et al.*, No. 04-11600; *Bogatin Family Trust v. Fidelity Management & Research Co. et al.*, No. 04-11642; *Awali v. Fidelity Management and Research Co. et al.*, No. 04-11709; *Groeschel v. Fidelity Management and Research Co. et al.*, No. 04-11735; and *Fallert v. Fidelity Management and Research Co. et al.*, No. 04-11812 (collectively, the "Class Actions").

The Class Action Plaintiffs' Reply Memorandum -- as their original motion for consolidation -- fails to establish that the Class Actions and the Bennett Action involve the same type of claims under the Investment Company Act or even that there are substantive factual or legal similarities among the cases that would support consolidation. The Class Action Plaintiffs' Reply Memorandum does not identify any particular benefit to be gained from consolidation, nor does it establish how any such benefit would outweigh the delay, confusion and prejudice that

3

are sure to result. Quite to the contrary, the Reply Memorandum makes clear that the Class Actions do not state a claim in the nature of the Bennett Action for excessive investment advisory fees under section 36(b), nor does it appear that they ever were intended to do so.[1]

### I. The Overwhelming Differences Between The Bennett Action And The Class Actions Mandate Against Consolidation

#### A. The legal claims and factual bases for the two cases are entirely different

In their Reply Memorandum, the Class Action Plaintiffs continue to ignore and gloss over the vast differences between their broad class allegations and the focused statutory claim set forth in the Bennett Action. Trying to show common issues of fact, the Class Action Plaintiffs claim that "every one of these cases is about excessive fees." Reply Memorandum at 4. To say that these cases should be consolidated because all of them are "about excessive fees" is tantamount to claiming that consolidation is proper because all of the cases involve mutual funds. The superficial similarities cited by the Class Action Plaintiffs have no substance and, therefore, cannot support the consolidation request.

A comparison of the Bennett Action complaint and the Class Action complaints reveals that they are entirely different cases. The Bennett Action alleges only that the fees charged to five specific Fidelity mutual funds by the defendants for investment advisory services were excessive in light of the services provided to those funds, so as to violate the defendants' statutory fiduciary duty under section 36(b) of the Investment Company Act. This streamlined, statutory, derivative claim, pertaining to only one particular element of the fees charged to the

---

[1] In addition to the motion for consolidation, the Class Action Plaintiffs have made a motion for the appointment of lead counsel, assuming that the Bennett Action is consolidated with the Class Actions. Because it is premature to discuss the appointment of lead counsel before the issue of consolidation is resolved, the Bennett Plaintiffs respectfully request an opportunity to be heard on the question of who should serve as lead counsel if and when the cases actually are consolidated.

4

five mutual funds, need not be supported by proof of any affirmative misconduct, malfeasance, or malicious intent on the part of the defendants. The claim, instead, reviews the fees paid by each fund for investment advisory services in light of certain factors, including, *inter alia*, the nature and quality of the services provided, the profitability of the funds to the defendants, economies of scale, comparative fee structures, and any fallout benefits generated. *See, e.g.*, *Pfeifer v. Bjurman, Barry Micro Cap Growth Fund*, No. 03-9741, 2004 U.S. Dist. LEXIS 16924, *13 (S.D.N.Y. Aug. 26, 2004) (citing *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 406 (2d Cir. 1989).

The Class Actions, quite differently, allege widespread fraud and malfeasance involving hundreds of Fidelity mutual funds by Fidelity fund trustees, Fidelity personnel, and brokers both within and outside of Fidelity. The Class Actions specifically name twenty-five defendants, plus John Does 1 through 100, and over 200 nominal defendants (namely, the Fidelity mutual funds themselves). They seek relief on seven different counts, alleging various common law and statutory violations.

The following sample of allegations from the complaint in *Gilliam et al. v. Fidelity Management and Research Company et al.* highlights the breadth, complexity, and fact-intense bases of the Class Action claims, which are brought on behalf of investors in 206 different Fidelity mutual funds.

