# EXHIBIT 1

26 JCORPL 609                                                                          Page 1
**(Cite as: 26 J. Corp. L. 609)**

Journal of Corporation Law
Spring 2001

**Article**

**\*609** MUTUAL FUND ADVISORY FEES: THE COST OF CONFLICTS OF INTEREST

John P. Freeman [FNa1]
Stewart L. Brown [FNaa1]

Copyright © 2001 University of Iowa (The Journal of Corporation Law); John P.

Freeman, Stewart L. Brown

I. Introduction ........................................................ 610

II. Funds' Unique Management Structure ................................... 614

   A. Independent Directors' Importance .................................. 616

   B. The Exception to the Rule: Internal Management at the Vanguard Group . 618

III. Economies of Scale for Advisory Services Rendered to Equity Mutual

   Funds .............................................................. 619

   A. Introduction ...................................................... 619

   B. Fund Industry Data Demonstrates that Economies of Scale Exist ........ 621

   C. Testing the ICI's Findings: Verification and Unbundling .............. 622

   D. Summary .......................................................... 625

IV. Exploring the Two-Tiered Structure for Professional Advisory Services:

   Mutual Fund Fees vs. Pensions Fund Fees ............................... 627

   A. Research Shows Fund Shareholders Pay A Premium For Investment Advice .

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

26 JCORPL 609                                                                    Page 2
**(Cite as: 26 J. Corp. L. 609)**

628

  B. Portfolio Company Size and Investment Advisory Fees ................. 634

  C. Individual Managers' Pricing: Fund Management vs. Pension Management . 635

  D. Externally Managed Vanguard Equity Fund Advisory Fees vs. the Fund

  Industry ............................................................ 637

  E. Further Evidence of Questionable Fund Industry Behavior: Charging

  High Advisory Fees for Passive Equity Portfolio Management .............. 639

  F. Analysis of Causes Underlying the Fund Industry's Dysfunctional

  Competitive System ................................................. 641

    1. Introduction .................................................... 641

    2. Section 36(b) Case Law Safeguards the Status Quo .................. 642

    3. Problems With the Gartenberg Test As Applied ...................... 651

    4. The Missing Ingredient: Admissible, Compelling Data ............... 652

  G. Critiquing the Industry's Defense of the Status Quo ................. 654

    1. The Industry's Position: Rampant Competition ..................... 654

    2. Price Competition is Largely Nonexistent in the Fund Industry ...... 655

    3. Government Regulation is Not "Stringent" When It Comes to Advisory

  Fee Levels ......................................................... 656

    4. The Fund Industry Lacks, Above All, "Clear Disclosure" ............ 662

 V. Proposals for Change ................................................ 668

 VI. Conclusion ....................................................... 671

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*610** I. Introduction

   In the early 1970s, America's mutual fund industry was suffering net redemptions, meaning it was contracting in size. [FN1] Fund marketing efforts were in disarray, thus prompting the Securities and Exchange Commission (SEC) to embark on a special study analyzing the problems then plaguing the industry. From that starting point, the SEC moved to loosen restrictions on fund marketing in order to foster a "more competitive environment." [FN2]

   **\*611** By mid-1973, as the SEC's distribution study neared completion, the industry's total assets stood at less than $55 billion, [FN3] with those assets held by fewer than 800 funds. [FN4] Today's industry boasts more than 10,000 funds, [FN5] with assets exceeding $7 trillion, [FN6] an average annual asset growth rate since 1974 exceeding twenty percent. [FN7] Over that same time span, fund sponsors have prospered greatly. In 1998, assets held by Merrill Lynch's own family of funds exceeded the fund industry's total net assets twenty-five years earlier. [FN8] In early 1999, fund sponsors' annual revenue was estimated at $55 billion, [FN9] equaling the industry's total assets twenty-five years earlier. A consequence of this staggering growth is that fund sponsors, the SEC, fund investors, and the courts must now confront a new wave of challenges. Despite its phenomenal marketing success, the fund industry now finds aspects of its conduct under attack from various quarters.

   The popular press is focusing attention on the industry's fee structure and the perceived inadequacy of mutual fund governance. [FN10] Scholarly articles published by **\*612** finance academics have ridiculed board-approved 12b-1 fees [FN11] paid by fund shareholders. [FN12] Law review commentators offer uncomplimentary evaluations of those who control fund management and policies. [FN13] The SEC has weighed in, questioning "whether changes are needed in the current system." [FN14] Another federal agency, the **\*613** General Accounting Office, recently issued a detailed report finding that mutual funds generally do not attempt to compete on the basis of costs (i.e., price competition is muted). [FN15] If the SEC's aim a quarter-century ago truly was to spur innovations to "set the stage for retail price competition" within the industry, [FN16] then, as we shall see, there is still a lot of work to be done. Indisputably, price competition is in investors' best interests. In the absence of competition, costs increase, resulting in a drag on performance. [FN17]

   The absence of price competition within the fund industry is by no means conceded by industry insiders, leaving observers faced with ambiguous and often contradictory data that can lead one to conclude that "competition is up--and so are costs." [FN18] This strangeness--tremendous popularity, proliferating consumer options, and less than robust price competition--arises in the realm of the most tightly regulated financial product sold in the country today. In the words of a former SEC chairman, "[n]o issuer of securities is subject to more detailed regulation than a mutual fund." [FN19] Unfortunately, as we shall see, decades of SEC-commissioned studies, rule-making, and jawboning have led to a system that, for the most part, works beautifully for those who sell funds to the public, or sell services to funds, but much less admirably for the industry's investors.

   **\*614** This Article examines whether the chief product that shareholders buy when they invest in mutual funds--professional investment advice--is being systematically over-priced by fund managers. The emphasis is on advisory fees imposed on equity mutual funds. Part II explains how the industry's unique management structure accounts for the alleged lack of price competition in the delivery of management advice perceived by the industry's detractors. Part III examines two questions related to economies of scale in the fund industry. First, do economies of scale exist for the delivery of investment management services to equity fund shareholders? Second, if so, are those economies being shared fairly with the funds' owners by the funds' agents, the investment advisors? Part IV studies causes for the status quo, including the industry's statutory scheme, the quality of the SEC's regulatory efforts, and the reception given fund critics by the courts. The Article concludes with a set of proposals for changing the present competitive environment in which fund advisory fees are set, disclosed, and evaluated.

II. Funds' Unique Management Structure

   The principal reason mutual funds have won acceptance in the marketplace has little to do with securities law requirements or the SEC's regulatory know-how. Mutual funds have been well received because, in the main, they can be very good products for investors to own. Mutual funds historically have provided their shareholders with the ability to pursue a vast array of different investment objectives as co-owners of an entity offering three main

26 JCORPL 609                                                                    Page 4
**(Cite as: 26 J. Corp. L. 609)**

services: diversified investment risk, professional investment management, and a redeemable security. [FN20] The fact that fund shares are redeemable at net asset value (minus, in some cases, a redemption fee) differentiates mutual funds from their closed-end fund [FN21] cousins and the rest of the entities populating the investment media universe. [FN22] Because funds issue a redeemable security, new sales generally are viewed as crucial to a fund's ability to survive and prosper. Absent new investors, funds risk being redeemed out of existence as shareholders cash in their holdings.

The concept of external management is nearly as universal a hallmark of the fund industry as redeemable shares. This characteristic is by no means crucial to a fund's existence, though it is nonetheless ubiquitous. As explained by the Vanguard Group's founder, John C. Bogle, mutual funds almost always

are operated by external . . . management companies which seek to earn high returns for fund investors, to be sure, but seek at the same time to earn the highest possible returns for themselves. Some of these companies are publicly-held, in which case their shares are held by investors who own their shares for **615** the same reason that investors own Microsoft or General Motors: To make money for themselves. [FN23]

The external manager typically controls all facets of fund life, from the fund's incorporation through the selection of the initial board. This control tends not to be relinquished over time, [FN24] or at least until the advisory office subsequently is sold to another external advisor, typically at a very nice profit. [FN25] Through agreements approved by the fund's board of directors, the external advisor normally contracts with the fund and related sister-funds operating in the advisor's "complex" to supply the investment advisory, marketing, and administrative services required for the funds to operate. [FN26] In return, the advisor is compensated through fees set in the board-approved management agreement. [FN27] As the SEC has noted, "Mutual funds are unique . . . in that they are 'organized and operated by people whose primary loyalty and pecuniary interest lie **616** outside the enterprise." ' [FN28] This Article examines how the cost of that conflict of interest is passed on to fund shareholders.

## A. Independent Directors' Importance

Aware of the inherent conflict existing between the fund's shareholders and the entity's external advisors, Congress took a position favoring shareholders when it enacted the Investment Company Act of 1940:

The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated and managed in the interest of investment advisors, rather than in the interest of shareholders . . . or when investment companies are not subject to adequate independent scrutiny. [FN29] To protect fund shareholders from self- dealing, Congress imposed a requirement that at least forty percent of a fund board needs to be composed of directors ostensibly independent of the investment advisor. The United States Supreme Court has dubbed these special directors "independent watchdogs." [FN30] The independent directors are charged with protecting against the overreaching of fund advisors. As the Delaware Supreme Court has pointed out, independent directors can play a pivotal role in American corporate life. Speaking in the context of directors' fiduciary duties when making a decision whether to change control, the court stated:

**617** The power to say no is a significant power. It is the duty of the directors serving on [an independent committee] to approve only a transaction that is in the best interests of the public shareholders, to say no to any transaction that is not fair to those shareholders and is not the best transaction available. [FN31]

In practice, while independent fund directors have the right to demand advisory or distribution fee cuts or to fire the fund's advisor or underwriter, those rights are virtually never exercised. [FN32] Indeed, in the leading fund industry management fee case of Gartenberg v. Merrill Lynch Asset Management, Inc., [FN33] the Second Circuit expressly called attention to "the existence in most cases of an unseverable relationship between the advisor-manager and the fund it services." [FN34]

The fund advisor's de facto control over the fund's board can lead to high profit margins [FN35] and a high price for the advisory office should the advisor wish to sell out at some point. The conflict also leads to the risk that well-understood obligations owed by **618** board members may not be fulfilled. Eminent authority has explained that the chief oversight function performed by a normal board of directors in this country is "overseeing management's dedication to the polestar of profit maximization." [FN36] In essence, fund industry critics contend that many fund managers have been allowed to view life looking through the other end of the telescope, with "dedication to the polestar of profit maximization" working in favor of maximizing profits for the funds' hired managers at the expense

of fund shareholders. One such critic is fund industry pioneer John Bogle. He has complained that "asset gathering has superceded fiduciary duty as the industry's hallmark." [FN37] From Bogle's perspective, "the spirit of fiduciary duty has not vanished. Rather, it has moved from the front seat to the back seat, subservient to the [fund advisors'] worship of market share." [FN38] According to Bogle, "[s]omewhere along the road, the industry has lost its way." [FN39] This is half the story. As we shall see, to a considerable extent, the industry has lost its way and gotten its way at the same time.

## B. The Exception to the Rule: Internal Management at the Vanguard Group

The Vanguard Group of mutual funds offers a management structure running counter to the fund industry's general rule of external management. Vanguard Group funds are internally managed, meaning that the funds receive administrative and distribution services at cost. Advisory fees are either virtually nonexistent in the case of the complex's index funds, or are used to pay for services supplied by third parties. Director-run fund boards, motivated purely by their desire to secure for Vanguard's shareholders the best quality services at the lowest possible prices, hire these third parties. Vanguard funds, in other words, are managed like regular companies operating elsewhere in the economy: the entities' managers are driven to generate the best bottom- line returns possible. At the Vanguard funds, directors' eyes are indeed focused on the polestar of profit maximization for the Vanguard funds' shareholders. The Vanguard Group appeals to the price-conscious segment of the fund marketplace. [FN40] That segment has been growing; between 1974 and 1998, the Vanguard Group's assets soared from $1.3 billion to $450 billion. [FN41]

Vanguard's Bogle claims that Vanguard's shareholder-oriented management structure, distinctly rare in the fund industry but common throughout the rest of the economy, generated $3 billion in savings for Vanguard shareholders in 1998 alone. [FN42] If Bogle is even close to being correct, then fund shareholders are paying an onerous tax to compensate for the conflict of interest inherent in the fund industry's near-universal **619** embrace of the external management model. The following section explores the available evidence that the industry's reliance on external management as a source for professional investment advice subjects fund shareholders to excessive costs.

## III. Economies of Scale for Advisory Services Rendered to Equity Mutual Funds

### A. Introduction

Mutual funds exhibit "economies of scale" when there is an inverse relationship between assets under management and their operating expense ratios. [FN43] Operating ratios represent operating expenses divided by average fund assets. For present purposes, this Article accepts the following operating expense formulation adopted by the fund industry's trade group, the Investment Company Institute (ICI): advisory expenses plus administrative expenses, [FN44] but excluding 12b-1 fees. [FN45]

The existence of economies of scale as fund assets under management increase has been dubbed "folklore," [FN46] and an item about which "no plaintiff has been able to produce evidence." [FN47] Given the industry's explosive growth, one would expect that fund expenses on average would have plummeted. It is not clear from the evidence that this has happened. The average equity fund's expense ratio has more than doubled since 1950. [FN48] According to a study published by the ICI, the operating expense ratio [FN49] for all equity **620** funds, using a sales-weighted average, rose 15% from 1980 to 1997, [FN50] a time of tremendous asset growth for the industry. [FN51] A recent SEC staff study showed that funds' weighted average expense ratio rose nearly 30% between 1979 and 1999, [FN52] with the jump exceeding 20% for equity funds. [FN53] A different study found that the cost of ownership for the industry's cheapest equity funds rose by 19% between 1980 and 1997. [FN54]

Another report on equity fund expenses shows that between 1981 and 1997, average equity fund expenses grew from 0.97% of net assets to 1.55%, with this 50% increase occurring over a period in which fund equity assets rose from $40 billion to $2.8 trillion. [FN55] During the same period, annual costs paid by fund shareholders soared from $320 million to $34 billion. Assuming that economies of scale exist, it is questionable why a hundredfold increase in costs should accompany a seventyfold increase in assets. [FN56] Had the average expense ratio merely stayed the same, and not risen over the period, fund investors would have saved billions annually. [FN57]

Nonetheless, it is accepted today that economies of scale exist in the fund industry. The existence of economies of scale has been admitted in SEC filings made by fund managers [FN58] and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase. [FN59] Fund industry investment managers are prone to cite economies of scale as justification for business combinations. [FN60] Though the ICI has **\*621** remained mute on the subject of economies of scale affecting advisory fees specifically, a knowledgeable industry insider has admitted that "there are staggering economies of scale in portfolio management and research." [FN61] Legal commentators likewise view economies of scale as a fact of life in the fund industry. [FN62] The GAO's investigators recently found a general consensus that fund operations benefit from economies of scale, [FN63] as well as strong evidence that economies of scale should exist. [FN64] The agency reported that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, [FN65] which, unlike growth from share sales to new investors, is costless. Though its analysis of operating efficiencies was stymied by the lack of cost data available for fund advisors, the GAO did find that, for at least the previous five years, operating profits of eighteen publicly-held fund advisory companies had grown as a percentage of revenues. [FN66] The GAO also found that, among a sample of the industry's largest funds that experienced asset growth of at least 500% from 1990 to 1998, more than a quarter of the funds either raised their expense ratios or failed to reduce them. [FN67]

### B. Fund Industry Data Demonstrates That Economies of Scale Exist

Studies by the ICI, though never focusing on advisory fees in isolation, generally confirm the existence of economies of scale within the industry. A 1998 ICI study found economies of scale to exist for individual equity funds. [FN68] A subsequent ICI study focusing on fund operating expenses "suggest [[s] the presence of economies of scale as equity fund assets grow." [FN69] Interestingly, the ICI's operating expense study avoided calling specific attention to advisory fees. The ICI researchers bundled advisory fees and **\*622** administrative fees (such as custodial fees, legal and accounting fees, and transfer agent fees, but excluding 12b-1 fees). The ICI study observed that the ratio of bundled costs to fund assets, the "operating expense ratio," did indeed decline as fund size rose. [FN70]

### C. Testing the ICI's Findings: Verification and Unbundling

To verify the ICI's analysis, the authors screened the Morningstar Principia Pro database for domestic equity funds. [FN71] After adjusting for missing and unusable data, [FN72] the final sample consisted of a total of 2161 actively managed, noninstitutional funds. Of these, 1090 were single class funds and 1071 were multiclass funds representing a consolidation of 3302 sub- funds. This approximated the ICI sample of 2260 funds.

The ICI analysis used simple average operating expense ratios to aggregate multiclass funds within ranges of fund size. For comparison purposes, the authors initially used simple averages. However, weighted averages are superior [FN73] and hence supply the principal data used in the authors' analyses. [FN74] Comparison of ICI results with the current study are presented in Table 1.

**\*623** Table 1

Comparison of Operating Expense Ratios with ICI Expense Study
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The left-hand column in Table 1 is the ICI breakdown by the size of fund. It is expected that economies of scale will cause average operating expense ratios to decline as fund size increases, and this is indeed the case. The ICI study shows the operating expense ratio declining from 147 basis points to 72 basis points as fund assets increase from under $250 million to greater than $5 billion. Operating expense ratios obtained from Morningstar exhibited a similar decline from 129 to 68 basis points, although the operating expense ratio averaged about 10 basis points less than the ICI study. [FN75]

The right-hand column of Table 1 presents the weighted average operating expense ratios. These also decline as asset size increases, although the decline is not as dramatic as occurs with the simple average numbers.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Unfortunately, the degree and source of lower expenses is not adequately explored in the ICI study which, by bundling different costs into one overall "operating ratio," failed to examine the differences between advisory and administrative expenses.

  **\*624** Having confirmed the essential equivalence of the Morningstar and ICI results, operating expense ratios were decomposed into advisory and administrative expense ratios. The ICI asset groupings and categories were maintained. The results of this analysis are presented in Table 2.

Table 2

Comparison of Weighted Average Operating, Advisory, and Administrative Expense
Ratios
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

  The third column of Table 2 shows the average size of the fund in each group. Note that there are large numbers (1295) of relatively small funds, with an average fund in the less than $250 million range having $77 million in assets. On the other hand, there are relatively small numbers (92) of very large funds (average assets of $14.5 billion). Thus, the distribution of fund size exhibits an extremely negative skew. The largest funds (greater than $5 billion) average more than $14 billion, almost seven times larger than the next largest grouping ($1 to $5 billion) and almost 200 times the average fund in the less than $250 million range.

  Weighted average operating expense ratios are identical to those in Table 1. These decline about 45% from the smallest to the largest funds (from 114 to 63 basis points). However, the two columns on the right reveal that the decline is not uniform for advisory and administrative fees. Advisory fees decline from 71 to 46 basis points from the smallest to the largest funds, only a 35% decline. Advisory fees are essentially flat at about 70 basis points up to about a $1 billion fund size. A twenty-fold increase in the average fund size (from $715 million to $14.5 billion) results in only a 31% decrease in advisory fees. Administrative fees, on the other hand, decrease from 43 to 17 basis points, a 60% decline. This decline is relatively smooth and linear. Thus, it is clear that, percentage-wise, greater economies of scale are being passed on to the fund shareholders **\*625** in the administrative fees than in the advisory fees. The ICI's bundling methodology, which combines the two different fee types, conceals this fact. [FN76] The authors' data is consistent with the ICI's in showing, unequivocally, that there are economies of scale operating in the fund industry. [FN77] Fund operating expenses tend to decline steadily as fund size grows. However, this decline is not uniform across administrative and advisory fee levels. The data reveals that fund advisors are reluctant to share economies with fund shareholders when negotiating the terms of advisory fee contracts. This reluctance depletes shareholder wealth.

  It is useful to put the authors' analysis into a larger context. The 2161 funds in the sample represent a total market value of about $2.2 trillion. With a weighted average operating expense ratio of 75 basis points, the fund industry is charging shareholders of this subset of mutual funds about $16 billion a year to manage their funds. The 92 funds with assets greater than $5 billion represent about $1.3 trillion, and their annual management costs are about $8.5 billion. Of the $8.5 billion, about $6 billion are charged for advisory services. We have seen that advisory and administrative costs decline as fund size increases, but with administrative costs declining much more rapidly. Had advisory costs declined by the same percentage amount as administrative costs, they would average 28 basis points for the largest funds (rather than 46 basis points), yielding annual advisory costs of $3.5 billion instead of $6 billion. Thus, under the assumption that economies of scale should be realized for advisory fees and administrative fees equally, in rough numbers there are about $2.5 billion of excess advisory fees paid annually among the very largest of the actively managed equity mutual funds.

D. Summary

  The ICI's position is that price competition reigns in the fund industry, with economies of scale existing and being properly shared by the advisor with fund **\*626** shareholders. This appraisal is supported by selectively presented data. [FN78] In reality, what has been declining is principally the cost of delivering shareholder administrative services relative to aggregate net assets. [FN79] Because most recent equity fund asset growth has resulted from

portfolio appreciation, [FN80] and has thus been costless to the advisor, it should not be surprising that the ratio of shareholder administrative expenses to fund assets has tended to drop as funds have gotten bigger.

   Though administrative expenses have dropped as fund size has grown, it is unclear whether there is robust price competition in the market for the most critical service **627** offered by the fund to its shareholders: professional management advice. The authors' data confirms that economies of scale in the market for advisory services are likely to exist. To the extent that they do exist, it appears they are being captured mainly by the funds' advisors, not the funds themselves. In the advisory services marketplace, price competition seems particularly weak. As Bogle argues: "Price competition is . . . defined by the actions of producers, not the actions of consumers. Thus, price competition is not 'intense' in the fund industry; it is barely alive." [FN81] The fiduciary-managers' seeming ability to reap large rewards by not sharing cost savings with fund shareholders brings to mind Professor Paul Samuelson's insightful testimony before the Senate Banking and Currency Committee in 1967 when it was considering fund legislation: "I decided that there was only one place to make money in the mutual fund business--as there is only one place for a temperate man to be in a saloon, behind the bar and not in front of the bar. And I invested in . . . [a] management company." [FN82]

IV. Exploring the Two-Tiered Structure for Professional Advisory Services:
Mutual Fund Fees vs. Pensions Fund Fees

   A fair question is how the cost of professional management advice sold to funds and their shareholders compares with the price paid for like services sold elsewhere in the economy. [FN83] Investment advice is essentially a commodity. [FN84] Outside the fund industry, it is bought and sold in a much more competitive marketplace. Active portfolio management essentially is a mental process. It principally involves deciding which securities to buy and sell in order to maximize returns. [FN85] The process is scalable, in that it is equally applicable to large and small portfolios. The manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, [FN86] but **628** the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower. Investment managers are regularly hired and fired and those doing the hiring enjoy the benefits of a competitive market. Significantly, as we shall see, some of those bidding for investment advisory work in the free market populated by pension and endowment fund managers are fund advisors or their affiliated entities.

A. Research Shows Fund Shareholders Pay A Premium For Investment Advice

   Wildly different fee structures apply to equity portfolio investment advisory services purchased by public pension funds on the free market compared to the same form of services purchased by investor-owned mutual funds. The disparity has received scant attention to date. Nearly forty years ago, a study conducted for the SEC by the Wharton School of Finance and Commerce determined that where fund advisors had outside advisory clients, there was a "tendency for systematically higher advisory fee rates to be charged open-end [mutual fund] clients." [FN87] The Wharton Report's authors ascribed the disparity in fee structures to fund advisors' ability to capitalize on the conflict of interest inherent in most funds' management structures and convert it into the power to set extra-competitive prices. [FN88] The Wharton Report identified 54 investment advisors with both mutual fund clients and other clients. [FN89] Of this sample, fee rates charged the mutual fund clients were at least 50% higher in 39 out of the 54 cases, 200% higher in 24 of the cases, and 500% or more higher in 9 of the cases. [FN90]

   **629** The existence of free market versus fund market pricing disparities for advisory services has long been known to the SEC. In its detailed report submitted to Congress in 1966, entitled Public Policy Implications of Investment Company Growth, [FN91] the SEC revisited the Wharton School's findings and determined that, "[t]he Wharton Report's conclusions correspond to those reached by the more intensive examination of selected mutual funds and mutual fund complexes made by the Commission's staff." [FN92] Nonetheless, over more than three decades, despite dramatic escalation in fund advisory fee levels and revenues, the SEC has ignored the subject of pricing disparities. Not everyone has been so generous as the fund industry's chief regulator. For example, one author has contended that fund shareholders "pay nearly twice as much as institutional investors for money management." [FN93] Other evidence that advisory fee structures are unusually lucrative in the fund industry in

comparison with pension advisory business comes in the form of reports that fund advisor buy-outs are more costly than acquisitions of firms that advise pensions. [FN94]

*630 To verify whether the advisory fee pricing disparities found in the Wharton Report and the Public Policy Implications study still exist, the authors sent questionnaires [FN95] inquiring about portfolio management fees to the 100 largest public pension funds listed in the January 25, 1999 edition of Pensions and Investments. Pension fund staff were asked for information on fees paid to their fund's external portfolio investment managers during 1998. Responses were received from 53 funds and 36 of these provided usable data. [FN96] The 36 public pension funds represented total assets of $754 billion, averaging $21 billion. Funds were widely diversified across asset classes and most had commitments to fixed income securities (bonds), real estate, and actively and passively managed domestic and international equities.

