# Conclusions and Recommendations

## Conclusions

Because of the unavailability of comprehensive data on costs advisers incurred operating mutual funds, we were unable to determine to what extent the growth in mutual fund assets during the 1990s provided advisers the opportunity to reduce fund expense ratios. We found that many large funds had reduced their operating expense ratios between 1990 and 1998, with the average fee among the largest stock funds declining by 20 percent. However, not all funds reduced their fees, including some that had grown by more than 500 percent during that period. These results also reflect the largest funds, whose advisers were most likely to have experienced economies of scale that would have allowed them to reduce these funds' expense ratios. In addition, our sample consisted primarily of the largest and fastest growing funds in the industry and thus may not reflect the characteristics and the trend in fees charged by other funds.

We also found certain limitations in the mechanisms that regulators currently rely on to influence fee levels. As with other financial products, regulators rely on competition as means of setting prices for products and services. However, competition in the mutual fund industry is not generally price-based and thus may not be strongly influencing fee levels.

Regulators also rely on fee disclosures to inform investors of the fees that funds charge. The information that is disclosed in mutual fund prospectuses and annual reports allows investors to compare the relative fees and expenses charged by differing funds. However, while mutual fund statements show the dollar amounts of any transaction fees deducted from shareholder accounts, they do not disclose the actual dollar amounts of each investor's share of the fund's operating expenses. Some officials we interviewed acknowledged that such information would reinforce the fact that investors are paying for mutual fund advisers' services. Including the dollar amount paid in fees along with each investor's account value would also put mutual fund statements on comparable footing with that of other financial services whose specific charges also routinely appear in confirmation and account statements. Fees stated in dollar terms, considered in conjunction with other relevant information such as investment goals, could spur investors to evaluate the services they receive from their funds in exchange for the fees being charged and to compare their funds' services and fees with those of other funds with similar investment objectives. Prominently and regularly disclosing to investors the specific dollar amount of operating expense fees each investor pays could also encourage more fee-based competition among fund advisers, as has occurred with brokerage commissions and other financial services.

**Chapter 7**
**Conclusions and Recommendations**

To produce such information, fund advisers may have to make changes in their account management systems to collect and calculate information that is not currently maintained. Advisers and certain broker-dealers whose customers invest in mutual funds would also incur both one-time and ongoing costs. However, estimates for these costs did not appear to be inordinately high—with some estimates generally indicating that such costs might be a few dollars or less per investor. In addition, industry participants have already identified alternative, less costly, ways of calculating the dollar amount of fees paid by individual fund investors, such as by multiplying a fund's share value by its expense ratio and an average of the number of shares held by an investor during the prior period rather than by maintaining information on each investors actual daily share of expenses.

Another alternative means of disclosing dollar amounts of operating expense fees paid on individual investor statements would be to provide the dollar amount of fees paid for preset investment amounts, such as $1,000, which investors could use to estimate the amount they paid on their own accounts. In determining how such disclosures could be implemented, regulators will have to weigh the costs that the industry may incur to calculate fees for each investor against the burden and effectiveness of providing investors with the requisite information and having them be responsible for making such calculations on their own.

Regulators also rely on mutual fund boards of directors to serve as a check on the fees charged by the funds they oversee. Currently, fund directors annually review the fees of the funds they direct and, among other things, generally maintain their funds' fees within a reasonable range of fees charged by other funds. Opinions about fund directors' effectiveness varied, and regulators are taking steps to increase directors' independence from their funds' advisers. However, these steps are not likely to have a significant impact on fees because most funds already have many of the proposed reforms in place and their purpose is to generally enhance director effectiveness and did not specifically address fees. Our analysis of the largest funds' fees, which showed higher fee funds migrating to lower fee levels while lower fee funds generally retained their levels, is consistent with assertions that mutual fund directors are choosing to keep fees at a level comparable to those of other funds. Whether this level is appropriate for the industry is not known.

