**Appendix II**
**Comments From the National Association of Securities Dealers Regulation, Inc.**

The following are GAO's comments on the National Association of Securities Dealers Regulation's May 8, 2000, letter.

## GAO's Comments

1. The National Association of Securities Dealers Regulation, Inc. (NASDR) commented that our draft report assumed that mutual funds impose ongoing fund operating expenses, such as Rule 12b-1 fees and advisory fees, at the account level. NASDR stated that, instead, funds impose these expenses at the entity level. In addition, it noted that NASD member broker/dealers are generally required to send all customers, at least quarterly, account statements that detail, among other things, all charges and debits imposed at the account level.

We have added language to both the Executive Summary and chapter 5 that clarifies that shareholder account statements do show amounts deducted directly from shareholder accounts, such as transaction charges and sales loads. However, the statements do not show in dollars each investor's share of the operating expenses that were deducted from the fund. In chapter 5 we mention that NASDR rules require quarterly statements.

2. NASDR stated that our recommendation may be difficult, if not impossible, to implement. It stated that mutual funds do not perform the shareholder-level accounting envisioned by the proposal and that many broker/dealers would not have access to the information about the mutual fund's expenses necessary to comply with these rules.

From discussions with operational staff at various mutual fund advisers and broker dealers, we learned that although such information is not currently calculated, compiling and making the calculations necessary to report to individual investors is feasible. As we discussed on page 79 of chapter 5, producing such information will require some additional programming and will entail some development and ongoing costs to fund advisers and broker dealers, but the estimated costs did not appear to not be prohibitive. On the basis of these discussions, we believe that SEC and NASDR can determine a cost-effective way for funds and others who maintain shareholder accounts to provide this information to shareholders.

3. NASDR commented that if our recommendation results in investors focusing solely on identifying funds with low expenses, such investors may sacrifice the performance that they might obtain if they were to consider other factors, such as a fund's investment objectives and the quality of the fund adviser's investment management.

**Appendix II**
**Comments From the National Association of Securities Dealers Regulation, Inc.**

As we stated in the conclusions to this report, investors should evaluate a fund's expenses in conjunction with their own investment goals and objectives. A reasonable approach may be for investors to first determine what types of funds they wish to invest in on the basis of the their tolerance for risk and the types of markets or securities invested in by the fund. After determining a desired fund category type, the investors could then evaluate the relative fees, expenses, and services provided by funds within each investment category.

Adequate disclosure is one of the primary goals of the securities laws. Withholding such specific information from investors because it could potentially be used inappropriately would not be consistent with the spirit of these laws. We would anticipate that funds would likely include explanatory materials with the disclosures we recommend to better ensure that investors evaluate the specific operating expense fee dollar amounts in context with their investment objectives and other information relevant to the fund.

4. We have changed the language noted in chapter 1 to clarify that NASDR regulates broker-dealers and not the funds. We also added footnotes stating that maximum permissible sales loads vary depending on certain factors, such as whether the fund imposes an asset-based sales charge or service fee; and stating the required conditions for a no load mutual fund.

5. We corrected the effective date of the applicable Gramm-Leach-Bliley Act provisions to May 12, 2001.

6. We calculated our estimates of fund adviser and service provider revenue by multiplying fund expense ratios by fund assets. These estimates used the net expense ratios reported by the funds in our sample, which exclude the amounts of any fund operating expenses that may be waived by the fund adviser.

7. In chapter 5, we corrected the table number to table 5.2 and changed wording in the sentence to reflect that direct sales are made by a fund, either through an internal or external sales force, and not the fund adviser.

# Comments From the Investment Company Institute

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**INVESTMENT COMPANY INSTITUTE**

MATTHEW P. FINK
PRESIDENT

May 3, 2000

Thomas J. McCool
Director, Financial Institutions
 and Markets Issues
General Government Division
U.S. General Accounting Office
Washington, D.C. 20548

Dear Mr. McCool:

Thank you for providing us with the opportunity to comment on GAO's draft report entitled Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition. The draft report's analysis of several issues associated with mutual fund fee levels makes a valuable contribution to this important subject.

