No. 04-cv-11651-MLW (Lead Case)
No. 04-cv-11756-MLW (Consolidated Case)

# Memorandum In Support of Plaintiffs' Motion To Compel Production of Documents

## Exhibit 16

EXHIBIT d(1)

## MANAGEMENT CONTRACT
## BETWEEN
## FIDELITY MAGELLAN FUND
## AND
## FIDELITY MANAGEMENT & RESEARCH COMPANY

AGREEMENT AMENDED and RESTATED as of this 1st day of May 2000, by and between Fidelity Magellan Fund, a Massachusetts business trust which may issue one or more series of shares of beneficial interest (hereinafter called the "Fund"), on behalf of its single existing series of shares of beneficial interest (hereinafter called the "Portfolio"), and Fidelity Management & Research Company, a Massachusetts corporation (hereinafter called the "Adviser") as set forth in its entirety below.

Required authorization and approval by shareholders having been obtained, the Fund, on behalf of the Portfolio, and the Adviser hereby consent, pursuant to Paragraph 6 of the existing Management Contract dated April 1, 1994, to a modification of said Contract in the manner set forth below. The Amended Management Contract shall, when executed by duly authorized officers of the Fund and Adviser, take effect on May 1, 2000 or the first day of the month following approval.

1. (a) Investment Advisory Services. The Adviser undertakes to act as investment adviser of the Portfolio and shall, subject to the supervision of the Fund's Board of Trustees, direct the investments of the Portfolio in accordance with the investment objective, policies and limitations as provided in the Portfolio's Prospectus or other governing instruments, as amended from time to time, the Investment Company Act of 1940 and rules thereunder, as amended from time to time (the "1940 Act"), and such other limitations as the Portfolio may impose by notice in writing to the Adviser. The Adviser shall also furnish for the use of the Portfolio office space and all necessary office facilities, equipment and personnel for servicing the investments of the Portfolio; and shall pay the salaries and fees of all officers of the Fund, of all Trustees of the Fund who are "interested persons" of the Fund or of the Adviser and of all personnel of the Fund or the Adviser performing services relating to research, statistical and investment activities. The Adviser is authorized, in its discretion and without prior consultation with the Portfolio, to buy, sell, lend and otherwise trade in any stocks, bonds and other securities and investment instruments on behalf of the Portfolio. The investment policies and all other actions of the Portfolio are and shall at all times be subject to the control and direction of the Fund's Board of Trustees.

(b) Management Services. The Adviser shall perform (or arrange for the performance by its affiliates of) the management and administrative services necessary for the operation of the Fund. The Adviser shall, subject to the supervision of the Board of Trustees, perform various services for the Portfolio, including but not limited to: (i) providing the Portfolio with office space, equipment and facilities (which may be its own) for maintaining its organization; (ii) on behalf of the Portfolio, supervising relations with, and monitoring the performance of, custodians, depositories, transfer and pricing agents, accountants, attorneys, underwriters, brokers and dealers, insurers and other persons in any capacity deemed to be necessary or desirable; (iii) preparing all general shareholder communications, including shareholder reports; (iv) conducting shareholder relations; (v) maintaining the Fund's existence and its records; (vi) during such times as shares are publicly offered, maintaining the registration and qualification of the Portfolio's shares under federal and state law; and (vii) investigating the development of and developing and implementing, if appropriate, management and shareholder services designed to enhance the value or convenience of the Portfolio as an investment vehicle.

The Adviser shall also furnish such reports, evaluations, information or analyses to the Fund as the Fund's Board of Trustees may request from time to time or as the Adviser may deem to be desirable. The Adviser shall make recommendations to the Fund's Board of Trustees with respect to Fund policies, and shall carry out such policies as are adopted by the Trustees. The Adviser shall, subject to review by the Board of Trustees, furnish such other services as the Adviser shall from time to time determine to be necessary or useful to perform its obligations under this Contract.

(c) The Adviser shall place all orders for the purchase and sale of portfolio securities for the Portfolio's account with brokers or dealers selected by the Adviser, which may include brokers or dealers affiliated with the Adviser. The Adviser shall use its best efforts to seek to execute portfolio transactions at prices which are advantageous to the Portfolio and at commission rates which are reasonable in relation to the benefits received. In selecting brokers or dealers qualified to execute a particular transaction, brokers or dealers may be selected who also provide brokerage and research services (as those terms are defined in Section 28(e) of the Securities Exchange Act of 1934) to the Portfolio and/or the other accounts over which the Adviser or its affiliates exercise investment discretion. The Adviser is authorized to pay a broker or dealer who provides such brokerage and research services a commission for executing a portfolio transaction for the Portfolio which is in excess of the amount of commission another broker or dealer would have charged for effecting that transaction if the Adviser determines in good faith that such amount of commission is reasonable in relation to the value of the brokerage and research services provided by such broker or dealer. This determination may be viewed in terms of either that particular transaction or the overall responsibilities which the Adviser and its affiliates have with respect to accounts over which they exercise investment discretion. The Trustees of the Fund shall periodically review the commissions paid by the Portfolio to determine if the commissions paid over representative periods of time were reasonable in relation to the benefits to the Portfolio.

The Adviser shall, in acting hereunder, be an independent contractor. The Adviser shall not be an agent of the Portfolio.

32

BFMR_00092759

2. It is understood that the Trustees, officers and shareholders of the Fund are or may be or become interested in the Adviser as directors, officers or otherwise and that directors, officers and stockholders of the Adviser are or may be or become similarly interested in the Fund, and that the Adviser may be or become interested in the Fund as a shareholder or otherwise.

