```
                    VOLUME:  I
                    PAGES:   1-312
                    EXHIBITS: 27-42
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 04-CV-11651-MLW (Lead case)

No. 1:04-CV-11756-MLW (Consolidated case)

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, | \* |
| NANCY HAUGEN, MICHAEL F. MAGNAN, | \* |
| KAREN L. MAGNAN, PRESLEY C. | \* |
| PHILLIPS, ANDREA M. PHILLIPS, and | \* |
| CINDY SCHURGIN, for the use and | \* |
| benefit of THE FIDELITY MAGELLAN | \* |
| FUND, FIDELITY CONTRAFUND, FIDELITY | \* |
| GROWTH & INCOME PORTFOLIO I FUND, | \* |
| FIDELITY BLUE CHIP GROWTH FUND, and | \* |
| FIDELITY LOW-PRICED STOCK FUND, | \* |
| Plaintiffs | \* |
| v. | \* |
| FIDELITY MANAGEMENT & RESEARCH | \* |
| COMPANY and FMR CO., INC., | \* |
| Defendants | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF NED C. LAUTENBACH

DATE:  TUESDAY, APRIL 17, 2007

Page 38

1  Fidelity have a fiduciary duty to the funds?  09:38:50
2        MR. KIERNAN: Object to form.  09:38:54
3        MR. BENEDICT: Objection.  09:38:56
4  A. What do you mean by that?  09:38:57
5  Q. Well, do you know what a fiduciary duty is?  09:38:58
6  A. I think so.  09:39:02
7  Q. And do you -- and do you as a board member  09:39:03
8     have a fiduciary to the funds?  09:39:04
9  A. Sure.  09:39:06
10 Q. And likewise, does Fidelity have a fiduciary  09:39:06
11    duty --  09:39:09
12 A. Yes.  09:39:10
13 Q. -- to the funds?  09:39:09
14    And does that fiduciary duty of  09:39:11
15    Fidelity run to each separate and individual  09:39:14
16    fund?  09:39:17
17 A. It does.  09:39:17
18       MR. BENEDICT: Objection.  09:39:18
19 Q. Likewise, does the fiduciary duty of the  09:39:19
20    board run to each separate fund?  09:39:21
21 A. Yes.  09:39:22
22 Q. And among the duties of Fidelity, does it  09:39:23
23    have a duty to not charge an excessive fee  09:39:29
24    for its management services?  09:39:32
25       MR. BENEDICT: Objection.  09:39:34

Page 39

1        MR. KIERNAN: Object to form.  09:39:35
2  A. I don't know what you mean by that.  09:39:36
3  Q. If Fidelity charged an excessive fee to one  09:39:38
4     of the mutual funds, would it breach its  09:39:42
5     fiduciary duty?  09:39:44
6        MR. BENEDICT: Objection.  09:39:45
7        MR. KIERNAN: Object to form.  09:39:46
8  A. I don't know how to answer that. We  09:39:46
9     wouldn't let them charge a fiduciary fee.  09:39:52
10    That's why we're here. That's why the  09:39:54
11    independent trustees are there. That's a  09:39:55
12    hypothetical question.  09:39:57
13 Q. I understand it's hypothetical, but if a fee  09:39:58
14    was excessive, would that breach the  09:40:00
15    fiduciary duty of Fidelity?  09:40:02
16       MR. BENEDICT: Objection.  09:40:04
17       MR. KIERNAN: Same objection.  09:40:04
18 A. I don't know. I would think it would, but I  09:40:05
19    don't know what -- I don't know what you're  09:40:08
20    -- I don't under -- I don't understand that.  09:40:16
21 Q. Could you explain the general fee structure  09:40:17
22    that exists for the equity mutual funds at  09:40:24
23    Fidelity? And I'm talking about the  09:40:28
24    management fee structure at this point.  09:40:30
25 A. Well, our management fee comes in really  09:40:32

Page 40

1  three parts. We have a group fee that is  09:40:39
2  shared by all funds. It varies a little bit  09:40:45
3  depending on the kind of fund it is, how  09:40:50
4  much research is involved, et cetera, but  09:40:53
5  it's a fee that represents the fact that  09:40:54
6  lots of things that are done in the  09:40:56
7  management company are with -- activities  09:41:01
8  are shared across all funds and are not  09:41:03
9  unique to a fund.  09:41:06
10    And then there's another fee that  09:41:07
11 varies by size of fund that's based on  09:41:09
12 assets, as its assets grow, this fee, that's  09:41:13
13 added to the size of the assets. And then  09:41:20
14 there's a performance fee on top of that  09:41:22
15 that adds or subtracts to the management fee  09:41:26
16 depending on performance.  09:41:30
17 Q. If as a result of this litigation the fee  09:41:34
18    charged by Fidelity for the management of  09:41:47
19    the five funds in question was to be  09:41:50
20    reduced, is there anything that you would  09:41:54
21    oppose as to that?  09:41:56
22       MR. BENEDICT: Objection. Would  09:41:58
23    you please repeat back the question?  09:42:00
24       MR. BURNS: I'll repeat it.  09:42:04
25 Q. If as a result of this litigation the fees  09:42:05

Page 41

1  to any one of the five funds were to be  09:42:07
2  reduced, would you oppose that?  09:42:09
3        MR. KIERNAN: Object to form.  09:42:11
4  A. Well, if all the services were performed as  09:42:12
