# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CYNTHIA A. BENNETT, GUY E. MILLER,
NANCY HAUGEN, MICHAEL F.
MAGNAN, KAREN L. MAGNAN,
PRESLEY C. PHILLIPS, ANDREA M.
PHILLIPS, and CINDY SCHURGIN, for the
use and benefit of THE FIDELITY
MAGELLAN FUND, FIDELITY
CONTRAFUND, FIDELITY GROWTH &
INCOME PORTFOLIO I FUND, FIDELITY
BLUE CHIP GROWTH FUND, and
FIDELITY LOW-PRICED STOCK FUND,

               Plaintiffs,

    vs.

FIDELITY MANAGEMENT & RESEARCH
COMPANY and FMR CO., INC.,

               Defendants.

CIVIL NO. 1:04-cv-11651-MLW
(Lead Case)

CIVIL NO. 1:04-cv-11756-MLW
(Consolidated Case)

## DEFENDANTS FIDELITY MANAGEMENT & RESEARCH COMPANY AND FMR CO., INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT .................................................................................................................... 3

I.    The Trustees Should Not Be Compelled to Answer Questions About their
      Deposition Preparation ...................................................................................... 3

      A.    The Trustees' Communications with Counsel in Preparation for
            their Depositions Are Privileged Pursuant to the Common Interest
            Doctrine ...................................................................................................... 3

            1.    Fidelity and the Trustees Have a "Common Interest" in
                  Defending Against Plaintiffs' Section 36(b) Claims ......................... 3

            2.    Plaintiffs' Arguments that the Common Interest Doctrine
                  Does Not Apply in these Circumstances Are Without Merit ............. 9

      B.    The Fiduciary Exception Is Inapplicable to the Trustees'
            Deposition Preparation Meetings ................................................................ 11

      C.    The Trustees' Deposition Preparation Meetings Are Protected by
            the Work-Product Doctrine ......................................................................... 12

II.   Legal Advice and Attorney Work Product Redacted from Board Meeting
      Minutes Is Immune from Discovery .................................................................... 12

      A.    All of the Redacted Material is Protected by the Common Interest
            Doctrine ...................................................................................................... 13

      B.    Redacted Legal Advice Relating to Representation of the Funds
            Before the SEC Is Independently Privileged Under SEC Rule 205 ............... 14

      C.    Much of the Redacted Legal Advice Is Immune from Discovery
            Under the Attorney Work Product Doctrine ................................................ 17

III.  The Compensation Paid to Individual Portfolio Managers Is Highly
      Sensitive and Not Relevant to Plaintiffs' Claims ................................................. 17

      A.    The Compensation Paid to Individual Portfolio Managers Is Not
            Relevant to Plaintiffs' Claims ..................................................................... 19

      B.    The Compensation Paid to Portfolio Managers Is Highly
            Confidential and the Existing Protective Order Is Insufficient to
            Adequately Protect It .................................................................................. 21

CONCLUSION .................................................................................................................. 25

i

Defendants Fidelity Management & Research Company and FMR Co., Inc. ("Fidelity" or "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Motion to Compel Discovery ("Plaintiffs' Motion").

## PRELIMINARY STATEMENT

Plaintiffs allege that Defendants breached their fiduciary duty under Section 36(b) of the Investment Company Act of 1940 by charging excessive fees to manage five Fidelity mutual funds (the "Funds"). Plaintiffs brought this claim notwithstanding the fact that Fidelity charges the Funds fees that are among the lowest in the mutual fund industry (*see* Mann Tr. at 287:18-288:20[1]) and that it has further reduced its fees in recent years.[2]

Defendants have already produced over 200,000 pages of materials relating to the process by which the Independent Trustees who sit on the Fidelity mutual fund Board of Trustees (the "Trustees") negotiated the fees paid by the Funds and oversaw the performance of services by Fidelity during the period relevant to Plaintiffs' claims. This includes over 60,000 pages of materials requested by the Trustees to inform their consideration of the fees, including, among other information, descriptions of the services provided by Fidelity to the Funds and how those services have improved over time, estimations of the cost to Fidelity of providing those services

---

[1]     Because this and the other documents and deposition testimony cited herein include sensitive and highly confidential information, Defendants have not attached them as exhibits to this memorandum of law. If, however, the Court believes that a review of these materials would inform its consideration of Plaintiffs' Motion, Defendants will provide copies to the Court under seal.

[2]     As Plaintiffs note, and as is standard practice in the mutual fund industry, Fidelity is compensated for its services based on a percentage of assets under management. Between 2003 and 2006, the fees paid by the Funds to Fidelity decreased by the following amounts: Contrafund decreased from 0.79% to 0.71% of fund assets; Low-Priced Stock decreased from 0.77% to 0.67%; Magellan decreased from 0.52% to 0.39%; Blue Chip Growth decreased from 0.40% to 0.37%; and Growth & Income decreased from 0.48% to 0.47%.

and how those costs have changed over time, Fidelity's profit from managing the Funds, and analyses of how the fees paid by the Funds compare to those paid by comparable funds.

Plaintiffs do not – and cannot – argue that Fidelity has failed to produce a complete contemporaneous record of the negotiation of the fees at issue by Fidelity and the Trustees. Instead, Plaintiffs seek to compel discovery of the following information, none of which constitutes part of that record: (1) testimony concerning deposition preparation conferences in this case attended by the Trustees, their counsel, and Fidelity's counsel; (2) attorney-client communications and attorney work product concerning pending litigation and regulatory investigations, compliance with the securities laws, and legal obligations in connection with SEC filings, which were redacted from the meeting minutes of the Board; and (3) the annual compensation paid to the individual portfolio managers of the Funds. Plaintiffs challenge Fidelity's position that the first two categories of information are privileged, and they argue that compensation information could somehow have a bearing on their Section 36(b) claim.

