UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT *et al.*, for the use and benefit of FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND, | |
| Plaintiffs, | No. 04-cv-11651-MLW (Lead Case) |
| v. | |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | No. 04-cv-11756-MLW (Consolidated Case) |
| Defendants. | |

## PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY

Plaintiffs hereby respectfully request that this Court compel Defendants to produce document discovery and, if necessary, deposition witness testimony concerning the compensation paid to and received by the Defendants' employees having responsibility for managing the five mutual funds at issue in this case (the "Funds").[1]  As shown herein, the compensation information sought by Plaintiffs is not only centrally relevant to Plaintiffs' claims but also to the justifications raised by Fidelity for the level of profitability of the Funds.[2]

In support of this motion, Plaintiffs rely on the (i) Declaration of Steve Pomerantz, Ph.D. and (ii) Declaration of James D. Lamb, filed herewith.  Plaintiffs further rely on the relevant portions of their original Plaintiffs' Motion to Compel Discovery and Memorandum in Support of Plaintiffs' Motion to Compel Discovery ("Mem. in Support"), filed on June 21, 2007, and their Reply Memorandum in Support of Motion to Compel Discovery, filed on July 17, 2007.

---

[1] The Funds are Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Growth & Income Portfolio, Fidelity Blue Chip Growth Fund, and Fidelity Low-Priced Stock Fund.

[2] As used herein, the term "Fidelity" refers to Defendants Fidelity Management & Research Co. and FMR Co., Inc.

## I.     Procedural Background

On June 21, 2007, Plaintiffs filed Plaintiffs' Motion to Compel Discovery, along with a supporting memorandum and Affidavit of Matthew J. Tuttle. Among other things, the June 21 motion sought to compel Fidelity to produce document discovery and deposition testimony concerning the actual compensation paid to and received by the Fidelity employees responsible for managing the Funds (known as "portfolio managers"). After briefing by the parties, the Court heard argument on Plaintiffs' Motion to Compel on July 18, 2007.

At the hearing on the motion, the Court denied without prejudice the portion of Plaintiffs' Motion to Compel dealing with portfolio manager compensation. The Court gave Plaintiffs leave to renew their motion with respect to this issue within sixty days, and indicated that Plaintiffs should make a greater "showing of need" in any renewed motion. By this motion and the materials submitted herewith, Plaintiffs set forth in detail their need for the specific portfolio manager compensation information they seek.

## II.    The Compensation Received by the Portfolio Managers Is a Central Issue in this Case, Both with Respect to the Claims Raised by Plaintiffs and the Defenses Asserted by Defendants

Despite Plaintiffs' repeated requests for documents and testimony concerning the compensation received by the portfolio managers of the Funds, Fidelity has refused to make any of this information available to Plaintiffs. Plaintiffs have been prevented from discovering anything that would suggest the amount of a portfolio manager's overall compensation, the amount of the individual components of a portfolio manager's compensation (which Plaintiffs understand based on the discovery permitted by Defendants to be cash salary, cash bonus, so-called "share program expense," so-called "other share program expense," and other equity-based compensation), whether that compensation went up or down from one year to the next, or the relative levels of compensation among different managers or for different funds.

The compensation information is centrally relevant to several key issues in this case, as it bears directly on the profitability of the mutual funds and whether any economies of scale (or diseconomies of scale) are realized as the Funds grow in size. *See* Mem. in Support (June 21, 2007) at 17-20 (Ex. 4 to Declaration of Laura R. Gerber, Sept. 17, 2007 ("Gerber Decl.")). The compensation of a Fund's portfolio manager comprises part of Fidelity's cost of providing the services for which they are charging fees. That cost implicates (1) "the profitability of the fund to the adviser-manager" and (2) "economies of scale" in operating the fund as it grows larger – both of which are factors to be considered when assessing the reasonableness of the fees being charged. *See Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (*citing Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929-30 (2d Cir. 1982).[3] Portfolio manager compensation is one cost that can be directly attributed to each Fund. How that cost is actually allocated and the impact of that cost on the Fund bear directly on the Fund's profitability. The cost of portfolio manager compensation is also a key factor in whether the fund is enjoying any economies of scale. The existence of economies of scale within the Fund as it grows in size bears directly on whether the fees being charged for the Fund's management are reasonable. Without being provided with complete information that shows the actual costs of managing a Fund's portfolio, Plaintiffs cannot properly analyze the appropriateness of the management fee in light of the Fund's profitability levels and existing economies of scale.

