**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CYNTHIA A. BENNETT et al., for the use and benefit of FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 04-cv-11651-MLW (Lead Case) |
| v. | ) ) | No. 04-cv-11756-MLW (Consolidated Case) |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

## I.    INTRODUCTION

Plaintiffs are shareholders of five mutual funds (the "Funds")[1] formed, distributed, managed and advised by Defendants Fidelity Management & Research Company and FMR Co., Inc. ("Defendants").  For their services, Defendants charge to the Funds management, transfer agent, accounting, security lending, custodian and other fees generally based on a percentage of each Fund's assets under management.  As set forth in the Consolidated Complaint, in 2003 the Defendants collected over *$800 million* in fees from the Funds.  *See* Consolidated Complaint (Nov. 3, 2005), ¶ 22.  Since Plaintiffs filed this case, Defendants have increased their rake by approximately 40 percent, taking in over *$1.1 billion* in investment management fees from the Funds' shareholders for providing essentially *the same services* provided in 2003.  *Total fees* collected by the Defendants from the Funds' shareholders in 2006 exceeded *$1.5 billion*.  *See*

---

[1] The Funds are Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Growth & Income Portfolio, Fidelity Blue Chip Growth Fund, and Fidelity Low-Priced Stock Fund.

Fidelity Magellan Fund, Annual Report (Mar. 31, 2006) at A-24 ($295 million) (Ex. 1)[2]; Fidelity Contrafund, Annual Report (Dec. 31, 2006) at 29 ($579 million) (Ex. 2); Fidelity Growth & Income Portfolio, Annual Report (July 31, 2006) at A-18 ($201 million) (Ex. 3); Fidelity Blue Chip Growth Fund, Annual Report (July 31, 2006) at 20 ($132 million) (Ex. 4); Fidelity Low-Priced Stock Fund, Annual Report (July 31, 2006) at 52 ($322 million) (Ex. 5).

Plaintiffs have brought claims against Defendants under § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) (the "ICA"), which provides,

> the investment adviser of a registered investment company [such as the Funds] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser . . . .

Plaintiffs allege that Defendants violate that fiduciary duty by (1) charging excessive fees as a result of their retention of the benefits of the economies of scale enjoyed by Defendants in managing the Funds and (2) charging excessive investment advisory and administrative fees.

Having served defense counsel with document requests 15 months ago, and having attempted to resolve objections raised thereto by Defendants through numerous letters and telephone meet-and-confer sessions, Plaintiffs' counsel have been advised by Defendants' counsel that they do not intend to produce certain documents responsive to Plaintiffs' First Request for Production of Documents ("Pl. Req.") (Ex. 6). Specifically, Defendants, without a valid basis or justification, have (1) heavily redacted documents concerning Board of Trustee meetings; (2) prevented certain deposition witnesses from testifying about their activities in preparation for and in anticipation of their depositions; and (3) refused to produce documents or allow deposition testimony concerning the actual compensation received by Defendants' employees having responsibility for managing the five mutual funds at issue in the case. Because the documents and information concerning each of these issues are not protected by any valid privilege, and because they are relevant to or are likely to lead to the Plaintiffs' discovery

---

[2] Citations to exhibits appearing as "(Ex ___)" are references to exhibits to the Affidavit of Matthew J. Tuttle, filed herewith.

of admissible evidence regarding Plaintiffs' claims, Plaintiffs seek an order from the Court compelling this discovery.

## II.     PLAINTIFFS' HAVE DILIGENTLY PURSUED THE DISCOVERY IN DISPUTE

The disputed documents are responsive to Plaintiffs' First Request for Production Directed to Defendants, served December 14, 2005 (Ex. 6), in which Plaintiffs sought, *inter alia*:

REQUEST FOR PRODUCTION NO. 8:

> All documents relating to the compensation paid by the Defendants or any of their affiliates to any person, including but not limited to employees and independent contractors, who performs or performed money management or investment advisory services on behalf of the Defendants or any of their affiliates, including individuals who act as money managers, investment advisors, analysts, or researchers.

REQUEST FOR PRODUCTION NO. 21:

> All documents relating to any calculation, review, cost benefit analysis, compilation, presentation or summarization (including financial statements) which reflect the costs incurred and income received by the Defendants or any of their affiliates in providing management, investment advisory, administrative, distribution, or other services to any of the funds in the Fund Complex, other than the Funds, or any other person or client. This request includes any calculation, review or analysis of the profitability of providing such services as well as any backup materials or data used to create any documents responsive to this request.

REQUEST FOR PRODUCTION NO. 53:

> All minutes of meetings of any board of directors (including committees thereof) for any of the Funds.

REQUEST FOR PRODUCTION NO. 54:

> All minutes of meetings of any board of directors (including committees thereof) for any of the funds in the Fund Complex, other than the Funds.

