# EXHIBIT 5

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

CYNTHIA BENNETT, et al  . CIVIL ACTION NO. 04-11651-MLW
  Plaintiffs            .
                        .
      V.                .
                        . BOSTON, MASSACHUSETTS
                        . JULY 18, 2007
FIDELITY MANAGEMENT &   .
 RESEARCH CO., et al    .
  Defendants            .
. . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:   Michael Woerner, Esquire
                     Keller Rohrback, LLP
                     Suite 3200
                     1201 Third Avenue
                     Seattle, WA  98101

                     Michelle H. Blauner, Esquire
                     Shapiro Haber & Urmy, LLP
                     53 State Street, 37th Floor
                     Boston, MA 02109
                     617-439-4949

                     Matthew Tuttle, Esquire
                     Burns & Levinson, LLP
                     125 Summer Street
                     Boston, MA  02110
                     617-345-3248

For the defendants:  James Dittmar, Esquire
                     David Apfel, Esquire
                     Goodwin Procter, LLP
                     Exchange Place
                     Boston, MA  02109
                     617-570-1944




                         *MARYANN V. YOUNG*
                      Certified Court Transcriber
                        Wrentham, MA  02093
                           (508) 384-2003

```
                          Sean Murphy, Esquire
                          Milbank, Tweed, Hadley & McCloy, LLP
                          1850 Eye Street, N.W.
                          International Square Building
                          Suite 1100
                          Washington, DC 20006-5417
                          202-835-7517

Intervenor Independent
   Trustees:              John S. Kiernan, Esquire
                          DeBevoise & Plimpton, LLP
                          919 Third Avenue
                          New York, NY  10022-3902
                          212-909-600
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

30

1 absolutist position.  There can't be a common interest he
2 seems to say on the one hand.  Or at least he says, the
3 independent trustees can't be viewed as clients of Fidelity.
4 We don't assert that they're clients.  We assert that there's
5 common interest.  We take the position that 205, Rule 205
6 recognizes that there can be common interests.  What I think
7 Mr. Tuttle just said that is really remarkable though is he
8 said retreating from the absolutist position, he can't tell if
9 there's a common interest or not.  Well, if they couldn't tell,
10 why are we here on a motion to compel as opposed to in
11 discussions with plaintiffs' counsel over what they say is the
12 inadequacy of our privilege log?  I mean the cart is really way
13 before the horse here.
14 　　　　THE COURT:  Right.
15 　　　　MR. DITTMAR:  And finally I would like to just give
16 an example that demonstrates in spades common interest, the
17 *Gilliam* litigation.
18 　　　　THE COURT:  Oh.
19 　　　　MR. DITTMAR:  Your Honor ruled on that.  The
20 independent trustees were defendants in that case alongside
21 Fidelity.
22 　　　　THE COURT:  All right.  Moving on to three.
23 Mr. Tuttle?
24 　　　　MR. TUTTLE:  The third issue, Your Honor, involves
25 portfolio manager compensation.  And this issue arises because

MARYANN V. YOUNG
Certified Court Transcriber
(508) 384-2003

31

1  as the plaintiffs' allege there are economies of scale that
2  are realized in large mutual funds where it doesn't cost as
3  much incrementally to provide the services and management the
4  larger a fund gets. It's a recognized concept and it's often
5  talked about. We allege that there are economies of scale that
6  exist in the five largest Fidelity funds that are at issue
7  here. And that the savings realized through these economies of
8  scale are not adequately shared with the investors as they're
9  supposed to be under Section 36(b).
10      The defendants in response say that, well they reject
11 the logic of there being economies of scale and say that not
12 only are there not economies of scale for these five larger
13 funds, that there are actually diseconomies of scale, that the
14 larger the funds grow the more expensive it gets incrementally
15 to actually run these things. So it becomes even more
16 expensive the larger the fund gets. So not only there are no
17 savings from economies of scale, there are actually
18 diseconomies of scale that is reducing Fidelity's profit. And
19 the primary, one of the primary things that they point to, one
20 of the primary increased expenses is portfolio manager
21 compensation. They say the larger a fund gets the more
22 complicated the management becomes and the number of things
23 that have to be reviewed to make appropriate investments and
24 the number of investments that have to be made requires you to
25 go out and find the most competent portfolio managers and you

1  have to pay them some amount of money.  We don't know what
2  amount of money that is, but apparently that money that is
3  being paid, the actual sum of money and compensation in
4  whatever form it comes has a direct bearing on whether there
5  are any economies of scale earned by these largest funds.
6        The relevance of these pieces of information that we
7  seek it couldn't be more central to the case.  And without this
8  information we have no way of presenting, I don't believe any
9  way of presenting our economies of scale argument with any
10 effectiveness.  And we certainly don't have any way of
11 rebutting the defendants' argument that there are actually
12 diseconomies of scale with these large funds because of the
13 portfolio manager compensation and so forth.  It's clearly
14 relevant.  It's clearly discoverable.  We do recognize that its
15 sensitive information much like most of the information in this
16 case.  Most of the thousands of pages of documents that have
17 been produced in this case have been marked as confidential.
18 We have a confidentiality order in place.  It was lengthily
19 negotiated by the parties.  Almost all of the deposition
20 transcripts, there's a provision in there for having those
