**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND, | CIVIL NO. 1:04-cv-11651-MLW (Lead Case) |
| Plaintiffs, | |
| vs. | CIVIL NO. 1:04-cv-11756-MLW (Consolidated Case) |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR A PROTECTIVE ORDER TO QUASH THE DEPOSITION**
**NOTICE OF EDWARD C. JOHNSON 3d, CHAIRMAN OF FMR CORP.**

James S. Dittmar (BBO# 126320)
David J. Apfel (BBO# 551139)
Sarah Heaton Concannon (BBO# 646884)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000

James N. Benedict
Sean M. Murphy
MILBANK, TWEED, HADLEY &
  MCCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000
*Attorneys for Defendants Fidelity*
*Management & Research Company and*
*FMR Co., Inc.*

Dated:  September 28, 2007

## INTRODUCTION

This Memorandum is submitted in support of the motion to quash the deposition notice of Edward C. Johnson 3d, Chairman of FMR Corp., the holding company that is parent to defendants, Fidelity Management & Research Co. ("FMR Co.") and FMR Co., Inc. ("FMRC") (together, "Fidelity").  The notice is unjustified and abusive and should be quashed.

Mr. Johnson's deposition is utterly unnecessary.  This is a case brought under Section 36(b) of the Investment Company Act.  The sole issue in the case is whether the investment management fees charged by Fidelity to five publicly registered mutual funds[1] and approved by the funds' board of trustees were "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[2]  This is not a question to which any one person uniquely holds the answer or as to which any one person has superior insight.  Numerous individuals are necessarily involved in the provision of services to the funds, the keeping of records relating to the affairs of the funds, and the negotiation and approval of the fees paid by the funds to their adviser.

Here, in addition to the funds' own extensive public filings, plaintiffs have received through discovery the materials and minutes for every fund board and relevant committee meeting since January 1, 2000, and have already taken or are scheduled to take the depositions of five independent trustees, two management or "interested" trustees, Fidelity's former chief operating officer, two former presidents of FMR Co., Fidelity's chief financial officer, and several other senior Fidelity employees responsible

---

[1]    The five funds at issue in this case are: Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Blue Chip Growth Fund, Fidelity Growth & Income Fund, and Fidelity Low-priced Stock Fund.

[2]    *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 927-28 (2d Cir. 1982).

LIBA/1833139.1

for the funds' management and administration.  Plaintiffs cannot make the case that Mr. Johnson has anything to add to this substantial evidence.

Indeed, Mr. Johnson's testimony would be wholly cumulative.  Of the hundreds of thousands of documents produced in the case, not a single one was authored exclusively by Mr. Johnson.  No document was sent to or from only Mr. Johnson.  No witness has declined to answer any question by pointing to Mr. Johnson as having superior or special knowledge about the disputed facts in this case.  Fidelity did not identify Mr. Johnson as a potential witness and will not call him as a witness should this case go to trial.

The lack of need for Mr. Johnson's deposition and the cumulative nature of any testimony he might give indicate that his deposition is not noticed to serve the interests of legitimate discovery.  For that matter, the timing of the notice confirms that it serves only to harass.  The notice was served on September 13, 2007, more than three full years into the litigation, one year after the Court set a time limit on discovery, and just days before the September 30, 2007 cut-off for fact discovery.  By the date of the notice, plaintiffs had already cancelled prior requests for a number of depositions, and had acknowledged they would not seek to take the 20 depositions they had requested and the Court had allowed.[3]  The notice was served after three of plaintiffs' lead attorney firms had either just withdrawn or announced their imminent withdrawal from the case.  Indeed, prior to the notice, many substantially identical cases, commenced three years ago by the same circle of plaintiffs' counsel, had terminated by summary judgment or stipulation of

---

[3]    Although plaintiffs initially indicated an interest in deposing a number of senior Fidelity executives and officers, including the former chief financial officer of FMR Corp., two additional interested trustees, and Fidelity's senior executive officer from 2005 to 2007, plaintiffs did not ultimately pursue these depositions.

dismissal.[4]  This case, like the others initiated by plaintiffs' counsel, is lawyer-driven.

