**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>        Plaintiffs,<br><br>vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>        Defendants. | CIVIL NO. 1:04-cv-11651-MLW<br>(Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW<br>(Consolidated Case) |

**DEFENDANTS FIDELITY MANAGEMENT & RESEARCH COMPANY AND FMR CO., INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY**

GOODWIN PROCTER LLP
  James S. Dittmar, P.C. (BBO# 126320)
  David Apfel (BBO# 551136)
Exchange Place
53 State Street
Boston, MA 02109
Tel: 617-570-1000

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
  James N. Benedict (*pro hac vice*)
  Sean M. Murphy (*pro hac vice*)
  Robert J. Liubicic (*pro hac vice*)
  Mia Korot (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants Fidelity Management & Research Company and FMR Co., Inc.*

Defendants Fidelity Management & Research Company and FMR Co., Inc. ("Fidelity" or "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Renewed Motion to Compel Discovery ("Plaintiffs' Renewed Motion").

### PRELIMINARY STATEMENT

This is Plaintiffs' second attempt to obtain confidential compensation information regarding eight Fidelity portfolio managers. Originally, Plaintiffs moved to compel production of this information by arguing that it was relevant to an analysis of fund profitability and economies of scale. See 6/21/07 Pl. Mem. at 17-20. Plaintiffs insisted that "[c]learly even the most basic questions of fund profitability and the existence of economies or diseconomies of scale cannot be answered without having the actual value of the various compensation elements paid to the portfolio managers of the funds in question." Id. at 19. On July 18, 2007, this Court denied Plaintiffs' original motion to compel this information, ruling that Plaintiffs could renew their motion within 60 days "upon a further and much stronger showing of need."[1]

Far from presenting a "further and much stronger showing of need," Plaintiffs' Renewed Motion simply recycles the exact same arguments made in their original motion to compel. The only difference between Plaintiffs' original motion and the Renewed Motion is the inclusion of affidavits from two of Plaintiffs' consulting experts attesting, despite their own prior sworn deposition testimony to the contrary, that their analyses would be "impossible" without the compensation information. These self-contradicted affidavits add nothing, and Plaintiffs' Renewed Motion should be denied for the following reasons:

---

[1] See 7/18/07 Tr. at 38-39 (attached as Exhibit A to the accompanying Affidavit of James S. Dittmar) (emphasis added).

- First, Plaintiffs' attempt to show "need" through their expert witnesses is belied by the fact that these same experts have performed profitability and economies of scale analyses in prior excessive fee cases without <u>any</u> individual portfolio manager compensation data, and have testified under oath that the information they seek here is <u>not</u> needed in order to prepare such analyses.

- Second, all relevant authority makes clear that portfolio manager compensation data is entirely irrelevant to claims under Section 36(b) of the Investment Company Act of 1940. The one case directly on point, <u>Strigliabotti v. Franklin Resources, Inc.</u>, No. C04-0883 SI, slip op. (N.D. Cal. Oct. 24, 2006), holds that compensation information is not relevant to Plaintiffs' claims, and the SEC has explicitly rejected a proposal that mutual funds disclose that information.

- Third, the Independent Trustees on the Fidelity mutual fund board have testified that they do not need the amounts of compensation paid to portfolio managers to assess the reasonableness of the advisory fees.

- Finally, compensation information is competitively sensitive and highly confidential, and the existing protective order provides an inadequate safeguard against inadvertent disclosure.

Accordingly, Plaintiffs' Renewed Motion should be denied.

## ARGUMENT

**I.   PLAINTIFFS' EXPERTS DO NOT NEED COMPENSATION DATA FOR INDIVIDUAL PORTFOLIO MANAGERS**

Just as they did the last time they moved to compel production of compensation information, Plaintiffs contend that the compensation paid to the portfolio managers who managed the five funds at issue ("the Funds") is somehow relevant to their analyses of profitability and economies of scale. The <u>only</u> new showing Plaintiffs have put forward this time around is the affidavits of Steve Pomerantz and James D. Lamb, consulting experts retained to analyze economies of scale and cost accounting issues related to the Funds. Pl. Mem. at 4. An analysis of the two affidavits and of prior sworn testimony given by each of the experts, however, reveals that compensation information is not relevant to their analysis of either economies of scale or fund profitability.

