UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT *et al*., <br> for the use and benefit of <br> FIDELITY MAGELLAN FUND, FIDELITY <br> CONTRAFUND, FIDELITY GROWTH & <br> INCOME PORTFOLIO I FUND, FIDELITY <br> BLUE CHIP GROWTH FUND, and <br> FIDELITY LOW-PRICED STOCK FUND, <br> <br>      Plaintiffs, <br> <br>   v. <br> <br> FIDELITY MANAGEMENT & RESEARCH <br> COMPANY and FMR CO., INC., <br> <br>      Defendants. | No. 04-cv-11651-MLW <br> (Lead Case) <br> <br> No. 04-cv-11756-MLW <br> (Consolidated Case) |

**PLAINTIFFS' OPPOSITION TO MOTION FOR A PROTECTIVE
ORDER TO QUASH THE DEPOSITION NOTICE OF EDWARD C. JOHNSON 3d**

## I.  INTRODUCTION

Plaintiffs Cynthia A. Bennett *et al.* hereby oppose the Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d ("Motion to Quash") filed by Defendants Fidelity Management & Research Company and FMR Co., Inc. ("Fidelity").

As shown below, the plaintiffs are entitled to take Mr. Johnson's deposition and are wholly justified in noticing the deposition at this stage of discovery. By every indication, Mr. Johnson has been a central player in much of the high-level decision-making that has taken place at Fidelity and which is at issue in this case. By virtue of his various leadership positions and his family's majority ownership of the privately-held Fidelity, Mr. Johnson appears to have been involved in or close to virtually all of the main areas of discovery inquiry in this case.

This is not some small personal injury case where the plaintiff seeks to depose a corporate president simply as a form of harassment. This is a case involving the decisions, practices and policies pursued at the highest levels of Fidelity, and, consequently, the highest

executives and trustees at Fidelity are necessarily involved.  The plaintiffs' efforts to depose Mr. Johnson are neither unjustified nor abusive.  Given Mr. Johnson's central role in Fidelity's operations, particularly its mutual fund business, the plaintiffs would be remiss if they did not seek Mr. Johnson's deposition.

## II.  <u>BACKGROUND</u>

The plaintiffs initially identified Edward C. Johnson 3d as an anticipated witness in this case as part of their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1).  The disclosures filed by the *Bennett* plaintiffs and the *Haugen* plaintiffs on October 3, 2005 and September 30, 2005, respectively, both list Mr. Johnson as an individual likely to have discoverable information relevant to this matter.

As the defendants acknowledge in their Motion to Quash, Mr. Johnson was always on the plaintiffs' informal list of whom they might choose to depose.  *See* Memorandum in Support of Motion to Quash at 17.  During discovery, the plaintiffs tried to work within the deposition limits set by the Court and proceeded from deponent to deponent in what they considered to be the most logical, efficient and expeditious manner possible.  Even with Mr. Johnson's deposition, the plaintiffs will complete discovery within the twenty-deposition limit set by the Court.

Also, as is the generally preferred practice, the plaintiffs have worked their way up the personnel ladder within Fidelity, choosing to first depose a Rule 30(b)(6) witness, followed by a number of portfolio managers, then independent trustees, and finally the firm's higher executives.  As is clear from the deposition scheduling, the plaintiffs have done everything they can to avoid taking unnecessary depositions or the depositions of higher level executives where a lower level executive might be more informative.  It is no coincidence that, at the last stages of fact discovery, the plaintiffs are scheduled to take the depositions of J.S. Wynant (Fidelity CFO); Abigail Johnson (former President of FMR Co.) and Drew Lawton (President of Fidelity's institutional asset management affiliate).  These depositions have been scheduled towards the

end of discovery so that (i) they could be cancelled in the event they became unnecessary; and (ii) they could proceed as efficiently as possible should they go forward.[1]

In early September, the plaintiffs' counsel orally informed the defendants' counsel of their intention to depose Mr. Johnson. This oral notice was followed up with a written notice of deposition on September 13, 2007. While the defendants cite the timing of this notice as evidence of the plaintiffs' intent to burden, inconvenience and harass Mr. Johnson, exactly the opposite is true. The plaintiffs have not wanted to depose Mr. Johnson (or, indeed, any other witness) unless it appeared necessary to do so. The fact that the plaintiffs decided towards the end of the discovery period to notice Mr. Johnson's deposition reflects their efforts at trying to avoid the deposition, if possible, and only requiring it when it became apparent that Mr. Johnson's testimony was going to be a necessary part of discovery.[2]

As shown below, the plaintiffs are not only well within their rights to seek Mr. Johnson's deposition, his testimony is relevant and probative on virtually all of the central issues in this case.

