UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CYNTHIA A. BENNETT, GUY E. MILLER,  )
NANCY HAUGEN, MICHAEL F. MAGNAN, )
KAREN L. MAGNAN, PRESLEY C.        )    CIVIL NO. 1:04-cv-11651-MLW
PHILLIPS, ANDREA M. PHILLIPS, and   )    (Lead Case)
CINDY SCHURGIN, for the use and benefit of )
THE FIDELITY MAGELLAN FUND,     )    CIVIL NO. 1:04-cv-11756-MLW
FIDELITY CONTRAFUND, FIDELITY    )    (Consolidated Case)
GROWTH & INCOME PORTFOLIO I FUND, )
FIDELITY BLUE CHIP GROWTH FUND and )
FIDELITY LOW-PRICED STOCK FUND,   )
                           )
                Plaintiffs,   )
                           )
     v.                       )
                           )
FIDELITY MANAGEMENT & RESEARCH  )
COMPANY and FMR CO., INC.,        )
                           )
                Defendants.  )
                           )

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENLARGE THE PERIOD FOR DISCOVERY FOR THE LIMITED PURPOSE OF CONDUCTING A HALF DAY DEPOSITION OF DONALD KIRK

### I. INTRODUCTION

Plaintiffs respectfully submit to the Court this Memorandum in Support of Plaintiffs' Motion to Enlarge the Period for Discovery for the Limited Purpose of Conducting a Half Day Deposition of Donald Kirk, pursuant to Fed. R. Civ. P. 6(b), Fed. R. Civ. P. 29, and Local Rule 26.1(a)(2). Following review of Mr. Kirk's documents, Plaintiffs believe that Mr. Kirk has unique information relevant to important issues in this case that prior witnesses have been unable to address when deposed. Due to Mr. Kirk's role on the Fidelity Board of Trustees as the Chair of the Audit Committee, Mr. Kirk personally provided input to Fidelity regarding the structure of its group fee rate schedule, as well as the annual fund profitability materials. Mr. Kirk also

played a key role in examining the work of the Fund's auditors, and was Chair of the Audit Committee at a different time during the damages period than his successor, Marie Knowles. For these reasons, Plaintiffs seek an order from the Court enlarging the period for discovery sufficient for the purpose of conducting a half day deposition of Mr. Kirk.

## II.    PLAINTIFFS HAVE DILIGENTLY PURSUED DISCOVERY IN THIS MATTER

On September 19, 2006, this Court set a discovery schedule requiring that fact discovery close by the end of September 2007, and limiting Plaintiffs to 20 depositions.  In light of the deposition limits set by the Court, Plaintiffs have been judicious in their deposition scheduling, and have cancelled depositions when it has appeared that information in a deposition would be cumulative following review of a potential deponent's documents. To wit, Plaintiffs had noticed the deposition of former Independent Trustee Ralph Cox for September 12, 2007; however, following review of Mr. Cox' documents, Plaintiffs' counsel determined that his deposition was not necessary.

Former Independent Trustee Donald Kirk was listed on the Defendants' Initial Disclosures, dated February 1, 2006, as a person likely to have discoverable information that the disclosing party may use to support its claims or defenses. Plaintiffs were informed on July 12, 2007, that Defendants did not intend to call Mr. Kirk as a witness. Upon receipt of this information and consideration of Mr. Kirk's role on the Fidelity Board of Trustees, Plaintiffs' counsel determined that it would be necessary to review Mr. Kirk's documents prior to determining whether or not he should be deposed.

On August 10, 2007, counsel for Plaintiffs sent a letter to counsel for the Independent Trustees, John Kiernan and Shannon Selden of Debevoise & Plimpton LLP ("Debevoise") informing them that Plaintiffs wished to review Mr. Kirk's relevant documents to determine

whether his deposition would be necessary (Ex. A to Declaration of Nina H. Fields, Oct. 19, 2007 ("Fields Decl.")). In that letter, counsel for Plaintiffs requested guidance from the Trustees' counsel as to whether formal subpoenas would be required, and requested that the documents be produced in a reasonable time frame. *Id.* ¶ 3. On Friday, August 17, 2007, Ms. Fields was informed by counsel for Mr. Kirk that they intended to produce his documents by Monday, September 17, 2007. *Id.* ¶ 4. Through Ms. Fields' correspondence and discussions with the Trustees' counsel, she was led to believe that discovery could proceed informally and that a subpoena of Mr. Kirk's documents was not necessary. *Id.* ¶¶ 3-5.  On August 27, 2007, Ms. Fields reiterated her request to the Trustees' counsel that the Kirk document production be produced forthwith. Ex. B. to Fields Decl. She also confirmed her understanding that Debevoise would produce the Kirk documents without a subpoena. Fields Decl. ¶ 5.

