# EXHIBIT 8

Ned Lautenbach

Page 1

```
         VOLUME:  I
         PAGES:   1-312
         EXHIBITS: 27-42
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 04-CV-11651-MLW (Lead case)

No. 1:04-CV-11756-MLW (Consolidated case)

* * * * * * * * * * * * * *

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, | * |
| NANCY HAUGEN, MICHAEL F. MAGNAN, | * |
| KAREN L. MAGNAN, PRESLEY C. | * |
| PHILLIPS, ANDREA M. PHILLIPS, and | * |
| CINDY SCHURGIN, for the use and | * |
| benefit of THE FIDELITY MAGELLAN | * |
| FUND, FIDELITY CONTRAFUND, FIDELITY | * |
| GROWTH & INCOME PORTFOLIO I FUND, | * |
| FIDELITY BLUE CHIP GROWTH FUND, and | * |
| FIDELITY LOW-PRICED STOCK FUND, | * |
| Plaintiffs | * |
| v. | * |
| FIDELITY MANAGEMENT & RESEARCH | * |
| COMPANY and FMR CO., INC., | * |
| Defendants | * |

* * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF NED C. LAUTENBACH

DATE: TUESDAY, APRIL 17, 2007

Ned Lautenbach

Page 90

1    which is one of the benefits of Fidelity.        10:51:37
2    It is a large complex. And because of that       10:51:39
3    they can hire lots of research people,           10:51:41
4    provide the very best service in the way of     10:51:43
5    phone banks, websites, et cetera, and hire      10:51:46
6    the best people. And that's why people come    10:51:49
7    here to invest in is a complex as well as       10:51:54
8    the individual funds.                            10:51:56
9  Q. How did -- how did the break points that are   10:51:57
10   set out in this group rate schedule on          10:52:10
11   Exhibit 27 come to be? Why do we have a         10:52:14
12   break point at 210 billion as opposed to        10:52:19
13   some other number?                              10:52:22
14 A. Well, I'll tell you I'm not precisely sure     10:52:23
15   because I wasn't here when they were            10:52:26
16   negotiated, but they were negotiated in an      10:52:27
17   arm's length way with Fidelity and these        10:52:30
18   were then the break points that were agreed     10:52:32
19   to, but I didn't go through that work.          10:52:33
20       We'll have to do that shortly because       10:52:36
21   we're running out, though. It'll be the top     10:52:37
22   of our break points before long. We'll have     10:52:40
23   to put another one in place, and so we'll go    10:52:43
24   through a piece of work to add break points.    10:52:44
25 Q. Have you -- since you've been on the board     10:52:46

Ned Lautenbach

Page 91

1    have there been additional break points         10:52:48
2    added?                                          10:52:50
3  A. No.                                            10:52:51
4  Q. So when you came on in 2000 the cap was        10:52:52
5    already at 1,260,000,000,000?                   10:52:56
6  A. Yeah, I believe so. I don't think any have     10:52:59
7    been added since I've been here.                10:53:03
8  Q. Have you seen any of the study that was        10:53:04
9    undertaken to determine where a break point    10:53:06
10   should be?                                      10:53:09
11 A. Not where the break point should be.           10:53:09
12 Q. You say that you believe that there will be    10:53:13
13   some study undertaken recently to add           10:53:16
14   additional break points?                        10:53:20
15 A. Well, we're getting to the point that our      10:53:21
16   assets are going to exceed the top end of       10:53:24
17   this limit, so when that happens we'll have     10:53:26
18   to have another break point.                    10:53:29
19 Q. And what are the assets under management       10:53:30
20   complex-wide today?                             10:53:32
21 A. As I said, I think they're about one billion   10:53:34
22   one something, in that neighborhood.            10:53:37
23 Q. 1.1 trillion?                                  10:53:38
24 A. Yeah, 1.1 trillion.                            10:53:40
25 Q. And when this new study is undertaken, is      10:53:42

Ned Lautenbach

Page 92

1    there going to be any attempt to go back        10:53:48
2    from dollar one and look at the break points    10:53:51
3    that are outlined in Exhibit 27?                10:53:54
4  A. I doubt it. I think the -- you know, the       10:53:57
5    break points have served us well. They          10:54:02
6    continue to return benefit to the               10:54:03
7    shareholders, and I don't know what work        10:54:05
8    we'll do because we haven't done it. We         10:54:08
9    have a charter to be done, but...               10:54:11
10 Q. Since --                                       10:54:14
11 A. We'll -- you know, we'll do a good review.     10:54:15
12   Everything we do in this board we do a very     10:54:17
13   in-depth analysis and review and challenge      10:54:19
14   things and make sure they're right, to the      10:54:21
15   best of our ability.                            10:54:23
16 Q. In any of the economy of scale studies that    10:54:24
17   you have seen has there been any attempt to     10:54:27
18   look at this group rate schedule and to         10:54:31
19   visit and/or revisit why these particular       10:54:37
20   break points are in existence?                  10:54:41
21 A. I've seen three different economies of scale   10:54:42
22   studies that have been done, two before I       10:54:46
23   got here, one since I've been here, with an     10:54:48
24   update. And at the end of those studies         10:54:52
25   it's very hard to measure economies of scale    10:54:54

Ned Lautenbach

Page 93

1    across the complex, and we've looked at it      10:54:56
2    lots of different ways.                         10:55:00
3        We've even gone back and looked --          10:55:01
4    tried to look at it by fund to see if the       10:55:03
5    larger funds should get more just on the        10:55:05
6    question you asked, and we can't find           10:55:07
7    anything there. We can't prove under            10:55:08
8    economies of scale that we can quantify it,     10:55:11
9    but we believe they exist.                      10:55:13
10       And the work -- early-on work that was      10:55:15
11   done in '94 said that if the economies of      10:55:18
12   scale exist, what data we could get, it         10:55:21
13   looks like they start to occur between one      10:55:24
14   and three billion as they grow, and then        10:55:26
15   they -- then if you have economies of scale     10:55:28
16   you get diseconomies of scale. As you get       10:55:32
17   large, it's hard to manage money at a fund      10:55:35
18   level or a complex level. You get               10:55:39
19   bureaucracy built in.                           10:55:41
20       But as I said before, we feel that          10:55:42
21   economy of scale -- economies of scale          10:55:45
22   benefits are being shared with shareholders     10:55:46
23   today in three ways. One is through these       10:55:48
24   schedules, which as the fund gets bigger,       10:55:50
25   the group fee rate comes down. The transfer    10:55:54

084f3188-f10f-4e17-be6d-5bfa5ce6a65b

Ned Lautenbach

Page 226

