UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND and FIDELITY LOW-PRICED STOCK FUND,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>Defendants. | CIVIL NO. 1:04-cv-11651-MLW<br>(Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW<br>(Consolidated Case) |

**PLAINTIFFS' SURREPLY TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY**
**(LEAVE TO FILE GRANTED OCT. 31, 2007)**

Plaintiffs respectfully submit to the Court this Surreply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Renewed Motion to Compel Discovery. The parties dispute whether Defendants' should be required to produce information regarding the amount of compensation paid to their employees who manage the investment portfolios of the mutual funds at issue in this case (the "Funds").[1] The factual background and disputed matters are set forth in the Memorandum in Support of Plaintiffs' Motion to Compel Discovery, June 21, 2007; Defendants' Memorandum of Law in Opposition, July 9, 2007; Plaintiffs' Memorandum in Reply to Defendants' Memorandum of Law in Opposition, July 17, 2007; Plaintiffs' Renewed Motion to

---

[1] The Funds are Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Growth & Income Portfolio, Fidelity Blue Chip Growth Fund, and Fidelity Low-Priced Stock Fund.

Compel Discovery, Sept. 17, 2007 ("Pls.' Renewed Mot."); and Defendants' Memorandum of Law in Opposition to Plaintiffs' Renewed Motion to Compel Discovery, Oct. 2, 2007 ("Defs' Opp. Mem."). For the reasons set forth below and in Plaintiffs' earlier filings, their motion should be granted.

## I. ARGUMENT

Fed. R. Civ. P. 26(b)(1) provides for the discovery of relevant, nonprivileged matters. The discovery that the rule permits is broad and liberal. *Fairbanks v. American Can Co.*, 110 F.R.D. 685, 686 (D. Mass. 1986); *SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). Plaintiffs have established that the amount of portfolio manager compensation is relevant. Defendants do not refute that in their opposition. Instead they created straw men from selective, out-of-context quotations of Plaintiffs' consulting experts and attempt to rely on broad-brush generalities by their own experts that miss the point.

**A.    Defendants' mischaracterize the plain meaning of Plaintiffs' consulting experts' statements.**

Plaintiffs in their Renewed Motion presented declarations from their consulting experts that explain how the amount and other details of compensation paid to the Funds' portfolio managers are important to the experts' analysis. Plaintiffs also illustrated the forms of relevant analysis that are not possible without knowledge of the compensation details. Defendants do not transparently present portfolio manager compensation – "the single largest investment management expense borne by a mutual fund" – in their profitability reporting. (Pomerantz Decl. ¶ 11-12, Sept. 17, 2007; Lamb Decl. ¶¶ 4-5, Sept. 14, 2007.) Defendants fail to address on their merits the specific, practical implications of failing to consider the details of portfolio manager compensation expense in analysis of mutual fund profitability.

\\KRFILE\DATA\CLIENTS\26488\1\DISCOVERY\PLSURREPLYTOMTC110207FINAL.DOC

2

Defendants allege incorrectly that "Plaintiffs' experts claim that it would be *impossible to perform their analyses* without portfolio manager compensation data." (Defs.' Opp. Mem. 3 (emphasis added); *see also id.* at 6 (setting up the same straw man with the phrasing "*necessary . . . to analyses*").)  To support this assertion, Defendants partially quote paragraphs from the Plaintiffs' experts' declarations.  *Id.*  These paragraphs read in their entirety as follows:

> *It is impossible to determine the true profitability of the mutual funds if excessive compensation*, whether it be from the misallocation of compensation, inappropriate compensation levels, or the misclassification of profit sharing as expenses, *is being misallocated to the mutual funds* in Fidelity's profitability calculations.

(Lamb Decl. ¶ 6, Sept. 14, 2007 (emphasis added).)

> It is necessary to know the portfolio manager compensation costs for each Fund *in order to determine whether they are unreasonably high and whether these costs are appropriately allocated among the funds* contained within the group of funds that a portfolio manager's Fund is assigned to.

