Exhibit C

**Statement of Marvin Mann**

**Chairman of the Independent Trustees of
The Fidelity Funds**

**Before the Senate Committee on Banking, Housing and Urban
Affairs**

**On**

**"Review of Current Investigations and Regulatory Actions
Regarding the Mutual Fund Industry:  Fund Operations and
Governance"**

**MARCH 2, 2004**

**Executive Summary**

- A mutual fund board can effectively oversee a large number of funds.  Effective mutual fund boards have five characteristics:  good people, time commitment, the authority to set the agenda, access to information and organization.

- It is not necessary for an effective mutual fund board to have an independent trustee serve as chairman.  A fund's independent trustees should, however, have the authority to elect and remove the chairman.

- The independent trustee certification requirements contained in certain legislation should not be enacted.  Such requirements would create uncertainty as to the board's duties and are inconsistent with the oversight function of the board.  These requirements also could have a chilling effect on a board's ability to recruit and retain independent trustees.

- The SEC and Congress should consider three proposals that will benefit investors.  These proposals would:

  - Provide better disclosure of fund expenses;

  - Eliminate the use of brokerage commissions to acquire non-execution services; and

  - Improve the way in which fund distribution costs are disclosed and paid.

## I.    Introduction

Chairman Shelby, Ranking Member Sarbanes, and distinguished members of the Committee:

My name is Marvin Mann.  I am Chairman of the Independent Trustees of the Fidelity Funds.  I appreciate this opportunity to appear before you today to discuss mutual fund governance and to describe how the Fidelity Funds board does its job.

The Fidelity Funds are the largest mutual fund family in the United States, with assets of over $900 billion and about 19 million shareholders as of December 31, 2003.  As an Independent Trustee, it is my job to oversee the Fidelity Funds and to help protect the interests of the many shareholders of the Fidelity Funds.  In that capacity, I have had the good fortune to work with a group of Independent Trustees who are dedicated to acting independently in pursuing the best interests of the Fidelity Funds and their shareholders. The way in which we go about our job may be instructive.

Before I begin, I want to applaud this Committee for the leadership it demonstrated in connection with the enactment of the Sarbanes-Oxley Act of 2002.  This Act recognized that corporate governance generally could best be improved by enhancing the role of independent directors, strengthening auditor independence, subjecting internal controls to more rigorous scrutiny and reinforcing the process by which information gets "reported up" through a corporation – ultimately, when necessary, to the board of directors.

Without this type of system, corporate boards, including fund boards, cannot do their job. These types of reforms, rather than efforts to mandate a specific "one-size-fits all" board of trustees model for all mutual funds, are the most effective means to improve mutual fund governance, compliance and accountability.

Today, I would like to address mutual fund governance matters. In addressing these matters, specifically in Parts II, III and IV of this testimony, I am expressing not only my own views but those of the Governance and Nominating Committee of the Fidelity Funds, all of the members of which are Independent Trustees.[1]

In addition, stepping from my role as an Independent Trustee of the Fidelity Funds and speaking more broadly about public policy issues affecting the entire fund industry, I would also like to address three proposals that I believe will improve mutual fund regulation and benefit investors in a meaningful way. I encourage Congress and the SEC to give these proposals serious consideration.

## II.    Characteristics of Effective Boards of Trustees

I know that you are interested in how fund boards oversee a large number of funds in an effective manner. An engaged and well-functioning board of trustees can undertake this responsibility and do the job well. To describe how this can be done, I would like to

---

[1]    The views expressed in this testimony may not represent the views of Fidelity Management & Research Company. The views expressed in Part V of this testimony reflect my own views.

identify what I believe are the five general characteristics of a well-functioning board. Having been an Independent Trustee for approximately 10 years and a member of corporate boards for many more, I have had ample opportunity to observe and think about the characteristics of a well-functioning board and to put my thoughts into practice. The Fidelity Funds board incorporates these characteristics.

It is important to understand the role of a board of directors in the corporate governance of mutual funds and, for that matter, of companies generally. The role of a board of directors is primarily one of oversight. A board of directors typically is not, and should not be, involved in the day-to-day management affairs of the company.

