UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>Plaintiffs,<br><br>vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>Defendants. | CIVIL NO. 1:04-cv-11651-MLW (Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW (Consolidated Case) |

**REPLY TO PLAINTIFFS' OPPOSITION TO FIDELITY'S MOTION
FOR A PROTECTIVE ORDER TO QUASH THE DEPOSITION NOTICE OF
EDWARD C. JOHNSON 3d, CHAIRMAN OF FMR CORP.**

James S. Dittmar (BBO# 126320)
David J. Apfel (BBO# 551139)
Sarah Heaton Concannon (BBO# 646884)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000

James N. Benedict
Sean M. Murphy
MILBANK, TWEED, HADLEY &
  MCCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000
*Attorneys for Defendants Fidelity Management &
Research Company and FMR Co., Inc.*

Dated: November 29, 2007

LIBA/1847498.2

Plaintiffs' opposition fails to rebut Fidelity's showing of good cause to quash the deposition of Edward C. Johnson 3d. Rather, their opposition makes it clear that their pursuit of Mr. Johnson's deposition is not for legitimate discovery purposes, but instead attempts to impose an *in terrorem* effect on Fidelity and its parent, FMR Corp. (now known as FMR LLC), by seeking to depose Fidelity's senior-most executive. Plaintiffs have not demonstrated – because they cannot demonstrate – any need or legitimate justification for Mr. Johnson's deposition.

In a *post hoc* attempt to justify Mr. Johnson's deposition, plaintiffs argue for the first time that Mr. Johnson has a "unique perspective" as to two actions taken decades ago – one of which is irrelevant to this case, the other of which did not involve Mr. Johnson, and neither of which Mr. Johnson recalls with any specificity. *See* Johnson Decl. ¶¶ 3 - 4. Plaintiffs then identify a catalog of subjects as to which they assert Mr. Johnson occupies a "central position and control," but they do not argue that Mr. Johnson has knowledge of these subjects that others lack or explain their failure to obtain the information they seek from others (or, in many cases, why they failed to request the information at all). Nor do plaintiffs show that Mr. Johnson has exercised his purported "central position and control" in any way relevant to the case. Throughout, plaintiffs attempt to bolster their weak assertions of need by invoking the wrong legal standard for consideration of Fidelity's motion. Plaintiffs' justifications are meritless and the protective order should issue.

## ARGUMENT

### A. Fidelity's Burden Is To Show "Good Cause," Not "Extraordinary Circumstances"

Relying on *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979), plaintiffs suggest that "absent extraordinary circumstances," an order precluding a deposition "would likely be in

1

error." Pls. Opp. at 4-5, 13. Plaintiffs invoke the wrong standard for the Court's consideration of Fidelity's motion; the standard is good cause.

District courts have broad discretion "for good cause shown" to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Discovery burdens can be legion – including not only time spent subject to interrogation, but also the enormous cost of time spent preparing for potentially wide-ranging, even if unnecessary, questioning. *See* Fidelity Mem. at 16-18. In an era of complex, costly and potentially oppressive civil litigation, federal courts increasingly find good cause to exercise oversight of the discovery process. *See, e.g., Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (1987) (noting danger that high economic and personal costs of unbridled discovery "will push cost-conscious defendants to settle even anemic cases before reaching those proceedings"); *id.* at 1987, n.13 (Stevens, J., dissenting) (describing the *in terrorem* effect of sweeping discovery, and urging that district courts use tools from their "case-management arsenal" to stop it); *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 146 (D. Mass. 1987) ("[T]he court's role in supervision of discovery has been increased substantially . . . .").

