## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND, | |
| Plaintiffs, | CIVIL NO. 1:04-cv-11651-MLW (Lead Case) |
| vs. | |
| FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC., | CIVIL NO. 1:04-cv-11756-MLW (Consolidated Case) |
| Defendants. | |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTION TO ORDER DENYING PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY (DKT. 130) AND ORDER ALLOWING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER TO QUASH THE DEPOSITION NOTICE OF EDWARD C. JOHNSON 3d (DKT. 131)

James S. Dittmar (BBO# 126320)
David J. Apfel (BBO# 551139)
Sarah Heaton Concannon (BBO# 646884)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000

James N. Benedict
Sean M. Murphy
MILBANK, TWEED, HADLEY &
  MCCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000
*Attorneys for Defendants Fidelity Management & Research Company and FMR Co., Inc.*

Dated: January 16, 2008

## INTRODUCTION

Plaintiffs' Objections to Magistrate Judge Bowler's considered, discretionary rulings on two non-dispositive pretrial discovery issues are utterly without merit and reflect an effort to impose on Defendants the *in terrorem* effect of discovery that would serve no legitimate litigation purpose but would disrupt and harm Fidelity's business.[1]  The Magistrate Judge has unquestioned authority under Federal Rule of Civil Procedure 26(c) to control the conduct of discovery and to limit discovery on a showing of good cause.  This Court should not set aside Magistrate Judge Bowler's rulings unless it determines that the rulings were clearly erroneous or an abuse of discretion.  The question is not close; Plaintiffs' Objections should be denied.

Plaintiffs object to the Magistrate Judge's refusal to permit: (i) discovery of the specific dollar amount of personal compensation paid to each of eight individual portfolio managers who have managed Fidelity's five largest equity mutual funds during the last five years, *see* Pls. Obj. (Dkt. 130); and (ii) the deposition of Edward C. Johnson 3d, the chairman and senior-most executive officer of FMR LLC, Defendants' holding company, *see* Pls. Obj. (Dkt. 131). Defendants have readily met their burden of showing good cause to limit this discovery:

- The discovery denied by the Magistrate Judge is wholly unnecessary to Plaintiffs' proof of any claim, will not be used by Fidelity in defense, is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and, with respect to the deposition of Mr. Johnson, is cumulative and/or duplicative of information previously obtained or readily obtainable from less burdensome sources;

- The discovery denied by the Magistrate Judge concerns highly confidential and competitively valuable business information, raises sensitive privacy concerns, and risks serious disruption of Fidelity's business;

---

[1]  *See* Plaintiffs' Objection to Order Denying Plaintiffs' Renewed Motion to Compel Discovery (Dkt. 130) (hereinafter "Pls. Obj. (Dkt. 130)"); Plaintiffs' Objection to Order Allowing Defendants' Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d (Dkt. 131) (hereinafter "Pls. Obj. (Dkt. 131)").  In their Objections, Plaintiffs challenge Magistrate Judge Bowler's rulings of December 5, 2007. *See* Electronic Order (Dec. 5, 2007) (denying Plaintiffs' Renewed Motion to Compel Discovery (Dkt. 95); granting Defendants' Motion for Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d (Dkt. 99)).

LIBA/1859608.1

- Throughout several rounds of briefing, Plaintiffs offered unpersuasive and often inconsistent arguments regarding their alleged "need" for the discovery denied by the Magistrate Judge; and

- Plaintiffs initiated the challenged discovery requests as the period for fact discovery wound down during the summer 2007 and only following the withdrawal from the case of the three Plaintiffs' firms with the greatest Section 36(b) litigation experience.

Together, these facts and circumstances strongly suggest that Plaintiffs' discovery requests were not only unnecessary and oppressive but also pretextual.

Magistrate Judge Bowler's rulings were squarely within the court's discretion. The rulings were made after full briefing, including reply and surreply briefing. Indeed, Plaintiffs' motion to compel discovery of individual portfolio manager compensation was fully briefed and argued not once but twice. The Magistrate Judge did not act in haste or without due consideration. Rather, Magistrate Judge Bowler heard lengthy oral argument and issued the December 5, 2007 Order after taking the motions under advisement.

Plaintiffs argue, in essence, that because the Federal Rules of Civil Procedure "contemplate broad and liberal discovery," anything goes. Pls. Obj. (Dkt. 131), at 4. This is not the law. Rather, in an era of complex, costly and potentially oppressive civil litigation, federal courts increasingly find good cause to exercise oversight of the discovery process. *See*, *e.g., Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (1987) (noting danger that high economic and personal costs of unbridled discovery "will push cost-conscious defendants to settle even anemic cases before reaching those proceedings"); *id.* at 1987, n.13 (Stevens, J., dissenting) (describing the *in terrorem* effect of sweeping discovery, and urging that district courts use tools from their "case-management arsenal" to stop it). Even before *Twombly*, the Federal Rules of Civil Procedure placed limits on discovery, and have long authorized both magistrate and district court judges to exercise their discretion to limit even potentially relevant discovery for "good cause" shown. *See* Fed. R. Civ. P. 26(c) and advisory committee's note (1983 amendments); *see also*

2

*Mack* v. *Great Atl. and Tea Co., Inc.*, 871 F.2d 179, 187 (1st Cir. 1989) ("The Civil Rules were amended in 1983 to increase the district courts' power to supervise discovery and curb excesses. Specifically, Rule 26(b)(1) was added to deal with the problem of over-discovery."). Here, the Magistrate Judge's rulings reflect an appropriate exercise of discretion, and there is no basis for second-guessing Magistrate Judge Bowler's considered judgments.

## **BACKGROUND**

A.  Plaintiffs' Burden Under Section 36(b) of the Investment Company Act of 1940

This case is brought under Section 36(b) of the Investment Company Act of 1940. That statute provides that mutual fund advisers have a fiduciary duty with respect to their compensation. *See* 15 U.S.C. § 80a-35(b). Plaintiffs are shareholders in one or more of the five largest equity funds in the Fidelity Investments family of mutual funds.[2] Plaintiffs claim that, as investment advisers, the Defendants violated their fiduciary duty by receiving excessive compensation from the five funds during the period commencing in April 2003.

Federal courts generally accept the Second Circuit's formulation, in *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), of the legal standard applicable to a claim of excessive compensation under Section 36(b). That standard holds that the receipt of compensation violates a mutual fund adviser's statutory fiduciary duty only when the compensation is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 927-28.

*Gartenberg* and its progeny, such as *Krinsk* v. *Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989), and *Krantz* v. *Fidelity Management & Research Co.*, 98 F. Supp. 2d 150 (D.

