# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>                    Defendants. | CIVIL NO. 1:04-cv-11651-MLW (Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW (Consolidated Case) |

**DECLARATION OF JAMES S. DITTMAR IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO COMPEL DISCOVERY**

JAMES S. DITTMAR, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.     I am a member of the law firm of Goodwin Procter LLP, counsel for Defendants Fidelity

Management & Research Company and FMR Co., Inc.  I am a member in good standing of the Bars of

the State of Massachusetts and the United States District Court for the District of Massachusetts.  I make

this declaration in support of Defendants' Opposition to Plaintiffs' Renewed Motion to Compel

Discovery.

2.     Attached hereto as Exhibit A is a true and correct copy of pages 32 through 33 and 38

through 39 of the transcript of the July 18, 2007 hearing before this Court on Plaintiffs' original motion to

compel.

3.     Attached hereto as Exhibit B is a true and correct copy of pages 134 through 137 of the

December 7, 2005 deposition transcript of Dr. Steven Pomerantz in Baker v. American Century Inv.

Mgmt., Inc., Case No. 04-4039-CV-C-ODS (W.D. Mo. 2006).

4.      Attached hereto as Exhibit C is a true and correct copy of pages 182 through 185 of the

December 20, 2005 deposition transcript of Mr. James D. Lamb in <u>Baker v. American Century Inv.</u>

<u>Mgmt., Inc.</u>, Case No. 04-4039-CV-C-ODS (W.D. Mo. 2006).

5.      Attached hereto as Exhibit D is a true and correct copy of an October 24, 2006 order of

the United States District Court for the Northern District of California in <u>Strigliabotti v. Franklin</u>

<u>Resources, Inc.</u>, No. C04-0883 SI, slip op. (N.D. Cal. Oct. 24, 2006).

I declare under penalty of perjury that the foregoing is true and correct.

Executed:       October 2, 2007
                Boston, Massachusetts


                                            /s/James S. Dittmar_____
                                            James S. Dittmar

**A**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CYNTHIA BENNETT, et al . CIVIL ACTION NO. 04-11651-MLW
  Plaintiffs        .

                 .

     V.          . BOSTON, MASSACHUSETTS
                 . JULY 18, 2007

FIDELITY MANAGEMENT &  .
 RESEARCH CO., et al  .
  Defendants      .

. . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:           Michael Woerner, Esquire
                          Keller Rohrback, LLP
                          Suite 3200
                          1201 Third Avenue
                          Seattle, WA   98101

                          Michelle H. Blauner, Esquire
                          Shapiro Haber & Urmy, LLP
                          53 State Street, 37th Floor
                          Boston, MA 02109
                          617-439-4949

                          Matthew Tuttle, Esquire
                          Burns & Levinson, LLP
                          125 Summer Street
                          Boston, MA   02110
                          617-345-3248

For the defendants:          James Dittmar, Esquire
                          David Apfel, Esquire
                          Goodwin Procter, LLP
                          Exchange Place
                          Boston, MA   02109
                          617-570-1944

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA   02093**
**(508) 384-2003**

32

1    have to pay them some amount of money.  We don't know what

2    amount of money that is, but apparently that money that is

3    being paid, the actual sum of money and compensation in

4    whatever form it comes has a direct bearing on whether there

5    are any economies of scale earned by these largest funds.

6              The relevance of these pieces of information that we

7    seek it couldn't be more central to the case.  And without this

8    information we have no way of presenting, I don't believe any

9    way of presenting our economies of scale argument with any

10   effectiveness.  And we certainly don't have any way of

11   rebutting the defendants' argument that there are actually

12   diseconomies of scale with these large funds because of the

13   portfolio manager compensation and so forth.  It's clearly

14   relevant.  It's clearly discoverable.  We do recognize that its

15   sensitive information much like most of the information in this

16   case.  Most of the thousands of pages of documents that have

17   been produced in this case have been marked as confidential.

18   We have a confidentiality order in place.  It was lengthily

19   negotiated by the parties.  Almost all of the deposition

20   transcripts, there's a provision in there for having those

21   designated as confidential.  We even have voluntarily

22   participated in a procedure that allows for extra secret

23   confidentiality in issues that come up at depositions where

24   Fidelity feels that it would like to limit the disclosure of

25   that information as much as possible and we've had certain

33

1  people leave the room during different parts of deposition

2  testimony and those parts of the transcripts have been

3  separately transcribed, separately produced.

