UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN,<br>for the use and benefit of<br>THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND and FIDELITY LOW-PRICED STOCK FUND,<br><br>                                        Plaintiffs,<br>   v.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>                                        Defendants. | CIVIL NO. 1:04-cv-11651-MLW<br>(Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW<br>(Consolidated Case) |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFFS' OBJECTION TO ORDER DENYING PLAINTIFFS'
RENEWED MOTION TO COMPEL DISCOVERY (DKT. 130) AND
ORDER ALLOWING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER TO
QUASH THE DEPOSITION NOTICE OF EDWARD C. JOHNSON 3D (DKT. 131)**

**I. INTRODUCTION**

Plaintiffs submit this reply to Defendants' Response to Plaintiffs' Objection to Order Denying Plaintiffs' Renewed Motion to Compel Discovery and Order Allowing Defendants' Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d, Jan. 16, 2008 (Dkt. 136).

District Courts determine objections to magistrate judges' pretrial orders on the basis of a review of the record. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(a); *In re Holywell Corp.*, 967 F.2d

568 (11th Cir. 1992). That record is listed in Plaintiffs' Objection to Order Denying Plaintiffs' Renewed Motion to Compel Discovery (Dkt. 130 at 5 n.5) and in Plaintiffs' Objection to Order Allowing Defendants' Motion for a Protective Order to Quash the Deposition Notice of Edward C. Johnson 3d (Dkt. 131 at 2-3).

In their objections, Plaintiffs guide the Court to areas of the record supporting their particular requests for discovery. Particularly, Plaintiffs have shown that the compensation information they seek underlies a key justification of Defendants for their failure to share with the shareholders of each of the funds the savings from economies of scale inherent in managing a mutual fund, that Plaintiffs' consulting experts declared under oath that the discovery sought was required for certain analysis that is uniquely pertinent to the funds at issue and that these declarations were not specifically refuted by declarations of Defendants' experts or any other evidence, that certain components of the compensation data result in unusual fluctuations in compensation that merit investigation, and that there is no factual basis for a determination that the blanket protective order applying to this case is not sufficient to protect the confidentiality of the information sought. With respect to the deposition of Mr. Johnson, Plaintiffs outline the breadth and depth of Mr. Johnson's involvement in the matters at issue in this case and the multiple conflicting positions he has held within Fidelity, which bear directly on the propriety of Defendants' fee-setting activities.

Defendants in their response make incorrect statements of law and fact, as well as attack Plaintiffs' counsel *ad hominem*. Plaintiffs file this reply to address Defendants' misstatements and attacks.

## II. ARGUMENT

### A. Plaintiffs have not taken an "anything goes" approach to discovery

The discovery that Plaintiffs seek is limited in scope, imposes minimal burden and is not oppressive. It certainly does not impose any of the "threat of discovery expense" likely to arise from nationwide discovery involving the local service providers to 90 percent of U.S. local telephone subscribers, which was the potential abuse that concerned the Supreme Court in *Bell Atlantic Corp. v. Twombly*. 127 S. Ct. 1955, 1967 (2007). Plaintiffs' approach to discovery in this case has always been limited and targeted. The disputed discovery is limited and targeted as well. The portfolio manager compensation expense information sought by Plaintiffs could fit on one sheet of paper and is no doubt readily available to Defendants from their information systems. Defendants have expended far more time and energy redacting and otherwise concealing that expense data than would have been required if they had just provided it. Mr. Johnson's deposition would be one day.

### B. *Gartenberg* is not the law of the First Circuit

The case that Defendants cite to support their application of the analytical framework of *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), states, "[T]he First Circuit has not had occasion to set an excessive fees standard [in an ICA § 36(b) case]." *Krantz v. Fidelity Management & Research Co.*, 98 F. Supp. 2d 150, 158 (D. Mass. 2000). *Gartenberg* is not the law of the First Circuit or this Court. *Id.*, Pls' Obj. (Dkt. 130). at 5 n.4.[1]

---

[1] *Accord Dumond v. Mass. Fin. Servs. Co.*, No. 04-11458, 2006 U.S. Dist. LEXIS 1933, at *4 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-10988, 2005 U.S. Dist. LEXIS 4892, at *12 (D. Mass. Mar. 28, 2005).

**C.      Defendants various other brushstrokes coloring Plaintiffs' case lack foundation, credibility or are otherwise inapposite**

The statements of Defendants' expert, Prof. Glenn Hubbard, regarding the competitiveness of the mutual fund industry, lack foundation and are irrelevant to the issues before the Court, which pertain to the discoverability of Defendants' cost information and other information pertinent to analysis of their execution of Defendants' fiduciary duty. Defs.' Resp. at 4-5. (To be sure, industry competitiveness has been the litany of the mutual fund industry for at least 40 years and was not persuasive to the Securities and Exchange Commission or Congress when § 36(b) was enacted. *See, e.g.,* Alan W. Rottenberg, *Developing Limits on Compensation of Mutual Fund Advisers*, 1970 HARV. J. LEGIS. 309, 337-39.) Moreover, the argument regarding the industry's competitiveness is entirely inapposite to whether the fees Defendants charge the Funds are consistent with Defendants' legal fiduciary duty, which requires the obligated party to act "with the punctilio of an honor most sensitive," and at a level "higher than that trodden by the crowd." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). Prof. Hubbard's claims are also contradicted by published work of his colleagues at the American Enterprise Institute:

> [I]n one industry . . . a form of rate regulation remains in force, suppressing price competition and ***keeping prices for many consumers above what a competitive market would produce.*** That industry is ***the mutual funds industry.***

Peter J. Wallison & Robert E. Litan, *Competitive Equity: A Better Way to Organize Mutual Funds* 1 (2007) (emphasis added).