* Fidelity "drew upon the assets of the Fidelity Funds to pay brokers to aggressively push Fidelity Funds over other funds, and . . . Fidelity concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, though payable from fund assets, were not disclosed to investors in the Fidelity Funds public filings or elsewhere." ¶ 2.

* "Thus Fidelity Funds investors were induced to purchase Fidelity Funds by brokers who received undisclosed payments from Fidelity to push Fidelity Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in one or more of the Fidelity Funds, Fidelity Funds investors were charged

and paid undisclosed fees that were improperly used, in part, to pay brokers to aggressively push Fidelity Funds to still other brokerage clients." ¶ 3.

* "Fidelity was motivated to make these secret payments to finance the improper marketing of Fidelity Funds because its fees were calculated as a percentage of the funds' average daily net asset value and, therefore, tended to increase as the number of Fidelity Funds investors grew." ¶ 4.

* "Fidelity continued to skim millions from the Fidelity Funds to finance its ongoing marketing campaign. The Fidelity Funds trustees, who purported to be Fidelity Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur." ¶ 5.

* The Fidelity Funds boards of trustees "were captive to and controlled by Fidelity, who induced the Trustee Defendants to breach their statutory and fiduciary duties to manage and supervise the Fidelity Funds, approve all significant agreements and otherwise take reasonable steps to prevent Fidelity from depleting Fidelity Funds assets. In many cases, key Fidelity Funds trustees were employees or former employees of Fidelity, and the defendant Johnsons, and were beholden for their positions, not to Fidelity Funds investors, but, rather, to Fidelity, whom they were supposed to oversee." ¶ 54.

* Fidelity was using "so-called 12b-1 fees, Soft Dollars . . . and directed brokerage commissions to improperly siphon assets from the funds to assist in peddling its wares to unwitting investors." ¶ 64.

* "[T]he purported Rule 12b-1 fees charged to Fidelity Funds investors were highly improper because . . . there was no 'reasonable likelihood' that the 12b-1 plans would benefit the company and its shareholders." ¶ 67.

* "[I]n violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers in the form of excessive commissions that were not disclosed or authorized by the Fidelity Funds Rule 12b-1 plans." ¶ 77.

* "Fidelity went far beyond what is permitted by the Section 28(e) safe harbor by paying third parties for 'research services' that provided no reasonable benefits to Fidelity Funds investors." ¶ 79.

* "Inconsistent with its highly-touted reputation for in-house research, Fidelity exceeded the bounds of the Section 28(e) safe harbor by using Soft Dollars to pay overhead costs, thus charging Fidelity Funds investors for costs . . . that . . . properly should have been borne by Fidelity." ¶ 84.

* "Fidelity also paid excessive commissions to broker-dealers, which, insofar as they were given under the guise of Soft Dollars, were a sham and utterly unjustifiable in light of Fidelity's in-house research apparatus. The purpose of these payments and Fidelity's directing brokerage business to firms that favored Fidelity Funds was to

6

induce the brokers to steer their clients to Fidelity Funds. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push Fidelity Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Fidelity Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty." ¶ 84.

* "Fidelity also structured the commissions for its own internal sales representatives to cause the representatives to push Fidelity Funds over non-Fidelity funds and to push certain favored Fidelity Funds or investments over other non-favored Fidelity investments. Fidelity failed to disclose to investors that its sales representatives' purportedly impartial advice was in fact largely determined by commissions and hitting sales targets. . . . These misleading sales practices are a further breach of fiduciary duties that had the effect of charging Fidelity investors excessive commissions while steering them into Fidelity investments that did not properly fit their financial objectives." ¶ 87.

* "The Fidelity Funds were identified . . . as one of the mutual fund families that Morgan Stanley brokers were improperly paid to push." ¶ 89.