For comparison purposes, the analysis was restricted to actively managed domestic equity portfolios. Because internally managed portfolios were excluded, each portfolio could be associated with a specific investment advisor. A total of 220 individual actively managed portfolios were identified with a total of $97.5 billion in assets. The average portfolio size was $443 million, with the range extending from $15 million to $4.8 billion.

Fee data at the individual manager level came in two forms. The majority of pension funds, representing 114 portfolios, sent only a fee schedule (e.g., 50 basis points up to $100 million and 20 basis points on the balance). In these cases, the advisory fee rate for each investment manager was calculated by applying the fee schedule to the level of assets under management. [FN97] In sixty other cases, funds set the actual dollar amounts of fees paid during the 1998 fiscal or calendar year and this number, divided by assets under management, yielded the annual advisory fee rate for each manager. In the balance of the cases (56), funds sent both a fee schedule and the actual advisory fee paid. [FN98] Some funds (37, or 17%) had performance fees built into their advisory contracts. Of these, 27 provided actual fee data, and the balance indicated that no performance fees above the scheduled rates were paid. Table 3 compares investment advisory fees for public pension funds and actively managed domestic equity mutual funds.

*631 Table 3

Comparison of Public Pension and Mutual Fund Investment Advisory Fees
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

To enable a direct comparison of advisory fees between mutual fund and pension fund portfolios, the mutual fund sample has been restricted to those funds with financial characteristics closest to those of the pension fund sample. [FN99] In Table 3, the bottom line, showing the overall category, reveals that investment advisory fees are twice as large for mutual funds as they are for pension funds, even though the average actively managed domestic equity mutual fund is nearly three times as large as the average actively managed equity pension portfolio. [FN100]

*632 Decile comparisons were achieved by ranking the respective samples by asset size and then splitting the sample into ten segments with the same number of portfolios/funds in each respective segment. In the first decile of funds, advisory fees are roughly similar, with pension funds paying 60 basis points for an average portfolio of $36 million and mutual fund owners paying 77 basis points for an average fund size of $24 million. [FN101] From that starting point, pension fund advisory fees decrease in an essentially linear fashion as portfolio size increases. Fees decline from 60 basis points for the smallest portfolios ($36 million on average) to 20 basis points for the largest ($1.55 billion on average). The competitive nature of the market for investment advisory services to public pension funds forces fees to decline as asset size increases, essentially reflecting economies of scale in the money management business.

The pattern is very different for mutual funds. The average fee charged is essentially flat through the first seven deciles, and the fee is consistently greater than 70 basis points. Fees decline when fund size increases above about $750 million, but the decline is not as steep as it is for pension portfolios. The top decile has an average fund size of almost $10 billion, but weighted average advisory fees decline to only 50 basis points.

The full impact of differential advisory fees is illustrated graphically in Figure 1, a bar chart showing the average

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

pension and mutual fund advisory fee in each decile. [FN102]

Figure 1
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

  **633** Comparison of pension and mutual fund investment advisory fees is confounded somewhat by portfolio/fund size differentials and the extreme negative skew of the fund size distribution for both pension and mutual fund portfolios. These issues will be addressed in turn.

  The average pension portfolio is $443 million and the average mutual fund portfolio is $1.3 billion, roughly three times greater. Moreover, in the largest deciles of portfolios/funds, the average mutual fund portfolio is about six times larger than the average pension portfolio. An ad hoc comparison of pension and mutual fund portfolios on a comparable size basis reveals an even greater differential in investment advisory fees between pension and mutual funds. For comparison purposes, the largest mutual funds were removed from consideration, and the size of the average mutual fund was calibrated to be $443 million, identical to the average pension portfolio. On a size-standardized basis, weighted average mutual fund advisory fees were 67 basis points as compared to 28 basis points for pension portfolios.

  Regression analysis is a more rigorous approach to comparing differential fees, and it also provides the means of controlling for the extreme negative skew in the distribution of fund size. [FN103] The standard technique used in studies of economies of scale is to use a log transformation on the nonlinear (skewed) variable. [FN104] This technique was applied to compare the differential responsiveness of pension and mutual fund advisory fees to increases in fund size. Regressions of the following form were run on both the pension and mutual fund data: Advisory Fee = a + b (Ln Size), where the advisory fees are scaled in whole basis points, and size is scaled in millions of dollars under management. The analysis yielded the following data:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

  The negative slope coefficient of both regressions indicates that advisory fees decline as the log of assets under management increases. Both slope coefficients are statistically significant. However, the slope coefficient for the pension fund regression is three times greater than the mutual fund regression. This reflects that pension fund fees are three times more sensitive to assets under management than mutual fund fees. The level of explained variance is more than four times greater for pension funds than mutual funds. This means that equity portfolio size explains only 6% of the variation of mutual fund advisory fees but 27% of pension advisory fee. Clearly there are variables other than fund size that impact advisory fees for both pension and mutual funds, and there is much more unexplained variance in the case of mutual funds than pension funds.

  **634** It is clear that public pension fund portfolio managers are willing to accept lower fees for a greater commitment of funds under management. There is no evidence that managers of public pension fund equity portfolios are paid less than equity fund managers because they do less work or perform at a lower level. There are no well-known cost differences for the advisory function between managing an equity portfolio for a pension fund or a mutual fund. To the extent that fund shareholders require special attention, those added cost differences are absorbed by the fund as administrative costs. They do not serve to inflate advisory fees unless, of course, such costs are bundled with advisory fees in the particular fund's management contract. The authors conclude that the chief reason for substantial advisory fee level differences between equity pension fund portfolio managers and equity mutual fund portfolio managers is that advisory fees in the pension field are subject to a marketplace where arm's-length bargaining occurs. As a rule, fund shareholders neither benefit from arm's-length bargaining nor from prices that approximate those that arm's-length bargaining would yield were it the norm.

B. Portfolio Company Size and Investment Advisory Fees

  It is common in the investment management business to characterize portfolios or funds by the market capitalization of the companies whose stock is held in the equity mutual fund portfolio. Company size is measured by the firm's market capitalization, defined as the product of the number of shares outstanding and the current

market price per share. Generally, portfolios are labeled large, mid, or small cap (capitalization) portfolios. Definitions vary, but typically large cap companies/stocks have a total market value in excess of $10 billion, mid caps range from $1 to $10 billion, and small cap stocks are generally defined as having a market capitalization of less than $1 billion.

The pension and mutual fund samples were analyzed for fee differences based on market capitalization. [FN105] Of the 220 portfolios in the pension sample, 177 named large, mid, or small cap in their titles. Morningstar explicitly labels all funds for market capitalization. The results of the analysis are presented in Table 4.

*635 Table 4

Comparison of Public Pension and Mutual Fund Investment Advisory Fees for
Portfolio Management of Large, Mid, and Small Capitalization Firms
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Table 4 reveals that managers do indeed charge higher fees for managing small and mid cap portfolios. This pattern is observed for both pension fund portfolios and mutual fund portfolios. However, there are significant differences between the two samples. Mutual funds charge far higher fees in relation to pension fund portfolios for managing large cap portfolios. The weighted average large cap advisory fee of mutual funds is 52 basis points as compared to 21 basis points for pension fund portfolios (about 150% higher). Moreover, the average large cap mutual fund is almost four times larger than the average pension fund portfolio ($2 billion versus $555 million).

Mid and small cap portfolios exhibit similar, although attenuated, patterns. The weighted average mutual fund advisory fee for mid cap portfolios is about 70% higher than the pension advisory fee (71 versus 42 basis points) and about 20% higher (71 versus 58 basis points) for small mid cap portfolios. Thus, the most conspicuous example of high prices caused by the absence of market forces affecting equity mutual fund advisory fees is found in the large cap stocks sector. This is an important category. It dominates among the largest funds by asset size. Of the 100 largest mutual funds, 85 are large cap portfolios, and they represent 93% of the total assets of the 100 largest funds.

There are many ramifications of advisory fee rate disparities of 100% or more between those charged to mutual fund and non-fund clients by the same advisor . They are analyzed in the following section.

C. Individual Managers' Pricing: Fund Management vs. Pension Management

There were a total of 110 different money managers in the 220 pension portfolios examined. Thus, some portfolio managers were represented several times in the sample. In addition, many of the pension fund portfolio managers were also entities managing money for mutual funds. Table 5 presents data for a representative sample of the investment managers with multiple pension portfolios that also managed mutual fund portfolios. The table shows total pension assets, the number of pension portfolios, and the weighted average pension investment advisory fee. In addition, those mutual fund assets of the corresponding managers that met the screens for direct comparison with pension *636 funds are presented. The table shows total assets, the number of funds and sub-funds, and the weighted average investment advisory fees.

Table 5

Comparison of Individual Manager Fees For Pension Portfolios and Mutual Funds
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Table 5 reveals that different investment managers apparently have widely different pricing policies. [FN106] Alliance Capital Management charged its mutual fund customers, on average, more than 350% more than its pension customer (84 basis points versus 18 for pension portfolios). Ark Asset Management, on the other hand, charged its mutual fund customers about 70% more, but with only about a third of the level of assets under management. Putnam Investment charged about 50% more, and Oppenheimer charged almost 300% more. Large

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

cap portfolios tend to dominate the sample presented. This is reflected in the overall averages. The overall, weighted average pension advisory fee for these managers was 23 basis points, slightly less than the weighted average for all pension managers. The overall, weighted average investment advisory fee for mutual funds was 54 basis points, 2 basis points lower than the overall average.

**\*637** D. Externally Managed Vanguard Equity Fund Advisory Fees vs. the Fund Industry

  It was noted earlier that the Vanguard Group of mutual funds tends to present lower expense ratios than the rest of the mutual fund industry. This is because Vanguard funds are run on the same basis as most companies in the economy: boards are unswervingly devoted to making as much money as possible-- within legal constraints--for shareholders. Stated differently, the Vanguard funds are uncontaminated by the conflict of interest that affects most of the rest of the fund industry. Shareholders of Vanguard's externally managed equity funds thus benefit directly from their boards' ability and willingness to perform a task rarely undertaken in the fund industry--namely, to negotiate at arm's-length for lower investment management fees. This point is illustrated below in Table 6, which shows investment management fees for the ten actively managed domestic equity funds offered by the Vanguard Group as of the end of 1999. [FN107]

**\*638** Table 6

Vanguard Investment Advisory Fees for Actively Managed Domestic Equity Funds
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

  Table 6 reveals that Vanguard is able to purchase investment advisory services for prices far lower than the industry as a whole. The weighted average base fee for the ten funds is 14.9 basis points: The base fee of the ten funds' average portfolio size is $11.6 billion. This is roughly in line with fees paid by pension funds for large portfolios. Table 3 reflects that the largest pension fund portfolios average 20 basis points for an average portfolio size of $1.5 billion (decile 10 in Table 3). Large mutual funds, on the other hand, pay 50 basis points on an average portfolio size of $9.7 billion (also decile 10 in Table 3), more than double the advisory fees pension funds pay and more than three times greater than the fees paid by the Vanguard Group.

  **\*639** The Vanguard Group aggressively negotiates performance fees as part of its investment advisory contracts. This practice causes the weighted average of actual fees paid to the Vanguard external managers, 13.2 basis points, to fall below the weighted average base fee. The chief reason for the difference between the weighted average base fee for the managers and the actual fees paid is due to the penalty assessed against the Windsor fund's managers for their under-performance. In all, five of the ten funds experienced investment advisory fee reductions as a result of unfavorable performance, and one fund, Morgan Growth, enjoyed a fee increase because of favorable results.

  The Table 6 data vividly illustrates how cost benefits can be reaped by unconflicted boards. In round numbers, the actively managed Vanguard funds in the sample, holding aggregate assets of $11.6 billion, paid about $150 million in investment advisory fees. Had their advisory fees been subject to standard industry quality negotiations, the subject funds would have paid about $580 million in advisory fees at the prevailing fund industry rate of 50 basis points for large, externally managed equity portfolios. The Vanguard boards' aggressive, shareholder-oriented approach to buying advisory services on the free market thus generated a direct savings exceeding $425 million for the funds' shareholders in 1999 alone.

E. Further Evidence of Questionable Fund Industry Behavior: Charging High Advisory Fees for Passive Equity Portfolio Management

  When a portfolio/fund is passively managed, there is no stock picking  (active management) involved. Rather, the fund attempts to mimic the returns of some market index, such as the S&P 500 or the Wilshire 5000. Funds using this approach are called "index funds," and the process is called indexing. [FN108] Pension funds and mutual funds normally pay investment advisory fees for passive management, although in a sense the term is a misnomer. An indexed portfolio is much simpler to manage than an actively managed portfolio. The securities in the portfolio are

fixed (except when changed by the index sponsor), and the manager's job is to minimize the tracking error with the index. This sometimes involves sampling a large subset of the index or the use of futures to deploy cash, but the basic process is essentially mechanical. Thus, little if any creativity is called for and personnel costs are kept to a minimum. For these reasons, investment advisory fees for passive management are typically much lower than for active management. [FN109]

To test whether the fee disparities previously found for external equity portfolio managers hold for index funds, the authors collected data on passive investment advisory fees for mutual funds, pension funds, and the Vanguard S&P 500 Fund. [FN110] The results are presented in Table 7.

**\*640** Table 7

Comparison of Weighted Average Investment Advisory Fees on S&P 500 Index Funds
for Pension Portfolios, Mutual Funds, and the Vanguard S&P 500 Index Fund
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Pension funds paid an average of 1.4 basis points to outside index fund managers. The average portfolio was $2.1 billion among the 20 pension fund portfolios examined. The typical mutual fund of the same size paid 20 basis points to their investment advisors. These results are confounded somewhat by the willingness of some funds' investment advisors to reduce total expenses. [FN111] Elimination of the five funds following this practice reduced the average portfolio size to $1.2 billion and the weighted average investment advisory fee to 16 basis points, a figure that is still more than ten times the weighted average pension index fund advisory fee. The Vanguard S&P 500 Fund (First Index) was a $91 billion fund as of October 1999. Examination of First Index's 1999 annual report revealed that Vanguard charged an investment advisory fee of $100,000 for the whole fund. This is equivalent to about 0.01 basis points. [FN112]

It is difficult to see how mutual fund investment advisors can justify advisory fees that are more than ten times greater than those charged for pension funds. Indexing is a mechanical process that is essentially identical for pension funds and mutual funds. In other words, the name or identity of the customer buying the service is not a valid justification for charging a higher or lower price. The indexing data further supports this Article's findings that fees for externally managed mutual funds are bloated; where arm's-length bargaining occurs, fees charged for an identical service are dramatically lower.

**\*641** F. Analysis of Causes Underlying the Fund Industry's Dysfunctional Competitive System

1. Introduction

The fund industry is over-regulated and under-policed. The absence of a strong corrective influence should not be surprising. Those in control of an industry boasting over $7 trillion in liquid assets can afford superb lawyers, lobbyists, and public relations specialists. The fund industry has all of these in abundance. ICI President Matthew Fink energetically argues against major reform proposals, [FN113] contending that "[c]ompetition is working effectively in the interests of investors." [FN114] Lately, Congress has not shown interest in improving investors' remedies [FN115] and cannot be counted on to alter the way **\*642** the fund industry chooses to conduct itself. The SEC generally has contented itself with presenting proposals destined to have little impact on the way most mutual funds do business.

In the courts, the industry's attorneys have enjoyed tremendous success in protecting management interests: the vast array of legal weaponry found in the securities laws and common law regularly comes to naught when targeted at mutual fund directors and investment advisors. Whatever the theory and wherever the forum, with impressive precision, fund shareholders' claims have been presented, scrutinized, and with scant exception, found wanting. [FN116]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

### 2. Section 36(b) Case Law Safeguards the Status Quo

The traditional focal point of fund industry advisory fee litigation is section 36(b) of the Investment Company Act of 1940, [FN117] an express cause of action permitting fund fee payments to be attacked, subject to several severe limitations: (1) plaintiffs are not entitled to a jury trial; [FN118] (2) only shareholders or the SEC have standing to sue [FN119] (the fund may not sue for wrongs inflicted on it, as in a common law derivative suit); (3) plaintiffs have the burden of proof, meaning that self-dealing fiduciaries are relieved of the burden of proving fairness; [FN120] (4) damages are not recoverable for any period prior to one year before the action was instituted; [FN121] (5) recovery is limited to actual damages resulting from the breach of fiduciary duty and may not exceed the amount of the payments received by such recipient from the investment company or its security holders; [FN122] and (6) federal courts have exclusive jurisdiction. [FN123] On the less-weighty, pro-shareholder side of the ledger, section 36(b) lawsuits are immune from the strictures of the Private Securities Litigation Reform Act. [FN124] Section 36(b), though important in **643** setting standards for fund directors' fiduciary duties, is not the last word on the subject. Section 36(b) does not preempt state law fraud and fiduciary duty claims. [FN125]

The seminal case interpreting section 36(b) is Gartenberg v. Merrill Lynch Asset Management, Inc., [FN126] a suit brought by shareholders of Merrill Lynch Ready Assets Trust, a successful money market mutual fund. Between 1977 and 1981, the trust's assets had skyrocketed from $428 million to more than $19 billion, generating a jump in the fund's management fee from $1.6 million to $39 million. [FN127] The plaintiffs claimed that the fund was realizing cost savings through economies of size generated by the tremendous inflow of cash, which was being captured and kept by the fund's advisor in the form of higher profits. The plaintiffs contended that the cash should have been passed on to the fund's shareholders in the form of lower costs and higher net investment returns. [FN128]

**644** En route to affirming the district court's order dismissing the fund shareholders' claims, the Second Circuit articulated a number of precepts adopted by subsequent courts in 36(b) cases:
   1. To be guilty of a violation of § 36(b) . . . the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. . . . To make this determination all pertinent facts must be weighed. [FN129]
   2. In determining whether the foregoing standard is met, the following factors need to be weighed: (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the advisor- manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees. [FN130]
   3. Though rates charged by other advisor-managers are a factor to be taken into account in evaluating reasonableness, the normally "unseverable relationship between the advisor--manager and the fund it services tends to weaken the weight to be given to rates charged by advisors of other similar funds." [FN131]
   4. [The] argument that the lower fees charged by investment advisors to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must . . . be rejected. [FN132]

As the Gartenberg test's first prong demonstrates, section 36(b) exists to help insure that prices paid by fund shareholders reflect prices set through arm's-length bargaining. The test furnishes a blueprint for those interested in designing challenges to allegedly oppressive fee regimes. Nevertheless, despite gaping differences between fee schedules for advisory services used in the fund industry and elsewhere, no plaintiff has yet met the Gartenberg burden of proving that fees extracted from a given fund are "unreasonably unreasonable." [FN133] A central problem has been investors' inability to generate the data needed to discharge their burden of proof.

**645** The Gartenberg plaintiffs failed to prove either the presence of economies of scale or the advisor's failure to share them with the fund. [FN134] The plaintiffs' efforts to show unreasonableness by pointing to rates charged by other fund managers were rejected on the stated ground that fees charged by other advisors have little relevance because advisors do not bid against each other in an effort to gain more fund assets to manage. [FN135] Thus, fund advisors' concerted refusal to compete with each other inures to their advantage to the extent it insulates the fund industry's advisory fee price structure from comparison with fee structures in related fields, such as the market for pension advisory services, where arm's-length bargaining over fees occurs not just in theory but in fact. Happily for equity fund shareholders, Gartenberg's refusal to allow use of comparative fee data seems limited to the facts before the court. In Gartenberg, the court was addressing use of pension fund fee data in a suit challenging fee levels in a money market fund. The court's ruling on admissibility would have no force in an apples-to-apples suit where equity pension fund fee levels are compared to fee levels for an equity mutual fund.

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 16 of 60

26 JCORPL 609                                                                                      Page 15
(Cite as: 26 J. Corp. L. 609)

Nonetheless, in Kalish v. Franklin Advisors, Inc., [FN136] the district court dismissed fiduciary duty claims against the defendant fund investment advisor, holding that it was improper to compare the profitability of fund managers to earnings reaped elsewhere in the financial services area: "[T]o the extent that comparisons are probative at all, a mutual fund advisor-manager must be compared with members of an appropriate universe: advisor-managers of similar funds." [FN137] The fund in Kalish invested in GNMA securities. The court in Kalish held, in essence, that the designation "similar funds" required disregarding evidence drawn from comparison with Vanguard group's low-cost GNMA fund. [FN138] The court branded any comparison with Vanguard "seriously flawed," [FN139] even though Vanguard's GNMA fund, like Franklin's, was managed by an external investment advisor. [FN140] The court focused on factors that distinguished Vanguard funds as unique including their internal management and their tendency to furnish *646 "corporate management, administrative, shareholder accounting, marketing and distribution services" on an "at-cost" basis. [FN141] The court viewed the low advisory fee (.03%) charged by the Vanguard GNMA fund's external advisor, Wellington Management Company, as attributable to the "the great buying power possessed by the Vanguard group." [FN142] Not mentioned by the court was another plausible justification that the Vanguard fund's board had bargained effectively and aggressively with Wellington to serve Vanguard's shareholders' interests. The court in Kalish likewise implied that Wellington had cut its fees for Vanguard's GNMA fund in an effort to win advisory contracts at other Vanguard funds. [FN143] An expert in the financial services field offered a one-word appraisal of the Kalish court's refusal to accept the Vanguard GNMA analogy argued by plaintiffs: "Heresy." [FN144]

The district courts in Krinsk v. Fund Asset Management, Inc. [FN145] and Schuyt v. T. Rowe Price Prime Reserve Fund, Inc. [FN146] were equally willing to favor industry defense arguments. Like Gartenberg, each dealt with attacks under section 36(b) on advisory fee levels assessed against shareholders of money market mutual funds. The court in Krinsk dismissed a fiduciary duty claim against Merrill Lynch, advisor to CMA Money Fund, under section 36(b), [FN147] and also dismissed a proxy claim under 14a-9. [FN148] In construing the Gartenberg factors, the court in Krinsk made a number of significant rulings. First, the court held that plaintiffs would not be permitted to prove that the fund's performance, lauded by the advisor as being "at or near the top of money market funds," [FN149] was actually inferior when analyzed on a "risk-adjusted" basis taking into account the portfolio's volatility. [FN150] Seizing on the fact that the SEC did not require risk-adjusted performance ratings, the court rejected the "concept of 'risk-adjusted' return as a standard of fund performance measurement." [FN151]

On the crucial issue of the advisor's profitability, the court in Krinsk received three expert reports presenting widely varying findings. Plaintiffs' expert testified that in 1984, the CMA generated pre-tax profits for Merrill Lynch of $47.5 million and a pre-tax return on revenues of 28.5%. [FN152] Merrill Lynch's chief expert reported a loss of $77 million and a negative profitability percentage of 55.8. [FN153] The court understated the issue when it *647 held that "it is safe to say that fee based profits fall somewhere in the range between the [two] positions." [FN154] After disparaging both sides' presentation on profitability, the court concluded that a weighted average of pre-tax profitability over the three-year test period "would probably fall in a range from at least a few percentage points greater than 0% to perhaps as much as 33%." [FN155] It is not a credit to either side's lawyering that the court was left to guess at what the advisory fee netted the fund's advisor. [FN156] Moreover, given the court's obvious uncertainty about the advisory contract's profitability, it is difficult to conclude that the fund's directors were better educated, and this is bothersome. For the defense to win a case alleging a breach of fiduciary duty rooted in an unfair compensation charge, one would expect the court and the fund's directors to demonstrate a clear understanding of the advisory contract's profitability to the advisor.