# Recommendations

To heighten investors' awareness and understanding of the fees they pay on mutual funds, we recommend that the Chairman, SEC, require that the periodic account statements already provided to mutual fund investors

Chapter 7
Conclusions and Recommendations

include the dollar amount of each investor's share of the operating expense fees deducted from their funds. This disclosure would be in addition to presently required fee disclosures. Because these calculations could be made in various ways, SEC should also consider the cost and burden that various alternative means of making such disclosures would impose on (1) the industry and (2) investors as part of evaluating the most effective way of implementing this requirement. Where the form of these statements is governed by NASD rules, SEC should require NASD to require the firms it oversees to provide such disclosures.

## Agency and Industry Comments and Our Evaluation

We requested comments on a draft of this report from the heads, or their designees, of SEC and NASDR. In addition, we requested comments from the mutual fund industry association, ICI. Each of these organizations provided us with written comments, which appear along with our responses to individual comments in appendixes I through III. Additional technical comments from SEC were incorporated into this report as appropriate.

Overall, each of the commenting organizations agreed that our report raised important issues and contributed to the public dialogue on mutual fund fees. In his letter, the director of SEC's Division of Investment Management indicated that SEC staff agreed that investors need to be aware of and understand the fees that mutual funds charge. The letter also indicated that the SEC staff welcomed the report's recommendation and intended to consider it carefully. The vice president of NASDR's Investment Companies/Corporate Financing Department agreed in his letter that investors should consider fees, expenses, and other issues in addition to performance in making investment decisions.

However, the letters from the SEC, NASDR and ICI officials raised several issues about our report. ICI's letter notes that although promoting investor awareness of the importance of fund fees is a priority for ICI and its members, ICI officials had reservations about the account statement recommendation that investors periodically receive information on the specific dollar amounts of the fees deducted from their mutual fund accounts. Their concern was that this requirement could erode the value of the fee information currently provided in the prospectus and thus impede informed assessments of fee levels at competing funds, which could paradoxically diminish rather than enhance investors' overall understanding of fund fees.

We agree with ICI and the other commenters that the current disclosures made by mutual funds, which provide fund expense ratios expressed as a

Chapter 7
Conclusions and Recommendations

percentage of fund assets and include an example of the likely amount of expenses to be incurred over various holding periods for a hypothetical $10,000 account, are useful for investors in comparing between funds prior to investing. The additional disclosure we recommend is intended to supplement, not replace, the existing disclosures, and should serve to reinforce to investors that they do pay for the services they receive from their mutual funds as well as indicate to them specifically how much they pay for these services.

SEC, NASDR, and ICI also commented on our observation that other financial products and services disclose specific dollar amounts for the fees charged to their users, but mutual funds do not. In their comments, these organizations generally indicated that not all charges are disclosed for other financial products and services; thus, the disclosures for mutual funds are not that dissimilar. For example, SEC noted that funds disclose to investors specific dollar charges subtracted from their accounts, such as for sales loads or account fees, but do not disclose the specific charges that are levied outside the account. SEC stated that this is similar to banks not disclosing the spread between the gross amount earned by the financial service provider on customer monies and the net amount paid to the customer.

We do not agree with the commenting organizations that mutual funds' lack of disclosure of the specific operating expenses to individual investor accounts is comparable to the practices of banks or other businesses that do not disclose the difference between their investment or operating earnings and the amounts they pay to the individuals who provided those operating or investment funds. Investors in mutual funds have in essence hired the adviser to perform the service of managing their investment dollars for them. The fees that the advisor and the other service providers deduct from the fund's assets represent the price of the services they perform. Although such fees are deducted from the fund overall, each individual investor's account is ultimately reduced in value by their individual share of these deductions. However, the specific amount of these deductions is not disclosed in dollar terms to each investor. In contrast, customers and users of other financial services, such as private money managers, banks, and brokerage firms, are told of the specific dollar amounts subtracted from their individual assets or accounts.

Customers who place money in savings accounts, bank certificates of deposit, or bonds are not purchasing investment management or financial transaction services as are mutual fund investors. Thus, customers placing money in those other investment or savings products are generally told

**Chapter 7**
**Conclusions and Recommendations**

what the nominal returns will be, regardless of how the firm providing the product will use the customer's capital to conduct investment or operating activities intended to produce sufficient income to provide the promised rate of return to the customer. In such cases, customers are not entitled to the residual returns earned by their capital but instead are promised and paid a fixed return.