The draft report's single most important finding is that mutual fund fee levels generally have declined during the nine-year period studied by the GAO. For example, the draft report notes that 85 percent of the large equity mutual funds examined reduced their total expense ratios, and that these reductions averaged 20 percent. In addition, the draft report indicates that mutual fund fee levels reflect economies of scale that can arise when a fund's assets grow. Of the mutual funds GAO reviewed that experienced significant asset growth in the 1990s, 89 percent reduced their fee levels. GAO's conclusions as to both trends in fee levels and economies of scale are consistent with the results of academic studies, as well as with a series of research reports prepared by the Institute during the last two years.

Our overall view is that the draft report does a commendable job of addressing important and complex topics. The comments set forth below represent suggestions about how certain elements of the draft report could be clarified or strengthened.

*Competition Based on Performance Leads to Competition Based on Fees*

See comment 1.

We agree with the draft report's conclusion that the mutual fund industry is highly competitive, with low levels of concentration among existing fund companies and low barriers to entry for new ones. The draft report notes in several places that mutual funds compete primarily on the basis of investment performance. Less prominent attention is given to the fact that by law, mutual fund performance results must be calculated after fees and expenses are deducted. Because of this requirement, investors who consider a fund's performance when making investment decisions are indirectly taking into account the impact that fees can have on a fund's returns. This indirect consideration of fees through performance appears to be highly relevant to shareholders' investment decisions. As of year end 1999, more than 78 percent of shareholder accounts and 86 percent of shareholder assets were invested in equity mutual funds

1401 H STREET, NW ■ WASHINGTON, DC 20005-2148 ■ 202/326-5801 ■ FAX 202/326-5806 ■ EMAIL fink@ici.org

Thomas J. McCool
U.S. General Accounting Office
May 3, 2000
Page 2

that charged less than the industry average. Moreover, in recent years, the typical equity fund investor has paid annual fees that were about one-third less than the average equity fund charged, indicating a strong investor preference for lower-cost funds.

Equally important, because funds compete fiercely on the basis of <u>net</u> performance, they have an incentive to keep fee levels as low as possible. A small difference in performance can affect a fund's competitive standing, which in turn substantially impacts the fund's ability to attract additional investments. The report would, in our view, better reflect both the competitive nature of the market and shareholder behavior if these facts were included.

*Fund Advisers' Revenues are not Equivalent to Total Fee Revenues*

See comment 2.

Our second comment arises from the draft report's apparent assumption that "total fee revenues" are the same as the revenues of fund investment advisers. The ICI data on "total fee revenues" (from which this observation is drawn) includes fees paid not only to fund investment advisers, but also to third parties, such as shareholder servicing, 12b-1 and custodial fees. These fees cannot accurately be described as revenues of the adviser. More important, data from various fund information providers indicates that advisory and administrative fees received by fund advisers are diminishing as a percentage of total fee revenues, and now typically account for only 50 to 60 percent of total annual fund expenses. This fact appears to significantly impact the draft report's observations about fund asset and adviser revenue growth rates. The draft report suggests that these growth rates have been similar for the past decade. Instead, a more accurate finding would be that advisers' revenues have grown more slowly than both overall fund expenses and assets.

*Mutual Fund Directors Have Contributed to Broad Based Fee Reductions*

See comment 3.