3. The Adviser will be compensated on the following basis for the services and facilities to be furnished hereunder. The Adviser shall receive a monthly management fee, payable monthly as soon as practicable after the last day of each month, composed of a Basic Fee and a Performance Adjustment. The Performance Adjustment is added to or subtracted from the Basic Fee depending on whether the Portfolio experienced better or worse performance than the Standard and Poor's 500 Index (the "Index"). The Performance Adjustment is not cumulative. An increased fee will result even though the performance of the Portfolio over some period of time shorter than the performance period has been behind that of the Index, and, conversely, a reduction in the fee will be made for a month even though the performance of the Portfolio over some period of time shorter than the performance period has been ahead of that of the Index. The Basic Fee and the Performance Adjustment will be computed as follows:

(a) Basic Fee Rate: The annual Basic Fee Rate shall be the sum of the Group Fee Rate and the Individual Fund Fee Rate calculated to the nearest millionth decimal place as follows:

(i) Group Fee Rate. The Group Fee Rate shall be based upon the monthly average of the net assets of the registered investment companies having Advisory and Service or Management Contracts with the Adviser (computed in the manner set forth in the Fund's Declaration of Trust or other organizational document) determined as of the close of business on each business day throughout the month. The Group Fee Rate shall be determined on a cumulative basis pursuant to the following schedule:

33

BFMR_00092760

| Average Net Assets | | | Annualized Fee Rate (for each level) |
|---|---|---|---|
| 0 | - | $ 3 billion | .5200% |
| 3 | - | 6 | .4900 |
| 6 | - | 9 | .4600 |
| 9 | - | 12 | .4300 |
| 12 | - | 15 | .4000 |
| 15 | - | 18 | .3850 |
| 18 | - | 21 | .3700 |
| 21 | - | 24 | .3600 |
| 24 | - | 30 | .3500 |
| 30 | – | 36 | .3450 |
| 36 | - | 42 | .3400 |
| 42 | - | 48 | .3350 |
| 48 | - | 66 | .3250 |
| 66 | - | 84 | .3200 |
| 84 | - | 102 | .3150 |
| 102 | - | 138 | .3100 |
| 138 | - | 174 | .3050 |
| 174 | – | 210 | .3000 |
| 210 | – | 246 | .2950 |
| 246 | – | 282 | .2900 |
| 282 | – | 318 | .2850 |
| 318 | – | 354 | .2800 |
| 354 | – | 390 | .2750 |
| 390 | – | 426 | .2700 |
| 426 | – | 462 | .2650 |
| 462 | – | 498 | .2600 |
| 498 | – | 534 | .2550 |
| 534 | – | 587 | .2500 |
| 587 | – | 646 | .2463 |
| 646 | – | 711 | .2426 |
| 711 | – | 782 | .2389 |
| 782 | – | 860 | .2352 |
| 860 | – | 946 | .2315 |
| 946 | – | 1,041 | .2278 |
| 1,041 | – | 1,145 | .2241 |
| 1,145 | – | 1,260 | .2204 |
| Over | | 1,260 | .2167 |

(ii) Individual Fund Fee Rate. The Individual Fund Fee Rate shall be 0.30%.

(b) Basic Fee. One-twelfth of the Basic Fee Rate shall be applied to the average of the net assets of the Portfolio (computed in the manner set forth in the Fund's Declaration of Trust or other organizational document) determined as of the close of business on each business day throughout the month. The resulting dollar amount comprises the Basic Fee.

(c) Performance Adjustment Rate: The Performance Adjustment Rate is 0.02% for each percentage point (the performance of the Portfolio and the Index each being calculated to the nearest .01%) that the Portfolio's investment performance for the performance period was better or worse than the record of the Index as then constituted. The maximum performance adjustment rate is 0.20%.

The performance period will commence with the first day of the first full month following the Portfolio's commencement of operations. During the first eleven months of the performance period for the Portfolio, there will be no performance adjustment. Starting with the twelfth month of the performance period, the performance adjustment will take effect. Following the twelfth month a new month will be added to the performance period until the performance period equals 36 months. Thereafter the performance period will consist of the current month plus the previous 35 months.

The Portfolio's investment performance will be measured by comparing (i) the opening net asset value of one share of the Portfolio on the first business day of the performance period with (ii) the closing net asset value of one share of the Portfolio as of the last business day of such period. In computing the investment performance of the Portfolio and the investment record of the Index, distributions of realized capital gains, the value of capital gains taxes per share paid or payable on undistributed realized long-term capital gains accumulated to

34

BFMR_00092761

the end of such period and dividends paid out of investment income on the part of the Portfolio, and all cash distributions of the securities included in the Index, will be treated as reinvested in accordance with Rule 205-1 or any other applicable rules under the Investment Advisers Act of 1940, as the same from time to time may be amended.

(d) Performance Adjustment. One-twelfth of the annual Performance Adjustment Rate will be applied to the average of the net assets of the Portfolio (computed in the manner set forth in the Fund's Declaration of Trust or other organizational document) determined as of the close of business on each business day throughout the month and the performance period.

(e) In case of termination of this Contract during any month, the fee for that month shall be reduced proportionately on the basis of the number of business days during which it is in effect for that month. The Basic Fee Rate will be computed on the basis of and applied to net assets averaged over that month ending on the last business day on which this Contract is in effect. The amount of this Performance Adjustment to the Basic Fee will be computed on the basis of and applied to net assets averaged over the 36-month period ending on the last business day on which this Contract is in effect provided that if this Contract has been in effect less than 36 months, the computation will be made on the basis of the period of time during which it has been in effect.