5     they are today and everything that the  09:42:17
6     shareholders were to get were to get it  09:42:21
7     tomorrow and that was for less money, I  09:42:22
8     wouldn't be opposed to that. But I doubt  09:42:25
9     that would be the case. We spend a lot of  09:42:27
10    time trying to understand what it costs to  09:42:28
11    do this and the fees that go with it. And  09:42:30
12    so when we agree to a management contract,  09:42:32
13    we agree not only to fees but service  09:42:37
14    levels, performance, et cetera.  09:42:39
15       And what we're trying to work through  09:42:41
16    with Fidelity for the interest of the  09:42:43
17    shareholders is that they get not only  09:42:45
18    reasonable fees, but they get good  09:42:47
19    management performance, they get excellent  09:42:50
20    service and support. So it's the whole  09:42:52
21    package is what we're trying to provide.  09:42:56
22 Q. And when you're talking about the support  09:42:57
23    and service, is that a package of activities  09:43:01
24    that are handled under a transfer agency  09:43:06
25    agreement?  09:43:08

11 (Pages 38 to 41)

Page 118

| | |
|---|---|
| 1 | September 8, 2005." Do you know if you 11:32:17 |
| 2 | attended an equity contract committee on or 11:32:22 |
| 3 | about that date? 11:32:28 |
| 4 | A. I'm sure I did. 11:32:28 |
| 5 | MR. BENEDICT: Can we just take a 11:32:30 |
| 6 | second to look through this document? 11:32:31 |
| 7 | (Witness reviews document.) 11:37:03 |
| 8 | MR. BENEDICT: You set? 11:37:04 |
| 9 | Q. Mr. Lautenbach, do you recall having 11:37:10 |
| 10 | previously in or around September of 2005 11:37:12 |
| 11 | received this document? 11:37:15 |
| 12 | A. I have received at least some of it. I 11:37:17 |
| 13 | might not have received the first part of 11:37:22 |
| 14 | it, but the other part I think I've seen. 11:37:24 |
| 15 | Q. The second page of the memo portion, third 11:37:25 |
| 16 | page in entitled "Update on 15(c) 11:37:35 |
| 17 | Questions" -- 11:37:39 |
| 18 | A. Yes. 11:37:39 |
| 19 | Q. -- and it says "Board Questions/Discussions 11:37:39 |
| 20 | - June/July 15(c) Cycle." 11:37:44 |
| 21 | Could you explain to us what the 11:37:49 |
| 22 | board's cycle is as it relates to the 15(c) 11:37:51 |
| 23 | analysis? 11:37:53 |
| 24 | A. Well, the 15(c) cycle is our annual review 11:37:57 |
| 25 | of all the elements of the contracts that we 11:37:59 |

Page 119

 1  sign with Fidelity and all the review of the   11:38:03
 2  services, performance, review channels.  We   11:38:05
 3  review 12(b)(1) fees, we review fallout       11:38:10
 4  benefits, we go look at economies -- look at  11:38:14
 5  everything in that cycle.                     11:38:16
 6      We have a specific date to approve the    11:38:18
 7  fixed price management contract, and we have  11:38:22
 8  a fixed date to review and approve the        11:38:25
 9  equity contract, as we do for every other     11:38:27
10  contract.  And July is the date around which  11:38:30
11  we sign off on the equity contract for the    11:38:33
12  next year.                                    11:38:37
13 Q. All right. When is the time that you sign    11:38:40
14  off on the fixed income?                      11:38:42
15 A. A month before.                              11:38:44
16 Q. In June?                                     11:38:45
17 A. Yeah.                                        11:38:45
18 Q. Okay. And what is the length of the 15(c)    11:38:45
19  cycle that you've described?                  11:38:50
20 A. It's for the whole year cycle. It goes       11:38:52
21  on -- it starts all over again in September   11:38:55
22  and goes back through June.                   11:38:58
23 Q. Okay. And of the now nearly 350 funds that   11:39:00
24  Fidelity has, how many would be in the fixed  11:39:08
25  income area, how many in the equity area?     11:39:10

Page 120

 1 A. I'm guessing. I don't know. I would say     11:39:12
 2  probably two-thirds are in equity and         11:39:19
 3  one-third in fixed income, something like     11:39:20
 4  that.                                         11:39:23
 5 Q. And in addition to the approval of the      11:39:23
 6  management contracts for fixed income in      11:39:29
 7  June and equity in July, do you also -- you   11:39:31
 8  and your other board members also approve     11:39:35
 9  the other contracts such as transfer agency   11:39:38
10  and --                                        11:39:40
11 A. Pricing and bookkeeping.                    11:39:41
12 Q. All right. Are there three contracts, then? 11:39:43
13 A. There are three contracts. We also approve  11:39:48
14  other things. We have other approval cycles  11:39:51