Plaintiffs' Motion is meritless. First, the common interest and work-product doctrines preclude Plaintiffs from eliciting testimony from the Trustees concerning their deposition preparation with counsel. Second, the legal advice redacted from the Board minutes relates directly to common legal interests shared by Fidelity and the Trustees and therefore is covered by the common interest doctrine. In addition, much of that redacted material is independently protected from disclosure by Securities and Exchange Commission ("SEC") Rule 205 and the attorney work-product doctrine as well. Third, the details of Fidelity' portfolio manager compensation are neither relevant to this lawsuit nor reasonably calculated to lead to admissible evidence, and the disclosure of that information would compromise highly confidential

information and lead to an invasion of the individual portfolio managers' privacy.  Accordingly, Plaintiffs' Motion should be denied.

<u>**ARGUMENT**</u>

## I. THE TRUSTEES SHOULD NOT BE COMPELLED TO ANSWER QUESTIONS ABOUT THEIR DEPOSITION PREPARATION

Because the Trustees and Fidelity have a common interest in defending against Plaintiffs' claims in this litigation, the Trustees, in preparing for their depositions, met with both their independent counsel, Debevoise & Plimpton LLP, and Fidelity's counsel.  Plaintiffs now move to compel the Trustees to answer deposition questions about their deposition preparation, arguing that: (1) the presence of Fidelity's counsel during the meetings "undermines a claim of attorney-client privilege"; and (2) any privilege is "overridden by the fiduciary exception."  (Pl. Mem. at 16.)  These arguments are baseless, and in any event, the meetings are protected by the work-product doctrine.

### A. The Trustees' Communications with Counsel in Preparation for their Depositions Are Privileged Pursuant to the Common Interest Doctrine

Communications between the Trustees and their counsel and Fidelity's counsel at deposition preparation meetings are privileged under the common interest doctrine because the Trustees and Fidelity have a common interest in defending against Plaintiffs' claims in this litigation, and the deposition preparation meetings were part of their joint defense effort.

#### 1. Fidelity and the Trustees Have a "Common Interest" in Defending Against Plaintiffs' Section 36(b) Claims

The common interest doctrine protects communications between or among separate clients and their counsel when the clients have common interests in a legal dispute or matter and the communications are part of an on-going and joint effort to carry out a common strategy.  *In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001); *Ken's Foods, Inc. v. Ken's Steak*

*House, Inc.*, 213 F.R.D. 89, 93 (D. Mass. 2002).[3]  The doctrine is "an exception to the general

rule that the attorney-client privilege is waived when privileged information is disclosed to a

third party," *Cavallaro*, 284 F.3d at 250, and is based on the rationale that parties with common

interests should be permitted to share information pertinent to each others' legal strategies.  *See*

*In re Grand Jury Subpoena*, 274 F.3d at 575-76.

Application of the common interest doctrine generally requires a showing that the parties

"agreed to engage in a joint effort and to keep the shared information confidential from

outsiders."  *Ken's Foods*, 213 F.R.D. at 93.  It applies whenever the parties' communications are

part of a "common legal enterprise."  *See Strougo v. BEA Assocs.*, 199 F.R.D. 515, 520

(S.D.N.Y. 2001).  Moreover, the common interest doctrine applies to communications about

issues as to which the parties have common interests even if the parties have adverse interests

with respect to other issues.  *See United States v. Bay State Ambulance & Hosp. Rental Serv.,*

*Inc.*, 874 F.2d 20, 28 (1st Cir. 1989) ("Communications to an attorney to establish a common

defense strategy are privileged even though the attorney represents another client with some

adverse interests.") (internal quotations omitted); *Ken's Foods*, 213 F.R.D. at 93 (same).[4]

---

[3]     There is no discernable difference between the "common interest" and "joint defense" doctrines, and they are discussed herein interchangeably.  *See Cavallaro v. United States*, 284 F.3d 236, 250 (1st Cir. 2002) (noting same fundamental principle has been termed  "common interest" and "joint defense").

[4]     *See also In re Megan-Racine Assocs.,* 189 B.R. 562, 572 (N.D.N.Y. 1995) ("In recognizing the exigencies of the joint-defense privilege, courts have not required a total identity of interest among the participants.  The privilege applies when a limited common purpose necessitates disclosure to certain parties."); *Visual Scene, Inc. v. Pilkington Bros.*, 508 So.2d 437, 441 (Fla. Dist. Ct. App. 1987) ("[T]he common interests privilege does not require that the defenses be in all respects compatible, but is applicable where different lawyers represent clients who have <u>some</u> interests in common.") (emphasis in original); *id.* at 444 (holding common interest applies where participants "are antagonistic as to some issues, but united as to others").

a.     **The Trustees Have an Interest in Refuting Plaintiffs'
Allegations that They Failed to Act Independently and
Conscientiously**

To prevail on their Section 36(b) claim, Plaintiffs must show that the challenged fees are

"so disproportionately large that [they] bear[] no reasonable relationship to the services rendered

and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch*

*Asset Mgmt., Inc.,* 694 F.2d 923, 928 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983).

*Gartenberg* and subsequent cases set forth six factors that are relevant in determining whether an

investment adviser has breached its fiduciary duty under Section 36(b):

> (a) the nature and quality of services provided to fund shareholders; (b) the
> profitability of the fund to the adviser-manager; (c) fall-out benefits; (d)
> economies of scale; (e) comparative fee structures; and (f) the
> independence and conscientiousness of the trustees.

*Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg*, 694 F.2d

at 929-30).[5]

Of these six "*Gartenberg* factors," the most important is the independence and

conscientiousness of the independent trustees in negotiating and approving the fund's

management contract with the adviser. *See Krinsk*, 875 F.2d at 412 ("The expertise of the

trustees, whether they are fully informed, and the extent of care and conscientiousness with

which they perform their duties are among the most important factors to be examined" under

---

[5]     *Gartenberg* has been cited hundreds of times, including by this court. *See Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 158 (D. Mass. 2000) ("Although the First Circuit has not had occasion to set an excessive fees standard, . . . [t]he *Gartenberg* standard . . . provides a comprehensive framework to analyze a claim of excessive fees. I will follow it here."). Indeed, *Gartenberg* provided the governing legal standard in all six cases under Section 36(b) that have been tried to final judgment – all of which held that the fees at issue were not excessive. *See Gartenberg*, 694 F.2d at 928-30, *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 740 F.2d 190 (2d Cir. 1984); *Krinsk*, 875 F.2d at 409; *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Kalish v. Franklin Advisers, Inc.,* 742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991).