The compensation information not only has a direct impact upon the proof that Plaintiffs must present at trial, but also bears directly on the justifications raised by Fidelity in its internal documents and through certain deposition witnesses. As more fully discussed in Plaintiffs' Mem. in Support, Fidelity's documents and its Trustees cite portfolio manager compensation as a primary reason why the largest of the Fidelity funds (including the ones at issue in this case) do

---

[3] Although the *Gartenberg* court established a framework that some courts have used to determine whether a fee violates § 36(b) of the Investment Company Act of 1940, the First Circuit has not determined that the *Gartenberg* framework applies, and Plaintiffs do not concede that the *Gartenberg* standard should be applied in this case. *Dumond v. Mass. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *4 (D. Mass. Jan. 19, 2006) (acknowledging the uncertain status of *Gartenberg* in the First Circuit); *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12 (D. Mass. Mar. 28, 2005) ("The First Circuit has not expressly adopted the Gartenberg factors or established a specific pleading standard for § 36(b) claims.").

not enjoy economies of scale and, actually, are subject to diseconomies of scale. Multiple Trustees have postulated that a fund may become more expensive to manage as it grows in size, because the largest funds must hire the most experienced and skillful (and thus most expensive) portfolio managers to run them. Mem. in Support 19.  Because the level of portfolio manager compensation may increase dramatically as a fund grows in size, Fidelity has contended that the increased cost of compensation undercuts any economies of scale that might otherwise be realized.  However, without being given access to specific information about the compensation paid to portfolio managers, Plaintiffs cannot evaluate or effectively respond to Fidelity's assertions on these key issues.

> **III.    Plaintiffs' Experts Have Identified Portfolio Manager Compensation to be Information Essential to Proper Review and Evaluation of the Profitability and Economies of Scale of the Funds**

Steve Pomerantz, Ph.D. and James D. Lamb are consulting experts retained by Plaintiffs to assess economies of scale and cost accounting issues related to the Funds.  Their Declarations provide more detail about the relevance of portfolio manager compensation to these experts' analyses of both the existence and level of any economies of scale experienced by the Funds and the profitability level of the Funds.  According to Pomerantz and Lamb, not having portfolio manager compensation data makes analyses of these issues difficult, if not in some cases impossible.

For instance, because portfolio manager compensation is typically the largest management expense borne by a mutual fund, it – as a single expense item – can significantly impact the reported profitability and the economies of scale realized by a mutual fund.  Lamb Decl. ¶ 4; Pomerantz Decl. ¶ 12.  For example, if a fund had $100 in revenue and $45 in expense (including $15 of portfolio manager compensation expense), it would have a reported profit margin of 55 percent (= ($100 – $45) ÷ $100).  If other expenses remained constant but portfolio manager compensation expense were $30, then the profit margin would be 40 percent (= ($100 – $60) ÷ $100).  The level of portfolio manager compensation thus can change drastically the

4

reported profitability (reducing it by 15 points, or nearly 30 percent relatively, in the example). The presence of this effect and its magnitude with respect to each of the Funds can be determined only by knowing the amount of portfolio manager compensation for each fund.

In its mutual fund profitability calculations, Fidelity allocates part of each portfolio manager's compensation to mutual funds in the Fidelity Complex that are *not* managed by the portfolio manager. Excerpt of Board of Trustees' 2005 Contract Renewal Questions 16-17 (attached as Ex. 19 to Aff. of Matthew J. Tuttle, Bennett et al. v. Fidelity Mgmt. & Research Co. et al., No. 04-cv-11756-MLW (D. Mass. June 21, 2007)). Plaintiffs' experts consider it important to assess this allocation and its appropriateness as a matter of cost accounting and economies of scale analysis. Lamb Decl. ¶ 4; Pomerantz Decl. ¶ 13. For instance, if a portfolio manager's compensation is allocated inappropriately to mutual funds that are not managed by the portfolio manager, then economies of scale realized by a Fund may be reported incorrectly or concealed. Pomerantz Decl. ¶ 13. These determinations can be made only by knowing the amount of portfolio manager compensation.