Defendants have refused to produce responsive documents regarding the compensation of Defendants' employees having responsibility for managing the Funds, which would be responsive to Requests 8 and 21. *See* Defendants' Responses and Objections to Plaintiffs' First Request for Production of Documents ("Def. Obj.") (Ex. 7). Defendants also have heavily redacted the Board of Trustee meeting minutes that have been produced in response to Requests 53 and 54, although no valid privilege appears to apply.

Despite their considerable efforts to narrow their disagreements and avoid discovery disputes, Plaintiffs and Defendants have been unable to reach agreements regarding these discrete discovery issues. With respect to the meeting minutes and deposition testimony with held on the grounds of privilege, Plaintiffs disagree with the scope and applicability of the privileges invoked by Defendants.

With respect to the documents and testimony concerning portfolio manager compensation, Defendants here responded that they "will provide summary documents sufficient to illustrate the structure and components of compensation for the portfolio managers of the Funds, but not the actual amounts of compensation." Def. Obj. at 13 (Ex. 7). Defendants reiterated their position in a letter dated February 1, 2007. *See* Letter from Sean Murphy to Michelle Blauner *et al.* (Feb. 1, 2007), Attachment at 5 ("Defendants agree to produce documents sufficient to illustrate the structure and components of portfolio manager compensation, but will not provide any actual compensation amounts.") (Ex. 8).

What Defendants have agreed to produce, however, is nothing more than information already available in Fidelity's regulatorily required public filings:

> The portfolio manager's base salary is determined by level of responsibility and tenure at FMR or its affiliates. A substantial portion of the portfolio manager's bonus for the fund is linked to the fund's pre-tax investment performance measured against the S&P 500 Index and the fund's pre-tax investment performance within the Lipper Growth Objective. The portfolio manager's bonus is based on several components calculated separately over his tenure over multiple measurement periods that eventually encompass periods of up to five years. The primary components of the portfolio manager's bonus are based on (i) the pre-tax investment performance of the portfolio manager's fund(s) and account(s) relative to a defined peer group and relative to a benchmark index assigned to each fund or account, and (ii) the investment performance of a broad range of other FMR equity funds and accounts. A smaller, subjective component of the portfolio manager's bonus is based on the portfolio manager's overall contribution to management of FMR. The portfolio manager also is compensated under equity-based compensation plans linked to increases or decreases in the net asset value of the stock of FMR Corp., FMR's parent company.

Fidelity Magellan Fund, Statement of Additional Information (May 29, 2005) at 62 ("Magellan 2005 SAI") (Ex. 9). This general, publicly available information tells Plaintiffs nothing about the actual compensation paid by the Defendants from the fees they charge to the Funds.

Questions at recent depositions concerning portfolio manager compensation also have yielded insufficient information. The portfolio manager witnesses who have testified to date have been instructed by Defendants' counsel to not answer questions concerning the actual amounts and value of compensation received. *See* Deposition of John McDowell (Apr. 25, 2007) at 165-66 ("McDowell Depo.") (Ex. 10); Deposition of Steven Kaye (Mar. 30, 2007) at 29 ("Kaye Depo.") (Ex. 11); Deposition of Robert Stansky (Apr. 18, 2007) at 117-18 ("Stansky Depo.") (Ex. 12). Robert Stansky, former portfolio manager of the Magellan Fund, could not even recall whether his compensation went up or down from one year to the next or the magnitude of changes between compensation years. Stansky Depo. at 118-20, 126. In addition, Trustees[3] for the Funds who have been deposed have disclaimed knowledge of specific compensation amounts. *See* Deposition of Ned Lautenbach at (Apr. 17, 2007) 170-72 ("Lautenbach Depo.") (Ex. 13); Deposition of Marvin Mann (May 31, 2007) at 295-96 ("Mann Depo.") (Ex. 14).

## III.  THE DOCUMENTS AND TESTIMONY SOUGHT BY PLAINTIFFS ARE RELEVANT TO THEIR CLAIMS OR LIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE

The core issue in this litigation is whether the fees charged by Defendants to the Funds for advisory and sub-advisory services are reasonable or excessive. Some courts have held that fees would be excessive and constitute a breach of Defendants' fiduciary duty under ICA § 36(b) if they are "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).[4] *Gartenberg* identified six

---

[3] A mutual fund typically has no personnel, relying entirely on entities such as Defendants for myriad services. A mutual fund typically has a board of trustees or directors that represents the fund against the adverse interests of the service providers. "The Board of Trustees governs the fund and is responsible for protecting the interests of shareholders." 2005 Magellan SAI (Ex. 9) at 48.