21 designated as confidential.  We even have voluntarily
22 participated in a procedure that allows for extra secret
23 confidentiality in issues that come up at depositions where
24 Fidelity feels that it would like to limit the disclosure of
25 that information as much as possible and we've had certain

1   people leave the room during different parts of deposition
2   testimony and those parts of the transcripts have been
3   separately transcribed, separately produced.
4          Given all those things there's certainly no reason
5   why this information, the discreet information that we're
6   looking for about portfolio manager compensation can't be
7   produced in this case, and I don't think it's relevance can be
8   questioned.
9          THE COURT:  All right, Mr. Dittmar, last round.
10         MR. DITTMAR:  Thank you, Your Honor.  We're talking
11  here about how much five individuals are paid.  Well actually
12  since the portfolio manager position has changed from time to
13  time during the period covered by the litigation as to a couple
14  of several of the funds there may be eight individuals.  The
15  compensation of eight individuals, that's what we're talking
16  about.  It is not Fidelity's position that the compensation to
17  these people derives whether there are any economies or
18  diseconomies of scale.  That is a red herring.  That is not our
19  position.  We have not asserted it.  We do not assert it in
20  this litigation.
21         Economies of scale--
22         THE COURT:  Where is the harm with disclosing this
23  subject or confidentiality order?
24         MR. DITTMAR:  The harm, Your Honor, is that this
25  information - first of all, confidentiality orders are

34

1  imperfect. I've been practicing litigation law over 35 years.
2  They are--
3            THE COURT: You look much too young for that.
4            MR. DITTMAR: Thank you very much. That made my day.
5  I won't tell you the birthday that I just had a couple of days
6  ago. They are imperfect. They are sometimes seriously
7  imperfect. Here we have an order that allows the use, and even
8  if we, even if we put a cabinet or boundary around some of the
9  use, there is bound to be exposure of this information to
10 multiple individuals or multiple law firms or multiple lawyers
11 in law firms, there are staff, there are consultants, there are
12 experts, especially if they're going to use it in economies of
13 scale. We have lawyers who are handling more than one of these
14 cases in this particular case. We have experts who probably -
15 they haven't been disclosed yet but dollars to doughnuts we
16 will have experts or consultants in this case that have been
17 involved in other cases. There's a bit of the, if I may borrow
18 from trade secret, inevitable disclosure through use of this
19 information because it's very discreet. So there are serious
20 risks. This information is highly, highly, highly sensitive
21 competitive information. It is ultimate trade secret
22 information, and it's trade secret information in the air in a
23 business where the capital is largely intellectual capital.
24 The portfolio--
25           THE COURT: I think the trade secret arguments

**MARYANN V. YOUNG**
Certified Court Transcriber
(508) 384-2003

1  pushing it a little bit.
2           MR. DITTMAR:  Well I'd be happy to support that if
3  Your Honor would like because I think that is a sound, it is a
4  sound position.  This information is not disclosed to anyone.
5  The Board - to make my point about the balance, if you will,
6  between what I think is an abstract assertion of need, oh,
7  we're doing economies of scale we need to know what this
8  individual is paid.  These mutual funds that are involved in
9  this case, Your Honor, one's approximately $20 billion in size.
10 The largest one is approximately $65 billion in size.  The
11 others are in between.  Economies of scale or profitability,
12 those features of the operation of the fund are dependent upon
13 the totality of costs.  This one individual is not driving
14 economies of scale or profitability in any of these funds.  No
15 one individual can.  It is a huge total basket of costs of
16 many, many, many different people.  The statement that this
17 information is essential to economies of scale without more
18 doesn't cut it.  I respectfully submit, it doesn't tell you
19 that there is a real need compared with, compared with the
20 competitive sensitivity and the personal privacy interests.
21 This is a very, very sensitive subject with the individuals who
22 are involved.
23          Now there have been--
24          THE COURT:  That's not your best argument.
25          MR. DITTMAR:  Well but it is one that we have to be

36

1  sensitive to cause there are employees and there are issues of
2  disclosures, if you will, within the business, within the firm
3  and disclosure outside the firm.  There are individual privacy
4  issues and there are for Fidelity competitive sensitivity
5  issues, since after all portfolio managers are among the most
6  important professional service people in the investment
7  management business.  It's a highly competitive business.  You
8  only have to read the business section of any newspaper any
9  day--
10           THE COURT:  You say we're talking about five to eight
11 people?
12           MR. DITTMAR:  We're talking about five to eight
13 people.  I would like to, if you will, Your Honor, the
14 independent trustees of the Fidelity funds don't believe this
15 information is necessary and don't get this information.  There
16 is no court decision, there has been no court decision in the
17 history of litigation of Section 36(b) where a judge in
18 considering whether a fee is a fair fee, whether there are
19 economies of scale realized or not, whether profitability is
20 excessive or not, there is not one court decision where a judge
21 analyzes the compensation of a portfolio manager or any other
22 key individual.
23           There has been a court decision directly on point of
24 what's before you today, a motion to compel disclosure of
25 portfolio manager individual compensation with an argument that

*MARYANN V. YOUNG*
Certified Court Transcriber
(508) 384-2003