Many of the named plaintiffs were recruited through attorney newspaper advertisements.[5]

Moreover, in deposition, the named plaintiffs have affirmatively disagreed with the core

allegations of the Complaint and/or evidenced complete ignorance of the most basic

information comprising the purported foundation of their case.[6]  The effect of Mr.

Johnson's deposition notice, in the last throes of this lawyer-driven case, is not to obtain

discovery, but to burden, inconvenience, and harass the Chairman of the Fidelity's

holding company.

Under similar circumstances, well-settled case law establishes that deposition

notices of senior executives in the position of Mr. Johnson should be quashed.  *See, e.g.*,

---

[4]    Two cases have ended with the granting of defendants' motions for summary judgment: *Gallus* v. *Ameriprise Financial, Inc.*, Civil No. 04-4498 (DWF/SRN), slip op. (D. Minn. July 10, 2007), *appeal pending*, No. 07-2945 (8th Cir. filed Aug. 22, 2007), and *Jones* v. *Harris Associates, L.P.*, No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007), *appeal pending*, No. 07-1624 (7th Cir. filed Mar. 20, 2007).  Five other cases have terminated through stipulations of dismissal.

[5]    *See, e.g.*, A. Phillips Tr., at 14-15; P. Phillips Tr., at 22-23; M. Magnan Tr., at 30-31; K. Magnan Tr., at 21-22; Miller Tr., at 171; Haugen Tr., at 121-24.

[6]    The following exchange, from the deposition of named plaintiff Cindy Schurgin, is illustrative:

> Q.  If Magellan had only charged .63 percent on an annual basis, would you have a complaint about the excessiveness of the fee?
>
> [Objection to form]
>
> A.  Probably not.

*See, e.g.*, Schurgin Tr., at 63-64.  During the time period at issue in this case, however, Magellan charged 0.63 percent annually.  *See* May 2005 Magellan Fund Prospectus, at BFMR_00092947-71.  Other named plaintiffs were similarly ignorant of their claims.  *See, e.g.*, Miller Tr., at 141-42 (noting trivial fees as the only examples of excessiveness); Bennett Tr., at 28 (unable to articulate basis of claim); A. Phillips Tr., at 24-25, 66 (stating that prior to becoming a plaintiff, she did not have an opinion as to whether fees were excessive, and further stating that she is not dissatisfied with her fund's performance); P. Phillips Tr., at 34 (asserting that he agreed with the allegations of the Complaint "to the extent that I remember them and understood them"); M. Magnan Tr., at 39 (indicating no complaints with fees prior to contacting plaintiffs' counsel); K. Magnan Tr., at 52-54 (indicating that she did not know whether the fees charged to Fidelity's institutional accounts are relevant to her allegations with respect to the excessiveness of the fees); Haugen Tr., at 121-24 (describing continued investment in Fidelity funds; unable to explain why she allows Fidelity to manage so much of her money while simultaneously asserting that Fidelity is breaching its fiduciary duty to her).

*AB&T Sales Corp.* v. *Digital Equip.*, No. 97-10673-DPW, slip op. (Aug. 26, 1997) (granting protective orders concerning deposition notices for two of Digital's most senior executives); *Mulvey* v. *Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (issuing protective order to preclude the deposition of Chrysler Chairman Lee Iacocca). This case is no different. The prospect for abuse here is real. The effort by plaintiffs' counsel to take the unnecessary and cumulative deposition of Mr. Johnson should not be countenanced by the Court.