2

The affidavits submitted by Plaintiffs' experts claim that it would be impossible to perform their analyses without portfolio manager compensation data. Lamb Aff. ¶ 6 (claiming it is "impossible" to determine the profitability of the mutual funds without the information); Pomerantz Aff. ¶ 13 ("It is <u>necessary</u> to know the portfolio manager compensation cost for each Fund. . . .") (emphasis added). However, these claims must be rejected because these same experts have analyzed economies of scale and fund profitability in other cases without relying on compensation information, and they have given testimony in other cases that directly contradicts their affidavits.

More specifically, Pomerantz and Lamb were retained in multiple other excessive fee cases – by the same group of plaintiffs' lawyers who have sued Fidelity – to provide the same types of analyses they intend to provide here.[2] In those prior cases, these two experts were able to offer opinions on economies of scale and fund profitability <u>without</u> the compensation information they now claim to need. In fact, in one case Pomerantz and Lamb did not rely on compensation data even though it was available to them, and they testified that the information would have no relevance to their opinions. The conflict of the sworn testimony in that case – <u>Baker v. American Century Inv. Mgmt., Inc.</u>, No. 04-4039-CV-ODS (W.D. Mo. 2006) – with the current affidavits shows that the contentions made in the Pomerantz and Lamb affidavits should be rejected. See <u>Torres v. E.I. DuPont de Nemours & Co.</u>, 219 F.3d 13, 20-22 (1st Cir. 2000) (affirming district court's decision to strike affidavits that were inconsistent with prior deposition testimony); <u>Colantuoni v. Alfred Calcagni & Sons, Inc.</u>, 44 F.3d 1, 4-5 (1st Cir. 1994) (disregarding affidavit that directly contradicted deposition testimony); <u>Murphy v. Ford Motor</u>

---

[2] <u>See, e.g.</u>, Pomerantz Aff. ¶ 5; Affidavit of Robert Glenn Hubbard, Ph.D. ¶ 7.

Co., 170 F.R.D. 82, 85-86 (D. Mass. 1997) (striking portions of affidavit that contradicted prior deposition testimony).

In Baker, a Section 36(b) case based on nearly identical allegations to those made here, both Pomerantz and Lamb submitted expert reports on fund profitability and economies of scale. Contrary to Plaintiffs' claim here that compensation data is "centrally relevant" to an analysis of economies of scale and fund profitability (see Pl. Mem. at 1, 3), in Baker these same two experts did not rely on the amounts of portfolio manager compensation in their analyses of the same issues. In fact, although individual portfolio manager compensation information had been produced in that case, Pomerantz and Lamb basically ignored it. Instead, their analyses of profitability and economies of scale in Baker were based on aggregate cost data (the same type of data that already has been produced by Fidelity in this case).

In explaining his decision not to consider portfolio manager compensation, Pomerantz affirmatively testified in Baker that the information had no bearing on his analysis of economies of scale:

> Q: Did you undertake any effort to determine whether the pay that is provided to the portfolio managers … went up or down in relation to assets?
>
> A: No, and it would have no contribution to my opinion.

Pomerantz Tr. at 134:6-12 (Dittmar Aff. Exhibit B) (emphasis added). This conflicts with Pomerantz's current affidavit, which states:

> Particularly important to my analysis of economies of scale … is an understanding of the portfolio manager compensation costs that have been attributed or allocated to each Fund. My analysis will be based in part upon my understanding of how allocations of portfolio manager costs vary by a Fund's share of the Fidelity Complex's total assets under management, as well as how those costs vary over time.

Pomerantz Aff. ¶ 12 (emphasis added).