---

[1] As Fidelity's Motion to Quash also makes clear, the plaintiffs have done what they could to streamline discovery where possible. The plaintiffs have already agreed to forgo a number of previously requested depositions, now believing them to be unnecessary. The plaintiffs also will complete fact discovery without using all twenty of the depositions previously allowed them by the Court. *See* Memorandum in Support of Motion to Quash at 2.

[2] The defendants' argument that the plaintiffs are only seeking Mr. Johnson's deposition as a "last-ditch harassment tactic" is unfounded bunk. The plaintiffs and their counsel remain resolute in the strength of their claims and are taking discovery with the full expectation that this matter is going to trial. This case is entirely different from any other mutual fund litigation currently taking place, and the plaintiffs believe they are doing the just and proper things by trying to recover the excessive management fees charged by Fidelity. As Plaintiff Cynthia Shurgin explained in her deposition:

> Q: What do you believe you will receive for participating as a named plaintiff in this action?
> A: Nothing.
> Q: So why is it that you agreed to do this if you are not receiving a benefit?
> A: ***I do not always have to receive benefit for doing something that I feel is right.***
> Q: Has anyone promised you anything, even informally, for your services as a named plaintiff in this case?
> A: No.
> Q: Did anyone ever suggest you get some additional money for being a named plaintiff if the case is successful?
> A: No.

C. Shurgin Depo. at 21 (emphasis added).

### III.    ARGUMENT

**A.    The Broad Rules And Practices Permitting Discovery Clearly Allow For Mr. Johnson's Deposition**

Rule 26(b)(1) provides the broad scope of discovery, stating that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of the other party . . ..  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1) (2007).  "It is well established that the Rules of Civil Procedure contemplate broad and liberal discovery."  *Fairbanks v. American Can Co.,* 110 F.R.D. 685, 687 (D. Mass. 1986).  "The Supreme Court has long recognized that the Federal Rules of Civil Procedure are to be construed liberally in favor of discovery."  *SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000), citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

These broad discovery provisions expressly apply to depositions as well.  "[D]eposition-discovery rules are to be accorded a broad and liberal treatment.  This is because mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  *Klosnoski v. Mahlab*, 156 F.3d 255, 268 (1st Cir. 1998), quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

Further, Fed. R. Civ. P. 26(c) requires that "good cause" be shown for a protective order to be issued such as that sought by the defendants in this case.  The burden of showing the need for a protective order is on the party resisting discovery, in this case the defendants.  *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973); *see also Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir. 1981).  The moving party must show good cause with a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  *General Dynamics Corp.*, 481 F.2d at 1212.  "[I]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary

circumstances, such an order would likely be in error." *Salter v. Upjohn Co.*, 593 F.2d 649, 651

(5th Cir. 1979); *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 144 (D. Mass. 1987).

The defendants have not met this burden, as explained more fully below, and their motion

for protective order should be denied.

### B.    Mr. Johnson's Central Position And Control Over Matters Within Fidelity Require That He Be Deposed In This Matter

The claims being brought against Fidelity for excessive mutual fund management fees

under Section 36(b) necessitate the type of high-level discovery that the plaintiffs have been

taking and which they seek to continue with Mr. Johnson.  A case of this nature brings, at a

minimum, the following matters under scrutiny:  (i) the process for reviewing, assessing, and

setting mutual fund management fees; (ii) the responsibilities, dealings and independence of the

mutual fund's board of trustees; (iii) the profitability of the mutual fund to the management

company; (iv) the services provided to the mutual fund customers; (v) the existence and sharing

of economies of scale; and (vi) the management company's pricing and provision of comparable

management services to other accounts, including institutional investors.[3]  Not surprisingly, the

highest executives, personnel and trustees are the ones with discoverable information on these

topics.  Mr. Johnson is no exception.  In fact, Mr. Johnson is anticipated to be a key witness with

respect to the practices, guidelines and policies in place at Fidelity with respect to each of these

subjects.