On August 29, 2007, Shannon Selden responded to Ms. Fields and stated that Debevoise expected to produce Mr. Kirk's documents by September 17, 2007, if not earlier. Fields Decl. ¶ 6.  On September 17, 2007, Ms. Selden called Ms. Fields to request a two-day extension on the production of the Kirk documents, and Ms. Fields assented. Fields Decl. ¶ 7.

Despite the agreement between Debevoise and Plaintiffs' counsel that the Kirk documents would be produced on or before September 17, 2007 without a subpoena, in fact, the first batch of Mr. Kirk's documents was not sent out until Friday, September 21, 2007, and Plaintiffs' counsel at Keller Rohrback LLP ("Keller") did not receive the documents until Tuesday, September 25, 2007 – three business days before the close of discovery. (Ex. 1.[1])

---

[1] Citations to exhibits appearing as "(Ex    )" are references to exhibits to the Declaration of Laura R. Gerber, filed herewith.

Counsel at Keller immediately printed and began reviewing the 5882 pages in Mr. Kirk's first production. On October 17, 2007, Plaintiffs' counsel at Keller received a second batch of Mr. Kirk's documents by email.

By Friday, September 28, 2007, after reviewing Mr. Kirk's documents, Plaintiffs' counsel determined that it would be necessary to depose Mr. Kirk. Due to the discovery deadline and Fed. R. Civ. P. 6(b) and 29, as well as Local Rule 26.1(a)(2), Plaintiffs immediately called and sent a letter to Debevoise and counsel for the Defendants requesting that they work cooperatively with Plaintiffs to schedule a mutually agreeable date for Mr. Kirk's deposition and file a joint stipulated motion to enlarge the period for discovery to allow for Mr. Kirk's deposition after September 30, 2007. (Ex. 2.) The Defendants and Debevoise both refused to so stipulate. (Ex. 3, 4.) Despite the fact that since August 10, 2007, counsel for Mr. Kirk has been on notice that Plaintiffs intended to review his documents prior to deciding whether to depose him, and that since August 17, 2007, Debevoise had confirmed on multiple occasions that it was not necessary to subpoena Mr. Kirk's documents in order to receive them for review by September 17, 2007, Mr. Kiernan has now stated by letter of October 8, 2007 that Plaintiffs could have subpoenaed Mr. Kirk's documents. (Ex. 4.)

In an effort to accommodate any concerns that the Court or Trustees' counsel may have that the testimony sought would be duplicative of testimony provided in other trustee depositions, Plaintiffs move that the Court extend discovery to permit a half-day deposition of Mr. Kirk. Plaintiffs seek to depose Kirk as to topics that are unique to his documents, or that other trustees were unable to satisfactorily respond to when deposed.

### III.    THE TESTIMONY SOUGHT BY PLAINTIFFS IS UNIQUE, AND RELEVANT TO CLAIMS MADE IN THE CONSOLIDATED COMPLAINT

Mr. Kirk was on the Fidelity Funds' Board of Trustees from 1987 to 2004. During his tenure on the Board, Mr. Kirk served on various Committees, and was the Chair of the Audit Committee for many years. During this same period of time, the number of funds overseen by the Fidelity Board of Trustees increased such that at the time Mr. Kirk retired from the Board it had fiduciary responsibility for more than 300 funds.

Mr. Kirk is a Certified Public Accountant who started his career at Price Waterhouse in 1959 and from 1967 to 1973 was a partner at Price Waterhouse. (Ex. 5.) From 1973 to 1987, he was a member of the Financial Accounting Standards Board, serving as Chairman of that body for nine years. (*Id.*) From 1987 until 2000, Kirk was affiliated with the Columbia University Graduate School of Business. (*Id.*)

Due to Mr. Kirk's academic and professional background in accounting, and his titular and functional role on the Fidelity Board of Trustees as the Chair of the Audit Committee prior to and during the damages period, Plaintiffs believe he has unique information and insight regarding issues in the case not previously made the subject of deposition at other independent trustee depositions.