```
1      stop doing research.                            02:49:35
2   Q. How does Fidelity and the board's fiduciary     02:50:10
3      duty to the individual mutual fund square       02:50:15
4      with the issue that as a fund's assets grow     02:50:19
5      and more dollars come in for the management     02:50:26
6      of that fund, that those growing dollars are    02:50:29
7      used to offset the cost associated with fees    02:50:37
8      that are out of -- with funds that are out      02:50:41
9      of favor and are shrinking?                     02:50:44
10         MR. BENEDICT: Objection to form.            02:50:48
11  A. I don't understand the question.                02:50:48
12  Q. Well, you just said there are times when one    02:50:50
13     particular investment style's in favor and      02:50:53
14     another's out of favor and so the funds that    02:50:56
15     are growing larger assume more of the cost      02:51:00
16     and the funds that are growing smaller          02:51:02
17     assume less of the cost; is that a fair         02:51:04
18     summary?                                        02:51:07
19  A. Sure, that's right.                             02:51:07
20  Q. So if you have an individual and Fidelity       02:51:08
21     has an individual fiduciary duty to each        02:51:11
22     particular fund, then how do you square that    02:51:15
23     individual fiduciary duty with the fact that    02:51:17
24     you're using assets from one fund and the       02:51:20
25     fees generated from one to support the          02:51:24
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