(Pomerantz Decl. ¶ 13.)  Lamb and Pomerantz plainly state that it is *the described analyses* that they cannot conduct without knowing the details of portfolio manager compensation, because those analyses rely on those details.  The relevance of these analyses is set forth in Plaintiffs' Renewed Mot. at 5-6.

Defendants' selective quotations of Plaintiffs' experts are the equivalent of truncating the statement, "It is impossible to count the apples and oranges in the bowl if we do not know the number of apples" to, "It is impossible to count the apples and oranges in the bowl . . . ."  Defendants' allegation, that Lamb and Pomerantz "claim that it would be *impossible to perform their analyses* without portfolio manager compensation data," is untrue.

**B.     The Plaintiffs' consulting experts' statements in other cases, fairly read, do not contradict the plain meaning of their declarations here.**

Defendants assert that Dr. Pomerantz's declaration is inconsistent with testimony he gave in the case *Baker v. American Century Inv. Mgmt., Inc.*, No. 04-4039-CV-ODS (W.D. Mo.) ("*Baker*"). (Except for the portion filed, Plaintiffs do not have access to the Pomerantz transcript from *Baker*, as the transcript is subject to a protective order entered in that case. *Baker*, Docket no. 68 (the "Baker Protective Order").) It cannot be ascertained whether the discussion even pertains to a discussion of economies of scale, because Defendants filed only selected excerpts of the transcript and Dr. Pomerantz remains subject to the Baker Protective Order. In any event the complete version of what Defendants quote is as follows:

> Q:   Did you undertake any effort to determine whether the pay that is provided to the portfolio managers of the Ultra Growth or Select funds went up or down in relation to assets?
>
> A:   No, and it would have no contribution to my opinion.

(Defs.' Opp. Mem. 4.) It is unclear from the record presented by Defendants what Dr. Pomerantz's "opinion" pertains to. Because it is not possible based on Defendants' pleadings to ascertain whether Dr. Pomerantz spoke of economies of scale and what opinion he was speaking of, Defendants' citation of this prior testimony should be disregarded for lack of foundation and relevance.

Even assuming that the opinion that Dr. Pomerantz provided in *Baker* pertained to economies of scale, Defendants' selective quotation is consistent with a complete and plain reading of the excerpts from Dr. Pomerantz's declaration in this matter that Defendants juxtapose and incorrectly claim to be inconsistent:

> Particularly important to my analysis of economies of scale <u>realized by Fidelity with respect to its provision of investment management services</u> is an understanding of the portfolio manager compensation costs that have been attributed or allocated to each Fund. My analysis will be based in

> part upon my understanding of how allocations of portfolio manager costs vary by a Fund's share of the Fidelity Complex's total assets under management, as well as how those costs vary over time.

(*Id.*; Pomerantz Decl. ¶ 12 (double underscore indicating omission from Defendants' quotation).) In the preceding quote from his testimony in *Baker*, Dr. Pomerantz appears to be responding to a question about whether he considered how portfolio manager compensation "**went up or down in relation to assets** [of the referenced mutual funds]." In his declaration here, Dr. Pomerantz is addressing the importance of how portfolio manager compensation "**ha[s] been attributed or allocated to each Fund**" and "**how allocations of portfolio manager costs vary by a Fund's share of the Fidelity Complex's total assets under management, as well as how those costs vary over time.**" (*Id.*) (The relevance of this information is explained in part in ¶ 13 of Dr. Pomerantz's declaration, where he notes that Defendants expense 25 percent of a portfolio manager's compensation to mutual funds that he or she does not manage, so that shareholders of the Funds are paying for the compensation of portfolio managers who do not handle their money.) Dr. Pomerantz's statement in *Baker* about *changes* in portfolio manager compensation does not contradict his statements in this case about *allocations* of portfolio manager compensation to Defendants' mutual funds.