With this in mind, I would now like to address the five characteristics of a well-functioning board.

First, a well-functioning board recruits high quality, highly experienced people, who are independent, to serve as Trustees. In the case of the Fidelity Funds board, the Independent Trustees have established criteria that are aimed at recruiting such people who also have the time, the commitment, the expertise, the judgment and, most importantly, the values to serve as Independent Trustees. One of the most important values, in addition to integrity, is the disposition to act independently in fact. We expect that the Independent Trustees, as fiduciaries, will play an active role and, as necessary, an adversarial role in pursuing the best interests of the Funds and their shareholders.

We also focus our Trustee recruiting efforts on people who are highly experienced in overseeing large, complex organizations.  Trustees with this type of experience have the expertise, disposition and the instincts to guide the formulation of processes that enable them to (*i*) oversee many complex issues in an effective manner, (*ii*) identify areas that require detailed board attention and (*iii*) establish reporting mechanisms that provide assurance that appropriate actions are promptly taken.

We make an effort to recruit senior executives from a variety of fields, including business operations, finance and accounting, marketing, investment management and government service.  Trustees with diverse backgrounds bring complementary skills, strengths, experiences and insights that enhance our ability to provide effective oversight.

The process of recruiting independent trustees is crucial.  It requires a lot of effort, because 10 of the 14 Trustees of the Fidelity Funds, or over 70%, are independent. Substantially more effort would be required if a limit were to be imposed on the number of funds that a single board could oversee.  As the number of boards overseeing funds increases, there would be more board seats to be filled without any increase in the number of suitable candidates.

Responsibility for all aspects of the Independent Trustee identification and recruitment process is vested in the Governance and Nominating Committee, which I chair and which is composed exclusively of Independent Trustees.  More recently, in order to assure that we consider a broader range of qualified candidates, the Governance and Nominating

Committee has retained an executive search firm to assist us in canvassing for qualified people.

The Governance and Nominating Committee consults with the other Independent Trustees throughout the selection process.  The decision to select an Independent Trustee for our board is made by all of the Independent Trustees.  Of course, ultimately our selections must be approved by Fund shareholders.

The second characteristic of a well-functioning board is time commitment.  Trustees must make the significant time commitment necessary to prepare for and fully participate in board meetings.  The Fidelity Funds' Board has regular meetings 11 times a year, almost always in person.  Special board and committee meetings are not infrequent.  Regular meetings generally take the better part of two days.  Board members are expected to review an extensive amount of material prior to each meeting.  Preparation time can span several days prior to the meeting.  In order to contribute meaningfully to Board discussions and meetings, Trustees therefore must be in a position to make a real commitment of their time.  Often, potential candidates who would otherwise be extremely capable Independent Trustees have been eliminated from consideration due to their inability to make this commitment.

The third important characteristic is the ability to exercise a strong voice in setting the agenda for board and committee meetings.  The Fidelity Funds Independent Trustees pay a great deal of attention to structuring the agenda.  First, we establish an annual calendar

to schedule all of the matters that require Board action and review over the course of the year, including individual Fund portfolio reviews. Each month we consider whether additional matters should be added to the agenda for that month's meeting. At every Board meeting, we reserve a substantial amount of time for executive sessions limited to Independent Trustees. At these meetings we discuss the agenda, the agendas for future meetings and other matters relating to our oversight of the Fidelity Funds.

This process ensures that issues important to fund shareholders are considered. As Chairman of the Independent Trustees of the Fidelity Funds, I not only approve meeting agendas, but I make sure that they reflect my input as well as the input of Committee chairs and the other Independent Trustees.

The fourth characteristic of a well-functioning board is access to information and resources. Trustees cannot exercise oversight and fulfill their fiduciary duties in a vacuum. The Independent Trustees of the Fidelity Funds have our own legal counsel. We need and receive regular reports and detailed presentations from Fidelity on a broad range of matters related to our oversight of the Funds. Our requests for information are promptly addressed. As necessary, we schedule tutorials to address additional questions and provide additional analytical data that we may need to support the Board's decision-making process. Importantly, Fidelity has the resources and commitment to keep the Board of Trustees fully informed.