Although precluding a deposition entirely is not commonplace, it is nonetheless well precedented. Numerous courts have barred depositions on a showing of good cause.[1] It is well within a court's discretionary power to quash a deposition notice, where, as here, there is no need

---

[1] *See, e.g., Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 365-66 (D.R.I. 1985) (precluding deposition of CEO, who is "a singularly unique and important individual who [could] be easily subjected to unwarranted harassment and abuse"); *Digital Equipment Corp. v. System Indus., Inc.*, 108 F.R.D. 742, 744 (D. Mass. 1986) (precluding deposition of company president where it was clear that deposition was noticed "for purposes of harassment and annoyance"); *see also, e.g., Armstrong Cork Co. v. Niagra Mohawk Power Corp.*, 16 F.R.D. 389, 389-91 (S.D.N.Y. 1954) (recognizing potential for harassment and wasteful expense); *M.A. Porazzi Co. v. The Mormaclark*, 16 F.R.D. 383, 383-84 (S.D.N.Y. 1951) (deponent lacked personal knowledge, and deposition would be an annoyance, embarrassment and oppression). *Cf. Community Federal Savings and Loan Association v. Federal Home Loan Bank Board*, 96 F.R.D. 619, 621-22 (D.D.C. 1983) (plaintiffs failed to justify depositions of agency officials by failing to show, *inter alia*, unique personal knowledge).

for the deposition and it would distract a senior executive from his responsibilities to his company and the customers and clients of an array of subsidiary businesses. *See* Fidelity Mem. at 3-4, 12-18; *see also Twombly*, 127 S.Ct. at 1987, n.13 (Stevens, J., dissenting) ("Rule 26(c) specifically permits a court to take actions 'to protect a party or person from . . . undue burden or expense' by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.").[2]

### B. Mr. Johnson Has No "Unique Perspective" On The 1978 Implementation of the Group Fee Or The 1994 Independent Trustees' Report On Economies Of Scale

Plaintiffs' opposition to Fidelity's motion rests heavily on the argument that "Mr. Johnson . . . brings a unique perspective to two critical issues in this case" – the establishment in 1978 of a component of the Fidelity mutual fund fee rates that is based on total assets in all funds in the Fidelity group combined and a 1994 report by the Fidelity Fund Independent Trustees on economies of scale. Pls. Opp. at 8-9. This argument is meritless. To the extent either of these topics is relevant to this case, Mr. Johnson has no unique perspective as to either. Indeed, he has no significant knowledge or memory of these now remote events. *See* Johnson Decl. ¶¶ 3 – 4.

#### 1. 1978 Implementation Of The Group Fee

Plaintiffs assert that due to his longevity at Fidelity Mr. Johnson is the "best possible witness" to provide testimony about the "creation and implementation" of Fidelity's mutual fund

---

[2] Even the cases cited by plaintiffs in fact stand for the proposition that upon a showing of good cause the deposition of a key corporate executive should be deferred pending exhaustion of less intrusive and burdensome means of discovery. For example, in *Salter* (the principal case on which plaintiffs rely), the Fifth Circuit affirmed a trial court's order vacating a deposition notice of a company president, pending pursuit of the requested information from less intrusive sources, as an appropriate exercise of a trial court's discretion to control the timing of discovery. *See* 593 F.2d at 650. *See also, e.g., Baine v. General Motors Corp.*, 141 F.R.D. 332, 333-36 (M.D. Ala. 1991); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985); *Hughes v. General Motors Corp.*, 18 Fed. R. Serv.2d 1249, 1250 (S.D.N.Y. 1974); *Mitchell v. American Tobacco Co.*, 33 F.R.D. 262, 263 (M.D. Pa. 1963); *Colonial Capital Company v. General Motors Corporation*, 29 F.R.D. 514, 518 (D. Conn. 1961).

3

fee structure in 1978, and specifically the combination of an "individual fund fee" and a "group fee." Pls. Opp. at 8-9. The argument is both irrelevant and incorrect.