---

[2]    The five funds are: Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Blue Chip Growth Fund, Fidelity Growth & Income Fund, and Fidelity Low-priced Stock Fund.

Mass. 2000), have developed and applied a six factor test to evaluate the disproportionality of an advisory fee: (i) the nature and quality of adviser's services; (ii) the profitability of those services to the adviser; (iii) any incidental benefits to the adviser from managing the funds at issue; (iv) whether there were economies of scale in the adviser's management of the funds (and, if so, whether they were shared with the funds); (v) comparison of the challenged compensation with fees charged to other investment vehicles that are comparable to the funds at issue; and (vi) the independence and conscientiousness of the Independent Trustees or Directors of the funds in their approval of the challenged fees. *See Gartenberg*, 694 F.2d at 929-30; *see also Krinsk*, 875 F.2d at 409; *Krantz*, 98 F. Supp. 2d at 158.[3]

Under Section 36(b), the burden is on Plaintiffs to prove that the challenged compensation is excessive. *See* 15 U.S.C. § 80a-35(b). The test is purely objective. The statutory claim has no intent, motive, or state of mind element. *See id.*; *Gartenberg*, 694 F.2d at 930. Damages may be recovered only for the period commencing one year before suit. *See* 15 U.S.C. § 80a-35(b)(3); *In re AllianceBernstein Mutual Fund Excessive Fee Litigation*, No. 04-Civ-4885, 2006 WL 74439, at *2 & n.2 (S.D.N.Y. Jan. 11, 2006). Trial is to the Court without a jury. *See In re Evangelist*, 760 F.2d 27, 29-31 (1st Cir. 1985); *Krinsk*, 875 F.2d at 414.

Plaintiffs' burden under Section 36(b) appears impossible to carry here.

- First, as one of Defendants' experts, R. Glenn Hubbard, Ph.D., Dean of Columbia School of Business and former Chairman of the President's Council of Economic Advisers, will testify, during the period at issue, the mutual fund industry has been highly competitive, and robust market forces constrain the compensation received by Fidelity to levels that are economically reasonable. Dr. Hubbard will opine that the

---

[3]    Plaintiffs note that the six factor *Gartenberg* test has not been adopted by the First Circuit and state that they "do not concede" its applicability. *See, e.g.*, Pls. Obj. (Dkt. 130), at 5, n.4. Plaintiffs do not, however, appear to challenge the *Gartenberg* court's finding that discharge of the adviser's fiduciary duty requires only a reasonable proportionality of fee and services, and it is difficult to imagine a challenge to that obvious principle. The Magistrate Judge was fully familiar with the legal standards underlying Plaintiffs' Section 36(b) claims, and Plaintiffs' Objections are not based on any theory of error by the Magistrate Judge in determining the principles governing Plaintiffs' claim on the merits.

4

mutual fund industry is a classically competitively structured industry, with hundreds of competing firms offering thousands of products, low barriers to entry and firm expansion, low switching costs, and low concentration.[4]

- Second, where, as here, fees are set by the funds' independent trustees who: (i) nominate, appoint and compensate themselves; (ii) are highly qualified; (iii) receive vast amounts of relevant information; and (iv) deliberate and negotiate with the advisers at arms length, courts should defer to the independent trustees' business judgment.[5] As Congress made clear in passing Section 36(b), the purpose of the statute is not to remove management fee decisions from the boardroom to the courtroom.[6] Here, throughout the relevant period, the Fidelity funds' Independent Trustees were all individuals of unquestionable integrity, competence, and independence, including, for example, the current U.S. Secretary of Defense, Robert M. Gates, who chaired Fidelity's Independent Trustees from January to December 2006. Evidence of the oversight and independent negotiations conducted by Fidelity's Independent Trustees is overwhelming.

---

[4] Plaintiffs' assertion before this Court that "the mutual fund industry still suffers from a severe lack of price competition," Pls. Opp. (Dkt. 130), at 4, is, to be charitable, outdated, and simply wrong as a matter of economics and reality.

[5] "[W]hether [the Independent Trustees] were able to negotiate the best possible arrangement does not factor into [the court's] analysis; the only question [the court] need consider is whether they could have agreed to the fee schedule in the advisory contracts after engaging in good-faith bargaining." *Jones* v. *Harris Associates, L.P.*, No. 04 C 8305, 2007 WL 627640, *8 (N.D. Ill. Feb. 27, 2007) (granting summary judgment for defendant in Section 36(b) case).

[6] As stated in the Senate Report accompanying Section 36(b):

> This section is not intended to authorize a Court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.
>
> * * *
>
> Directors of the Fund, including the independent directors, have an important role in the management fee area. A responsible determination regarding the management fee by the directors including a majority of disinterested directors is not to be ignored. While the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached rests with the court, approval of the management fee by the directors and shareholder ratification is to be given such weight as the court deems appropriate in the circumstances of a particular case.
>
> These provisions highlight the fact that the section is not designed to ignore concepts developed by the courts as to the authority and responsibility of directors. Indeed, this section is designed to strengthen the ability of the unaffiliated directors to deal with these matters and to provide a means by which the federal courts can effectively enforce the federally-created fiduciary duty with respect to management compensation. Th[is] section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary.

S. Rep. No. 184, 91st Cong., 1st Sess. 15, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902-03.

- Third, this is purely lawyer-driven litigation. In deposition, the named Plaintiffs affirmatively disagreed with the core allegations of the Complaint and/or evidenced complete ignorance of the most basic information comprising the purported foundation of their case.[7]

- Fourth, this case is one of more than a dozen virtually identical cases brought by the same cluster of plaintiffs' counsel against various mutual fund advisers around the country. These cases assert identical claims based on identical theories on behalf of mutual funds in a wide variety of fund families. Within the last year to 15 months, many of these cases have been terminated without any downward revision of the fee formulas originally challenged or any compensatory financial payment by the defendant adviser to the funds at issue.[8] In short, the tide of Section 36(b) litigation is ebbing, and Plaintiffs' most experienced counsel in this case have voluntarily withdrawn. Coincident with these withdrawals, the remaining Plaintiffs' counsel made the irrelevant, but highly sensitive, discovery demands now at issue.

B.    Magistrate Judge Bowler's Meticulous Oversight Of Discovery

This case commenced on May 3, 2004. Motion practice relating to possible

consolidation with other, unrelated, litigation asserting a Section 36(b) claim against Defendants

pending before Judge Gertner followed. These important preliminary matters, including a

motion to dismiss the unrelated cases, were all heard and decided by Magistrate Judge Bowler.