4        Given all those things there's certainly no reason

5  why this information, the discreet information that we're

6  looking for about portfolio manager compensation can't be

7  produced in this case, and I don't think it's relevance can be

8  questioned.

9        THE COURT:  All right, Mr. Dittmar, last round.

10        MR. DITTMAR:  Thank you, Your Honor.  We're talking

11  here about how much five individuals are paid.  Well actually

12  since the portfolio manager position has changed from time to

13  time during the period covered by the litigation as to a couple

14  of several of the funds there may be eight individuals.  The

15  compensation of eight individuals, that's what we're talking

16  about.  It is not Fidelity's position that the compensation to

17  these people derives whether there are any economies or

18  diseconomies of scale.  That is a red herring.  That is not our

19  position.  We have not asserted it.  We do not assert it in

20  this litigation.

21        Economies of scale--

22        THE COURT:  Where is the harm with disclosing this

23  subject or confidentiality order?

24        MR. DITTMAR:  The harm, Your Honor, is that this

25  information - first of all, confidentiality orders are

38

1  manager compensation the SEC took the position that its

2  proposed rules would require description of the structure of

3  and method used to determine that compensation, exactly the

4  kind of information that we have disclosed here, but not the

5  compensation itself.  And the SEC said in the release of March

6  17, 2004, which we cite in our brief, Your Honor, the SEC said,

7  "We are not proposing to require disclosure of the value of

8  compensation paid to a portfolio manager."

9         They then note the position exactly as argued by

10  plaintiffs here, is portfolio manager compensation like

11  executive compensation which is disclosed for public

12  corporations?  And the SEC said, no, they disagree with that.

13  And the staff's language was the most direct mutual fund analog

14  to the compensation of an operating company's executive

15  officers is the compensation of the investment advisor,

16  Fidelity, which is disclosed.  The advisory fee which is the

17  amount paid by fund shareholders for portfolio management

18  services, that's what's really being paid for portfolio

19  management services, not what any one individual employee in

20  turn is compensated along with the great number of other

21  employees who provide services of one sort or another.  That

22  compensation the fee is paid to the fund advisor is fully

23  disclosed and we've disclosed it of course.

24         THE COURT:  All right.  My ruling is as follows.  As

25  to the first, the independent trustees' preparation sessions, I

39

1    find a common interest and therefore discovery relating to the

2    deposition preparation sessions that independent trustees shall

3    not be the subject of discovery at this time.

4            As to number two I will allow the redactions as set

5    forth in the privilege log, again on a basis of common interest

6    theory.

7            As to three as to compensation, the motion to compel

8    is denied without prejudice at this time to be renewed in 60

9    days upon a further and much stronger showing of need.  And

10   that is my ruling.

11           MR. TUTTLE:  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. DITTMAR:  Thank you, Your Honor.

14           THE COURT:  Hearing nothing else we stand in recess

15   at this time.

16           MR. MURPHY:  Thank you, Your Honor.

17           MR. WOERNER:  Status conference.

18           THE COURT:  Certainly.  Good point.  Mr. Duffy?

19           MR. WOERNER:  It has usually helped us to--

20           THE COURT:  Sure.

21           MR. WOERNER:  --get things moving.

22           THE COURT:  Late September?

23           MR. WOERNER:  We have a discovery cut off of the end

24   of September, so I'm just wondering if we could do it a little

25   bit earlier so if we see any issues before the discovery cutoff

**B**

IN THE WESTERN STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION
------------------------------------------------ x
ROBERT L. BAKER,

                         Plaintiff,

        -against-
AMERICAN CENTURY INVESTMENT MANAGEMENT, INC.,

                         Defendant.
------------------------------------------------ x

        DEPOSITION of the Plaintiff, STEVE
POMERANTZ, taken by the Defendant, held at the
offices of Milbank, Tweed, Hadley & Mc Cloy,
L.L.P., One Chase Manhattan Plaza, New York, New
York, on December 7th, 2005, at 9:30 a.m., before
a Notary Public of the State of New York.