Defendants patronize Plaintiffs' assertion that "the mutual fund industry still suffers from a severe lack of price competition" as "outdated and . . . wrong." (Defs.' Resp. at 5 n.4.) Their impertinence flies in the face of Plaintiffs' citation of publications from 2000, 2005 and 2007

4

(Pls.' Obj. (Dkt. 130) at 4), as well as the availability of several other U.S. government studies from this decade regarding fee abuses in the mutual fund industry.[2]

Defendants cite the work of the Funds' independent trustees. While this group is well-credentialed and reputable, their performance betrays that they are the wrong horse for the course. These Funds' trustees, including Secretary Gates, have managed neither to reduce the rates specifically charged to any of the Funds during any of their current tenures (and in some cases since at least 1995)[3] nor to change or threaten change, even in periods of laggard performance, of any of the Funds' investment advisers, even though these terms are subject to annual review. ICA § 15(c). The legendary investor Warren Buffet has written truth to such "fiduciary" conduct:

> Mutual fund directors and the entire board have many perfunctory duties, but in actuality have only two important responsibilities: obtaining the best possible investment manager and negotiating with that manager for the lowest possible fee. When you are seeking investment help yourself, those two goals are the only ones that count, and directors acting for other investors should have exactly the same priorities. Yet when it comes to independent directors pursuing either goal, their record has been absolutely pathetic.

---

[2] *E.g.,* Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment Companies, Investment Company Act Rel. No. 26350 (Feb. 11, 2004) (*available at* http://www.sec.gov/rules/final/33-8433.htm); Memorandum from Paul F. Roye, Director, Division of Investment Management, Securities and Exchange Commission, to William H. Donaldson, Chairman, Securities and Exchange Commission (June 9, 2003) (*available at* http://web.archive.org/web/20040601123255/http:/financialservices.house.gov/media/pdf/02-14-70+memo.pdf); Disclosure of Mutual Fund After-Tax Returns, Investment Company Act Rel. 24832 (Jan. 18, 2001) (*available at* http://www.sec.gov/rules/final/33-7941.htm); Division of Investment Management, Securities and Exchange Commission, Report on Mutual Fund Fees and Expenses (Dec. 2000) (*available at* http://www.sec.gov/news/studies/feestudy.htm); General Accounting Office, Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition (June 7, 2000) (*available at* http://www.gao.gov/archive/2000/gg00126.pdf).

[3] *Compare, e.g.,* Fidelity Magellan Fund, Statement of Additional Information, March 31, 1995 (*available at* http://www.sec.gov/Archives/edgar/data/61397/0000354046-95-000018.txt) *to* Fidelity Magellan Fund, Statement of Additional Information, March 31, 2007 (*available at* http://www.sec.gov/Archives/edgar/data/61397/000006139707000004/main.htm).

> Year after year the directors of Fund A select manager A, Fund B directors select manager B, etc. … in a zombie-like process that makes a mockery of stewardship. . . . *[A] monkey will type out a Shakespeare play before an "independent" mutual-fund director will suggest that his fund look at other managers . . . . When they are handling their own money, of course, directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others. . . .*
>
> [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably.

2002 Berkshire Hathaway, Inc., Annual Report to Shareholders, at 17-18 (*available at http://www.berkshirehathaway.com/2002ar/2002ar.pdf*).

Also for no purpose salient to the issues raised in Plaintiffs' Objections, Defendants selectively quote Plaintiffs' deposition testimony out of context, disregard the numerous form objections preserved in the record, mischaracterize the testimony and run roughshod over other evidentiary matters. The admissibility of such testimony is not to be determined at this phase of the proceedings. The issue in this ICA § 36(b) case is whether Defendants have abided by their fiduciary duty in taking hundreds of millions of dollars from the Funds and indirectly their shareholders, not whether a Fund's shareholders individually notice the skimming of several basis points of fees. (*See* Pls.' Obj. (Dkt. 130) at 3.) Indeed, this common problem is part of the policy structure underlying ICA § 36(b).