* Fidelity's mutual fund prospectuses "failed to disclose and misrepresented, *inter alia*, the following material and damaging adverse facts which damaged plaintiff and other members of the Class:

    "(a) that Fidelity authorized the payment from fund assets of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any 'safe harbor';

    "(b) that Fidelity directed brokerage payments to firms that favored Fidelity Funds, which was a form of marketing that was not disclosed in or authorized by the Fidelity Funds Rule 12b-1 plans:

    "(c) that the Fidelity Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

    "(d) that by paying brokers to aggressively steer their clients to Fidelity Funds, Fidelity was knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

    "(e) that any economies of scale achieved by marketing of the Fidelity Funds to new investors were not passed on to Fidelity Funds investors;

7

> "(f) that defendants improperly used Soft Dollars and excessive commissions, paid from Fidelity Funds assets, to pay for overhead expenses the cost of which should have been borne by Fidelity and not Fidelity Funds investors; and
>
> "(g) that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that they failed to monitor and supervise Fidelity and that, as a consequence, Fidelity was able to systematically skim millions and millions of dollars from the Fidelity Funds."

¶ 96.

The Class Actions do not overlap with the Bennett Action in any appreciable way so as to make consolidation appropriate or advisable. The Bennett Action deals with five specific instances where advisory fees charged to a Fidelity mutual fund were disproportionately large -- not necessarily because of any sinister scheme, but simply as those fees are viewed in comparison to the actual advisory services rendered. The Class Actions, on the other hand, deal with wrongful corporate and brokerage practices, improper payoffs, and securities fraud that allegedly have affected the entire family of Fidelity mutual funds. Excessive fees are mentioned in the Class Actions only in that the defendants' wrongful conduct allegedly resulted in increased revenue to Fidelity and monies that were skimmed off the funds for improper purposes. The excessiveness of the fees is not the basis of the Class Action claims, as it is in the Bennett Action. Any excessive fees in the Class Actions are merely a byproduct of the fraudulent activities alleged.

The specific count of the Class Action complaints alleging a violation of section 36(b) contends only that the defendants "improperly charg[ed] investors in the Fidelity Funds purported Rule 12b-1 marketing fees, and [drew] on Fidelity Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule

12b–1." *See Gilliam* Complaint, ¶ 107. The Class Actions do not allege any violation even similar to the excessive investment advisory fee claim put forward by the Bennett Plaintiffs.[2]

### B. The Reply Memorandum fails to justify the substantial confusion, delay and prejudice that would result from consolidation

In their opposition to the Class Action's motion for consolidation, the Bennett Plaintiffs identified the great potential for delay, confusion and prejudice should consolidation take place. Without recounting all of the issues, the Bennett Plaintiffs' original opposition set forth how the Bennett Action would be delayed needlessly for months or years while the Class Actions litigated motions to dismiss, motions concerning standing, and class certification issues. If and when the consolidated cases would be permitted to proceed to discovery (where the Bennett Action is now), substantial confusion is likely to arise in the management, prosecution, and adjudication of the cases because of: (i) the vast differences in the relevant facts and areas of discovery; (ii) the differences among the causes of action, elements and standards of proof, and statutes of limitations; (iii) the conceptual and legal differences between the derivative and class claims; and (iv) the fact that the section 36(b) claims must be tried to the Court while the Class Actions have demanded a jury trial.

The Reply Memorandum cannot explain away any of these significant barriers to consolidation, nor does it identify any substantial benefit from consolidation that would justify these increased burdens and potential for delay and prejudice. It is not enough for the Class

---

[2] Where some of the paragraphs of the Class Action complaints actually do overlap with paragraphs of the Bennett complaint, those paragraphs are virtually identical. *See, e.g.*, Gilliam Complaint at ¶ 69(a)-(e) and Bennett Complaint at ¶ 22(a)-(e). The Class Action Plaintiffs apparently copied these allegations directly out of the Bennett complaint, which was first filed in the United States District Court for the Southern District of Illinois in December 2003. The fact that the Class Actions just copied a discrete portion of the Bennett allegations explains why any discussion of excessive advisory fees in the Class Actions appears as an afterthought and does not really fit with the flow of the allegations of fraud and misconduct that are the basis of those cases. Even with the paragraphs that have been added from the Bennett complaint, the Class Actions still do not state a claim for excessive advisory fees in any way comparable to the Bennett Action. *See Gilliam* Complaint, ¶ 107.