Plaintiffs' fundamental problem in Krinsk thus mirrored the problems encountered in Gartenburg and Kalish: a lack of solid proof. [FN157] As in Gartenburg and Kalish, the court in Krinsk evaluated comparable expense ratios in a way that was highly favorable to the defense. [FN158] The court found that expense ratios for stand-alone money market funds were less relevant than for other brokerage money management accounts, and, citing Gartenberg, that comparison with even those funds was of "limited value due to the lack of competition among advisors for fund business." [FN159] The court found that the CMA Fund expense ratio placed it in the "middle range" among similar funds. [FN160]

The court in Krinsk found totally irrelevant the fact that, over and above its charging a level of costs placing it in the middle of its peer group, fund advisor Merrill Lynch pocketed an additional $65 million from a $65 annual fee it assessed against each of its one million CMA investors. [FN161] The "irrelevant" annual fee paid by the fund's *648

shareholders alone generated enormous revenue for Merrill Lynch, exceeding the total amount of the fund's advisory fee. [FN162] The court's justification for ignoring the $65 million item was that the fee was mandatory for all Merrill Lynch CMA shareholders having cash management accounts, whether they used the CMA fund or not. It viewed the payment as "a reasonable means by which to seek to hedge against the entrepreneurial risk incurred in setting up and maintaining the CMA." [FN163] There is another way to characterize the annual fee: cash cow. [FN164]

   Schuyt presents a case study of fund directors' fee-setting behavior. The fund in question had experienced ten-fold growth over three years. [FN165] The advisor's pre-tax profit margin had escalated from 57% for the first nine months of 1979, [FN166] to 59.1% for the entire year, [FN167] to 66.8% for 1980, [FN168] and to 77.3% for 1981. [FN169] The court in Schuyt approved the directors' behavior based on the Gartenberg factors, [FN170] faulting plaintiff's experts for failing to address them in detail. [FN171] In the course of its favorable appraisal of **649 the directors' behavior, the court approved of this formulation of directors' duties by the lawyer who served as independent counsel to the fund's independent directors: "The basic test is whether the directors can satisfy themselves that the information that is available provides a reasonable basis for judgment that the benefits of the economies of scale are, in fact, shared by the advisor with the Fund . . . ." [FN172]

   Though the court recognized that other funds' fee schedules were relevant, indeed, "significant to economies of scale," [FN173] it rejected the attempts of the plaintiff's experts to show excessiveness by comparing the advisory fee to the fees they charged "to its private counsel accounts and fees charged by others for performing different types of services," [FN174] faulting the expert for failing to correlate the nature of the services provided in the different settings. [FN175]

   While Schuyt can be read to leave the door open to proof of excessiveness built in part on evidence of fees charged by the advisor in other venues, the court also emphatically rejected use of fee rates used by banks and trust companies in rendering advisory services outside the fund industry, finding such services "unrelated to the advisory services at issue in this case" and ineligible for consideration under Gartenberg. [FN176] The court in Schuyt dismissed the idea that advisory fees charged outside the fund industry could furnish helpful guidance, contending, as did the appellate court in Gartenberg, that managers in other venues are not required to cope with processing numerous purchases and redemptions each day. [FN177] This is a very questionable distinction, at least when the issue is the advisory fee level. It is true, of course, that daily shareholder redemptions add costs to mutual fund administration, and the redemption feature distinguishes mutual funds from other professionally managed investment portfolios, such as pension and endowment funds. On the other hand, the costs associated with the characteristics that make mutual funds unique (such as the need for daily pricing of portfolio securities) tend to be nominal, [FN178] and in any event, get realized as administrative expenses.

   **650 For equity mutual funds, share redemption results in few, if any, added portfolio management costs. Fees paid by the Vanguard group to the outside portfolio managers it hires are rock bottom and comparable to equity pension fund management costs. The asset pools managed by those advisors are, as with the case of all funds, subject to fluctuation as new sales arise and shareholders redeem. In truth, portfolio management costs are subject to substantial economies of scale, as the authors' empirical research shows. [FN179]

   Included in the plaintiff's allegations in Schuyt was the charge that the fund's shareholders had been misled, in violation of Rule 14a-9 under the Securities Exchange Act of 1934, due to a failure to disclose to them in a proxy solicitation information concerning the profitability of the advisory contract to the advisor. [FN180] The court held that, from the standpoint of the fund's shareholders, information disclosing the advisory contract's profitability to the advisor was immaterial as a matter of law. [FN181] The court found "that the omitted profitability information is neither accurate nor significant enough to influence the vote of investors . . . ." [FN182]

   Obvious problems exist with the court's 14a-9 ruling. First, the court applied an improper test. In a 14a-9 case, the materiality test is not whether the omitted fact would cause an investor to change his or her vote; the voting decision need not be altered. [FN183] All that is necessary is that there be a substantial likelihood that a reasonable investor would consider the fact important. [FN184] Adding to the seriousness of the court's analytical error was its willingness to shrug off the need for disclosure on the ground that the profitability information that would have been disseminated about the advisory contract was inaccurate. The court thus turned a blind eye to the fact that the advisor and the fund directors were using and relying on inaccurate profitability data, a circumstance that a

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 18 of 60

26 JCORPL 609                                                                                    Page 17
(Cite as: 26 J. Corp. L. 609)

reasonable shareholder surely could have viewed as material, particularly in light of the court's finding that the advisor's pre-tax profit margin was an astronomical 77%. Without detailed discussion, the Second Circuit affirmed the lower court's ruling in Schuyt two days after it was argued, "substantially for the reasons stated in Judge Ward's thorough opinion . . . ." [FN185]

**\*651 3. Problems With the Gartenberg Test As Applied**

Gartenberg's reasonableness test is unexceptionable in theory; in practice, it is a failure. The reasonableness test's starting point is fair; it is a demand that fees be equivalent to those resulting from "arm's-length bargaining." The next part of the test demands that among the factors that "are to be considered" are "comparative fee structures." [FN186] So far, so good. What happens next is not good; Gartenberg's pro-investor logic becomes perverted. Post-Gartenberg courts have improperly denied the relevance of advisory fee structures actually set by arm's-length bargaining (as in the pension fund advisory fee analogy). Low-cost fee structures charged by other funds (like Vanguard's) are likewise found essentially irrelevant, if for no other reason than the fact that, because fund advisors refuse to compete against each other for advisory business, lower prices are not available to the fund. Misapplication of the Gartenberg criteria has led to a tilted playing field. The absence of a competitive market has not become a reason for enhanced scrutiny, but a justification for fitting the judiciary with blinders.

Problems prevail with the judiciary's refusal to consider and learn from free market pricing patterns. The Kalish court's refusal to credit the Vanguard analogy is absurd. Vanguard competes directly with all other funds for investors' money. Its pricing structure is relevant precisely because its low cost orientation provides a yardstick for measuring the reasonableness of other funds' fee structures. [FN187] To say that Vanguard's fee schedules are irrelevant just because the Vanguard managers, like most other corporate managers in the economy, operate with an eye single to their shareholders' interests, only calls attention to the peculiarity of the fund industry's default management structure. Likewise, it is foolish to say that fee levels charged by pension funds' external advisors have no relevance to mutual fund advisory services. If, as Gartenberg insists, free market pricing (or "arm's-length bargaining") is relevant to the examination of fees under section 36(b), then all pertinent evidence should be marshaled and scrutinized. This includes prices set in the free market for the same commodity, whether by Vanguard funds, pension funds, endowment funds, or other institutional investors. Again, it is improper to read Gartenberg as barring such evidence, for the court in that case held the pension fund advisory fee data was irrelevant to the claim only because the fund in question was a money market fund; had it been a bond or equity fund, the court almost certainly would have allowed the comparison.

Moreover, analogies to establish fairness by fiduciaries can play a major role in addressing misconduct in the securities field. For example, experts testifying in individual brokerage account churning cases today are free to support their opinions with turnover rate data drawn from mutual fund prospectuses. [FN188] Another securities area where argument by analogy has been accepted relates to excessive markups. In Grandon v. Merrill Lynch & Co., [FN189] the Second Circuit had no difficulty analogizing to markup **\*652** limits on equity securities en route to holding that plaintiffs had stated a cause of action based on allegedly excessive, undisclosed markups for municipal securities. There is another reason why Grandon is pertinent here. In Grandon, the court dealt with a material nondisclosure issue and held that investors are entitled to be informed when the prices charged them are not reasonably related to prices charged in "an open and competitive market." [FN190] The authors do not understand why fund shareholders deserve a lower caliber of disclosure than investors trading municipal securities. Advisors who milk fund shareholders by charging them prices for advisory services well beyond those charged other institutions, such as pension funds, risk liability if the duty of full disclosure that Grandon espouses for bond market pricing gets transplanted and takes root in fund advisory fee litigation. [FN191]

**4. The Missing Ingredient: Admissible, Compelling Data**

Plaintiffs' inability to discharge their burden of proof in fully litigated fund advisory fee cases highlights a grave problem confronting plaintiffs in every suit under section 36(b) charging unreasonable fee levels: a lack of accurate supporting data. When legislation to address perceived problems with fund fee levels was considered by Congress in 1967, Professor Ernest Folk testified that saddling plaintiffs with the burden of showing that fees were excessive "unduly favors management," [FN192] since fund shareholders do not have access to crucial data relating to the

quality of the services provided, economies of scale, or the value of all benefits received by the advisor through its control position. [FN193] Congress refused, however, to shift the burden of proving fairness from the shareholder to the advisor as Professor Folk advocated. [FN194] This lack of data sealed the fate of the plaintiffs in Gartenberg, Schuyt, Kalish, and Krinsk. [FN195]

   The absence of quality data still presents problems for those willing to question the status quo. Most recently, the GAO's detailed study was "unable to determine the extent to which mutual fund advisors experienced . . . economies of scale because information on the costs and profitability of most fund advisors was not generally publicly available." [FN196] When a federal agency, conducting an investigation at the urging of a **\*653** congressional committee, comes up empty-handed in its search for facts, it is obvious that there is a data shortage. This shortage works in favor of fund sponsors and against the interest of fund shareholders.

   In truth, fund managers are blessed with a doubly favored litigation posture in fee cases: they do not have the burden of justifying their behavior and, at least prior to litigation, their adversaries are not privy to the crucial data needed to show abusive behavior. Gartenberg, as misinterpreted by subsequent courts, has unfairly hindered attacks on excessive fund fees. It is no wonder that recent fund litigation reflects a shift in focus away from excessive compensation claims. [FN197]

   From the standpoint of fund shareholders, about the best that can be said of the Gartenberg line of cases is that they are confined to their facts. Three of the four cases--Gartenberg, Krinsk, and Schuyt--concerned money market fund advisory fees [FN198] and thus are easily distinguishable in an equity fund advisory fee case. Kalish dealt with a bond fund. To the extent that price competition or sensitivity to operating cost levels exists in the fund industry, it is most evident in the money market and bond fund segments. [FN199] None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower. Whether a future court will accept such an analogy may depend on the care taken by the plaintiff's expert to develop, explain, and defend his or her reasoning.

**\*654** G. Critiquing the Industry's Defense of the Status Quo

1. The Industry's Position: Rampant Competition

   In his testimony before Congress in September 1999, ICI President Matthew Fink used some form of the word "compete" more than twenty-five times. His central theme was that the fund industry is the embodiment of competitive perfection: "[b]ecause of the sheer number of competitors, stringent government regulation, clear disclosure, low barriers to entry, and high scrutiny by the media, the mutual fund marketplace is a near textbook example of a competitive market structure." [FN200]

   Insofar as he was referring to price competition, Mr. Fink's quoted claim is right in only two respects, both insignificant. It is true that, in a sense, the fund industry features low barriers to entry (a fund's initial capital may be as low as $100,000), [FN201] and there are a large number of funds available in the marketplace, at present more than 10,000. [FN202] **\*655** However, in the specialized context of price competition, in all other respects, Mr. Fink's claim is substantially untrue.

2. Price Competition is Largely Nonexistent in the Fund Industry

   The General Accounting Office Study examined price competition in the fund industry and concluded that "competition in the mutual fund industry is not generally price-based." [FN203] SEC regulation can be detailed and complex, but it has not generated any semblance of intra-industry competition on the part of equity fund advisors. [FN204] Stated differently, fund managers compete aggressively for new sales, but principally in ways designed to shelter high fee levels from price-cutting pressures. This state of affairs is nothing new. Fund advisors' refusal to compete with each other for advisory business has been the norm for decades. [FN205]

   **\*656** There is no proof that fee ranges within the fund industry, where arm's-length dealing is lacking, tend to be

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 20 of 60

26 JCORPL 609                                                                     Page 19
**(Cite as: 26 J. Corp. L. 609)**

within hailing distance of the fee rates that the same advisory firms charge elsewhere when selling investment advisory services in the free market. In fact, the evidence shows the opposite. [FN206] Because, as Gartenberg and its progeny affirm, funds truly are prisoners; their captor-advisors have little incentive to invade other advisors' turfs, thereby inviting retaliatory price-cutting.

### 3. Government Regulation is Not "Stringent" When It Comes to Advisory Fee Levels

The SEC has a role to play in helping to drive competitive forces to bring fund advisory fees down, but so far it has been missing in action. The Commission could take an amicus position in advisory fee litigation, endorsing the relevance of comparative cost data, but it has not done so. [FN207] Nor has it demanded that advisors identify, quantify, and justify price disparities between the prices they charge the funds they manage versus advisory fees paid by other customers. [FN208] Nor has it demanded that fund sponsors explain publicly, and in detail, how they profit from their services on both fund-by- fund and complex-wide bases. [FN209] It has not even offered a specific reporting requirement demanding that funds report separately what they pay for advisory service, the better to foster comparative fee analyses by fund directors, shareholders, and industry observers. [FN210] The SEC's torpor in demanding detailed, specific accounting of fee charges is curious given the agency's professed interest in fostering a more competitive environment. Comparable data is crucial if that is to happen, something that both the **\*657** Wharton Report prepared for the SEC, and the Public Policy Report, written by the SEC, recognized when they focused on comparative fee structures. Those studies highlighted the disparity between advisory fee rates in the fund industry and elsewhere in the economy. [FN211]

The comparative cost disparities are large, and they have been deemed worthy of note by the SEC and the Wharton report authors, not to mention the experts who testify in fund fee litigation. This leads one to wonder why the SEC has not pressed for focus on fee rate differences via rule-making (not to mention the bully pulpit available to the SEC's leadership). Rather than aggressively pushing the fund industry in a direction calculated to force boards to confront noncompetitive fee levels, the SEC has been content to engage in rulemaking enshrining the status quo. Thus, a recently promulgated SEC rule, adopted after its well-publicized "roundtable" deliberation of current fund issues, mandates what is already a de facto standard by requiring nearly all fund boards and nominating committees to have a majority of independent directors. [FN212] As part of the same proposal, the SEC is requiring the independent directors to be represented by independent counsel. [FN213]

The rule will accomplish little. The board majority requirement is nothing but a warmed-over rehash of an SEC Investment Management Division proposal advanced eight years ago. [FN214] Worse, it is beside the point. Today, many, if not most, funds have a majority of directors who are supposed to be independent of the external advisor to keep fees and expenses in line. [FN215] In many cases, truly independent directors already **\*658** populate funds' nominating committees. [FN216] All of the many funds with Rule 12b-1 plans already are required to have self-nominating independent directors. [FN217] The independent legal counsel requirement consists mainly of high-sounding rhetoric. It calls on the independent directors to assure themselves that a lawyer they hire has no ties to fund service providers that would be likely "to adversely affect the [lawyer's] professional judgment . . . in providing legal representation." [FN218] This requirement does not signal a breakthrough in the field of attorney-client relations--far from it. The rule changes nothing. Any lawyer whose exercise of professional judgment on behalf of fund directors would likely be adversely affected by ties to another client would have a disabling conflict of interest under well-understood legal ethics rules. [FN219]

Illustrating the deferential, laissez-faire approach taken in the SEC's management reform package is the fact that the fund industry itself has proposed a set of "best practices" for fund directors that go well beyond the SEC's new requirements. [FN220] And **\*659** even the industry's "best practices" proposals have been attacked as simply calling for conduct that, for the most part, already is the industry norm. [FN221]

What is most significant about the SEC's latest rulemaking effort is what it does not attempt to accomplish. The SEC failed to demand that funds separately and specifically identify what the advisor charges for the most crucial of all fund services: investment advice. Nor has the SEC shown any interest in calling specifically for fund independent directors to inquire whether fund managers or their affiliates [FN222] sell advisory services to others and, if so, on what terms.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

One of the fund directors' most important jobs is to see that the bills submitted for services furnished to fund shareholders are accurate and reflect fair pricing. For fund directors to properly exercise their oversight function, they need to know the prices comparable advisory services fetch in a free market and need to consider those prices in deciding the fairness of bills presented by the fund's advisor for equivalent services. Indeed, the Gartenberg test explicitly requires this comparison. [FN223] In a glaring oversight, the SEC has not specifically called for fund directors to make such a comparative analysis. However, in light of Gartenberg, they surely should. [FN224] By failing to require uniform reporting of crucial cost data and by refusing to demand that fund advisors make public sufficient financial data to enable interested observers to calculate the profitability of advisory contracts, the SEC has paved the way for judicial findings, as in Schuyt, that *660 profitability information is immaterial as a matter of law. Fund directors unquestionably need and deserve detailed cost and profitability disclosure, [FN225] and so does the public. The SEC's failure explicitly to demand that they receive it is at odds with the Commission's professed concern over the fund industry's uniquely conflicted fiduciary duty landscape; the agency's inaction also runs counter to its endorsement of disclosure as a means of enhancing competition. [FN226] The absence of comparative cost and profitability data makes it virtually impossible for shareholders bringing section 36(b) suits to sustain the burden of proving that fees are excessive. [FN227]

Requiring public disclosure of such proprietary data can be justified on the ground that the industry's incestuous management structure deprives fund shareholders of the protection that a competitive market offers. Fund managers' resort to external management should carry with it the requirement that the service providers live with less privacy than is afforded those who earn their money through arm's-length transactions. The SEC's continued willingness to permit fund managers to conceal crucial advisory fee information and profitability data leaves investors, the news media, and inquiring agencies such as the GAO stymied. For their part, the courts have shown no interest in demanding disclosure that would further comparison shopping by investors. [FN228] A free market price offers more than a useful analogy. Outside prices qualify as "pertinent facts" under Gartenberg's mandate that when the fund's board makes its fair price determination, "all pertinent facts must be weighed." [FN229] Moreover, assuming approximately equal levels of service, significant price discrepancies are not just "pertinent facts," they are "material facts" under the securities laws and fiduciary duty concepts [FN230] that need to be very carefully evaluated by the fund's directors. After all, any *661 reduction in advisory fees directly enhances fund shareholders' returns. [FN231] Fund shareholders should no more overpay for advisory services than for the securities that are purchased and held in their funds' portfolios.

If fund shareholders are to see the advent of competitive pressure on advisory fees, the SEC needs to demand expressly that fund directors accumulate and weigh comparative prices used by the fund's advisor (or its affiliates) to bill for advisory services. Gartenberg calls for such study, for it is read to demand that the "profitability of the fund to the advisor" [FN232] be studied in order that the price for advice paid by the fund to its advisory be equivalent to "the product of arm's-length bargaining." [FN233] The Commission should require such scrutiny by fund directors, but it should also go further. It should use its rule-making authority to declare that a presumption exists that fund shareholders deserve "most favored nations" treatment over advisory fees charged by their advisors. The "most favored nations" concept is both simple and powerful. Fund shareholders should pay a price for investment advice that is no higher than that charged by the fund's advisor and its affiliated entities when billing for like services rendered to other customers, such as pension funds, endowment funds, "private counsel accounts," or other advisory service users.

Financial advisors are not philanthropists. The prices they charge funds and other consumers of advisory services necessarily have an embedded profit element. An understanding by fund independent directors of the prices charged for advisory services  by their fund's advisor to its other customers cannot help but strengthen the independent directors' bargaining position. But there is more to comparison shopping than price. Differences in services rendered, to the extent they exist, need to be identified and quantified in dollars and cents terms by the fund's advisor for the independent directors' benefit. The data will furnish fund independent directors and their counsel with a way to verify the profitability claims supplied by the advisor.

In sum, the SEC's latest rulemaking effort is long on form and noticeably short on substance calculated to improve the lot of fund shareholders. In the unique context of the contemporary mutual fund industry, the SEC's time would be better spent writing rules spelling out what is meant by the term "investment advisory fee," and requiring that it be reported throughout the fund industry on a consistent basis, than preaching to fund directors about the meaning

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of, and need for, "independent legal counsel." [FN234] It is time **\*662** for the SEC to start discharging the leadership obligation Congress gave it when the Investment Company Act of 1940 was enacted. Obviously, little support exists for the ICI's claim that "stringent government regulation" is a major force driving the industry's competitive engine. As is discussed in the next section, the SEC has the ability to wield its regulatory power to spur price competition by improving the quality of fund fee disclosure.

### 4. The Fund Industry Lacks, Above All, "Clear Disclosure"

When defending the fund industry, the ICI's Matthew Fink presented "clear disclosure" as a hallmark of the fund industry's "near textbook example of a competitive market structure." [FN235] The "clear disclosure" claim does not hold up. The GAO went looking for such "clear disclosure" and manifestly did not find it. [FN236] The GAO is not alone in voicing concern over the quality of fund industry disclosure. The Chairman of a House committee considering fund legislation in 1995 offered this appraisal: "[m]utual fund shareholders are beset by a confusing array of fees. Investment advisory fees, service fees, distribution fees, all of these fees can make it very difficult for investors to compare one fund against another." [FN237] A fund shareholder who today seeks "clear disclosure" about the advisor's bill for portfolio management, its advisor's profitability, or its demonstrated willingness to perform comparable services for significantly lower prices will not find this information available for inspection at the SEC, at any other government agency, or at fund headquarters. No such disclosures are required in fund prospectuses, though they should be.

A 1995 study commissioned by the SEC and the Office of the Comptroller of the Currency found that fund prospectuses were the single most widely used information resource consulted by investors. [FN238] Unfortunately, those same widely used fund prospectuses have been criticized for tending to "obscure rather than illuminate what a fund is doing." [FN239] In truth, a great many fund shareholders are ignorant of major insights into the product they own, and key facts are not disclosed. [FN240]

**\*663** The news media has not provided a notable counterbalance to the conflict of interest exploited by most fund advisors. Despite a number of articles in the news media illuminating some of the fund industry's shortcomings prejudicial to shareholders, [FN241] for the most part, the industry has escaped careful, searching, sophisticated scrutiny of its pricing practices by journalists, as well as the SEC and the GAO. Perhaps news analysts are daunted by the density and complexity of fund financial disclosures. If so, they are not alone.

The SEC shows no signs of facing up to the fact that the industry it regulates features confusing, incomplete, and inadequate fee disclosure. Instead, like the ICI, the SEC professes that the opposite is true. The Division of Investment Management's recently-promulgated Report on Mutual Fund Fees and Expenses offers this self-congratulatory assessment: "Through the Commission's disclosure efforts, mutual fund fee information is readily available to investors in an understandable, easy-to-use format in the new mutual fund prospectuses." [FN242] A disinterested observer is left to wonder how fee information can be understandable and easy to use when some funds mix **\*664** administrative and advisory fees together, making it nearly impossible to break out advisory fees for comparison purposes. One may also wonder how fund directors can compare fee levels without knowing exactly what services the payments are buying.

Evidencing the lack of clarity in fund industry cost disclosures is an easily overlooked finding by the court in Krinsk: the fund's independent directors themselves were unable to explain what was covered by the separate advisory and administrative fees they approved. One of them testified that the administrative fees and advisory fees offset the costs of the program as a whole and "if you can tell me exactly what is paying for what, you're a better man than I." [FN243] Another explained that looking at a component of the overall CMA fee structure "as though it were a stand-alone piece, was trying to unscramble an omelet." [FN244] These comments are telling. They come from paid directors, presumably represented by competent counsel, and were delivered as testimony made under oath in multi-million dollar fund fee litigation. The specter of testifying fund directors confessing ignorance about fees they have approved confirms that "clear disclosure" in the fund industry simply is a laudable goal, not a reality.

The SEC staff claims in its fees and expenses report that its regulatory scheme generates for fund shareholders "mutual fund fee information in an understandable, easy-to-use format." [FN245] This portrayal of the 1940 Act disclosure scheme as a consumer protection paradigm collides with the staff report's later admission that it was

unable to "analyze directly the cost of providing portfolio management services to a mutual fund in order to determine whether economies exist (because the data are unavailable)." [FN246] If the federal government, after 60 years of regulatory experience, is unable to determine directly whether economies exist in the provision of portfolio management services, how can fund shareholders or directors have any confidence in their own calculations?

  The Gartenberg reasonableness factors demand that fund directors bargain effectively with service providers at arm's-length over "the nature and quality of the services" provided. [FN247] The test further requires that fund directors make determinations as to "economies of scale" and "comparative fee structures." [FN248] The SEC has failed to require that clear, useful data be generated on an industry-wide basis to assist fund directors in making the crucial comparisons. A fund director, as in Krinsk, who is clueless about what different fund services cost his or her fund, or comparable funds, obviously cannot bargain effectively on behalf of the fund. Given the broad array of services purchased with fund assets, [FN249] and the fact that different fees pay different *665 services depending on the fund's fee structure, [FN250] it is no wonder that there is confusion over fund fees in fund boardrooms. The question is how fund directors possibly can serve their watchdog function if they are not presented with clear, understandable, pertinent information. If fund directors are unable to comprehend or explain fund fees, it stands to reason that investors, too, lack high quality disclosure about fund expenses.