Furthermore, the fact that not all financial products provide information on all their charges to account holders does not reduce the likely usefulness of such information to the millions of mutual fund investors. Instead, independent evaluations of the usefulness of providing such information for those other products would be necessary to determine if similar disclosures would also benefit the users of those other products.

All three commenting organizations also generally questioned our finding that mutual funds do not compete primarily on the price of their services. SEC noted that although an argument could be made that more price competition should occur in the mutual fund industry, it is not completely absent. ICI emphasized that because funds report performance on an after fees and expenses basis, mutual funds do compete on the basis of their fees. NASDR stated that our draft report did not address the fact that mutual funds present performance net of expenses.

Our report notes that a mutual fund is required to disclose its performance net of fees and expenses; its performance is the primary basis upon which funds compete. However, competition on the basis of net returns may or may not be the same as competition on the basis of price. Separating the fee from the return would remind investors that a fee is embedded in their net returns. In addition, our report also notes that when customers are told the specific dollar amounts of the fees or charges, such as they are for stock brokerage transactions or bank checking accounts, firms in those industries appear to more frequently choose to compete directly on that basis, resulting in greatly reduced charges for such services. Implementing our recommendation to have such information provided to mutual fund investors could provide similar incentive for them to evaluate the services they receive in exchange for the fees they pay. Disclosing such information regularly could also encourage more firms to compete directly on the basis of the price at which they are willing to provide mutual fund investment services.

SEC and ICI also questioned the legal accuracy of some of the statements made by individuals we interviewed regarding the role of mutual fund directors in overseeing fees. The individuals we quoted were critical of the

**Chapter 7**
**Conclusions and Recommendations**

director practice of setting their funds' fees only in relation to the fees charged by other funds; however, both SEC and ICI indicated that fund directors, by law, are required to review a wide range of information when assessing the fees charged by their fund advisor and other service providers.

We have added text to the report to indicate that comparing one fund's fees to those charged by other funds is not the only factor that directors are required to consider when evaluating fees. However, in the opinion of the individuals whose comments we cited, directors are primarily emphasizing such comparisons over the other factors they are also required to consider as part of their fee reviews. As a result, these individuals see directors as maintaining fee levels, or at least allowing fees to be lowered only to the extent that other funds are taking similar actions.

Furthermore, we recognize that a firm's comparison of the prices it charges with those its competitors charge is a legitimate and perfectly acceptable means for firms to evaluate their own business strategies. However, in the mutual fund industry, which competes indirectly on the basis of such charges, such comparisons may serve to maintain fees at a consistent level or allow them to be reduced only by amounts similar to those of other funds' reductions, as the individuals we interviewed stated. Although we did find that fees for many mutual funds have declined, we also noted in chapter 2 of our report that we were unable to determine if the growth in fund assets would have provided advisers the opportunity to reduce fees by even more.

Appendix I

# Comments From the Securities and Exchange Commission

Note: GAO comments
supplementing those in the
report text appear at the
end of this appendix.



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

DIVISION OF
INVESTMENT MANAGEMENT

May 10, 2000

Thomas J. McCool
Director, Financial Institutions
 and Markets Issues
General Government Division
U.S. General Accounting Office
Washington, DC 20548

Re:    GAO Draft Report
       Mutual Fund Fees:  Additional Disclosure Could Encourage Price
       Competition

Dear Mr. McCool:

Thank you for the opportunity to comment on the General Accounting Office's
draft report and assessment of mutual fund fees.  The report provides a wide-ranging
analysis of mutual fund fees and the market forces and regulatory requirements that
impact those fees.  I commend the GAO for contributing to the public dialog about this
important matter.