Third, the draft report lists many of the legal duties of mutual fund directors in overseeing fees. These governance responsibilities are unique, go well beyond what is expected of typical corporate directors, and were specifically designed by the authors of the Investment Company Act to provide safeguards for fund shareholders. Because fund directors play such an important role in fund governance, we believe additional discussion of these qualities is merited. We are not aware of any other competitive industry -- in the world of financial services or outside it -- in which a firm is required to have an independent body annually review the "price" the firm wishes to charge for its products or services. One individual apparently suggested to GAO staff that fund directors have served to increase rather than reduce fee levels, contending that directors only consider the fees charged by similar funds. This individual's claim was presented without any supporting evidence, and is contradicted directly by the applicable legal standards governing the work of directors. These legal standards require directors, as fiduciaries, to always act on shareholders behalf and to consider carefully a broad range of specific factors when reviewing fees. The claim also overlooks the fact that fund advisory fees can only be increased if approved by the fund's shareholders, as well as by the directors, including a majority of the independent directors. Finally, the individual's claim is contradicted by the various studies, now including GAO's draft report, that show mutual fund fees declining. GAO's data shows that 70 percent of the largest mutual

Appendix III
**Comments From the Investment Company Institute**

Thomas J. McCool
U.S. General Accounting Office
May 3, 2000
Page 3

funds reduced their total operating expense ratio between 1990 and 1998. As noted earlier, of the funds in this group that experienced significant asset growth in the 1990s, 89 percent experienced fee reductions.

*Mutual Fund Fee Disclosure Is Unsurpassed*

See comment 4.

Fourth, an area that should be clarified is the draft report's assessment of the disclosure practices of competing financial services products. The draft report asserts that, unlike mutual funds, most other financial services disclose "specific dollar amounts of all fees paid." With all due respect, we do not believe that this assertion is supportable. To cite just two types of financial services listed in the draft report, we are not aware of any bank in the country that discloses to depositors the amount of the spread that the bank earns on a depositor's balances in savings and checking accounts. We are also not aware of any brokerage firm that discloses routinely the mark-up charged to investors when selling securities. And we are not aware of any other financial product that, like mutual funds, is required to aggregate all of its fees in order to promote comparability and easy understanding.

We believe very strongly that the mutual fund fee table provides the most comprehensive and understandable disclosure of fees in the financial services world. The fee table – which must be prominently presented in the front of every fund prospectus -- was recently made even simpler for investors by the Securities and Exchange Commission following the most exhaustive field-testing ever undertaken by that agency. The fee table lets fund investors easily compare all of the costs of competing mutual fund investments on an apples to apples basis. We believe the draft report should reflect the SEC's significant efforts in this area.

In our view, mutual funds disclose far more than other financial products because they provide investors with a precise expense ratio, which allows for exact cost comparisons of annual fees for thousands of competing mutual funds. Funds also provide investors with a standardized hypothetical, which shows in dollars and cents the exact impact that a fund's annual fees and sales charges will have on a $10,000 investment over 1, 5 and 10 year periods. No other financial product provides disclosure that is this comprehensive, and we were disappointed to see the draft report suggests otherwise.

*Requiring Even More Fee Disclosure Could Be Counterproductive*

Finally, notwithstanding the decline in fund fee levels and the shareholder preference for lower cost funds noted earlier, the draft report states that additional government regulation is needed to make investors more aware of mutual fund fees. The draft report states that awareness of fund fees might be heightened if fund companies were required by the SEC or NASD Regulation to include customized fee information on shareholder account statements.

Promoting investor awareness of the important role fees can play in long term financial planning is a priority for the Institute and its members. We have a long history of supporting investor awareness proposals and will continue to do so, but we have reservations about the account statement recommendation. Our reservations stem from our concern that this

**Appendix III**
**Comments From the Investment Company Institute**

Thomas J. McCool
U.S. General Accounting Office
May 3, 2000
Page 4

requirement could erode the value of the standardized, all-inclusive fee information in the prospectus and thus impede informed assessments of fee levels at competing funds. Paradoxically, this could diminish rather than enhance investors' overall understanding of fund fees.

The Institute appreciates the opportunity to offer comments on a few of the more significant issues in the draft report. As noted in your letter, we would welcome the chance to meet with you to provide additional comments.

Very truly yours,

Matthew P. Fink

**Appendix III**
**Comments From the Investment Company Institute**

The following are GAO's comments on the Investment Company Institute's May 3, 2000, letter.