4. It is understood that the Portfolio will pay all its expenses, which expenses payable by the Portfolio shall include, without limitation, (i) interest and taxes; (ii) brokerage commissions and other costs in connection with the purchase or sale of securities and other investment instruments; (iii) fees and expenses of the Fund's Trustees other than those who are "interested persons" of the Fund or the Adviser; (iv) legal and audit expenses; (v) custodian, registrar and transfer agent fees and expenses; (vi) fees and expenses related to the registration and qualification of the Fund and the Portfolio's shares for distribution under state and federal securities laws; (vii) expenses of printing and mailing reports and notices and proxy material to shareholders of the Portfolio; (viii) all other expenses incidental to holding meetings of the Portfolio's shareholders, including proxy solicitations therefor; (ix) a pro rata share, based on relative net assets of the Portfolio and other registered investment companies having Advisory and Service or Management Contracts with the Adviser, of 50% of insurance premiums for fidelity and other coverage; (x) its proportionate share of association membership dues; (xi) expenses of typesetting for printing Prospectuses and Statements of Additional Information and supplements thereto; (xii) expenses of printing and mailing Prospectuses and Statements of Additional Information and supplements thereto sent to existing shareholders; and (xiii) such non-recurring or extraordinary expenses as may arise, including those relating to actions, suits or proceedings to which the Portfolio is a party and the legal obligation which the Portfolio may have to indemnify the Fund's Trustees and officers with respect thereto.

5. The services of the Adviser to the Portfolio are not to be deemed exclusive, the Adviser being free to render services to others and engage in other activities, provided, however, that such other services and activities do not, during the term of this Contract, interfere, in a material manner, with the Adviser's ability to meet all of its obligations with respect to rendering services to the Portfolio hereunder. In the absence of willful misfeasance, bad faith, gross negligence or reckless disregard of obligations or duties hereunder on the part of the Adviser, the Adviser shall not be subject to liability to the Portfolio or to any shareholder of the Portfolio for any act or omission in the course of, or connected with, rendering services hereunder or for any losses that may be sustained in the purchase, holding or sale of any security or other investment instrument.

6. (a) Subject to prior termination as provided in sub-paragraph (d) of this paragraph 6, this Contract shall continue in force until July 31, 2000 and indefinitely thereafter, but only so long as the continuance after such date shall be specifically approved at least annually by vote of the Trustees of the Fund or by vote of a majority of the outstanding voting securities of the Portfolio.

(b) This Contract may be modified by mutual consent subject to the provisions of Section 15 of the 1940 Act, as modified by or interpreted by any applicable order or orders of the Securities and Exchange Commission (the "Commission") or any rules regulations adopted by, or interpretative releases of, the Commission.

(c) In addition to the requirements of sub-paragraphs (a) and (b) of this paragraph 6, the terms of any continuance or modification of this Contract must have been approved by the vote of a majority of those Trustees of the Fund who are not parties to the Contract or interested persons of any such party, cast in person at a meeting called for the purpose of voting on such approval.

(d) Either party hereto may, at any time on sixty (60) days' prior written notice to the other, terminate this Contract, without payment of any penalty, by action of its Trustees or Board of Directors, as the case may be, or with respect to the Portfolio by vote of a majority of the outstanding voting securities of the Portfolio. This Contract shall terminate automatically in the event of its assignment.

7. The Adviser is hereby expressly put on notice of the limitation of shareholder liability as set forth in the Fund's Declaration of Trust or other organizational document and agrees that the obligations assumed by the Fund pursuant to this Contract shall be limited in all cases to the Portfolio and its assets, and the Adviser shall not seek satisfaction of any such obligation from the shareholders or any shareholder of the Portfolio or any other Portfolios of the Fund. In addition, the Adviser shall not seek satisfaction of any such obligations from the Trustees or any individual Trustee. The Adviser understands that the rights and obligations of any Portfolio under the Declaration of Trust or other organizational document are separate and distinct from those of any and all other Portfolios.

8. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the choice of laws provisions thereof.

The terms "vote of a majority of the outstanding voting securities," "assignment," and "interested persons," when used herein, shall have the respective meanings specified in the 1940 Act, as now in effect or as hereafter amended, and subject to such orders as may be granted by the Commission.

35

IN WITNESS WHEREOF the parties have caused this instrument to be signed in their behalf by their respective officers thereunto duly authorized, and their respective seals to be hereunto affixed, all as of the date written above.

FIDELITY MAGELLAN FUND
on behalf of Fidelity Magellan Fund

By /s/Robert C. Pozen
Robert C. Pozen
Senior Vice President

FIDELITY MANAGEMENT & RESEARCH COMPANY

By /s/Robert C. Pozen
Robert C. Pozen
President

36

BFMR_00092763

No. 04-cv-11651-MLW (Lead Case)
No. 04-cv-11756-MLW (Consolidated Case)

# Memorandum In Support of Plaintiffs' Motion To Compel Production of Documents

## Exhibit 17

OPERATIONS COMMITTEE
April 21, 2005

| Present: | Messrs. | Mann | Mses. | Cronin | Mr. | Rathgeber |
|---|---|---|---|---|---|---|
| | | Dirks | | Johnson | Ms. | Reynolds |
| | | Gates | Messrs. | Reynolds | Messrs. | Roiter |
| | | Heilmeier | | Churchill | | Stadtler |
| | Ms. | Knowles | Ms. | Erickson | | Wynant |
| | Messrs. | Lautenbach | Messrs. | Farinacci | | Berman |
| | | McCoy | | Goebel | | Campbell |
| | Ms. | Small | | Jeffreys | | Phillips |
| | Messrs. | Stavropoulos | | Jones | | |
| | | Wolfe | | | | |

Mr. Mann, Chairman of the Committee, presided, and Mr. Roiter recorded the minutes. It was noted that the meeting was being conducted by conference telephone and that each meeting attendee could hear and be heard by all present. The booklet to the presentation identified on the agenda to the meeting was previously distributed to the Committee and is filed in the Exhibit Book to the meeting.