15  beyond that.                                  11:39:52
16 Q. Three contracts with Fidelity would be      11:39:53
17  management, transfer agency, pricing and     11:39:54
18  bookkeeping?                                  11:39:56
19 A. Right.                                      11:39:56
20 Q. Are there any other Fidelity contracts or   11:39:56
21  contracts with Fidelity affiliates for the    11:39:58
22  funds?                                        11:40:02
23 A. Contracts per se, probably not, but there's 11:40:02
24  lots of other reviews that would take place   11:40:07
25  in there like 12(b)(1) fees, and we approved  11:40:09

Page 121

 1  12(b)(1) fees. We approve enter-lend --       11:40:13
 2  inter-fund lending. So we have -- I think     11:40:19
 3  we have -- I added up the other day, we have  11:40:21
 4  98 different issues that we sit down with     11:40:23
 5  Fidelity on in a given year and have some     11:40:25
 6  kind of review and/or decision.               11:40:28
 7 Q. All right. And does that -- do those 98     11:40:30
 8  issues attach to each one of the mutual       11:40:35
 9  funds?                                        11:40:39
10 A. They could. They could be --                11:40:39
11     MR. BENEDICT: Objection to form.          11:40:41
12     THE WITNESS: I'm sorry.                   11:40:41
13 A. They might be fund-specific or they might be 11:40:43
14  cross-fund.                                   11:40:46
15 Q. On the management contract, the transfer    11:40:46
16  agency contract and the pricing and          11:40:52
17  bookkeeping contract, does each fund have a   11:40:54
18  separate contract for those services?         11:40:57
19 A. Has a contract with Fidelity for their      11:40:59
20  services, yes.                                11:41:01
21 Q. So it would be 348 funds today times those  11:41:02
22  three contracts?                              11:41:05
23 A. Right.                                      11:41:06
24 Q. Are there any contracts that the board     11:41:06
25  authorizes and signs with Fidelity for the    11:41:09

Page 238

```
1        MR. BENEDICT:  You do not need to       03:18:43
2     answer that question.                      03:18:44
3  Q. Do you have any money in the Growth & Income  03:18:45
4     Fund?                                      03:18:46
5  A. I do.                                      03:18:46
6  Q. How much do you have in the Growth & Income  03:18:47
7     Fund?                                      03:18:47
8  A. I don't know.                              03:18:49
9        MR. BENEDICT:  Objection.               03:18:49
10       MR. KIERNAN:  Object.                   03:18:50
11 Q. You don't know what your investment is?    03:18:51
12 A. No, I don't know what my investment is in  03:18:53
13    any fund.                                  03:18:54
14 Q. Do you know what your investment is in the  03:18:55
15    Magellan Fund, your personal investment?   03:18:57
16 A. I do not.                                  03:18:59
17 Q. How about in the Low-Priced Stock Fund?    03:19:01
18 A. I do not.                                  03:19:03
19 Q. How about in the Blue Chip Growth Fund?    03:19:03
20 A. I do not.                                  03:19:06
21 Q. Do you have more than, say, 10 percent of  03:19:07
22    your net worth in any of those funds?      03:19:11
23       MR. BENEDICT:  Objection.               03:19:13
24       MR. KIERNAN:  Objection.                03:19:13
25       MR. BENEDICT:  You don't have to        03:19:14
```

Page 239

```
1     answer the question.                       03:19:15
2  A. I'm not going to answer that question.     03:19:17
3  Q. Do you have more or less than a million    03:19:19
4     dollars in the Growth & Income Fund?       03:19:22
5        MR. BENEDICT:  Objection.               03:19:24
6        MR. KIERNAN:  Objection.                03:19:24
7        MR. BENEDICT:  The witness is not       03:19:25
8     going to answer any personal questions about  03:19:26
9     his net worth or his personal investments  03:19:27
10    other than to state that he has invested in  03:19:31
11    each of the five funds at issue here, and I  03:19:34
12    believe he told you he owns approximately 30  03:19:36
13    Fidelity funds, so just cut off the line of  03:19:39
14    inquiry and we can get out of here.        03:19:41
15       BY MR. LINK:                            03:19:43
16 Q. Mr. Lautenbach, are you represented today?  03:19:43
17 A. Yes.                                       03:19:45
18 Q. Who's your attorney?                       03:19:46
19 A. John Kiernan.                              03:19:47
20 Q. Is Mr. Benedict your attorney?             03:19:48
21 A. He's here, too, on my behalf.              03:19:50