Section 36(b).); *Kalish*, 742 F. Supp. at 1241 (same). Where a fund's independent trustees have acted independently and conscientiously in approving the management agreement, courts are reluctant to second guess the trustees' business judgment. *Krinsk*, 715 F. Supp. at 501 ("The Court will not ignore a responsible decision by the Trustees, including a majority of the unaffiliated Trustees, to continue the fee structure").

Where a plaintiff attacks the independence and conscientiousness of a fund's trustees, that attack aligns the trustees' interests with the adviser's interests under the common interest doctrine. *See Strougo*, 199 F.R.D. at 525. In *Strougo*, fund shareholders claimed a rights offering constituted a breach of fiduciary duty by the investment adviser and the funds' directors, in part based on allegations that the adviser unduly influenced the outside directors. *Id.* at 518, 525. The plaintiffs sought to compel draft board minutes sent by the adviser to the outside directors' counsel. The court held that "[t]he disclosure to counsel for the outside directors did not waive the privilege because the outside [fund] directors have a common interest with the defendant [investment adviser's directors] in responding to plaintiff's allegations that the [fund] directors were not independent of [the investment adviser]." *Id.* (emphasis added).

Here, a major thrust of Plaintiffs' claim is that the Trustees failed to act independently and conscientiously in negotiating the management agreements between the Funds and Fidelity. Plaintiffs dedicate an entire section of the Complaint to allegations about "The Funds' Conflicted Board of Trustees," alleging, for example, that "[t]he trustees are in all practical respects dominated and unduly influenced by Defendants in reviewing fees paid by the Funds" (Compl. ¶ 29), and that "Defendants do not provide the trustees with sufficient information for them to fulfill their obligations, and when information is supplied, it is cursorily reviewed and not meaningfully considered." (*Id.* ¶ 30; *see also id.* ¶¶ 28-30, 114-123.) Consistent with this

6

allegation, Plaintiffs have focused their discovery efforts on the independence and

conscientiousness of the Trustees, taking four Trustee depositions and seeking more.

The Trustees have an interest in responding to Plaintiffs' allegations that they failed to act

independently and conscientiously in approving the Funds' management agreements – allegations

the Trustees vigorously dispute:

> I think I've negotiated the best total package for shareholders that I can do.
> I'm very proud of it, and I look at the results of what we get. I think we
> do an excellent job. And I look at the amount of time and effort we've put
> in reviewing this and inspecting things that we've talked about today, and
> my colleagues and I feel like we do as good a job as anybody in the
> industry.

Lautenbach Tr. at 244:19-245:2 (testimony of the Funds' current Lead Independent Trustee).

Plaintiffs' allegations call into question the Trustees' business judgment and professional

integrity. What is more, if properly pleaded, those allegations could serve as the basis for claims

that the Trustees failed to satisfy their fiduciary duties under common law. In fact, the Trustees

(and Fidelity) were recently sued in a separate case in this very court based on allegations that

the Trustees improperly approved the management agreements of the Funds. *See Gilliam v.*

*Fidelity Mgmt. & Research Co.*, No. 04-11600-NG (D. Mass. filed July 19, 2004) (dismissed

based on a Report and Recommendation of Magistrate Bowler on September 29, 2006).

Accordingly, *Strougo*'s holding that the independent trustees have a common interest with the

adviser in responding to a shareholder's allegations that the trustees were not independent of the

adviser is directly on point. *Strougo*, 199 F.R.D. at 525.

> **b.    The Trustees Have an Interest in Protecting the Funds'**
> **Management Agreements Against Plaintiffs' Challenge**

The Trustees also have an interest in protecting the Funds' management agreements

against Plaintiffs' efforts to have them declared void *ab initio* and/or to retroactively reduce the

fees Fidelity earned pursuant to those agreements. (*See* Compl. at 37.) As Marvin Mann, the

former Lead Independent Trustee for the Funds, explained, the Trustees seek to strike a balance when negotiating the fees paid by the Funds, setting fees at a reasonable level while ensuring that Fidelity earns a return sufficient to allow it to continue making the massive investments in technology and personnel that are necessary to provide high-quality services to the Funds and their shareholders:

> My charge is to get a reasonable fee for the shareholders, and that reasonable fee must provide for the advisor to make a profit so that he can fund the investments in the business that are required to support the shareholders and continue to add resources . . . .

Mann Tr. at 285:12-287:4. The Trustees believe that the current management agreements reflect the appropriate balance and, therefore, are in the best interests of Fund shareholders. *See id.* at 127:14-24 ("I think the trustees and the management of the funds have done a very good job of providing good products at competitive fee rates, and those fees have paid for excellent people who manage the investment of the funds and service and support the shareholders."); Lautenbach Tr. at 243:16-25 ("We think [the management contract with Fidelity is] a right and appropriate contract, and we think it's fair, and we think it's in the best interest of the shareholders."). Accordingly, Ned Lautenbach, the Funds' current Lead Independent Trustee, testified that he would oppose a reduction in fees for the Funds as part of this litigation because it would limit Fidelity's ability to make investments in its operations, leading to a decrease in the quality of its services:

> Q.  If as a result of this litigation the fees charged by Fidelity for the management of the five funds in question was to be reduced, is there anything that you would as to that?
>
>            \*       \*       \*
>
> A.  Well, if all the services were performed as they are today and everything that the shareholders were to get it tomorrow and that was for less money, I wouldn't be opposed to that. But I doubt that would be the case. We spend a lot of time trying to understand what it costs to do this and the fees that go with it. And so when

> we agree to a management contract, we agree not only to fees but
> service levels, performance, et cetera. And what we're trying to
> work through with Fidelity for the interest of shareholders is that
> they get not only reasonable fees, but they get good management
> performance, they get excellent service and support. So it's the
> whole package is what we're trying to provide.

Lautenbach Tr. at 40:25-41:21; *see also* Mann Tr. at 127:5-13 ("I really don't think what

[Plaintiffs are] trying to achieve is in the interests of fund shareholders . . . ."). Because the

Trustees believe the Funds' management agreements establish appropriate fees and are in the

best interests of the Fund shareholders, they have an interest in protecting those agreements

against Plaintiffs' challenge. *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 546 (1984)

(Stevens, J., concurring) (recognizing that fund trustees are likely to align themselves with the

investment adviser in defending the management contract they negotiated).