Portfolio manager compensation, which is hidden in high-level expense line items reported to the Funds' Board of Trustees, may also simply be unreasonably high or excessive. Lamb Decl. ¶ 5, 6; Pomerantz Decl. ¶ 13. If a fund received $100 million in revenue, paid its portfolio manager $80 million in compensation and had $20 million in other expenses, it would report a profit of zero (= $100 – $80 – $20). At issue at least would be whether the profitability calculation is proper and whether the fund's trustees were properly discharging their fiduciary duty to the fund's shareholders. Absence of portfolio manager compensation data makes this evaluation impossible.

The compensation expense that Fidelity reports for each of the Funds also includes costs arising from "share program expense," "other share program expense," and other equity-based compensation. In documents produced to Plaintiffs to date, this equity-based compensation is aggregated into high-level expense items and therefore cannot be assessed separately. Lamb Decl. ¶¶ 4-5; Pomerantz Decl. ¶¶ 15-16. It is necessary to assess this equity-based compensation

separately from conventional cash salary and bonus, for at least two reasons. If equity-based compensation is improperly counted as an expense for the purpose of calculating profitability, then the calculation can understate the true level of profit. Lamb Decl. ¶ 6; Pomerantz Decl. ¶ 21. (That is to say, it may be improper to count equity-based compensation as reduction of profit, because the value of equity-based compensation arises from profit. It would be as if a company had $100 in revenue and $60 in expense (including cash salaries and bonuses paid to employees) and paid $30 of that difference as equity-based compensation or profit-sharing to employees. What was actually a $40 profit ($100 revenue – $60 expense), ends up being reported as a $10 profit ($100 – $60 – $30 in profit-sharing paid to employees).) Moreover, Defendants' produced documents show that the reported expense of equity-based compensation is highly variable from year to year and significantly affects the calculated change in Fund management expense from year to year. Pomerantz Decl. ¶¶ 17-19; Excerpt from 2005 Annual Mutual Fund Profitability Analysis (April 11, 2006) at 8 (Ex. 3 to Gerber Decl.). These drastic changes in equity-based compensation expense make it difficult to determine profitability or economies of scale.

### IV. **Fidelity's Failure to Provide the Trustees with Detailed Compensation Information Is Evidence that the Trustees Were Not Fully Informed of All Material Facts**

The Fidelity Trustees faced the same roadblocks that Plaintiffs have encountered with regard to disclosure and review of portfolio manager compensation data. During the 2004 Management Contract Renewal process, the Independent Trustees asked Fidelity to provide a "much more detailed picture of the structure of portfolio manager and research personnel compensation…." Equity Contract Renewal Questions (July 2, 2004) at 2 (Ex. 2 to Gerber Decl.); Email from JS Wynant to Abby Johnson (July 1, 2004) (Ex. 1 to Gerber Decl.). The Trustees went on to state in the same question that it was difficult for them to fully understand the impact on incentives of the "Other Share Program" described in detail in the fund profitability responses without more context. *Id.*

While Defendants proffer as a basis for withholding portfolio manager compensation from Plaintiffs the fact that the Trustees did not receive such information,[4] as shown above the Trustees' non-receipt was not for lack of trying. The fact that Fidelity has consistently withheld this information from the Trustees becomes a key factor when considering whether the Trustees were fully informed of all material facts bearing on their consideration of the Funds' management contracts. In order for Plaintiffs to be able to adequately prosecute their case, they must be able to analyze the impact of Fidelity's refusal to disclose compensation information to the Trustees. Without receipt of the compensation information, this assessment cannot be made.

### V.     The Production of Sensitive Compensation Documents is Subject to the Protective Order Entered on August 3, 2006

Defendants have objected to producing compensation documents on the grounds that the Protective Order is imperfect and that production of the documents will lead to "inevitable disclosure" of the information through an apparent violation of the Protective Order. Excerpt from Transcript of Motion Hearing at 33:22-34:24, Bennett et al. v. Fidelity Mgmt. & Research Co. and FMR Co., Inc., No. 04-11651-MLW (D. Mass July 18, 2007) (Ex. 5 to Gerber Decl.). Defendants have further stated that this information is a very sensitive subject to the individuals involved. Plaintiffs believe that Defendants' concerns regarding the 'inevitable disclosure' of information under the Protective Order are groundless. Throughout this case, Plaintiffs have always been in full compliance with their obligations under the Protective Order, have consulted with Defendants' attorneys regarding the filing of information covered – or potentially covered – by the Protective Order, and are fully aware of the personally and competitively sensitive nature of portfolio manager compensation. Plaintiffs will treat this information accordingly.