[4] Although the *Gartenberg* court established a framework that some courts have used to determine whether a fee violates ICA § 36(b), the First Circuit has not determined that the *Gartenberg* framework applies, and Plaintiffs do not concede that the *Gartenberg* standard should be applied in this case. *Dumond v. Mass. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *4 (D. Mass. Jan. 19, 2006) (acknowledging the uncertain status of *Gartenberg* in the

factors to be used in evaluating whether a fee is excessive: "(a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (*citing Gartenberg*, 694 F.2d at 929-30).

> **A.      Defendants' Redaction Of Minutes Of Board Of Trustees' Meetings On The Basis Of Attorney-Client Privilege Is Improper, And Defendants Should Be Compelled To Produce Unredacted Minutes**

The minutes of the meetings of the Board of Trustees and its subcommittees (hereafter "Board Meetings") that Defendants have produced in response to Plaintiffs' First Request for Production Directed to Defendants have been extensively redacted. The redactions are logged in a 48-page privilege log with well over 200 assertions of privilege, produced on April 30, 2007. A typical log entry is as follows:

| | |
|---|---|
| Production Number | BFMR_00019195-BFMR_00019200 |
| Date | 04/21/2005 |
| Document Type | Minutes |
| Author/Speaker | Eric D. Roiter, Esq. |
| Addressee | Operations Committee |
| Copyee | [blank] |
| Basis of Privilege | Redactions of legal advice re: regulatory requirements and pending litigation p. 5-6; Redactions of legal advice re: regulatory requirements (NYSE and Archipelago Exchange Merger) p. 6 |
| Privilege Asserted | Attorney-Client Communication, Work Product |

Defendants' Redacted Document Draft Privilege Log (Apr. 30, 2007, received) at 32 (Ex. 15).

---

First Circuit); *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12 (D. Mass. Mar. 28, 2005) ("The First Circuit has not expressly adopted the *Gartenberg* factors or established a specific pleading standard for § 36(b) claims.").

These assertions of attorney-client privilege are improper, because either they do not involve communications between an attorney and client or, if the assertions were made in respect of communications between an attorney and client, the privilege was waived without exception.

**1.    The structure of Defendants' mutual fund complex shows that there is no attorney-client relationship between Defendants and Board of Trustees**

Some background about the organization of mutual funds is helpful in the consideration of Defendants' assertions of privilege.  The investment vehicle that is marketed and sold to investors as a "mutual fund" is a separate investment portfolio of a trust formed by the organizer of the mutual fund.  For instance, "Fidelity Magellan Fund is a fund of Fidelity Magellan Fund, an open-end management investment company created under an initial declaration of trust dated June 25, 1984."  Magellan 2005 SAI at 69 (Ex. 9).  Similarly, Contrafund is an investment portfolio of the Fidelity Contrafund Trust, Growth and Income Portfolio and Blue Chip Growth Fund are investment portfolios of Fidelity Securities Fund Trust, and Low-Priced Stock Fund is an investment portfolio of Fidelity Puritan Trust.

Mutual funds neither have any personnel nor conduct any operations.  Instead, funds contract for all of the services they need, including investment management, marketing and distribution of shares, servicing of shareholder accounts, custodianship of assets, financial auditing, and legal services.   In the case of Defendants' mutual funds, these services are generally provided by various subsidiaries or other affiliates of Defendants.  (As do many other companies that sponsor and form mutual funds, Defendants operate many mutual funds through a unified structure of related, commonly controlled companies, forming a so-called "fund complex."  *See generally* Robert C. Pozen, *The Mutual Fund Business* 13-14 (2002).)

The trusts containing the mutual funds have boards of trustees (or directors) having common law fiduciary and other duties to the mutual funds' shareholders.   As the U.S. Government Accountability Office (formerly the U.S. General Accounting Office) has noted,

> The structure of most mutual funds embodies a potential conflict of interest between the fund shareholders and the adviser.  This conflict arises because the fees the fund charges the shareholders represent revenue to the adviser.  For this

7

> reason, mutual funds have directors who are tasked with overseeing the adviser's activities. Under the Investment Company Act of 1940, fund directors [or trustees] are required to review and approve the compensation paid to the fund's adviser.

U.S. General Accounting Office, Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition, June 2000 at 14 (available at *http://www.gao.gov/cgi-bin/getrpt?GAO/GGD-00-126*). The potential for conflict is recognized in the ICA, which requires that a contract between an investment advisor and a mutual fund be approved by a majority of the fund's disinterested directors. ICA § 15(a)(2), (c).