## BACKGROUND

### I.    Relevant Issues In The Case

This case arises under Section 36(b) of the Investment Company Act. That statute creates a private cause of action by any securities holder of a registered investment company on behalf of such company against its investment adviser for breach of fiduciary duty with respect to the adviser's compensation. 15 U.S.C. § 80a-35(b). Under Section 36(b), plaintiff bears the burden to prove that fees charged by the adviser are so high as to fall outside the range of fairness. "A fee is excessive, and thus a breach of the investment adviser's fiduciary duty under § 36(b), if it is 'so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" *Krantz* v. *Fidelity Management & Research Co.*, 98 F. Supp. 2d 150, 158 (D. Mass. 2000) (quoting *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 927-28 (2d Cir. 1982)); *see also Krinsk* v. *Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989). Here, plaintiffs allege that the fees paid by five Fidelity mutual funds are excessive when considered in light of six factors, frequently called *Gartenberg* factors: (1) the nature and quality of the services provided by the adviser and its affiliates to the funds and their shareholders; (2) the profitability of

4

the funds to the adviser; (3) "fall-out" benefits to the adviser or its affiliates from operating the funds; (4) whether economies of scale are realized by the adviser and, if so, whether they have been shared with the funds; (5) comparative fee structures of similar investment vehicles; and (6) the independence and conscientiousness of the funds' independent trustees in their review, negotiation and approval of the advisers' fees. Consolidated Complaint Under Investment Company Act of 1940, ¶¶ 15-30 (Nov. 3, 2005).

## II.    The Discovery Completed To Date Has Comprehensively Addressed Each Of The Six *Gartenberg* Factors

To date, Fidelity has produced more than 280,000 pages of documents. This production includes all materials provided to the Fidelity mutual fund board of trustees relating to the five mutual funds at issue covering a more than seven year span – January 1, 2000 to February 28, 2007. Fidelity has also produced over 20,500 emails from the electronic files of 49 different individuals. These documents include documents comprising and/or relating to each of the six *Gartenberg* factors.

Furthermore, Fidelity has provided detailed answers to 19 interrogatories propounded by plaintiffs in three separate requests, including questions covering subject matters such as fund profitability; software applications used in the management of assets, cash flow, and/or risk; specific analyses to determine whether the Magellan Fund was a "closet index fund"; studies or analyses directed toward increasing operating efficiency; cost allocation methodologies; scope of services provided to non-mutual fund clients; and other subjects bearing on the *Gartenberg* factors.

To date, plaintiffs have taken the following depositions:

| | Deponent | Title |
|---|---|---|
| 1 | Robert L. Reynolds | FMR Corp. Vice Chairman and Chief Operating Officer<br>Former Fidelity Interested Trustee<br>Former President of defendant FMR Co. |
| 2 | Marvin Mann | Retired Chairman of the Fidelity Mutual Fund Independent Trustees<br>Former President and CEO of Lexmark International Inc. |
| 3 | Ned Lautenbach | Current Chairman of the Fidelity Mutual Fund Independent Trustees<br>Partner of Clayton, Dubilier & Rice, Inc.<br>Former Senior Vice President of IBM Corporation |
| 4 | Marie Knowles | Fidelity Mutual Fund Independent Trustee<br>Chairman of the Independent Trustees' Audit Committee<br>Former Executive Vice President, Chief Financial Officer of Atlantic Richfield Company (ARCO) |
| 5 | William Stavropoulos | Fidelity Mutual Fund Independent Trustee<br>Chairman of the Independent Trustees' Equity Contract Committee<br>Former CEO and Chairman of The Dow Chemical Company |
| 6 | William McCoy | Fidelity Mutual Fund Independent Trustee<br>Former President of BellSouth Enterprises<br>Chairman of the Board of BellSouth Corporation |
| 7 | Robert Stansky | Former portfolio manager of Fidelity Magellan Fund |
| 8 | William Danoff | Portfolio manager of Fidelity Contrafund |
| 9 | Steve Kaye | Former portfolio manager of Fidelity Growth & Income Fund |
| 10 | John McDowell | Former portfolio manager of Fidelity Blue Chip Growth Fund |
| 11 | Nicholas Steck | Senior Vice President and Compliance Officer for FMR Co.<br>Rule 30(b)(6) designee testifying on the corporate and operational structure of Fidelity; the operation of Fidelity's internal compliance office; document retention policies and practices at Fidelity; the location and form of Fidelity's business records; the operation of the Board of Trustees; and governmental and quasi-governmental investigations of the defendants. |