4

There are other contradictions that undermine Pomerantz's affidavit in this case. For example, Pomerantz gave the following testimony in Baker:

> Q: Do you know what percentage of the compensation to American Century portfolio managers is in salary versus bonus or some other incentive compensation?
>
> A: I mean, it would have to be very small because if you look at, say, Ultra as an example, the combined costs for managing the asset is running about 5 basis points. I mean, <u>I don't really care if it's 5 basis points of bonus or 5 basis points of salary. It doesn't really have any impact.</u>
>
> Q: So you didn't look into that?
>
> A: No.

Id. at 135:9-21 (Dittmar Aff. Exhibit B) (emphasis added). Although in Baker, Pomerantz said he "[doesn't] really care" about the different components of compensation and "[i]t doesn't really have any impact" on his analysis, his affidavit proffered by Plaintiffs here states:

> As I understand it, total portfolio manager compensation for the Fidelity Complex consists of several components, including salary, bonus [and equity-based incentive compensation programs] . . . .Without a better understanding of how [the incentive compensation expenses] affect investment management expenses, it will be difficult for me to opine on the allocation methodologies used by Fidelity, the economies of scale it experiences, and hence the amount of those economies that are being shared with the Funds and their shareholders.

Pomerantz Aff. ¶¶ 14, 16. Again, these two positions are directly at odds with each other.

Similarly, Plaintiffs' expert James Lamb provided an expert opinion on fund profitability in Baker without reviewing the compensation data which had been made available to him. Lamb testified under oath:

> Q: Do you know what components go into a portfolio manager's compensation?
>
> A: <u>No, I do not know the specifics of it. I just know that they're compensated.</u>

5

Lamb Tr. at 183:2-6 (Dittmar Aff. Exhibit C) (emphasis added).  This testimony stands in stark contrast to the Lamb affidavit now offered by Plaintiffs, where Lamb states just the opposite:

> To perform a complete analysis of the mutual fund profitability reporting of Fidelity . . . . I need to understand the components of each individual portfolio manager's compensation at a detailed level.

Lamb Aff. ¶ 4.

In addition to <u>Baker</u>, both Pomerantz and Lamb submitted expert reports in <u>Strigliabotti</u>, No. C 04-0883 SI, slip op., another Section 36(b) case based on allegations nearly identical to those made here.  In that case, information about portfolio manager compensation was not produced because the court denied plaintiffs' motion to compel production of that information due to its lack of relevance to plaintiffs' claims.  <u>See id</u>., slip op. at 2 (Dittmar Aff. Exhibit D). <u>Messrs. Pomerantz and Lamb nevertheless submitted extensive expert reports in that case regarding economies of scale and fund profitability, despite not having access to the compensation information they seek here</u>.  Hubbard Aff. ¶ 7.  Clearly, the lack of compensation information did not limit their ability to formulate opinions on exactly the same issues, notwithstanding their protestations to the contrary here.

In short, by virtue of their own prior inconsistent testimony, the current claims that portfolio manager compensation is "necessary" to Lamb's and Pomerantz's analyses must be rejected.  <u>See</u> <u>Colantuoni</u>, 44 F.3d at 4-5; <u>Torres</u>, 219 F.3d at 20-22; <u>Murphy</u>, 170 F.R.D. at 85-86.  This circumstance, alone, calls for a ruling by the Court that Plaintiffs have failed to make the "further and much stronger showing of need" required by the Court's July 18, 2007 order from the bench.

Dr. Robert Glenn Hubbard and Russell F. Peppet, Fidelity's consulting experts regarding economies of scale and fund profitability, further support the fact that portfolio manager compensation is irrelevant to Plaintiffs' claims.  <u>See</u> Hubbard Aff.; Affidavit of Russell F.