By virtue of his titles and formal offices alone, Mr. Johnson clearly is an appropriate

deponent in this action.  In and around the relevant time period, Mr. Johnson has been the Chief

Executive Officer, Chairman, and a Director of FMR Corp., which is the parent entity that

---

[3] Although the defendants' Memorandum in Support of the Motion to Quash cites *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, (2d Cir. 1982), for the framework of a Section 36(b) claim alleging excessive fees, the First Circuit has not determined that the *Gartenberg* framework applies, and the plaintiffs do not concede that the *Gartenberg* standard should be applied in this case.  *Dumond v. Massachusetts. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *4 (D. Mass. Jan. 19, 2006) (acknowledging the uncertain status of *Gartenberg* in the First Circuit); *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12 (D. Mass. Mar. 28, 2005) ("The First Circuit has not expressly adopted the Gartenberg factors or established a specific pleading standard for § 36(b) claims.").

oversees Fidelity's mutual fund business, institutional account management, and other enterprises. He also actively participates in the FMR Corp. Management Committee, which consists of the primary business heads reporting to FMR Corp., among others. *See* Reynolds Depo. at 63 (Deposition excerpts are attached hereto as <u>Exhibit A</u>).

During the relevant period, Mr. Johnson also has been a Director, Chairman of the Board, and Chairman of the Executive Committee of Fidelity Management & Research Company, one of the defendants in this matter. He also has served as the Chairman and a Director of FMR Co., Inc., the other defendant in this matter. He has been the President of numerous Fidelity mutual funds.

Mr. Johnson also has served for decades as Chairman of the Fidelity Board of Trustees. The Board of Trustees, of course, is charged on an annual basis with reviewing, negotiating and setting the very management fees at issue in this case. The Board of Trustees also is responsible as a watchdog for the rights of investors who purchase Fidelity mutual funds. The Trustees owe a fiduciary duty to the mutual fund investors pursuant to the Investment Company Act of 1940. Similarly, the two defendants, Fidelity Management & Research Co. and FMR Co., Inc. owe a fiduciary duty to the mutual fund investors to charge a reasonable fee. Mr. Johnson served as the head of both entities on opposite sides of the transaction that negotiated the fees for the mutual funds, presenting the clear potential for conflicts of interest and breaches of duty in setting those fees. These conflicts and dynamics are at the core of this case.

Beyond his formal positions, Mr. Johnson exerts a profound amount of control and influence over all aspects of Fidelity's mutual fund business. This is not surprising as Fidelity was founded by Mr. Johnson's father in 1946, Mr. Johnson has worked at Fidelity since 1957, and he holds a controlling interest in the privately-held company with other members of his immediate family. Discovery has shown that, as a practical matter, much of the decision-making within Fidelity begins and ends with Mr. Johnson. For example, when asked about the succession of executives within FMR Corp., Robert Reynolds acknowledged that "titles were not important." Mr. Reynolds confirmed that Mr. Johnson essentially assumed the role of President

in 2000 without taking the formal title, suggesting that whether he was "CEO," "Chairman" or "President," Mr. Johnson was in charge of FMR Corp. without peer. *See* Reynolds Depo. at 72.

Mr. Johnson also appears to have been in charge of all major corporate structural and personnel changes bearing on the mutual fund business. As an example, it was his ultimate decision in 2005 to change the senior executive officer of Fidelity Management and Research Co.[4] The plaintiffs assert that this management change followed some years of lackluster performance and declining mutual fund assets complex wide. When FMR Corp. COO Robert Reynolds decided to retire, Mr. Johnson alone decided to parcel certain of Reynolds's responsibilities among two other executives while himself taking on the responsibility for overseeing Fidelity Management and Research Co. *See* Reynolds Depo. at 71-72. Mr. Johnson also appears responsible for transferring Portfolio Manager John McDowell's responsibilities away from the daily management of the Blue Chip Growth Fund to head a new initiative focusing on large cap research. *See* McDowell Depo. at 10.

Mr. Johnson also is directly involved in setting the compensation of at least the largest mutual fund portfolio managers and top executives. *See* Stavropoulos Depo. at 220; Reynolds Depo. at 70-71. Of course, the compensation paid to portfolio managers is a central issue in this case because the level of compensation directly impacts the fund's profitability to Fidelity as the advisor, and also can affect whether any economies or diseconomies of scale are being realized by the funds. Mr. Johnson also appears to have been the architect of (or at least a major contributor to) the compensation program through which portfolio managers are given an ownership interest in other Fidelity entities as part of their yearly compensation. *See* Mann Depo. at 196.