### A.    Kirk Has Unique Information Regarding Fidelity's Group Fee Structure During the Damages Period.

Plaintiffs bring this case on behalf of five mutual funds, alleging that Fidelity has breached its fiduciary duties by charging excessive fees for managing the named funds. Fidelity's management fee structure differs from many other mutual fund complexes and for equity funds includes three discrete percentage-based fees: (1) a "group fee"; (2) an individual fund fee; and (3) a performance adjustment. Statement of Additional Information, Fidelity

Contrafund, March 1, 2007 ("Contra SAI") (Ex. 6, pp. 26-28).  The group fee for each fund is pre-set based upon the monthly average net assets of all management contracts complex-wide and includes breakpoints that reduce at the margin the percentage fees charged to shareholders as the assets in the complex increase.[2] *Id.* The fund fee is a fixed percentage charged to each individual fund. *Id.* The performance percentage fee is adjusted upward or downward depending on whether the fund's investment performance for the measured period is better or worse than its benchmark. If the fund has outperformed its benchmark for the measured period, fund shareholders pay an increase in management fees. If the fund's performance has been poorer than its benchmark, fund shareholders pay less in management fees. *Id.*

According to *Gartenberg v. Merrill Lynch Asset Management Inc.,* 740 F.2d 190, 194 (2d Cir. 1984),[3] one of the factors to be considered when analyzing whether the fees being charged are excessive is whether economies of scale are shared with the fund shareholders. One of the key issues in this case is whether Fidelity has appropriately shared the economies of scale it realizes. *See Sins v. Janus*, No. 04-cv-02395, 2006 U.S. Dist. LEXIS 90673, at *12, (D. Colo., Dec. 15, 2006) (stating that a lack of breakpoints in fee structures demonstrates that savings from economies of scale are not being passed on to mutual funds if growth in funds' assets has not been matched by a proportional, as opposed to marginal, decrease in fees).  In the case of

---

[2] It is noteworthy that while the percentage fee may remain constant, the actual dollar fee will change based on the assets under management.  For example a fund with assets under management of $10 billion and a management fee of 0.50 percent will incur a management fee of $5 million.  If the fund's managers do nothing and the fund increases 10 percent with the overall market in the next year to $11 billion, the management fee incurred will be $5.5 million.  So the fee in dollars will have increased, although the percentage remained constant.

[3] Although the *Gartenberg* court established a framework that some courts have used to determine whether a fee violates § 36(b) of the Investment Company Act of 1940, the First Circuit has not determined that the *Gartenberg* framework applies, and Plaintiffs do not concede that the *Gartenberg* standard should be applied in this case. *Dumond v. Mass. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *4 (D. Mass. Jan. 19, 2006) (acknowledging the uncertain status of *Gartenberg* in the First Circuit); *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12 (D. Mass. Mar. 28, 2005) ("The First Circuit has not expressly adopted the Gartenberg factors or established a specific pleading standard for § 36(b) claims.").

Fidelity's group fee structure, witnesses deposed to date have stated that it is the mechanism by which any economies of scale relating to management fees are shared on a complex-wide basis among all the mutual funds managed by Fidelity. *See, e.g.,* Lautenbach Dep. Tr. at 93:20-25. The reality of this group fee structure for shareholders of the named funds is that big, profitable funds subsidize small, unprofitable funds and well-performing funds subsidize poorly performing funds, and the fees charged to a shareholder of an individual fund are inextricably tied to the fortune of all the other funds in the fund complex. Year after year, when renewing the management contracts for the funds, Fidelity's Board of Trustees has approved the status quo ante group fee structure in place since 1999, without any change in the fee or structure. *See* Knowles Dep. Tr. at 89:22 – 90:12 (Ex. 7.)

Review of Mr. Kirk's documents has shown that Mr. Kirk was the only trustee who had first-hand knowledge of the group fee structure. Mr. Kirk had personal discussions with Fidelity in his role as the Chair of the Audit Committee as to the appropriateness of the group fee rate structure for Fidelity's equity funds in 2002 and 2003. (Ex. 10.)  He also served as a gatekeeper as to the information and decisions regarding the appropriateness of the group fee breakpoints that was given to the other Trustees, and made recommendations to the Trustees based upon his personal discussions with Fidelity about the group fee. (Ex.11.) Additionally, Mr. Kirk was a Board member in 1999 when the last changes were made to the group fee schedule.