Ned Lautenbach

Page 227

```
1      activities in another?                          02:51:26
2   A. Well, we square that very easily because        02:51:28
3      we're looking at providing the best level of    02:51:33
4      support across the whole complex and when       02:51:35
5      one fund goes up, another goes down and         02:51:37
6      through time those change. One day people      02:51:39
7      are using a lot more research. The next day     02:51:41
8      they may not. And that's why we put the         02:51:44
9      group fee in place and the asset fee. We        02:51:47
10     think that best reflects the way to manage      02:51:51
11     the service and support in Fidelity to all      02:51:53
12     funds and all fund shareholders.                02:51:56
13        I couldn't imagine how we would change       02:51:59
14     the fee every year for every fund. It would     02:52:01
15     be chaos, and it doesn't really reflect the     02:52:06
16     activities that are going on underneath it.     02:52:09
17     And it's the ability, frankly, of Fidelity      02:52:11
18     to build these common support systems, these    02:52:14
19     common websites, these common huge              02:52:19
20     investments in research, training that I        02:52:21
21     think attract people to come to Fidelity.       02:52:24
22     If they didn't want that, they could go         02:52:25
23     someplace else.                                 02:52:28
24        MR. BURNS: Let me check through              02:53:12
25     here.                                           02:53:13
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

Ned Lautenbach

Page 228

```
1      (Pause.)                                        02:53:20
2         THE WITNESS: Are you finished with           02:53:20
3      this document?                                  02:53:21
4         MR. BURNS: Yes, sir.                         02:53:22
5      (Pause.)                                        02:53:40
6      BY MR. BURNS:                                   02:54:04
7   Q. During the time that you have been on the      02:54:04
8      board has there been any change in the basic    02:54:06
9      fee structure for any of the five funds in      02:54:11
10     this case?                                      02:54:19
11  A. I don't believe so.                             02:54:20
12  Q. So each year they have all been renewed with    02:54:20
13     the same group fee --                           02:54:25
14  A. Group fee schedule.                             02:54:30
15  Q. -- including the group fee schedule and the     02:54:31
16     same individualized fee associated with that    02:54:33
17     fund?                                           02:54:37
18  A. I believe that's right.                         02:54:37
19  Q. And since you've been on board there's been     02:54:45
20     no change in the group fee schedule; is that    02:54:48
21     correct?                                        02:54:51
22  A. Right.                                          02:54:51
23  Q. Have there been any changes in the              02:54:52
24     individual fee component schedule for any of    02:54:53
25     the funds?                                      02:54:57
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

Ned Lautenbach

Page 229

```
1         MR. KIERNAN: Related to these                02:54:57
2      five?                                           02:54:58
3   A. These five you're talking about or any fund?    02:54:58
4   Q. Any fund.                                       02:55:01
5   A. Yeah, we've changed some fee schedules.         02:55:01
6      We've pushed on Fidelity to change some.        02:55:05
7      They've done some on their own volition. We     02:55:07
8      changed the Exchange Contra -- or Exchange      02:55:13
9      and Congress Street Funds, which are old        02:55:15
10     funds that had a different schedule. And we     02:55:15
11     looked at the activity there and the            02:55:18
12     results, and we pushed and got a fee            02:55:20
13     reduction. We've had a reduction in index       02:55:22
14     fees, the Spartan funds, Fidelity fully         02:55:25
15     supported. And there have been other fee        02:55:29
16     changes to funds, but not, to my knowledge,     02:55:32
17     to the fees -- the broad group rate and         02:55:35
18     individual fee structure.                       02:55:39
19        And I would assume, too, we've moved         02:55:40
20     funds between the kinds of funds that they      02:55:42
21     are in that group fee structure which gets a    02:55:46
22     little different rate.                          02:55:49
23  Q. In terms of going through that again, you       02:55:50
24     said there were some older funds that --        02:55:56
25  A. Yes.                                            02:55:58
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

# EXHIBIT 9

M. MANN

Page 1

```
         VOLUME: I
         PAGES:  1-311
         EXHIBITS: 93-107
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 04-CV-11651-MLW (Lead case)

No. 1:04-CV-11756-MLW (Consolidated case)

* * * * * * * * * * * * *

CYNTHIA A. BENNETT, GUY E. MILLER,        *

NANCY HAUGEN, MICHAEL F. MAGNAN,          *

KAREN L. MAGNAN, PRESLEY C.               *

PHILLIPS, ANDREA M. PHILLIPS, and         *

CINDY SCHURGIN, for the use and           *

benefit of THE FIDELITY MAGELLAN          *

FUND, FIDELITY CONTRAFUND, FIDELITY       *

GROWTH & INCOME PORTFOLIO I FUND,         *

FIDELITY BLUE CHIP GROWTH FUND, and       *

FIDELITY LOW-PRICED STOCK FUND,           *

       Plaintiffs                         *

v.                                        *

FIDELITY MANAGEMENT & RESEARCH            *

COMPANY and FMR CO., INC.,                *

       Defendants                         *

* * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF MARVIN L. MANN

DATE: THURSDAY, MAY 31, 2007

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                516-608-2400