Defendants similarly set up as a straw man a statement that Dr. Pomerantz made in *Baker* about the irrelevance there of whether portfolio manager compensation was allocated or labeled as "salary" or "bonus." (Defs.' Opp. Mem. 5.) In *Baker* Dr. Pomerantz knew what the actual compensation amounts were, so whether those amounts were labeled salary, bonus, honorarium or tip income would not matter for quantitative analysis. Defendants claim that Dr. Pomerantz's lack of concern about labels in *Baker* is "directly at odds" with his declarations in this case that (a) inclusion or exclusion of equity-based compensation expense appears to significantly affect investment management expense, as also noted by Defendants' Board of Trustees and internal

analysis, and (b) he cannot determine the actual effect without knowing the amount of the "share program expense," among other components of portfolio manager compensation. *Compare id.* to Pomerantz Decl. ¶¶ 15-19. In *Baker*, Dr. Pomerantz knew the amount of portfolio manager compensation and cared not how it was labeled. In this case, Dr. Pomerantz does not know the amount of portfolio manager compensation, but declares that knowing its value and particularly the value of the equity component is relevant specifically for the purpose of assessing and analyzing a phenomenon highlighted by the Funds' Board of Trustees and Defendants' own profitability analyses.

Mr. Lamb was not provided with portfolio manager compensation data in *Baker*. *See* (Defs.' Opp. Mem. 5; Lamb Decl. ¶ 4, Oct. 15, 2007.) This is consistent with his declaration about the applicability of the details of portfolio manager compensation to his analysis here.

C.  **The declarations submitted by Defendants are conclusory and fail to address the specific issues raised by Plaintiffs' consulting experts.**

Defendants rely on their experts' recitation of high-level cost accounting concepts and the applicability of total cost to economies of scale analysis. (Defs.' Opp. Mem. 7.) For instance, Mr. Peppet's declaration itself begs the question inquired by Plaintiffs' consulting experts:

> ***If an item of expense*** (e.g., employee cost data) incurred by a company ***is . . . reported in accordance with suitable, professional standards***, ***then*** the amount of one component is not relevant to whether the accounting itself was proper.

(Peppet Decl. ¶ 6, Oct. 2, 2007 (emphasis added).) Mr. Peppet's assumption – that the reporting of the amount of portfolio manager compensation is proper – is the very matter that Plaintiffs' consulting experts want to analyze. As Mr. Lamb states, "[Portfolio manager compensation] data allows me to *assess* how a portfolio manager's compensation is ultimately allocated to the mutual funds and *the appropriateness of this allocation*." (Lamb Decl. ¶ 4, Sept. 14, 2007.) For

this analysis, Plaintiffs' consulting experts consider it important to clearly understand the details of portfolio manager compensation.

Compensation expense accounts for approximately two-thirds of the total investment management expense of at least four of the five Funds. *See* 2005 Management Contract Renewal, Money Market and Bond Funds, Questions from Independent Trustees, June 10, 2005 at 8 (Ex. A to Chen Decl., Oct. 16, 2007). Portfolio manager compensation expense can change drastically from year to year, for instance increasing by **34 percent** and **15 percent** in 2003 and 2004, respectively. *See* Overview of Investment Incentives, Dec. 2005 at BFMR00255229 (Ex. B to Chen Decl.). Such large changes in a significant expense item call into question the appropriateness of its calculation and allocation. Without evaluation or other due diligence of these underlying facts, Mr. Peppet declares that "the magnitude of [portfolio manager compensation] is not relevant to formulating an opinion as to whether the allocation is logical and reasonable." (Peppet Decl. ¶ 8.) Is it normal for a significant expense to change so drastically? What accounts for that change? Is that change treated properly in the cost accounting system?

Professor Hubbard's opinion also relies on assumptions, in his case about "total cost":

> [E]conomies of scale exist in firms when, at a given level of production, the average <u>total</u> cost of production declines as the quantity produced increases. . . .
>
> The determination of whether Fidelity has achieved economies of scale in connection with the management of mutual funds must be made by looking at the *total* costs incurred by Fidelity in managing a fund or funds relative to some measure of output."