The fifth and final characteristic is organization. A well-functioning board needs to have effective and flexible structures and processes that govern the board and its committees. These structures and processes must be designed to ensure that all necessary work is completed, based on the right mix of information.

The Fidelity Funds Board has developed a well-defined committee structure that is a critical factor in our ability to oversee the Funds. The structure, mission and membership of each Board committee are decided solely by the Independent Trustees. These committees are chaired by, and consist exclusively of, Independent Trustees. This assures that the committee agendas and decisions are controlled by the Independent Trustees.

We have a nominating and governance committee, an audit committee, an operations committee, a fair value oversight committee and a committee that focuses on brokerage, distribution and shareholder services. We also have divided the universe of Fidelity Funds into three categories, based largely on investment focus, and we have established a separate committee to oversee each category. We also have committees that lead the Board's review and negotiation of the Fund's investment advisory contracts.

The committee structure, coupled with the other elements that I have described, make it possible for the Independent Trustees to consider the issues faced by all of the Fidelity Funds in an effective manner.

It may be much more difficult for a board to oversee a large number of operating companies in diverse businesses, each with different groups of shareholders. But there are important differences between operating companies and mutual funds. Funds within the same fund complex share a substantial number of common elements. These common elements include distribution, fair value pricing procedures, brokerage allocation processes, administrative and operational processes (such as transfer agency, custody and IT issues), audit, internal control and compliance processes and many investment management processes. And, unlike operating companies, funds do not have separate employees or substantial physical assets and operating facilities. Rather, mutual fund boards generally oversee a relatively limited number of service providers that furnish specified services to each of the funds in the complex. While there may be variations in the specific services that each fund receives, they are generally variations of the common services that each fund must receive. Issues arising in connection with these common elements often must be resolved in a uniform way – a resolution that can most readily be achieved by a single unified board.

The time and effort involved in overseeing a large number of funds with common elements is, therefore, not the same as would be required to serve on separate boards of the same number of unaffiliated operating companies. A well-functioning unified fund board can leverage its knowledge of the common elements, address them in an efficient manner and in the process do a superior job in exercising its fiduciary duties and looking after the best interests of fund shareholders.

Our committee structure comes into play here and really makes it possible for the Independent Trustees to oversee all of the Fidelity Funds. The common elements of fund operation, such as fair value procedures, internal controls and audit functions, brokerage allocation, shareholder services and distribution, are addressed by committees that have oversight responsibilities for these areas across all Funds in the complex.

We also have processes that allow us to identify issues that are unique to specific Funds. The Board of Trustees' oversight of fund performance provides a good example. The Independent Trustees receive monthly reports on the performance of all of the Funds. This includes information comparing the performance of each Fidelity Fund to a peer group of funds and an appropriate securities index or combination of indices. Unusual performance that may require attention is immediately obvious to all of us. The fund oversight committees also conduct regularly scheduled in-depth reviews of the Funds they oversee. Prior to each Fund review meeting, the board receives written reports and analyses from the portfolio manager to assist the oversight committee's preparation for the meeting. This material provides the Independent Trustees with essentially the same information that Fidelity management uses in its periodic reviews of portfolio performance. At the meeting, the oversight committee discusses this data and other aspects of Fund performance in depth with the portfolio managers and their supervisors. The highlights of these meetings are reported to and discussed by the full Board. In this manner, all of the Independent Trustees are made aware of the significant issues faced by each of the Fidelity Funds and any actions required to remedy them.

Another good example of the process that allows us to identify issues that are unique to specific Funds relates to our review of the Funds' investment management agreements with Fidelity. I'll discuss this in the next section of my testimony.

To sum up, the five characteristics of a well-functioning board are people, time commitment, the authority to set the agenda, access to information and organization. When all five of these elements are present, a board should be able to effectively fulfill its oversight and supervisory responsibilities. This certainly is the case with the Fidelity Funds board.