First, the sole issue in this case is whether the fees paid by certain Fidelity funds were excessive during a period of time commencing in mid-2003 – more than 25 years after the creation and implementation of the group fee in 1978.[3] By law, mutual fund investment advisory contracts may have a term of not more than one year and must terminate at the end of one year, unless the independent members of a fund's board of trustees approve a new contract. *See* 15 U.S.C. 80a-15(a)(2). Thus, the fees at issue in this case are negotiated and approved at least annually by the Independent Trustees. Plaintiffs' assertion that they need information about the creation and implementation of the group fee in 1978 is therefore nonsensical; the use of an individual fund/group fee structure was approved afresh by the Independent Trustees each year during the more than four year period covered by this case. What happened 25 years ago with respect to the creation and implementation of the group fee is irrelevant. *See, e.g., Jones v. Harris Assocs. LP*, No. 04-8305, Hearing Tr. (N.D. Ill. Dec. 19, 2005) (ruling that damages under Section 36(b) are only recoverable for the one-year period before the filing of the action and stating that "if the statute circumscribes damages and limits it, then any discovery beyond what the statute would afford would not be relevant").

Second, plaintiffs do not contend and in fact it is not the case that Mr. Johnson has "unique" knowledge of the fees – including the group fee – agreed upon annually for a period of

---

[3] Those fees are calculated by fee rates (expressed in terms of percentage of assets under management) that have two or three components, depending upon the fund. One component, called the "fund fee," establishes a rate based upon the investment discipline of the individual fund; this rate varies among funds. The second component, called the "group fee," establishes a rate that graduates up or down depending upon total assets of all Fidelity mutual funds combined; while this rate changes with total fund assets, it is identical for all funds at any particular time. The third component, called a "performance adjustment," establishes a rate based on comparison of a fund's historical investment performance against a benchmark; this fee component is not applicable to all funds and where applicable necessarily varies from fund to fund.

4

time commencing in mid-2003 that <u>are</u> relevant to this case. The "best possible witness[es]" to discuss the individual fund/group fee structure are the Independent Trustees who approved that fee structure each year. Five of them have already provided testimony on this topic. *See* Knowles Tr. at 89-105, 122-24, 172-77, 195-99, 231-41; Lautenbach Tr. at 39-40, 83-94, 197-99; Mann Tr. at 60-63, 116-17, 305-07; McCoy Tr. at 112-21, 125-26, 212-18; Stavropoulos Tr. at 101-09.[4] Similarly, Fidelity identified a number of senior executives with knowledge of the fee structure. Plaintiffs elected to depose some of these individuals, such as Robert Reynolds, FMR Corp.'s Vice Chairman and Chief Operating Officer, and J.S. Wynant, Fidelity's Chief Financial Officer, who both testified extensively about the group fee, *see* Reynolds Tr. at 225-65; Wynant Tr. at 26-27, 41-45, 102-06, 115-17, and Abigail Johnson, Fidelity's former President, whom plaintiffs declined to examine in depth on the subject, but who identified knowledgeable individuals in response to questioning. A. Johnson Tr. at 43-46. Plaintiffs do not assert that there is any fact about the 2003 through 2007 fee negotiations as to which they failed to obtain complete information from the witnesses already deposed. In addition, plaintiffs have received copious board materials that are contemporaneous with the relevant annual contract approvals and that detail the purpose, structure and effect of the group fee.[5]

Finally, even assuming that the origin of the group fee in 1978 were relevant, Mr. Johnson has no particular memory of the creation of the group fee structure approximately three decades ago. *See* Johnson Decl. ¶3. Plaintiffs' insistence that they need Mr. Johnson's

---

[4] Notably, if plaintiffs' interest in the individual fund/group fee structure were genuine, they likely would have more thoroughly interrogated three Independent Trustees – Messrs. McCoy, Mann, and Ralph Cox – who were all members of the *Ad Hoc* Committee of Independent Trustees involved in the restructuring of the group fee in 1999. Although plaintiffs questioned Mr. McCoy about the restructuring of the group fee, McCoy Tr. at 112-21, they elected not to question Mr. Mann about it. Mr. Cox was not deposed.

[5] *See, e.g.*, BFMR_00098168-247; BFMR_00098205-06; BFMR_00098246; BFMR_00097844-76; BFMR_00097866-76; BFMR_00017515A-19A; BFMR_00015097-98; BFMR_00143847-89; BFMR_00166828-50; BFMR_00059253-70; BFMR_00255235-60; BFMR_00153911-37.