---

[7]    The following exchange, from the deposition of named plaintiff Cindy Schurgin, is illustrative:

> Q. If Magellan had only charged .63 percent on an annual basis, would you have a complaint about the excessiveness of the fee?
> [Objection to form]A. Probably not.

*See, e.g.*, Schurgin Tr., at 63-64. During the time period at issue in this case, Magellan charged 0.63 percent annually. *See* May 2005 Magellan Fund Prospectus, at BFMR_00092947-71. Other named plaintiffs were similarly ignorant of their claims. *See, e.g.*, Miller Tr., at 141-42 (noting nominal fees as the only examples of excessiveness); Bennett Tr., at 28 (unable to articulate basis of claim); A. Phillips Tr., at 24-25, 66 (stating that prior to becoming a plaintiff, she did not have an opinion as to whether fees were excessive, and further stating that she is not dissatisfied with her fund's performance); P. Phillips Tr., at 34 (asserting that he agreed with the allegations of the Complaint "to the extent that I remember them and understood them"); M. Magnan Tr., at 39 (indicating no complaints with fees prior to contacting Plaintiffs' counsel); K. Magnan Tr., at 52-54 (indicating that she did not know whether the fees charged to Fidelity's institutional accounts are relevant to her allegations with respect to the excessiveness of the fees); Haugen Tr., at 121-24 (describing continued investment in Fidelity funds; unable to explain why she allows Fidelity to manage so much of her money while simultaneously asserting that Fidelity is breaching its fiduciary duty to her).

[8]    Two cases have ended with the granting of defendants' motions for summary judgment: *Gallus* v. *Ameriprise Financial, Inc.*, Civil No. 04-4498 (DWF/SRN), slip op. (D. Minn. July 10, 2007), *appeal pending*, No. 07-2945 (8th Cir. filed Aug. 22, 2007), and *Jones* v. *Harris Associates, L.P.*, No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007), *appeal pending*, No. 07-1624 (7th Cir. filed Mar. 20, 2007). Five other cases have terminated through stipulations of dismissal.

*See* Order Referring Case to Magistrate Judge Bowler for Motion to Consolidate (Feb. 17, 2005) (Dkt. 40); Order of Judge Marianne B. Bowler, Report and Recommendations Regarding Motions to Dismiss Consolidated Amended Complaint (Dkt. 132), *in Gilliam* v. *Fidelity Investments*, Civ. A. No. 04-cv-11600-NG (Sept. 18, 2006).

On July 25, 2006, this Court issued an order of reference to Magistrate Judge Bowler for "full pretrial case management, including all dispositive motions." Order Referring Case to Magistrate Judge Bowler for Full Pretrial (July 25, 2006) (Dkt. 53). Thereafter, throughout the course of discovery, the Magistrate Judge has maintained a firm hand on the case, holding conferences and hearings on: (i) September 19, 2006; (ii) October 30, 2006; (iii) January 4, 2007; (iv) March 5, 2007; (v) June 6, 2007; (vi) July 18, 2007; and (vii) December 3, 2007. Magistrate Judge Bowler has made numerous discovery rulings. *See, e.g.*, Order Entering Protective Order (Aug. 3, 2006) (Dkt. 55); Order Granting Motion for Extension of Time to Complete Discovery (Oct. 31, 2007); Transcript of Conference (Sept. 19, 2006) (Dkt. 67) ("9/19/06 Tr."); Transcript of Status Conference (Oct. 30, 2006) (Dkt. 64); Transcript of Motion Hearing (July 18, 2007) (Dkt. 90) ("7/18/07 Tr.").

In September 2006, Magistrate Judge Bowler held a comprehensive case management conference and issued orders setting forth the rules of the road for discovery. *See* 9/19/06 Tr. Among other rulings, the Magistrate Judge authorized Plaintiffs to take 20 depositions, a substantial reduction from the 40 depositions Plaintiffs initially requested, but six more than Plaintiffs eventually took during the next fourteen months of deposition discovery. The Magistrate Judge ordered that fact discovery be completed by September 30, 2007, admonishing the parties that discovery was to proceed expeditiously. At the request of the parties, Magistrate Judge Bowler later authorized a limited extension of fact discovery to October 30, 2007 for the

7

sole purpose of enabling Plaintiffs to take three specific depositions.  *See* Order Granting Motion for Extension of Time to Complete Discovery (Oct. 31, 2007).  Fact discovery concluded on October 30, 2007.

During fact discovery, Defendants produced hundreds of thousands of pages of documents, including over 60,000 pages of materials requested by the Independent Trustees during the period of January 1, 2000 to February 2007 to inform their consideration of the adviser's fees; minutes of Board of Trustees and trustee committee meetings during that period; key documents on fund profitability and economies of scale (including economies of scale documents dating back to 1994); and over 21,000 email communications from the electronic files of 49 different individuals.

Plaintiffs have also taken 14 depositions:

1.     Abigail Johnson:   During the relevant time period, the President of Defendant FMR Co. and Trustee of the Fidelity mutual funds;

2.     Robert L. Reynolds:  During the relevant time period, Vice Chairman and Chief Operating Officer of parent company FMR Corp., the President of FMR Co., and Trustee of the Fidelity mutual funds;

3.     JS Wynant:  Chief Financial Officer of FMR Co.;

4.     Drew Lawton:  During the relevant time period, President of Fidelity Management Trust Company, an affiliated institutional asset management company;

5.     John McDowell:  During the relevant time period, Senior Vice President of FMR Co., Head of Domestic Equities, and Portfolio Manager of the Blue Chip Growth Fund;

6-8.   Portfolio Managers:  Three other senior Portfolio Managers who managed the mutual funds at issue, including Will Danoff (Contrafund portfolio manager) and Robert Stansky (Magellan portfolio manager);

9.     Nicholas Steck:  Senior Vice President and Compliance Officer for FMR Co.; and

LIBA/1859608.1

10-14. <u>Five Fidelity mutual fund independent trustees</u>: (i) Marvin Mann; (ii) Ned Lautenbach; (iii) Marie Knowles; (iv) William Stavropoulos; and (v) William McCoy.

Each of the six *Gartenberg* factors has been fully addressed by the documents produced and depositions conducted in this matter.