*************************************************
        BARRISTER REPORTING SERVICE, INC.
                120 Broadway
            New York, N.Y. 10271
                212-732-8066

Pomerantz - Confidential

1         Pomerantz - Confidential
2  went up or down in relation to the assets of
3  either the Ultra Growth or Select fund?
4  A.    No, that wouldn't really contribute
5  to my opinion.
6  Q.    Did you undertake any effort to
7  determine whether the pay that is provided
8  to the portfolio managers of the Ultra
9  Growth or Select funds went up or down in
10  relation to assets?
11  A.    No, and it would have no contribution
12  to my opinion.
13  Q.    Do you know if portfolio managers'
14  and analysts' bonuses tend to increase as
15  assets tend to increase?
16  A.    I think that they do, yes, certainly
17  in dollar terms, but not in basis point
18  terms.
19  Q.    Well, how do you know if they go up?
20        How do you know they don't go up in
21  basis point terms, as well?
22  A.    I think I have kind of seen enough
23  salaries in my day to kind of have a sense.
24  I'm not citing any particular surveys that
25  would try to draw that link.

Page 134

1         Pomerantz - Confidential
2  Q.    If portfolio managers goes up as
3  assets go up, is that a fixed cost?
4  A.    Well, it's much closer to fixed in
5  basis points. I think of the salary -- the
6  salary I think of as a fixed cost, and as
7  assets go up, I actually see the salary as a
8  percentage of the assets going down.
9  Q.    Do you know what percentage of the
10  compensation to American Century portfolio
11  managers is in salary versus bonus or some
12  other incentive compensation?
13  A.    I mean, it would have to be very
14  small because if you look at, say, Ultra as
15  an example, the combined costs for managing
16  the asset is running about 5 basis points.
17  I mean, I don't really care if it's 5 basis
18  points of bonus or 5 basis points of salary.
19  It doesn't really have any impact.
20  Q.    So, you didn't look at that?
21  A.    No.
22  Q.    Do you know if in the late '90s, as
23  the market was rising, the portfolio manager
24  compensation was generally rising in the
25  market?

Page 135

1         Pomerantz - Confidential
2  A.    In the late '90s?
3  Q.    Yes.
4  A.    Yes, I believe that's true.
5  Q.    Do you know if mutual funds compete
6  with hedge funds for portfolio managers?
7  A.    I mean, I don't know how you would
8  say compete. I think there are portfolio
9  managers and there are hedge fund managers.
10  There are advantages and disadvantages to
11  each.
12  Q.    Throughout the '90s, did advisors
13  have to pay their portfolio managers more
14  money to retain them because of competition
15  with hedge funds?
16  A.    I don't know the answer to that.
17  Q.    Can an advisor add research analysts
18  to the fund regardless of what's going on
19  with assets?
20  A.    Can he? If he gets approval from his
21  superiors.
22  Q.    Just the advisor. If the advisor
23  chooses to add analysts to a portfolio
24  regardless of assets, can it do so?
25  A.    I think it can.

Page 136

1         Pomerantz - Confidential
2  Q.    Do you know if American Century ever
3  added analysts to its portfolios?
4  A.    No.
5  Q.    Do you look at how headcount changed
6  at American Century in relation to assets?
7  A.    I know I kind of observed the
8  numbers, but they don't stick with me, nor
9  do they contribute to my conclusions.
10  Q.    Have you ever heard that larger
11  mutual funds are harder to manage than
12  smaller?
13  A.    What does "harder" mean?
14  Q.    Have you ever heard the term
15  "harder"?
16  A.    Like in the context of diamonds being
17  harder than coal.
18  Q.    More complicated. More difficult to
19  manage.
20  A.    I think at some point -- I think the
21  size of the assets in the fund can start to
22  dilute the integrity of the investment
23  management process, but operationally, there
24  is no difference between buying 100 shares
25  or buying 1000 shares.

Page 137

35 (Pages 134 to 137)

C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

ROBERT L. BAKER, et          )
al.,                         )
                             )
        Plaintiffs,          )
                             )
        vs.                  )  Case No.
                             )  04-4039-CV-C-ODS
AMERICAN CENTURY             )
                             )
INVESTMENT MANAGEMENT,       )
                             )
INC.,                        )
                             )
                             )
                             )
        Defendant.           )
                             )

        VIDEOTAPED DEPOSITION of JAMES D. LAMB, taken
by the Defendant, held at the offices of Rouse,
Hendricks, German, May, P.C., 1010 Walnut Street,
One Petticoat Lane, Suite 400, Kansas City,
Missouri, on Tuesday, December 20, 2005, at
9:00 a.m., before a Notary Public of the State of
Missouri, Peggy E. Corbett, RDR-CCR-CRR.