Finally, Defendants attempt to disparage Plaintiffs' counsel by noting that co-counsel has withdrawn from the case, then arguing that these discovery disputes at issue were only raised after their withdrawal. (Defs.' Resp. at 3.) Neither point is in any way relevant to whether Plaintiffs are entitled to the disputed discovery. It is also incorrect as a factual matter. Plaintiffs' original papers seeking to compel production of actual portfolio manager compensation information were joined by all counsel on the matter, three months prior to the withdrawal of co-counsel

6

in September 2007.  (Pls.' Mot. to Compel Disc. & Pls.' Mem. Supp. Pls.' Mot. to Compel Disc., June 21, 2007 (Dkts. 71, 72).)

**D.    Defendants impugn Plaintiffs' counsel and consulting experts with facile strawman arguments**

The record already details the selective, incomplete quotations and other misportrayals that underlie the sophistry of Defendants' accusation that the positions of Plaintiffs' counsel and consulting experts have been contradictory and inconsistent.  *Compare* Defs.' Resp. at 10-13 *to* Pls.' Reply, Oct. 19, 2007 (Dkt. 118), at 2-8.

**E.    Plaintiffs' effort to depose Ned Johnson 3d is not only genuine and proper, but necessary in light of Mr. Johnson's unique position at the head of numerous conflicting entities within the privately-held Fidelity**

Defendants' bald allegation that Plaintiffs only seek to depose Mr. Johnson as a form of harassment is outrageous.  The record is clear that Plaintiffs have taken a targeted and relatively restrained approach to discovery, having moved calculatedly from deponent to deponent, seeking the information essential to their case first from the most available and efficient sources and limiting the actual number of depositions along the way whenever Plaintiffs could determine that a particular witness's testimony was unnecessary.  Mr. Johnson has always been on Plaintiffs' list of potential deponents, however, Plaintiffs held off in actually noticing his deposition until it became apparent that Mr. Johnson's testimony would an important and necessary part of this case.

Defendants' attempt to characterize Mr. Johnson as an aloof "chairman of a holding company," having limited input and influence in the matters bearing on Fidelity's mutual fund business, is disingenuous.  It is belied by the record, which clearly establishes Mr. Johnson's decades in leadership roles at all relevant levels and branches of Fidelity's mutual fund business, his influential role as the Chairman of the Fidelity Board of Trustees, his control of Fidelity through the stock ownership of the Johnson family, all in addition to being the Chairman of the

"holding company" that ultimately reaps the profits of the excessive fees being charged to the Fidelity mutual funds at issue in this case.

Finally, Defendants' suggestion that Plaintiffs could have acquired the same information that they seek from Mr. Johnson through other Fidelity witnesses is simply unbelievable. Of course, other witnesses may have information that would overlap some of the knowledge that Mr. Johnson possesses. The lower-level Fidelity personnel mentioned by Defendants (Stephen Jonas and Karen Hammond), however, are hardly a substitute for the unique knowledge and perspective of Mr. Johnson. Moreover, the fact that two witnesses might possess certain overlapping knowledge does not give a defending party the right to put forward one witness over the other.[4] Those types of choices and the strategic decisions involved in pursuing discovery necessarily are the purview of the discovering party.

### III.  CONCLUSION

For the foregoing reasons and others, all as set forth in Plaintiffs' prior filings and the prior proceedings relating to these issues, the pretrial Electronic Order of Magistrate Judge Marianne B. Bowler denying Plaintiffs' Renewed Motion to Compel Discovery and allowing

---

[4] Simply because more than one witness may be asked about the same subject matter does not render that discovery ***unreasonably*** duplicative and cumulative. *Travelers Rental Co.*, 116 F.R.D. 140, 145 (D. Mass. 1987). With respect to the potentially different perspectives of different witnesses on the same subject:

> Lower-level executives may have greater knowledge of the manner in which the plan was implemented or administered. The lower-level executives may even have their own views as to why the plan was implemented or administered in a particular way. But those with greater authority may have the last word on why Ford formulated and/or administered the plan in the manner which the lower-level executives described it as being formulated and/or administered. And as the ultimate authority, their views as to why may be of far greater probative value on the issue of intent and motive than the views of the lower-level executives.

*Id.* at 146.

8

Defendants' Motion for Protective Order should be reversed, and Plaintiffs should be permitted to proceed with discovery as requested.

Dated February 1, 2008.

Respectfully submitted,

/s/
Lynn Lincoln Sarko *(pro hac vice)*
Michael D. Woerner *(pro hac vice)*
Laura R. Gerber *(pro hac vice)*
David Y. Chen *(pro hac vice)*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Michelle H. Blauner, BBO #549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street, 37th Floor
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

*Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin*

Robert D. Friedman, BBO# 180240
Harry S. Miller, BBO# 346946
Matthew J. Tuttle, BBO# 562758
Joshua N. Cook, BBO# 660346
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3000
Facsimile: (617) 345-3299

*Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent on February 1, 2008 to the following attorneys indicated as non-registered participants:

Robert J. Liubicic
MILBANK TWEED HADLEY & MCCLOY, LLP
One Chase Manhattan Plaza
New York, NY 10005-1413

David S. Cohen
Donna F. Mulvihill
MILBANK TWEED HADLEY & MCCLOY, LLP
International Square Building
1850 K Street, N.W.
Washington, DC 20006

/s/ _____