Action Plaintiffs to argue that consolidation would be permissible. They must show that it is the best course of judicial action despite the cumulative negative effect of the delay, confusion and prejudice it is likely to cause. *See Duguay v. Androscoggin Valley Hosp.*, No. 95-112-SD, 1995 U.S. Dist. LEXIS 6985, *3 (D.N.H. May 15, 1995) ("[t]he court must examine the underlying facts with close attention, and considerations of convenience and economy must yield to the paramount concern for a fair and impartial trial") (citing *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993); *Megan-Racine Assocs. v. Niagara Mohawk Power Corp.* 176 B.R. 687, 691 (Bankr. N.D.N.Y. 1994) (same)).

Because the few similarities that exist between the cases are superficial at best, the potential benefits of consolidation do not outweigh the prejudice that the Bennett Plaintiffs will suffer. *See* Wright & Miller, Federal Practice & Procedure: Civil 2d § 2383 at 440-42 (denial of consolidation is appropriate where "the common issue is not a central one"). Indeed, it is fundamental that even where common issues of law and fact exist, consolidation is not appropriate or advisable where it will result in prejudice to a party. *Figueroa v. Dinitto*, No. 03-186, 2003 U.S. Dist. LEXIS 23825, *8 (D.R.I. Dec. 15, 2003) ("despite common questions of law or fact, 'where confusion and prejudice will result, it is inappropriate for a court to order consolidation.'") (quoting *Tucker v. Arthur Andersen & Co.*, 73 F.R.D. 316, 317 (S.D.N.Y. 1976)).

The case of *Storlazzi v. Bakey*, No. 95-1596, 1995 U.S. App. LEXIS 30146 (1st Cir. Oct. 24, 1995), cited by the Class Action Plaintiffs in support of consolidation, is inapposite because the factors making consolidation appropriate in that case do not exist here. In *Storlazzi*, the same individual plaintiff brought three separate actions against mostly the same defendants, all relating to essentially the same wrong. Indeed, the second action was commenced to assert claims that

the plaintiff was unable to assert in the original action after a motion to amend his complaint to add the new claims was denied. The obvious legal and factual commonalities among the three different actions, which favored consolidation, are not present here. Moreover, the potential prejudice faced by the Bennett Plaintiffs is far greater than that at issue in *Storlazzi* where the only potential for prejudice was a brief delay in the first two actions while discovery was completed in the third action. *See Storlazzi v. Bakey*, 894 F. Supp. 494, 499 (D. Mass. 1995).

The cases cited in the Reply Memorandum concerning the consolidation of derivative and class claims are similarly unsupportive of the Class Action Plaintiffs' position. Not one of their cited cases deals with consolidation, nor do they address the issues present here. *See In re Transocean Tender Offer Sec. Litig.*, 455 F. Supp. 999 (N.D. Ill. 1978) (motion for summary judgment); *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977) (motion for class certification); *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 624, 630 (S.D. Ohio 1984) (motion for class certification); *Bertozzi v. King Louie Int'l, Inc.*, 420 F. Supp. 1166 (D.R.I. 1976) (motion for class certification); *Petersen v. Federated Dev. Co.*, 416 F. Supp. 466 (S.D.N.Y. 1976) (motion for summary judgment); *Lamphere v. Brown University*, 71 F.R.D. 641 (D.R.I. 1976) (motion for class certification).