  In truth, one of the chief causes of the fund industry's perceived lack of price competition is investor ignorance. A joint study of fund shareholders conducted several years ago by the Office of the Comptroller of the Currency and the SEC determined that fewer than one in five of the respondents could give an estimate of expenses for the largest fund they held. [FN251] Nearly one-fifth of the respondents believed that funds with higher fees produced better results; more than three-fifths believed funds with higher expenses produced average results; and fewer than one in six believed higher expenses led to lower than average returns. [FN252] This depiction of investor naivete is consistent with other survey results. [FN253] Sixty years of SEC fund industry regulation has created a $7 trillion colossus of an industry with expense structures and terminology overlaps that bewilder many shareholders and at least some fund directors. The SEC's web site carries the motto: "We are the investor's advocate." [FN254] It is thus peculiar to find that, after six decades of close dealings between the fund industry and the SEC, [FN255] fund shareholders are confronted with a disclosure system that, according to a memorandum from the SEC's Division of Investment Management to the SEC's Chairman, causes investors to *666 have "difficulty in evaluating overall costs and services." [FN256] This lack of market transparency necessarily inhibits price competition. [FN257]

  The SEC talks a good game, but it is not blameless for the fund industry's lack of pricing transparency. Recently, upon the SEC's consideration of Regulation FD, SEC Chairman Levitt observed: "High quality and timely information is the lifeblood of strong, vibrant markets. It is at the very core of investor confidence." [FN258] The market for fund advisory services is neither strong nor vibrant, if, indeed, it can be said to exist at all. As for fund shareholders, Chairman Levitt has admonished that "[i]nvestors need to scrutinize a fund's fees and expenses." [FN259] Scrutinizing, however, is difficult when individualized data is missing and when fund shareholders lack access to information about the profitability of their fund's advisory fee to the advisor.

  The SEC's response to the GAO Report's criticism of disclosure practices in the fund industry was decidedly cool and defensive. [FN260] Though it holds the whip hand over the funds it regulates, the SEC's tendency is to cast blame on investors when speaking about cost data problems affecting the fund industry. The SEC's chief economist has announced: "[i]t appears that shareholders don't have a clue as to how important expenses are." [FN261] According to the Division of Investment Management's Director: "We know the information is out there. We need to get investors to look at it." [FN262] The SEC *667 Investment Management Division's director has admitted that an investor "may do more comparison shopping for her VCR than for her mutual funds." [FN263]

  Turning to the lack of price competition within the fund industry, the same official proceeded to explain that funds themselves choose not to compete on the basis of price comparisons because of "fear of liability." [FN264] These representations by workers for the SEC, "the investor's advocate," raise several questions. First, if the "information is out there," why could not the GAO find it? And the GAO is not the only government agency to come up empty-handed when searching for cost data. The SEC staff itself was unable to determine directly whether there are economies of scale in the provision of fund advisory services "because the data are unavailable." [FN265]

  The SEC's chronic refusal to mandate that fund sponsors break out clearly, on a uniform basis, different types of expenses, abets the lack of price competition in the fund industry. The same is true of courts' refusal to validate

comparative cost disclosure in suits challenging excessive advisory fees. The GAO study found that advisory fee profitability data is nowhere to be seen by investors or even government investigators. [FN266] In truth, as the GAO Report on price competition in the fund industry shows, mutual funds generally do not choose to compete directly and aggressively on the basis of price. A recent letter from the SEC's Chief Economist to an industry executive responded this way to the executive's call for a detailed SEC-led "revenue/cost/profit study" of fund-sponsored finances by stating: "I know I'd be interested, but I don't think the industry would oblige us." [FN267] This sort of outlook coming from the SEC's top echelon, raises the question: Who is in charge of whom? If the SEC cannot wrest important data from fund advisors, who can? Those who control the fund industry eschew price competition for two main reasons. First, by not competing based on price, fund advisory firms can earn higher profits. Second, those in control know they can get away with it.

## *668 V. Proposals for Change

   Six decades after the enactment of the Investment Company Act of 1940, the fund industry finds itself with no effective check on managerial over-reaching; the SEC and the courts have let the advisors get away with charging extra-competitive prices. Contributing to the lack of competition over fund advisory fees is a shortage of quality disclosures crafted to enable investors to ferret out unfair pricing. Two reform proposals have recently been put forth. Industry critic Bogle has branded cost disclosure within the industry as "wholly inadequate," while calling for:

   [e]ach fund manager to report, for the fund complex, and for each individual fund within the complex: (a) its advisory fees, service fees, distribution charges, sales commissions, other fund expenses, and total revenues; (b) its total expenses, separating out those for investment management and research from those for advertising, sales and marketing, administration and investor services, etc.; and (c) its profits, before and after taxes. [FN268]

   The GAO likewise judged disclosure deficient, calling for an individualized approach to disclosure in contrast with Bogle's broad coverage. The GAO recommended that funds, in essence, present investors each quarter with itemized statements showing not just account holdings and activities but also an itemized statement of the expenses paid by the shareholder over the period. [FN269] The GAO found the fund industry's failure to account to fund shareholders for the costs incurred in their accounts to be counter to the norm in the financial services industry. [FN270]

   The GAO's plan is aimed at driving home to individual shareholders the size of the bill each individual fund investor pays for fund services. The GAO's approach addresses a disclosure problem revealed by case law under section 36(b), namely, that investors seem to be indifferent to fee levels because of fee levels' seeming insignificance to individual investors. [FN271] The agency's narrow, individualized approach aims to accomplish two goals: to encourage investors to evaluate more accurately the quality of services for which they pay fees and to encourage service providers to emphasize price in *669 their sales efforts. [FN272] Two years ago, the Director of the SEC's Investment Management Division announced that both he and SEC Chairman Arthur Levitt believed that personalized disclosure for fund investors is a good idea, one that may work better. [FN273]

   In its Report on Mutual Fund Fees and Expenses, the SEC's Division of Investment management endorsed a form of dollar disclosure along the lines advocated by the GAO. The staff's plan would "require fund shareholder reports to include a table that shows the cost in dollars associated with an investment of a standardized amount (e.g., $10,000) that earned the fund's actual return for the period and incurred the fund's actual expenses for the period." [FN274] The staff's endorsement is a step in the right direction. It will be interesting now to see what action, if any, the Commission itself is willing to take in order to bring some form of the GAO's proposal to fruition.

   In contrast to the GAO's proposed individualization of cost data, Bogle's industry-wide, big-picture approach travels under a headline taken from Watergate-era advice: "[F]ollow the money." [FN275] This suggestion has merit. By forcing funds and sponsors to identify and itemize costs and profits according to an SEC-required format, the Bogle proposal would open the fund industry and its practices to a level of scrutiny and study never before possible. Bogle's door-opening approach will well serve the interests of sophisticated investors, with a foreseeable trickle-down effect to less sophisticated fund buyers once the data generated is reviewed and analyzed by the media and academics. The chief problem with it is that it does not go far enough.

   First, to facilitate comparative cost disclosures, the SEC needs to require financial reporting on a standardized basis

so that categories of expense are comparable on an industry-wide basis. Currently, some funds blend administrative costs into the advisory fee. This bundling frustrates cost comparisons and detailed analysis (most prominently by the SEC staff itself), and it needs to be stopped. Secondly, and more importantly, the time has come for fund advisors to come clean about their extracurricular dealings, specifically their advisory fee arrangements with non-fund clients. In the highly regulated, highly conflict-of-interest-ridden world of the fund industry, it is time to require the advisor-fiduciaries to detail in writing to the SEC and to fund directors what material extra-fund advisory services they render, what they charge, and what they earn off of those services. To the extent that the prices charged non-fund customers are lower than those charged to the advisor's captive funds, the fund's advisor-fiduciary should be required to explain why it cannot render advisory services to the captive funds for prices equivalent to the prices for which it sells its portfolio management services to pension funds and other clients in the free market. Why should costs be higher when paid by the beneficiary of a fiduciary relationship than they are when the payor is a stranger dealing at arm's-length?

The principle advocated here is simple. Fund shareholders have a right not to be over-charged. They have a right to fair treatment, and this translates into "most favored nations" pricing for comparable advisory services. The SEC owes it to fund investors to see that this highly relevant data is made public so that those interested in fund **\*670** fiduciaries' behavior can know and understand what fees are charged, of whom, and why. It is in the public interest for fund advisors' behavior to be explained and their justifications collected so that they may be carefully reviewed and analyzed by fund independent directors, government agencies, the media, and academics. Standardization will facilitate comparisons which will in turn spur price competition.

As it is, fund advisors are feasting on a complex, poorly disclosed fee structure that is out of kilter with free market price levels and has been for decades. There is a perception that some fund advisors supposedly cite their below-industry standard fee levels as a justification for fee hikes, with fees thus ratcheting upward leapfrog-style. [FN276] The ICI, funded with money diverted from fund shareholders, is the one entity aside from the SEC that is equipped to spotlight excessive fee levels that are injurious to shareholders. It has shown no zeal for promoting the interests of fund shareholders at the expense of fund sponsors. [FN277] Rather than call attention to the obvious evidence that economies of scale for advisory services are not being shared with fund shareholders, the ICI instead has published studies calculated to defend the status quo while masking reality. [FN278] The ICI's bundling of advisory fees with other operating costs in its effort to prove fund managers' case that fund shareholders are benefitting from economies of scale bespeaks an agenda antagonistic to shareholders' own financial interests. Meanwhile, the SEC either sits mute, offers innocuous proposals calculated not to roil the water, or blames fund shareholders for their inability to make sense out of the current, inadequate disclosure regime fostered by the SEC itself.

## *671 VI. Conclusion

The Investment Company Act of 1940 declares that "the national public interest and the interest of investors is adversely affected . . . when investment companies are organized, operated, or managed . . . in the interest of investment advisors" and not in the interest of fund shareholders. [FN279] In the course of the 1967 House hearings dealing with fund legislation, respected jurist Henry Friendly was asked: "Do you feel that the usual pattern of stockholder protection exists in this industry as in other industries?" [FN280] His answer: "I don't think it exists in this industry." [FN281] More ominous yet was Nobel Laureate Paul Samuelson's warning made in the course of Senate hearings also held in 1967:

[S]elf-regulation by an industry tends usually to be self-serving and often inefficient. There is a danger that government commissions, set up . . . originally to regulate an industry, will in fact end up as a tool of that industry, becoming more concerned to protect it from competition than to protect the customer from the absence of competition. . . . The SEC must itself be under constant Congressional scrutiny lest it lessen rather than increase the protection the consumer receives from vigorous competition. [FN282]

When it comes to fund advisors having their way, little has changed since 1967 or, for that matter, 1940. The first comprehensive study of the fund industry following enactment of the Investment Company Act, established that "the advisory fee rates . . . charged other clients [by mutual fund investment advisors] are significantly lower than those paid by open-end [mutual fund] companies." [FN283] Those conclusions, presented nearly forty years ago, are still accurate. The data presented in this Article shows that the phenomenon of materially unequal compensation still holds true. That this aberration exists in the most regulated of all corners of the securities business demonstrates

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 26 of 60

26 JCORPL 609                                                                                          Page 25
(Cite as: 26 J. Corp. L. 609)

powerfully the consequences of watered-down fiduciary standards, weak, misguided regulation, Congressional indifference, and either poor advocacy on the part of investors' lawyers or excessive judicial deference to fund managers' contentions.

  Courts that read Gartenberg to bar use of comparative fee structures in advisory fee litigation have deprived complaining shareholders of one of their strongest weapons. This misapplication of Gartenberg has likely contributed to an unsavory game of financial leap-frog, making it possible for fund advisors to point to fee schedules lagging behind their peer funds to justify fee hikes. On the other hand, Gartenberg's grip on future case outcomes predictably will be weakest for the segment of the fund industry studied most closely in this article: actively managed equity funds. Nearly all of the fully litigated cases have involved money market funds, which are a different breed of investment **672 vehicle than equity pension fund portfolios. [FN284] None of the fully litigated cases involves equity fund advisory fees, and it is here that "apples-to-apples" fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds. Future cases will afford fund advisors an opportunity to explain why picking a stock for a mutual fund equity portfolio should be much more expensive to the customer than picking the same stock for a pension fund equity portfolio.

  The gap between prices charged funds for advisory services versus prices fetched elsewhere in the economy for those same services represents the bill paid by fund shareholders for the advisory conflict of interest that is both the fund industry's hallmark and its stigma. That tab runs into billions of dollars per year. Fund industry cost data reviewed and developed by the authors suggest that equity fund management fees on the whole are around 25 basis points higher than they need to be in order to furnish fund advisors with fair and reasonable compensation and fund shareholders with the same quality of service. Against an equity fund asset base of $3.5 trillion, [FN285] this translates into equity mutual fund shareholders being overcharged to the tune of nearly $9 billion-plus annually--a staggering number--nearly reaching the price tag that the tobacco companies agreed to pay each year as part of their landmark "global settlement" with 46 states' attorneys general announced in November of 1998. [FN286]

  The SEC needs to face up to the fact that competent evidence shows that fund advisory fee levels are too high, a phenomenon in part caused by the Commission's decision not to impose rigorous disclosure requirements designed to foster fee comparisons. The SEC has clear power to require funds to adhere to a uniform accounting and reporting system, but it has not exercised its power in a way calculated to elicit the all-important fee data in a form readily understandable to the public. Its inaction has allowed fee categories and prices to become scrambled and thus distorted or concealed. [FN287] John Bogle's disclosure proposal is sound, needed, and should be required by SEC rule. That same rule-making effort should require that fund shareholders receive most favored nations treatment when it comes to fees for advisory services. Less urgent, but of some potential value, is adoption of the GAO's personalized cost disclosur **673 approach. It doubtless will provide a beneficial wake-up call to some fund investors, particularly in times of meager or negative investment returns by fund managers.

  SEC inaction has an undesirable side-effect over and above depriving investors of benefits they otherwise would enjoy. Whether it is accurately perceived or not, the SEC's inaction can be, and is taken as, an endorsement of the status quo. The agency's failure or refusal to act provides industry members with useful cover when they come under attack. In fund litigation, the SEC's silence on an issue gives credence to defense claims. Defendants can, and do, successfully argue that positions taken by those challenging the status quo in the fund industry deserve no credence absent violation of a mandatory SEC requirement. Thus, in Krinsk, the court rejected plaintiffs' contention that performance should be evaluated on a risk-adjusted basis because performance- adjusted ratings were not required by the SEC. In another mutual fund case, the court refused to find actionable a broker's concealment that the recommended house fund had a high expense ratio relative to competing funds, noting that plaintiffs had presented "no precedent or SEC ruling that requires this comparison." [FN288]

  Whether or not the SEC decides to lead rather than continue its observer role, fund independent directors need to demand that advisors identify and quantify what they charge for rendering investment advice. Only by isolating and focusing on this item can directors discharge their obligation under Gartenberg to reach sound conclusions on such important matters as advisor profitability, economies of scale, and comparative fee structures. The SEC Staff's Report on Mutual Fund Fees and Expenses declares that "the current regulatory framework would be enhanced by independent directors who more closely monitor fund fees and expense." [FN289] The staff has let fund directors down by not requiring that fund service providers furnish clear, comparable cost data. This shortcoming needs to be

addressed immediately.

   It is crucial that fund directors are able to gather information about comparable funds, and also about the fees charged by the fund's advisor for advisory services furnished to non-fund clients. Advisors must be made to explain at length and in detail how service differences rendered to their captive and free market customers justify price disparities of the sort pointed out in this article. Finally, the courts need to resist the temptation to limit evidence of comparable pricing behavior on fund cases. Fund industry cases are beset with conflicts of interest that call for careful, reasoned, thorough analysis. All potentially helpful facts need to be gathered and tested without unfounded preconceptions or biases. Comparable data, if assembled with care and explained clearly, is well-geared to showing, in appropriate cases, that fund fee levels are excessive, particularly where that data is drawn from marketplaces where arm's-length bargaining over fees is more than a pious wish.

[FNa1]. Campbell Professor of Legal and Business Ethics, University of South Carolina. B.B.A., 1967; J.D., 1970, University of Notre Dame; LL.M. 1976, University of Pennsylvania. Member, Ohio and South Carolina Bars.

[FNaa1]. Professor of Finance, Florida State University. B.S.B.A., 1970; M.B.A. 1971; Ph.D. 1974, University of Florida; CFA.

[FN1]. Between February 1972 and July 1974, Investment Company Institute- member (ICI) funds suffered net redemptions in twenty-six out of thirty months. Division of Investment Management, SEC, Mutual Fund Distribution and Section 22(d) of the Investment Company Act of 1940 19 (1974).

[FN2]. See id. at 10-11, 84-135. The SEC's Division of Investment Management Regulation conducted hearings into the state of mutual fund marketing. In its report on mutual fund distribution, the Division observed:
   The hearings confirmed that the mutual fund industry is faced with a disrupted marketing system. Record sales of earlier years have given way to net redemptions; competing products have made substantial inroads; fund managers have diversified into other fields; and the fund industry, which in many cases has operated at a distribution deficit, has allowed its relationship with small broker-dealers to deteriorate, while it has become increasingly dependent for sales upon large broker-dealers to whom mutual fund shares are a relatively unimportant source of income.
Id. at 9. The report further noted: "[T]he industry is not prospering with the marketing strategy which was so successful in past years. Hence, changes in the pattern of fund distribution seem inevitable...." Id. at 43.
   The SEC's analysis was on target. A major factor contributing to the industry's subsequent resurgence was the flood of money into the industry's money market funds as investors chased high yields during the mid-to-late 1970s and into the 1980s. See Lisa McCue, Is Deposit Insurance Necessary, Am. Banker, Apr. 15, 1982, at 14 (discussing the success of money market mutual funds). The 1974 SEC staff report observed that cash management funds were a "relatively new phenomenon," accounting "for a significant portion of industry sales and a growing portion of industry assets," and that, "[b]ut for the rapid growth of these funds, the industry as a whole would be in a net redemption position." Division of Investment Management, supra note 1, at 129 n.1. By 1979, the money market funds alone accounted for $45.2 billion in assets. Terry R. Glenn et al., Distribution in Mid-Decade: Coping with Success and Other Problems, in Investment Companies 1986, at 73, 77 (PLI Corp. Law Practice Course, Handbook Series No. B4-6746m 1986). By 1980, the figure was $76 billion, easily surpassing the $58 billion held in equity, bond, and income funds. William J. Baumol et al., The Economics of Mutual Fund Markets: Competition Versus Regulation 34 (1990).
   A second, huge change in fund distribution resulted from the SEC's 1980 promulgation of rule 12b-1, which enabled funds to pass on distribution costs directly to fund shareholders. 17 C.F.R. § 270.12b-1 (1999). Since rule 12b-1's adoption, over 7000 mutual funds have adopted rule 12b-1 plans. Joel H. Goldberg & Gregory N. Bressler, Revisiting Rule 12b-1 Under the Investment Company Act, 31 Sec. & Commodities Reg. Rev. 147 (1998). Rule 12b-1 fees provide a means by which pricing and distribution could be reordered through the imposition of conditional deferred sales loads. Though its rulemaking enabled this change, the SEC never saw the transformation coming. See Glenn et al., supra at 84. ("[T]he major result of Rule 12b-1, the development of the widespread appearance of contingent deferred sales charges beginning in 1981, was clearly unanticipated by the Commission when it adopted Rule 12b-1.").

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN3]. Baumol et al., supra note 2, at 19 n.1.

[FN4]. Id. at 17.

[FN5]. Weiss Ratings Now Available Online, Bus. Wire, Jan. 8, 2001, LEXIS, Curnws File (reporting risk-adjusted performance ratings for more than 10,000 mutual funds). The SEC staff has reported that stock and bond funds alone numbered more than 8900 at the end of 1999. Division of Investment Management, SEC, Report on Mutual Fund Fees and Expenses (Dec. 2000), at http:// www.sec.gov/studies/feestudy.htm [hereinafter Report on Mutual Fund Fees].

[FN6]. Investment Company Institute Reports Trends in Mutual Fund Investing: April 2000, PR Newswire, May 31, 2000, LEXIS, Curnws File. As of year-end 2000, gross assets remained around $7 trillion. Aaron Lucchetti, After Stock Funds' Poor Year, Time for the Damage Report, Wall St. J., Jan. 12, 2001, at C1.

[FN7]. A quarter century ago, additions to American families' net cash savings were $180 billion, with the fund industry claiming $1 billion of that amount. By 1998, net cash inflows into mutual funds amounted to $401 billion, accounting for nearly all of the $406 billion addition to American families' savings for the year. John C. Bogle, Economics 101 for Mutual Fund Investors... for Mutual Fund Managers, Speech Before the Economic Club of Arizona (Apr. 20, 1999), at http://www.vanguard.com/educ/lib/bogle/econ.html [hereinafter Bogle, Economics 101].

[FN8]. Merrill Lynch & Co., 10-K, 4 (1998) (reporting 1998 mutual fund sales of $55.5 billion, of which approximately $22.5 billion were funds advised by Merrill Lynch affiliates).

[FN9]. John C. Bogle, Investment Management: Business or Profession, Address at the New York University Center for Law and Business (Mar. 10, 1999), at http://www.vanguard.com/educ/lib/bogle/ investmanage.html; see also John Waggoner & Sandra Block, High Fund Performance at Low Cost, USA Today, Mar. 26, 1999, at 3B (quoting John Bogle). Bogle estimated that out of the total gross revenue for fund sponsors, less than 10%, "[m]aybe $5 billion" actually goes to paying for management of the funds. Id.

[FN10]. See, e.g., Tracey Longo, Days of Reckoning: Congress is Finally Starting to Look Into Why Mutual Fund Fees Keep Rising, Fin. Plan., Nov. 1, 1998, at 1 ("Several leading mutual fund analysts and critics are also making the case that not only do higher fees not mean better performance, often the opposite is true."); Robert Barker, High Fund Fees Have Got to Go, Bus. Wk., Aug. 16, 1999, at 122 ("Since 1984, Morningstar reports, the average cost of actively run no-load U.S. stock funds fell less than 10%, even as their assets multiplied 32 times. Vast economies of scale benefited mutual-fund companies, not investors."); Robert Barker, Fund Fees Are Rising. Who's to Blame?, Bus. Wk., Oct. 26, 1998, at 162 ("If expenses are too high, it's the independent directors who have failed."); Thomas Easton, The Fund Industry's Dirty Secret: Big is Not Beautiful, Forbes, Aug. 24, 1998, at 116, 117 ("The dirty secret of the business is that the more money you manage, the more profit you make--but the less able you are to serve your shareholders.... In most businesses size is an advantage. In mutual funds it is an advantage only to the sponsor, not to the customer."); Charles Gasparino, Some Say More Could be Done to Clarify Fees, Wall St. J., May 20, 1998, at C1 ("[I]s the industry rising to the challenge? Is it doing all it can to clearly and simply explain how much investors are paying in fees and expenses?"); Linda Stern, Watch Those Fees, Newsweek, Mar. 23, 1998, at 73 ("Today's financial marketplace is a bizarre bazaar: in the flourishing fund industry, the law of supply and demand sometimes works backward, and heightened competition can mean higher prices."); Steven T. Goldberg, Where Are Fund Directors When We Need Them?, Kiplinger's Pers. Fin. Mag., Apr. 1997, at 111 ("It isn't hard to find examples of fund directors who are tolerant of high fees, bad performance or both."); Jeffrey M. Laderman, Are Fund Managers Carving Themselves Too Fat a Slice?, Bus. Wk., Mar. 23, 1992, at 78 (discussing the fact that

26 JCORPL 609                                                                                                          Page 28
**(Cite as: 26 J. Corp. L. 609)**

mutual fund advisory "fees are not coming down as they are in the pension-fund business. 'Perhaps that's because pension-plan sponsors pay attention to fees,' notes Charles Trzcinka, a finance professor at the State University of New York at Buffalo."); Ruth Simon, How Funds Get Rich at Your Expense, Money, Feb. 1995, at 130 (explaining that fund shareholders "pay nearly twice as much as institutional investors for money management. And that calculation doesn't even include any front- or back-end sales charges you may also pony up."); Anne Kates Smith, Why Those Fund Fees Matter, U.S. News & World Rep., July 8, 1996, at 73 ("[I]magine customers cheerfully swallowing price hikes each year--even though competing products keep flooding the market. Sound ridiculous? That's how the mutual-fund business works."); Geoffrey Smith, Why Fund Fees Are So High, Bus. Wk., Nov. 30, 1998, at 126 (noting allegations that the amount of assets under management in the Fidelity fund complex jumped from $36 billion to $373 billion from 1985 to 1995 without economies of size being shared with investors; management fees were increased from 1.085% of assets under management to 1.146% of assets, yielding the management company an extra $288 million in revenue); Maggie Topkis, Getting Wise to Mutual Fund Fees, Fortune, Dec. 23, 1996, at 191 ("Put bluntly, in all but a few cases, fees are the keys to future returns."); Edward Wyatt, Empty Suits in the Boardroom, N.Y. Times, June 7, 1998, § 3, at 1 ("Rarely, if ever, since the current system of mutual fund oversight was laid out in the Investment Company Act of 1940 have fund directors been under fire on so many fronts at once."); Industry Doing a Poor Job of Explaining Charges, USA Today, July 8, 1998, at 14A (complaining that "fees are going up" and that they "have become so complicated you need a financial advisor just to wade through them").