The report raises important issues concerning the impact of mutual fund fees on
investors.  The major conclusion of the report is that additional disclosure could help
increase investor awareness and understanding of mutual fund fees and, thereby, promote
additional competition by funds on the basis of fees.  The report recommends that the
Commission require that periodic account statements include additional disclosure about
the portion of mutual fund expenses that the investor has borne.

We agree that investors need to be aware of and understand the fees that mutual
funds charge.  The question to be answered, however, is how best to accomplish that goal.
As the report points out, there are advantages and disadvantages of the report's
recommendation and alternatives that need to be considered.  We welcome the report's
recommendations and suggestions, and will consider them carefully.

As you know, Congress and the Commission have sought to protect investors
from excessive fees in two ways.  First, the securities laws require full and complete
disclosure of fees so investors can make informed decisions.  Second, the Investment
Company Act establishes procedural safeguards relating to the corporate governance
structure of funds to protect against potential conflicts of interest, including those
involving fees.  In this regard, the Commission has taken many steps in recent years to
protect the interests of shareholders.  Below we summarize the recent initiatives.

Appendix I
**Comments From the Securities and Exchange Commission**

Thomas J. McCool
Page 2

Following this summary are our general comments and observations concerning various issues addressed in the report.

I.    Recent Initiatives Relating to Mutual Fund Fees

     A.    Disclosure and Investor Education Initiatives

        The primary focus of our disclosure effort has been to make fund fees and expenses more transparent to investors and to allow investors the ability to compare fees and expenses between different funds, as well as to educate investors about the importance of fees.

See comment 1.

        In the 1980s, the Commission became concerned that the increasing variety of sales loads and other fund distribution arrangements could, unless uniformly presented, confuse investors. For that reason, since 1988 every mutual fund prospectus has included a fee table. The fee table is a uniform, tabular presentation that shows both charges paid directly by a shareholder out of his or her investment, such as front-end and back-end sales loads as well as recurring charges deducted from fund assets, such as management and rule 12b-1 fees. The fee table is accompanied by a numerical example that illustrates the total dollar amounts that an investor could expect to pay on a hypothetical investment if he or she received a 5% annual return and remained invested in the fund for various time periods. The fee table is intended to present fund investors with expense disclosure that can be understood easily and that facilitates an investor's comparison of expenses among funds.

        In 1998, the Commission required the fee table to be included in a new plain English risk/return summary that appears in the front portion of all prospectuses. The risk/return summary functions as a standardized "executive summary" of key information about the fund. As part of these changes, the Commission increased the investment amount illustrated in the fee example from $1,000 to $10,000 to reflect the size of a more typical fund investment and to approximate more closely the amount of fees and expenses that a typical investor would expect to incur over time. The Commission also improved the method of presentation for several items included in the fee table, including temporary expense reimbursements, fee waivers, and certain account fees paid directly by shareholders.

        Most recently, the Commission proposed that mutual funds be required to report investment returns on an after-tax basis in prospectuses and shareholder reports. The proposal reflects the fact that taxes represent the largest single expense borne by many fund investors. Recent estimates suggest that taxes may reduce the average stock fund's total return by 2.5%, an amount larger than the expense ratios of most funds.

        Although information about mutual fund fees has been made clearer and more readily available than in the past, the Commission remains concerned that many investors are not paying attention to information about fees. These concerns have prompted the Commission to mount an extensive investor education campaign to improve the financial

**Appendix I**
**Comments From the Securities and Exchange Commission**

Thomas J. McCool
Page 3

literacy of investors. The Commission has published and posted on its website a
brochure about investing in mutual funds that contains a section on the importance of
fees. In town meetings and speeches to investors across the country, the Commission has
emphasized the importance of fees in evaluating mutual fund investments. The
Commission is a major sponsor of the Facts on Savings Campaign, a joint effort among
government agencies, financial industry associations, and consumer organizations to help
Americans of all ages and incomes to "get the facts" they need to save and invest wisely.[1]
The campaign includes information about mutual funds and the importance of fund costs
in determining the amount that will be accumulated for retirement or to meet other
financial goals. In January of this year the Commission issued an investor alert that
advises mutual fund investors to look at more than past performance, recommending, in
particular, that they assess a fund's costs which can have an enormous effect on
performance. To assist investors in assessing costs, the Commission posted on its
website a Mutual Fund Cost Calculator, an innovative interactive web-based tool that
investors can use to calculate the costs of mutual fund ownership. During the first quarter
of 2000, the calculator averaged over 8,500 hits per month – making it one of the most
frequented portions of the SEC website.