## GAO Comments

1. The Investment Company Institute (ICI) notes that our report indicates that mutual funds compete primarily on the basis of investment performance but gives less prominent attention to the fact that mutual funds disclose their performance after fees and expenses have been deducted. ICI states that as a result, investors who consider performance are indirectly taking into account the impact of fees on returns. ICI also states that this indirect consideration appears to be highly relevant to shareholder investment decisions because, as of year-end 1999, more than 78 percent of shareholder accounts and 86 percent of shareholder assets were invested in equity mutual funds that charged less than the industry average. Finally, ICI states that by competing on the basis of net performance, funds have an incentive to keep fee levels as a low as possible because small differences in performance can affect a fund's competitive standing.

At the beginning of each discussion of how funds compete, our report notes that funds are required to disclose performance net of fees. However, competition on the basis of net returns may or may not be the same as competition on the basis of price, and such indirect competition may not result in the same level of fees as could likely result from more direct fee-based competition. As we noted in chapter 5 of the report, the charges associated with other financial services, such as bank checking accounts and stock brokerage, which are generally disclosed in dollar terms to the users of these services, have been subject to vigorous competition directly on the basis of these costs, which has resulted in lower charges for many consumers. In addition, we noted that loads, which are disclosed in investor statements, have also declined over time. In addition, because past performance is not an indication of future returns, relying on such disclosures alone would not be sufficient for ensuring that adequate competition is occurring on that basis.

The statistics that ICI cites in its letter regarding the majority of mutual fund shareholders invested in funds charging fees lower than the industry average is based on a calculation of the simple average fees charged by funds in the industry. As we note in chapter 3 of our report, calculations using simple averages of mutual fund fees are biased upwards by the growing proportion of new funds, funds investing in foreign securities, and other funds that tend to have higher expense ratios than older funds investing in domestic securities. Therefore, finding that most investors are invested in funds charging less than such an average is not sufficient

**Appendix III**
**Comments From the Investment Company Institute**

evidence to indicated that fund investors overall are highly fee-conscious, particularly in light of surveys we reviewed that indicated that investors generally considered fees to be less important than other factors in making their investment decisions. In addition, although ICI's studies reported that some investors are increasingly investing in lower fee funds does not obviate the need for more explicit disclosure of fees and the increased competition that could result.

2. ICI noted that our draft report assumed that total fee revenues were the same as the revenues of fund investment advisers. ICI states that the expense ratios deducted from fund assets include amounts that are used to compensate not only the fund adviser but also other entities for shareholder servicing, marketing (12b-1 fees), and other services. ICI's letter also notes that adviser fees now typically account for 50 to 60 percent of fund expense ratios. It further states that the report suggests that the growth rates of fund assets and adviser revenues have been similar in the 1990s. ICI indicates that a more accurate finding would be that advisers' revenues have grown more slowly than both overall fund expenses and assets.

Although our report previously acknowledged that the expense ratio includes fees charged for various purposes, we have added additional text where appropriate to indicate that the fees deducted from fund assets represent revenue to more entities than just the fund advisor. However, all fees, regardless of which entities receive them as revenue, are deducted from investor assets; thus, our overall conclusion that such fees and assets grew at comparable rates remains accurate.

3. ICI commented that the duties that mutual fund directors have regarding the fees funds charge exceed those of typical corporate directors. ICI emphasized that these duties are unique and were specifically designed to provide safeguards for fund shareholders. ICI notes that one of the individuals with whom we spoke about mutual fund directors appears to have suggested that mutual fund directors' activities may be serving to increase fees by evaluating a fund's fees in light of those charged by other funds. ICI states that directors, as fiduciaries, are legally required to act on shareholders' behalf and to consider a broad range of specific factors when reviewing fees. ICI indicates that the individual's claim is also contradicted by various studies, including our own, that found fees have declined.