**Review of Ad Hoc Committee on Fidelity Services; Ad Hoc Committee on Compliance Program; Audit Committee; and Shareholder Services, Brokerage and Distribution Committee**

Mr. McCoy, Chairman of the Ad Hoc Committee on Fidelity Services, reported that the Committee met on March 17, 2005 and earlier today, as detailed in the separate minutes of the Committee.

Mr. Gates, Chairman of the Ad Hoc Committee on Compliance Program, reported that the Committee met on April 8, 2005 and earlier today to discuss matters involving gifts, entertainment and personal trading, as detailed in the separate minutes of the Committee.

Ms. Knowles, Chairwoman of the Audit Committee, reported that the Committee met on March 17, 2005 and reviewed the report on FMR's investigation into disclosure of portfolio holdings information by custodian banks, as detailed in the separate minutes of the Committee.

Ms. Knowles reported that the Committee was provided an update on certain accounting policies important to the funds, as detailed in the separate minutes of the Committee.

#414673                              1 of 6        Fidelity Highly Confidential Information

BFMR_00019195

CONFIDENTIAL

operations. *FMR stated that it would provide the Committee with additional information on Fidelity's investments in its fund businesses at an upcoming meeting.*

Mr. Wynant concluded his report and introduced Mr. John Stadtler, a partner at PwC, who is responsible for services provided to the Board in connection with Fund Profitability, and Mr. Simon Jeffreys, PwC's global relationship partner for services to Fidelity. Mr. Stadtler distributed a presentation booklet to be filed in the Exhibit Book to the meeting.

Mr. Stadtler reviewed the scope of PwC's services, stating that PwC's mid-year focus included an assessment of the continuing reasonableness of allocation methodologies and the year-end focus included performing agreed-upon procedures related to financial data present in the Fund Profitability analysis.

Mr. Stadtler discussed the processes and resources that FMR used in its presentation of Fund Profitability, including (i) the technologies used in the compilation of the data, (ii) the active involvement of business units in the assessment of business changes, development of updated methodologies and reporting of data, and (iii) the oversight provided by FMR Finance. He discussed PwC's observations and findings, stating that while other methodologies may also be reasonable and may produce different results, the methodologies used in the analysis, as summarized in <u>FMR's Fund Profitability--Procedures and Methodology</u> document, are reasonable in all material respects. He stated that there were no findings resulting from the procedures that were performed that exceeded the reporting standard previously agreed to with the Trustees. Mr. Stadtler reviewed the Fund Profitability summary reconciliation, as detailed in PwC's booklet.

After a brief discussion, Mr. Stadtler concluded his report, and he and Messrs. Farinacci and Jeffreys left the meeting.

**Annual Review of Class Action Settlement Report**

*REDACTED*

#414673                              5 of 6          Fidelity Highly Confidential Information

BFMR_00019199

CONFIDENTIAL

*REDACTED*

**Other Matters**

Ms. Reynolds reported on a trading error that affected Fidelity International Discovery Fund. She stated that when a potential compliance issue was resolved on a European security, the portfolio manager's buy transaction was not inputted into the trading system on a timely basis, and as a result, the Fund overpaid for the security. She stated that Fidelity International Limited has reimbursed the Fund approximately $80,000 for the amount that the Fund overpaid.

*REDACTED*

At this time, all Fidelity personnel left the meeting and the Committee met in Executive Session. Mr. Campbell recorded the minutes. There was a discussion of fund investment performance.

There being no further business to come before the Committee, the meeting was adjourned.

No. 04-cv-11651-MLW (Lead Case)
No. 04-cv-11756-MLW (Consolidated Case)

# Memorandum In Support of Plaintiffs' Motion To Compel Production of Documents

## Exhibit 18

VOLUME: I
PAGES: 1 to 302
EXHIBITS: 79 to 92

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11651-MLW (Lead case)
No. 1:04-CV-11756-MLW (Consolidated case)

CYNTHIA A. BENNETT, ET AL          )
            Plaintiffs,            )
                                   )
v.                                 )
                                   )
FIDELITY MANAGEMENT &              )
RESEARCH COMPANY and FMR           )
CO., INC.,                         )
            Defendants.            )
                                   )

        VIDEOTAPED DEPOSITION OF MARIE LOUISE

KNOWLES, called as a witness on behalf of

the Haugen Plaintiffs, pursuant to the

applicable provisions of the Federal Rules

of Civil Procedure, before Jeanette N.