22 Q. He's here on your behalf as your lawyer?   03:19:53
23 A. No, but on the --                          03:19:54
24       MR. BENEDICT:  I'm here to              03:19:56
25    represent Fidelity.                        03:19:57
```

Page 240

```
1  Q. Is Mr. Benedict here as your lawyer, sir?  03:19:58
2  A. Not as my lawyer.                          03:20:01
3  Q. Okay.  Are you paying Mr. Benedict anything  03:20:02
4     to be here, you personally?                03:20:05
5  A. I don't think so.                          03:20:06
6  Q. Has he given you any legal advice in this  03:20:06
7     case?                                      03:20:09
8  A. He has given me some, yes.                 03:20:09
9  Q. Okay.  Tell me what legal advice Mr.       03:20:12
10    Benedict, who is not your lawyer, has given  03:20:14
11    you.                                       03:20:16
12       MR. KIERNAN:  I instruct you not to     03:20:16
13    answer.                                    03:20:18
14 A. I'm not going to answer that.              03:20:19
15 Q. Okay.  When you prepared for your          03:20:21
16    deposition, when was that?  When did you   03:20:26
17    come to Boston?                            03:20:28
18 A. I came to Boston last -- yesterday afternoon  03:20:29
19    around --                                  03:20:33
20 Q. Did you --                                 03:20:33
21 A. I landed around 1:00.                      03:20:34
22 Q. And did you meet with anybody to get ready  03:20:35
23    for your deposition?                       03:20:38
24 A. I met with lawyers, yes.                   03:20:38
25 Q. Who did you meet with, sir?                03:20:39
```

Page 241

```
1  A. I met with John Kiernan.  I met with Shannon  03:20:41
2     Selden.  I met with Jim Benedict.  I met   03:20:45
3     with Jody.                                 03:20:46
4        THE WITNESS:  I forget your name,       03:20:48
5     sorry.                                     03:20:50
6        MS. FORCHHEIMER:  Forchheimer.          03:20:51
7     That's okay.                               03:20:52
8  A. Rob Helm was the fund's counsel.           03:20:53
9  Q. All right.  So during the entire time that  03:20:55
10    you were preparing for your deposition Mr.  03:20:57
11    Benedict was there as well?                03:21:00
12 A. Yes.                                       03:21:00
13 Q. And all the folks that you've mentioned were  03:21:00
14    there during the entire time that you were  03:21:02
15    being prepared, correct?                   03:21:04
16 A. Correct.                                   03:21:05
17 Q. Were you provided with any documents to    03:21:05
18    review for your deposition by Mr. Benedict?  03:21:07
19 A. I don't know who provided them, but I had a  03:21:10
20    whole set of documents I reviewed.         03:21:12
21 Q. Were they sent to you before your          03:21:14
22    deposition?                                03:21:16
23 A. Some were, some -- yeah, some were.        03:21:16
24 Q. And some were provided to you yesterday?   03:21:18
25 A. Yes.                                       03:21:19
```

Page 242

1  Q. And in preparing for your deposition Mr.          03:21:20
2     Benedict helped prepare you for the answers      03:21:23
3     you were going to give today?                    03:21:26
4  A. Well, he briefed me on lots of background        03:21:27
5     data and documents that had been given to        03:21:29
6     you for review and tried to refresh my           03:21:32
7     memory to the documents, yes.                    03:21:35
8  Q. Did he suggest to you that what you said to      03:21:36
9     him would somehow be privileged or               03:21:38
10    confidential as the lawyer for Fidelity in       03:21:40
11    this case?                                       03:21:41
12        MR. BENEDICT: Objection.                     03:21:42
13        MR. KIERNAN: I instruct you not to           03:21:42
14    answer.                                          03:21:43
15        MR. BENEDICT: And it was.                    03:21:43
16        MR. KIERNAN: I instruct you not to           03:21:45
17    answer.                                          03:21:46
18 A. I'm not going to answer.                         03:21:47
19 Q. Do you know whether there's a defense joint      03:21:48
20    (sic) agreement in this case?                    03:21:50
21        MR. KIERNAN: I instruct you not to           03:21:52
22    answer.                                          03:21:53
23 A. I don't know.                                    03:21:54
24 Q. Are you a party in this lawsuit? Have you        03:21:55
25    been sued?                                       03:22:00

Page 243