<div style="text-align:center">

**2.    Plaintiffs' Arguments that the Common Interest Doctrine Does
Not Apply in these Circumstances Are Without Merit**

</div>

Citing absolutely no authority, Plaintiffs argue that a common interest can <u>never</u> exist

between the Trustees and Fidelity, under any circumstances, because they are "contractual

counterparties" with respect to the annual negotiation of the management agreements between

the Funds and Fidelity.[6] (Pl. Mem. at 12.) Indeed, Plaintiffs contend that because of the

"fundamental relationship" that exists between the Trustees and Fidelity, they cannot have

common interest on any subject matter. (*See id.* at 12-13.)

Plaintiffs' contention that the Trustees and Fidelity can never have a common interest

strains logic and is contrary to law. The Trustees and Fidelity share common interests on a wide

range of matters affecting themselves or the Funds, and the fact that they are "contractual

---

[6]    Fidelity and the Trustees clearly do have adverse interests with respect to the annual negotiation of the Funds' management agreements. As such, Fidelity has not asserted privilege as to any communications between its counsel and the Trustees that occurred as part of those negotiations.

<div style="text-align:center">9</div>

counterparties" does not mean they have adverse interests on <u>all</u> subject matters. Indeed, *Strougo* held that the independent directors of a mutual fund had a common interest with the funds' adviser in the context of litigation challenging the directors' independence. 199 F.R.D. at 525. In addition, SEC Rule 205 requires that an attorney for a mutual fund's investment adviser represent both the adviser *and* the fund with respect to certain activities of the fund, such as preparing the fund's SEC filings. *See* § II.B, *infra* (discussing Rule 205 in detail). Moreover, there is ample authority supporting the fact that parties can have common interests on certain matters even if they have adverse interests as to other matters. *See* cases cited *supra* note 4 and accompanying text. Indeed, the First Circuit has found common interests to exist between a plaintiff and defendant in the <u>same</u> litigation. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 228 (1st Cir. 2005) (co-owners of patent held to have common interest with regard to patent application despite being adversaries in underlying litigation concerning patent), *cert. denied* 126 S. Ct. 2292 (2006).

Plaintiffs' other arguments against application of the common interest doctrine also are meritless. First, the common interest doctrine is not limited to communications between co-defendants in actual litigation, as Plaintiffs suggest. *See Ken's Foods,* 213 F.R.D. at 94 (finding common interest prior to initiation of litigation); *Mass. Eye & Ear Infirmary*, 412 F.3d at 226 (co-applicants have common interest in securing a patent); *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987) (common interest applies "[e]ven where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability").[7] Second, the Trustees' deposition testimony directly contradicts

---

[7]     The cases cited by Plaintiffs do not hold otherwise. For example, in *Cavallaro*, the First Circuit stated that the common interest doctrine applies "when attorney-client communications are shared with a

(continued . . .)

Plaintiffs' contention that a common interest cannot exist with respect to any aspect of this lawsuit because it seeks a reduction in fees paid by the Funds. As explained above, the Trustees have testified that they believe the existing management agreements are fair and that a reduction in fees is not in the best interest of Fund shareholders because it would disturb the balance the Trustees have struck between setting fees at a reasonable level and ensuring that Fidelity earns a return sufficient to allow it to continue making the massive investments in technology and personnel that are necessary to provide high-quality services to the Funds and their shareholders. *See* § I.A.1.b, *supra*.

    **B.**    **The Fiduciary Exception Is Inapplicable to the Trustees' Deposition Preparation Meetings**

Plaintiffs' alternative argument that the "fiduciary exception" overrides any claim of privilege by the Trustees also should be rejected because the communications at issue relate to the defense of this lawsuit. The fiduciary exception, established by the Fifth Circuit in *Garner v. Wolfinbarger*, provides that the attorney-client privilege can be overcome by a showing of "good cause" when the party asserting the privilege owes fiduciary duties to the party seeking disclosure. 430 F.2d 1093, 1102-04 (5th Cir. 1970), *cert. denied*, 401 U.S. 974 (1971). The fiduciary exception, however, does not apply to communications regarding the defense of shareholder litigation. *See Strougo*, 199 F.R.D. at 524 (finding *Garner* exception inapplicable to communications subsequent to initiation of lawsuit because "while the *Garner* exception permits disclosure of communications relating to the conduct of an alleged action in proper circumstances, it does not permit disclosure of communications regarding the defense of a lawsuit" ) (citing *Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982));

---

third person who has a common legal interest with respect to these communications, <u>for instance</u>, a codefendant." 284 F.3d at 250 (emphasis added).

*see also Panter v. Marshall Field & Co.,* 80 F.R.D 718, 723-24 (N.D. Ill. 1980) ("To the extent that any of the documents here sought raised bona fide claims of attorney-client privilege with respect to legal advice concerning this or other possible shareholder litigation . . . we would not find 'good cause' to overcome the attorney-client privilege.").

### C.    The Trustees' Deposition Preparation Meetings Are Protected by the Work-Product Doctrine

In any event, the Trustees' deposition preparation meetings are protected by the work-product doctrine because the topics discussed, issues addressed, and documents reviewed during those meetings reflect counsel's litigation strategy and mental impressions. *See Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) (extending work-product protection to documents selected by counsel for use in deposition preparation because "in selecting the documents that [counsel] thought relevant to [the witness's] deposition, defense counsel engaged in proper and necessary preparation of his client's case"); *In re First Commodity Corp. of Boston Customer Accounts Litig.*, No. 713, 1987 WL 11621 (D. Mass. May 15, 1987) ("Documents collected by an attorney or his agent are entitled to the same protection as documents prepared by the attorney, where the production of documents assembled would reveal an attorney's mental impressions or legal theories."); *Miramar Const. Co. v. Home Depot, Inc.*, 167 F. Supp. 2d 182, 185-86 (D.P.R. 2001) ("[C]ommunications between [counsel] and [the witness] in preparation for [the witness's] deposition may be protected from disclosure by virtue of the work-product doctrine . . . ."); *see also Hickman v. Taylor*, 329 U.S. 495 (1947).