---

[4] "Your Honor, the independent trustees of the Fidelity funds don't believe this information is necessary and don't get this information." Excerpt from Transcript of Motion Hearing at 36:12-15, Bennett et al. v. Fidelity Mgmt. & Research Co. and FMR Co., Inc., No. 04-11651-MLW (D. Mass July 18, 2007) (July 18, 2007) (Ex. 5 to Gerber Decl.).

7

## VI. Conclusion

For the foregoing reasons, and for the reasons set forth in the Declarations filed herewith, Plaintiffs' respectfully request that the Court compel Defendants to produce documents and deposition witness testimony concerning the compensation paid to and received by the portfolio managers of the five funds at issue here.

## LOCAL RULE 7.1 CERTIFICATION

Counsel for Plaintiffs and Defendants have conferred on numerous occasions in an effort to resolve and narrow the issues between them concerning discovery and, specifically, the issues raised by this motion. With respect to the relief sought herein, no further progress can be made between the parties.

Respectfully submitted on September 17, 2007.

By:    s/ David Y. Chen
Lynn Lincoln Sarko
Michael D. Woerner
David Y. Chen
Laura R. Gerber
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ 85012
Telephone: 602-248-0088
Facsimile: 602-248-2822

Michelle H. Blauner BBO # 549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 439-3939

**Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin**

Harry S. Miller, BBO# 346946
Robert D. Friedman, BBO# 180240
Matthew J. Tuttle, BBO# 562758
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA  02110
(617) 345-3000

**Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller**

CERTIFICATE OF SERVICE

I hereby certify that, on September 17, 2007, the Court's electronic filing system experienced a technical error, as indicated on the attached page.  In lieu of providing notice and access to all parties by operation of the Court's electronic filing system, service was effected by causing this PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY, the DECLARATION OF LAURA R. GERBER, the DECLARATION OF JAMES LAMB and the DECLARATION OF STEVE POMERANTZ, PH.D. to be sent to the counsel below at the indicated email addresses at approximately 5 p.m. PDT.

Subsequently on September 17, 2007, access to the Court's electronic filing was restored and a copy of the foregoing documents was filed electronically.  Notice of these filings will be sent to all parties by operation of the Court's electronic filing system.  Parties may access these filings through the Court's system.  Counsel not registered through the Court's electronic filing system will be served via email or First Class mail.

James S. Dittmar
David J. Apfel
Stuart M. Glass
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
jdittmar@goodwinprocter.com

dapfel@goodwinprocter.com
sglass@goodwinprocter.com

James N. Benedict
Sean M. Murphy
Robert J. Liubicic
Mia C. Korot
MILBANK TWEED HADLEY & MCCLOY, LLP
One Chase Manhattan Plaza
New York, NY 10005
jbenedict@milbank.com
smurphy@milbank.com
rliubicic@milbank.com
mkorot@milbank.com

David S. Cohen
Donna F. Mulvihill
MILBANK TWEED HADLEY & MCCLOY, LLP
International Square Building
1850 K Street, N.W.
Washington, DC 20006
dcohen2@milbank.com
dmulvihill@milbank.com

Michelle H. Blauner BBO # 549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street
Boston, MA  02109
mblauner@shulaw.com

Harry S. Miller, BBO# 346946
Robert D. Friedman, BBO# 180240
Matthew J. Tuttle, BBO# 562758
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA  02110
hmiller@burnslev.com
rfriedman@burnslev.com
mtuttle@burnslev.com

                     s/ David Y. Chen

# Internal Server Error

The server encountered an internal error or misconfiguration and was unable to complete your request.

Please contact the server administrator, root@localhost and inform them of the time the error occurred, and anything you might have done that may have caused the error.

More information about this error may be available in the server error log.

---

*Apache Server at ecf.mad.uscourts.gov Port 443*