This diagram (hereafter "Figure 1") illustrates the relevant structure of Defendants' mutual fund complex:



At the Board meetings whose minutes are at issue, there are typically four groups of attendees: (1) Independent Trustees (that is, Trustees who are not deemed to be interested trustees because of their employment or other affiliation with the Trust or Defendants, *see* Magellan 2005 SAI at 48-49, ICA § 2(a)(19)), (2) counsel to the Independent Trustees, (3) Interested Trustees and other employees of Defendants, and (4) in-house counsel to Defendants. "The Board of Trustees governs the fund and is responsible for protecting the interests of shareholders." Magellan 2005 SAI at 48. In contrast, "Under the terms of its management contract with the fund, FMR acts as investment adviser and . . . has overall responsibility for directing investments of the fund [and] provides the management and administrative services necessary for the operation of the fund." *Id.* at 58. The Board of Trustees and FMR have fundamentally adverse interests: The Board of Trustees has a fiduciary duty under Massachusetts common law and duties under the ICA to the five Funds, whereas Defendants are service providers and contractual counterparties to the five Funds. *See, e.g.,* Management Contract Between Fidelity Magellan Fund and Fidelity Management & Research Company (May 1, 2000) (Ex. 16).

> **2.   Defendants cannot sustain their burden of establishing that the redacted portions of the minutes are protected by attorney-client privilege because they did not preserve the confidentiality of the legal advice claimed to have been rendered**

The "essential elements" of the attorney-client privilege are

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J.H. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961)). Some First Circuit cases cite a rhetorically different but substantively identical recitation: "[T]he person asserting the privilege is required to make four showings: (1) that he was or sought to be a client of [the attorney]; (2) that [the attorney] in connection with the [document] acted as a lawyer; (3) that the [document] relates to facts

9

communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding; and (4) that the privilege has not been waived." *U.S. v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 27-28 (1st Cir. 1989) (internal quotes and citation omitted). The party asserting the privilege bears the burden of proving its existence. *Id.* at 28. Defendants here cannot sustain that burden.

Every assertion by Defendants of privilege as the basis for redaction of the minutes is based on the communication of "legal advice," presumably rendered by Defendants' counsel to Defendants' employees during the Board Meetings. *See generally* (Ex. 15). But Defendants' privilege claims fail, because the presence of the Independent Trustees demonstrates that the Defendants' employees did not intend their communications with their counsel to be confidential, and Defendants cannot meet any exception to the confidentiality requirement.

> The presence of third parties during an attorney-client communication is often sufficient to undermine the "made in confidence" requirement, 3 Weinstein's Federal Evidence § 503.15[3] (J.M. McLaughlin, ed., 2d ed. 2002), or to waive the privilege, E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 168-69, 189 (4th ed. 2001).

*Cavallaro*, 284 F.3d at 246; *In re Keeper of the Records*, 348 F.3d 16, 22 (1st Cir. 2003) (same); *see also New Orleans Saints v. Griesedieck*, 612 F. Supp. 59, 63 (E.D. La. 1985) (holding that minutes of partnership meeting attended by counsel were not privileged, because the "presence of [persons], who were neither partners nor clients, negate the confidential element of the meeting and its minutes"). In Figure 1, Defendants and their counsel are to the left of the Funds. Defendants are counterparties to commercial contracts with the Funds. Defendants do not own the Funds. The Funds' shareholders own the Funds, and those shareholders are third parties to Defendants. As shown in the right side of Figure 1, the Board of Trustees has a fiduciary obligation to those third-party Fund shareholders; it has no fiduciary relationship to Defendants or other entities in the left half of Figure 1. Consistency with the obligations imposed on the Board by Federal and Massachusetts law requires that the Board of Trustees – particularly the Independent Trustees – be regarded as third-party to Defendants.

10

Facts and circumstances also support the conclusion that the interests of the Board of Trustees and Defendants are different. The Independent Trustees have counsel separate from Defendants at both the Board meetings and in the proceedings in this case. "The Independent Trustees are advised by independent legal counsel selected by the Independent Trustees." Magellan 2005 SAI at 62. Debevoise & Plimpton LLP represents the Independent Trustees. Eric Roiter (general counsel of Defendants), Goodwin Proctor LLP and Milbank Tweed Hadley & McCoy LLP represent Defendants. The Funds themselves are represented by Dechert LLP, further evidencing the multiplicity and disparity in interests among the entities. Woodrow Campbell of Debevoise & Plimpton LLP is present at many of the Board Meetings, representing the Independent Trustees. Minutes of the Operations Committee (Apr. 21, 2005) at 1 (Ex. 17). The Independent Trustees are paid by the Funds, not Defendants. Magellan 2005 SAI at 58. The presence of the Independent Trustees is not required for Defendants' employees to receive effective legal counsel from their attorneys. *See United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (holding attorney-client privilege not necessarily waived by third party's presence when presence is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit").