In addition, with leave of Court and by agreement of Fidelity, plaintiffs have

noticed the depositions of three additional witnesses, to be taken in October, after the

close of fact discovery:

| | Deponent | Title |
|---|---|---|
| 1 | J.S. Wynant | Fidelity's Chief Financial Officer<br>Rule 30(b)(6) designee testifying on seven topics, including: the selection, collection, preparation, content, source, and/or presentation of any materials provided to trustees by Fidelity; the defendants' financial status over the past ten years; fund profitability; advisory agreements and subadvisory agreements; negotiation, execution, and operation of all 12b-1 plans of distribution for each of the funds; and governmental and quasi-governmental investigations of the defendants. |
| 2 | Drew Lawton | President of Fidelity's affiliated institutional asset management company |
| 3 | Abigail Johnson | Former president of defendant FMR Co.<br>Former Interested Trustee<br>Current president of Fidelity Employer Services Company |

6

Each of the six *Gartenberg* factors has been fully addressed by the documents already produced, by the interrogatories answered, and by the witnesses whose depositions have been taken and/or those whose depositions are scheduled for October. For example:

1)  *The nature and quality of services*:

- Summary tables and quadrant charts setting forth the funds' management fees, performance, and profitability (*see, e.g.,* BFMR_00020693-20702);

- Detailed annual reviews of each Fidelity mutual fund (*see, e.g.* BFMR_00012519-12530);

- Periodic presentations from various Fidelity business units discussing operational initiatives, technology enhancements and customer service and satisfaction with respect to the website, investors centers and phone representatives ( *see, e.g.*, BFMR_00156209);

- Annual reviews of execution quality (*see, e.g.,* BFMR_00017683-87).

- Additionally, nearly all of the deponents to date, including Mr. Reynolds, Mr. Steck, Mr. Mann, and Mr. Lautenbach, have been examined about the nature and quality of the services provided to the funds.

2)  *Profitability of the mutual funds at issue*:

- Comprehensive annual reports on mutual fund profitability (*see, e.g.*, BFMR_00061633-62097);

- Semi-annual and annual presentations by Fidelity to the Board of Trustees on the funds' profitability (*see, e.g*., BFMR_00018690-18714; BFMR_00021814-21826);

- Annual reports issued by PriceWaterhouse Coopers assessing Fidelity's mutual fund profitability analyses (*see, e.g.*, BFMR_00052796-52865);

- Annual memoranda and presentations discussing proposed fund profitability methodology improvements (*see, e.g.*, BFMR_00016398-16405; BFMR_00033535-33543; BFMR_00010164-10175; BFMR_00038024-38035);

- Monthly minutes of the Audit Committee.

- Additionally, Ms. Knowles, Chairman of the Independent Trustees' Audit Committee, testified at length about Fidelity's cost accounting system and the Board's consideration of the funds' profitability.  Plaintiffs will also have an opportunity to depose Mr. Wynant, Fidelity's Chief Financial Officer, in October.

3) *Fees charged by other funds*:

- Annual memoranda outlining the competitiveness of the Fidelity funds' management fee);

- Summary charts and diamond graphs comparing the management fees, performance and expenses of the Funds' portfolios with the

8

fees, performance and expenses of comparable funds in the industry (*see, e.g.*, BFMR_00020703-20743);

- Annual memoranda discussing the management fee rates charged to other equity assets managed by Fidelity, such as subadvised and institutional accounts (*see, e.g.*, BFMR_00011559-76);

- Additionally, nearly all of the Trustees were examined about the funds' fees and the Board's consideration of the fees charged to other mutual funds as well as other products, such as institutional accounts. Mr. Reynolds testified on this subject at length at his deposition.