Peppet. Dr. Hubbard and Mr. Peppet are mutual fund industry experts who, between them, have provided expert testimony in a number of excessive fee cases, including Gartenberg v. Merrill Lynch Asset Management, Inc., 528 F. Supp. 1038 (S.D.N.Y. 1981), Krinsk v. Fund Asset Management, Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), Strigliabotti, and Baker. Each concludes that individual portfolio manager compensation information is irrelevant here:

- Mr. Peppet explains that in order to opine on the reasonableness of a company's cost accounting system, an expert needs only aggregate cost data, and individual compensation data has nothing to do with whether that compensation should be included in fund profitability or how it is allocated to a fund. Peppet Aff. ¶¶ 7-9; and

- Dr. Hubbard explains that assessing economies of scale involves an analysis of how the total costs of operating the Funds has changed in relation to assets, not one individual's compensation. Hubbard Aff. ¶ 6.

Plaintiffs have been provided with all of the information that Dr. Hubbard and Mr. Peppet conclude they would need to be able to perform these analyses. Indeed, Fidelity has produced total cost data for all employees involved in investment management of the Funds – including portfolio managers – as well as annual changes in the total compensation to Fidelity for management of all of its funds. See, e.g., BFMR_00062098-548. Fidelity has also produced extensive information regarding portfolio manager compensation, including:

- discussions of the methodology used by Fidelity to compensate its portfolio managers, see, e.g., BFMR_00047755;

- extensive descriptions of the types of compensation received by Fidelity's portfolio managers and the factors considered in setting portfolio manager compensation, see, e.g., BFMR_00011103A-04A;

- detailed explanations of how Fidelity allocates portfolio manager compensation expenses to the Funds for purposes of calculating fund profitability, see, e.g., BFMR_00013896, BFMR_00013899-901;

- analyses of the changes in portfolio manager compensation over time and the factors, such as competition between financial services companies for portfolio managers, that have led to those increases, see, e.g., BFMR_00098189, BFMR_00097855;

7

- analyses of how Fidelity's portfolio manager compensation compares to that of other investment advisers, see, e.g., BFMR_00097856; and

- meeting minutes reflecting the Trustees' discussions of portfolio manager compensation with Fidelity representatives, see, e.g., BFMR_00021710.

Thus, Plaintiffs already have more than sufficient information to prepare their analyses.

## II. INDIVIDUAL PORTFOLIO MANAGER COMPENSATION IS IRRELEVANT UNDER APPLICABLE LAW

### A. Cases Decided Under Section 36(b) Have Never Analyzed Portfolio Manager Compensation

In the over thirty-five years since Section 36(b) was first enacted, no court has ever analyzed the compensation paid to an individual portfolio manager when assessing the reasonableness of the fees charged to a mutual fund, nor has any court ever suggested that the amount of compensation relates in any way to any of the six Gartenberg factors courts consider in connection with that assessment. See Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982). Indeed, the court in Strigliabotti specifically held that individual compensation information was unnecessary under Section 36(b). Strigliabotti, No. C 04-0883 SI, slip op. at 2 (Dittmar Aff. Exhibit D). Plaintiffs in that case (represented by the same counsel who have sued Fidelity here) argued that they needed the information to analyze economies of scale and fund profitability. In denying the motion to compel, the court ruled:

> If plaintiffs have been provided with information about the total fees charged to each fund, as well as information about how those fees have changed over time, there is no need for further information about specific incomes.

Id.

Fidelity has already produced to Plaintiffs thousands of pages of information reflecting the fees and costs associated with the management of each Fund. Thus, the reasoning of Strigliabotti applies equally here.