In his work with the Fidelity Board of Trustees, Mr. Johnson appears to interview each and every trustee candidate before they are approved to serve, *see* Lautenbach Depo. at 22; Knowles Depo. at 46; Stavropoulos Depo. at 11; McCoy Depo. at 55; and will offer his substantive comments and opinions on potential candidates, *see* McCoy Depo. at 55-56. As

---

[4] For purposes of this motion, the defendants do not contest Mr. Johnson's role in this management change.

Chairman of the Fidelity Board of Trustees, Mr. Johnson is described as keeping informed of issues throughout the deliberative process and committee analysis, prior to issues reaching the full Board and even where the issues are being primarily addressed by the Board's independent trustees.  *See* Stavropoulos Depo. at 249-50.  Discovery also has shown that if a Trustee wanted to accomplish something significant within Fidelity, he needed the approval or at least the support of Mr. Johnson.  For example, when certain Trustees became concerned about the performance of certain mutual funds and believed that personnel changes were in order, they went to Mr. Johnson to enlist his support.[5]

These examples of Mr. Johnson's activities and influence at Fidelity, which have only arisen anecdotally through discovery, show that he was and continues to be an active, hands-on executive and Trustee with substantial control over and input into Fidelity's mutual fund business.  He is directly involved in the factual subjects listed above that are at issue in this case.  The more discovery that is conducted, the clearer it becomes that Mr. Johnson is a critical, central figure who must possess substantial knowledge of key discoverable issues.

In addition to the depth and breadth of his involvement in Fidelity's mutual fund business, Mr. Johnson also brings a unique perspective to two critical issues in this case because of his longevity with Fidelity.  The first issue involves the actual creation and implementation of Fidelity's unusual fee structure for its mutual fund products.  In simple terms, the management fee charged to customers consists of two parts;  a group fee and an individual fund fee.  The level of the individual fund fee is generally linked to the nature of the fund, with funds invested in similar styles having similar fees.  The group fee, on the other hand, varies with the total mutual fund assets Fidelity has under management, complex-wide.  The more assets Fidelity has under management, the smaller the group fee rate, and vice versa.  Fidelity has claimed that any economies of scale in the largest funds are shared with customers through this group fee component.  It is believed that Fidelity's group fee structure is substantially different from the

---

[5] For purposes of this motion, the defendants do not contest that the Trustees have discussed with Mr. Johnson personnel changes at Fidelity.

structure of fees and breakpoint schedules used by virtually every other mutual fund company in the industry. There is a serious question as to whether this fee structure violates the defendants' fiduciary duties and results in excessively high management fees.

To date, the plaintiffs have gotten very little discovery concerning the background, considerations and thinking behind Fidelity's fee structure and its creation and implementation because it predates the tenure at Fidelity of all witnesses deposed to date. Given Mr. Johnson's history with Fidelity, the plaintiffs believe he is the best possible witness to speak on the subject of Fidelity's mutual fund fee structure.

Similarly, many of the issues concerning economies of scale, Fidelity's ability to measure such economies, and Fidelity's policies for fulfilling its obligations for sharing such economies with its mutual fund customers predate the witnesses who have been available so far. Fidelity purportedly conducted a comprehensive economies of scale analysis in 1994. When trustees have raised issues concerning economies of scale in subsequent years, they often are referred back to the 1994 report and informed that the particular economies-of-scale issue has been previously examined and resolved. The 1994 report reflects many policy decisions put in place at the time, and the report's conclusions have been repeatedly cited in subsequent years. The plaintiffs have had limited discovery concerning these economies of scale issues because, again, the oft-relied-upon 1994 report predates all of the witnesses deposed to date. Given his history, Mr. Johnson is in a unique position to address this key subject and related matters, which again go to the central issues in this case.

### C.    The Cases Cited By Defendants Are Inapposite Given The Circumstances Surrounding The Plaintiffs' Need To Depose Mr. Johnson

The cases cited by the defendants in support of their Motion to Quash actually confirm that Mr. Johnson's deposition is appropriate in this case. Some courts have recognized an "apex deposition doctrine," which is designed to prevent litigants from abusing high-level corporate executives by seeking discovery from them solely because of their position rather than because the executives possess any pertinent information. In *Mulvey v. Chrysler Corp.*, for example,

cited by the defendants, the Court considered the appropriateness of deposing Lee Iacocca, Chairman of the corporate defendant, in connection with a personal injury clam resulting from a defective fuel system in a Chrysler car.  106 F.R.D. 364, 366 (D.R.I. 1985).  The Court noted that Mr. Iacocca was a "singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse."  *Id.*  In addition, Mr. Iacocca had submitted an affidavit to the Court professing ignorance of the information sought by the plaintiffs.  *Id.*  Nevertheless, the Court ruled that the plaintiffs could seek discovery from Mr. Iacocca in the form of interrogatories and only then through deposition should the interrogatory responses be insufficient.[6]  *Id.*