In particular, a February 14, 2003 memo from John Farinacci of Fidelity to Mr. Kirk reveals the following as to Kirk's leadership role on the Board of Trustees regarding negotiations of Fidelity's group fee for the mutual funds:

> In June 2002, Don Kirk, Chairman of the Audit Committee, asked FMR to evaluate whether we have the right group fee schedules in place for equity vs. fixed-income funds. FMR held meetings with Mr. Kirk in July and

> September 2002 and January 2003. At Mr. Kirk's request, FMR has documented the nature of his questions and the results of our analysis below.
>
> . . .
>
> At Mr. Kirk's request, FMR also investigated three alternative group fee scenarios.

(Ex. 10.) Thus, Mr. Kirk is the only Fidelity Independent Trustee with knowledge about the group fee structure breakpoints and the manner in which they were set for the equity funds throughout the damages period. To the best of Plaintiffs' counsels' knowledge, this component of Fidelity's management fee was reviewed by Mr. Kirk during 2002-2003, and then not reviewed at this level of detail again during the damages period by any other trustee. After completion of his 2003 review, Mr. Kirk told Fidelity's David Jones that he would recommend to the trustees that the issue of the group fee schedule "not be raised again until an updated economies of scale study is done." (Ex. 11.) The other trustee documents reviewed to date have not shown any similar level of analysis undertaken by an individual trustee as to Fidelity's group fee structure.

None of the five trustees deposed to date have been able to definitively recall when the group fee rate schedule was last re-negotiated to change breakpoints (as distinguished from merely adding new breakpoints to accommodate the growth in assets under management) although most of the trustees thought that it was probably in 1999. Ms. Knowles testified,

> Q: Do you recall specific negotiations that you just mentioned with Fidelity over the group fee rates that are on Page 27 of Exhibit 79?
>
> A: My understanding is that the last time those group fee rates were changed was 1999, and I was not a trustee at that time. I have, however, seen documents to the effect of the initial proposals by Fidelity, the responses by the trustees back and forth until an agreed-upon fee structure was established.

Q: So if I'm understanding you correctly, the fee schedule set forth on Page 27 of Exhibit 79 was something that was negotiated and went into effect sometime around 1999?

A: Yes. This is the group fee structure.

Knowles Dep. Tr. at 89:22 – 90:12 (Ex. 7).

Ned Lautenbach, who joined the Fidelity Board in 2000, confirmed Ms. Knowles's recollection of the group fee schedule negotiations. Mr. Lautenbach testified,

Q: How did -- how did the break points that are set out in this group rate schedule on Exhibit 27 come to be? Why do we have a break point at 210 billion as opposed to some other number?

A: Well, I'll tell you I'm not precisely sure because I wasn't here when they were negotiated, but they were negotiated in an arm's length way with Fidelity and these were then the break points that were agreed to, but I didn't go through that work.....

Q: Have you -- since you've been on the board have there been additional break points added?

A: No.

Q: So when you came on in 2000 the cap was already at 1,260,000,000,000?

A: Yeah, I believe so. I don't think any have been added since I've been here.

Q: Have you seen any study that was undertaken to determine where a break point should be?

A: Not where the break point should be.

. . .

Q: During the time that you have been on the board has there been any change in the basic fee structure for any of the five funds in this case?

A: I don't believe so.

Q: So each year they have all been renewed with the same group fee --

A: Group fee schedule

Q:  --including the group fee schedule and the same individualized fee associated with that fund?

A:  I believe that's right.

Q:  And since you've been on board there's been no change in the group fee schedule; is that correct?

A:  Right.

Lautenbach Dep. Tr. at 90:9-91:11, 228:7-22 (Ex. 8); *see also* Marvin Mann Dep. Tr. at 62:2-63:8 (confirming that group fee schedule has been in effect since at least 1999 and suggesting that higher breakpoints may have been added in 2004) (Ex. 9). As review of Mr. Kirk's documents and the testimony of the other trustees deposed to date show, it appears that no trustee has more knowledge of Fidelity's group fee structure and the manner in which the breakpoints were negotiated than Mr. Kirk. (Ex. 10, 11.)

**B.    As Audit Committee Chair, Mr. Kirk Expressed Concerns Regarding the Ability of the Trustees to Adequately Fulfill Their Fiduciary Duties to all the Funds.**

One of the most important factors that courts following *Gartenberg* have generally considered in determining liability in Section 36(b) cases is whether the independent trustees are fully informed, and the extent of care and conscientiousness with which they perform their duties in evaluating the fees charged by the fund adviser. *See Krinsk v. Fund Asset Management, Inc*., 875 F.2d 404, 412 (2d Cir. 1989).