f6f4011c-0063-4ee1-8099-3ed90d21c4d5

M. MANN

Page 62

1  A.  You see, it's been almost 15 years ago.          10:24:51
2  Q.  Sure. I think Marie Knowles testified that       10:24:55
3      as far as she was aware, the group fee           10:24:59
4      schedule had been in effect at least going       10:25:03
5      back to about 1999. She wasn't sure, but         10:25:06
6      she gave me that as a rough date. Do you         10:25:09
7      have any reason to disagree that the group       10:25:11
8      fee schedule for Magellan and Contrafund has     10:25:13
9      been in effect since at least 1999?              10:25:16
10 A.  No, I have no reason to doubt that. I know       10:25:18
11     it was in place that far back.                   10:25:21
12 Q.  Okay. Just one more question before we take      10:25:25
13     a break. The group fee schedule goes until       10:25:26
14     it gets to a point where assets under            10:25:29
15     management are a certain amount and the          10:25:31
16     group fee applies at that point. When was        10:25:34
17     the last time that the board or Fidelity had     10:25:36
18     to negotiate what the next, call it break        10:25:40
19     point would be on the group fee schedule for     10:25:44
20     Magellan or Contrafund?                          10:25:46
21 A.  Well, that was negotiated in '99 and I           10:25:47
22     believe again in 2004.                           10:25:51
23 Q.  What was added in 2004?                          10:25:55
24 A.  Higher break points. I think that's right.       10:25:57
25     I'm not sure that it's true, but the reason      10:26:00

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

M. MANN

Page 63

1      that might not have been the case is that       10:26:06
2      there had been since 2000, which was soon        10:26:09
3      after the '99 break points were added, the      10:26:13
4      market came down dramatically and assets in      10:26:17
5      2004 were, as I recall, equal to or less        10:26:21
6      than they were in like 2001. So it may not      10:26:26
7      have called for additional break points at      10:26:29
8      that point. I just don't recall.                10:26:31
9  Q.  And the individual fee that's part of this     10:26:32
10     formula, when was the last time that that      10:26:35
11     changed for Magellan or Contrafund?            10:26:38
12 A.  I really don't know, but from time to time    10:26:40
13     we changed fees for certain groups of funds   10:26:46
14     that fit into different categories, and I     10:26:52
15     just don't remember the specifics of which    10:26:57
16     fees were changed and when.                   10:26:58
17 Q.  Do you recall whether the individual fee      10:26:59
18     applicable to Magellan or Contrafund was      10:27:03
19     changed at any time during the last five      10:27:05
20     years that you were on the board?             10:27:07
21 A.  I don't recall.                               10:27:09
22     MR. WOERNER: We're about out of              10:27:12
23     tape, so why don't we take a break.          10:27:13
24     MR. BENEDICT: Okay.                          10:27:15
25     THE VIDEOGRAPHER: The time is                10:27:16

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

M. MANN

Page 64

1      10:27 a.m. This is the end of Tape 1, and        10:27:17
2      we are off the record.                           10:27:20
3      (Recess taken.)                                  10:27:21
4      THE VIDEOGRAPHER: The time is                    10:44:25
5      10:44 a.m. This is the beginning of Tape 2,      10:44:26
6      and we are back on the record.                   10:44:29
7  BY MR. WOERNER:                                      10:44:30
8  Q.  Mr. Mann, I have a couple of follow-up           10:44:30
9      questions about your service on boards other     10:44:33
10     than on Fidelity, and I just want to make        10:44:35
11     sure I understood your service that involved    10:44:40
12     the Clayton Dubilier & Rice firm. Were you      10:44:41
13     on the board of that company or the board of   10:44:45
14     a company that was owned all or in part by     10:44:48
15     Clayton Dubilier & Rice?                        10:44:52
16 A.  I was on the board of a corporation that       10:44:54
17     was -- that Clayton Dubilier & Rice held a    10:45:03
18     major ownership interest in.                   10:45:08
19 Q.  Okay. And during what time frame did          10:45:13
20     Clayton Dubilier & Rice have this major       10:45:15
21     ownership stake in the company for which you 10:45:17
22     served as a board member?                      10:45:20
23 A.  It would have been I think the latter part   10:45:28
24     of the '90s, and it probably was over a      10:45:36
25     period of four years, something like that.   10:45:38