(Hubbard Decl. ¶ 6, Oct. 2, 2007 (original emphases).) It appears that Professor Hubbard will take as a given "total cost" data provided to him by Defendants, without a critical view of the key cost elements or other due diligence. In contrast, Mr. Lamb and Dr. Pomerantz state that because of Defendants' cost accounting practices, the "total cost" cannot be accurately deter-

mined without knowledge of the amounts of portfolio manager compensation and their components. (Lamb Decl. ¶ 4-6, Sept. 14, 2007; Pomerantz Decl. ¶ 13-19.)

The type of analysis that Plaintiffs' consulting experts wish to undertake is similar to the review of fund profitability undertaken by Defendants' outside accountants, to whom Defendants already provide details of portfolio manager compensation. These are excerpts of the information required by PricewaterhouseCoopers LLP for their review:

> I.  FMR Co schedules needed . . .
>    - ***Schedule by fund manager of base salary, bonus, benefits and shares outstanding by share class for that month.*** . . .
>    - Change in NAV by share class for that month in order to calculate total compensation.
>
>    . . .
>
> II. FMR Co share plan expenses . . . ***The management compensation schedules will be needed as share plan expense is allocated in the same manner*** (75%-25% split)

Fidelity Management & Research Co., Information Request (issued by PricewaterhouseCoopers LLP), Dec. 31, 2000 at 4 (Ex. C to Chen Decl.) (emphasis added).

The need for detailed information about portfolio manager compensation is not satisfied by the qualitative description of portfolio manager compensation that Defendants recite. (Defs.' Opp. Mem. 7-8.) In any event, Defendants' experts do not refute the specific issues raised by Mr. Lamb and Dr. Pomerantz's declarations. (Pls.' Renewed Mot. 4-6.)

**D.    The fiduciary duty required by Investment Company Act requires examination of the entire fairness of the compensation paid to a mutual fund's investment advisor.**

Defendants argue that § 36(b) of the Investment Company Act of 1940 does not require specific consideration of portfolio manager compensation. They rely on two instances where § 36(b) claims were dismissed because the plaintiffs failed to aver factual bases for the allegations that the management fee charged by a mutual fund's investment manager was excessive in violation of § 36(b). *See In re: Evergreen Mutual Funds Fee Litig.*, 423 F. Supp. 2d 249, 259

(S.D.N.Y. 2006); *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005). Whether the overall management fee contained improper payments was irrelevant in those cases. In contrast, Plaintiffs here aver myriad facts supporting their allegation that Defendants' fees are excessive. *E.g.*, Consolidated Compl., Nov. 3, 2005 ¶¶ 22, 32, 54-58, 84-86, 108-13.

Where fees are excessive, it is appropriate to investigate why. Is it because Defendants treat profit-sharing – in the form of significant amounts of equity-based compensation – as an expense and use it to reduce the reported profitability of the Fund? Is it because portfolio managers are paid grossly excessive compensation, and such compensation amounts consequently reduce the reported profitability of a mutual fund? These and similar questions demand inquiry and analysis of the amount of portfolio manager compensation.[2]

Defendants' selective disclosure of the *Baker* deposition testimony only highlights the failure of Defendants to meet their fiduciary duty to the Funds, by spending too much money managing them, charging the shareholders too much to do so, and consequently earning excessive profits. The public record in *Baker* and publicly available information about the American Century mutual fund discussed in the transcript demonstrates why.

For the years ended October 31, 2003 and 2004, Ultra had approximately $23 billion under management. American Century Investments, Ultra Fund, Annual Report (Form N-CSR Oct. 31, 2004) at 19, *available at http://sec.gov/Archives/edgar/data/100334/ 000010033405000003/n-csr.htm* ("Ultra 2004 Annual Report"). (*Baker* appeared to have been

---

[2] In common law, situations involving a conflicted fiduciary, such as the Defendants, are evaluated under the entire fairness standard. *See, e.g., Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The entire fairness standard insists on "both fair dealing and fair price." *Cede*, 634 A.2d at 361. The price must represent "the highest value reasonably available under the circumstances." *Id.* If Defendants are paying the portfolio managers excessively, then are they obtaining the "highest value" for the Funds?