You will note that one characteristic that I did not include is having an independent chairman.

A well-functioning board can, and in the case of the Fidelity Funds board does, act independently and effectively without having an Independent Trustee serve as chairman. Independent trustees should have the authority to select an independent chairman, and the Independent Trustees of the Fidelity Funds have that authority now. I believe that the key structural component of assuring that independent trustees are in a position to control the board is to assure that they constitute a substantial majority of the board, as the SEC has proposed. The Independent Trustees of the Fidelity Funds further reinforce their independence by setting their own compensation. The investment adviser and management Trustees are not involved in this determination.

I am sure that there are some fund boards where governance might be improved if a particular individual, who also happened to be an independent trustee, served as chairman.  In the case of many funds, that may not be the case.  In each case, the independent trustees are the parties in the best position to make this decision.

The SEC and the Investment Company Act entrust to independent trustees a number of important decisions with respect to various matters, including the approval of investment advisory contracts, underwriting agreements and determinations under various rules that address conflicts of interest.  Removing from our discretion the election of the board chairman seems to me to be in basic conflict with that approach, particularly when, as a practical matter, the independent trustees must be at least a majority of the board.  The Sarbanes-Oxley Act strengthened corporate governance for public operating companies.  Wisely, it did not require corporate boards to have independent chairs.  I do not believe that the case has been made that an independent chairman is essential to improving mutual fund governance.  I therefore feel strongly that mandating a governance structure that requires an independent chairman is not in the best interests of all funds or all shareholders.  It may be appropriate, however, to require that a majority of the independent trustees of a fund have the authority to elect and remove the board chairman.

### III.    Consideration of Investment Management Contracts

One of the most important functions of a mutual fund board of trustees is its annual consideration of the investment management contract between the mutual fund and its

investment adviser. The approval and annual renewal of the investment management contract requires the approval of a majority of the independent trustees. The Fidelity Funds Board of Trustees receives an enormous amount of information in connection with our review of the Funds' investment management contracts with Fidelity and any affiliates of Fidelity that serve as sub-advisers (who, for purposes of this testimony, I refer to collectively as "Fidelity").

First, however, I want to dispel any notion that all of the issues relating to investment advisory contracts are considered at a single meeting. The formal contract reviews occur over a series of meetings. Moreover, we receive data and information relevant to that review throughout the year, including the fund reviews that I discussed above.

In reviewing the contracts, the Board of Trustees considers a number of factors. We receive data and information from Fidelity to support our consideration of these factors, including comparative data relating to peer groups of funds. I should also emphasize that the management fees paid by a large number of the Fidelity Funds include a performance-based adjustment, which can increase or decrease the fee. Thus, we receive information on the impact of performance adjustments to the management fees.

The factors that we consider typically include the following:

- **Benefits to Shareholders.** We consider the benefit to shareholders of investing in a Fund that is part of a large family of funds offering a variety of investment disciplines and providing for a large variety of Fund and shareholder services.

- **Investment Compliance and Performance.** We consider whether each Fund has operated within its investment objective and its record of compliance with its investment restrictions. We also review each Fund's investment performance as well as the performance of a peer group of mutual funds, and the performance of an appropriate index or combination of indices (approved by the Independent Trustees).

- **The Investment Advisers' Personnel and Methods.** As discussed above, we have annual meetings with each Fund's portfolio manager. We review each Fund's investment objective and discipline. The Independent Trustees also have discussions with senior management of Fidelity responsible for investment operations and the investment discipline of each Fund. Among other things that we consider are the size, education and experience of Fidelity's investment staff, their use of technology, and Fidelity's approach to recruiting, training and retaining portfolio managers and other research, advisory and management personnel.

- **Nature and Quality of Other Services.** We consider the nature, quality, cost and extent of administrative and shareholder services performed by Fidelity and its affiliates, under the investment management contracts and under separate agreements covering transfer agency functions and pricing, bookkeeping and securities lending services, if any. We also consider the nature and extent of Fidelity's supervision of third-party service providers, principally custodians and subcustodians.