5

purportedly "unique" testimony on this topic, when Mr. Johnson disclaims any specific knowledge and the plaintiffs have already deposed those most knowledgeable, underscores the pretextual nature of their argument.

### 2. 1994 Independent Trustees' Report On Economies Of Scale

Plaintiffs also assert that Mr. Johnson is in a "unique position" to address certain economies of scale issues that "predate" the witnesses plaintiffs have deposed. Plaintiffs declare that they "believe that he is the best possible witness" regarding a report on economies of scale that was prepared in 1994 (BFMR_00098166-247 (the "1994 Report")). *See* Pls. Opp. at 9. Plaintiffs are wrong again.

First, there is no basis for plaintiffs to "believe" that Mr. Johnson could provide "unique" testimony with regard to the 1994 Report. The 1994 Report was prepared by an *Ad Hoc* Committee of the Independent Trustees. Mr. Johnson has never been an Independent Trustee and was not a member of the committee. *See* BFMR_00098172. Mr. Johnson did not attend any of the committee's meetings, and is not mentioned in its minutes. *See* BFMR_00098445-63; *see also* Hammond Decl. ¶¶ 3, 8-9. As Mr. Johnson's declaration makes clear, he has no knowledge of the work of the Independent Trustees' committee. *See* Johnson Decl. ¶¶3-4. The 1994 Report has been produced to plaintiffs, and its contents speak for themselves.

Second, the bona fides of plaintiffs' desire to depose Mr. Johnson on the 1994 Report are called into question by plaintiffs' failure to pursue deposition testimony from individuals plainly more knowledgeable than Mr. Johnson about the subject. For example, the Fidelity representative responsible for project oversight and presentations to the 1994 *Ad Hoc* Committee was Stephen Jonas, who at the time was Fidelity's Chief Financial Officer.[6] *See*

---

[6] Mr. Jonas later served as Fidelity's executive director, from 2005-07, and as an interested Fidelity fund trustee. In June 2007, he retired from Fidelity.

6

LIBA/1847498.2

BFMR_00098445-63; BFMR_00098179. He was identified in Fidelity's Initial Disclosures; yet plaintiffs chose not to depose him. Mr. Jonas was assisted in 1994 by Karen Hammond, a Senior Vice President who is still employed by Fidelity. *See* Hammond Decl. ¶ 3. Ms. Hammond was responsible for all fact-finding, interviews and data analysis submitted to the 1994 *Ad Hoc* Committee and, like Mr. Jonas, attended the majority of the trustee meetings at which the report was discussed. *See id.* ¶¶ 4-7. Although document production alerted plaintiffs to the fact that Ms. Hammond, as well as Mr. Jonas, played a central role in assisting the 1994 *Ad Hoc* Committee, plaintiffs did not seek Ms. Hammond's deposition. Similarly, although retired Independent Trustee Donald Kirk was a member of the 1994 *Ad Hoc* Committee and was identified in Fidelity's Initial Disclosures, plaintiffs did not decide to pursue Mr. Kirk's deposition until two days before the September 30, 2007 close of fact discovery. And, in their separate pending motion for leave to depose Mr. Kirk, plaintiffs do not even mention the 1994 Report or Mr. Kirk's membership on the 1994 *Ad Hoc* Committee as subjects justifying his belated deposition.

To avoid a pointless dispute over the deposition of Mr. Johnson concerning the 1994 Report, Fidelity has proposed that plaintiffs and Fidelity agree to a limited extension of discovery to permit the deposition of Mr. Kirk and/or Ms. Hammond in lieu of Mr. Johnson's deposition. In making this offer, Fidelity not only identified the relevant documents, but also described Ms. Hammond's role in the preparation of the 1994 Report. Plaintiffs have refused Fidelity's proposal. If the 1994 Report were truly so critical as to warrant the deposition of Fidelity's senior-most officer, one must ask why plaintiffs have chosen not to depose the individual who performed the analytical work for Fidelity or an individual who was a member of the Independent Trustees' committee.