C.    <u>The Discovery At Issue</u>

1.    <u>Plaintiffs' Initial And Renewed Motions To Compel Production Of Individual Portfolio Manager Compensation</u>.

a.    <u>Plaintiffs' Initial Motion To Compel Discovery</u>

On June 21, 2007, Plaintiffs filed a motion to compel discovery of the exact amounts of compensation paid to eight individuals who acted as portfolio managers for each of the five funds involved in the case during the statutory damages period.  *See* Plaintiffs' Motion to Compel Discovery (June 21, 2007) (Dkt. 71).  Plaintiffs challenged Fidelity's position that this information is irrelevant to Plaintiffs' Section 36(b) claim and that disclosure of this information would compromise highly confidential information and lead to an invasion of individual portfolio managers' privacy.  Plaintiffs argued that portfolio manager compensation information is necessary to properly analyze fund profitability and economies of scale.  *See* Memorandum in Support of Plaintiffs' Motion to Compel Discovery, at 17-19 (June 21, 2007) (Dkt. 72).

b.    <u>Fidelity Established Good Cause To Preclude The Discovery</u>.

Fidelity opposed Plaintiffs' motion to compel, emphasizing that the sole issue to be determined in this Section 36(b) litigation is the amount of compensation received by the ***adviser*** from a ***mutual fund***, not the amount of the ***adviser's*** compensation to its ***employees***.  *See* Defendants Fidelity Management & Research Company and FMR Co., Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Discovery, at 19-21 (July 9, 2007) (Dkt. 84) ("PM Comp. Memo.").  Fidelity also itemized in detail all of the compensation-related

9

information conceivably relevant to an analysis of fund profitability and economies of scale that

had already been provided to Plaintiffs, including: (i) all compensation (including portfolio

manager compensation) in aggregate by fund; (ii) virtually all information regarding the

determination of portfolio manager compensation; and (iii) the methodology for allocating

portfolio manager compensation to individual mutual funds. *See id.* at 20-21; Defendants

Fidelity Management & Research Company and FMR Co., Inc.'s Memorandum of Law in

Opposition to Plaintiffs' Renewed Motion to Compel Discovery, at 6-8 (Oct. 2, 2007) (Dkt. 101)

("Renewed PM Comp. Memo."). Fidelity also argued that production of individual portfolio

manager compensation would implicate competitively sensitive and private information and

conflict with all relevant authority. *See* PM Comp. Memo. at 2-3, 17-20.

      c.    <u>Magistrate Judge Bowler Precluded The Discovery Sought, With Leave To Renew</u>.

After full briefing of the issues, Magistrate Judge Bowler heard lengthy argument on this

motion on July 18, 2007. At the conclusion of argument, the Magistrate Judge denied the

Plaintiffs' motion with leave to renew the motion within 60 days, upon "a further and much

stronger showing of need." 7/18/07 Tr. at 39.

      d.    <u>Plaintiffs' Renewed Motion To Compel Discovery</u>.

On September 17, 2007, Plaintiffs filed a renewed motion, which largely repeated the

arguments asserted in Plaintiffs' initial motion. *See* Plaintiffs' Renewed Motion to Compel

Discovery (Sept. 17, 2007) (Dkt. 95) ("Pls. Renewed Mtn."). The only "further" showing of any

sort was the submission of declarations by two experts, suggesting that information regarding

dollar amounts of individual portfolio manager compensation was necessary for them to analyze

respectively Fidelity's profitability and economies of scale. *See* Declaration of James D. Lamb,

¶¶ 4-6 (Sept. 17, 2007) (Dkt. 98); Declaration of Steve Pomerantz, Ph.D., ¶¶ 12-15 (Sept. 14,

2007) (Dkt. 97). Plaintiffs argued that these experts "have identified portfolio manager compensation to be information ***essential*** to proper review and evaluation of the profitability and economies of scale of the funds." Pls. Renewed Mtn. at 4 (emphasis added). Plaintiffs further claimed that "[a]ccording to Pomerantz and Lamb, not having portfolio manager compensation data makes analyses of these issues ***difficult, if not in some cases impossible***." *Id.* (emphasis added).

e.    Fidelity Again Established Good Cause To Preclude Discovery.

In its opposition to Plaintiffs' renewed motion to compel, Fidelity drew the Magistrate Judge's attention to the fact that Plaintiffs' experts, Dr. Pomerantz and Mr. Lamb, had never before identified portfolio manager compensation information as "essential," despite the fact that these experts had testified on precisely the same issues of profitability and economies of scale in other, virtually identical, Section 36(b) cases. *See* Renewed PM Comp. Memo. at 1-6. In fact, in the earlier Section 36(b) cases, both Dr. Pomerantz and Mr. Lamb: (i) analyzed profitability and economies of scale without access to portfolio manager compensation information; (ii) analyzed profitability and economies of scale without using portfolio manager compensation information when they did have access to it; and (iii) provided sworn testimony that they did not need portfolio manager compensation information to perform analyses of profitability and economies of scale. *See id.* at 2-6. Fidelity demonstrated that any claims by Plaintiffs' experts that it would be "difficult, if not in some cases impossible" to perform their analyses without portfolio manager compensation data were belied by their own past professional actions and sworn testimony. *See id.* at 3-4 (citing Lamb Decl. ¶ 6; Pomerantz Decl. ¶ 13).[9] Since Plaintiffs'

---

[9]    For example, in *Baker* v. *American Century Inv. Mgmt., Inc.*, No. 02-2039-CV-ODS (W.D. Mo. 2006), a Section 36(b) case based on nearly identical allegations to those made here, Dr. Pomerantz testified that individual portfolio manager compensation "would have no contribution to my opinion." Pomerantz Tr. at 134:6-12 (attached hereto as Ex. 1.B). Similarly, although portfolio manager compensation information was

11

"further and much stronger showing of need" consisted exclusively of its experts' obviously misleading declarations, it amounted to no showing at all.

In opposition to the renewed motion, Fidelity also presented declarations from its own experts. Dr. Hubbard opined that portfolio manager compensation data "would not contribute in any meaningful way to an understanding of economies of scale." Declaration of R. Glenn Hubbard, Ph.D., ¶ 5 (Oct. 2, 2007) (Dkt. 101). Dr. Hubbard observed that to make a determination regarding economies of scale requires "looking at **total** costs." *Id.* (emphasis in original). Dr. Hubbard further noted that Fidelity

> has already produced information on total costs . . . . Additional disaggregated cost information about any one component of the already-produced cost data – such as the portfolio manager compensation data sought by plaintiffs – is not relevant to analysis of economies of scale.

*Id.* ¶ 6. Fidelity's second expert, Russell F. Peppet – who, among his other credentials, had testified as an expert on fund profitability in the original *Gartenberg* case in the early 1980s – concluded that the magnitude of individual portfolio manager compensation is not relevant to forming an opinion whether that compensation is a cost element that is properly attributed to the funds at issue. Similarly, so long as one knows the method by which individual portfolio manager compensation is allocated, the magnitude of that compensation is not relevant to formulating an opinion as to whether the allocation is logical and reasonable. Declaration of Russell F. Peppet, ¶ 8 (Oct. 2, 2007) (Dkt. 101).

    f. <u>Plaintiffs Make An About Face</u>.