C O N F I D E N T I A L

1  I know that I have to set them up. I know that
2  there's a preponderance that there's a lot higher
3  variable to shareholder services than there are to
4  managed money services.
5      Q.   Did you look at whether Ultra's portfolio
6  managers were made more money as the fund grew from
7  a billion dollars to $20 billion dollars?
8      A.   I know that they have a variable
9  compensation. I don't know what necessarily drives
10  the variable compensation, but the reality is
11  whatever team that they have, they behave as
12  somewhat of a fixed cost.
13      Q.   Well, do you know if they get paid more as
14  assets increase, would you consider that a fixed
15  cost?
16      A.   If the behavior is unrelated to the volume
17  of activity, yes.
18      Q.   So you think if Ultra's portfolio manager,
19  when it was a billion dollars, made $500,000, and he
20  makes $5 million when it's a $20 billion dollar
21  fund, that could be a fixed cost?
22      A.   For that particular year, it could be a
23  fixed cost because, you know, it's more related to
24  the number of equity companies that they're trading,
25  and has less to do with the number of shareholders

Page 182

1  that are buying the funds.
2      Q.   Do you know what components go into a
3  portfolio manager's compensation?
4      A.   No, I do not know the specifics of it. I
5  just know that they're compensated.
6      Q.   Do you believe that economies of scale in
7  the mutual fund industry are inexhaustible?
8      A.   I don't understand the question,
9  "inexhaustible."
10      Economies of scale exist because there are
11  fixed costs, there are some costs, and I know that
12  some of these, such as managed money, the cost per
13  unit goes down as the fund sizes increase.
14      Q.   You've never heard the phrase exhaustible
15  or inexhaustible in connection with the concept of
16  economies of scale?
17      A.   No, I have not.
18      Q.   Do you think economies of scale in the
19  mutual fund business are limitless? Is there a
20  limit to the amount of economies of scale that you
21  can achieve at some asset levels?
22      A.   The limit is conceptually and
23  theoretically tied to the point, and when fixed
24  costs near zero increment, to the next unit of
25  measure.

Page 183

1      So basically what happens, I mean if you
2  look at the bottom of the chart of where I used just
3  kind of the educational slide on breakpoints and
4  economies of scale.
5      Q.   15?
6      A.   Yes, the thing I think that's the most
7  important to notice is that when the cost per unit
8  in one unit is $105, the cost per unit for two is
9  $55. Economies of scale certainly exhibit
10  themselves early on in the volume.
11      As you get down to 100 units, that changes
12  to 200. The cost per unit only changed .50 cents,
13  where up here at the top it changed $50 dollars for
14  one unit.
15      Q.   I think we're agreeing. What I was trying
16  to say is it -- do economies of scale generally in a
17  production run exhibit themselves early in the
18  production run, and then the economies of scale
19  curve flattens out as production increases and fixed
20  costs become a smaller percentage of overall costs?
21      A.   Yes, I agree with that statement.
22      Q.   And at some point the amount of fixed
23  costs that you're achieving scale on become a very,
24  very small percentage of your overall costs so that
25  scale eventually exhausts itself?

Page 184

1      A.   That's possible.
2      Q.   We've talked a little about the efficiency
3  gains that you believe exist over time at American
4  Century.
5      A.   Yes, we have talked about that.
6      Q.   And did you quantify the cost reductions
7  that were attributable to efficiencies gained by
8  American Century over time?
9      A.   I did not quantify it in a total dollar
10  amount. I tried to illustrate that it probably
11  exists in the table and the text on Page 17.
12      Q.   And the text on Page 17, you don't know if
13  those costs were coming down because of efficiency
14  gains, economies of scale, or potentially other
15  reasons?
16      A.   I think it's a combination of it. There's
17  no doubt that in my mind that a higher percentage of
18  shareholder services is probably tied up in variable
19  costs, certainly a much higher percentage than you
20  would have in the managing money side of it.
21      So I'm assuming that a lot of these gains
22  are probably technological gains, and you know, for
23  all intents and purposes they changed some of their
24  variable costs into fixed costs, is my supposition,
25  but as technology has taken a much greater role in

Page 185

47 (Pages 182 to 185)

CONFIDENTIAL

**D**

1

2

3

4

5                              IN THE UNITED STATES DISTRICT COURT

6                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   SUSAN STRIGLIABOTTI, et al.,                    No. C 04-0883 SI

9               Plaintiffs,                         **ORDER GRANTING PLAINTIFFS'**
                                                    **MOTION TO COMPEL DISCOVERY**
10    v.