Indeed, in *Transocean Tender Offer Sec. Litig.*, the court specifically recognized the potential for conflict where derivative claims are joined with class claims, particularly in the fashioning of an appropriate remedy. 455 F. Supp. at 1014. In the present case, the potential for conflict is evident where the Class Action Plaintiffs want to consolidate a derivative claim that seeks to benefit five Fidelity mutual funds with the Class Actions that name those funds as nominal defendants. An award on some of the claims in the Class Actions could have a substantial negative impact on the five Fidelity funds.

11

> II. **The Class Action Plaintiffs' Arguments For Consolidation Show A Lack Of Understanding Of The Bennett Action's Claim For Excessive Advisory Fees And How Such Claims Arise Under Section 36(b)**

The arguments of the Reply Memorandum clearly show that the Class Action Plaintiffs do not understand the nature of the claims made in the Bennett Action or how such claims are properly analyzed and proven under section 36(b) of the Investment Company Act. Moreover, to the extent the Class Action Plaintiffs argue that they have stated a claim for excessive advisory fees as in the Bennett Action (which is contradicted by the plain language of the Class Action complaints), it is clear that they have not analyzed the facts and law relating to each of the 206 Fidelity mutual funds to even determine whether a viable claim for excessive advisory fees exists for each of the funds.

A primary theme of the Reply Memorandum is that counsel for the Bennett Action Plaintiffs are improperly and artificially "limiting their claims for the *sole* purpose of getting a lead position for their counsel at the expense of the vast majority of Fidelity mutual funds and investors who will be left with no representation under [the Bennett Action's] restrictive theories." Reply Memorandum at 3 (emphasis in original). Aside from being ridiculous on its face,[3] the argument reflects the Class Action Plaintiffs' profound misunderstanding of section 36(b).

---

[3] The argument is ridiculous because the Bennett Action was filed in the Southern District of Illinois seven months before the Class Actions even existed. At the time, and particularly as a derivative claim, there was no contemplation that "lead counsel" issues would ever arise, nor would counsel structure a complaint in anticipation of such a non-issue. Moreover, if one were to lend any credence to the Class Action Plaintiffs' arguments, it makes no sense how artificially limiting the scope of one action would help an attorney take a lead position in other litigation. The fact is that the Bennett Action has been brought on behalf of the five identified funds after careful review of the available data and strategies for effectively litigating these claims. Structuring the case in this way has done nothing to prejudice the rights of other mutual fund shareholders. Through their kitchen-sink pleadings and the tone of the motions for consolidation, motions to intervene, motions to stay other actions, and motions to have themselves appointed as lead counsel, the Class Action Plaintiffs' counsel appear to be the ones feverishly trying to secure a "lead counsel" position for themselves.

The claim for excessive advisory fees brought by the Bennett Action requires specific analysis and proof on a fund-by-fund basis to determine whether the fees charged actually were excessive in light of the advisory services rendered.

> To determine whether a fee charged by an investment advisor is excessive for purposes of Section 36(b), a court must examine the following factors:
>
> > (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees.

*Pfeifer v. Bjurman, Barry Micro Cap Growth Fund*, No. 03-9741, 2004 U.S. Dist. LEXIS 16924, *13 (S.D.N.Y. Aug. 26, 2004) (citing *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 406 (2d Cir. 1989).

The number and size of the assets, investments and fees are vastly different across the more than 200 Fidelity mutual funds on behalf of which the Class Actions are claiming to sue. *See* Exhibit 1 to the Haugen Plaintiffs' [Proposed] Sur-Reply in Opposition to Motions for Appointment of Tri-Lead Counsel and for Consolidation. The largest funds have billions in assets and pay hundreds of millions of dollars in investment advisory fees, while smaller funds may have as little as $5 million in assets and pay less than $50,000 for investment advisory services.