[FN11]. See 17 C.F.R. § 270.12b-1 (1999) (setting forth rules by which a registered open-end management investment company may pay expenses associated with the sale of its shares).


[FN12]. See, e.g., Antonio Apap & John M. Griffith, The Impact of Expenses on Mutual Fund Performance, 11 J. Fin. Plan. 76 (1998) (stating that for funds with investment objectives of long-term growth, growth and current income, and equity income, 12b-1 fees do not add to funds' performance); Stephen P. Ferris & Don M. Chance, The Effect of 12b-1 Plans on Mutual Fund Expense Ratios: A Note, 42 J. Fin. 1077, 1082 (1987) (describing 12b-1 fees as "a dead-weight cost"); Robert W. McLeod & D.K. Malhotra, A Re-examination of the Effect of 12b-1 Plans on Mutual Fund Expense Ratios, J. Fin. Res. 231, 239 (1994) (stating that 12b-1 fees are "a dead weight cost" to shareholders that has been increasing over time). For criticism in fund industry literature see, Amy C. Arnott, The Rising Tide, Morningstar Mutual Funds, Oct. 11, 1996, at S1- S2; Michael Mulvihill, A Question of Trust, Morningstar Mutual Funds, Aug. 30, 1996, at 51-52.
  The General Accounting Office Report noted that academics have voiced the following concerns about fee levels in the fund industry: "whether competition, fund disclosures, and mutual fund directors are sufficiently affecting the level of fees," General Accounting Office, Mutual Fund Fees Additional Disclosure Could Encourage Price Competition 4 (2000) [ hereinafter "GAO Report" ]; "that the information currently provided does not sufficiently make investors aware of the level of fees they pay," id. at 7; "the directors' activities may be keeping fees at higher levels because of [a] focus on maintaining fees within the range of other funds," id. at 8; "some studies or analyses that looked at the trend in mutual fund fees found that fees had been rising," id. at 47; "funds do not compete primarily on the basis of their operating expense fees," id. at 62; "academic researchers [and others] saw problems with the fee disclosures [ [made by mutual funds]," GAO Report, supra, at 76.


[FN13]. See, e.g., Samuel S. King, Note, Mutual Funds: Solving the Shortcomings of the Independent Director Response to Advisory Self-dealing Through Use of the Undue Influence Standard, 98 Colum. L. Rev. 474 (1998) (discussing various approaches to dealing with conflicts of interests of mutual fund investment advisors).


[FN14]. See Wyatt, supra note 10, at 1 (discussing the SEC's examination of mutual fund governance). Most recently, in January 2001, the SEC amended various exemptive rules in an effort to "enhance director independence and effectiveness." Role of Independent Directors of Investment Companies, Investment Company Act Release No. 24816 (Jan. 2, 2001), 2001 WL 6738 (SEC). The SEC's action is discussed in notes 212-22 infra and accompanying text.


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN15]. GAO Report, supra note 12, at 62-65.


[FN16]. Division of Management Regulation, s upra note 1, at v.


[FN17]. See, e.g., Jonathan Clements, Hint: Managers Are Only as Smart As the Expenses They Charge, Wall. St. J., July 6, 1999, at R1 ("It's not a hard and fast rule, but the more a fund costs, the less you can expect from your investment."); Ruth Simon, Avoid Stock and Bond Funds With High Expenses, Buffalo News, Mar. 6, 1995, at 10 (according to studies conducted separately by the SEC and Princeton University, "investors lose roughly 2 percentage points in return for every one percentage point they pay in annual expenses").


[FN18]. "Most fund companies don't even attempt to point to strong performance as a rationale for higher fees," says Amy Arnott, an editor with Morningstar. "Rather, they typically justify increases in their management fees by pointing to the average for similar funds. This argument can only lead to an upward spiral in costs: As more funds raise their fees to bring them in line with the averages, the averages go up, more funds raise their fee and so on." Stern, supra note 10, at 73; see also Longo, supra note 10; John C. Bogle, Bogle on Mutual Funds 284 (1994) (observing that most proxies seeking shareholder approval of fee hikes "suggest that, after long consideration, the fund's directors have approved the fee increase requested by the management company, since the fund's rates were below industry norms"). If upward movement in others' fees provides a valid reason for advisory fee rate hikes, then fund revenues can be expected to boom, for fund expense ratios have been rising, at least for the most popular funds. Average annual expense ratios for the 10 best-selling funds are reportedly running at 0.93% of fund assets, up from 0.79% last year and 0.73% in 1998. See Christopher Oster, Fees? You Mean Mutual Funds Have Fees?, Wall. St. J., July 14, 2000, at A1. For its part, the ICI understandably takes a dim view of the notion that fund directors increase advisory fees to keep up with rates levied at other funds. See Letter from Matthew P. Fink, President, Investment Company Institute, to Thomas J. McCool, Director, Financial Institutions and Market Issues, U.S. General Accounting Office 2 (May 3, 2000), reprinted in GAO Report, supra note 12, at Appendix III (contending that the view that this goes on "is contradicted directly by the applicable legal standards governing the work of directors"). Of course, the fact that applicable legal standards ought to prevent such action does not mean it does not occur, it means only that if the behavior does go on it may well be illegal.


[FN19]. Division of Investment Management, s upra note 1, at v.


[FN20]. Many other services may also be offered, depending on the fund. Among them are free switching between funds in the same group or complex, automatic dividend reinvestment, telephone or check-writing withdrawal, and various retirement benefit plan options. For a basic introduction to fund operations, see Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law. 107 (1993).


[FN21]. Closed-end investment companies differ from mutual funds because their shares are not redeemable. Thus, closed-end shares are traded in the marketplace at prices that range from premiums with net asset value per share to discounts below net asset value. See id. at 112-13.


[FN22]. Indeed, a mutual fund's aggregate holdings of illiquid securities may not exceed 15% of the fund's assets. See Revisions and Guidelines to Form N-1, Investment Company Act Release No. 18,612, [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 84,930, at 82,479 (Mar. 12, 1992). Closed-end funds have no such liquidity requirement since their shares are not redeemable.


[FN23]. John C. Bogle, Honing the Competitive Edge in Mutual Funds, Address Before the Smithsonian Forum, Washington, D.C. 5 (Mar. 23, 1999) (on file with author). Stated differently, "Ordinary corporations do not need to go out and hire other corporations, with separate owners, to manage their affairs. Mutual funds do precisely that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

today ...." Bogle, supra note 18, at 300. As evidence of the cost drag on fund performance flowing from the industry's conflicted management structure, Bogle noted that of actively managed stock funds in existence for the preceding 15 years, only 1 in 24 outpaced the return of the Standard & Poor's 500 Index, John C. Bogle, Honing the Competitive Edge in Mutual Funds, Address Before the Smithsonian Forum, Washington, D.C. (Mar. 23, 1999), at 2 (on file with author). In 1998, bond funds returned to their investors only 86% of the total return offered by the bond market. Id. at 4. Money market funds earned only 89% of the money market's returns over the last 15 years. Id. at 5.

[FN24]. See Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 86,212, at n.10 (Oct. 14, 1999). In the words of one of the industry's earliest and most vociferous critics:

  Now, this is about the birds and the bees of the American corporate scene.... The fund is conceived by a bunch of people whom we call advisors or managers.... This group gives birth to the fund. The fund is manned by the advisors. If I may carry this figure of speech, the umbilical cord is never cut after birth, as would be true in ordinary biological life.

Statement of Abraham Pomerantz, University of Pennsylvania Law School Conference on Mutual Funds, 115 U. Pa. L. Rev. 659, 739 (1967). As former SEC Commissioner Manuel Cohen once remarked when referring to testimony by fund investment advisors:

  They also made the point that the investment advisor creates the fund, and operates it in effect as a business. Many of them stated that "It is our fund, we run it, we manage it, we control it," and I don't think there is anything wrong with them saying it. They were just admitting what is a fact of life. The investment advisor does control the fund.

Investment Company Act Amendments of 1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce, 90th Cong. 674 (1967) (statement of Manuel Cohen, Commissioner, SEC).

[FN25]. See, e.g., Bogle, supra note 18, at 327-28 (reporting an instance in which, following a successful effort to have fund shareholders raise the advisory fee because, among other things, its rates were about half of all fund advisors,' "below average," the advisor promptly sold itself for "a cool $1 billion"); Saul Hansell, J.P. Morgan Shifts Strategies to Buy a Stake in Fund Concern, N.Y. Times, July 31, 1997, at D1 (discussing J.P. Morgan's purchase of a 45% stake in a fund manager for $900 million). See also note 92 infra and accompanying text.

[FN26]. Baumol et al., supra note 2, at 22.

[FN27]. Board control over advisory fees is mandated by section 15(c) of the Investment Company Act of 1940. 15 U.S.C. § 80a-15(c) (1994).

[FN28]. Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 86,212, at 82,451 (Oct. 14, 1999), quoting from Division of Investment Management, SEC, Protecting Investors: A Half Century of Investment Company Regulation 251 (1992) [hereinafter 1992 Protecting Investors Report].

[FN29]. Investment Company Act of 1940 § 1(b)(2), 15 U.S.C. § 80a- 1(b)(2) (1994).

[FN30]. Burks v. Lasker, 441 U.S. 471, 484 (1979). Warren Buffett has compared independent fund director watchdogs to "Cocker Spaniels and not Dobermans." John C. Bogle, Common Sense on Mutual Funds: New Perspectives for the Intelligent Investor 368 (1999). For his part, industry critic Bogle offers a different word image: "Fund directors are, to a very major extent, sort of a bad joke." Geoffrey Smith, Why Fund Fees Are So High, Bus. Wk., Nov. 30, 1998, at 126. Bogle also observes: "Everybody knows... that people come on fund boards because they're friends of the CEO. So they go along with whatever he wants."  Tyler Mathisen, Bogle May Have Had a Transplant, But He Hasn't Had a Change of Heart, Money, Dec. 1996, at 15. A lawyer who brought numerous cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

against fund management companies once put it this way:

  I have had fourteen investment company cases and fourteen sets of depositions and/or cross examinations of the independent directors, and in not one single case did any unaffiliated director ever respond "Yes," to this type of question: When your fund grew from $100 million to $600 million, did you ever give any thought to making a comparison between your half of one percent and somebody else's fees?

  "No...."

  "Did you ever once suggest that when the fund got to be over a billion dollars... perhaps a reduction from one-half percent to seven-sixteenths of one percent, or any other minute fraction?"

  "Answer: No-and I mean the uniform answer."

  "[T]he realities are... that you can't count on the unaffiliated director [ [s]."

Statement of Abraham Pomerantz, supra note 24, at 753-54.


[FN31].  Kahn  v.  Lynch  Communications  Sys.,  Inc.,  638  A.2d 1110,  1119   (Del.  1994) (brackets in original) (emphasis added) (quoting In re First Boston, Inc. Shareholder Litig., C.A. 10338, 1990 WL 78836, at *15-*16 (Del. Ch. June 7, 1990)).


[FN32]. See, e.g., Werner Renberg, Sixth Men or Fifth Wheels: Do Fund Directors Earn Their Paychecks?, Barron's, Aug. 12, 1991, at M13 ("[Fund] directors have seldom booted an investment advisor, no matter how lousy a fund's performance.").


[FN33]. 694 F.2d 923 (2d Cir. 1982).


[FN34]. Id. at 929; see also Peter Tufano & Matthew Sevick, Board Structure and Fee Setting in the U.S. Mutual Fund Industry, 32 J. Fin. Econ. 321, 325 (1997) (citing only three instances in which a fund board replaced the fund manager against the manager's wishes and noting that the "board virtually never selects a sponsor other than the initial firm who established the fund and selected its initial board"). The dynamics of one fee negotiation were explained as follows:

  [I]n 1993, the directors of $87 million American Heritage asked shareholders to approve a pay package that would raise the annual management fee by two- thirds to 1.25% and authorize the fund (that is, the shareholders) to pick up an additional $40,000 in office rent previously paid by management. In the proxy statement sent to the shareholders, the directors explained that American Heritage Management Co., the fund's investment advisor, had threatened that without the increase it "could not assure that Board it would [continue to serve] as the Fund's investment advisor ...."

Simon, supra note 10, at 130. Kahn, 638 A.2d at 1110, reports on a similar form of negotiation between a dominant party and independent directors:

  [I]n this case the coercion was extant and directed to a specific price offer which was, in effect, presented in the form of a "take it or leave it" ultimatum by a controlling shareholder with the capability of following through on its threat....[A]ny semblance of arm's length bargaining ended when the Independent Committee surrendered to the ultimatum that accompanied [ [the] final offer.

Id. at 1120-21. In Kahn, the court held that coercive conduct exerted on independent directors by those in control will nullify a shift in the burden of proving a transaction's fairness to those challenging the transaction. The court expressly held that burden-shifting can only occur when the group of independent directors negotiating with a controlling party "was truly independent, fully informed, and had the freedom to negotiate at arm's length." Id. A like ruling in fund fee litigation--that coercive behavior by a fund manager saddles the manager with the burden of proving the transaction's entire fairness--would be both warranted and revolutionary.


[FN35]. See infra notes 165-69 and accompanying text(describing pre-tax profit margins ranging over time from 57 to 77% for one money market fund advisory whose fee levels were among the lowest in the money market advisory industry).


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN36]. Ira M. Millstein, The Responsible Board, 52 Bus. Law. 407, 409 (1997).

[FN37]. Bogle, supra note 18, at 298.

[FN38]. Id.

[FN39]. Id. at x.

[FN40]. In the words of its managing director, the Vanguard Group "has sought to differentiate itself from its competition in large measure by keeping costs low." Improving Price Competition for Mutual Funds and Bonds: Hearing Before the House Subcomm. on Fin. & Hazardous Materials Subcomm. of the Comm. on Commerce, 105th Cong. 72 (1998) (statement of F. William McNabb III, Managing Director, The Vanguard Group), available at http:// www.ici.org/issues/fee_hearing.html [hereinafter Improving Price Competition].

[FN41]. Bogle, supra note 30, at 407. This is an annual growth rate of over 27%, significantly outpacing the fund industry's 20% annual gain over roughly the same period. See supra note 7 and accompanying text.

[FN42]. Bogle, supra note 30, at 431.

[FN43]. John Rea et al., Operating Expense Ratios, Assets and Economies of Scale in Equity Mutual Funds, Investment Company Institute Perspective, Dec. 1999, at 1. The notion of economies of scale is a familiar one. Typically, the concept arises in the context of a manufacturing firm. As the number of units of output increases, total costs increase, but not as rapidly as output, so that average unit costs decrease as output increases. Such economies typically arise from spreading fixed costs among more units of production. The portfolio management process, which underpins advisory services, is characterized by high fixed costs (offices, computers, salaries, etc.) and very low variable costs. Thus, as the SEC staff recently noted: "Most observers believe that portfolio management is the fund cost with the greatest economies." Report on Mutual Fund Fees, supra note 5. An earlier SEC staff report concluded that "a portfolio manager can manage $500 million nearly as easily as $100 million." 1992 Protecting Investors Report, supra note 28, at 256 n.12. Since advisory services are subject to economies of scale, the fund's advisor may or may not pass along the largess to the fund. If economies of scale exist and fees are not lowered when assets under management increase, then the benefits of increased scale accrue to the manager in the form of increased profits. This can be especially insidious in a bull market environment. The GAO's report on price competition in the fund industry found that 64% of fund portfolio growth is due to portfolio appreciation. See GAO Report, supra note 12, at 9. This appreciation benefits investment advisors who garner increased fees from the general increase in market prices with no commensurate efforts on their part.

[FN44]. Rea et al., supra note 43, at 1, 5.

[FN45]. Rule 12b-1 fees are payments out of mutual fund assets to finance activities intended to result in the sale of fund shares or to pay for other services intended to benefit share holders. They were excluded because they are more closely associated with sales activity than post-sale administrative services. See supra note 12 and infra note 69.

[FN46]. Baumol et al., supra note 2, at 87.

[FN47]. Id.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN48]. John C. Bogle, Mutual Funds at the Millennium: Fund Directors and Fund Myths, at http://www.vanguard.com/bogle_site/may152000.html (May 15, 2000). Between 1980 and 1998, the average equity fund's annual expense ratio jumped from 1.10% to 1.57%. Bogle, Economics 101, supra note 7.

[FN49]. This consists of management and administrative expenses born by shareholders divided by the fund's net assets; it does not include distribution costs, such as sales loads or 12b-1 fees.

[FN50]. John D. Rea & Brian K. Reid, Trends in the Ownership Cost of Equity Mutual Funds, Inv. Co. Inst. Perspective, Nov. 1998, at 12.

[FN51]. The average size of the 100 largest funds in existence in 1997 that were also in existence in 1980 blossomed from $282 million to $5.8 billion. Id. at 13.

[FN52]. Report on Mutual Fund Fees, supra note 5, tbl. 2.

[FN53]. Id. at tbl. 9.

[FN54]. Rea et al., supra note 43, at 9. According to Vanguard's Bogle,  "Given that Vanguard dominates the low end universe-and that our expense ratios have declined by 53% since 1980-I would estimate that the other 'low cost' funds in the ICI survey raised expenses by as much as 40 percent." Bogle, Economics 101, supra note 7 .

[FN55]. Bogle, supra note 30, at 320.

[FN56]. Id.

[FN57]. Id.

[FN58]. See John P. Freeman, The Use of Mutual Fund Assets to Pay Marketing Costs, 9 Loy. U. Chi. L.J. 533, 554-55 n.109 (1978) (noting arguments presented in SEC filings by Investors Diversified Services, Putnam Management, and the Vanguard Group).

[FN59]. The existence of fee breakpoints in the fund industry has been viewed as "[o]ne piece of evidence for the existence of economies in portfolio management." Report on Mutual Fund Fees, supra note 5. The breakpoint pricing system has been explained as follows:
  Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase.... The declining rate schedule reflects the expectation that cost efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.
Rea et al., supra note 43 at 1, 4. On the other hand, the authors' survey of Morningstar data covering all domestic equity mutual funds in 1999 revealed that 70% operated under flat fee investment advisory contracts. See infra note 71.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN60]. See M. Christian Murray, ReliaStar Buys Asset Manager, Nat'l Underwriter, Aug. 2, 1999, at 41 (reporting on a merger of two fund groups with the acquirer announcing that it "expects the acquisition will provide its asset management group with economies of scale benefits, resulting in lower unit costs and increased sales and profitability"); Navigator Fund Changes, Nat'l Post, July 14, 1999, at D03 (fund manager merging two funds to "benefit investors by achieving a greater economy of scale and a more diversified fund").

[FN61]. Bogle, supra note 30, at 321 (emphasis added).

[FN62]. See Schonfeld & Kerwin, supra note 20, at 107. ("Mutual funds increasingly are the investment vehicle of choice.... Mutual funds offer advantages that other investment vehicles may not, including diversification, economies of scale, and professional management.") (emphasis added).

[FN63]. The GAO Report noted:
  Industry officials we interviewed... generally agreed that mutual fund operations experience economies of scale. An official at a money management firm whose customers invest in mutual funds told us that mutual fund advisors' operations are subject to large economies of scale, and additional investor inflows result in little additional cost. Officials of the fund advisors we interviewed also agreed that their operations experienced economies of scale. GAO Report, supra note 12, at 34.

[FN64]. Id. at 9.

[FN65]. Id.

[FN66]. Id. at 9-11.

[FN67]. The GAO found that among the industry's 77 largest funds, of the 51 that experienced asset growth of at least 500% from 1990 to 1998, 38 reduced their expense ratios by at least 10%; of the remaining 13 funds, 7 reduced their expense ratios by less than 10%, and 6 either had not changed their fees or had raised them. GAO Report, supra note 12, at 11-12.

[FN68]. Rea & Reid, supra note 50, at 12-13.

[FN69]. Rea et al., supra note 43, at 2. Excluded from the definition of "operating expenses" were 12b-1 fees paid by many fund shareholders. The omission was justified by the study's authors on the basis that the payments are mainly used "to compensate sales professionals for advice and assistance given to buyers of fund shares." Id. at 1. In litigation, the payments have been justified on the ground that they are assessed "not only to encourage growth, but also to stimulate improved shareholder service." Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 490 n.37 (S.D.N.Y. 1988). Included as operating expenses for purposes of the study were such items as custodial and transfer agent fees. Rea et al., supra note 43, at 5.

[FN70]. Rea et al., supra note 43, at 2, 15.

[FN71]. Morningstar's Principia Pro compilation for October 1999 was the principal source of data for the authors' study. This date was chosen as corresponding most closely to pension fund data presented in the next section. The Morningstar material contained data as of the end of September 1999, reflecting expenses for most funds as of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

end of June 1999. Initially, the authors' total database was screened to include only domestic equity funds--a total of 5238 were obtained. The sample included index, specialty, balanced, asset allocation, and a few convertible bond funds. Next, funds with zero assets and missing data were eliminated. This reduced the sample to 4943 funds. At this point, multiclass funds were aggregated into single funds. Such funds are an aggregation of sub-funds, each with different distribution channels. For instance, there may be a front-load fund (with or without 12b-1 fees), a back-load fund (with 12b-1 fees), a level-load fund (with 12b-1 fees), and an institutional fund with no 12b-1 fees and lower administrative fees. Portfolio expenses and most administrative expenses are incurred at the fund level and prorated to share classes based upon share class assets. Funds assets were totaled, and averages of expense ratios, operating expense ratios, management fees and administrative fee ratios were obtained using simple and weighted averages where the sub-fund assets were used as weights. Initially, an analysis was conducted corresponding to the ICI Table 1. Results were nearly identical to those presented in the body of the paper. Subsequently, all index and single class institutional funds were excluded from consideration, and these results, corresponding to ICI Table 6, are presented in Table 1. Although they are subject to minor inaccuracies, management fees from Morningstar were used as a proxy for advisory fees. See infra note 100 and accompanying text.

[FN72]. Funds were excluded from consideration if they reported bundled administrative costs or if advisory or administrative fees were zero. The latter occurs frequently when the investment advisor temporarily waives all or part of such fees as a means of subsidizing the fund, typically during the start-up period. The majority of excluded funds were small (total assets less than $100 million) and the balance of excluded funds were spread uniformly among different-sized funds. An analysis of the total sample revealed no significant differences, with the exception of the very small funds, where fee waivers caused average advisory and administrative fees to be lower than some larger funds.

[FN73]. Using simple averages, the expenses of a $1 million fund would be of equal importance to a $100 billion fund.

[FN74]. The authors' simple average numbers are presented in the text to demonstrate that the authors' data generate results similar to those presented in the ICI study.

[FN75]. There are several reasons for the slightly lower average operating expense ratios. First, the ICI study contained over 150 additional smaller funds, presumably because such funds are more likely to report to a trade association than Morningstar. Second, the authors' study had larger funds. This occurred because of the combined effects of a rising stock market and a slightly later period of analysis, which caused fund size to appreciate, and perhaps caused lower expenses due to economies of scale. In addition, the ICI simple average methodology allowed for the exclusion of all institutional funds. The current study was able to exclude only single class institutional funds and maintain the weighted average methodology. Finally, an ICI staff member suggested to us that Morningstar sometimes reports 12b-1 fees at the maximum rather than the actual level. Telephone Interview with Brian K. Reid, Senior Economist, Investment Company Institute (Aug 23, 2000). The authors were unable to confirm this.

[FN76]. In fairness to the ICI, there is no easy, simple way to unbundle the data since the SEC has never seen fit to define "investment advisory fees" and require separate reporting for that item. As a result, the SEC's staff embarrassingly professes not to be able to determine directly whether economies of scale exist for advisory fees. Report on Mutual Fund Fees, supra note 5.

[FN77]. Other studies have likewise tended to find declines in fund expenses as assets have ballooned. One study by Kanon Bloch evaluated funds accounting for 80% of the industry's equity fund assets and found that the average equity fund's expense ratio dropped 16% between 1993 and 1999 on an asset-weighted basis. Richard J. Oppel, Jr., Fund Expenses: They're Going Down, Down, Down; Conventional Wisdom Is Belied By the Numbers, N.Y. Times, July 4, 1999, § 3, at 11. The same ICI study that showed a rise in overall operating expenses from 1980 to 1997 also showed a drop over the same period of time for the same array of equity funds in total shareholders costs, from

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2.25% of net assets to 1.49%. Rea & Reid, supra note 50, at 11. The drop principally reflected lower distribution costs caused by investor preferences shifting from load to no-load funds, low expense ratio funds, and low-cost index funds. Bogle, supra note 48; see also Jerry Morgan, Mutual Fund Loads Can Be a Load Over Time, Newsday, Dec. 6, 1998, at F06. The effect of the no-load option in driving down overall fund distribution costs demonstrates that in a free market, with load differences clearly disclosed, investors over time are able to migrate in the direction of low-cost providers of fund services. The choice between buying a load and no- load fund is one unhindered by any impediments save brand preference and lack of knowledge.