   B.    Fund Governance Initiatives

      Because independent directors play such an important role under the Investment
Company Act in approving the contract between the investment adviser and the fund, we
have undertaken a series of initiatives to strengthen their ability to perform that role.

      In February 1999, the Commission hosted a two-day public Roundtable on the
role of independent fund directors. Participants included independent directors, investor
advocates, executives of fund advisers, academics, and legal counsel. One panel at the
Roundtable was entitled "Negotiating Fees and Expenses." The Roundtable served to
heighten the industry's awareness of the importance of directors in protecting the interests
of shareholders.

      In October 1999, the Commission proposed new rules and rule amendments to
enhance the independence and effectiveness of mutual fund directors. One proposal
would require funds that rely on Commission exemptive rules to have independent
directors that constitute at least a majority of board members. Although, as you point out,
many fund boards currently have a majority of independent directors, our proposal would
strengthen the governance for the remainder that do not. Taken together, the rule
proposals (along with an accompanying interpretive release) are designed to reaffirm the
important role that independent directors play in protecting fund investors, strengthen

[1] Other government agency sponsors include the Board of Governors of the Federal Reserve System, the
North American Securities Administrators Association, and the Federal Trade Commission. Other financial
industry and consumer sponsors include the American Association of Individual Investors, American Stock
Exchange, Bank Securities Association, Certified Financial Planner Board of Standards, International
Association for Financial Planning, Investor Protection Trust, National Association of Securities Dealers,
National Investor Relations Institute, Securities Industry Association, and the Security Traders Association.

Appendix I
**Comments From the Securities and Exchange Commission**

Thomas J. McCool
Page 4

fund directors' hand in dealing with fund management, reinforce directors' independence
and provide investors with greater information to assess directors' independence.

In June 1999, an advisory group of industry experts formed by the Investment
Company Institute recommended a set of fifteen "best practices" for funds and their
boards to consider.[2] Some recommendations were designed to enhance the independence
of independent directors.[3] Other recommendations were designed to enhance the
effectiveness of fund boards as a whole.[4]

Finally, in response to Chairman Levitt's call for improved fund governance, a
Mutual Fund Directors Education Council has been created. The Council, chaired by
former SEC Chairman David S. Ruder and administered by Northwestern University, will
foster the development of programs to promote a culture of independence and
accountability in fund boardrooms.

We believe that these mutual fund governance initiatives have and will continue
to focus increased attention on the importance of directors performing their duties as
effectively as possible, particularly in the critical areas of considering and approving the
advisory contract and overseeing fund fee levels.

II.    General Comments on the Report

A.    Competition in the Mutual Fund Industry

Your report states that, "competition in the mutual fund industry is not generally
price-based, and thus may not be strongly influencing fee levels...."[5] Although one
certainly could argue that there should be more competition in the industry, it is hard to
argue that there is an absence of price competition. The two largest fund groups are
among the industry's low cost providers; and another large and well-funded low cost
provider recently entered the industry. Low cost index funds have grown from less than
2% of stock fund assets in 1990 to 7% today. Directly marketed funds, which tend to
have lower expenses, have increased their market share from 35% in 1990 to 46% today.

---

[2] *Report of the Advisory Group on Best Practices for Fund Directors*, Investment Company Institute, June
24, 1999.

[3] For example, independent directors should comprise at least two thirds of the board; obtain qualified
counsel who is independent from the fund's adviser; and meet separately from management when evaluating
advisory and underwriting contracts.

[4] For example, fund directors should invest in funds on whose boards they serve and should periodically
evaluate the board's effectiveness. New fund directors should receive appropriate orientation and all fund
directors should keep abreast of industry and regulatory developments.

[5] Executive Summary, p.6.