ICI has identified various duties placed on mutual fund directors that exceed those of the directors of a typical corporation, and we have added

**Appendix III**
**Comments From the Investment Company Institute**

a footnote in chapter 6 to acknowledge these additional responsibilities. However, as our report points out, these additional duties, particularly those related to the approval of the advisor's contract and its fees, arise because of the potential conflicts of interest between fund shareholders and the adviser. As a result, the independent directors are required to review and approve the fund's contract and fee arrangement with the adviser.

Congress intended that the independent directors of mutual funds serve as a check on the adviser because of the conflicts between the interests of the adviser and fund shareholders. However, the critics of fund directors whose comments we cited are of the opinion that directors are placing primary emphasis on comparing their funds' fees to those of other funds rather than the other factors that directors are required to consider as part of their fee reviews. Therefore, these individuals see directors as maintaining fee levels, or at least allowing fees to be lowered only to the extent that other funds are taking similar actions. Although we did find that fees for many mutual funds have declined, we also noted in chapter 2 of our report that we were unable to determine if the growth in fund assets would have provided advisers with the opportunity to reduce fees by even more than they had. Furthermore, a firm comparing the prices it charges its customers to those charged by competitors is a legitimate and perfectly acceptable means for such firms to evaluate their own business strategies. However, in an industry that only indirectly competes on the basis of such charges, such an activity may serve to maintain fees at a consistent level or allow them to be reduced only to the extent that other funds reduce theirs, as the individuals we interviewed stated.

4. ICI commented that the assertion in our report that unlike mutual funds, most other financial services disclose the specific dollar amounts of all fees paid is unsupportable. As an example, ICI states that no bank it is aware of discloses to depositors the amount of the spread that the bank earns on a depositor's balances in checking or savings accounts. ICI states that the fee disclosures required of mutual funds are the most comprehensive and understandable in the financial services world. It also notes that these disclosures have been recently made simpler by the Securities and Exchange Commission.

We agree with ICI that the currently required disclosures are comprehensive and reasonably understandable. In response to this comment by ICI and others on the draft report, we have added a footnote that discusses some of the recent changes to the disclosures we describe in our report.

**Appendix III**
**Comments From the Investment Company Institute**

Although the disclosures that mutual funds make are comprehensive and useful for investors in comparing the relative fees charged by different funds, the information in them discloses fees in percentage terms and uses hypothetical examples, which are less direct indications of the specific prices charged to any one investor. In our report, we cite five examples of other common financial services or transactions with which most mutual fund investors are also likely to be familiar, such as checking accounts, stock brokerage, or bank trust services. These services disclose in periodic statements the specific fees in dollars charged to customers. As we point out, mutual funds do not similarly provide specific dollar amounts of charges on the periodic statements they provide to individual investors.

# GAO Contacts and Staff Acknowledgments

## GAO Contacts

Thomas J. McCool, (202) 512-8676
Cody J. Goebel, (202) 512-7329

## Acknowledgments

In addition to those named above, Michael Burnett, Suzie Bright, Melvin Thomas, Darlene Wall, and Desiree Whipple made key contributions to this report.

**Ordering Copies of GAO Reports**

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Order by mail:

U.S. General Accounting Office
P.O. Box 37050
Washington, DC 20013

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (202) 512-6061, or TDD (202) 512-2537.

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touch-tone phone. A recorded menu will provide information on how to obtain these lists.

**Viewing GAO Reports on the Internet**

For information on how to access GAO reports on the INTERNET, send e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

**Reporting Fraud, Waste, and Abuse in Federal Programs**

To contact GAO FraudNET use:

Web site: http://www.gao.gov/fraudnet/fraudnet.htm
E-Mail: fraudnet@gao.gov
Telephone: 1-800-424-5454 (automated answering system)

PRINTED ON RECYCLED PAPER

Case 1:04-cv-11651-MLW   Document 46-8   Filed 11/03/2005   Page 15 of 16

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

| |
|---|
| **Bulk Rate**<br>**Postage & Fees Paid**<br>**GAO**<br>**Permit No. G100** |

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**



(233592)