Maracas, Registered Professional Reporter

and Notary Public in and for the Commonwealth

of Massachusetts, at the Offices of Goodwin

Procter, LLP, 53 State Street, Boston,

Massachusetts, on Tuesday, May 15, 2007,

commencing at 9:00 a.m.

```
 1  APPEARANCES:

 2
        KELLER ROHRBACK, LLP
 3      By: Michael Woerner, Esq.
        By: David Y. Chen, Esq.
 4      1201 Third Avenue
        Suite 3200
 5      Seattle, Washington 98101
        For the Plaintiffs
 6      Mwoerner@kellerrohrback.com
        Dchen@kellerrohrback.com
 7

 8      BURNS & LEVINSON, LLP
        By: Matthew J. Tuttle, Esq.
 9      125 Summer Street
        Boston, Mass. 02110
10      For the Plaintiffs.
        Mtuttle@burnslev.com
11

12      MILBANK, TWEED, HADLEY & McCLOY, LLP
        By: James N. Benedict, Esq.
13      By: Andrew W. Robertson, Esq.
        By: Tommaso Bencivenga, Esq.
14      One Chase Manhattan Plaza
        New York, New York 10005
15      For the Defendants.
        Jbenedict@milbank.com
16      Arobertson@milbank.com

17
        DEBEVOISE & PLIMPTON, LLP
18      By: John S. Kiernan, Esq.
        919 Third Avenue
19      New York, New York 10022
        For the Deponent.
20      jskiernan@debevoise.com

21
        Bill Slater, Videographer
22

23  ALSO PRESENT:  Colleen A. Hankins, Esq.
                    Scott Goebel
24

25
```

1            I N D E X

2

3   Testimony of:            Direct    Cross

4   Marie Louise Knowles

5       (by Mr. Woerner)        5
        (by Mr. Tuttle)                   231
6

7

8           E X H I B I T S

9

        No.                    Page
10

        79.....................30
11      80.....................60
        81.....................110
12      82.....................110
        83.....................110
13      84.....................143
        85.....................177
14      86.....................184
        87.....................190
15      88.....................209
        89.....................217
16      90.....................222
        91.....................223
17      92.....................288

18

19

20

21

22

23

24

25

Page 64

| | | | |
|---|---|---|---|
| 1 | Q. | Okay.  And you are a trustee for the funds, | 10:36:29 |
| 2 | | is that correct? | 10:36:35 |
| 3 | A. | That's correct. | 10:36:35 |
| 4 | Q. | Do you have any duties or obligations as a | 10:36:36 |
| 5 | | fund trustee to either of the defendants that | 10:36:41 |
| 6 | | are listed in the complaint? | 10:36:45 |
| 7 | A. | No, I do not. | 10:36:47 |
| 8 | Q. | What have you done in preparation for your | 10:36:55 |
| 9 | | deposition other than read the complaint on | 10:36:58 |
| 10 | | your own? | 10:37:01 |
| 11 | A. | I have reviewed some of the documents that | 10:37:07 |
| 12 | | have been provided you, provided to you in | 10:37:14 |
| 13 | | the discovery process. | 10:37:16 |
| 14 | Q. | Have you met with counsel? | 10:37:20 |
| 15 | A. | I have been advised by my counsel, yes. | 10:37:23 |
| 16 | Q. | Have you had in-person meetings with your | 10:37:27 |
| 17 | | attorney? | 10:37:30 |
| 18 | A. | Yes. | 10:37:30 |
| 19 | Q. | And that's the gentleman seated to your left | 10:37:31 |
| 20 | | here or members of his firm? | 10:37:34 |
| 21 | A. | Correct. | 10:37:35 |
| 22 | Q. | Do you know how many people or lawyers you've | 10:37:38 |
| 23 | | met with who are part of your attorneys?  In | 10:37:40 |
| 24 | | other words, has it been just one attorney | 10:37:46 |
| 25 | | or more than one attorney from that firm? | 10:37:48 |

M. L. KNOWLES

Page 65

| | | | |
|---|---|---|---|
| 1 | A. | One or more, but not a bunch. | 10:37:50 |
| 2 | Q. | And the name of that firm is what? | 10:37:53 |
| 3 | A. | Debevoise. | 10:37:57 |
| 4 | Q. | Does Debevoise represent all of the Fidelity | 10:37:59 |
| 5 | | trustees? | 10:38:04 |
| 6 | A. | Yes, and I have also met with attorneys | 10:38:04 |
| 7 | | representing the defendants. | 10:38:15 |
| 8 | Q. | Why, if your obligation is to the funds and | 10:38:18 |
| 9 | | the funds are plaintiffs, are you meeting | 10:38:23 |
| 10 | | with attorneys for the defendants? | 10:38:26 |
| 11 | | MR. KIERNAN:  Objection and instruct | 10:38:29 |
| 12 | | you not to answer. | 10:38:29 |
| 13 | | MR. WOERNER:  On what basis? | 10:38:31 |
| 14 | | MR. KIERNAN:  It's attorney-client | 10:38:32 |
| 15 | | privilege. | 10:38:33 |
| 16 | | MR. WOERNER:  How can it be | 10:38:34 |
| 17 | | attorney-client privilege?  Mr. Benedict or | 10:38:36 |
| 18 | | his firm is not her attorney. | 10:38:38 |
| 19 | | MR. KIERNAN:  I've instructed the | 10:38:39 |
| 20 | | witness. | 10:38:41 |
| 21 | | MR. WOERNER:  Okay. | 10:38:42 |
| 22 | Q. | Are you going to follow your attorney's | 10:38:42 |
| 23 | | instruction? | 10:38:45 |
| 24 | A. | You bet. | 10:38:45 |
| 25 | Q. | How many attorneys from Mr. Benedict's firm | 10:38:46 |