1  A. No.                                              03:22:00
2  Q. Have any of the trustees been sued in this       03:22:00
3     case?                                            03:22:02
4  A. No.                                              03:22:02
5  Q. Who are the defendants in this case?             03:22:03
6  A. Fidelity.                                        03:22:05
7  Q. Okay. Other than yesterday when you met          03:22:06
8     with all the folks that you identified, have     03:22:11
9     you met with any of the lawyers from             03:22:13
10    Fidelity before to talk about this case?         03:22:15
11 A. Yes. We've had prior discussions.                03:22:16
12 Q. By the way, in your fiduciary duty world do      03:22:19
13    you owe any fiduciary duties to Fidelity?        03:22:23
14 A. Well, I don't know if I have fiduciary duty,     03:22:24
15    but we struck a contract with Fidelity           03:22:28
16    representing the shareholders. We think          03:22:30
17    it's a right and appropriate contract, and       03:22:33
18    we think it's fair, and we think it's in the     03:22:36
19    best interests of the shareholders. And          03:22:37
20    it's why I'm a party to that and I'm willing     03:22:40
21    to come forward and discuss what we went         03:22:43
22    through to make sure it is a fair and right      03:22:45
23    contract, and to that extent I'm part of         03:22:47
24    those negotiations, I felt I should be here,     03:22:49
25    yes.                                             03:22:51

Page 244

1  Q. I understand that. My question is, do you        03:22:52
2     owe any fiduciary duties to Fidelity --          03:22:53
3  A. No.                                              03:22:55
4  Q. -- in your capacity as a trustee for the         03:22:55
5     mutual funds?                                    03:22:57
6  A. No.                                              03:22:58
7  Q. In fact -- what does arm's length                03:22:58
8     negotiation mean, sir?                           03:23:02
9         MR. KIERNAN: Object to the form of           03:23:03
10    the question. You can answer generally.          03:23:04
11 A. Well, it means that you negotiate on the         03:23:06
12    best interests of your shareholders and try      03:23:11
13    to make sure you get the very best total         03:23:13
14    package for them that you can.                   03:23:16
15 Q. And during the seven years that you have         03:23:17
16    been a trustee do you personally feel that       03:23:19
17    you have negotiated the best fee deal for        03:23:21
18    all of the shareholders that you represent?      03:23:24
19 A. I think I've negotiated the best total           03:23:25
20    package for shareholders that I can do. I'm      03:23:29
21    very proud of it, and I look at the results      03:23:31
22    of what we get. I think we do an excellent       03:23:33
23    job. And I look at the amount of time and        03:23:35
24    effort we've put in reviewing this and           03:23:37
25    inspecting things that we've talked about        03:23:39

Page 245

1     today, and my colleagues and I feel like we      03:23:40
2     do as good a job as anybody in the industry.     03:23:44
3  Q. In all seven years that you've been a            03:23:47
4     trustee have you approved the contract with      03:23:50
5     Fidelity?                                        03:23:53
6  A. We have, with some exceptions.                   03:23:53
7  Q. I'm sorry, my question is you, you               03:23:55
8     personally. Have you always voted in favor       03:23:55
9     of approving the contract?                       03:23:56
10 A. Yeah. We all do.                                 03:23:56
11 Q. Has there ever been a time in the seven          03:23:58
12    years you've been on the board that any          03:24:00
13    trustee hasn't voted to approve the Fidelity     03:24:02
14    contract?                                        03:24:04
15        MR. BENEDICT: Objection. Now                 03:24:05
16    you're going down duplicative lines of           03:24:06
17    inquiry already handled by your colleague,       03:24:08
18    Mr. Link.                                        03:24:12
19 Q. You can answer the question.                     03:24:12
20 A. Well, there have been times where we have        03:24:13
21    all voted not to approve the contract on the     03:24:15
22    day and asked for additional work to be          03:24:18
23    done, and after that work would be done,         03:24:19
24    then we would approve the contract.              03:24:21
25 Q. And ultimately all the contracts have been       03:24:22