## II.    LEGAL ADVICE AND ATTORNEY WORK PRODUCT REDACTED FROM BOARD MEETING MINUTES IS IMMUNE FROM DISCOVERY

Among the almost quarter of a million pages of documents already produced by it, Fidelity has produced over 60,000 pages of Board materials.  Out of this sizable production of Board materials, Fidelity made only 288 redactions, mostly from minutes of Board meetings.

Those redactions all were made on privilege grounds, pursuant to the common interest doctrine; some redactions were also made under the work-product doctrine. Those redactions involved a very labor- and time-intensive process whereby Fidelity's counsel analyzed the minutes literally line-by-line to determine whether the statements involved the communication of legal advice or litigation-oriented attorney thought processes, and whether a common interest existed between Fidelity and the Trustees on the subject matter discussed. As a testament to the effort and precision of this exercise, many statements made by the same individuals, including senior members of Fidelity's in-house legal department, were not redacted from the produced minutes because they were determined not to involve legal advice or a common interest.

Plaintiffs now challenge <u>every</u> one of these redactions. Plaintiffs do not address the particular merits of any specific redaction, nor do they argue that the redacted information does not involve attorney-client communications and/or attorney work product. Rather, Plaintiffs argue that no privilege can ever exist when both the Trustees and Fidelity personnel are in the same room. This broad brush argument has no merit.

### A.    All of the Redacted Material is Protected by the Common Interest Doctrine

Fidelity selectively redacted <u>only</u> information concerning: (1) pending litigation and regulatory investigations; (2) compliance with the securities laws; and (3) legal obligations in connection with SEC filings (the "Redacted Legal Advice").[8] Fidelity and the Trustees share common interests with respect to these matters. *See Strougo*, 199 F.R.D. at 525; *In re LTV Sec. Litig.*, 89 F.R.D. 595, 603-05 (N.D. Tex. 1981) (applying common interest doctrine to

---

[8]      For example, some of these redactions relate to the *Gilliam* action, with which this Court is familiar. Both Fidelity and the Trustees were named as defendants in that case, and there is no credible basis to challenge that a common interest existed between Fidelity and the Trustees with respect to legal communications about that litigation.

communications between two parties relating to SEC investigation); *Mass. Eye & Ear Infirmary*, 412 F.3d at 226 (co-applicants have common interest in securing a patent); *see also* Restatement of the Law Governing Lawyers § 76 (2000) (privilege applies where two or more parties have "a common interest in a litigated or nonlitigated matter").

Plaintiffs' only basis for seeking production of the redacted material is their argument that the Trustees and Fidelity can <u>never</u> share a common interest because there is an inherent, structural adversity of interests between the trustees of a mutual fund and the fund's adviser. For all of the reasons detailed in Section I.A.2, *supra*, this argument fails as a matter of law.[9]

**B.    Redacted Legal Advice Relating to Representation of the Funds Before the SEC Is Independently Privileged Under SEC Rule 205**

A significant subset of the Redacted Legal Advice is also privileged on <u>completely independent grounds</u> under SEC Rule 205, 17 C.F.R. § 205.3(b), promulgated pursuant to Section 307 of the Sarbanes-Oxley Act, 15 U.S.C. § 7245. Under Rule 205, which Plaintiffs have completely ignored, counsel for a mutual fund's investment adviser is deemed to jointly represent both the adviser <u>and</u> the fund with regard to the fund's SEC filings. Many of the redactions challenged by Plaintiffs involve advice provided by a Fidelity lawyer relating to the Funds' SEC filings or related regulatory requirements, and they are protected as privileged by operation of this rule.

Rule 205 provides that an attorney who is "appearing and practicing before the Commission in the representation of an issuer" has an obligation to report evidence of a material violation of the securities laws by any officer, director, employee, or agent of the issuer. 17

---

[9]    To the extent Plaintiffs argue that Fidelity and the Trustees have an adverse interest with respect to the annual negotiation of the advisory fee contract, <u>none</u> of the redacted material concerned those negotiations (other than *post hac* attorney-client communications in the context of this lawsuit).

C.F.R. 205.3(b).  Under Rule 205, "appearing and practicing before the Commission" is defined to include:  (1) "[t]ransacting any business with the Commission"; (2) "[p]roviding advice in respect of the United States securities laws or the Commission's rules or regulations thereunder" regarding the filing or preparation of any document to be filed with or submitted to the Commission; and (3) "[a]dvising an issuer as to whether information or a statement, opinion, or other writing is required under the . . . securities laws or the Commission's rules and regulations" with regard to the filing of any such document.  17 C.F.R. 205.2(a)(1).

Under Rule 205, attorneys employed by advisers such as Fidelity <u>jointly</u> represent the adviser and the mutual funds they advise with regard to a variety of SEC business.  Indeed, the Rule defines "in the representation of an issuer" as "providing legal services as an attorney for an issuer, <u>regardless of whether the attorney is employed or retained by the issuer</u>."  17 C.F.R. § 205.2(g) (emphasis added).  The SEC stated in its Final Release that it is a "<u>fact</u>" that an adviser's counsel, "<u>though employed by the investment adviser</u> rather than the [fund], <u>is providing legal services for the [fund]</u>."  Implementation of Standards of Professional Conduct for Attorneys, Release Nos. 33-8185, 34-47276, IC-25929, 2003 SEC LEXIS 256, at *47-48 (Jan. 29, 2003) ("Final Release") (emphasis added).[10]  The SEC further stated that because of this fact, "the attorney employed by the investment adviser is accordingly representing the [mutual fund] before the Commission."  *Id.*; *see also* Implementation Standards of Professional Conduct for Attorneys, Release Nos. 33-8150, 34-46868, IC-25829, 2002 SEC LEXIS 3004, at

---

[10]    The SEC also noted that the investment company pays for the services of counsel to the adviser as such services "are usually performed pursuant to an advisory contract . . . and are covered by the overall investment advisory fee."  Final Release, 2003 SEC LEXIS 256, at *48 n.55.  The SEC stated that because an attorney employed by an adviser also represents the investment company, the reporting requirement created by Rule 205 "does no violence to the attorney-client privilege."  *Id.* at *49 n.56.