If Defendants genuinely considered and desired the communications to be privileged, they had every opportunity to protect that communication. Defendants and their counsel could have met separately from the Board of Trustees. (The Board itself met in executive session without Fidelity personnel from time to time, (Ex. 17 at 6); such a session is simply the mirror image of a session at which Defendants and their counsel should have conducted truly privileged communications.) Defendants could have notated in the minutes that the communications made were privileged; they could have annexed claimed-privileged sections to the main body of the minutes. That Defendants did not make any of these indications in the minutes, but instead assert attorney-client privilege in discovery in this case *post hoc*, which further indicates that they had no contemporaneous intent that the communications be privileged. *See Bay State*, 874 F.2d at 28.

### 3. No exception to the confidentiality requirement for claiming attorney-client privilege applies

Neither doctrine that might excuse Defendants' failure to meet the confidentiality condition – common-interest or joint defense – applies, each for essentially the same reasons. (Some commentators unify these doctrines, *e.g.*, Jeffrey J. Carlson, *The Joint Defense Privilege: An Illusion or Magic Wand*, Attorney-Client Privilege in Civil Litigation 405 (Vincent S. Walkowiak, ed. 2004), but they are discussed separately here because the First Circuit has discussed them separately.)

"The common-interest doctrine prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications, for instance, a codefendant." *Cavallaro*, 284 F.3d at 250. In this case the legal interests of the Independent Trustees and the Defendants are not in common. As noted above, the Funds that the Board of Trustees serves as a fiduciary, on the one hand, and Defendants, on the other hand, are contractual counterparties in a transaction that the GAO recognizes is overripe with conflict. The Board of Trustees has an obligation of loyalty to the shareholders of the Funds and the Independent Trustees have a Federal statutory duty to approve contracts between the Funds and Defendants. ICA § 15(a)(2), (c). In contrast, Defendants are engaged in a profit-maximizing commercial venture in which they provide investment advisory services to the Funds and seek to capture from the Funds' shareholders as much profit as the market and the law will allow.

Any suggestion that the Independent Trustees and Defendants have a common legal interest contradicts the fundamental relationship that exists between them. The Funds publicly disclose that the Board "is responsible for protecting the interests of shareholders" (and Defendants implicitly and necessarily are not). Magellan 2005 SAI at 46. The Board is not protecting the shareholders from other mutual funds, other investment advisors or the government. It is supposed to protect the shareholders from the Defendants, and it could not

12

effectively do so if it shared a common legal interest with the Defendants in respect of the redacted Board minutes.

The joint defense doctrine:

> protects communications between an individual and an attorney for another when the communications are "part of an on-going and joint effort to set up a common defense strategy." In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.

*Bay State*, 874 F.2d at 28. The Board of Trustees and Defendants are not engaged in a joint defense effort. They cannot be: the Board of Trustees and the individual Trustees are not defendants here. The notion that the Board of Trustees – particularly the Independent Trustees – has a commonality of interest in assisting Defendants in their defense in this or any other case is unsupportable for the reasons in the preceding two paragraphs. A successful outcome for Plaintiffs in this case would result in a reduction of the fees paid by the Funds' shareholders to Defendants. This would be economically favorable to the Board of Trustees' trust beneficiaries, but economically unfavorable to Defendants. The Board and Defendants cannot sensibly be argued to have a joint defense in this circumstance.

Moreover, a majority of Defendants' privilege claims are premised on "legal advice re: regulatory requirements." The joint defense doctrine is inapplicable to those claims, since there was no pending legal matter requiring a joint defense of Defendants and the Board of Trustees. Similarly, even if Defendants and the Board were deemed to be engaged in a joint defense, the communications as to which Defendants claim privilege were not in furtherance of any such defense.

For the foregoing reasons, the Court should find that Defendants' claims of attorney-client privilege are not a valid basis for redacting the Board minutes. Plaintiffs respectfully move the Court to order Defendants to produce unredacted minutes.

13

**B.    Trustees' Counsel's Instructions Not To Answer Deposition Questions About The Trustees' Deposition Preparation Are Improper, Because Any Attorney-Client Privilege Was Waived By The Presence Of Unnecessary Third Parties Or Overridden By The Fiduciary Exception, And The Trustees Should Be Compelled To Answer Questions About Their Deposition Preparation Sessions At Which Third Parties Were Present**

At the instruction of counsel, Marie Knowles, Ned Lautenbach and Marvin Mann, Independent Trustees, declined to answer substantive questions regarding their deposition preparation, on the basis that those communications were attorney-client privileged. Because the confidentiality of the communications was not preserved, and no accepted exception to the confidentiality requirement is available, the Trustees cannot avail themselves of the privilege and their counsel's instructions were improper, for the reasons stated in the sections above.