4) *Fall-out benefits*:

- Annual memoranda discussing potential fall-out benefits (*see, e.g.* BFMR_00018949-18962);

- Periodic presentations by Fidelity to the Trustees concerning potential fall-out benefits (*see*, e.g., BFMR_00031813-31823);

- Documents relating to the 2004 Ad Hoc Committee on Fall Out Benefits and the 2005 Ad Hoc Committee on Fidelity Services in 2005 ( *see* e.g., BFMR_00014882-14883);

- Additionally, during their depositions, independent trustees Lautenbach and McCoy, explained, in-depth, the Trustees' consideration of fall-out benefits.

5) *Economies of scale*:

- Three in-depth Economies of Scale analyses conducted in 1994, 1999 and 2003 and relevant back-up data (*see e.g.,* BFMR_00098168-247; BFMR_00097844-76; BFMR_00015091-112);

- Questions from the Trustees to Fidelity concerning economies of scale and Fidelity's responses, including presentations to the Board of Trustees (*see, e.g.* BFMR_00017515A-19A; BFMR_00166828-50; BFMR_00059253-70; BFMR_00153911-37);

- Periodic presentations from Fidelity's various business units detailing various service enhancements and other reinvestments in the business (*see, e.g.* BFMR_00156209-30).

- Additionally, during their depositions, nearly all the trustees, including Ms. Knowles, Mr. Lautenbach , Mr. McCoy, and Mr. Mann, discussed the Board's consideration of economies of scale. Mr. Reynolds also discussed economies of scale at length, and plaintiffs will have an opportunity to depose Mr. Wynant, Fidelity's Chief Financial Officer on the subject, in October.

6) *Independence and conscientiousness of the independent directors*:

- Monthly questions from the Trustees to Fidelity seeking clarifications relating to the Board materials and requesting additional information and, Fidelity's responses to these requests (*see, e.g.,* BFMR_00017432-17442; BFMR_00017515A-17533A; BFMR_00017462A-17481A; BFMR_00005822-5842;

BFMR_00011103A-11112A; BFMR_00020920-20944;

BFMR_00143847-143889; BFMR_00170143-170165);

- Documents concerning various Ad Hoc committees created by the Trustees to address and consider particular issues (*see, e.g.*, BFMR_00020120-20121; BFMR_00014882-14883; BFMR_00015675; BFMR_00016050-16055; BFMR_00016930);

- Documents reflecting the Trustees' retention of third party consultants to provide opinions and guidance on certain issues (s*ee, e.g.*, BFMR_00212703-212706; WSS00000527-600; BFMR_00020120-20121);

- Annual self-evaluations of the Trustees (*see, e.g.*, NCL00004479-4491).

- Additionally, during their depositions, nearly all of the trustees have been cross-examined about their independence and conscientiousness and their relationship with Fidelity.  Mr. Steck and Mr. Reynolds were also examined about this issue.

The deposition of Mr. Reynolds alone expressly covered substantially all of the *Gartenberg* factors.  During the years that are relevant to this case, Mr. Reynolds served as an interested mutual fund trustee, president of defendant FMR Co., and chief operating officer of FMR Corp. (to whom the then-president of FMR Co. reported), and the second highest executive officer in FMR Corp. (subordinate only to Mr. Johnson).  Mr. Reynolds was examined at length on the nature and quality of services provided by the funds, fund profitability, comparable fees charged by other funds, economies of scale, and

11

independence and conscientiousness of the independent trustees. In addition, Mr.

Reynolds' deposition covered every potentially relevant board meeting and document as

to which Mr. Johnson might testify. Mr. Reynolds' deposition was wide-ranging and he

answered every question that was asked fully, often with extensive elaboration. He was

knowledgeable and he testified in detail. He did not restrict his answers to simple "yes's"

or "no's." In short, there is no relevant subject matter about which Mr. Johnson could be

asked, where Mr. Reynolds' testimony would not render Mr. Johnson's testimony

cumulative.