B.  <u>Plaintiffs' Reason For Needing Compensation Data is Inconsistent With the Purpose of Section 36(b)</u>

Plaintiffs' experts claim that the amounts of individual portfolio managers' compensation is necessary to opine on whether that compensation is "excessive." <u>See</u> Pomerantz Aff. ¶ 13 (expressing a need for portfolio manager compensation amounts to assess whether they are "unreasonably high"); Lamb Aff. ¶ 6 (referring to "inappropriate compensation levels" paid to portfolio managers). This is the wrong inquiry. Under Section 36(b), it is the compensation paid to the adviser by the fund that is at issue. What the adviser pays its employees is not relevant to that issue. Indeed, the use to which an advisor puts its fees is not the proper area of inquiry under Section 36(b). <u>See</u> <u>In re Evergreen Mutual Funds Fee Litig.</u>, 423 F. Supp. 2d 249, 259 (S.D.N.Y. 2006) (Section 36(b) claim dismissed where plaintiffs alleged only that "the fees at issue were used improperly, and not that the fees themselves were excessive"); <u>In re Eaton Vance Mutual Funds Fee Litig.</u>, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005) (Section 36(b) "addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds"), <u>aff'd</u>, 481 F.3d 110, 118 (2d Cir. 2007). The reasonableness of the adviser's compensation is evaluated in light of the services rendered, and does not turn on whether one employee is overpaid. This Court should not let this case degenerate into a trial about whether Fidelity pays its most valuable employees too much, as the issue is completely irrelevant to an analysis of the fees paid to Fidelity by the Funds.

Moreover, the compensation Fidelity pays to one individual cannot inform an assessment of whether Fidelity's fees are excessive given that there are literally <u>thousands</u> of employees that contribute to the operation of each Fund. These employees perform hundreds of different functions including: research, trading, compliance, legal, fund accounting, preparation of

9

shareholder reports, phone and investor center service, information technology, board support, etc. The compensation paid to an individual portfolio manager is but one sub-component of the overall costs of managing a Fund.

      C.      <u>The SEC Has Found That Disclosure of Portfolio Manager Compensation is Not in the Best Interests of Fund Shareholders</u>

The case law under Section 36(b) is consistent with the fact that the SEC does <u>not</u> require mutual funds to disclose the actual amounts paid to portfolio managers.  <u>See</u> Disclosure Regarding Portfolio Managers of Registered Management Investment Companies, 69 Fed. Reg. 52,788, 52,791 (Aug. 27, 2004).  Indeed, the SEC has acknowledged that the disclosure of portfolio manager compensation would create both privacy and competitive concerns, and has, therefore, rejected a proposal that compensation amounts be publicly reported.  <u>See</u> Disclosure Regarding Portfolio Managers of Registered Management Investment Companies, 69 Fed. Reg. 12,752, 12,755 (Mar. 17, 2004) (reasoning that it is the compensation paid <u>to the adviser</u> rather than the compensation paid <u>by the adviser</u> to its portfolio managers that is relevant to mutual fund investors).  Plaintiffs ignore the absence of any regulatory requirement that such compensation be publicly disclosed.  <u>See</u> Fidelity's 7/09/07 Opp. at 22-23.

**III.  THE INDEPENDENT TRUSTEES HAVE TESTIFIED THAT THE AMOUNT OF COMPENSATION PAID TO INDIVIDUAL PORTFOLIO MANAGERS IS IRRELEVANT TO THEIR ANALYSIS OF THE FEES CHARGED TO THE FUNDS**

Plaintiffs' Renewed Motion claims that Fidelity has "consistently withheld" from the Independent Trustees information relating to portfolio manager compensation, and that this undermined the Trustees' consideration of the Funds' management contracts.  Pl. Mem. at 6-7. Plaintiffs grossly mischaracterize the record.

Plaintiffs cite to two emails discussing a question from the Trustees in 2004 relating to portfolio manager compensation, which Plaintiffs claim demonstrate that the Trustees asked for

10

compensation figures and Fidelity failed to provide them. See id.; Gerber Aff. Exhibits 1 & 2. However, a plain reading of the documents makes crystal clear that the Trustees did not ask Fidelity to furnish them with the amount of portfolio manager compensation. Rather, the Trustees asked Fidelity to provide a "detailed picture of the structure of portfolio manager and research personnel compensation." Gerber Aff. Exhibit 1 (emphasis added).