In *Digital Equipment Corp. v. System Indus., Inc.*, also cited by the defendants, the Court clearly acknowledged that "[w]hen a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president is subject to deposition."  108 F.R.D. 742, 744 (D. Mass. 1986), citing *CBS, Inc. v. Ahern*, 102 F.R.D. 820 (S.D.N.Y. 1981).  The Court only felt compelled to quash the deposition of Digital Equipment's President because the defendants' counsel clearly stated on the record of another deposition that he was going to "waste" the time of the President by noticing his deposition.  "[W]hen the party noticing the deposition states in language so transpicuously clear that he is going to 'waste' the time of the deponent . . ., the Court cannot disagree with the plaintiffs that the deposition was noticed for the purposes of harassment and annoyance."  *Id.*

The case at bar does not involve a renegade "apex deposition."  The plaintiffs are not seeking to depose Mr. Johnson simply to harass a high-level executive with no connection to or knowledge of the facts and issues pertinent to this case.  Instead, the plaintiffs seek to depose Mr. Johnson because of his central and controlling position at Fidelity and his direct involvement in the matters centrally relevant to this case.  The plaintiffs' challenge to the excessive management fees being charged by Fidelity implicate the firm's policies, planning, and practices at their

---

[6]  Also distinguishing the case at bar is the fact that Chrysler was a huge publicly-held company whereas Fidelity is privately held and controlled by one family, the Johnsons, with Mr. Johnson as an active, hands-on manager controlling the aspects of the business at issue in this case.

highest levels. A person in Mr. Johnson's position, with his level of control and involvement, would be expected to be a witness in a case such as this.

It is most telling that the defendants nowhere argue that Mr. Johnson does not possess any relevant or discoverable knowledge. Before seeking the Court's protection in the *Mulvey* matter, Lee Iacocca at least submitted an affidavit stating that he had no knowledge of the relevant subject matter. Here the defendants do not and indeed cannot make that claim. Instead they argue that the plaintiffs can obtain relevant information from other sources. Not only do the plaintiffs strongly disagree with that assertion, but such an argument is insufficient grounds for claiming that Mr. Johnson deserves the Court's protection against a standard deposition notice. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (allowing the deposition of publisher George Hearst over the objection that the deposition would be repetitious of what plaintiff had learned from other sources); *Wright v. Patrolmen's Benevolent Ass'n*, 72 F.R.D. 161, 164 (rejecting motion to bar depositions brought on grounds that the information sought was discoverable from other sources); *Gill v. Stolow*, 18 F.R.D. 323, 323-24 (S.D.N.Y. 1955) (rejecting motion to quash deposition brought on grounds that plaintiff already had full and complete examinations of other witnesses). As the Court noted in *Mulvey*, "if Mr. Iacocca has any information, albeit inadmissible as evidence, ***reasonably*** calculated to lead to the discovery of admissible evidence, he must be required to reveal the same. His prestigious position is an unimpressive paper barrier shielding him from the judicial process . . .." *Mulvey*, 106 F.R.D. at 366 (emphasis in original).

### D.    The Defendants Cannot Avoid Mr. Johnson's Deposition Simply By Claiming That The Plaintiffs Have All Of The Information They Need

The Defendants attempt to argue that Mr. Johnson's deposition will be superfluous based on the fact that all of the purportedly relevant issues in this case already have been addressed by the documents, interrogatory responses and other deponents made available by the defendants. *See* Memorandum in Support of Motion to Quash at 5-12. Not only is this assertion

unsupportable, even if it were true it could not provide a basis for quashing Mr. Johnson's deposition notice.

With all due respect, it is impossible for the defendants to know all of the details and strategies of the plaintiffs' case, so it is impossible for them to assert that all relevant issues in this matter have been sufficiently addressed by prior discovery. The plaintiffs strongly disagree that discovery is complete. While the plaintiffs will admit that a substantial amount of paper has been produced by the defendants, the plaintiffs still are seeking much additional information concerning this case. The plaintiffs expect that a significant amount of additional information will be forthcoming in the discovery events that still are to take place, including the deposition of Mr. Johnson. As set forth above, the plaintiffs believe Mr. Johnson to be in a unique position as a senior executive, Board of Trustees Chairman, controlling shareholder, and long-time Fidelity employee/executive to address many of the remaining open issues as well as to provide his unique point of view on some of the subjects that already may have been discussed by other witnesses or other documents.