In the case of the Fidelity complex, a unitary board of 12 to 14 individuals has had fiduciary responsibility for upwards of 300 of its mutual funds during the damages period. Minimally, this means that during the damages period these individuals had fiduciary responsibility for review and renewal or renegotiation of all the management contracts, transfer agent agreements, and service agreements for each fund on an annual basis, review and oversight

of each fund's performance, and review and oversight of the fund profitability methodology of the adviser over the funds, in addition to myriad other tasks and oversight functions of the board.

Recently, Fidelity has publicly announced that it plans to split in two the Board of Trustees in order to have effective oversight as the complex expands. (Ex. 12.) Fidelity has previously been criticized for the number of funds being overseen by one board.(*Id.)*

Mr. Kirk was a member of the Fidelity Board of Trustees until December 31, 2004 and an active Chair of the Audit Committee for many years. During 2004, Ms.  Knowles began to assume more responsibility, in anticipation of becoming Chair of Audit Committee following Kirk's planned retirement at the end of 2004. While the Plaintiffs have already deposed Ms. Knowles in this matter, Mr. Kirk's documents reveal that he was still providing most of the substantive input on auditing matters during the beginning of the damages period, not Ms. Knowles. Ms. Knowles, by her own admission, was still working to "muddle" through during that time. (Ex. 13.)

In his role as the Chair of the Audit Committee, Mr. Kirk was concerned about the scope of work that the Audit Committee and the Board had for the hundreds of Fidelity funds. (Ex. 14, 15.) Kirk anticipated being questioned as to how the Audit Committee should field responses to potential concerns that it would be difficult for even a single committee to oversee the financial reporting process and financial statements for just 50 to 100 funds, never mind, as in the case of Fidelity, many more funds. (Ex. 14.) Kirk suggested that the goal of Fidelity's financial reporting disclosure should be to say that the Fidelity process and audit committee role produced the same substantive results, and in effect, the same scrutiny, as if they were just the Audit Committee for one fund.  (Ex. 15.) This information and the concerns that Mr. Kirk expressed therein are

directly relevant to consideration of the ability of the Board of Trustees to carefully and conscientiously fulfill their fiduciary duties to upwards of 300 funds.

**C.    Mr. Kirk Received and Scrutinized the Fund Profitability Materials Prior to Distribution to Other Independent Trustees**

As noted above, at issue in this case is whether the management fees received by Fidelity for the services it provided to the funds were excessive. Key to this analysis is reviewing and analyzing the annual fund profitability materials and methodology that Fidelity prepared for the trustees to determine whether the allocation of expenses and revenues to the funds was proper and whether the overall profitability of the funds was calculated properly. Mr. Kirk's documents show that as Chair of the Audit Committee, he was apprised of the fund profitability numbers by Fidelity in advance of receipt of those documents by other Trustees. (Ex. 16.) Kirk also received personal explanations regarding fund profitability methodology changes that the other trustees did not receive. For these reasons, Plaintiffs believe that he has more insight and information relating to Fidelity's fund profitability process and methodology than the other trustees deposed to date.

## IV.    CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that this Court should extend the period for discovery sufficient for Plaintiffs to conduct a half day deposition of former Independent Trustee Donald Kirk.

DATED October 22, 2007.

KELLER ROHRBACK L.L.P.

/s/ David Y. Chen
Lynn Lincoln Sarko *(pro hac vice)*
Michael D. Woerner *(pro hac vice)*
Laura R. Gerber *(pro hac vice)*
David Y. Chen *(pro hac vice)*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ  85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Michelle H. Blauner, BBO #549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street, 37th Floor
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

**Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin**

Robert D. Friedman, BBO# 180240
Harry S. Miller, BBO# 346946
Matthew J. Tuttle, BBO# 562758
Joshua N. Cook, BBO# 660346
Andrea Martin
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3000
Facsimile: (617) 345-3299

**Attorneys for Plaintiffs Cynthia A. Bennett
and Guy E. Miller**

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent on October 22, 2007 to the following attorneys indicated as non-registered participants:

Robert J. Liubicic
MILBANK TWEED HADLEY & MCCLOY, LLP
One Chase Manhattan Plaza
New York, NY 10005-1413

David S. Cohen
Donna F. Mulvihill
MILBANK TWEED HADLEY & MCCLOY, LLP
International Square Building
1850 K Street, N.W.
Washington, DC 20006

/s/ David Y. Chen
David Y. Chen