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

M. MANN

Page 65

1      We can get that information for you if you   10:45:41
2      desire.                                       10:45:47
3  Q.  Do you remember the name of the company?    10:45:47
4  A.  Dynatech was the original name, but it      10:45:52
5      seemed to me it was changed to something    10:45:54
6      else along the way. Don't remember a lot    10:45:56
7      about the company.                           10:45:59
8  Q.  Can you tell me with respect to Lexmark what 10:46:02
9      was your role within Lexmark over the time  10:46:05
10     period that you were also on the Fidelity   10:46:12
11     board? Can you start like in 1993/94 and    10:46:13
12     tell me what your role was with Lexmark.    10:46:19
13 A.  I was chairman and chief executive officer  10:46:22
14     during the period 1993 till sometime in 1997 10:46:28
15     when I became chairman of the Lexmark board 10:46:37
16     and gave up the chief executive officer     10:46:41
17     role, and I retired as chairman of the      10:46:45
18     Lexmark board in May 1999 --                10:46:48
19 Q.  During the time --                           10:46:57
20 A.  -- before I became chairman of the Fidelity 10:46:58
21     independent trustees.                        10:47:02
22 Q.  During the time that you were either        10:47:02
23     chairman of Lexmark or CEO and you were also 10:47:08
24     serving on the Fidelity board, were you     10:47:11
25     aware as to whether or not FMR in total     10:47:13

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868 516-608-2400

# EXHIBIT 10



To: Donald Kirk, Chairman of the Audit Committee
From: John Farinacci, Vice President Finance
Date: February 14, 2003

Subject: Summary of Group Fee Discussions

Don,

As requested during our meeting last month, attached is a memorandum that summarizes our previous discussions regarding group fees.

After you review this material, please let me, JS Wynant or David Jones know if you would like to discuss prior to the Board meeting.

Please feel free to contact me at (617) 563-1739 if you have any questions.

CONFIDENTIAL INFORMATION

DJK00001069

**Fidelity Management & Research Company**
**Review of Group Fee Structure**
**February 14, 2003**

**Purpose of Report:** Review the group fee structure used to calculate management fees for certain equity and fixed-income mutual funds.

**Background:**

o   The management fees of most Fidelity funds include a group fee component, which provides for lower management fee rates as Fidelity's assets under management increase and higher rates as assets decrease.

  - As of December 2002, 220 Fidelity funds employ either the equity or fixed-income group fee rate. These funds represent approximately 79% of FMR's mutual fund assets under management.

o   The group fee component recognizes that some portion of Fidelity's costs are shared by all funds. The decline in the rates as assets grow guarantees that shareholders will achieve a certain level of economies of scale as assets under management increase at the fund complex level.

o   Separate group fee rate schedules are used for equity and fixed-income (bond and money market) funds. Both are based on total group assets for Fidelity funds of all types, defined as the aggregate net assets in all registered investment companies that have management contracts with FMR.

o   The group fee rates are determined by "breakpoint" schedules that specify marginal bp rates for various group asset levels. The most recent amendments to these schedules took effect in August 1999, when group assets were approximately $763 billion.

  - At that time, nine new breakpoints were added beyond $587 billion, with the equity marginal rate declining by 0.37 bp and the fixed-income rate by 0.20 bp for every 10% increase in assets.

  - For equity, FMR proposed 0.37 bp so as to continue the same slope of declining effective rates over the next phase of significant asset growth as occurred when total group assets grew by 77% from $365 billion to $650 billion between December 1995 and December 1998. For fixed-income, FMR proposed 0.20 bp, which was a slightly slower decline than experienced historically, but still faster than provided for in the then-current schedule.

  - FMR had chosen a lower declining rate for fixed-income than equity to reflect a slower growth expectation for fixed-income assets at the time, the reduced contribution of fixed-income assets to total group assets, and to take into account the lower pricing and FMR's lower margins on fixed-income funds.

  - The current equity and fixed-income group fee schedules are shown in Attachment I.

o   Group assets have fallen from $763 billion in August 1999 to $696 billion in December 2002, driven by a decline in equity assets of $159 billion, partly offset by growth in fixed-income assets (bond and money market) of $92 billion.