actively litigated from between 2004 and 2006, so it is reasonable to assume that Dr. Pomerantz's opinions in that case were based on data from 2003 or 2004. In any event, the Ultra Fund's assets under management were in the same range in 2001 and 2002, at $20 billion and $26 billion. American Century Investments, Ultra Fund, Annual Report (Form N-30D Oct. 31, 2002) at 20, *available at http://sec.gov/Archives/edgar/data/100334/000010033402000035/books-2002uv.htm.*)

Based on the excerpt of Dr. Pomerantz's testimony presented by Defendants, for the period referenced therein, it cost American Century approximately 5 basis points[3] (0.05 percent) of the assets under management to manage Ultra, or approximately $12 million. The following table compares the assets under management and expenses of the Funds in 2004:

**Comparison of assets under management and investment management expense of American Century Ultra Fund and the Fidelity Funds, 2004**

|  | Assets under mgmt. ($ million) | Investment mgmt. expense (basis pts.) | Investment mgmt. expense ($ million) | Fidelity Funds' multiple of Ultra's AUM | Fidelity Funds' multiple of Ultra's mgmt. expense |
|---|---|---|---|---|---|
| American Century Ultra | $23,405[4] | 5.0 (est.)[5] | $11.7 (est.) | n/a | n/a |
| **Fidelity Funds** | | | | | |
| Magellan[6] | $64,569 | 11.0 | $71.1 | **2.8x** | **6.1x** |
| Contrafund[7] | $38,610 | 12.2 | $47.0 | **1.6x** | **4.0x** |
| Low-Priced Stock[8] | $30,652 | 13.4 | $41.0 | **1.3x** | **3.5x** |
| Growth & Income[9] | $30,565 | 10.9 | $33.4 | **1.3x** | **2.9x** |
| Blue Chip Growth[10] | $22,722 | 11.0 | $25.0 | **1.0x** | **2.1x** |

---

[3] A basis point is 1/100 of one percent, or 0.01%. One percent equals 100 basis points.

[4] Ultra 2004 Annual Report 19.

[5] Dep. Tr. of Steve Pomerantz, Ph.D., Dec. 7, 2005, at 135:13-19 (Ex. B to Dittmar Decl., Oct. 2, 2007).

[6] Fidelity Investments, 2004 Annual Mutual Fund Profitability Analysis, Apr. 13, 2005, at Bates no. BFMR 00061835 (excerpts attached as Ex. D to Chen Decl.).

[7] *Id.* at BFMR00061792.

[8] *Id.* at BFMR00061834.

[9] *Id.* at BFMR00061822.

[10] *Id.* at BFMR00061786.

The data in the table should prompt the following questions, among others:

- To manage a fund comparable in size to Ultra (the $23 billion Fidelity Blue Chip Growth Fund) why did it cost Defendants $13 million more – *twice as much* as Ultra?

- To manage Magellan – with triple the assets of Ultra – why did it cost Defendants *more than six times as much* as Ultra?

- What are the components of these differences?  Is portfolio manager compensation part of the difference?

- Ultra had four portfolio managers in 2004.  Ultra 2004 Annual Report 4.  Each of the Fidelity Funds had one.  Portfolio manager compensation being so significant to a mutual fund advisor, is Fidelity paying significantly more for *one* portfolio manager than Ultra is paying for *four*?

- Does the difference in cost between Defendants and American Century affect Defendants' profitability calculation?

- Would Defendants (and the Funds' shareholders) be better served if Defendants hired American Century to manage the Funds' assets?

These and other questions regarding the fairness to the Funds' shareholders of the amounts spent and charged by Defendants for the Funds' management are central to this case.  The amount of portfolio manager compensation, its allocation to different mutual funds – including funds that the portfolio managers do not manage – and whether it contains embedded excess profit are all factual matters relevant to these questions.