- **Expenses.** We consider each Fund's expense ratio, and expense ratios of a peer group of funds. We also consider the amount and nature of fees paid by shareholders.

- **Profitability.** We consider the level of Fidelity's profits in respect of the management of the Fidelity Funds, including each Fund. This consideration includes an extensive review of Fidelity's methodology in allocating its costs to the management of a Fund. We consider the profits realized by Fidelity in connection with the operation of a Fund and whether the amount of profit is a fair entrepreneurial profit for the management of a Fund. We also consider Fidelity's profits from non-Fund businesses that may benefit from or be related to a Fund's business. We also consider Fidelity's profit margins in comparison with available industry data.

- **Economies of Scale.** We consider whether there have been economies of scale in respect of the management of the Fidelity Funds, whether the Fidelity Funds (including each Fund) have appropriately benefited from any economies of scale, and whether there is potential for realization of any further economies of scale.

- **Other Benefits to Fidelity.**  We consider the character and amount of fees paid by each Fund and each Fund's shareholders for services provided by Fidelity and its affiliates, including fees for services like transfer agency, fund accounting and direct shareholder services.  We also consider the allocation of Fund brokerage to brokers affiliated with Fidelity, the receipt of sales loads and payments under Rule 12b-1 plans in respect of certain of the Fidelity Funds and benefits to Fidelity from the use of soft dollar commissions to pay for research and other similar services.  We also consider the revenues and profitability of Fidelity's businesses other than its mutual fund business, including Fidelity's retail brokerage, correspondent brokerage, capital markets, trust, investment advisory, pension record keeping, insurance, publishing, real estate, international research and investment funds, and others.  We also consider the intangible benefits that accrue to Fidelity and its affiliates by virtue of their relationship with each Fund.

I have outlined a significant number of factors and, as you can imagine, that means we review a significant amount of information.  As I have discussed, our committee structure makes our review of this information more efficient.  The Independent Trustees and Fidelity also spend a great deal of time in developing formats for the presentation of this information that facilitate our review of the data applicable to each Fund.  As I discussed earlier, a well-functioning board of trustees can and, in the case of the Fidelity Funds, does have the capabilities required to consider all of the factors relevant to the review of each Fund's investment management contract.

## IV.    Independent Director Certifications

Certain legislative proposals would require independent trustees, or an independent board chairman, to certify as to certain matters, such as, depending on the bill, the existence of procedures for verifying a fund's net asset value, the oversight of the flow of assets into and out of the fund, the adoption of codes of ethics, the accuracy of disclosure documents and certain other matters.

The fundamental role of a mutual fund board, and particularly of the independent trustees, is to provide oversight.  It is important that the fundamental oversight role of independent trustees not be confused with the operating responsibilities of fund management.  Certification is a proper function for entities that manage the fund on a day-to-day basis since it is they, not the board, that must carry out the appropriate risk assessment, compliance and internal audit responsibilities.

Proper oversight may require a board to review and approve various policies and procedures and receive reports on their implementation.  A certification requirement is not necessary to assure that these actions are taken by the board.  It would be relatively simple for a regulator to confirm that required procedures have been adopted from a review of the board's minutes and to take appropriate action if the board had failed to adopt required procedures.

Certification requirements would go beyond the requirements imposed on independent directors of other public companies and would not serve any practical purpose.  They would only blur the line between the oversight function of the board and the day-to-day management and operational responsibilities of various entities, such as the investment adviser.  This is likely to create uncertainty as to the board's duties and potential liabilities.  It would have a chilling effect on a board's ability to recruit and retain independent trustees.

For these reasons, I do not support trustee certification requirements.

## V.    Three Proposals to Improve Regulation

The existing regulatory framework under which mutual funds operate has served

investors well.  It continues to accomplish its primary goal of investor protection.  There

is always room for improvement, however.  In that spirit, I would like to take off my

Fidelity Funds trustee hat, and instead speak more broadly about issues that affect the

fund industry as a whole.  In particular, I would like to discuss three proposals that would

improve the regulation of mutual funds and the financial markets generally, to the benefit

of all investors.