7

### C. Mr. Johnson's Alleged "Central Position And Control" Do Not Support Taking His Deposition

Separate and apart from the two lynchpin topics as to which plaintiffs incorrectly assert Mr. Johnson has unique knowledge, plaintiffs recite a litany of subjects[7] as to which they claim Mr. Johnson's "central position and control . . . require that he be deposed." Pls. Opp. at 5-8. Even assuming that any of these subjects is relevant to plaintiffs' excessive fee claim, plaintiffs do not assert, nor could they, that Mr. Johnson's knowledge of these subjects is unique or that prior deponents have not been sufficiently knowledgeable as to these topics. Rather, transparently based on a mere word search for Mr. Johnson's name in the transcripts of depositions conducted to date,[8] plaintiffs simply claim that that Mr. Johnson may have discoverable information on these topics, without identifying what they want to know or why Mr. Johnson is the right witness to respond to their questions. *See* Pls. Opp. at 6-7. Plaintiffs' *post hoc* list of topics is not enough.

Of course, mere possession of corporate power is not sufficient to justify an executive's deposition in a case where possession of such power is not a material issue in and of itself, and where exercise of executive authority in specific instances is not relevant to the issues in the case. Mr. Johnson's "titles and formal offices alone" do not overcome Fidelity's showing of good cause to preclude his deposition. Rather, Mr. Johnson's position, and the "vulnerability" to discovery abuse that comes with it, weighs in favor of precluding his deposition. *See, e.g., Mulvey*, 106 F.R.D. at 366 (noting that although any witness may be required to disclose

---

[7] These subjects are: executive succession, major corporate structural and personnel changes, compensation, independent trustee recruitment, and the Board of Trustees' deliberative process and decisionmaking.

[8] In purported support of their opposition, plaintiffs attach numerous deposition excerpts. *See* Attachment to Pls. Opp. From 3,769 pages of deposition testimony, plaintiffs managed to cull 21 references to Mr. Johnson. *See id.* A review of these excerpts makes it clear that the references to Mr. Johnson are nothing more than a handful of off-hand comments that were made over the course of weeks of deposition testimony. *See id.* Further, these excerpts illustrate plaintiffs' failure to ask follow-up questions about issues that they now claim are "central" to their case and grounds for Mr. Johnson's deposition. *See infra* at 10-11.

8

discoverable information, "[t]he fact remains [the Corporate Chairman] is a singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse. He has a right to be protected, and the courts have a duty to recognize his vulnerability.").

The laundry list of topics identified by plaintiffs likewise fails to defeat Fidelity's showing of good cause for preclusion. As plaintiffs concede, Mr. Johnson's knowledge of these topics is not unique, and, to the extent relevant, numerous prior deponents either have or could have testified at length as to each of these topics. To the extent plaintiffs do not have all the information they wish on each of these subjects, it is manifestly due to their decision not to ask questions on these topics of prior deponents. For example:

- Plaintiffs purport to want to depose Mr. Johnson because he "actively participates in the FMR Corp. Management Committee." Pls. Opp. at 6. Yet plaintiffs already deposed the head of the Management Committee, Mr. Reynolds, and asked virtually no questions about the Committee, other than to establish that Mr. Johnson does not attend most meetings. *See* Reynolds Tr. at 63. Plaintiffs did not even ask Mr. Reynolds to identify the other individuals who are members of the committee.

- Plaintiffs claim to want to question Mr. Johnson about the selection of John McDowell to head a new research initiative. *See* Pls. Opp. at 7. However, at Mr. McDowell's deposition, plaintiffs did not ask any follow up questions on this subject after Mr. McDowell testified that he had numerous discussions with the Fidelity "management team" on the issue. *See* McDowell Tr. at 9-11. Plaintiffs also deposed other members of the "management team" who were directly involved in Mr. McDowell's new position (Ms. Johnson and Mr. Reynolds). Tellingly, plaintiffs did not ask either Ms. Johnson or Mr. Reynolds any substantive questions about this issue. Plaintiffs did not depose a third member of the management team, Mr. Jonas.