After Fidelity's exposure of the meretricious nature of their argument based on their experts' purported need, Plaintiffs executed an about face. Without any explanation by their

---

available to him in *Baker*, Mr. Lamb testified that "I do not know the specifics of it. I just know that they're compensated." Lamb Tr. at 183:2-6 (attached hereto as Ex. 1.C).

experts of their obvious self-contradiction, Plaintiffs simply asserted in their surreply brief that

Fidelity's criticism of Plaintiffs' experts for having claimed "that it would be impossible to

perform their analyses without portfolio manager compensation data" was "untrue" and

"incorrect."  Plaintiffs' Surreply to Defendants' Memorandum of Law in Opposition to

Plaintiffs' Renewed Motion to Compel Discovery, at 3 (Nov. 2, 2007) (Dkt. 118).  Having rested

their "further and much stronger showing of need" on their experts' purported say-so, Plaintiffs

then expressly denied that their experts' had asserted a need for the information.[10]

      g.      <u>Magistrate Judge Bowler Denies The Renewed Motion</u>.

After a full second round of briefing on the renewed motion, the Magistrate Judge heard

argument on December 3, 2007.  After reserving decision, Magistrate Judge Bowler issued the

Order, to which Plaintiffs now object, ruling that Plaintiffs' further showing of need was

"inadequate," and, in a proper exercise of discretion, denying Plaintiffs' renewed motion.

      2.      <u>Defendants' Motion For A Protective Order To Preclude Deposition Of Edward C. Johnson 3d</u>.

On September 13, 2007, a little more than two weeks before the close of fact discovery,

Plaintiffs noticed the deposition of Edward C. Johnson 3d, chairman and chief executive officer

of FMR LLC (formerly FMR Corp.), the holding company of Fidelity Investments' operating

businesses.[11]  Reflecting no genuine effort to secure relevant information from alternative

---

[10]    Plaintiffs have once again flip-flopped before this Court.  In their Objection, Plaintiffs argue the point they denied to the Magistrate Judge – namely, that information concerning portfolio manager compensation is purportedly "required" by their experts.  Pls. Opp. (Dkt. 130), at 2.

[11]    Through subsidiaries, FMR LLC engages in investment management, brokerage, employee health and welfare, employer payroll, trustee, and custodial services.  The corporation also owns diverse businesses in non-financial services fields, including telecommunications, building supplies, transportation, and hotel and restaurant services.  The operating units of the company of which Mr. Johnson is chairman have approximately 13,000 employees in Massachusetts and over 44,000 employees worldwide.  These businesses have offices on four continents, in 25 countries, and in 31 states.  *See generally* http://www.Fidelity.com (last visited Sept. 24, 2007).  FMR LLC's subsidiaries serve over ninety million customers and clients.  *See* Defendants'

sources, Plaintiffs noticed Mr. Johnson's deposition even though they had used only 11 of the 20

depositions authorized by the Magistrate Judge.

        a.        <u>Plaintiffs Rejected Fidelity's Attempts To Resolve The Discovery
Dispute</u>.

After Plaintiffs noticed Mr. Johnson's deposition, Defendants met and conferred with

Plaintiffs and explained Mr. Johnson's importance to the overall Fidelity organization, as well as

his lack of any relevant, non-cumulative knowledge about the issues in this case.  During this

conference, Plaintiffs were unable to articulate any specific need for Mr. Johnson's deposition.

*See* Defendants' Memorandum of Law in Support of Motion for a Protective Order to Quash the

Deposition Notice of Edward C. Johnson 3d, Chairman of FMR Corp., at 15 (Sept. 28, 2007)

(Dkt. 100) ("Quash Memo.").  Defendants offered to produce alternative, less burdensome,

witnesses, but Plaintiffs declined to compromise, suggesting – if not betraying – Plaintiffs'

improper motives.

        b.        <u>Fidelity Established Good Cause To Preclude Mr. Johnson's Deposition</u>.

Fidelity moved to quash, arguing that Mr. Johnson's deposition is unnecessary, that any

relevant testimony he might provide would be wholly cumulative, and that the Magistrate Judge

should exercise discretion to preclude the unjustified and potentially abusive deposition.  Fidelity

evidenced, through a detailed review of Plaintiffs' Section 36(b) claim and the discovery already

completed, that the information sought from Mr. Johnson was cumulative and his testimony

unnecessary.  *See* Quash Memo. at 1, 4-12, 13-15.  Fidelity illustrated that, although Plaintiffs

contend that Mr. Johnson is a "central figure" within Fidelity, he is far from central to the issues

in this litigation.  *See id.*; Reply to Plaintiffs' Opposition to Fidelity's Motion for a Protective

---

Memorandum of Law in Support of Motion for a Protective Order to Quash the Deposition Notice of Edward C.
Johnson 3d, Chairman of FMR Corp., at 16 (Sept. 28, 2007) (Dkt. 100).

Order to Quash the Deposition Notice of Edward C. Johnson 3d, Chairman of FMR Corp., at 8-10 (Nov. 29, 2007) (Dkt. 124) ("Quash Reply").  Rather, it is the Independent Trustees – not Mr. Johnson – who, by statutory requirement and well-evidenced practice, negotiate and approve advisory contracts between the funds and Fidelity at least annually.  *See* Quash Memo. at 10-13; Quash Reply at 4-5.[12]  It is therefore the Independent Trustees who can best address the issues of the Board of Trustees' fee approvals, not Mr. Johnson.  *See id.*  Similarly, although Mr. Johnson is Chairman and/or chief executive officer of FMR LLC and of the Fidelity defendant registered investment advisers, it is others, not Mr. Johnson, who run Defendants' day to day operations and who, therefore, are best suited to answer questions regarding the *Gartenberg* factors or other possibly relevant subjects.  *See* Quash Memo. at 1, 4-12, 13-15.

c.    Plaintiffs Failed To Establish A Need For Mr. Johnson's Deposition.