11  FRANKLIN RESOURCES, INC., et al.,

12              Defendants.
                                             /
13

14          By letter briefs, the parties seek resolution of several discovery disputes.[1]

15

16  **1.      Extension of discovery**

17          First, plaintiffs seek an extension of time to issue follow-up discovery. Plaintiffs assert that they

18  need an extension of time because, *inter alia*, defendants' document production has been hampered by

19  the fact that defendants have changed law firms three times during the course of this litigation. The

20  parties dispute whether plaintiffs are entitled to any additional information, as well as which side is

21  responsible for any delay. Both sides have submitted voluminous correspondence to the Court in an

22  effort to demonstrate that the other side has delayed in discovery.

23          The Court concludes that a brief extension of discovery is warranted. While the Court does not

24  find that defendants have intentionally delayed in producing any discovery, the correspondence

25  submitted by both parties shows that discovery has been protracted, scheduling of depositions has been

26  difficult, and document production has been complicated by defendants' use of three law firms

27

28          [1] The parties' letter briefs are found at Docket Nos. 187, 190, 191, and 200.

United States District Court
For the Northern District of California

1  responsible for document discovery. The new non-expert discovery cut-off is **November 13, 2006**. The

2  parties are directed to meet and confer on a modified pretrial schedule, and shall submit a stipulation

3  and proposed amended schedule no later than **October 27, 2006**.

4

5  **2.    Income of individual portfolio managers**

6       The second discovery dispute concerns whether the individual income of each portfolio manager

7  is privileged.  During depositions of portfolio managers, defense counsel instructed witnesses not to

8  answer any questions about individual manager compensation on the grounds that such information is

9  highly sensitive, competitive information to Franklin, and because it would invade the privacy of the

10  individual manager.  Defendants assert that the individual incomes of the portfolio managers are

11  irrelevant to plaintiffs' § 36(b) claim because whether the fee charged to Funds was excessive does not

12  depend on what an individual portfolio manager earned, but rather whether the total fee was so

13  disproportionately large that it bears no reasonable relationship to the services rendered.  Plaintiffs

14  respond that the costs of compensation paid to portfolio managers over time is relevant to an economies

15  of scale analysis, as well as a profitability analysis.

16       The Court generally agrees with defendants that plaintiffs have not demonstrated that they need

17  to know the incomes and bonuses of individual portfolio managers.  If plaintiffs have been provided

18  with information about the total fees charged to each fund, as well as information about how those fees

19  have changed over time, there is no need for further information about specific incomes.

20

21  **3.    Monthly Operating and Performance reports**

22       The final dispute centers on whether defendants must produce Monthly Operating &

23  Performance (MOP) Reports.  According to defendants,

24       The MOP report is an internal report distributed to the managers of the Franklin Equity
        Group on a monthly basis.  It provides the managers of the Franklin Equity Group with
25      a snapshot of how the accounts that group manages are performing, their revenue to date
        (based on fees multiplied by assets under management) and the contribution of this
26      revenue to Franklin's total revenue figures, as well as information regarding the comings
        and goings of personnel.
27

28  Docket No. 190.

2

1      Plaintiffs assert that the MOP reports are responsive to request numbers 15 or 19 of the first

2 request for production of documents. The Court agrees that the MOP reports are responsive to request

3 15, which sought:

> 4   All documents relating to any calculation, review, cost benefit analysis, compilation,
> presentation or summarization (including financial statements) which reflect the costs
> 5   incurred and income received by the Defendants or any of their affiliates in providing
> management, investment advisory, administrative, distribution or other services to any
> 6   of the funds in the Fund Complex or any other person or client. This request includes
> any calculation, review or analysis of the profitability of providing such services.

7

8 Docket No. 187 at n. 4. Based on defendants' description of the MOP reports, those reports are

9 "documents relating to . . . income received by the Defendants . . ." because these reports summarize

10 financial performance, including revenue. Defendants are ordered to produce these documents by

11 **October 27, 2006**.

12

13      **IT IS SO ORDERED.**

14

15 Dated: October 23, 2006

                                    SUSAN ILLSTON
16                                       United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

*(left margin, vertical)* United States District Court — For the Northern District of California