Because the question of whether fees are excessive under section 36(b) depends on issues such as fund size, profitability, and economies of scale, not all of the Fidelity funds can claim that their investment advisory fees are excessive for purposes of a section 36(b) review. The Class Action Plaintiffs have either ignored or do not understand the fact that they cannot bring viable section 36(b) claims on behalf of all of the Fidelity mutual funds because such claims are fund-specific and do not exist across the board. Whereas the Bennett Action complaint contains

great detail about the bases for its claims and a specific analysis of the fees and issues involved with each of the five funds, the Class Actions present no analysis to support a claim for excessive investment advisory fees across all 206 Fidelity funds or even across the 32 Fidelity funds that actually were owned by the Class Action Plaintiffs.

By purporting to represent the shareholders of all 206 Fidelity funds, the Class Actions also have created an inescapable conflict among their participants. If the Class Action Plaintiffs were bringing claims for excessive investment advisory fees, the shareholders of the larger Fidelity funds -- like those five identified in the Bennett Action -- would be expected to prove their case, at least in part, by contrasting the fees charged in their funds with the much more reasonable advisory fees charged to other Fidelity funds. The legislative history of section 36(b) contemplates this very type of analysis. Factors relevant to whether an investment advisor breached its fiduciary duty under section 36(b) include the compensation received, the services rendered, and a comparison to "services rendered by such investment advisors to other funds in such complex and compensation or payments made by other funds for such services." *See* S. Rep. No. 91-184 at 15 (1969).[4] If, however, this type of comparison was made in the Class Actions on behalf of the shareholders of the larger funds, it would seriously damage the claims of other shareholders in the class. To not present the evidence, however, would sacrifice the interests of those shareholders with the strongest claims.

The Class Action Plaintiffs' argument that they are entitled to bring section 36(b) claims on behalf of 206 funds -- even though they actually owned only 32 of those funds -- again shows that the Class Actions were never reasonably intended to pursue claims for excessive investment

---

[4]  The Class Action Plaintiffs improperly cite this same portion of the legislative history of section 36(b) in their discussion of standing to support their contention that a class representative has standing to assert claims regarding funds he does not own. Considering the context of this section of the legislative history, it is clear that this sentence refers to a comparison of fees charged in other funds and does not pertain to the standing issue in any way.

advisory fees under section 36(b). The Investment Company Act and relevant case law are clear that only a fund shareholder has the right to bring a claim for breach of fiduciary duty under section 36(b). 15 U.S.C. § 80a-35(b); *see Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D. Ill. 1999); *Dandorf v. Fahnestock & Co.*, 462 F. Supp. 961, 965 (D. Conn. 1979). The Reply Memorandum goes to great lengths to argue that the shareholders of 32 funds can bring claims on behalf of more than 200 funds because of some unidentified "juridical link," but this simply is not the case.

The straightforward and amply supported claims of the Bennett Action should not be consolidated with the Class Actions, which were never designed nor intended to pursue claims for excessive investment advisory fees under section 36(b). The Class Actions are rife with conflicts, pleading infirmities, and legal pitfalls that are certain to result in protracted ancillary litigation before those claims are permitted to proceed in earnest, if at all. The Bennett Action, which already has progressed to the start of discovery, should proceed without the substantial burdens and prejudice that consolidation would bring.

## CONCLUSION

For the foregoing reasons, the Class Action Plaintiffs' Motion for Consolidation should be denied in its entirety.

Respectfully submitted,

CYNTHIA A. BENNETT and
GUY E. MILLER,

By their attorneys,

    s/Matthew J. Tuttle
Robert D. Friedman, BBO# 180240
  rfriedman@pscboston.com
Harry S. Miller, BBO# 346946
  hmiller@pscboston.com
Matthew J. Tuttle, BBO# 562758
  mtuttle@pscboston.com
Sara B. Davis, BBO# 648002
  sdavis@pscboston.com
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA 02108

Dated: December 27, 2004    (617) 854-4000

Thomas R. Grady (*pro hac vice*)
THOMAS R. GRADY, P.A.
720 Fifth Avenue South
Suite 200
Naples, Florida 34102
(239) 261-6555

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party via the electronic filing system or via facsimile on December 27, 2004.

    s/Matthew J. Tuttle
Matthew J. Tuttle