Another possible source of downward pressure on selling costs is cut-rate pricing offered to investors who buy load funds through 401(k) plans. "Investors may look at their 401(k) plans and start questioning why funds offered through the retirement plans have lower fees than the same funds offered outside the plans." Mindy Rosenthal, A Loud Call to Lower Fees?, Fund Directions, Feb. 1999, at 1.


[FN78]. It is argued on behalf of the ICI, that funds' operating expense ratios (consisting of advisory and administrative fees lumped together) have "generally" tended to decline with significant asset growth. Rea et al., supra note 43. Nowhere does the ICI study attempt to focus solely on the fees charged for the single item most fund shareholders want to buy--investment advice. The authors' analysis separates out advisory fees and administrative fees. When this is done, it becomes evident that economies of scale in the rendition of advisory services are, for the most part, not being shared with fund shareholders.

Missing from the ICI operating expense study is data showing the percentage growth of revenues flowing to fund managers in comparison with the growth of fund assets. In contrast, a 1996 study reported that while fund assets grew by more than 80% between 1992 and 1996, fund managers' revenues nearly doubled, from $11.7 billion to $23 billion. Anne Kates Smith, Why Those Fund Fees Matter, U.S. News & World Rep., July 8, 1996, at 73; see also Oppel, supra note 77 ("[W]hatever the fee cuts at some fund companies, they pale next to huge revenue gains, as assets under management in stock funds soared 44-fold, to $3.2 trillion, in the 15 years ended in May, according to data from the [ICI]."). The ICI's Operating Expense Ratio study is thus akin to a bikini bathing suit: it reveals the interesting and conceals the vital.

Another ICI theme is that the "total costs of fund ownership" have been dropping for fund shareholders. See Improving Price Competition, supra note 40, at 86 (statement of Matthew P. Fink, President, Investment Company Institute). This ICI policy position was subsequently backed up by a study featuring tortured results published in November of 1998. See Rea & Reid, supra note 50 (finding that the "total cost of investing" in mutual funds, or the "total cost of fund ownership" has been decreasing). Its methodology is attacked in Bogle, supra note 48. Bogle isolated five flaws in the ICI's study. First, the results were weighted by sales volume; unweighted expense ratios escalated 64%, from 0.96% to 1.58%. Second, the ICI failed to note that expense ratios for the lowest cost decile were up 28% from 0.71% to 0.90%. Bogle theorizes that the increase would be greater ("perhaps up 35- 40%") if Vanguard were excluded from the sample. Third, the ICI data ignores the hidden cost of increased portfolio turnover among the industry's funds, which cuts performance and generates taxable gains, potentially adding another 0.50% to 1.00% in costs. Fourth, Bogle criticizes the ICI's cost data for ignoring the opportunity cost of not being fully invested in stocks. This cost Bogle estimates at 0.6%. Fifth, Bogle faults the ICI data for ignoring the fees charged to investors who buy funds through "wrap accounts." Sixth, and finally, Bogle charges the ICI with manipulating load costs by amortizing sales loads based on inaccurate assumptions which, if corrected, would increase average sales-weighted costs by an estimated 0.50% to 1.85%. Id. That ownership costs have dropped due to lower distribution charges is a tribute to investors' behavior at the purchase point, where the load/no load option is visible and increasingly well understood. See GAO Report, supra note 12, at 47. The convergence of increased consumer sophistication, indexing, institutional sales, and price sensitivity on the part of retirement plan fiduciaries are having an impact in cutting distribution expenses charged by fund sponsors.


[FN79]. That administrative costs should show economies of scale comes as no surprise. Administrative costs are a mixture of fixed costs (directors' fees, legal fees, insurance premiums, auditing, taxes, and state and federal registration fees) and variable costs (custodial and transfer agent fees, postage, printing, etc). Variable costs are dominated by transfer agent fees. The transfer agent maintains records of shareholders' accounts and transactions, disburses and receives funds from shareholder transactions, prepares and distributes account statements and tax information, handles shareholder communication, and provides shareholder transactions services. The GAO found that the bulk of stock and bond funds' recent growth has come from portfolio appreciation, a circumstance almost certain to create economies of scale. See GAO Report, supra note 12, at 9.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN80]. As noted earlier, the GAO found that 64% of equity fund growth was due to the appreciation in value of portfolio securities. Id.


[FN81]. Id.


[FN82]. Mutual Fund Legislation of 1967: Hearing on S. 1659 Before the Senate Comm. on Banking and Currency, 90th Cong. 353 (1967). The investment paid off. Id. See also Simon, supra note 10, at 130 ("One obvious fact emerges: It is far more lucrative to own a mutual fund company than to invest in the company's products.").


[FN83]. An even fairer question is what funds themselves are paying now for the professional management advice they need in order to function. The answer is not clear. It has been suggested that only a small fraction of the total bill paid to the advisor by shareholders actually goes to pay for the cost of producing investment advice. Waggoner & Block, supra note 9, at 3B (quoting John C. Bogle for the proposition that only $3 to $5 billion of the $55 billion earned annually by fund management companies "goes to investment resources").


[FN84]. Two years ago, Morningstar mutual fund analysts started warning investors that the fund industry was ratcheting up fees, especially management fees, to dangerous levels forcing people to pay premium prices for what is in essence a commodity. Worse, says John Rekenthaler, the group's director of research, it has become pretty clear that over time funds with lower expense ratios outperform those with higher ratios....
Longo, supra note 10, at 1.


[FN85]. As part of the management process, the investment advisor will need to deal with additional issues such as dividend reinvestment, cash balances and flows, trading costs, and market timing.


[FN86]. Managers differentiate themselves in various ways. There are large, mid, small, and micro cap managers, as well as value, growth, balanced, asset allocation, hybrid, and quantitative managers. However, the essential insight remains intact: portfolio management is a mental process that is applicable to all portfolio types and sizes. It follows that what is being produced by the portfolio manager is intangible. It also comes close to possessing infinite scalability, just like the Internet or television. Adding additional shareholder accounts does not run up the cost of portfolio management any more than adding viewers increases the creative cost of devising a TV show or a class broadcast over the Internet. Once the investment objectives of the fund have been specified and an appropriate list of securities chosen, the size of the portfolio tends to be inconsequential. See Staff of the New York Institute of Finance, Stocks Bonds Options Futures--Investments and Their Markets 134 (Stuart R. Veale ed., 1987) ("Generally, the larger the fund, the less percentage the manager charges because it is almost as easy to run a $200,000 account as it is to run a $100,000 account. (You just buy and sell twice as much of whatever it is you're going to buy and sell.)"). It is true that larger funds with larger portfolios bear greater trading and shareholder administrative costs. However, these are administrative costs. Since they are not charged to the investment manager, they are irrelevant to the question of economies of scale in the pricing of investment advisory services.


[FN87]. Wharton School of Finance & Commerce, 87th Cong., A Study of Mutual Funds 493 (Comm. Print 1962) [hereinafter Wharton Report].


[FN88]. The price disparity was explained as follows:
   The principal reason for the differences in rates charged open-end companies and other clients appears to be that with the latter group "a normal procedure in negotiating a fee is to arrive at a fixed fee which is mutually acceptable." In the case of the fees charged open-end companies, they are typically fixed by essentially the same

persons who receive the fees, although in theory the fees are established by negotiations between independent representatives of separate legal entities, and approved by democratic vote of the shareholders. This suggests that competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds.
Id. at 493-94.


[FN89]. Id. at 489.


[FN90]. Id.


[FN91]. H.R. Rep. No. 89-2337 (1966).


[FN92]. Wharton Report, supra note 87, at 120.


[FN93]. Simon, supra note 10, at 130. The author makes a key point while overlooking another one. In truth, mutual funds are not different from institutional investors in form; a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on "institutional status," it turns on self-dealing and conflict of interest. It is worth noting that within the universe of fund shareholders, there are some institutional investors, many of whom tend to buy shares in institutional funds. Expense ratios for institutional funds are roughly half of the expense ratios borne by retail funds. Mary Rudie Barneby, Why Your 401(k) Plan Needs an Investment Policy and How to Establish One, in Pension Plan Investments, Confronting Today's Investment Issues ERISA Litigation: The Regulatory Perspective & Practical Implications on Plan Management & Investments (1997) at 79, 92 (PLI Tax Law & Practice Course, Handbook Series No. J-397, 1997). Some expenses, such as transfer agent costs, naturally will tend to shrink as a percentage of fund assets as account size rises. See Rea et al., supra note 43, at 5. ICI data reflected, as of year-end 1998, an average fund account size for retail accounts of $19,050; for institutional accounts it was $76,160. Id. at 5 n.17. Even in the market segment populated by supposedly sophisticated institutional fund investors, there is room to question whether robust price competition operates. See Elizabeth A. White, DOL Issues Section 401(k) Fee Guide, Continues To Consider Further Requirements, 25 Pens. & Ben. Rep. (BNA) 1545 (July 6, 1998) (noting employers generally are unknowledgeable about fund expenses); see also Ross D. Spencer, Disclosure Required for Fee Arrangements Between Mutual Funds and Service Providers, Employee Ben. Plan Rev., Jan. 1998, at 14 (noting that 401(k) sponsors have tended to ignore fund investment management fees).


[FN94]. Control positions in pension management companies, who must compete in the free market for business and who risk getting fired, tend to sell for less.
  Because the pension fund accounts managed by Aeltus pay annual management fees that average only 10- to 30-hundredths of a percentage point, and because those accounts can easily change managers, companies like Aeltus can be difficult to sell and may fetch lower prices than the sales of management companies that advise mutual funds. The managers of pension fund assets often sell for prices equal to twice the annual management fees.
Michael Quint, Aetna is Seen Seeking Buyer for Aeltus Investment Unit, N.Y. Times, Mar. 23, 1995, at D2. Fee multiples in control purchases are higher in the fund industry. See Barry B. Burr, Frontlines: A Good Deal: Asset Management Is Added Value, Pensions & Inv., Oct. 13, 1997, at 8 (stating that fund managers reported to sell for four or more times annual revenues); William H. Rheiner, Acquisition of Mutual Fund Families: Corporate and Regulatory Issues, in Understanding Securities Products of Insurance Companies 2000, at 415, 418 (PLI Commercial Law & Practice Course, Handbook Series No. A-799, 2000) ("Stock price multiples of mutual fund advisors are often larger than those of other types of financial services companies."). According to its March 28, 2000 Form 10-K, T. Rowe Price Associates, Inc.'s revenue totaled $1.03 billion for its most recent year-end. The firm's market capitalization as of late July 2000 was $4.89 billion. See Robert McGough & Ken Brown, T. Rowe Remains Aloof Amid Merger Dance, But Investors May End Up Disappointed, Wall St. J., July 31, 2000, at C2. Recently, Pioneer Group, Inc., parent of fund manager Pioneer Investment Management, was acquired for $1.2

billion. Id. at C2 (discussing the acquisition and characterizing Pioneer Investment Management as a firm "that has been struggling lately"). The acquisition prices were slightly less than five times Pioneer's 1999 revenues from continuing operations. See The Pioneer Group, Inc. Reports Results for the Fourth Quarter and Year Ended December 31, 1999, Bus. Wire, Feb. 11, 1999, LEXIS, Curnws File. For an account of a control transfer for a fund advisor at a price exceeding 22 times the annual management fees, see Bogle, supra note 30, at 327-28 (discussing how an advisor sold itself for $1 billion at a time that annualized fees were $45 million; fees were raised substantially pre- and post-control sale).

[FN95]. The questionnaires asked for voluntary cooperation but were also framed as Freedom of Information Act requests.

[FN96]. Of the seventeen remaining funds, six were internally managed, three were defined contribution plans and invested exclusively in mutual funds, two refused outright, one wanted $500 to collect the data, and the balance (five funds) had incomplete data.

[FN97]. Asset levels were typically provided as of June or December 1999, which correspond to the 1998 fiscal year and the 1999 calendar year, respectively.

[FN98]. Although there were some small differences between scheduled and actual advisory fees paid, analysis revealed no average net difference between the two approaches. In the analysis that follows, the greater of the fees calculated by the two methods was utilized in calculating overall averages.

[FN99]. Initially, all mutual funds, including multiclass funds with assets less than $15 million were eliminated. This corresponded to the smallest pension portfolio. Next, all balanced, asset allocation, specialty, convertible bond, and index funds were discarded, as well as those funds classified as "domestic hybrid" by Morningstar. Finally, all funds with a commitment to bonds greater than 5% were eliminated, as well as those single class funds with inception dates after May of 1998. The above procedure generates a sample of mutual funds closely corresponding to characteristics of portfolios of public pension funds. The final sample consisted of 1,343 funds of which 659 were single class funds and 684 were multiclass funds representing a total of 2,118 sub-funds.

[FN100]. The analysis attempts to put pension and mutual fund advisory costs on a comparable basis. This process was confounded somewhat by inconsistent reporting of advisory and administrative costs among mutual funds. Specifically, the "management fee" reported in Morningstar sometimes includes not only fees for advisory services but some administrative services as well. This same problem hindered the SEC staff in its recent analysis of fund fees and expenses. See Report on Mutual Fund Fees, supra note 5. The authors' methodology minimized the impact of such problems by excluding from the sample funds shown by Morningstar to have no administrative fees. Such funds tended to be small. Those funds that bundle some administrative costs in the management fee are also likely to be small and have minimal impact on category averages, which are calculated on an asset-weighted basis. Analysis of the Lipper data, which explicitly differentiates between management and advisory fees, revealed a weighted average difference of about three basis points. The authors consider this difference immaterial in the overall comparison of advisory fees between pension and mutual funds.

[FN101]. There are respectively 22 portfolios in each pension fund decile, 135 mutual funds in the first three mutual fund deciles, and 134 funds in the remaining deciles.

[FN102]. The chart is somewhat misleading in that the size of the average fund is different for public pension and mutual funds in each decile.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 41 of 60

26 JCORPL 609                                                                                    Page 40
(Cite as: 26 J. Corp. L. 609)

[FN103]. From Table 1, funds with greater than $5 billion in assets represented less than 5% of the total number of funds (92 out of 2161) but controlled 60% of the total assets under management.

[FN104]. See David A. Latzko, Economies of Scale in Mutual Fund Administration, 22 J. Fin. Res. 331 (1999).

[FN105]. It is generally recognized that investment managers charge higher fees for managing small and mid cap portfolios, although the explanation for this is not immediately obvious. One reason could be that information about large cap stocks is widely available, and the market for such stocks is generally viewed as highly efficient.

[FN106]. Care must be taken in interpreting these data because the numbers for some managers include a mixture of investment styles and are thus not strictly comparable. For instance, Putnam manages six pension portfolios, comprised of two large and four small cap funds. Of the fourteen Putnam mutual funds, nine are large cap, three are mid cap and two are small cap. Moreover, where Putnam is concerned, there is a far higher level of mutual fund than pension fund assets under management. On the other hand, all of the Alliance Capital portfolios (pension and mutual funds) are large cap portfolios.

[FN107]. These data were obtained from the annual reports of the funds as of the dates shown in the right-hand column.

[FN108]. See, e.g., Jonathan Clements, Getting Started: Index Funds Are Hot--But Which One?, Wall St. J., June 6, 1990, at C1.

[FN109]. See, e.g., James A. White, Investing Lessons of the Eighties: The Decade of Phenomenal Growth for Institutions, Wall St. J., Dec. 26, 1989, at C1, C17.

[FN110]. The analysis is limited to plain vanilla S&P 500 indexed portfolios. It is also common to find portfolios indexed to other indexes, such as the Russell 2000 or the Wilshire 5000 stock indexes. In addition, enhanced index funds are sometimes seen where there is a small active component on top of a basic passive approach.

[FN111]. The best example of this is the Fidelity Spartan Fund. It was a $27 billion fund in October 1999 and the contractual (and actual) investment advisory fee was 24 basis points. However, by agreement, the expense ratio is limited to 19 basis points, and the procedure to accomplish this is a reduction in overall expenses. Unfortunately, this expense reduction cannot be uniquely associated with advisory or administrative expenses. In the final analysis, an overall expense ratio of 19 basis points, if maintained, is quite competitive and reasonable. See supra Table 2 (illustrating that, for large equity funds, average administrative fees alone approximated 17 basis points). This is not true of the remaining funds, which had a weighted average administrative fee of 18 basis points in addition to the 16 basis points investment advisory fee.

[FN112]. The expense ratio was 18 basis points, reflecting fund administrative costs. There were no distribution fees.

[FN113]. See, e.g., GAO Report, supra note 12, Appendix III, at 117-20 (Letter from Matthew P. Fink, President, on behalf of the Investment Company Institute defending the status quo in the face of the GAO's recommendation for enhanced shareholder disclosure). On the other hand, the ICI has taken some pro-shareholder positions, such as supporting increased funding for the SEC, privacy protection for shareholder information, and limitations on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

personal investing by fund managers. Lewis Braham, A Raw Deal for Fund Shareholders, Bus. Wk., July 31, 2000, at 94 .

[FN114]. Improving Price Competition, supra note 40, at (Statement of Matthew P. Fink, President, Investment Company Institute. Mr. Fink finds the mutual fund industry competitive to an extent other observers do not. For example, the GAO recently issued a detailed report finding that mutual funds generally do not attempt to compete with each other on the basis of costs; for example, price competition is muted. GAO Report, supra note 12, at 62-65. The report observed that "most economists view competition in the mutual fund industry as imperfect." Id. at 64. It also noted that there was some evidence that competition was not completely absent, pointing to the growing popularity of index funds and the fact that "the two largest fund groups are among the industry's low-cost providers." Id. at 65.

  On behalf of the ICI, Mr. Fink greeted a preliminary version of the GAO's report as follows: "We agree with the draft report's conclusion that the mutual fund industry is highly competitive ...." Letter from Matthew P. Fink, President, Investment Company Institute, to Thomas J. McCool, Director, Financial Institutions and Market Issues, U.S. General Accounting Office (May 3, 2000), reprinted in GAO Report, supra note 12, at Appendix III. In fact, the only use of the phrase "highly competitive" found in the GAO Report is in Mr. Fink's letter, which appears as an attachment. What the GAO actually found was this:

  [A]lthough thousands of mutual funds compete actively for investor dollars, competition in the mutual fund industry may not be strongly influencing fee levels because fund advisors generally compete on the basis of performance (measured by returns net of fees) or services provided rather than on the basis of the fees they charge. Id. at 7.

[FN115]. The Private Securities Litigation Reform Act of 1995, 15 U.S.C.A. § 78u-4 (West 1997), enacted over President Clinton's veto, is such a statute. It was designed to:

  (1) curb abusive practices in the conduct of securities class action suits;  (2) put greater control over class action suits in the hands of large shareholders who are not "professional" plaintiffs; (3) require more detailed information about settlements to be disclosed to shareholders; (4) deter plaintiffs from bringing frivolous lawsuits by imposing sanctions in appropriate cases; (5) give courts discretion to grant early dismissal of suits; (6) provide a statutory safe harbor for forward looking statements; and (7) provide a cap on damages by limiting joint and several liability. Laura R. Smith, The Battle Between Plain Meaning and Legislative History: Which Will Decide the Standard for Pleading Scienter after the Private Securities Litigation Reform Act of 1995?, 39 Santa Clara L. Rev. 577, 577-78 (1999). Subsequently, sensing that plaintiffs were evading the PSLRA's reach by suing in state court, Congress preempted state law claims when raised in class action suits involving publicly-held companies by enacting the Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353, 112 Stat. 3227 (1998).

[FN116]. Fund management companies have a sterling litigation record. See Baumol et al., supra note 2, at 68, 72-74, 84-85. Like Big Tobacco, fund sponsors to date have never paid a dime in damages in cases alleging excessive advisory fees; unlike the tobacco companies, they have never lost an advisory fee lawsuit on the merits. Most of the cases challenging fund fees as excessive have been settled; those that did not settle were dismissed. Id.

[FN117]. 15 U.S.C. § 80a-35(b) (1994).

[FN118]. See Kalish v. Franklin Advisors, Inc., 928 F.2d 590, 591 (2d Cir. 1991), cert. denied, 502 U.S. 818 (1991); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y. 1987), aff'd, 835 F.2d 45, 46 (2d Cir. 1987), cert. denied, 485 U.S. 1034 (1988); Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 487 F. Supp. 999, 1001 (S.D.N.Y.), aff'd, 636 F.2d 16, 17 (2d Cir. 1980), cert. denied, 451 U.S. 910 (1981).

[FN119]. Investment Company Act of 1940 § 36(b), 15 U.S.C. § 80a- 35(b) (1994).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 43 of 60

26 JCORPL 609                                                                                      Page 42
**(Cite as: 26 J. Corp. L. 609)**

[FN120]. Id. § 80a-35(b)(1).


[FN121]. Id. § 80a-35(b)(3).


[FN122]. Id.


[FN123]. Id. § 80a-35(b)(5).


[FN124]. Pub. L. No. 104-67, 109 Stat. 737 (1995). Most fund shareholder class actions seeking relief under other federal theories are doomed by the Private Securities Litigation Reform Act of 1995. A case in point is Castillo v. Dean Witter Discover & Co., [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 90,299 at 91,091 (S.D.N.Y., June 25, 1998). Castillo involved a class action brought by three Florida investors who had lost money after investing in Dean Witter's investment company offerings. Two of the class representatives, Castillo and Fernandez, were described as inexperienced and elderly. Id. at 91,092. Fernandez's investment of $15,000 in Dean Witter's "U.S. Government Securities Trust" represented "his life savings." Id. The third class representative, Chupka, was described as having "little knowledge of mutual funds prior to investing with Dean Witter." Id. Class actions against fund independent directors have been made particularly difficult by the new litigation. See Jordan Eth & Christopher A. Patz, Securities Litigation and the Outside Director, 33 Rev. Sec. & Commodities Reg. 95 (2000).

For present purposes, plaintiffs' key claim was that Dean Witter secretly paid extra compensation to its brokers to cause them to push Dean Witter funds that were, unbeknownst to plaintiffs, higher priced and worse performers than other available funds. Castillo, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 91,093. Because the suit was brought as a class action, the plaintiffs were required to satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995, and they failed miserably. Id. at 91,094. The first stumbling block was loss causation, i.e., the need to connect the deception with the ensuing loss. Id. The court noted that what caused plaintiffs' damages was poor performance by the funds, an event unrelated to the compensation payments to the registered representatives who had sold them. The court thus found that loss causation had not properly been pleaded. Id. at 91,095.

The court likewise inspected and found wanting the various alleged misleading statements or omissions asserted by the plaintiffs. Castillo, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 91,096-97. The court rejected out of hand the notion that Dean Witter owed an obligation to compare its funds' allegedly poor performances with competitors' products, finding, as a matter of law, that there is no obligation to disclose information about competitors' products. Id. at 91,097. Significantly, the court implied that placing such a burden on Dean Witter would be unfair because it would be hard for "the broker to define its competitors for purposes of comparison, particularly since the various holdings in mutual funds are different in innumerable respects." Id. at 91,097 n.10.

As for the claim that plaintiffs were duped because they were not advised that Dean Witter brokers were paid extra compensation to favor Dean Witter funds, the court scolded: "Plaintiffs should have been aware that sale of a Dean Witter fund, as opposed to an outside fund, would mean greater compensation for the Dean Witter companies," and that requiring any special warning about salesperson conflicts would impose new duties never previously recognized under the securities laws. Id. at 91,098. Here the court simply was dead wrong. Receipt of secret profits by fiduciaries has long been recognized as grounds for a securities fraud suit. See, e.g., Coburn v. Warner, 110 F. Supp. 850 (S.D.N.Y. 1953) (holding a secret commission actionable); SEC v. Kaweske, [1995-1996 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 98,950 at 93,600 (D. Colo. Nov. 28, 1995) (holding that secret commissions received by the fund advisor from issuers actionable). See also Investment Company Act Release No. 9470, 10 S.E.C. Docket 680, 681 n.3 (Oct. 4, 1976) ("It would raise serious questions under the anti-fraud provisions... for a broker-dealer to recommend a change of customer's investment... merely because such a change would result in compensation for the broker dealer."). The same view can be found under state law. See O'Malley v. Boris, 742 A.2d 845 (Del. 1999) (holding that brokerage firm's receipt of ownership interest in a fund management company in exchange for transfer of a firm's customer accounts to a new fund complex may be a material fact required to be disclosed to customers under Delaware fiduciary duty law).