Page 66

| | | | |
|---|---|---|---|
| 1 | | have you met with? | 10:38:50 |
| 2 | | THE WITNESS: I'm allowed to answer | 10:38:57 |
| 3 | | that one? | 10:38:58 |
| 4 | | MR. KIERNAN: Yes. | 10:38:58 |
| 5 | A. | Primarily two. | 10:39:02 |
| 6 | Q. | Who are? | 10:39:04 |
| 7 | A. | Seated here. | 10:39:07 |
| 8 | Q. | Two of the lawyers seated here in the room | 10:39:09 |
| 9 | | today? | 10:39:10 |
| 10 | A. | Right. | 10:39:11 |
| 11 | Q. | How many times -- I will represent to you | 10:39:16 |
| 12 | | that they're attorneys from the firm of | 10:39:21 |
| 13 | | Milbank Tweed. How many times have you met | 10:39:23 |
| 14 | | in preparation for your deposition with | |
| 15 | | attorneys when Milbank Tweed lawyers were | |
| 16 | | present? | 10:39:29 |
| 17 | A. | Couple of times. | 10:39:29 |
| 18 | Q. | Have you ever met with your attorneys from | 10:39:35 |
| 19 | | Debevoise separate from where there was no | 10:39:40 |
| 20 | | attorney from Milbank Tweed present in | 10:39:42 |
| 21 | | preparation for your deposition? | 10:39:48 |
| 22 | A. | Not in specific preparation for my | 10:39:58 |
| 23 | | deposition. | 10:40:03 |
| 24 | Q. | So all of the times you've met with your | 10:40:03 |
| 25 | | attorneys in preparation for your deposition, | 10:40:06 |

M. L. KNOWLES

Page 67

| | | | |
|---|---|---|---|
| 1 | | one or more attorneys from the defendants, | 10:40:08 |
| 2 | | Milbank Tweed, the Milbank Tweed firm have | 10:40:12 |
| 3 | | also been present? | 10:40:16 |
| 4 | A. | To my recollection. | 10:40:17 |
| 5 | Q. | To your recollection, yes? | 10:40:20 |
| 6 | A. | Yes, to my recollection, yes. | 10:40:21 |
| 7 | Q. | Have you ever seen a document or been told | 10:40:33 |
| 8 | | a document exists to the effect of a joint | 10:40:35 |
| 9 | | defense agreement? | 10:40:40 |
| 10 | A. | I believe so, but that's a technical legal | 10:40:46 |
| 11 | | term.  I'm not exactly sure what documents | 10:40:54 |
| 12 | | have been prepared between the attorneys for | 10:41:00 |
| 13 | | the trustees and the attorneys for the | 10:41:06 |
| 14 | | defendants. | 10:41:24 |
| 15 | Q. | And I'm sorry if I've asked you this | 10:41:24 |
| 16 | | previously, but do you know who is paying | 10:41:27 |
| 17 | | the fees of the Debevoise firm to represent | 10:41:29 |
| 18 | | you and any of the other trustees in this | 10:41:35 |
| 19 | | litigation? | 10:41:38 |
| 20 | A. | I believe the fund shareholders. | 10:41:39 |
| 21 | Q. | And you understand that none of the trustees | 10:41:46 |
| 22 | | have been named as parties to this case? | 10:41:48 |
| 23 | A. | That's correct. | 10:41:51 |
| 24 | Q. | You mentioned that you've reviewed the | 10:42:09 |
| 25 | | consolidated complaint and I think you said | 10:42:12 |

Page 289

1    to some specific pages.                                05:32:40

2              On the second page, this is a               05:32:42

3    summary of the economies of scale discussions   05:32:44

4    dated March 15, 2006.  Do you see that?         05:32:47

5 A.  Mm-hmm.                                         05:32:49

6 Q.  Do you recall receiving this presentation?     05:32:49

7 A.  Yes.                                            05:32:52

8 Q.  I'm going to ask you to turn to what's marked  05:32:59

9    at the bottom right-hand corner of the page,    05:33:01

10    Page 2 of 13, and there's a summary of          05:33:04

11    trustee questions.  Do you see that?            05:33:08

12 A.  Yes.                                            05:33:12

13 Q.  If you could just review those three           05:33:12

14    questions.  Are those three questions that      05:33:14

15    the trustees had for Fidelity?                  05:33:15

16 A.  Yes.                                            05:33:19

17 Q.  If you turn to the next page which says        05:33:23

18    3 of 13, the first bullet point says, "FMR      05:33:31

19    achieves economies of scale as the funds        05:33:39

20    collectively increase assets."  Is that what    05:33:40

21    we've been talking about today, about how       05:33:43

22    economies of scale are realized complexwide?    05:33:45

23 A.  Yes.                                            05:33:47

24 Q.  Skipping down to Bullet Point No. 3, do you    05:33:51

25    see that?  It says, "individual funds may       05:33:54

| | | |
|---|---|---|
| 1 | experience economies of scale as assets | 05:33:57 |
| 2 | increase.  Funds also have diseconomies of | 05:34:00 |
| 3 | scale due to the complexity and financial | 05:34:03 |
| 4 | risk related to large funds, e.g., PM | 05:34:05 |
| 5 | compensation, trading and research."  Could | 05:34:08 |
| 6 | you tell me, do you agree that individual | 05:34:10 |
| 7 | funds might experience economies of scale | 05:34:15 |
| 8 | as assets increase? | 05:34:17 |
| 9 A. | Intuitively you have to think that perhaps | 05:34:21 |
| 10 | they do and intuitively you also know that | 05:34:25 |
| 11 | there are diseconomies of scale at the | 05:34:29 |
| 12 | other end.  An economy of scale, having a | 05:34:30 |
| 13 | decreasing cost on the margin, I think, | 05:34:35 |
| 14 | is what you're really talking about in | 05:34:37 |
| 15 | economies of scale, but that's specific | 05:34:40 |
| 16 | to a capacity constraint and then there | 05:34:41 |
| 17 | are elements of capacity that have to be | 05:34:44 |
| 18 | increased at some point in time, and that's | 05:34:47 |
| 19 | what I would term as a diseconomy of scale. | 05:34:49 |
| 20 | So the cost actually goes up as the size | 05:34:52 |
| 21 | of a fund or the size of a plant or anything | 05:34:55 |
| 22 | that reaches capacity limitations. | 05:35:01 |
| 23 Q. | Could you give an example specifically | 05:35:03 |
| 24 | relating to the funds, to any funds which | 05:35:05 |
| 25 | might mean by diseconomies of scale?  I | 05:35:08 |