*59 (Nov. 21, 2002) ("[A]n attorney employed by the investment adviser and representing the investment company before the Commission has <u>joint clients</u>.") (emphasis added).

Thus, with respect to legal advice that relates to the activities set out in Rule 205, counsel for Fidelity has two clients:  Fidelity and the Funds.  As a result, counsel for Fidelity is necessarily in an attorney-client relationship with the Funds regarding the transaction of business with the SEC, advice regarding the securities laws or SEC regulations with respect to documents filed with the SEC, and advice regarding the inclusion of information in the Funds' SEC filings. *See* 17 C.F.R. § 205.2(a)(1).  Much of the Redacted Legal Advice falls squarely within this joint representation,[11] and these redactions are protected from disclosure pursuant to the attorney-client privilege acknowledged by Rule 205.

Plaintiffs completely overlook Rule 205.  In fact, they argue that the "majority of Defendants' privilege claims" are based on the purportedly improper redaction of "legal advice re: regulatory requirements."  (*See* Pl. Mem. at 13.)  Yet these communications are <u>exactly</u> the type of legal advice that Rule 205 contemplates Fidelity's lawyer to be acting on behalf of both the adviser and the Funds.  Thus, Plaintiffs' challenge to what they concede is a "majority" of the redactions clearly must fail.[12]

---

[11]     *See, e.g.*, Tuttle Decl., Ex. 15 at 3 (redaction of legal advice re: regulatory requirements registration statements); 17 (legal advice re: Rule 10f-3 transactions); 23 (legal advice re: SOX certifications); 33 (legal advice re: Registration Statement Disclosure); 34 (legal advice re: Form N-CSR filings); 45 (legal advice re: SEC registration process and disclosure issues); 48 (legal advice re: prospectus disclosure).

[12]     Rule 205 in essence codifies the common law doctrine of common interest with respect to statutory and regulatory requirements for the fund, as the adviser, the trustees and the fund all obviously have an interest in making sure the fund complies with these requirements.  Thus, regardless of Rule 205, these communications would be covered by the common interest doctrine.

C.    **Much of the Redacted Legal Advice Is Immune from Discovery Under the Attorney Work Product Doctrine**

As is evident from Defendants' privilege log, approximately half of the Redacted Legal Advice relates to pending litigation or regulatory investigations and has been withheld from Plaintiffs as attorney work product. Plaintiffs do not contend that the redacted materials do not constitute work product; instead, they argue that any such protection was waived due to the presence of the Independent Trustees. (*See* Pl. Mem. at 10.) This argument fails.

Contrary to Plaintiffs' assertions, work product protection is not automatically waived by the presence of third parties. Rather, a waiver occurs only if the disclosure to the third party "substantially increased the opportunities for potential adversaries to obtain the information." *In re Raytheon Sec. Litig.,* 218 F.R.D. 354, 360 (D. Mass. 2003). Plaintiffs do not – and cannot – argue that disclosure of the redacted work product to the Trustees would have substantially increased the possibility that the material could fall into the hands of "potential adversaries."

III.    **THE COMPENSATION PAID TO INDIVIDUAL PORTFOLIO MANAGERS IS HIGHLY SENSITIVE AND NOT RELEVANT TO PLAINTIFFS' CLAIMS**

Contrary to Plaintiffs' suggestion that Fidelity has only produced information about compensation that is "nothing more than information already available in Fidelity's regulatorily required public filings" (Pl. Mem. at 4), Fidelity has produced volumes of information regarding portfolio manager compensation, including:

- discussions of the methodology used by Fidelity to compensate its portfolio managers, *see, e.g.*, BFMR_00047755;

- extensive descriptions of the types of compensation received by Fidelity's portfolio managers and the factors considered in setting portfolio manager compensation, *see, e.g.*, BFMR_00011103A-04A;

- detailed explanations of how Fidelity allocates portfolio manager compensation expenses to the Funds for purposes of calculating fund profitability, *see, e.g.*, BFMR_00013896, BFMR_00013899-901;

- analyses of the changes in portfolio manager compensation over time and the factors, such as competition between financial services companies for portfolio managers, that have led to those increases, *see, e.g.*, BFMR_00098189, BFMR_00097855;

- analyses of how Fidelity's portfolio manager compensation compares to that of other investment advisers, *see, e.g.*, BFMR_00097856; and

- meeting minutes reflecting the Trustees' discussions of portfolio manager compensation with Fidelity representatives, *see, e.g.*, BFMR_00021710.

In addition, Plaintiffs have been permitted to question Fidelity's portfolio managers at length about their compensation. *See* Kaye Tr. at 28:8-38:8; Stansky Tr. at 34:18-22, 117:13-128:17, 149:7-153:6; McDowell Tr. at 165:1-179:11.

The only information Fidelity has refused to produce is the compensation figures for individual portfolio managers. Indeed, in hope of reaching a compromise without involving the Court, counsel for Fidelity has expressed a willingness to consider <u>any</u> proposal from Plaintiffs whereby Fidelity would produce additional information about portfolio manager compensation as long as the proposal did not involve disclosing actual amounts for individual portfolio managers. Consistent with this position, Fidelity has instructed its witnesses not to answer questions about the specific dollar amount of their compensation, but made clear that <u>any</u> other question was "fair game." *See, e.g.*, Stansky Tr. at 117:21-118:2 (objection of defense counsel: "You can ask him any question except the amount [of compensation]. If you want to ask him whether it went up or down, what component, how it was structured, anything except the dollar amount, which I don't think is relevant. <u>Any other question you want is fair game</u>.").

Plaintiffs nonetheless have moved to compel Fidelity to produce the actual compensation figures for individual portfolio managers. This compensation information, however, is neither relevant nor reasonably calculated to lead to admissible evidence on Plaintiffs' claim under

Section 36(b), and Plaintiffs have no legitimate need for it.  Moreover, the information is highly confidential because the market for talented portfolio managers is extremely competitive, and the information is highly personal and can be used to embarrass, harass, or annoy Fidelity and its most senior portfolio managers.  Clearly, any remotely probative value of the compensation data is outweighed by the potentially prejudicial effect the disclosure of that information would have.