Mrs. Knowles and Messrs. Lautenbach and Mann were represented by their counsel, from Debevoise & Plimpton LLP, in their depositions in this matter. They also testified that Defendants' counsel, from Milbank Tweed, was present at each of the deposition preparation sessions:

> Q.    Do you know how many people or lawyers you've met with who are part of your attorneys? In other words, has it been just one attorney or more than one attorney from that firm?
> A.    One or more, but not a bunch.
> Q.    And the name of that firm is what?
> A.    Debevoise.
> Q.    Does Debevoise represent all of the Fidelity trustees?
> A.    Yes, and I have also met with attorneys representing the defendants.
> Q.    Why, if your obligation is to the funds and the funds are plaintiffs, are you meeting with attorneys for the defendants?
> MR. KIERNAN:  Objection and instruct you not to answer.
> MR. WOERNER:  On what basis?
> MR. KIERNAN:  It's attorney-client privilege.
> MR. WOERNER:  How can it be attorney-client privilege?  Mr. Benedict or his firm is not her attorney.
> MR. KIERNAN:  I've instructed the witness.
> . . .
> Q.    Have you ever met with your attorneys from Debevoise separate from where there was no attorney from Milbank Tweed present in preparation for your deposition?
> A.    Not in specific preparation for my deposition.
> Q.    So all of the times you've met with your attorneys in preparation for your deposition, one or more attorneys from the defendants, Milbank Tweed, the Milbank Tweed firm have also been present?
> A.    To my recollection.

Deposition of Marie Knowles (May 15, 2007) at 64-67 ("Knowles Depo.") (Ex. 18).

> Q.  Mr. Lautenbach, are you represented today?
> A.  Yes.
> Q.  Who's your attorney?
> A.  John Kiernan [of Debevoise].
> Q.  Is Mr. Benedict [of Milbank] your attorney?
> A.  He's here, too, on my behalf.
> Q.  He's here on your behalf as your lawyer?
> A.  No, but on the --
> MR. BENEDICT:  I'm here to represent Fidelity.
> Q.  Is Mr. Benedict here as your lawyer, sir?
> A.  Not as my lawyer.
> . . .
> Q.  Has he given you any legal advice in this case?
> A.  He has given me some, yes.
> Q.  Okay.  Tell me what legal advice Mr. Benedict, who is not your lawyer, has given you.
> MR. KIERNAN:  I instruct you not to answer.
> A.  I'm not going to answer that.
> Q.  And did you meet with anybody to get ready for your deposition?
> A.  I met with lawyers, yes.
> Q.  Who did you meet with, sir?
> A.  I met with John Kiernan.  I met with Shannon.  I met with Jim Benedict.  I met with Jody. . . .
> Q.  All right.  So during the entire time that you were preparing for your deposition Mr. Benedict was there as well?
> A.  Yes.
> Q.  And all the folks that you've mentioned were there during the entire time that you were being prepared, correct?
> A.  Correct.
> Q.  And in preparing for your deposition Mr. Benedict helped prepare you for the answers you were going to give today?
> A.  Well, he briefed me on lots of background data and documents that had been given to you for review and tried to refresh my memory to the documents, yes.
> Q.  Did he suggest to you that what you said to him would somehow be privileged or confidential as the lawyer for Fidelity in this case?
> MR. BENEDICT:  Objection.
> MR. KIERNAN:  I instruct you not to answer.
> MR. BENEDICT:  And it was.
> MR. KIERNAN:  I instruct you not to answer.
> A.  I'm not going to answer.

Lautenbach Depo. at 239-42 (Ex. 13).

> Q.  Do you have any idea how many hours you've spent meeting with counsel for the independent trustees in preparation for your deposition?
> A.  Probably 15 hours, but that's a guess.  I didn't add them up.  I don't get paid by the hour, so...
> . . .
> Q.  Okay.  And how many times did you meet with Mr. Benedict or anybody from his firm in preparation for your deposition?

> A.    Same number of times, same number of hours, basically.
> Q.    Okay. So basically all of your preparation time for your deposition involved attorneys both for the independent trustees as well as for the advisor?
> A.    Right.

Mann Depo. at 128-29 (Ex. 14).

As discussed above, the presence of a third party typically undermines a claim of attorney-client privilege. *Cavallaro*, 284 F.3d at 246. The privilege is not available to the Trustees here, because the presence of counsel for Defendants – third parties to the Trustees and their counsel – contradicts any claim that the Trustees intended their communications with counsel to be confidential. If the Trustees genuinely considered their communications with counsel to be privileged, then they could have easily protected that communication by meeting separately from Defendants' counsel. If the Trustees wished to review any matters with employees of Defendants or Defendants' counsel, then they could have met with them selectively, preserving the privilege as to the Trustees' other communications with their own counsel.