## **ARGUMENT**

It is well-settled that courts may preclude the depositions of high-level corporate

executives, such as Mr. Johnson, where the executives' testimony would be cumulative

of other evidence, unnecessary, unduly burdensome, and/or where the executive has no

superior or unique knowledge about the disputed facts in this case. For example, in

*Mulvey* v. *Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985), the District of Rhode Island

issued a protective order and refused to allow the deposition of Chrysler Chairman Lee

Iacocca, despite the fact that excerpts from Mr. Iacocca's own writings seemingly

contradicted Chrysler's stated policies. *Id.* at 365. The court issued the protective order,

stating that any relevant information that Mr. Iacocca possessed was otherwise obtainable

through less burdensome means, such as by way of written interrogatories. *Id.* at 365-66.

Numerous courts, including the District of Massachusetts, have similarly held. *See, e.g.*,

*AB&T Sales Corp.* v. *Digital Equip. Corp.*, No. 97-10673-DPW, *slip op.* (D. Mass. Aug.

26, 1997) (granting protective orders concerning deposition notices for two of Digital's

most senior executives); *Digital Equip. Corp.* v. *System Indus. Inc.*, 108 F.R.D. 742, 743

(D. Mass. 1987) (granting Digital's motion for a protective order to prevent deposition of its president where it was clear that deposition was noticed "for purposes of harassment and annoyance").[7]

I.      **The Information Sought From Mr. Johnson Is Cumulative And His Testimony Is Not Needed**

Over the course of the last year of fact discovery, plaintiffs have had extensive opportunity to obtain – and have in fact obtained (or will soon obtain) – information on all relevant fact issues from myriad sources other than Mr. Johnson. *See supra*, pp. 5-12. This is not a case involving a single decisionmaker. Rather, numerous individuals are involved in the delivery of services to the funds and in the process of setting the fees to be paid in exchange for services. No one witness is unique, let alone indispensable. Here, any testimony that Mr. Johnson might give would merely duplicate extensive testimony of prior and/or upcoming deponents. To the extent plaintiffs seek testimony from Mr. Johnson as the chairman of the board of trustees of the mutual funds, they have deposed (or will depose) five independent and two interested trustees.[8] Mr. Johnson was not the sole participant or decisionmaker in any meeting of the board of trustees, and plaintiffs have had an opportunity – through seven separate trustee deponents – to exhaustively explore the board's decisionmaking process. To the extent plaintiffs seek

---

[7]     *See also Thomas* v. *International Business Machines*, 48 F.3d 478, 483 (10th Cir. 1995) (concluding that chairman's deposition was unjustified because the plaintiff had not demonstrated that the information sought could be obtained only from the chairman); *Websidestory, Inc.* v. *Netratings, Inc.*, Civil No. 06CV408 WQH(AJB), 2007 WL 1120567 (S.D. Cal. Apr. 6, 2007) ("When a high-level corporate executive lacks unique or superior knowledge of the facts in dispute, courts have found that good cause exists to prohibit the deposition."); *Baine* v. *Stephens*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (imposing protective order where witness had no superior or unique relevant first-hand knowledge).

[8]     In addition, plaintiffs initially expressed an interest in deposing two additional interested trustees, but later withdrew these requests. The mutual funds' board of trustees is comprised of ten independent trustees and three to four interested trustees. During the course of fact discovery, plaintiffs have deposed  (or will depose) five independent and two interested trustees.

LIBA/1833139.1

Mr. Johnson's testimony as president of FMR Corp., they have already deposed Mr.

Reynolds, FMR Corp.'s chief operating officer and former president of defendant FMR

Co. To the extent plaintiffs seek Mr. Johnson's testimony about Fidelity's investment

advisory business, they have already deposed Mr. Reynolds and will soon depose Ms.

Johnson – the two presidents of FMR Co. during the period covered by this action – and

plaintiffs will also soon depose FMR Co.'s chief financial officer. Following the

completion of all pending fact deposition discovery, no question could be posed to Mr.

Johnson that will not already have been answered – or that could not already have been

asked and answered – by others. Mr. Johnson's deposition is, accordingly, not necessary.