Indeed, at their depositions, the Trustees explained that the purpose of this question was not to learn the amounts of portfolio manager compensation, but to determine whether the incentives for portfolio managers and research personnel were properly aligned with shareholder interests. See, e.g., Knowles Tr. at 183:17-20 ("We were specifically interested in whether or not the incentives built into the compensation system were appropriately aligned with shareholder interest[s]."); Lautenbach Tr. at 170:8-13 ("[W]e wanted to make sure the – we understood how the fund managers' [incentive] was aligned with fund performance as far as whether they're getting paid more or less based on how that fund's doing."). Plaintiffs ignore the deposition testimony of the Trustees on this issue, as well as Fidelity's answer to the Trustee's question. Far from withholding any information from the Trustees, Fidelity's response directly answers the Trustees' question, providing an elaborate explanation of the components and structure of portfolio manager compensation. See Gerber Aff. Exhibit 2.

It is also misleading for Plaintiffs to contend that the amount of portfolio manager compensation was "consistently withheld" from the Trustees in light of the Trustees' testimony that compensation amounts are not necessary in order for them to assess the reasonableness of the fees paid to Fidelity. For example, Marvin Mann, the former Chairman of the Independent Trustees, testified:

> Q:   That wouldn't be a piece of information that you as a trustee would like to have, to know what portfolio manager compensation was?

11

> A:   No. What's important is – I mean, an important element is what are the expense – what is the expense of supporting the fund? What does it cost to manage the fund? That's an important element. Knowing each and every individual element of that cost is not important to the trustees.

Mann Tr. at 299:19-300:9.

Similarly, the current Chairman of the Independent Trustees, Ned Lautenbach, testified:

> A:   No, we have never seen specific people's compensation package. We have seen structures of how they're put together and what they're paid on and the range of what people will be paid, but its never been our belief that we need to see how each fund manager's paid.

Lautenbach Tr. at 170:17-171:7; see also Stavropoulos Tr. at 256:16-258:13 (explaining that the Trustees are able to adequately assess fund profitability and economies of scale based on the aggregated cost data that Fidelity provides). Plaintiffs' conclusory, two-paragraph discussion of this issue in their Renewed Motion disregards all of this testimony.[3]

### IV.  THE COMPENSATION PAID TO PORTFOLIO MANAGERS IS HIGHLY CONFIDENTIAL AND THE EXISTING PROTECTIVE ORDER IS INSUFFICIENT TO ADEQUATELY PROTECT IT

Portfolio manager compensation is extraordinarily sensitive from a competitive standpoint. See Fidelity's 7/09/07 Opp. at 21-23. Portfolio managers are among Fidelity's most valuable assets, and Fidelity is in a constant battle for talent with other entities, including hedge funds. See, e.g., Fund Alarm, "Highlights and Commentary," ("For several years, [Fidelity] has been losing managers to hedge funds.") available at http://www.fundalarm.com/arc0102.htm; see also Stansky Tr. at 126:15-22 (Fidelity portfolio manager noting that he has been approached by

---

[3] Plaintiffs' Renewed Motion also contends that Fidelity has made portfolio manager compensation relevant because some documents indicate that an increase in portfolio manager compensation may contribute to an adviser's diseconomies of scale in managing a fund. See Pl. Mem. at 3-4 (claiming that Fidelity "cite[s] portfolio manager compensation as a primary reason why the … Fidelity funds … do not enjoy economies of scale"). As discussed at the July 18 oral argument when Plaintiffs made the same exact argument, this is a red herring. Fidelity is not taking this position in this litigation, and it does not
(continued . . .)

12

hedge funds "many times."). Given this intensely competitive environment, it is vital that Fidelity keep its compensation information confidential. See Mann Tr. at 301:3-12 ("[Compensation is] one of the most tightly held things in the mutual fund industry …."). Even within Fidelity, information about individual compensation is a closely guarded secret, with only the most senior executives of the company having access to the information and only on a "need to know" basis. Plaintiffs have conceded the confidential nature of this information. See, e.g., 7/18/07 Tr. at 32 (Plaintiffs' counsel: "We do recognize that its [sic] sensitive information ….") (Dittmar Aff. Exhibit A).