The mere fact that deponent already may have been questioned about a certain topic does not put that topic off-limits for all subsequent deponents. As the Court noted in *Travelers Rental Co.*, simply because more than one witness may be asked about the same subject matter does not render that discovery **unreasonably** duplicative and cumulative. *Travelers Rental Co.*, 116 F.R.D. at 145. In discussing the potentially different perspectives of different witnesses on the same subject, the Court noted:

> Lower-level executives may have greater knowledge of the manner in which the plan was implemented or administered. The lower-level executives may even have their own views as to why the plan was implemented or administered in a particular way. But those with greater authority may have the last word on why Ford formulated and/or administered the plan in the manner which the lower-level executives described it as being formulated and/or administered. And as the ultimate authority, their views as to why may be of far greater probative value on the issue of intent and motive than the views of the lower-level executives

*Id.* at 146.

The plaintiffs also must take issue with the defendants' claim that the deposition of Robert Reynolds, the retired COO of FMR Corp., would render the entire deposition of Mr. Johnson cumulative. In the first instance, short of some improper collusion, it is impossible to contend that one witness will testify exactly the same as a previous witness on all of the topics at issue in this case. That is particularly true where Mr. Reynolds and Mr. Johnson come from entirely different perspectives in their management roles at Fidelity. Mr. Johnson has spent most of his adult life at Fidelity working in and managing all aspects of the business. Mr. Reynolds, on the other hand, worked his way up in Fidelity through its trust management company and its employee retirement and employer services divisions. His work as COO continued to focus primarily on Fidelity's retirement services and employer services, with limited focus on the mutual fund business. The plaintiffs believe that, during the period relevant to this case, Mr. Reynolds and Mr. Johnson concentrated on and were responsible for entirely different aspects of Fidelity's business. And, as a practical matter, Mr. Reynolds never had the clout, responsibility or involvement that Mr. Johnson did in all aspects of Fidelity's business as Chairman of the Board of Trustees, President, and controlling shareholder.[7]

Clearly the defendants have not met their burden in showing good cause for why the plaintiffs should be altogether prohibited from deposing Mr. Johnson. Without showing some "extraordinary circumstances" to justify their request, the defendants cannot avoid the standard discovery provisions of the civil rules. *See Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 144 (D. Mass. 1987).

---

[7] The plaintiffs disagree with the defendants' characterization of Mr. Reynolds's deposition as a comprehensive font of valuable information. Although Mr. Reynolds was asked a wide variety of questions and did not withhold answers, his testimony was largely superficial and lacked any real depth on the most substantive matters of the case. Before the deposition even took place, the defendants' counsel downplayed the significance of Mr. Reynolds's testimony, claiming that, despite his high position at Fidelity, Mr. Reynolds was more of a "salesman" than a weighty executive with far-flung management responsibilities. After conducting the deposition, the plaintiffs' counsel could not disagree with that characterization. It is surprising that the defendants now try to claim with a straight face that Mr. Reynolds's testimony eliminates the plaintiffs' need to depose Mr. Johnson.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court deny the Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d, award the plaintiffs their costs and attorneys fees in having to oppose this motion, and award the plaintiffs such other and further relief as it deems just and proper.

By:_____s/ Matthew J. Tuttle_____
    Michelle H. Blauner BBO # 549049
    SHAPIRO HABER & URMY LLP
    Exchange Place
    53 State Street
    Boston, MA  02109
    (617) 439-3939

    Lynn Lincoln Sarko
    Michael D. Woerner
    Laura R. Gerber
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    Telephone: (206) 623-1900

    Gary Gotto
    Ron Kilgard
    KELLER ROHRBACK P.L.C.
    National Bank Plaza
    3101 North Central Avenue, Suite 900
    Phoenix, AZ  85012
    Telephone: 602-248-0088

    **Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin**

    Harry S. Miller, BBO# 346946
    Robert D. Friedman, BBO# 180240
    Matthew J. Tuttle, BBO# 562758
    Joshua Cook, BBO# 660346
    BURNS & LEVINSON LLP
    125 Summer Street
    Boston, MA  02110
    (617) 345-3000

    **Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller**

14

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 17th day of October 2007, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>    s/ Matthew J. Tuttle                    </u>

01180258