1 of 3          Fidelity Highly Confidential Information

CONFIDENTIAL INFORMATION                                           DJK00001070

- o  In June 2002, Don Kirk, Chairman of the Audit Committee, asked FMR to evaluate whether we have the right group fee schedules in place for equity vs. fixed-income funds. FMR held meetings with Mr. Kirk in July and September 2002 and January 2003. At Mr. Kirk's request, FMR has documented the nature of his questions and the results of our analysis below.

**Discussion:**

- o  Mr. Kirk asked FMR to evaluate the following:

    1. Are the cost structures of equity funds vs. fixed-income funds different enough that the equity and fixed-income group fee schedules should be based on their respective disciplines rather than total group assets?

    2. Separately, should the marginal rate of decline be the same in the equity and fixed-income group fee schedules?

- o  Mr. Kirk raised these questions in part because although fixed-income assets increased in 2001 and 2002, the fixed-income group fee rate also increased since it is driven by total group assets, which declined due to decreases in equity assets. This resulted in higher management fee rates in 2001 and 2002 for fixed-income funds that use the group fee structure.

- o  In response to Mr. Kirk's request, FMR reviewed (i) fund costs by discipline; (ii) trends in fund assets by type of fund vs. asset class; (iii) trends in fund assets in relation to Fund Management & Administration (FM&A) and Customer Sales & Service (CS&S) expenses, and (iv) trends in fund assets in relation to management fees and total fund expenses.

- o  As a result of this analysis, FMR believes that equity and fixed-income group fee rates should continue to be based on total group assets, rather than discipline-specific assets.

    - We did not find clear evidence that costs more closely follow discipline-specific assets than total group assets. The bulk of the combined FM&A and CS&S costs of managing and distributing mutual funds are not attributable to a specific discipline. Rather, Fidelity is managed as a complex of funds, where distribution is organized around customer type, investment management around security type, and investment support by function.

**REDACTED**

**REDACTED**

- o  FMR also believes it is appropriate for the fixed-income marginal rate of decline to remain lower than the equity rate.

2 of 3          Fidelity Highly Confidential Information

CONFIDENTIAL INFORMATION                                             DJK00001071

- Fixed-income funds already have lower pricing structures than equity funds, so the rate of decline in the fixed-income schedule as a percentage of total management fees should be lower relative to equity. For example, the management fee on an investment grade bond fund is 43 bp vs. 58 bp for a growth fund.

- Additionally, FMR notes that there have been significant, targeted fee reductions on the fixed-income funds, e.g., expense caps, transfer agent fee reductions, and fund mergers.

**Alternative Group Fee Scenarios**

o At Mr. Kirk's request, FMR also investigated three alternative group fee scenarios. Attachment IV shows that the group fee schedules under these scenarios would have yielded similar total group fee revenues between 1994 and 2002, ranging from $11.4 billion to $11.5 billion.

- Scenario 1 shows what group fees would have been had the current marginal rates of 0.37 bp and 0.20 bp for equity and fixed-income, respectively, been added back at 1994 asset levels rather than in 1999, using total group assets.

- Also starting at 1994 asset levels, Scenario 2 shows what group fees would have been had FMR used the same marginal rate of decline for both equity and fixed-income, based on total group assets. (FMR used 0.32 bp as the single rate since it is the weighted average of the equity and fixed-income marginal rates added in 1999.)

- Similar to Scenario 2, Scenario 3 shows what group fees would have been had FMR used the same 0.32 bp marginal rate of decline for both equity and fixed-income. However, the group fee schedules in Scenario 3 are based on discipline-specific assets, rather than total group assets.

o A comparison of Scenario 2 to Scenario 3 demonstrates that fixed-income shareholders benefit from a schedule based on total group assets, which provides them with lower management fees over time since equity assets are expected to grow faster than fixed-income assets in the long run.

- Fixed-income shareholders would have paid $60 million more in cumulative group fees over the 1994-2002 time period using a schedule based on fixed-income assets vs. a schedule based on total group assets ($1.1 billion in Scenario 3 vs. $997 million in Scenario 2).

**Conclusion:** FMR believes the current group fee schedules for equity and fixed-income mutual funds are appropriate since all shareholders benefit from lower management fees as total group assets increase over time.

CONFIDENTIAL INFORMATION                                      DJK00001072