    E.    *Strigliabotti* **is inapposite.**

Defendants' invoke the "reasoning of *Strigliabotti*" as a basis for their position. Defs.' Opp. Mem. 8. The two sentence analysis of the discoverability of portfolio manager compensation in the unreported three-page *Strigliabotti* order is spare in its reasoning. Plaintiffs respectfully disagree with that court's conclusion, and its order is not binding here. "When a case assumes a point without discussion, the case does not bind future panels." *Estate of Magnin v. Comm'r of Internal Revenue*, 184 F.3d 1074, 1077 (9th Cir. 1999) (citations omitted).

    F.    **Defendants have no factual or legal basis for arguing that the Protective Order provides inadequate protection.**

While Defendants refer to other cases where Defendants' counsel and Plaintiffs' counsel and consulting experts were engaged, it is telling that Defendants do not cite any circumstance from those cases in which confidential information was disclosed by the plaintiffs' counsel or experts. Defs.' Opp. Mem. 3. This is because counsel and experts apparently abided by the protective orders in effect in those cases, as they will here. To the best knowledge of Plaintiffs' counsel, the only confidential information emerging from those cases is that which is being selectively publicized at the behest of Defendants' counsel.

Defendants also cite two cases quashing third party subpoenas that they claim counter the presumption of liberal discovery. *In re: ANC Rental Corp.* concerned a subpoena issued by a company's franchisees (National Car Rental) to obtain business information of a competitor (Dollar Rent-A-Car). 2002 U.S. Dist. LEXIS 12260, *1-2 (E.D. Pa. June 20, 2002). The court quashed the subpoena, noting that a protective order would be inadequate protection because, as a non-party, Dollar would not be continually present for the proceedings. *Id.* at *4. Defendants here are of course a party to this proceeding and can be expected to be continually present and able to protect their interests.

*Berrie v. Berrie*, 457 A.2d 76 (N.J. Super. Ct. 1983), is similarly inapposite. The court quashed a subpoena duces tecum seeking the deposition of a third party regarding valuation of a business similar to a business at issue in a family law action. In holding that in balance a protective order would not be adequate, the court noted that evidence related to valuation of the third party's business "would be collateral and supportive rather than direct proof of the value of plaintiff's business interests." Here the evidence sought is in control of Defendants, not a third party, and contributes directly to the proof of a matter in Plaintiffs' case.

Defendants' proffer a final red herring by noting that Dr. Pomerantz is engaged by Gordon Asset Management. Defs.' Opp. Mem. 14. The subject matter of his engagement with Gordon Asset Management has no factual relationship to the subject matter of his engagement in this case. Pomerantz Decl. ¶ 4, Oct. 16, 2007.

## II.  CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Plaintiffs' prior pleadings, Plaintiffs' Renewed Motion to Compel Discovery should be granted.

Dated October 29, 2007.

                KELLER ROHRBACK L.L.P.

                /s/ David Y. Chen
                Lynn Lincoln Sarko *(pro hac vice)*
                Michael D. Woerner *(pro hac vice)*
                Tana Lin *(pro hac vice)*
                Gretchen F. Cappio *(pro hac vice)*
                Laura R. Gerber *(pro hac vice)*
                David Y. Chen *(pro hac vice)*
                KELLER ROHRBACK L.L.P.
                1201 Third Avenue, Suite 3200
                Seattle, WA 98101-3052
                Telephone: (206) 623-1900
                Facsimile: (206) 623-3384

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ  85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Michelle H. Blauner, BBO #549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street, 37th Floor
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

**Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin**

Robert D. Friedman, BBO# 180240
Harry S. Miller, BBO# 346946
Matthew J. Tuttle, BBO# 562758
Joshua N. Cook
Andrea Martin
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3000
Facsimile: (617) 345-3299

**Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller**

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent on November 2, 2007 to the following attorneys indicated as non-registered participants:

Robert J. Liubicic
MILBANK TWEED HADLEY & MCCLOY, LLP
One Chase Manhattan Plaza
New York, NY 10005-1413

David S. Cohen
Donna F. Mulvihill
MILBANK TWEED HADLEY & MCCLOY, LLP
International Square Building
1850 K Street, N.W.
Washington, DC 20006

/s/ David Y. Chen
David Chen