These proposals relate to fund expense disclosure, the use of fund brokerage to acquire

certain types of goods and services (sometimes referred to as "soft dollar" arrangements)

and fund distribution costs.  I cannot take credit for these proposals because they appear,

in one form or another, in various bills that have been introduced to reform the mutual

fund industry.

I want to emphasize that these proposals reflect systemic and competitive issues that can

only meaningfully be addressed on an industry-wide basis.  I raise them today in the hope

that my voice will encourage their consideration.

### A.    Expense Disclosure

Mutual fund investors could benefit from being told, in dollars and cents, exactly how

much it costs for them to invest in their fund.  Current rules, which require that fee

disclosures be presented in fund prospectuses as a generic percentage of fund assets and a

dollar-based hypothetical may be helpful, but they lack precision and specificity.  An investor who is interested in getting the full picture of the expenses related to his or her investment would be required to collect data concerning commissions, fees, expenses (to the extent that the data is available) and performance from multiple sources (such as account statements, confirmations and prospectuses).  The investor would also be required to keep track of changing account balances and then would have to attempt to make computations of the expenses and net performance on each investment.  Investors, even reasonably sophisticated investors, would find this time consuming and difficult. Investors could receive more useful information regarding the costs associated with their investments, and that information could be presented in a better way.

It may be useful for investors to receive information on actual expenses applied to a hypothetical investment amount that would be the same for all funds, so that investors could compare expenses among funds.  This type of disclosure requirement was recently adopted by the SEC.  I would have liked the SEC to have gone further.

The regulations should require that when an investor buys shares in a fund he or she receive from the fund or the broker a statement setting forth the expenses that the investor will incur.  This information should be set forth as a percentage of his or her investment and in actual dollars.  The statement would detail all sales charges and itemize all of the fees and expenses that will be paid by the investor either directly or indirectly.  The disclosure would be presented so that the investor would not need to search for it in the prospectus or other documents that the investor may receive.

Thereafter, on a quarterly basis, the investor would receive as part of his or her account statement the amount of fees and expenses that the investor actually paid with respect to his or her investment in each fund during the period and, on a cumulative basis, since the beginning of the year.  The gross and net returns of the fund investment, in dollars, would also be shown.  The goal would be to allow investors who are interested in expense information to receive it in a manner that is readily accessible, easy to understand and, more importantly, in the context of a report that shows what they really earned on their investment.

I believe that this approach should be required for all investment vehicles and accounts.  There will be some costs in implementing it, some of which may be borne by investors.  But I firmly believe that improved expense disclosure will result in greater investor awareness of expenses.  I believe that this increased awareness will, over time, bring competitive pressures to bear on some funds with higher fees.  I hope that the SEC will be encouraged to continue to actively pursue the type of expense disclosure that I suggest.

### B.    Fund Brokerage and Soft Dollars

Broker-dealers often provide investment advisers with research products and services in exchange for the direction by the adviser of mutual fund and other client brokerage transactions to the broker-dealer.  A portion of the commission paid by a client, sometimes substantial, may, in effect be used to pay for these research products and

services.  In other words, the additional services are bundled with execution and their costs are reflected in commission rates.

These arrangements, known as soft dollars, are specifically permitted under current law. Section 28(e) of the Securities Exchange Act of 1934 provides, in effect, that an investment adviser shall not be deemed to have breached a fiduciary duty solely by reason of having caused the client to pay more than the lowest available commission. The adviser must determine in good faith that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided.  The research need not have any relationship to the client that generated the commission; the investment adviser can conclude that the value of the research was reasonable when viewed in terms of its overall responsibilities with respect to clients for whom it has investment discretion.

Brokerage commissions are not reported as fund expenses.  Thus, while the use of fund brokerage in connection with soft dollar arrangements is disclosed in mutual fund disclosure documents, the real costs of the services provided under soft dollar arrangements are not obvious to investors.

I believe that regulatory action should be taken to "unbundle" fund portfolio brokerage. Specifically, mutual fund brokerage commissions should reflect execution costs and nothing else.  I support the recent SEC rule proposal to prohibit the use of fund

commissions to reward brokers for sales of fund shares as a step in the right direction. But more needs to be done.