- Plaintiffs state that Mr. Johnson is "<u>directly</u> involved in setting the compensation of at least the largest mutual fund portfolio managers." Pls. Opp. at 7. This assertion is simply wrong. In fact, the deposition testimony plaintiffs cite expressly states that portfolio manager compensation is decided by "the head of the equity group." *See* Stavropoulos Tr. at 220. The person directly involved in the compensation process was Ms. Johnson, Fidelity's former President, whom plaintiffs have already deposed. Ms. Johnson testified about her role in the compensation decisions, and that she personally met with the managers to discuss how the compensation levels were determined. *See* A. Johnson Tr. at 103-05. Ms. Johnson also testified that her decisions on portfolio manager compensation were reviewed by Mr. Reynolds, another witness plaintiffs have deposed (but of whom plaintiffs did not ask any questions about this topic). *See id.* at 228.

9

- Plaintiffs purport to want to depose Mr. Johnson because he was a "contributor" to the program that gives portfolio managers shares in other Fidelity entities as part of their compensation. *See* Pls. Opp. at 7. In fact, the most knowledgeable witness about this share-based compensation program is Fidelity's Chief Financial Officer, Mr. Wynant. Plaintiffs recently deposed Mr. Wynant but did not ask him any detailed questions about how that program worked.

- Plaintiffs ostensibly want to question Mr. Johnson because he met with new trustee candidates before they joined the mutual fund board. *See* Pls. Opp. at p. 7. But plaintiffs deposed <u>five</u> independent trustees, and did not ask any of them about the substance of their meetings with Mr. Johnson prior to joining the board. Furthermore, all of these trustees confirmed that the decision as to who would be accepted as an independent director was made by the independent trustees – not by Mr. Johnson or other members of Fidelity senior management. Plaintiffs did depose Ms. Johnson and Mr. Reynolds, both of whom met with new trustee candidates. Ms. Johnson testified that, far from interviewing the trustee candidates, she and other members of management, as a courtesy, made themselves available to meet with the candidates to the extent the candidates wished to do so. *See* A. Johnson Tr. at 90. Plaintiffs did not ask either Ms. Johnson or Mr. Reynolds a single question about those meetings. Plaintiffs also did not seek the depositions of other Fidelity personnel who met with new trustee candidates, including Gary Burkhead and Robert Pozen.

In short, plaintiffs' after-the-fact attempt to justify Mr. Johnson's deposition through identification of a "grab bag" of irrelevant subjects about which Mr. Johnson has no unique knowledge and as to which plaintiffs have already received substantial discovery highlights the absence of any legitimate need for his deposition. To the extent any of the subjects identified by plaintiffs is relevant to the question of fee excessiveness, plaintiffs already have had access to numerous sources of evidence. If plaintiffs now argue that they have failed to discover all that they would like, it has not been due to an absence of sources of information; it has been due to their decision not to investigate these issues through witnesses to whom they have already had access.

### D.   Plaintiffs Have Not Established A Basis For Duplicative Discovery

Plaintiffs argue that even if Mr. Johnson's deposition is superfluous, the cumulative nature of his testimony does not provide a basis for protection. *See* Pls. Opp. at 12. Fidelity does not disagree with the proposition that, during discovery, parties are generally permitted to

10

ask the same question of more than one witness. However, where plaintiffs seek to ask duplicative and largely irrelevant questions of a large company's most senior executive, the interests of justice weigh in favor of a protective order. *See* Fidelity Mem. at 5-18.