Plaintiffs opposed Fidelity's motion for a protective order, asserting that Mr. Johnson has "unique" knowledge on two topics: (i) the 1978 origin of one feature of Fidelity's fee structure – the so-called "group fee," which establishes a percentage of assets fee rate applicable to all individual equity funds that is graduated based upon all assets invested in all Fidelity mutual funds; and (ii) the Independent Trustees' 1994 report on economies of scale.  *See* Plaintiffs' Opposition to Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d, at 8-9 (Oct. 17, 2007) (Dkt. 106).  In reply, Fidelity established that to the extent these issues are relevant – and the 30 year old reasoning behind the origin of one aspect of the

---

[12]    The Independent Trustees nominate, appoint and compensate themselves.  They have their own chair, who, during the relevant period, included the chief executive officer of Lexmark, the President of Texas A&M University and now U.S. Secretary of Defense, and a private equity firm chief executive officer.  The Independent Trustees also constitute the only members of all committees of the Board of Trustees.

15

current fee structure is clearly not[13] – Mr. Johnson has no unique perspective as to either, and his

information, if any, is at best cumulative of what has already been obtained or could be obtained

from others.  *See* Quash Reply at 3-7.  Through the submission of a declaration from

Mr. Johnson, Fidelity also demonstrated that Mr. Johnson has no specific memory of the now

remote events of 1978 and 1994.  *See* Declaration of Edward C. Johnson 3d, ¶¶ 3-4 (Nov. 29,

2007) (Dkt. 125).  Further, Fidelity identified two senior Fidelity officials, Stephen Jonas[14] and

Karen Hammond, both of whom possess information regarding the 1994 report errantly sought

from Mr. Johnson.  *See* Quash Reply at 7.  Defendants also noted in their reply brief that they

had offered to make either Ms. Hammond or Donald Kirk, an independent trustee who was a

member of the 1994 *Ad Hoc* Committee on Economies of Scale, available for deposition in lieu

of Mr. Johnson, but were rebuffed by Plaintiffs.  *See id.*

        d.       <u>Magistrate Judge Bowler Finds Good Cause To Issue A Protective Order As To Mr. Johnson's Deposition</u>.

After full briefing, Magistrate Judge Bowler heard argument on Fidelity's motion for a

protective order on December 3, 2007.  After taking the motion under advisement, the Magistrate

Judge, in an appropriate exercise of discretion, precluded the deposition:

> Although highly placed executives are not immune from
> discovery, a court may place limits upon such discovery.  The
> burden of the discovery outweighs its likely benefit.  It is also
> unreasonably cumulative or duplicative, and was obtainable to a
> large degree from less burdensome sources.

---

[13]    This case concerns whether Fidelity's advisory fees from 2003 (one year prior to the filing of the Complaint) forward were excessive.  15 U.S.C. § 80a-35(b).  Fidelity's decision in 1978 to introduce a group fee component to its fee structure is not relevant to annual fee decisions that were made 25 to 30 years later.

[14]    Mr. Jonas, Fidelity's chief financial officer in 1994, was the Fidelity representative responsible for project oversight and presentations to the 1994 *Ad Hoc* Committee on Economies of Scale.  Mr. Jonas was assisted in 1994 by Ms. Hammond, a Senior Vice President who is still employed by Fidelity.  Mr. Jonas later served as Fidelity's executive director, from 2005-07, and as an interested Fidelity fund trustee.  In June 2007, he retired from Fidelity.  Plaintiffs initially named Mr. Jonas as a potential deponent, but later elected not to take his deposition.

Electronic Order (Dec. 5, 2007).

## ARGUMENT

A.    Standard of Review

The district court may reconsider a magistrate judge's ruling on a non-dispositive pretrial matter and may set such a ruling aside only when it determines that the ruling was clearly erroneous or contrary to law.[15]  Where, as here, the challenged rulings reflect the court's discretionary management of discovery, the Magistrate Judge's orders must stand unless they constitute a clear abuse of discretion.[16]  As Plaintiffs acknowledge, the Court should accept both the Magistrate Judge's findings of fact and conclusions of law, unless "after scrutinizing the entire record, [the Court] form[s] a strong, unyielding belief that a mistake has been made."  Pls. Obj. (Dkt. 130), at 7 (quoting *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir.

---

[15]    *See* Fed. R. Civ. P. 72(a) (addressing treatment of non-dispositive pre-trial matters under 28 U.S.C. § 636(b)(1)(A)); Rule 2(b), Rules for U.S. Magistrates in U.S. District Court for the District of Massachusetts (same); *see also Pagano* v. *Frank*, 983 F.2d 343, 346 (1st Cir. 1993); *Holmes Products Corp.* v. *Dana Lighting, Inc.*, 926 F. Supp. 264, 266-67 (D. Mass. 1996); *Cooper* v. *Church of Scientology of Boston, Inc.*, 92 F.R.D. 783, 784 (D. Mass. 1982).

[16]    *See, e.g.*, *Emerson Electric Co.* v. *Ouellette*, No. Civ. A. 96-0364-B, 1998 WL 34088465, at *2 (D.N.H. May 12, 1998) ("Pursuant to this highly deferential standard, a magistrate judge is afforded broad discretion in resolving discovery disputes, and reversal is ordinarily only appropriate if that discretion is abused.").  As the First Circuit stated in *Mack* v. *Great Atlantic and Pacific Tea Co.*,

> For the most part, there are no barbed-wire fences marking the precise boundaries of pretrial discovery.  Management of discovery is a largely empirical exercise, requiring judges to balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions, and then to factor in systemic concerns.  Limits can best be set case by case.  Although judicial discretion is not unrestrained – courts must apply a set of general principles, *see, e.g.*, Fed. R. Civ. P. 26 – parties have a correlative obligation to tailor interrogatories to suit the particular exigencies of the litigation. They ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up.  ***And above all, the trier must be accorded considerable latitude in gauging the extent of a party's compliance with these precepts.  Sticking the appellate nose too readily into the district court's scope-of-discovery tent is, we think, a recipe for disaster.***

871 F.2d at 187 (emphasis added).

LIBA/1859608.1

1999)); *see also Mack*, 871 F.2d at 186 (appellate court will "intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party"). Here, the Court cannot find clear error or abuse of discretion in light of the Magistrate Judge's:

- Knowledge of the case, issues, and parties;

- Oversight of discovery through periodic hearings and status conferences for more than one year;

- Provision of ample opportunity for the parties to be heard on the discovery issues at hand – by brief, declaration, and oral argument;

- Offer to Plaintiffs, in the case of portfolio managers' compensation, of an opportunity for a renewed motion based on a "further and much stronger showing of need," and reasonable determination, after a second round of briefing and oral arguments, that the purported further showing was "inadequate"; and

- Issuance of rulings that are supported by the principles of both Rule 26 and established case law.

Far from having committed a clear error or an abuse of discretion, the Magistrate Judge got it spot on.