[FN125]. See Green v. Fund Asset Mgmt., L.P., 245 F.3d 214 (3d Cir. 2001).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN126]. 694 F.2d 923 (2d Cir. 1982).


[FN127]. Id. at 930.


[FN128]. Id. at 928.


[FN129]. Id. at 928-29.


[FN130]. Id. at 929-32.


[FN131]. Gartenburg, 694 F.2d at 929.


[FN132]. Id. at 930 n.3. The court justified its ruling on this point on the grounds that "[t]he nature and extent of the services required by each type of fund differ sharply.... [T]he pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days." Id.


[FN133]. The term was coined by Judge Henry Friendly in discussing the role of courts in reviewing fund fee cases:
  There is a common law liability of directors for waste, and while a plaintiff who seeks to prevail on that score may have to show that the fee is not merely unreasonable but unreasonably unreasonable, a court still has the job of comparing what has been done with what has been received.
Investment Company Act Amendments of 1967: Hearing on H.R. 9510 and H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce, 90th Cong. 610 (1967) (statement of Judge Henry J. Friendly, U.S. Appeals Court., N.Y., N.Y.).


[FN134]. Gartenberg, 694 F.2d at 931.


[FN135]. We disagree with the district court's suggestions that the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisors to funds managed by them, that the "price charged by advisors to those funds establishes the free and open market level for fiduciary compensation," that the "market price... serves as a standard to test the fairness of the investment advisory fee," and that a fee is fair if it "is in harmony with the broad and prevailing market choice available to the investor." Competition between money market funds for shareholder business does not support an inference that competition must therefore also exist between advisor-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy § 36(b).
Gartenberg, 694 F.2d at 929 (internal citations omitted).


[FN136]. 742 F. Supp. 1222 (S.D.N.Y. 1990).


[FN137]. Id. at 1237.


[FN138]. See id. at 1230, 1250 (discussing and rejecting the Vanguard analogy).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN139]. Id. at 1250 .

[FN140]. Id. at 1231. Distinguishing factors focused on by the court were that the Vanguard funds were unique due to their internal management and their tendency to furnish "corporate management, administrative, shareholder accounting, marketing and distribution services" on an "at-cost" basis. Kalish, 742 F. Supp. at 1231.

[FN141]. Id. (quoting a letter sent to the defendant from Lipper Analytical Services, Inc., a leading source on statistics of mutual fund performance).

[FN142]. Id. (same).

[FN143]. Id.

[FN144]. Interview with Richard Ennis, Founder and former Chief Executive Officer, Ennis, Knupp & Assoc. (July 19, 2000).

[FN145]. 715 F. Supp. 472 (S.D.N.Y. 1988).

[FN146]. 663 F. Supp. 962 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987), cert. denied, 485 U.S. 1034 (1988).

[FN147]. Krinsk, 715 F. Supp. at 502-03.

[FN148]. Id. at 503.

[FN149]. Id. at 487.

[FN150]. Id. This was a dubious ruling. One observer has found that one of the fund industry's chief disclosure shortcomings is that "there is little quantitative risk disclosure. Quantitative measures of risk can greatly aid in judging the quality of a mutual fund." Improving Price Competition, supra note 40, at 53 (1998) (statement of Charles Trzcinka, Professor of Finance, State University of New York at Buffalo).

[FN151]. Krinsk, 715 F. Supp. at 487.

[FN152]. Id. at 489 (citing to tables within the case).

[FN153]. Id. (citing to tables within the case).

[FN154]. Id. Merrill Lynch's average annual profitability for 1984 to 1986 according to the plaintiff was 40.4%; the defendants' expert estimated average profitability for the same period to be 32.7%. Id. at 494.

[FN155]. Krinsk, 715 F. Supp. at 494.


[FN156]. The defense lawyers certainly would dispute this point; after all, they won. On the other hand, given that the Gartenberg test requires that the fund's directors weigh "the profitability of the fund to the advisor-manager," the inability of the defense credibly to advance a profitability number does not speak well for either the defense's presentation or the Franklin directors' discharge of their investigative duties. Krinsk, 875 F.2d at 409, citing Gartenburg, 694 F.2d at 929-30.


[FN157]. The court in Krinsk likewise found the plaintiffs unable to quantify fall-out benefits accruing to Merrill Lynch flowing from (1) "commission profits from trades in the CMA program securities account;" (2) "margin interest;" (3) "management fees derived from funds other than the Fund within the CMA program;" (4) earnings from sales of products and services outside the program, but sold to Fund customers; and (5) profits earned by affiliates who transact business with the Fund. Krinsk, 715 F. Supp. at 494. Failure to quantify the fall-out left the plaintiff with no means of showing they contributed to the advisory fee being unreasonably high. Id. at 494-96. Likewise, plaintiffs failed to show Merrill Lynch benefitted from economies of scale, because they never quantified the existence and size of any economies realized. Id. at 496. The court held that it is not enough to show that costs decreased as the fund grew in size; the per unit cost of providing management services directly to the Fund decreases as the Fund grows, but "the per unit cost of servicing Fund shareholders does not." Id. The court found that money fund shareholders "tend to transfer money in and out of their funds on a regular basis," with per unit processing costs remaining constant, and not varying with the size of the fund or the number of accounts. Id.


[FN158]. See Krinsk, 715 F. Supp. at 497.


[FN159]. Id.


[FN160]. Id. In 1985, the fund had approximately one million shareholders. Janet Bamford, See You In Court, Forbes, Sept. 9, 1985, at 144.


[FN161]. Krinsk, 715 F. Supp., at 497-98.


[FN162]. The advisory fee for 1985 was under $64 million. Id. at 479.


[FN163]. Id. at 498.


[FN164]. Well appreciating the importance of the court's ruling that the annual fee was not subject to scrutiny under section 36(b), Merrill Lynch reacted in a predictably entrepreneurial way--it hiked the fee to $100 per year, and, for good measure, added a $25 annual charge for shareholders who wanted a Visa Gold card. Andrew Leckey, Money Market Accounts Try to Woo Clients, St. Louis Post-Dispatch, Mar. 18, 1993, available at LEXIS, Curnws File. By 1996, Merrill Lynch had 1.3 million CMA accounts. Merrill Lynch Introduces the CMA Global Gold Travel Awards Program; First Offering of its Kind from a Brokerage Firm, PR Newswire, Feb. 26, 1996, available in LEXIS, Curnws File. For the fiscal years ending Mar. 31, 1994, 1995, and 1996, the total advisory fees paid by the Money Market Fund to the Investment Advisor aggregated $101,568,034, $104,060,839, and $124,239,520, respectively. CMA Money Fund Prospectus, July 26, 1996, at 12, LEXIS, Company Library, EdgarPlus File. This means that, by 1996, the legally meaningless CMA annual fee alone generated in that year more revenue than the advisory fee for that year, and twice the advisory revenues attacked as excessive ten years earlier in Krinsk.

[FN165]. Schuyt, 663 F. Supp. at 964. The court was impressed. It variously described the fund's growth as "unprecedented," id. at 980 n.53, "amazing," id., and "astonishing," id. at 966.

[FN166]. Id. at 968.

[FN167]. Schuyt, 663 F. Supp. at 979.

[FN168]. Id. at 978-79.

[FN169]. Id. at 979. In blessing such a munificent return for the advisor, the court cautioned that it was "not holding that a profit margin of up to 77.3% can never be excessive. In fact, under other circumstances, such a profit margin could very well be excessive." Id. at 989 n.77. In Strougo v. BEA Assocs., [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 90,742, at 93,611 (S.D.N.Y. Jan. 19, 2000), a closed-end fund advisory fee case, the district court recognized another way to establish under section 36(b) that advisory fee levels are unfairly high: contrast the advisor's take with shareholders' total return. In Strougo, for fiscal years 1997 and 1998, the advisor's net fee equaled 46.0% and 42.3% of the fund's total investment income. Id. P 93,616. In light of the fund's poor performance relative to peer funds, these numbers made it "impossible to say, as a matter of law, that the net advisor fee... is not disproportionately large enough to bear an unreasonable relationship to the services rendered by that advisor." Id.

[FN170]. The factors are articulated in supra text accompanying notes 129- 32. The Schuyt court's explanation of how the directors' conduct militated in favor of a defense verdict in light of those factors is found in Schuyt, 663 F. Supp. at 974-88.

[FN171]. Schuyt, 663 F. Supp. at 973-74. Defendants' expert fared little better. His position that fees were not excessive rested in part on his contention that "the market for advisors... [is] sufficiently competitive to prevent excess profits." Id. at 974 n.39. The problem with this testimony, of course, is that it is untrue; it flies in the face of Gartenberg's finding that fund shareholders are basically locked into buying services from their current advisor. "[I]nvestment advisors seldom, if ever, compete with each other for advisory contracts with mutual funds." Id. (quoting Gartenburg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 929 (2d. Cir. 1982)).

[FN172]. Schuyt, 663. F. Supp. at 969 n.20 (quoting Exhibit AL, at 11). See also id. at 970 n.25 (restating "the basic test").

[FN173]. Id. at 972 n.34.

[FN174]. Id. at 973 n.38.

[FN175]. Id. at 973-74 n.38.
   In making his comparison... Mr. Silver neglected to inquire about the services provided to [T. Rowe Price's private] counsel clients... and was therefore unable to compare the fees charged to the fund to the fees charged to counsel clients. The evidence before this Court clearly indicates that if Mr. Silver had made such an inquiry, he would have found that the types of services provided by the Advisor to the Fund and private counsel clients differ substantially. Schuyt, 663 F. Supp. at 973-74 n.38.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 48 of 60

26 JCORPL 609                                                                Page 47
**(Cite as: 26 J. Corp. L. 609)**

[FN176]. Id. at 974 n.38.


[FN177]. In so holding, the court cited Gartenberg for the proposition that "fee rates of advisors to non-mutual fund clients should not be used as criterion for determining fairness of mutual fund fees because advisors to other types of entities perform services that do not involve a myriad of daily purchases and redemptions." Id. The court in Schuyt later explained that, "due to the unique nature of the services provided by money market advisors and the industry, the Court finds there were no fee schedules from the competitive market that could have appropriately guided the directors." Id. at 983-84.


[FN178]. The authors analyzed fund accounting fees presented in Lipper Analytical's mutual fund data. They found that weighted average fund accounting fees amounted to about two basis points of funds' weighted average net assets.


[FN179]. See supra notes 93-105 and accompanying text.


[FN180]. Schuyt, 663 F. Supp. at 989.


[FN181]. Id. at 990. "[A] reasonable shareholder would not consider profitability information important when voting on the investment advisory agreement." Id. The court justified its immateriality ruling on the ground that the SEC did not require disclosure and lacked proof that "such profitability information is commonly provided in proxy statements by others in the money market industry." Id. According to one SEC official, disclosure of information about the advisor's profitability in fund proxy statements "has somewhat of a checkered past," and is not expressly required. Letter from Anthony A. Vertuno, Senior Special Counsel, SEC, Division of Investment Management, to John C. Bogle, Chairman, The Vanguard Group (Feb. 29, 1996) (on file with author). Funds must disclose factors weighed by the board in setting the advisory fee, including advisor profitability which "is often considered by a fund's board," but the disclosure may be made "without specific numbers." Id. In short, on the crucial issue of disclosure to fund shareholders about the dollars paid for advisory services, the SEC tolerates, and thus abets, nondisclosure or, at best, weak, generalized disclosure.


[FN182]. Schuyt, 663 F. Supp. at 990.


[FN183]. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448-49 (1976).


[FN184]. See infra note 219 .


[FN185]. Schuyt v. Rowe Price Prime Reserve Fund, Inc., 835 F.2d 45, 46 (2d Cir. 1987).


[FN186]. See Krinsk, 875 F.2d at 409 (enumerating the Gartenberg factors).


[FN187]. See Rosenthal, supra note 77, at 1 ("[S]ome directors are already pondering what, if anything, they should do to lower fees.... Jenine Stranjord, independent trustee with American Century Investments, notes that as more investors move to Vanguard, mutual funds will have to re-look at fees.").

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 49 of 60

26 JCORPL 609                                                                                          Page 48
(Cite as: 26 J. Corp. L. 609)

[FN188]. Both authors are personally familiar with the practice. The scholarly support for the practice stems from Donald Arthur Winslow & Seth C. Anderson, A Model for Determining the Excessive Trading Element in Churning Claims, 68 N.C. L. Rev. 327 (1990).


[FN189]. 147 F.3d 184 (2d Cir. 1998).


[FN190]. Id. at 189-90.


[FN191]. See Simon, supra note 10, at 130 ("What we have learned is not likely to endear your fund sponsor to you. Among our findings: You pay nearly twice as much as institutional investors for money management. And that calculation doesn't even include any front- or back-end sales charges you may also pony up.").


[FN192]. Investment Company Act Amendments of 1967: Hearing on H.R. 9510 and H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce, 90th Cong. 801 (1967) (statement of Ernest Folk, Professor of Law, University of North Carolina).


[FN193]. Id. at 803-04."


[FN194]. Then SEC Chairman Manuel Cohen testified that the Commission did not object to Professor Folk's burden-shifting proposal. Id. at 738.


[FN195]. Indeed, the Second Circuit in Gartenberg explicitly called attention to the plaintiffs' failure of proof:
  Our affirmance is not a holding that the fee contract between the Fund and the Manager is fair and reasonable. We merely conclude that on this record appellants failed to prove by a preponderance of the evidence a breach of fiduciary duty. Whether a violation of § 36(b) might be established through more probative evidence... must therefore remain a matter of speculation.
Gartenberg, 694 F.2d at 933.


[FN196]. GAO Report, supra note 12, at 33.


[FN197]. See James N. Benedict et al., Recent Trends in Litigation Under the Investment Company Act of 1940, 32 Rev. Sec. & Commodities Reg. 165 (1999). For example, in Strougo v. Scudder Stevens & Clark, plaintiffs pressed and won the argument that, in the context of a fund complex, payments to directors for serving on multiple boards could "call into question the director's independence from the manager of the complex." 964 F. Supp. 783, 795 (S.D.N.Y. 1997). This simple and straight-forward ruling enabled the plaintiffs to avoid the demand condition precedent to filing a derivative suit alleging state claims against the directors. The case "ignited a firestorm in the investment company world," leading to legislation in Maryland designed to change state law to eliminate any benefit to litigants seeking to exploit the ruling. See James J. Hanks, Jr., Straightening Out Strougo: The Maryland Legislative Response to Strougo v. Scudder, Stevens & Clark, Inc., 1 Vill. J.L. & Inv. Mgm't 21 (1999). The Maryland legislation designed to choke off the litigation inroad made by the plaintiff in Strougo subsequently was held unconstitutional by Maryland's Court of Appeals in Migdal v. Maryland, 747 A.2d 1225 (Md. 2000).


[FN198]. Another money market fund case that has been litigated is Meyer v. Oppenheimer, 609 F. Supp. 380 (S.D.N.Y. 1984), rev'd, 764 F.2d 76 (2d Cir. 1985). Meyer started as an action under section 36(b) attacking advisory fees charged against the Daily Cash Accumulation Fund. That case was settled. Meyer, 609 F. Supp. at 381-82. The fund board subsequently adopted a Rule 12b-1 plan that caused certain costs to be shifted to fund

shareholders which previously had been borne by brokerage firms distributing the fund. This was attacked under section 36(b) and other theories as a violation of the terms of the settlement agreement, and that charge ultimately was rejected. Like the other 36(b) cases, the section 36(b) claim in Meyer failed due to a lack of proof. Id. at 680-81. Interestingly, the Second Circuit expressly recommended that, on remand, the district court invite comment from the SEC. Meyer, 764 F.2d at 85. But when later invited, the SEC declined to participate. Meyer, 691 F. Supp. at 680-81. Meyer thus was litigated less like a full-blown advisory fee case, and more like a lawsuit alleging breach of a settlement agreement capping compensation.


[FN199]. GAO Report, supra note 12, at 62-63.


[FN200]. Improving Price Competition, supra note 40, at 79-93 (statement of Matthew P. Fink, President, Investment Company Institute). In fairness, Mr. Fink is not alone in extolling the fund industry's alleged competitiveness. See, e.g., Alyssa A. Lappen, Funds Follies, Inst. Inv., Oct. 1993, at 39 ("[A] pressing concern [is] quite simply, whether the nation's banks, as a group, have the financial--or intellectual--wherewithal to succeed in the ferociously competitive mutual fund business."); Edward B. Rock, Foxes and Hen Houses?: Personal Trading by Mutual Fund Managers, 73 Wash. U. L.Q. 1601, 1641 (1994) ( "[P]roduct markets that are as competitive as the market for mutual funds... provide firms with strong incentives to adopt optimal personal trading policies."); Wallace Wen Yeu Wang, Corporate Versus Contractual Mutual Funds: An Evaluation of Structure and Governance, 69 Wash. L. Rev. 927, 965 (1994) ("[M]utual funds operate in a very efficient and competitive market."); see also The Financial Institutions Equity Act of 1984 Written Statement of the Investment Company Institute Hearing on H.R. 5734: Before the House Comm. on Banking, Finance and Urban Affairs, 98th Cong. (statement of David Silver, President of Investment Company Institute), reprinted in PLI, Third Annual Financial Services Institute 579, 581 (1984) ("The mutual fund industry is a vigorous and highly competitive business. We are therefore vitally concerned with any legislation or regulation which would hinder free and open competition."). Mr. Wang's claim that the fund industry is competitive was premised on a cite to the "Fact Book," put out by the ICI, the fund industry's trade association, for the proposition that "[a]t the end of 1990 there were more than 3,108 mutual funds in the United States. These funds offer similar services, with competitive fees." Wang, supra note 200, at 965 n.159. The ICI has been accused of excessive bias in favor of fund advisors, to the detriment of fund shareholders. Braham, supra note 113, at 94.


[FN201]. Schonfeld & Kerwin, supra note 20, at 108. The requirement stems from section 14(a) of the Investment Company Act, 15 U.S.C. § 80a- 15(a) (1994), which bars funds from making public offerings before their net worth equals $100,000. On the other hand, according to some industry observers, free entry is hampered by several practical problems: (1) it may be necessary for a fund to attract $100 million in assets before the advisor can cover its costs; (2) the fund's lack of an adequate performance history may prevent it from being followed by fund rating services; and (3) fund distributors recently have shown a tendency of raising their costs while reducing the number of funds and complexes they are willing to promote. See GAO Report, supra note 12, at 60.


[FN202]. The proliferation of funds is commonly cited as evidence that the industry is highly competitive. See, e.g., The Investment Company Act Amendments of 1995: Hearing on H.R. 1495 Before the Subcomm. on Telecomm. and Finance of the House Comm. on Commerce, 104th Cong. 62, 63 (1995) (statement of James Riepe, Managing Director, T. Rowe Price) ("With thousands of funds offered by hundreds of different advisors, the mutual fund industry has become very competitive. A fund with an excessive expense ratio will not be competitive and, therefore, will not attract meaningful assets if investors have alternatives."). Of course, there is another way to read the significance of the large number of market entrants: a gold rush to capitalize on extra-high margins. "There is no other marketing category with that amount of product proliferation. It defies the laws of nature, or at least the laws of marketing ...."  Lou Rubin, Financial Services: Feeling Isn't Mutual, Brandweek, Sept. 15, 1997, at 36, 36. The GAO Report made an oblique reference to this phenomenon:

  A senior official at one mutual fund firm said in a speech that about 50 fund advisors actually attempt to compete across all types of funds. He asserted that in other industries, this number would be enough to produce fierce price competition, but he found price competition conspicuously absent among mutual fund advisors.
GAO Report, supra note 12, at 64-65 (citing John C. Bogle, Senior Chairman, The Vanguard Group, Remarks on

Receiving the Special Achievement Award of the National Association of Personal Financial Advisors (June 4, 1999)).

[FN203]. GAO Report, supra note 12, at 96.

[FN204]. Price competition is more pronounced for money market funds and bond funds. This is not due to differences in regulation, which is the same for these funds and equity funds. Instead, it is due to the nature of the product. Money market funds and bond funds have lately featured lower returns, accentuating the impact of costs on investors' returns and exerting some competitive pressure on managers to keep costs down. Id. at 62-63. On the other hand, for stock funds there is little evidence that shareholders are able to buy better performance by paying higher fees. See Tufano & Sevick, supra note 34, at 347.

[FN205]. Consider the following colloquy between Congressman Moss and Robert Loeffler of IDS, which occurred in the course of the 1967 House Hearings dealing with mutual fund legislation:
  Mr. Moss:... Do they [fund directors] cover offers from other managers?
  Mr. Loeffler: They have had no occasion to do [so] sir.
  Mr. Moss: Can you cite me any instance in any fund where that has happened?
  Mr. Loeffler:... Generally speaking, sir, it does not happen, and I do not mean to contend, and would not suggest, that the unaffiliated directors of the funds... should sit down and say, "We can get a better deal from another management company.... Therefore we shift over here."
   Mr. Moss: They do not really know, do they, because they do not invite any competing offers-....Or proposals?....Do they entertain any proposals?  Do you go out and submit proposals to other funds?
  Mr. Loeffler: To other funds?
  Mr. Moss: To undertake management activities for them?
  Mr. Loeffler: No, sir.
  Mr. Moss: You do not.
  Mr. Loeffler: We have never considered this.
Investment Company Act Amendments of 1967: Hearing on H.R. 9510, H.R. 9511 Before the Subcomm. of Commerce and Fin. of the Comm. on Interstate and Foreign Commerce, 90th Cong. 479 (1967).
   In the course of the same House Hearings, another fund executive, Fred Alger, presented his view of fund economics:
  Mr. Alger: We [fund advisors] view it [the fund share] as a product which we are just trying to-
  Mr. Keith: Yes.
  Mr. Alger: I mean, that is the way we view it.
  Mr. Keith: The SEC does not think this is healthy.
  Mr. Alger: Well, there is such tremendous competition. How can something be unhealthy which is so tremendously competitive?.... I mean you can only describe it in competitive terms.... I mean no one is making an awful lot of money.... I mean management companies really are not very profitable. That is the fact of it.
Id. at 506-07. Alger's views on sponsors' profitablity may well have been accurate in 1967; they no longer are today.

[FN206]. See supra notes 85-107 and accompanying text.

[FN207]. Indeed, in Meyer v. Oppenheimer Management Corp., 609 F. Supp. 380 (S.D.N.Y. 1984), rev'd, 764 F.2d 76, 80-81 (2d Cir. 1985), the SEC expressly refused the district court's invitation to weigh in with its views . In the course of the 1967 Senate Hearings into fund industry governance, Professor Paul Samuelson stated his conclusion "that in the past competition has not served to bring down management fees to a minimal competitive level," and he suggested that "the SEC should be required to help the courts as a friend of the court in deciding on what has constituted adequate performance and proper remuneration." Mutual Fund Legislation of 1967: Hearing on S. 1659 Before the Senate Comm. on Banking and Currency, 90th Cong. 354 (1967) (statement of Prof. Paul Samuelson).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN208]. Indeed, it has studiously avoided calling for frank, detailed disclosure of advisors' profitability in fund proxy statements. See Letter from Anthony A. Vertuno, supra note 181.

[FN209]. The SEC has considered and rejected adding a proxy disclosure requirement that shareholders be given an "adviser balance sheet." Id.

[FN210]. This oversight led to the SEC staff recently admitting that it could not directly analyze the cost of providing portfolio management services "because the data are unavailable." See infra note 234.

[FN211]. See supra text accompanying notes 87-94 .

[FN212]. Role of Independent Directors of Investment Companies, Investment Company Act Release No. 24816 (Jan. 2, 2001), 2001 WL 6738 (SEC). The use of independent counsel by the independent directors has flourished in recognition of the attention given the practice by the industry's real regulators, the federal judiciary. See Tannenbaum v. Zeller, 552 F.2d 402, 428 (2d Cir. 1977) (stating that it would have been preferable if the fund's independent directors received advice from independent counsel, rather than counsel who also represented the fund and the fund's advisor and distributor); Fogel v. Chestnutt, 533 F.2d 731, 750 (2d Cir. 1975) ("It would have been... better to have the investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors."); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 965, 982, 986 (S.D.N.Y.), aff'd, 835 F.2d 45 (2d Cir. 1987) (noting that "[d]uring all relevant times, the independent directors... had their own counsel" who was an "important resource" and whose advice "the record indicates the directors made every effort to keep in mind as they deliberated"); Gartenberg v. Merill Lynch Asset Mgm't, Inc., 528 F. Supp. 1038, 1064 (S.D.N.Y. 1981), aff'd, 694 F.2d 923 (2d Cir. 1982) (noting that the "non-interested Trustees were represented by their own independent counsel... who acted to give them conscientious and competent advice"). The SEC proposal would not impose blanket requirements on all funds; however, most funds, those relying on any of the SEC's ten most commonly used exemptive rules, would be covered. See Materials Submitted by the Division of Investment Management, The SEC Speaks In 2000, at 13, 21 (2000).