| | | |
|---|---|---|
| 1 | understand the concept, but do you have an | 05:35:11 |
| 2 | example for me? | 05:35:13 |
| 3 | MR. BENEDICT:  Objection to form. | 05:35:16 |
| 4 Q. | Let me ask you about the -- | 05:35:17 |
| 5 | MR. BENEDICT:  Let her, she'll | 05:35:20 |
| 6 | answer it. | 05:35:22 |
| 7 A. | I'm going to answer your question. | 05:35:22 |
| 8 Q. | Okay. | 05:35:23 |
| 9 A. | Let me restate your question.  Diseconomies | 05:35:25 |
| 10 | of scale examples of how that might affect | 05:35:28 |
| 11 | an individual fund. | 05:35:33 |
| 12 Q. | That was what I was going to ask.  Instead | 05:35:34 |
| 13 | of just picking a random example, can you | 05:35:37 |
| 14 | give me what your understanding is of the | 05:35:39 |
| 15 | three examples that are listed here, PM | 05:35:41 |
| 16 | compensation, trading and research? | 05:35:51 |
| 17 A. | It's PM compensation, trading, research. | 05:35:56 |
| 18 | I think what they're getting at here is | 05:36:02 |
| 19 | when funds get really big, you have to | 05:36:04 |
| 20 | hire some really expensive portfolio | 05:36:06 |
| 21 | managers to run them.  When you've got a | 05:36:10 |
| 22 | really big fund, you already own a lot of | 05:36:15 |
| 23 | the stocks and so trading positions, you | 05:36:20 |
| 24 | own a lot of any individual stocks so trading | 05:36:24 |
| 25 | in that particular stock may move markets. | 05:36:28 |

Page 292

| | | |
|---|---|---|
| 1 | If you have a lot of money to invest, you | 05:36:34 |
| 2 | may be at the limits of your ability to | 05:36:38 |
| 3 | invest in a list of stocks and have to find | 05:36:41 |
| 4 | a whole bunch of new stocks so your research | 05:36:43 |
| 5 | requirements actually expand.  These kinds | 05:36:48 |
| 6 | of things are the things that led us to | 05:36:51 |
| 7 | close low price stock because people wanted | 05:36:53 |
| 8 | to buy that mutual fund, and at some point | 05:36:58 |
| 9 | in time it becomes difficult to productively | 05:36:59 |
| 10 | invest that money within the objectives | 05:37:04 |
| 11 | and restrictions of the management of that | 05:37:09 |
| 12 | fund. | 05:37:14 |
| 13 Q. | Have you done any, or has the board done | 05:37:15 |
| 14 | any analysis of what other diseconomies of | 05:37:18 |
| 15 | scale might have arisen in the five funds | 05:37:21 |
| 16 | that are at issue in this case? | 05:37:24 |
| 17 | MR. BENEDICT:  Objection to form. | 05:37:27 |
| 18 A. | Well, I think this study really is asking | 05:37:32 |
| 19 | the question of economies/diseconomies, are | 05:37:35 |
| 20 | there differences in various kinds of costs | 05:37:41 |
| 21 | which are articulated in this study that | 05:37:45 |
| 22 | correlate to fund size so that's either side | 05:37:52 |
| 23 | the data in here could have had, could | 05:38:01 |
| 24 | have been indicative of economies or | 05:38:01 |
| 25 | diseconomies. | 05:38:03 |

1    COMMONWEALTH OF MASSACHUSETTS)

2    SUFFOLK, SS. )

3

4

5    I, Jeanette Maracas, Registered
      Professional Reporter and Notary Public in
      and for the Commonwealth of Massachusetts, do
6    hereby certify that there came before me on
      the 15th day of May, 2007, at 9:00 a.m., the
7    person hereinbefore named, who was by me duly
      sworn to testify to the truth and nothing but
8    the truth of his knowledge touching and
      concerning the matters in controversy in this
9    cause; that he was thereupon examined upon
      his oath, and his examination reduced to
10   typewriting under my direction; and that the
      deposition is a true record of the testimony
11   given by the witness.

12

13   I further certify that I am neither
      attorney or counsel for, nor related to or
      employed by, any attorney or counsel employed
14   by the parties hereto or financially
      interested in the action.

15

16   In witness whereof, I have hereunto
      set my hand this 29th day of May, 2007.

17

18

19

20

                  Notary Public
21                My commission expires 9/6/13

22

23

24

25

No. 04-cv-11651-MLW (Lead Case)
No. 04-cv-11756-MLW (Consolidated Case)

# Memorandum In Support of Plaintiffs' Motion To Compel Production of Documents

## Exhibit 19

REDACTED

**17. (a)The data provided in the June 10, 2005 responses to the trustee questions shows that total compensation expense for Magellan fund was** *REDACTED* **versus** *REDACTED* **Contrafund. Of that amount,** *REDACTED* **was in Share Program Expense and Other Share Program for Magellan while it was** *REDACTED* **for Contrafund. Given that the explanation from JS indicates that the Share Program Expense focuses on performance while the Other Share Program also has performance attributes (as well as others such as length of service with Fidelity), why are the figures so much larger for a poorly performing fund versus one that has done very well? Given that the Board raised these issues in 2004 and again in 2005, more information should be provided.**

Portfolio managers are awarded bonuses each year based on (i) their individual investment performance compared to peers and benchmark for the prior 1, 3 and 5 years, (ii) the performance of other Fidelity funds with similar investment objectives compared to peers over 1, 3, and 5 years and (iii) a smaller, subjective component based on their contribution to the management of FMR.