### A.    The Compensation Paid to Individual Portfolio Managers Is Not Relevant to Plaintiffs' Claims

Plaintiffs argue that portfolio manager compensation information is necessary to properly analyze fund profitability and economies of scale.  (Pl. Mem. at 17-18.)  In over thirty-five years since Section 36(b) was first enacted, however, no court has ever analyzed the compensation paid to an individual portfolio manager when assessing the reasonableness of the fees charged to a mutual fund, nor has any court ever suggested that the amount of compensation relates in any way to the six *Gartenberg* factors.  Indeed, in a recent decision addressing this exact issue, one court specifically held that individual compensation information was unnecessary under Section 36(b).  *Strigliabotti v. Franklin Resources, Inc.*, No. C 04-0883 SI, slip op. (N.D. Cal. Oct. 24, 2006) (attached as Exhibit A to the accompanying Declaration of James S. Dittmar ).

In *Strigliabotti*, the same plaintiffs' counsel who have sued Fidelity here brought a Section 36(b) claim against a different investment adviser based on allegations nearly identical to those made in this case.  The plaintiffs moved to compel information about the salary and bonus of each of the portfolio managers, arguing that they needed the information to analyze economies of scale and fund profitability.  In denying the motion to compel, the court ruled:

> The Court generally agrees with defendants that plaintiffs have not demonstrated that they need to know the incomes and bonuses of individual portfolio managers.  If plaintiffs have been provided with information about the total fees charged to each fund, as well as information about how those fees have changed over time, there is no need for further information about specific incomes.

19

*Id.* at 2.

The reasoning of *Strigliabotti* applies equally here.  Defendants have already produced to Plaintiffs thousands of pages of information reflecting the fees and costs associated with the management of each Fund.  For example, Fidelity has provided aggregated cost data for all employees involved in investment management of each Fund for each year since 1996, as well as annual changes in compensation expense for all Fidelity funds.  Plaintiffs simply have no need for data about what any <u>one employee</u> earns, given that literally <u>thousands of employees</u> contribute to the operation of each Fund.[13]

Moreover, consistent with *Strigliabotti*, Dr. William Stavropoulos, the Independent Trustee who is chairperson of the Board's Equity Contract Committee, testified that he and the other Trustees believe it is unnecessary to receive the actual compensation paid to individual portfolio managers and that they are able to adequately assess fund profitability and economies of scale based on the aggregated cost data that Fidelity provides.  Stavropoulos Tr. at 256:16-258:13.  Likewise, Mr. Mann, the former lead Independent Trustee, testified that the actual compensation paid to individual portfolio managers is irrelevant to the Trustees' assessment of the fees paid to Fidelity, as long as the Trustees receive aggregated cost data:

---

[13]    Plaintiffs argue that a portfolio manager's compensation "informs the assessment of Defendants' profitability." (Pl. Mem. at 18.)  No court has ever found individual portfolio manager compensation to be necessary to assess the profitability of the fund to the adviser.  In addition, Fidelity has produced thousands of pages of documents dedicated to the calculation of Fidelity's profit from each of the Funds.  These materials include annual profit and loss statements for each fund (including profit margins) with detailed line items for different categories of revenues and expenses, a discussion of why revenues and expenses were increasing/decreasing for each fund on an annual basis, descriptions of the methodology and cost allocations used to calculate fund profitability, and a comprehensive assessment of the reasonableness of the methodology and accuracy of the calculation of fund profitability.  Defendants also have begun producing over 10,000 additional pages of "back up" fund profitability materials, which provide excruciating detail on the calculation of the profitability of each fund.  This is far more than the court found sufficient for plaintiffs in *Strigliabotti* to analyze fund profitability and economies of scale.

Q.   That wouldn't be a piece of information that you as a trustee would like to have, to know what portfolio manager compensation was?

A.   No. What's important is – I mean, an important element is what are the expense – what is the expense of supporting the fund? What does it cost to manage the fund? That's an important element. Knowing each and every individual element of that cost is not important to the trustees . . . .

Mann Tr. at 299:19-300:9; *see also* Lautenbach Tr. at 170:17-171:7 ("No, we never have seen specific people's compensation package. We have seen structures of how they're put together and what they're paid on and the range of what people will be paid, but it's never been our belief that we need to see how each fund manager's paid.").

### B.   The Compensation Paid to Portfolio Managers Is Highly Confidential and the Existing Protective Order Is Insufficient to Adequately Protect It

The amount of compensation paid to Fidelity's portfolio managers is also highly confidential because investment professionals are the most valuable asset of a discretionary investment management firm such as Fidelity. Portfolio managers are the critical personnel who develop investment judgments; design investment strategies; make all buy, sell, and hold decisions; and manage client portfolios (such as the portfolios of the Funds). Fidelity spends substantial sums training and cultivating the skills and judgment of these key professionals in an effort to differentiate its investment advisory services from those of its competitors.

Having spent enormous resources developing portfolio managers, Fidelity takes extraordinary steps to avoid losing that intellectual capital. It is no easy task, however, as Fidelity must compete for investment personnel with the largest and most successful financial organizations in the world, including highly profitable hedge funds. *See, e.g.*, Danny Hakim, *Mutual Funds Report: The Care and Feeding of Managers*, N.Y. Times, July 8, 2001, at sec. 3, col. 2, p. 13 (observing that "most mutual fund managers have paychecks that are closely guarded secrets" and that "[h]edge funds, which cater to the wealthy and to institutions, offer

21

managers the chance for enormous wealth, and some prominent mutual fund managers have

defected"); Fund Alarm, "Highlights and Commentary," ("For several years, [Fidelity] has been

losing managers to hedge funds.") *available at* http://www.fundalarm.com/arc0102.htm.  Indeed,

a senior Fidelity portfolio manager confirmed that hedge funds routinely attempt to poach

Fidelity's portfolio managers and that he personally had been approached "many times."

Stansky Tr. at 126:15-22.

Given this intensely competitive environment, it is vital that Fidelity keep this

information confidential.  Access to the amount Fidelity pays to individual key investment

professionals would give Fidelity's competitors a blueprint for luring away critical personnel.