Neither the joint defense doctrine nor the common interest doctrine excuses the Trustees' failure to preserve the confidentiality of the communications that they now claim was attorney-client privileged. The Trustees are not defendants in this case. Commercial circumstances and Federal and Massachusetts law establish that Defendants and the Board of Trustees do not have a common interest.

The Trustees' assertion of attorney-client privilege is also overridden by the fiduciary exception, which provides that "communications between attorneys and clients that are fiduciaries . . . will not be protected by the attorney-client privilege except 'where [the client-fiduciary] seeks legal advice solely in his own personal interest or where the discovery material has been shown to relate exclusively to non-fiduciary matters.'" *Cavanaugh v. Saul*, 2007 WL 1601743 (D.D.C. 2007) (citing *Cobell v. Norton*, 377 F. Supp.2d 4, 15 n. 8 (D.D.C. 2005)); *see also In re Atlantic Financial Mgmt. Sec. Lit.*, 121 F.R.D. 141, 146 (D. Mass. 1988) (finding that the exception did not apply when fiduciary relationship did not exist).

As described above, the Board has a fiduciary duty to Plaintiffs and the other shareholders of the Funds. It is implausible that the legal advice given to the Trustees in preparation for their depositions in this matter was in connection with their personal interest, as the depositions related to the Trustees' performance of their respective fiduciary duties to the Funds. For the same reason, it is implausible that the advice that the Trustees received in their deposition preparation in this matter related exclusively to non-fiduciary matters. The essential issue at the Trustees' depositions was their performance of their fiduciary duty to the Funds' shareholders.

For the foregoing reasons, the Court should find that Mrs. Knowles's and Messrs. Lautenbach and Mann's claims of attorney-client privilege as to communications with their counsel during which third parties were present are invalid, and we respectfully move the Court to compel the reopening of these Trustees' depositions for the limited purpose of answering questions about their deposition preparation sessions at which third parties were present.

## C.   Discovery Of Portfolio Manager Compensation Is Relevant To The Claims Asserted In This Action

Compensation of the Funds' portfolio managers comprises part of Defendants' cost of providing the services for which they are charging fees, and that cost implicates (1) "the profitability of the fund to the adviser-manager" and (2) "economies of scale" in operating the fund as it grows larger. As such, discovery of portfolio manager compensation, including the various salary, bonus, share programs, and other elements of such compensation, is relevant and should be made available to Plaintiffs. Defendants, however, have produced nothing with respect to the value of such compensation, and deponents have been instructed by Defendants' counsel to not provide this centrally-relevant information.

The Fund Trustees obviously consider portfolio manager compensation to be a significant factor in assessing fund profitability. The relevance of this cost to profitability calculations is demonstrated by questions asked by the Funds' Independent Trustees and Defendants' responses

17

to them, in the Trustees' pro forma evaluation of whether to renew the Funds' management contracts with Defendants:

> [Q:]   The data provided . . . shows that the total **compensation expense** for Magellan fund [one of the Funds] was [redacted] versus [redacted] [for] Contrafund [one of the Funds]. . . . [W]hy are the figures so much larger for a poorly performing fund versus one that has done very well?  Given that the Board raised these issues in 2004 and again in 2005, more information should be provided.
>
> [A:]   In **fund profitability** there are a number of factors which influence how much **compensation** and share program expense is **allocated to a particular fund**.

2005 Contract Renewal Questions at 16 (Ex. 19).

As the Funds' Trustees recognize, an assessment of profitability (revenue minus expenses) of a business or business unit requires analysis of expenses.  For instance, Defendants may receive from a fund $400 million in fees, claim $500 million in expenses, and claim that the fund is "unprofitable."  The Funds' portfolio managers' compensation is an expense to the Defendants.  Whether a portfolio manager is paid $100,000 or $100,000,000 a year informs the assessment of Defendants' profitability (and prudence).

Portfolio manager compensation is also a factor in evaluating economies of scale.[5]  *Gartenberg* recognizes that mutual funds realize economies of scale because of fixed costs, and the benefits thereof should devolve to the funds' shareholders.  In this case, Defendants may realize economies of scale from the Funds' portfolio managers.  The portfolio manager is a fixed cost:  The number of portfolio managers for a Fund does not fluctuate as the assets of the Funds increase.  The economies of scale realized from this phenomenon can end up in one of two pockets: (1) Defendants' or (2) the Funds' (and their Plaintiff shareholders).  Knowing portfolio manager compensation, and what happens to it when Funds change in assets, is essential to evaluating what happens to the benefits of economies of scale.

---

[5] Economies of scale is the economic concept that the per-unit cost of production decreases as the number of units produced increases, generally because fixed costs can be allocated to more units of production.  In a widget factory that costs $100 to build, where each widget requires $1 of raw materials and labor to produce, the average cost of the second widget is $51 (the $100 factory plus $2 of raw materials and labor, divided by two), but the average cost of the 100th widget is $2 (the $100 factory plus $100 of raw materials and labor, divided by 100).