   Moreover, no deponent has refused to answer questions regarding documents

containing Mr. Johnson's name; no deponent has suggested that Mr. Johnson would be

better situated to answer a specific question; and no deponent has deferred to Mr.

Johnson as having unique or superior knowledge on any relevant subject matter. In short,

no deponent has suggested any need for any follow-up with Mr. Johnson.

   Likewise, nothing in the documentary record indicates that Mr. Johnson has

unique or superior knowledge of any factual matter in dispute. There is no indication that

Mr. Johnson was the critical author of any of the documents produced in discovery. Mr.

Johnson is neither the sole recipient nor the sender of a single one of the more than

20,500 emails that have been produced to date. And, of the emails of which Mr. Johnson

is one of multiple recipients at least one of the other recipients of every one of those

emails has already been deposed, has been committed for imminent deposition, or could

have been deposed had plaintiffs not voluntarily withdrawn their earlier request.

14

Against this backdrop, plaintiffs have woefully failed to justify the need for Mr. Johnson's deposition. Despite repeated requests by defense counsel, plaintiffs' counsel have not explained what additional information they purportedly need from Mr. Johnson that has not already been covered – or will not soon be covered – by other discovery. In conference on this motion to quash, plaintiffs' counsel have said nothing more than that they should be permitted to depose Mr. Johnson because he is one of the "central characters" at Fidelity Investments. Plaintiffs' counsel have further alleged that although Mr. Johnson "may not be familiar with nitty gritty, day-to-day operational issues," he is the "key guy for overall management issues." Such general and conclusory allegations of knowledge based solely on Mr. Johnson's "key" or "central" position are not a sufficient basis for his deposition. Where, as here, plaintiffs have wholly failed to identify any relevant fact in dispute as to which Mr. Johnson has superior or unique knowledge, Mr. Johnson's testimony would do nothing more than duplicate discovery plaintiffs have already obtained, and plaintiffs have made no showing of need, the deposition notice should be quashed. *See, e.g.*, *Baine*, 141 F.R.D. at 335 (precluding deposition of vice president where "[i]t has . . . not been demonstrated that [the vice president] has any superior or unique personal knowledge"); *Thomas*, 48 F.3d at 483-84 (concluding that chairman's deposition was unjustified because the plaintiff had not demonstrated that the information sought could be obtained only from the chairman); *Mulvey*, 106 F.R.D. at 366 (holding that Rule 26 gives the court authority to limit discovery if it determines that the same information is obtainable from other sources that are "more convenient and less burdensome").

15

II.    **The Deposition Of Mr. Johnson Would Be Unduly Burdensome And Oppressive**

There is no doubt that Mr. Johnson's deposition would be unduly burdensome and oppressive. Mr. Johnson is chairman of FMR Corp., the holding company for a large and diverse array of businesses. Through subsidiaries, FMR Corp. engages in investment management, brokerage, employee health and welfare, employer payroll, trustee, and custodial services. The corporation also owns diverse businesses in non-financial services fields, including telecommunications, building supplies, and hotel and restaurant services. The operating units of the company of which Mr. Johnson is chairman have approximately 13,000 employees in Massachusetts and over 44,000 employees worldwide. These businesses have offices on four continents, in 25 countries, and in 31 states. *See generally* http://www.Fidelity.com (last visited Sept. 24, 2007). FMR Corp.'s subsidiaries serve over ninety million customers and clients.

As Chairman, Mr. Johnson is FMR Corp.'s senior-most executive. He travels extensively, in this country and around the world. Neither Mr. Johnson nor Fidelity shareholders and employees can readily afford the distraction and time that would be required to prepare Mr. Johnson for his deposition,[9] and for him then to sit for it.[10] In light of the comprehensive discovery completed to date and plaintiffs' abject failure to offer any legitimate reason for Mr. Johnson's deposition, the deposition would be unduly burdensome.