In addition, courts have recognized that information about an individual's personal records, including financial records, implicates privacy concerns, and thus should not be subject to discovery unless plaintiffs make a higher showing of relevance.[4] At a minimum, the nature of this information means that Plaintiffs are not entitled to the benefit of the doubt with regard to its discoverability.[5] Notably, courts have held that such information is immune from disclosure even when a protective order exists. See, e.g., In Re ANC Rental Corp., No. 02-148, 2002 U.S.

---

intend to use the amounts of portfolio manager compensation at trial for any purpose. 7/18/07 Tr. at 33 (Dittmar Aff. Exhibit A).

[4] See Fitzgerald v. Morrison, No. 00-2247B, 2002 Mass. Super. LEXIS 37, at *4 (Mass. Super. 2002) (denying motion to compel production of personnel file and noting that "individuals have a heightened privacy interest in such records"); Afrow v. Cumberland Farms, Inc., No. 95-1669-A, 1996 Mass. Super. LEXIS 494, at *9-10 (Mass. Super. 1996) (denying discovery regarding employees' medical conditions because employees' privacy interests outweighed plaintiff's need for information); Flores v. Albertson's Inc., No. CV 01-0515-PA, 2004 WL 3639290, at *3 (C.D. Cal. Apr. 9, 2004) (value of disclosing social security number in the discovery process does not outweigh the potentially prejudicial effects); Flores v. Amigon, 233 F. Supp. 2d 462 (E.D.N.Y. 2002) (prohibiting discovery of immigration status where potentially prejudicial effect outweighed any probative value).

[5] Notably, named Plaintiff Cindy Schurgin refused to produce many of her personal brokerage account statements to Fidelity, citing privacy concerns. See Schurgin Tr. at 39:24-41:2. Plaintiffs are holding themselves to a different discovery standard than the one to which they seek to hold Fidelity. See Fidelity's 7/09/07 Opp. at 24-25.

Dist. LEXIS 12260 at *4-5 (E.D. Pa. June 20, 2002) (refusing to order production of confidential financial information and noting that a protective order would not be an adequate safeguard); Berrie v. Berrie, 457 A.2d 76, 82 (N.J. Super. Ct. 1983) ("the right of privacy with respect to personal financial affairs and confidential business information far outweighs the necessity for disclosure" and "[a]ny…'protective order' would be more nominal than real").  Here, the existence of a Protective Order is insufficient under the circumstances given the very real risk of inadvertent disclosure.  Plaintiffs intend to give this compensation information to their experts Pomerantz and Lamb, both of whom are regularly engaged as experts in similar litigation against other mutual fund advisers.  In addition, Mr. Pomerantz currently works for Gordon Asset Management, a competitor of Fidelity.  It is hard to imagine how these experts could compartmentalize Fidelity compensation information from their other professional endeavors.  The risk of inadvertent disclosure would also be compounded by the fact that this information would be circulated among multiple plaintiffs' law firms, additional experts or vendors used by Plaintiffs.

**CONCLUSION**

Plaintiffs have failed to make the "further and much stronger showing of need" required by the Court, and the Renewed Motion should be denied.

Dated: October 2, 2007

        Respectfully submitted,

        GOODWIN PROCTER LLP
        /s/ James S. Dittmar
           James S. Dittmar, P.C. (BBO# 126320)
           David Apfel (BBO# 551136)
        Exchange Place
        53 State Street
        Boston, MA 02109
        Tel: 617-570-1000

        MILBANK, TWEED, HADLEY &
        M<sup>C</sup>CLOY LLP
           James N. Benedict (*pro hac vice*)
           Sean M. Murphy (*pro hac vice*)
           Robert J. Liubicic (*pro hac vice*)
           Mia Korot (*pro hac vice*)
        1 Chase Manhattan Plaza
        New York, NY 10005-1413
        Tel: (212) 530-5000
        Fax: (212) 530-5219

        *Attorneys for Defendants Fidelity Management*
          *& Research Company and FMR Co., Inc.*