Section 28(e) should be repealed.  I acknowledge that repeal of Section 28(e) could result in some significant changes in the way in which brokerage firms and others conduct business.  I believe that the SEC should develop a transition plan to allow the repeal of Section 28(e) to take effect on a date certain without inordinate disruptions to market participants.

If an adviser wants to purchase research products or other services such as data terminals, or other non-execution services, or pay a dealer compensation for fund sales (to the extent currently permitted by law), it would pay for those in hard dollars from its own resources, not from fund commissions.  Once soft dollar arrangements are eliminated, the receipt of research would no longer be a factor in allocating portfolio brokerage.

The end of soft dollar arrangements may result in pressure to increase investment advisory fees, since investment advisers will need to pay for certain research products and services out of their own pocket.  If that is a result, it is a matter that would be considered by fund boards as part of their advisory contract review process.  I would expect that any increased advisory fees will in the long run be more than offset by reduced brokerage costs.  In any event, the cost of the services, if they continued to be purchased by the fund or through increased advisory fees, would be reported to investors. Investors would have a much better understanding of the expenses of investing in a

mutual fund and would be able to make better-informed investment decisions. At the very least, the cost of research and other services to fund investors would be transparent.

### C.    Distribution Costs

The third area where change is called for relates to the way in which the costs of distributing fund shares are paid.

Investors who purchase fund shares through intermediaries pay for the distribution of fund shares in a number of ways. The investor may be charged a commission or sales load at the time they purchase their shares. The investor may also have the option to pay for the services of the intermediaries on a deferred basis through an annual asset-based fee imposed in accordance with Rule 12b-1 under the Investment Company Act. The Rule 12b-1 fees provide for the payment over time of distribution and marketing expenses from fund assets. The investor, of course, bears these expenses through his or her investment in the fund and, in certain circumstances, through a contingent deferred sales load.

Sales loads and Rule 12b-1 fees also have been supplemented, in some cases, by fund brokerage commissions, which may be allocated to sellers of fund shares under certain circumstances. In other words, a portion of the fund brokerage commissions may actually pay for distribution costs.

In addition, the investment adviser also may supplement sales loads and Rule 12b-1 fees by paying for marketing and distribution costs from its own resources. These payments

may be for services such as advertisements in newspapers or cash payments to dealers. The latter type of payments, have come to be characterized as "revenue sharing." Revenue sharing payments may cover some of the broker's costs in selling the funds. They may also, in effect, be payments for "shelf-space" or being placed on "preferred lists" at the broker-dealer.

The complexity of these different methods for paying sales charges may make it difficult for investors to fully comprehend the cost of investing in a mutual fund. Certain practices, such as revenue sharing, may create conflicts of interest for the broker that, even when fully disclosed, may be difficult to understand.

I have a three-element proposal that would bring greater clarity to this area. First, sales charges for the services of broker-dealers or other intermediaries, whether up front or paid in installments, should be paid directly by the investor. A Rule 12b-1 fee should not be used as a substitute for sales loads. The compensation of intermediaries should generally be limited to their receipt of sales loads (whether paid up front or over time) paid by the investors that choose to utilize their services. If brokers want to give investors the option of paying their sales loads over time, they should collect them in installments as is specifically permitted by the rules.

There is no reason why such installment payments should be a fund expense – they can and should be deducted from the shareholder's account. Thus, if a dealer charges a deferred asset-based sales fee in lieu of a front-end load for its distribution efforts, it

should be collected by the broker or by the fund complex either by imposing a direct charge on the investor or by deducting the amount from the shareholder's account. These charges would, of course, be fully disclosed and agreed to by the investor.

The SEC recently requested comment on whether Rule 12b-1 should be amended to require this approach. I hope that, after reviewing the comments that it receives, the SEC embraces this approach.