The cases cited by plaintiffs to support duplicative discovery are inapposite. For example, plaintiffs cite *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987), for the proposition that the court may authorize discovery of senior executives even where lower level employees have been deposed. *See* Pls. Opp. at 12 (citing *Travelers*, 116 F.R.D. at 145-46). However, *Travelers* rested on the court's determination that motive and intent were relevant to the antitrust claims at issue. *See* 116 F.R.D. at 142. Thus, the court held that, although the senior executives' depositions were "somewhat" duplicative and cumulative, they were not "unreasonably" so because of the plaintiffs' right to inquire into motive and intent. *Id.* at 145. In contrast, Fidelity's state of mind is irrelevant to the Section 36(b) claim in this case. *See, e.g.*, 15 U.S.C. § 80a-35(b); *see also Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409-12 (2d Cir. 1989); *Gartenberg*, 694 F.2d at 927-28; *Krantz v. Fidelity Management & Research Co.*, 98 F. Supp. 2d 150, 158 (D. Mass. 2000).

The other cases on which plaintiffs rely – *Blankenship v. Hearst Corp.*, 519 F.2d 418 (9th Cir. 1975) and *Wright v. Patrolmen's Benevolent Ass'n*, 73 F.R.D. 161 (S.D.N.Y. 1976) – are likewise inapposite. In these two cases, the courts determined that preclusion of executives' depositions would be inappropriate, where the <u>sole objection</u> to the depositions was that the witnesses' testimony would be repetitious of what had been learned or could be learned from other sources. *See Blankenship*, 519 F.2d at 429; *Wright*, 73 F.R.D. at 163. In contrast, here,

Fidelity has demonstrated that Mr. Johnson's testimony would be not only cumulative, but also largely irrelevant, pretextual, burdensome and oppressive.[9]

The fact that the subject matters which plaintiffs identify have been or could have been amply explored in depositions of numerous other individuals calls into question any legitimate discovery purpose of the proposed deposition of Mr. Johnson. Indeed, the fact that the subject matters identified in plaintiffs' brief are not the same as those identified in the pre-motion meet and confer, *see* Fidelity Mem. at 15, supports further skepticism about the argued need for this deposition.

In short, where plaintiffs have not demonstrated any need for the desired deposition and have not justified their failure to exhaust other avenues of discovery, and where commitment of substantial time by Mr. Johnson to prepare for and sit for his deposition would impose substantial burdens not only on Mr. Johnson, but also on the operations of FMR Corp. and its subsidiaries worldwide, the Court should protect both Mr. Johnson and Fidelity. *See Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995) (protective order upheld where no attempt was made to seek information from IBM personnel "for whom a deposition might have been less burdensome"); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (finding that deposing senior executive would be "oppressive, inconvenient, and burdensome inasmuch as it has not been established that the information necessary cannot be had from [another witness], other of the distributees of the . . . memorandum, interrogatories, or the corporate deposition").

---

[9] Mr. Johnson's importance to the day-to-day operations of FMR Corp. and its many subsidiaries cannot be understated. *See* Fidelity Mem. at 16. Mr. Johnson is responsible for the operations of FMR Corp. and its large and diverse array of subsidiaries, which employ over 44,000 employees worldwide. Neither Mr. Johnson nor Fidelity shareholders and employees can afford for Mr. Johnson to be distracted from his duties for the purpose of the extensive preparation and taking of a needless deposition.

## CONCLUSION

For the reasons set forth above and the reasons stated in Fidelity's moving papers, Fidelity's motion for a protective order quashing the notice of deposition directed to Edward C. Johnson 3d, Chairman of FMR Corp., should be granted.

Respectfully submitted,

GOODWIN PROCTER LLP

/s/ James S. Dittmar
James S. Dittmar (BBO# 126320)
David J. Apfel (BBO# 551139)
Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000

MILBANK, TWEED, HADLEY &
 MCCLOY LLP
   James N. Benedict
   Sean M. Murphy
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000

*Attorneys for Defendants Fidelity Management & Research Company and FMR Co., Inc.*

Dated: November 29, 2007

## CERTIFICATE OF SERVICE

I, James S. Dittmar, hereby certify that on November 29, 2007, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                    /s/ James S. Dittmar
                                  James S. Dittmar (BBO# 126320)