B.    Magistrate Judge Bowler's Rulings Were Neither Clearly Erroneous Nor An Abuse Of Discretion.

1.    The Magistrate Judge's Ruling Regarding Individual Portfolio Manager Compensation Was Not Clearly Erroneous Or An Abuse Of Discretion.

Plaintiffs' Objection on the issue of portfolio manager compensation is to the Magistrate Judge's denial of Plaintiffs' *renewed* motion, by which they purported to advance "a further and much stronger showing of need." The sole support for the renewed motion came in the form of expert affidavits that were in direct conflict with the same experts' past conduct and testimony under oath. *See supra* at pp. 10-12. Faced with these affidavits, which were at best misleading, and briefs from Plaintiffs that were shamelessly inconsistent and factually incorrect, *see supra* at

pp. 10-12,[17] the Magistrate Judge reasonably exercised discretion in concluding that "a further and stronger showing of need" had not been made.

Magistrate Judge Bowler's ruling is in keeping with *Strigliabotti* v. *Franklin Resources, Inc.*, No. C 04-0883 SI, slip op. (N.D. Cal. Oct. 24, 2006) (attached hereto as Ex. 1.D), the only written decision addressing whether portfolio manager compensation is discoverable in a Section 36(b) action. In that case, the district court denied discovery of individual portfolio manager compensation on exactly the grounds argued by Fidelity here. *See* PM Comp. Memo. at 19-20 The Magistrate Judge's ruling is also consistent with every reported decision under Section 36(b), for no court in any such case has ever relied on – or even referenced – portfolio manager compensation in considering the merits of a claim of excessive compensation. *See id.* at 20, n.13.[18]

On the record of the motion, opposition, and argument, it is clear that Magistrate Judge Bowler carefully balanced privacy interests and business sensitivity concerns, on the one hand, against the relevance of the information to Plaintiffs' claims, on the other, and came out in favor of the former. This Court cannot find fault with the Magistrate Judge's methodology for addressing the discovery issue presented to her, the thoroughness of the court's consideration, or

---

[17]    Plaintiffs' factual misrepresentations continue before this Court. In their Objection, Plaintiffs misleadingly imply that portfolio manager compensation accounts for two thirds of all investment management expenses. Pls. Opp. (Dkt. 130), at 9. In reality, it is the compensation expense for ***all*** employees who contribute to investment management (not just the portfolio manager) that account for two thirds of that expense category. Thus, the portfolio manager's compensation is only one of the hundreds of employees (including research analysts, trading personnel, management, systems personnel, and others) whose compensation is included to make up the majority of total investment management expenses. Moreover, investment management expenses are but one of a number of categories of expenses incurred by Defendants in rendering services to the five funds at issue in the case.

[18]    Securities and Exchange Commission disclosure regulations likewise confirm that individual employee compensation is not information that is relevant to shareholder issues. The SEC declines to require disclosure of individual employee compensation due to competitive sensitivity and personal privacy concerns and analogizes mandated executive compensation disclosure in other industries to disclosure of the adviser's compensation in the mutual fund industry. *See* 17 C.F.R. § 229.402; *see also* August 2006 Executive Compensation and Related Person Disclosure rulemaking, Sec. Act Rel. No. 8732A; December 2006 Executive Compensation amendments, Sec. Act Rel. No. 8765.

19

the reasonableness of the court's assessment of the purported "further showing" based upon self-contradictory opinions of Plaintiffs' experts and ultimately Plaintiffs' disclaimer of their experts' need.  There is no basis for any finding an abuse of discretion by the Magistrate Judge.

      2.      <u>The Magistrate Judge's Ruling Regarding Mr. Johnson's Deposition Was Not Clearly Erroneous Or An Abuse Of Discretion</u>.

It is not an abuse of discretion to preclude a deposition where, as here: (i) a company's senior-most executive has no information to provide that is not cumulative or duplicative of information already provided or that easily could have been obtained from others; (ii) the deposition is potentially abusive; and (iii) it appears to be based on pretext with an aim toward harassment.[19]  Indeed, protective orders precluding depositions of senior executives are granted with some frequency.  *See, e.g.*, Quash Reply at 2-3 & nn.1-2.  Magistrate Judge Bowler's preclusion of Mr. Johnson's deposition – which was based on an ample showing of good cause and reflects an appropriate understanding of the case law – was neither clearly erroneous nor an abuse of discretion.[20]

---

[19]    *See, e.g.*, *Conrail* v. *Primary Indus. Corp.*, Nos. 92 Civ. 4927 (PNL), 92 Civ. 6313, 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) ("[P]ermitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation."); *Digital Equip. Corp.* v. *System Indus. Inc.*, 108 F.R.D. 742, 743 (D. Mass. 1987) (granting Digital's motion for a protective order to prevent deposition of its president where it was clear that deposition was noticed "for purposes of harassment and annoyance"); *see also Mulvey* v. *Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985) (precluding deposition of Chrysler's CEO, stating "[the CEO is] a singularly unique and important individual who [could] be easily subjected to unwarranted harassment and abuse"); *Lange* v. *Roman Catholic Diocese of Dallas*, 648 N.Y.S.2d 265, 266 (Sup. Ct. New York County 1996) (observing that noticed deposition of high-ranking church official was probably "sought not to obtain necessary information as to events and circumstances at issue . . . but for the purpose of promotion, publicity or strategic value"), *aff'd*, 665 N.Y.S.2d 651 (N.Y. 1st Dep't 1997).

[20]    Another court has similarly recently exercised its discretion under Rule 26(b) to preclude Mr. Johnson's deposition, stating:

> Although the Complainant correctly argues that having a busy schedule is not a satisfactory reason for granting a protective order, the cases . . . also recognize that very senior corporate officers can be subject to potential harassment in the discovery process. . . . Despite Complainant's attempt to minimize the time, effort and expense required for Mr. Johnson to prepare for deposition, I find that it would not be insignificant.

Order Granting Motion for a Protective Order Quashing Notice of Deposition of Edward C. Johnson, at 8, *in Zang* v. *Fidelity Management & Research Co.*, Case No.: 2007-SOX-00027 (U.S. DOL Jan. 3, 2008).  As the

20

Plaintiffs' Objection does nothing to undermine the factual and legal correctness of the Magistrate Judge's ruling. Plaintiffs have consistently failed to identify any question that could be posed to Mr. Johnson that will not already have been answered – or that could not already have been asked and answered – by others. Instead, in their Objection, Plaintiffs now claim that "Mr. Johnson's testimony cannot be replaced by another witness as he alone can testify as to his unique perspective and history with the company." Pls. Opp. (Dkt. 131), at 5. But, of course, every individual has a "unique perspective." The issue is not whether Mr. Johnson's perspective is different from that of others, but whether any such difference could possibly matter. Here, it cannot. The issue in the case is the reasonable proportionality of fees and services. That is a question addressed by objective facts. The investment adviser's motive, intent, and state of mind, are not issues. Thus, the "unique perspective" of Mr. Johnson, or of any individual, is simply irrelevant. Plaintiffs also make the absurd assertion that Mr. Johnson's testimony would be unique because of the "sole responsibility he takes for much of Fidelity's operations." *Id.* at 7. This is nonsensical; as the chairman of a holding company with operating units that employ more than 44,000 employees worldwide, *see supra* note 11, Mr. Johnson does not have "sole responsibility" for ***any*** component of Fidelity's business, let alone for any issue relevant to this lawsuit.