[FN213]. See infra note 212 and accompanying text.

[FN214]. Protecting Investors Report, supra note 28, at 266-67.

[FN215]. Investment Company Institute, Report of The Advisory Group on Best Practices for Fund Directors 5 (June 1999) ("The vast majority of fund boards today consist of a majority of independent directors.") [hereinafter "ICI Advisory Group Report" ]. In 1992, the SEC's staff proposed that the Commission require by regulation that a majority of fund directors be independent, and noted that this change would be minor because "many, if not most, major investment company complexes already have boards with independent majorities." SEC Division of Investment Management, Protecting Investors: A Half Century of Investment Company Act Regulation 268 (1992). Six years ago, legislation was pending in Congress to require that a majority of fund directors be independent. One industry witness, speaking in favor of the legislation, noted that "Investment Company Institute data indicate that nearly all... funds... have a majority of independent directors," with the result that "the proposed statutory revisions would be largely superfluous." Investment Company Act Amendments of 1995: Hearing on H.R. 1495 Before the Subcomm. on Telecomm. and Finance of the House Comm. on Commerce, 104th Cong. 75, 78 (1995) (statement of Paul G. Haaga, Jr., Senior Vice President and Director, Capital Research and Management Company). A study analyzing the makeup of fund boards for the industry's 50 largest fund sponsors found in 1992 that 71% of the seats on the sampled fund boards were held by independent directors, with the average independent director sitting on sixteen board seats within the sponsor's complex. Tufano, supra note 34, at 331-34. Interestingly, the study found that "funds whose boards have a larger fraction of independent directors tend to charge investors lower fees." Id. at 348. It also found "some evidence that funds whose independent directors are paid relatively larger directors' fees

approve higher shareholder fees than those directors who are paid less." Id. at 353.


[FN216]. American Bar Association, Fund Directors' Guidebook, 52 Bus. Law. 229, 247-48 (1996) (discussing the role of nominating committees). Testifying before Congress in 1995, the Director of the SEC's Division of Investment Management noted that the requirement that fund independent directors be nominated and selected by the other independent directors "is a type of arrangement that is used in many fund complexes today." Investment Company Act Amendments of 1995: Hearing on H.R. 1495 Before the Subcomm. on Telecomm. and Finance of the Comm. on Commerce, 104th Cong 30 (1995) (Statement of Barry P. Barbash, Director, SEC Division of Investment Management).


[FN217]. American Bar Association, supra note 216, at 254.


[FN218]. Role of Independent Directors of Investment Companies, Investment Company Act Release No. 24816 (Jan. 2, 2001), 2001 WL 6738 (SEC).


[FN219]. See, e.g., Model Rules of Prof'l Conduct R. 1.7(b).


[FN220]. ICI Advisory Group Report, supra note 215. Among other things, the ICI group recommended that at least two-thirds of the directors of all investment companies be independent directors (the SEC requires merely a majority). The ICI Advisory Group also recommended that: "Former officers or directors of a fund's investment advisor, principal underwriter or certain of their affiliates not serve as independent directors of the fund." Id. at 23. "Independent directors be selected and nominated by the incumbent independent directors." Id. at 25. "Independent directors establish the appropriate compensation for serving on fund boards." Id. at 27. "Fund directors invest in funds on whose boards they serve." Id. at 28. "Independent directors have qualified investment company counsel who is independent from the investment advisor and the fund's other service providers; and that independent directors have express authority to consult with the fund's independent auditors or other experts, as appropriate, when faced with issues that they believe require special expertise." ICI Advisory Group Report, supra note 215, at 29. "Independent directors complete on an annual basis a questionnaire on business, financial and family relationships, if any, with the advisor, principal underwriter, other service providers and their affiliates." Id. at 32.
   Investment company boards establish Audit Committees composed entirely of independent directors; that the committee meet with the fund's independent auditors at least once a year outside the presence of management representatives; that the committee secure from the auditor an annual representation of its independence from management; and that the committee have a written charter spelling out its duties and powers.
Id. at 33.
   "Independent directors meet separately from management in connection with their consideration of the fund's advisory and underwriting contracts and otherwise as they deem appropriate." Id. at 35. "Independent directors designate one or more 'lead' independent directors." Id. at 36. "Fund boards obtain directors' and officers' errors and omissions insurance coverage and/or indemnification from the fund that is adequate to ensure the independence and effectiveness of independent directors." ICI Advisory Report, supra note 215, at 36. "Investment company boards of directors generally are organized either as a unitary board for all the funds in a complex or as cluster boards for groups of funds within a complex, rather than as separate boards for each individual fund." Id. at 38. "Fund boards adopt policies on retirement of directors." Id. at 40. "Fund directors evaluate periodically the board's effectiveness." Id. "New fund directors receive appropriate orientation and all fund directors keep abreast of industry and regulatory developments." Id. at iii-iv.


[FN221]. See Barker, supra note 10, at 122 (reporting on a study of the top 10 complexes, accounting for 46% of the industry's assets); ISS Takes on ICI Over Best Practices Proposals, Fund Action, July 12, 1999, at 1 ("The recommendations from the ICI Advisory Group on Best Practices for Fund Directors amounted to 'a good beginning, but certainly not enough,' said ISS Director of Proxy Voter Services, Richard Ferlauto. 'It was less than half a step even." ') .

[FN222]. Used with the same meaning ascribed to it in Rule 405 under the Securities Act of 1933, 17 C.F.R. § 230.405 (1999): An "affiliate" of, or person "affiliated" with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

[FN223]. Gartenburg, 694 F.2d at 929-30; see Krinsk v. Fund Management, Inc., 875 F.2d 404, at 409 (1989) (citing Gartenburg for the proposition that comparative fee structures should be weighed by fund boards when determining whether the section 36(b) reasonableness standard has been met).

[FN224]. In fairness to the SEC, it is not alone in failing to demand, or even suggest, that fund directors investigate other advisory dealings by the advisor or its affiliates when approving advisory fee requests. The ABA- authored Fund Directors' Guidebook, supra note 216, likewise ignores other advisory activity, suggesting only that directors undertake "a comparative analysis of expense ratios of, and advisory fees paid by, similar funds." Id. at 249-50.

[FN225]. For an essay emphasizing the tie-in between corporate governance and financial disclosure, see Louis Lowenstein, Financial Transparency and Corporate Governance: You Manage What You Measure, 96 Colum. L. Rev. 1335 (1996).

[FN226]. SEC Chairman Arthur Levitt testified before Congress in 1998 that:
  Historically, Congress and the Commission have taken a three-pronged approach to investor protection. First, reduce conflicts of interest that could result in excessive charges. Second, require that mutual fund fees be fully disclosed so that investors can make informed decisions. And third, let market competition, not government intervention, answer the question of whether any mutual fund's fees are too high or low. The Commission remains vigilant on behalf of investors in its oversight of mutual fund fees and expenses.
Improving Price Competition, supra note 40 (statement of Arthur Levitt, Chairman, U.S. Securities and Exchange Commission), available at http:// www.sec.gov/news/testimony/testarchive/1998/tsty1398.htm. Action by the Commission to mandate disclosure allowing calculation of advisory profits would address each of the three prongs mentioned by Chairman Levitt.

[FN227]. This data is essential to evaluate whether fees are excessive under Gartenburg, which takes into account the profitability of the fund to the advisor-manager, economies of scale, and comparative fee structures. Gartenberg, 694 F.2d 929-30.

[FN228]. See In re Donald J. Trump Casino Sec. Litig., 793 F. Supp. 543, 559 (D.N.J. 1992) ("[T]here [is no] legal obligation for management to compare itself, unfavorably or otherwise, to industry competitors. Comparison shopping is the responsibility of the reasonable investor.").

[FN229]. Gartenberg, 694 F.2d at 929 (emphasis added).

[FN230]. A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The Court explained in TSC that to fulfill the materiality requirements "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. See also 17 C.F.R. § 230.405 (1999) (definition of materiality paralleling that enunciated in TSC Industries). For a state law fiduciary duty case arising in the fund setting using the same materiality test, see O'Malley v. Boris, 742 A.2d 845, 850 (Del. 1999).

[FN231]. See, e.g., GAO Report, supra note 12, at 28 (noting that "[v]arious studies have also documented the impact of fees on investors' returns by finding that funds with lower fees tended to be among the better performing funds.").

[FN232]. Krinsk, 875 F.2d at 409.

[FN233]. Gartenburg, 694 F.2d at 929.

[FN234]. The SEC's staff made clear in its Report on Mutual Fund Fees and Expenses that "although expense ratios are important, it can be misleading to focus on one number without identifying key factors that influence that number." Report on Mutual Fund Fees, supra note 5. A key component of expense ratios for actively managed funds is the investment advisory fee, reflecting the price charged for investment advice rendered to the fund. Yet the SEC has prescribed no uniform reporting requirement for that key item, a shortcoming reflected in the staff's report on fees and expenses. The report presents the staff's finding that it was unable to analyze directly the cost of providing portfolio management services because "the data are unavailable." The report used management fees as a proxy for the missing advisory fee data, a substitution the staff admitted was far from perfect since management fees "often pay for other services as well." Id.

[FN235]. See Improving Price Competition, supra note 40, at 79 (statement of Matthew P. Fink, President, Investment Company Institute).

[FN236]. For example, the GAO found its analysis of overall industry profitability stymied due to "the unavailability of comprehensive financial and cost information." GAO Report, supra note 12, at 6.

[FN237]. Investment Company Act Amendments of 1995: Hearing on H.R. 1495 Before the Subcomm. on Telecomm. and Finance of the Comm. on Commerce, 104th Cong. 2 (1995) (statement of Hon. Jack Fields, Chairman of Subcomm. on Telecomm. and Finance). Another industry observer has concluded, "Investors have a hard time determining what they are paying and an even more difficult time determining what they are getting. Some fees are hidden and many fees are charged in a complicated fashion." Improving Price Competition, supra note 40, at 50 (statement of Charles Trzcinka, Professor of Finance, State University of New York at Buffalo).

[FN238]. Robert A. Robertson, In Search of the Perfect Mutual Fund Prospectus, 54 Bus. Law. 461, 472 (1999).

[FN239]. Id. at 475 ("While mutual fund companies are catering directly to bakers and sales clerks, mutual fund prospectuses appear intelligible to only bankers and securities lawyers.").

[FN240]. Professor Charles Trzcinka testified as follows before Congress in the course of the same hearings in which Mr. Fink made his "clear disclosure" claim:
  The theme of my work is simple. Investors have a hard time determining how much they are paying and an even more difficult time determining what they are getting. Some fees are hidden and many fees are charged in a complicated fashion. At best, the total fee can be estimated from the disclosure of most funds but if an investor decides to estimate fees, it is very difficult to compare portfolios of risky securities. There are limitations in applying all measures of risk and there is a lack of uniformity in their application.
Improving Price Competition, supra note 40, at 50.
  Professor Trzcinka's findings are as follows:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:04-cv-11651-MLW    Document 46-2    Filed 11/03/2005    Page 56 of 60

26 JCORPL 609                                                                    Page 55
**(Cite as: 26 J. Corp. L. 609)**

Total expenses paid by investors have not fallen over the past decade and probably have risen.

There is no relationship between the level of expense ratios and risk- adjusted performance except that large expense ratios substantially reduce performance.

There is no evidence that managed mutual funds have performed better than funds that simply try to match an index or a combination of indices.

There is little evidence of persistence of good performance, there is stronger evidence of persistence of poor performance.

Good performance is rewarded by investors, poor performance is ignored except when the poor performance is extreme.

Information available to investors on mutual fund portfolio management is poor.
Id.

Many of Professor Trzcinka's views were echoed at the hearings by witness Harold Evensky, a certified financial planner who complained:

[I]n the aggregate the fund industry is ethical and professional, however there are numerous problems. Most seem to be related to the industry's shift from a focus on trusteeship to a focus on asset gathering and distribution. More specifically, these problems include a misperception of the role of the fund vis-à-vis the investor, inadequate supervision by the funds' independent trustees, poor disclosure, inadequate communications and a long bull market. The combination of these factors results in poorly informed investors making bad decisions about investing in funds that often do not deliver the benefits reasonably expected of competition and economies of scale.
Improving Price Competition, supra note 40, at 62 (statement of Harold Evensky).

[FN241]. See supra note 10 .

[FN242]. Report on Mutual Fund Fees, supra note 5.

[FN243]. Krinsk, 715 F.Supp. at 481 (internal citations omitted).

[FN244]. Id.

[FN245]. Report on Mutual Fund Fees, supra note 5.

[FN246]. Id.

[FN247]. Krinsk, 875 F.2d at 409.

[FN248]. Id.

[FN249]. Total fund expenses generally include investment advisory services, administration and operations, shareholder account maintenance, marketing and distribution, custodian's fee, auditing fee, state taxes, shareholders' reports, annual meetings and proxy costs and directors' fees and expenses.
Mary Joan Hoene, Fund Distribution: Proposed Elimination of Section 22(d); Market Tailored Fund Structures, in Investment Companies 1992, at 87, 107 n.4 (PLI Corp. Law & Practice Course, Handbook Series No. B4 7015) (quoting a memorandum from SEC Division of Investment Management to Chairman Breeden, Apr. 9, 1992).

[FN250]. Id. at 107 n.3 (noting that the fund's advisory fee pays for  "portfolio management but, under some contracts, they may also pay for ancillary administrative, shareholder accounting, and transfer agency services.").

Copr. ©  West 2004 No Claim to Orig. U.S. Govt. Works

[FN251]. Gordon J. Alexander, et al., Mutual Fund Shareholders: Characteristics, Investment Knowledge, and Sources of Information (June 26, 1996), available at 1996 WL 10828970.

[FN252]. Id.

[FN253]. See, e.g., Ellen Schultz, Blizzard of Retirement-Plan Offerings Eases Drought in Mutual-Fund Choices, Wall. St. J., Dec. 21, 1995, at C1, C25 (reporting on survey of retirement-plan participants by a division of John Hancock Mutual Life Insurance Co., reflecting that more than a third of respondents believed it was impossible to lose money in a bond fund, while an additional 10% were unsure, 12% of the respondents also believed it was impossible to lose money in a stock fund or answered that they were unsure).

[FN254]. SEC, U.S. Securities and Exchange Commission, at http:// www.sec.gov/ (last visited Jan. 24, 2001).

[FN255]. Longo, supra note 10, at 1. "The attention paid to the issue [of rising fund fees] by the Subcommittee on Finance and Hazardous Materials has the Securities and Exchange Commission and the mutual fund industry falling all over themselves to defend and justify not only rising fund fees, but the fund industry itself." Id.

[FN256]. Another barrier to greater price competition is the fund industry's complex fee structures. In addition to advisory fees, funds assess distribution charges through front-end or contingent deferred sales loads and through rule 12b-1 fees; some funds also charge certain types of administrative fees. The investor's difficulty in evaluating overall costs and services inhibits price competition.
Id. at 108 (quoting a Memorandum from the Division of Investment Management to SEC Chairman Breeden, Re: Chairman Dingell's Inquiry Concerning Mutual Fund Fees). The staff's observation that the fund industry's "complex fee structures" breed investor confusion obviously fails to conform with the ICI's contention that "clear disclosure" is a fund industry norm, and a force driving vigorous competition. Id.

[FN257]. Hoene, supra note 249, at 108.

[FN258]. Arthur Levitt, Opening Statement of Chairman Arthur Levitt at the Open Meeting on Regulation Fair Disclosure (Aug. 10, 2000), at http:// www.sec.gov/extra/seldisal.htm (last modified Aug. 10, 2000).

[FN259]. Arthur Levitt, Remarks at Mutual Fund Directors Education Council Conference (Feb. 17, 2000), http://www.sec.gov/news/speeches/spch346.htm (last modified Feb. 18, 2000). Levitt explained: "On an investment held for 20 years, a 1% annual fee will reduce the ending account balance by 18%." Id.

[FN260]. See Letter from Paul F. Roye to Thomas J. McCool (May 10, 2000), reprinted in GAO Report, supra note 12, at 102-09.

[FN261]. Simon, supra note 10 at 130 (quoting Susan Woodward).

[FN262]. Rachel Witmer, SEC Wants Mutual Funds Voluntarily to Disclose Risk, Fee Data, Barbash Confirms, 30 Sec. Reg. & L. Rep. (BNA) 1006-07 (Jul. 3, 1998). The SEC's Chairman, Arthur Levitt, lamented to Congress, "I continue to be struck by the lack of investor knowledge of fund fees and expenses. The typical investor simply is not

using the wealth of available fee information in considering mutual funds." Improving Price Competition, supra note 40, at 37 (statement of Arthur Levitt, Chairman, U.S. Securities and Exchange Commission), available at http:// www.sec.gov/news/testimony/testarchive/1998/tsty1398.htm. If the Commission demanded that advisors publish cost information showing advisory office profitability, the information would undoubtedly have a profound impact on competition, whether individual investors studied it or not. Such information could be used by directors in negotiating fee concessions, by the media in assessing the quality of board oversight, and by plaintiffs' lawyers in holding boards accountable under section 36(b). As it is, investors, the media, litigants, and even inquiring agencies such as the GAO are left to operate in the dark. This serves the interests of fund advisors, but not the interests of the fund investors the SEC was created to protect.

[FN263]. Barry P. Barbash, Mutual Fund Consolidation and Globalization: Challenges for the Future, Remarks at the Mutual Funds and Investment Management Conference (March 23, 1998), available at http:// www.sec.gov/news/speech/speecharchive/1998/spch208.htm. The SEC Division Director's analogy is worth inspecting. VCR's are made by companies driven to be the low-cost providers, the better to earn profits for the selling company's owners, i.e., its shareholders. In the VCR industry, conflicts of interest between the manufacturer's managers and its shareholders are not a way of life. Indeed, it is acknowledged that, over the years "makers of VHS VCR's have competed vigorously, lowering prices and improving product quality." Carole E. Handler and Julian Brew, The Application of Antitrust Rules to Standards in the Information Industries--Anomaly or Necessity?, The Computer Law., Nov. 1997, at 1, 6. In the fund industry, where price competition is less bare-knuckled, money managers still routinely enjoy returns on equity for their advisory firms exceeding 25%. Oppel, supra note 77, at 11.

[FN264]. Witmer, supra note 262, at 1006-07. Division Director Barry Barbash explained that: "In short, any comparison to a competitor's fund that a fund company might make in an ad could be claimed by its competitor to be unfair, as funds provide varying levels of services and use varying means to calculate costs." Id.

[FN265]. Report on Mutual Fund Fees, supra note 5.

[FN266]. The GAO's detailed study of fund costs was inhibited because the researchers were "unable to determine the extent to which mutual fund advisors experienced... economies of scale because information on the costs and profitability of most fund advisors was not generally publicly available." GAO Report, supra note 12, at 33.

[FN267]. Letter from Erik Sirri, Chief Economist, SEC, to John C. Bogle, Chairman, The Vanguard Group 2 (March 23, 1999).

[FN268]. John C. Bogle, Investment Management: Business or Profession and What Role Does the Law Play?, Remarks at the New York University Center for Law and Business 9 (Mar. 10, 1999) (transcript on file with the Journal of Corporation Law).

[FN269]. GAO Report, supra note 12, at 1, 7-8. The GAO also recommended as an alternative, disclosures allowing investors to estimate fee charges for their accounts. Id. at 14.

[FN270]. GAO Report, supra note 12, at 13:
  After they have invested, fund shareholders are not provided the specific dollar cost of the mutual fund investments they have made. For example, mutual fund investors generally receive quarterly statements detailing their mutual fund accounts. These statements usually indicate the beginning and ending number of shares and the total dollar value of shares in each mutual fund owned. They do not show the dollar amount of operating expense fees that were deducted from the value of these shares during the previous quarter. This contrasts with most other financial

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

products or services, such as bank accounts or brokerage services, for which customer fees are generally disclosed in specific dollar amounts.

[FN271]. See Schuyt, 663 F. Supp. at 973, 974 (quoting twice with approval from Gartenberg, 694 F.2d at 929, the proposition that a key reason why "fund competition for shareholder business does not lead to similar competition between advisors for fund business is the relative insignificance of the advisor's fee to each shareholder").

[FN272]. GAO Report, supra note 12, at 17.

[FN273]. Witmer, supra note 262, at 1006-07.

[FN274]. Report on Mutual Fund Fees, supra note 5.

[FN275]. Bogle, supra note 268, at 8.

[FN276]. The GAO Report notes:

  Critics have also indicated that the legal standards applicable to directors' oversight of fees are flawed. One factor that directors consider is how their fund's fee compares to those charged by other similar funds. However, a private money manager stated that directors have no basis, therefore, for seeking a lower fee if their fund is charging fees similar to those of other funds. An industry analyst indicated that basing a fund's fees on those charged by similar funds results in fees being higher than necessary. He stated that although it is a safe way to set fees, in light of the Gartenberg standards, such practices do not contribute to lower fees.

GAO Report, supra note 12, at 94; see also Bogle, supra note 18, at 327-28  (reporting an instance in which, following a successful effort to have fund shareholders raise the advisory fee because, among other things, its rates were "below average," the advisor promptly sold itself for "a cool $1 billion") . The problem, in other words, is that so long as fund fees levels are viewed in isolation, as Gartenberg has been read (incorrectly) to suggest they should be, high fee levels are apt to lead to still higher fees. Half of the service suppliers at any point in time will be working for below-average compensation. The cellar dwellers are thus able to argue they need a raise, particularly in view of the allegedly ferociously competitive market for fund advisory talent. See Wyatt, supra note 10, § 3, at 1 ("We have to make sure that the fees the funds are paying are competitive enough to keep the players in the game," said Stephen K. West, a lawyer at the New York firm of Sullivan & Cromwell, who serves as an independent director of the Pioneer and Winthrop Focus funds. "The competition for managerial talent is enormous, which has caused the cost of running the business to explode."). Evidently, the market for pension fund advisory help has not caught fire to the same extent as the fund management market.

[FN277]. According to one industry observer, "[t]he ICI is by fund companies, for fund companies, and their incentive, their compensation-- everything is to favor fund management." Braham, supra note 113, at 94 (quoting Don Phillips, CEO of Morningstar, Inc.). As of July 2000, 39 of 45 ICI board members worked for fund advisors. Id.

[FN278]. A digest of John Bogle's critique of one industry study is set forth supra note 78 . For the authors' critical analysis of the ICI's economies of scale study, see supra notes 70-86 and accompanying text.

[FN279]. Investment Company Act of 1940 § 1(b)(2), 15 U.S.C.A. § 80a- 1(b)(2) (West Supp. 1999). The Act was written "to mitigate and, so far as is feasible, to eliminate these conditions." Id. § 80a-1(b)(2).

[FN280]. Investment Company Act Amendments of 1967: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce, 90th Cong. 616 (1967) (statement of Judge Henry J. Friendly, U.S. Appeals Court., N.Y., N.Y.).

[FN281]. Id.

[FN282]. Mutual Fund Legislation of 1967: Hearing on S. 1659 Before the Senate Comm. on Banking and Currency, 90th Cong. 368-69 (1967) (statement of Prof. Paul Samuelson).

[FN283]. Wharton Report, supra note 87, at 485.

[FN284]. Moreover, price competition, to the extent it exists, is more evident in the money market segment of the fund industry. See GAO Report, supra note 12 at 6 n.3 ("[m]oney market funds generally have not been the focus of recent concerns regarding fees").

[FN285]. Susan Harrigan, Street Smarts, Newsday, July 30, 2000, at F2, available at 2001 WL 9230159.

[FN286]. Jacquelyn Rogers, Burning Issues Waft over Smoking and the Workplace, Employee Benefit News, June 1, 2000, 2000 WL 10182690. The equity fund savings number is in line with Warren Buffett's estimate that funds could save their shareholders $10 billion annually if they were managed more like regular corporations, for example, with primary emphasis on creating and protecting value for shareholders. See Bogle, supra note 30, at 372. Bogle puts the number considerably higher: "In fact, such savings could easily top $30 billion each year." Id.

[FN287]. The authors' analysis of fund data was complicated greatly by some funds' tendency to include as advisory fees extraneous expense items which other funds categorized as administrative costs. In the fund industry, "[a] dvisory fees generally pay for portfolio management but, under some contracts, they also may pay for ancillary administrative, shareholder accounting, and transfer agency services." Hoene, supra note 249, at 89, 106, 107 n.4. (quoting SEC Division of Investment Management Memorandum to SEC Chairman Breeden (Apr. 9, 1992)).

[FN288]. Castillo v. Dean Witter Discover & Co., [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 90,299 at 91,091 (S.D.N.Y., June 25, 1998). The case is discussed in supra note 124 .

[FN289]. Report on Mutual Fund Fees, supra note 5.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works