Share program expense as well as other share program costs reflect the cost of phantom and real share awards that are granted based on a number of criteria include the level of assets managed, the complexity of the mandate, long-term investment performance and tenure. Shares are cumulative, the benefit accrues over a number of years and reflects the portfolio manager's longer term contribution to the company and shareholders.

In fund profitability there are a number of factors which influence how much compensation and share program expense is allocated to a particular fund.

- With respect to an individual portfolio manager's compensation (base, bonus and shares), 75% is allocated pro-rata to the assets they manage. The portfolio manager for Magellan manages one fund, while Contrafund's manager is responsible for Contrafund, VIP II Contrafund and Fidelity Advisor New Insights. As a result,

Attorney/Client Privilege                16          Fidelity Confidential Information

CONFIDENTIAL                                                    BFMR_00143862

75% of Will Danoff's direct compensation would be shared across the three funds he manages.

- The remaining 25% of a portfolio manager's compensation is pooled with compensation from other portfolio managers in their group and allocated based on assets to all assets in the group. Depending on the number of portfolio managers in the group, their performance and assets under management, these cost pools and the allocation of expense to specific funds will vary. Contrafund is part of the Specialized Growth group and Magellan is included in the Capital Appreciation group. In addition, Magellan was approximately 1.5 times the size of Contrafund during this period.

- Compensation for the remainder of the complex – including research, trading, systems and administration - is allocated to funds based on relative assets. Magellan would bear a larger allocation of these expenses due to its larger asset base.

For ease of reference, we have included the table from the June 10th response which showed the components of total compensation for 5 of the representative funds.

| 2004<br>REDACTED | Magellan | Contrafund | Cash<br>Reserves | Low-Priced<br>Stock | Growth &<br>Income |
|---|---|---|---|---|---|
| Salary<br>Bonus<br>Share Program Expense<br>Other Share Program | | | | | |
| Total Compensation<br>All Other Expenses* | | | REDACTED | | |
| Total Investment Management | | | | | |
| Compensation as a % of Total | | | | | |
| *Includes compensation expenses included in intercompany expenses (e.g., G&A). | | | | | |

As you noted, the performance of Contrafund has been much better than Magellan. As such, Contrafund's manager received a significantly higher percentage of his annual bonus target than Magellan's. However, these other factors listed above resulted in a higher salary, bonus and share program expense allocated to Magellan than for Contrafund in 2004.

# REDACTED

CONFIDENTIAL

No. 04-cv-11651-MLW (Lead Case)
No. 04-cv-11756-MLW (Consolidated Case)

# Memorandum In Support of Plaintiffs' Motion To Compel Production of Documents

## Exhibit 20

Presentation to the Board of Trustees

Summary of
Economies of Scale
Discussions

March 15, 2006

Fidelity Highly Confidential Information

CONFIDENTIAL

BFMR_00153911

## Summary of Trustee Questions

- Larger equity funds generally have higher than average profitability; does this suggest that large funds are not sufficiently benefiting from economies of scale?

- To what extent does Fidelity achieve greater economies of scale on a $50B fund compared to a $5B fund?

- Should large funds have a fund-level breakpoint?

Fidelity Highly Confidential Information

2 of 13

# Does FMR Achieve Economies of Scale as Assets Increase?

- FMR achieves economies of scale as the funds collectively increase assets, i.e., costs for managing and providing services to the funds and shareholders decrease in basis points as total complex assets increase.

- FMR's ability to provide the level of investment management, distribution and servicing capability is based on the revenues provided by all funds/assets in the complex. The vast majority of these costs are shared across the complex.

- Individual funds may experience economies of scale as assets increase; funds also have diseconomies due to the complexity and financial risk related to large funds, e.g., PM compensation, trading, research.

- Diseconomies of scale also occur at the complex level as evidenced by the current expansion of research and investment management capabilities, i.e., the size and breadth of our equity funds/assets reached a point where a significant change in research and management capabilities was required.

- FMR notes that average assets in 2004 of $862B were only 0.5% higher than in 2000 (with equity assets down 11%). The lack of growth in total assets while investment management and distribution costs increased over this period would suggest the absence of economies of scale.

Fidelity Highly Confidential Information

3 of 13

CONFIDENTIAL

BFMR_00153914

# FMR Believes that Large Equity Funds are Sufficiently Benefiting from Economies of Scale

- FMR believes fund profitability should not be used to determine fund-level economies of scale due to the inherent limitations of allocating shared costs.

- Calculating fund-level economies of scale is problematic (if not unsolvable) due to the existence of shared costs and fund-level diseconomies of scale.

- Portfolio manager costs are the only significant cost that can be directly attributed to a fund, however FMR has shown that a $5B fund may have similar expenses in basis points as a $50B fund because FMR assigns the most experienced (highly compensated) manager to large funds.

- FMR shares the benefits of economies of scale realized at the complex level (while maintaining the integrity of its pricing philosophy) through the group fee structure and ongoing investments in the business.

- Management fees for each of the large equity funds are more than reasonable when considering the competitiveness of the fees, the reasonableness of the profitability and the wide array of services as well as the sharing of economies of scale at the complex-level.

Fidelity Highly Confidential Information

CONFIDENTIAL