*See* Mann Tr. at 301:3-12 ("[Compensation is] one of the most tightly held things in the mutual

fund industry because the last thing you want your competitors to know is what you – how you

pay your people so that they can target their offers to your compensation plan.").

Consistent with the extraordinary competitive sensitivity of individual portfolio manager

compensation, there is no regulatory requirement that such compensation be publicly disclosed.

While the SEC has recently required general disclosure of the structure and method of portfolio

manager compensation, the agency does not require disclosure of the actual amounts paid.[14]  *See*

Disclosure Regarding Portfolio Managers of Registered Management Investment Companies, 69

Fed. Reg. 52,788, 52,791 (Aug. 27, 2004).  Indeed, the SEC has acknowledged that the

---

[14]    The purpose of the SEC disclosure rules is to inform shareholders about the extent to which the portfolio managers' incentives are aligned with fund shareholders'.  The Fidelity Board has testified that they believe this consideration is relevant as well.  *See* Knowles Tr. at 183:7-20 (stating that in requesting more detail about the structure of portfolio manager of compensation, the Trustees "were specifically interested in whether or not the incentives built into the compensation system were appropriately aligned with shareholder interests").  However, there is no dispute that Fidelity has produced to Plaintiffs all relevant information about the structure and components of compensation such that it is clear that the portfolio managers' interests are aligned with shareholders' (*e.g.*, a "substantial portion" of the portfolio managers' compensation is based on positive performance versus peer funds).  (*See* Pl. Mem. at 4.)

disclosure of compensation created both privacy and competitive concerns and rejected a proposal that compensation amounts be publicly reported. *See Disclosure Regarding Portfolio Managers of Registered Management Investment Companies*, 69 Fed. Reg. 12,752, 12,755 (Mar. 17, 2004) (reasoning that it is the compensation paid <u>to the adviser</u> rather than the compensation paid <u>by the adviser</u> to its portfolio managers that is relevant to mutual fund investors); *see also* Summary of Comments on Proposed Amendments Requiring Disclosure Regarding Portfolio Managers of Registered Management Investment Companies, July 2, 2004, S7-12-04, (commenters "opposed any disclosure of actual compensation, arguing that it would give no indication of the portfolio manager's incentives, would raise privacy issues, and would act as a disincentive for talented portfolio managers to manage mutual funds, as opposed to other accounts (such as private accounts or hedge funds) that are not subject to such a requirement"). These same concerns were shared by a senior executive of Fidelity when he was asked at his deposition if he had any objection to disclosing his compensation. McDowell Tr. at 165:7-23 (testifying he had competitive and privacy concerns about disclosing his compensation).

Plaintiffs argue that "[a]ny privacy concern that Defendants might have here is more than adequately addressed by the August 3, 2006 Protective Order." (Pl. Mem. at 19.) However, just because the Protective Order is in place does not mean that Plaintiffs are entitled to private and competitively sensitive information that is otherwise irrelevant to the litigation, especially given that any probative value of the information is clearly outweighed by the potentially prejudicial effects disclosure would have.[15]

---

[15]    *See Afrow v. Cumberland Farms, Inc.*, No. 95-1669-A, 1996 Mass. Super. LEXIS 494, at *9-10 (Mass. Super. 1996) (denying discovery regarding employees' medical conditions because employees' privacy interests outweighed plaintiff's need for information); *Flores v. Albertson's Inc.*, No. CV 01-0515-PA, 2004 WL 3639290, at *3 (C.D. Cal. Apr. 9, 2004) (value of disclosing social security number in the discovery process does not outweigh the potentially prejudicial effects); *Flores v. Amigon*, 233 F.

(continued . . .)

23

In addition, the Protective Order would not adequately protect portfolio manager compensation data. Even within Fidelity, information about individual compensation is a closely guarded secret, with only the most senior executives of the company having access to the information and only on a "need to know" basis. Indeed, since compensation is largely based on management's assessment of individual performance, Fidelity does not disclose to individual portfolio managers what their colleagues are paid so as to limit the disruptive effect proliferation of this information among portfolio mangers would create. Nothing in the Protective Order would prevent Plaintiffs from undoing all of the steps Fidelity has so carefully taken to limit access to this information internally at Fidelity itself. For example, the Protective Order does not prevent Plaintiffs from disclosing the portfolio manager compensation data to any individual at his deposition or at trial, and the disclosure of this information, even to Fidelity personnel, could be highly disruptive. In addition, Plaintiffs apparently intend to give this compensation information to their experts, some of whom may be in the investment advisory business or engaged as experts in similar litigation against other mutual fund advisers. It is hard to imagine how these experts could compartmentalize the information from their other professional endeavors. Moreover, to the extent this information is sent to the five different plaintiffs law firms in this case, all of their experts, and any vendors they use, there is at least some risk of inadvertent disclosure.

Finally, Plaintiffs' argument that any "privacy concerns" are "more than adequately addressed" by the Protective Order is disingenuous given that they hold themselves to a different standard. Indeed, one of the named Plaintiffs refused to produce certain personal brokerage

---

Supp. 2d 462 (E.D.N.Y. 2002) (prohibiting discovery of immigration status where potentially prejudicial effect outweighed any probative value).

account statements, citing privacy concerns. *See* Schurgin Tr. at 39:24-41:2. Defendants have

respected Plaintiffs' privacy, and Plaintiffs should respect the privacy of Fidelity's portfolio

managers. What is good for the goose is good for the gander.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Dated: July 9, 2007

<div style="margin-left:40%">

Respectfully submitted,

GOODWIN PROCTOR LLP
/s/ James S. Dittmar
   James S. Dittmar, P.C. (BBO# 126320)
   David J. Apfel (BBO# 551139)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: 617-570-1000

MILBANK, TWEED, HADLEY &
McCLOY LLP

   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert J. Liubicic (*pro hac vice*)
   Andrew W. Robertson
1 Chase Manhattan Plaza
New York, NY  10005-1413
T: (212) 530-5000
F: (212) 530-5219

*Attorneys for Defendants Fidelity Management
  & Research Company and FMR Co., Inc.*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on July 9, 2007.

<div style="margin-left:40%">

 /s/ James S. Dittmar

</div>