Moreover, Defendants' own documents put portfolio manager compensation at the center of the debate over economies of scale. In response to specific questions from Trustees, Defendants prepared a presentation to the Trustees, which noted that "[i]ndividual funds may experience economies of scale as assets increase; funds also have diseconomies due to the complexity and financial risk related to large funds, e.g., ***PM [portfolio manager] compensation***, trading, research." Summary of Economies of Scales Discussion (Mar. 15, 2006) at 3 (emphasis added) (Ex. 20). Elsewhere in the presentation, Defendants acknowledge that portfolio manager costs are not only significant costs that can be directly attributed to a fund, but that "a $5B fund may have similar expenses in basis points as a $50B fund because FMR assigns the most experienced (highly compensated) manager to large funds." *Id.* at 13. Trustee Marie Knowles also confirmed her understanding that a fund may become more expensive to manage as it grows (supposedly creating diseconomies of scale) because the largest funds must hire the most expensive portfolio managers to run them. Knowles Depo. at 289-92 (Ex. 18).

Clearly even the most basic questions of fund profitability and the existence of economies or diseconomies of scale cannot be answered without having the actual value of the various compensation elements paid to the portfolio managers of the funds in question. Defendants, however, have flatly refused to produce documents on this subject and, at depositions, have improperly instructed witnesses not to answer questions seeking this information. *See* McDowell Depo. at 165-66 (Ex. 10); Kaye Depo. at 29 (Ex. 11); Stansky Depo. at 117-18 (Ex. 12). Regarding the deposition testimony, Fed. R. Civ. P. 30(d) provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." No privilege has been claimed here, nor any motion presented. Any privacy concern that Defendants might have here is more than adequately addressed by the August 3, 2006 Protective Order entered by the Court. Plaintiffs have no interest in prying voyeuristically into the personal circumstances of the portfolio managers or broadly disseminating sensitive

19

compensation data.  But Plaintiffs do have an essential need for the compensation data if they are to be given a fair opportunity to present their claims.

Plaintiffs, therefore, request the Court to compel Defendants to either produce documents reflecting all elements of portfolio manager compensation or produce or re-produce knowledgeable deponents for deposition to answer the questions concerning portfolio manager compensation.

## IV.   CONCLUSION

The documents and information requested by Plaintiffs are crucial to Plaintiffs' case. Without this discovery, Plaintiffs will be severely hindered, if not completely curtailed, in the prosecution of their claims.  As a result, Plaintiffs respectfully submit that this Court should deem Defendants' objections as to the scope of discovery as legally unsupportable and order Defendants to produce all documents and testimony as set forth in Plaintiffs' Motion to Compel Discovery.

By:_____s/ Matthew J. Tuttle_____
     Michelle H. Blauner BBO # 549049
     SHAPIRO HABER & URMY LLP
     Exchange Place
     53 State Street
     Boston, MA  02109
     (617) 439-3939

     Lynn Lincoln Sarko
     Michael D. Woerner
     Laura R. Gerber
     KELLER ROHRBACK L.L.P.
     1201 Third Avenue, Suite 3200
     Seattle, WA 98101-3052
     Telephone: (206) 623-1900
     Facsimile: (206) 623-3384

     Gary Gotto
     Ron Kilgard
     KELLER ROHRBACK P.L.C.
     National Bank Plaza
     3101 North Central Avenue, Suite 900
     Phoenix, AZ  85012
     Telephone: 602-248-0088
     Facsimile: 602-248-2822

Michael J. Brickman
James C. Bradley
Nina H. Fields
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
174 East Bay Street
Charleston, SC  29401
Telephone: 842-727-6500
Facsimile: 843-727-3103

Guy M. Burns
Jonathan S. Coleman
Becky Ferrell-Anton
JOHNSON, POPE, BOKOR, RUPPEL &
BURNS, L.L.P.
100 North Tampa Street, Ste. 1800
Tampa, FL  33602
Telephone: 813-225-2500
Facsimile: 813-223-7118

**Attorneys for Plaintiffs Nancy Haugen,
Michael F. Magnan, Karen L. Magnan,
Presley C. Phillips, Andrea M. Phillips,
and Cindy Schurgin**

Harry S. Miller, BBO# 346946
Robert D. Friedman, BBO# 180240
Matthew J. Tuttle, BBO# 562758
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA  02110
(617) 345-3000

**Attorneys for Plaintiffs Cynthia A.
Bennett and Guy E. Miller**

CERTIFICATE OF SERVICE

I hereby certify that, on the 21st day of June 2007, a copy of the foregoing document was

filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

_____ s/ Matthew J. Tuttle _____

01145515