---

[9]    In addition to the time required for deposition itself, Mr. Johnson's testimony would require extensive and time-consuming preparation. The wide-ranging nature of the *Gartenberg* factors compounds – many times over – the burden of deposition preparation.

[10]    Indeed, Mr. Johnson has prior commitments to travel overseas from October 2 through November 12, 2007.

LIBA/1833139.1

In addition, Mr. Johnson's deposition would be oppressive.  The legitimacy of plaintiffs' need for Mr. Johnson's deposition is belied by their own actions.  Although fact discovery has been ongoing for over a year, and plaintiffs have issued sixteen deposition notices, until September 13, plaintiffs never noticed Mr. Johnson's deposition. Indeed, although plaintiffs counsel preliminarily suggested, in February 2007, that they might be interested in deposing Mr. Johnson, over the next eight months they took no steps to arrange for his deposition.  A surprise two-week notice of his deposition for the last business day of the period of permitted discovery is sheer harassment.

The balance of burden and oppression, on the one hand, against the claim of need, on the other, should also take into account the circumstances of this case:

- This is a lawyer-driven case.  It was initiated by counsel's efforts to recruit plaintiffs.  *See* note 5, *supra*.  The plaintiffs who were recruited know next to nothing about their own claims, and, in fact, appear to have no real quarrel with the fees paid by the five funds at issue.  *See* note 6*, supra.*

- This case is one of more than a dozen copy-cat cases filed at roughly the same time by the same counsel against various mutual fund advisers around the country.

- In this case, over the last few months, three of plaintiffs' four lead attorney firms have withdrawn their appearances.  Indeed, two lead attorney firms withdrew at the same time that remaining counsel noticed Mr. Johnson's deposition.

Under the circumstances, plaintiffs' notice of Mr. Johnson's deposition has all the earmarks of a last-ditch harassment tactic, aimed at leveraging settlement negotiations or other litigation advantage.

The Court should grant protection from such unduly burdensome, oppressive, and unnecessary discovery.  *See, e.g.*, *Conrail* v. *Primary Indus. Corp.*, Nos. 92 Civ. 4927 (PNL), 92 Civ. 6313, 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) ("[P]ermitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation."); *Digital Equip.*, 108 F.R.D. at 743 (granting Digital's motion for a protective order to prevent deposition of its president where it was clear that deposition was noticed "for purposes of harassment and annoyance"); *see also Mulvey*, 106 F.R.D. at 366 (precluding deposition of Chrysler's CEO, stating "[the CEO is] a singularly unique and important individual who [could] be easily subjected to unwarranted harassment and abuse"); *Lange* v. *Roman Catholic Diocese of Dallas*, 648 N.Y.S.2d 265, 266 (Sup. Ct. New York County 1996) (observing that noticed deposition of high-ranking church official was probably "sought not to obtain necessary information as to events and circumstances at issue . . . but for the purpose of promotion, publicity or strategic value"), *aff'd*, 665 N.Y.S.2d 651 (N.Y. 1st Dep't 1997).

## <u>CONCLUSION</u>

For the reasons set forth above, Fidelity respectfully requests that this Court enter a protective order quashing Mr. Johnson's notice of deposition.

Respectfully submitted,

GOODWIN PROCTER LLP

_____/s/ James S. Dittmar_____
    James S. Dittmar (BBO# 126320)
    David J. Apfel (BBO# 551139)
    Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000

18

MILBANK, TWEED, HADLEY &
 MCCLOY LLP
   James N. Benedict
   Sean M. Murphy
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000

*Attorneys for Defendants Fidelity Management*
*& Research Company and  FMR Co., Inc.*

Dated: September 28, 2007

LIBA/1833139.1

## <u>CERTIFICATE OF SERVICE</u>

I, James S. Dittmar, hereby certify that on September 28, 2007, this document

filed through the ECF system will be sent electronically to the registered participants as

identified on the Notice of Electronic Filing (NEF).


<u>/s/ James S. Dittmar            </u>
James S. Dittmar (BBO# 126320)

20