The second element would be to prohibit intermediaries from collecting any additional cash payments (including brokerage commissions) from the fund, its adviser or the adviser's affiliates for distribution efforts. In other words, revenue sharing and other similar practices that involve cash payments to dealers would be prohibited. Accommodation may have to be made for the provision of training and due diligence services by the fund adviser to the dealer sales force.

The third element would recognize that fund complexes themselves have marketing and other unique costs, whether the funds are sold directly to investors or through intermediaries. These fund expenses, which reflect the cost of gathering and servicing assets from tens of thousands of investors as well as the administrative and regulatory compliance costs, differ greatly from the expenses incurred by investment advisers to pension plans and other large institutional investors. The investment adviser should be permitted to collect a reasonable fee from fund assets to pay for these costs. The fee could be approved by the independent trustees (subject to their fiduciary duty to approve

only reasonable fees).  The fee could be used to pay for marketing, administrative and

shareholder servicing expenses.  This fee could not be used to make cash payments to

intermediaries (although it could be used, subject to NASD rules, to pay for marketing

activities directed at intermediaries).

This fee would be separate and unbundled from the investment advisory fee.  The

investment advisory fee would only represent the charges for portfolio management

services and thus would be more directly comparable to the investment management fees

paid by pension funds and other large institutional investors.

This three-element approach would have several benefits.  First, the amount that the

investor pays an intermediary for its selling efforts would be clear and obvious.  The

amounts would be paid by the investor directly.  There would be little need for the

complex multi-class fund structures that have been developed to accommodate different

distribution arrangements, since the payments would not pass through the fund.  The

amount would be totally transparent.

Second, eliminating revenue sharing payments would reduce conflicts of interest.

Revenue sharing creates potential conflict of interest situations for broker-dealers and

other recipients and has presented significant regulatory issues and resulted in SEC

enforcement actions.  And I do not believe that the way to address these conflicts is more

disclosure – the disclosure simply becomes too complicated even for the more

sophisticated investor.  I believe that the conflicts created by these practices can best be addressed through prohibition rather than disclosure.

Third, my proposal would recognize the reality that mutual fund sponsors have marketing and other costs.  The approach would provide investors with a basis for differentiating between the expenses borne by the fund for these efforts and the expenses borne by the fund for pure portfolio management.  This may provide better disclosure for certain investors.

Greater transparency, reduced conflicts and better disclosure:  I think that these are worthwhile objectives.

I appreciate that implementing this approach would create complex transition issues for mutual funds and intermediaries that have been relying on the current system.  I believe that these issues could be effectively addressed once the basic concepts are understood.

*       *       *

These proposals must be implemented on an industry-wide basis.  These are not issues that each fund family can choose to address as it sees fit; it would simply not be feasible for a board of trustees to attempt to implement these changes on its own.  I have been advised that substantially all of these proposals could be implemented by the SEC. Therefore, in order to ensure industry-wide change, Congress and the SEC should give these proposals serious consideration.

I am certain that you will hear lots of arguments from all sides against these three proposals. If implemented, they will result in some dislocations. They will also result in some up-front costs, mostly for systems development, as well as some ongoing costs, mainly in the reporting area. But we should view these costs in the context of the trillions of dollars invested in mutual funds and the billions of dollars of trading commissions mutual funds generate. Improving market forces through greater transparency and reducing opportunities for conflicts of interest should offset these costs many times over.

## VI.    Conclusion

The series of hearings on mutual fund regulation being held by this Committee is a great service. These hearings serve to demonstrate, above all, that the issues facing mutual fund investors do not present simple problems or solutions. I believe that this Committee should consider other proposals to help investors better understand their mutual fund investments and the costs associated with them.

Thank you for this opportunity to share my views.

# TABLE OF CONTENTS

**Page**

I. Introduction ........................................................................................ 1

II. Characteristics of Effective Boards of Trustees ..................................... 2

III. Consideration of Investment Management Contracts ............................11

IV. Independent Director Certifications ...................................................14

V. Three Proposals to Improve Regulation................................................16

    A. Expense Disclosure ......................................................................16

    B. Fund Brokerage and Soft Dollars...................................................18

    C. Distribution Costs........................................................................21

VI. Conclusion .....................................................................................26