Plaintiffs also attempt to bolster their argument rhetorically by asserting that "conflicts of interest lie" at the heart of this case. *See* Pls. Obj. (Dkt. 131), at 5. This argument is preposterous. For one thing, whether there are conflicts of interest inherent in the structure of the Fidelity mutual funds – which have, like most mutual fund families, an "externalized"

---

court further noted, "[i]f Mr. Johnson were subject to deposition in every suit filed against Fidelity, he would have little time for performing his duties as chairman." *Id.* at 8, n. 3.

investment adviser – is a matter of law.[21]  Any such conflict is addressed by numerous requirements of the Investment Company Act and SEC regulations, including the requirements that an adviser's contract must be renewed at least annually, that a majority of a fund's noninterested trustees or directors must approve contracts with the adviser and certain affiliates of the adviser, and that the adviser has a fiduciary duty with respect to receipt of compensation. *See, e.g.*, 15 U.S.C. § 80a-15(a)(2), 80a-35(b).  Mr. Johnson has nothing to add about the legal or regulatory framework of the mutual fund business that is germane to this case.  Moreover, whether Fidelity conducts its business in a way that emphasizes alignment of interest between Fidelity and its managed mutual funds is a question of objective fact about which numerous individuals have already testified.

Plaintiffs acknowledge the general rule that, before trying to obtain discovery from a chief executive, a party must first try to obtain the information from lower-level employees.  *See* Pls. Obj. (Dkt. 131), at 8.  But Plaintiffs argue that "with a strict limit on the number of depositions that plaintiffs had available for discovery, plaintiffs did not have the luxury of deposing a range of lower-level employees to determine whether they could provide some of the information that Plaintiffs reasonably believed would be provided by Mr. Johnson."  *Id.*  This contention is remarkable in light of the fact that Plaintiffs used only 14 of their 20 allotted depositions.  *See supra* at pp. 8-9 (identifying, by name and title, each of 14 senior executives, portfolio managers, and independent trustees made available by Defendants for deposition, including Ms. Johnson, then-President of FMR Co., Mr. Reynolds, second-in-command to Mr.

---

[21]  As a matter of standard industry practice, the management and operation of a mutual fund are externalized and contractually delegated to an investment adviser.  As numerous courts have recognized, Congress enacted the Investment Company Act and the Investment Advisers Act of 1940 with the goal of protecting mutual fund investors by maintaining a fund's legal separation (and, therefore, its independence) from its investment adviser.  *See* 15 U.S.C. §§ 80a-10(A)-(B), 80a-15(a)-(c); *see also Burks* v. *Lasker*, 441 U.S. 471, 480-87 (1979) ("Congress consciously chose to address the conflict-of-interest problem through the Act's independent directors section, rather than through more drastic remedies.").

Johnson, and other similarly busy executives).  Among other glaring omissions, Plaintiffs elected

not to depose Mr. Jonas, who served as Defendants' executive director and senior-most

executive from 2005 to 2007.  Mr. Jonas not only ran the operations of the investment advisers

through much of the period of time covered by the case, but also made the adviser's

presentations to the Independent Trustee Committee on Economies of Scale in 1994.  *See supra*

at p. 16 & note 14.  Similarly, while Plaintiffs justify their attempt to take Mr. Johnson's

deposition on his purportedly "unique" knowledge of the Independent Trustee Committee's 1994

Report, they chose not to ask questions of numerous witnesses on the subject.  *See supra* pp. 15-

16.[22]  In short, Plaintiffs' argument that they need Mr. Johnson's testimony on certain subjects is

belied by their own conduct of discovery in the case as a whole.  Under the circumstances,

Plaintiffs' assertion that they need Mr. Johnson's deposition can only be interpreted as

pretextual.[23]

## **CONCLUSION**

Fact discovery was long scheduled to close by September 30, 2007 and in fact closed on

October 31, 2007.  Plaintiffs now seek discovery they do not need but could cause business harm

to Fidelity.  Enough is enough.  Magistrate Judge Bowler has closely supervised this case and

has given careful and reasoned consideration to the discovery requests upon which the

Objections are based.  The issues at hand are committed to Magistrate Judge Bowler's discretion,

and the record shows that the Magistrate Judge exercised that discretion soundly.  Plaintiffs'

Objections should be denied.

---

[22]    Not only did Plaintiffs reject Defendants' offer of Ms. Hammond and Mr. Kirk, but Plaintiffs also asked only
minimal questions about the 1994 report – with little or no follow-up – of independent trustee, Marvin Mann,
who was on the board in 1994 and was a member of the 1994 Ad Hoc Committee on Economies of Scale.  *See*
Mann Tr. 291:11-307:7.

[23]    Notably, Plaintiffs request to take Mr. Johnson's deposition first came on the heels of the withdrawal from the
case of Plaintiffs' three most experienced law firms.

## REQUEST FOR ORAL ARGUMENT

In accordance with Rule 7.1(d) of the Local Rules of this Court, Defendants request oral argument at a date and time to be set by this Court.

Respectfully submitted,

GOODWIN PROCTER LLP

_____ /s/ James S. Dittmar _____
James S. Dittmar (BBO# 126320)
David J. Apfel (BBO# 551139)
Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 570-1000
jdittmar@goodwinprocter.com
dapfel@goodwinprocter.com
sconcannon@goodwinprocter.com

MILBANK, TWEED, HADLEY &
  MCCLOY LLP
James N. Benedict
Sean M. Murphy
One Chase Manhattan Plaza
New York, New York 10005
Tel: (212) 530-5000

*Attorneys for Defendants Fidelity Management
& Research Company and  FMR Co., Inc.*

Dated: January 16, 2008

## CERTIFICATE OF SERVICE

I, James S. Dittmar, hereby certify that on January 16, 2008, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_____ /s/ James S. Dittmar _____
James S. Dittmar (BBO# 126320)