UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYNTHIA A. BENNETT *et al.*,<br>for the use and benefit of<br>FIDELITY MAGELLAN FUND, FIDELITY<br>CONTRAFUND, FIDELITY GROWTH &<br>INCOME PORTFOLIO I FUND, FIDELITY<br>BLUE CHIP GROWTH FUND, and<br>FIDELITY LOW-PRICED STOCK FUND,<br><br>          Plaintiffs,<br><br>    v.<br><br>FIDELITY MANAGEMENT & RESEARCH<br>COMPANY and FMR CO., INC.,<br><br>          Defendants. | No. 04-cv-11651-MLW<br>(Lead Case)<br><br>No. 04-cv-11756-MLW<br>(Consolidated Case) |

**PLAINTIFFS' MOTION FOR LEAVE
TO TAKE ADDITIONAL FACT DISCOVERY**

**I.     Introduction and Summary**

On March 27, 2008, Plaintiffs learned the identity of a new witness who has broad and detailed first-hand knowledge of facts central to Plaintiffs' claims in this matter. The new fact witness is Jackie Lawson, a former Fidelity employee who served as Head of the Board Support Group for Fidelity Brokerage Services, LLC. In 2006, Ms. Lawson declared that she could no longer stand behind the financial information given to the Fidelity Mutual Funds' Board of Trustees ("Board of Trustees") concerning mutual fund profitability, and that problems with the financial information being received by the Board of Trustees amounted to securities fraud against Fidelity's mutual fund customers.

Ms. Lawson was in charge of a critical function within Fidelity of supplying profitability and other financial information to the Board of Trustees during the exact time period covered by

this case.  She identified, analyzed, and tried to correct specific problems with the mutual fund profitability methodology and reporting to the Trustees.  She has characterized these problems as amounting to securities fraud against the mutual fund shareholders.  Although all of these issues are central to Plaintiffs' claims, Defendants did not identify Ms. Lawson as part of their initial disclosures or in response to Plaintiffs' specific discovery requests seeking such information.  Nor did Defendants produce any documents concerning the serious issues Ms. Lawson raised.  Plaintiffs only learned of Ms. Lawson's concerns after she filed a Federal suit against Fidelity in March 2008, alleging wrongful termination and retaliation after she pressed her concerns about Fidelity's mutual fund profitability with senior management and filed a whistleblower complaint pursuant to the Sarbanes-Oxley Act of 2002.

By this motion, Plaintiffs request leave to depose Ms. Lawson outside of the discovery period set by the Court for fact witness discovery.[1]  Plaintiffs also seek leave to request specific additional documents (including e-mails and electronically stored documents) concerning Ms. Lawson, her work and activities at Fidelity, the profitability and reporting issues she has raised, and the complaints she has made within Fidelity or filed with any regulatory authority or court.

Discovery outside of the time designated by the Court's scheduling order may be permitted upon a showing of good cause.  Fed. R. Civ. P. 16(b)(4); *see Zimmermann v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 265 (D. Mass. 2008); *Cabana v. Forcier*, 200 F.R.D. 9, 14-15 (D. Mass. 2001).  As shown below, Plaintiffs have good cause for seeking additional discovery at this stage, having only just learned of Ms. Lawson's concerns despite their earlier discovery efforts.  Plaintiffs are entitled to this discovery, which is essential if Plaintiffs are to have a fair opportunity to present their claims against Defendants in this Court.

---

[1] Even with Ms. Lawson's deposition, Plaintiffs will still have conducted only fifteen depositions, which is fewer than the limit of twenty permitted by the Court in its pretrial scheduling order.  Allowing Ms. Lawson's deposition also should not delay the current expert discovery being conducted by the parties.

## II. While She Was Responsible For Providing The Board Of Trustees With Mutual Fund Profitability Information, Ms. Lawson Repeatedly Raised Serious Issues Concerning The Validity Of The Methodology And Results And The Independence Of The Reporting

According to her Federal complaint, Ms Lawson became employed by Fidelity in 1993.[2] In 1999 she was promoted to the position of Director of Finance, and in 2001 became Senior Director of Finance. In May 2004, because of her expertise in "Activity Based Costing," Ms. Lawson was assigned to review the mutual fund profitability calculations performed by two businesses within Fidelity Brokerage Services, LLC and reported to the Board of Trustees. Her employment review from June 2004 states that:

> Jackie excels at fixing problems. She has recently demonstrated this yet again by taking it upon herself to understand [Fund Profitability], what was wrong with it and what's needed to be done to fix it. . . . Jackie . . . has developed a project plan which she will lead in order to fix FP [Fund Profitability].

In August 2004, Ms. Lawson was appointed as Head of the Board Support Group, responsible for providing information on behalf of the various Fidelity Brokerage Services businesses to the Board of Trustees. One of her first tasks in this position was to rebuild the mutual fund profitability models for two businesses within Fidelity Brokerage Services, LLC.

Beginning in spring 2005, Ms. Lawson began raising concerns regarding certain actions by a particular business within Fidelity Brokerage Services, LLC concerning its fund profitability analysis and reporting to the Board of Trustees. Ms. Lawson initially had success in having these concerns addressed, however, the issues with fund profitability methodologies

---

[2] The facts recited here concerning Ms. Lawson and her employment at Fidelity are taken from Ms. Lawson's Complaint and Demand for Jury Trial, dated March 20, 2008, 08-cv-10466-DPW (D. Mass.). Plaintiffs have been advised by Ms. Lawson's counsel that she is party to a confidentiality agreement with Fidelity that prevents her from discussing her specific allegations with Plaintiffs' counsel. Also apparently because of the confidentiality agreement, Ms. Lawson's complaint does not contain specific details about the profitability and reporting issues within Fidelity that ultimately led to her OSHA whistleblower complaint and communications to the SEC. Correspondence, attached as an exhibit to her complaint, from Ms. Lawson's attorney to the Division of Fair Labor Standards concerning Ms. Lawson's whistleblower allegations has been redacted to eliminate specific details of Ms. Lawson's allegations.

resurfaced when Ms. Lawson was temporarily transferred away from the Board Support Group to work on another project. Upon her return to the Board Support Group, Ms. Lawson made numerous attempts over many months through various senior managers to have the fund profitability issues corrected.

Ms. Lawson's Federal complaint explains that her efforts at remedying the fund profitability issues were met with strong resistance, hostility, and retaliation. Among other things, Ms. Lawson was officially removed as Head of the Board Support Group in October 2006, although she still continued to have full work responsibility for supervising that Group. Management changes within the Board Support Group also caused Ms. Lawson to question the independence of the Group and its role of providing information to the Board of Trustees. Ms. Lawson believes that the changes were made specifically to cover up the fund profitability issues that she had raised.

Ultimately, in December 2006, Ms. Lawson informed Fidelity that she could no longer support the fund profitability methodologies being used, which she said resulted in inaccurate numbers being presented to the Board of Trustees and amounted to fraud on the Fidelity mutual fund shareholders. Ms. Lawson also states that since January 2007 she has brought additional matters to Fidelity's attention that she believes constitute securities fraud within Fidelity's mutual fund business. In light of Fidelity's steadfast resistance on these issues, Ms. Lawson was compelled to make certain submissions to the Securities and Exchange Commission ("SEC") and to file a whistleblower complaint with the Occupational Safety and Health Administration ("OSHA") under the Sarbanes-Oxley Act of 2002. Due to the rising hostility and deteriorating circumstances of her employment, as detailed in her Federal Court filing, Ms. Lawson was compelled to resign from Fidelity in 2007.

Ms. Lawson continues to assert that she is subject to a strict confidentiality agreement with Fidelity, which has prevented her from disclosing (even in her Federal complaint) the details concerning fund profitability and Board of Trustees reporting that caused her such concern as Head of the Board Support Group.

### III.  Ms. Lawson's Tenure At Fidelity And The Problems She Identified With Respect To Fidelity's Mutual Fund Profitability Practices And Board Reporting Are Directly Related To Plaintiffs' Claims In This Action, Yet Her Identity And Dealings Were Never Disclosed

Plaintiffs' claims include allegations that Defendants have breached their fiduciary duty under § 36(b) of the Investment Company Act of 1940 to the investors in the five mutual funds at issue (the "Funds") by receiving excessive fees for investment advisory and other services. Plaintiffs contend that the five Funds, primarily due to their size, enjoy significant economies of scale, and that the benefits of those economies are not shared with the Funds' investors as required. Instead, the cost savings from economies of scale fall right to Fidelity's bottom line.

Defendants provided the Board of Trustees with profitability reports at least annually, which the Trustees relied upon as a key factor in approving Fidelity's investment advisory fees and renewing annually the management contracts between the Funds and Fidelity. Two issues central to Plaintiffs' claims are (1) the profitability of the funds to Defendants, *see* Consolidated Complaint Under Investment Company Act of 1940, ¶¶ 104-13 (Dkt. 46), and (2) the provision of information to the Board of Trustees, which negotiates the management agreements between the Funds and Defendants (including the fees payable by the Funds to Defendants thereunder) and serves to protect the interests of the individual fund investors, *id*. at ¶¶ 114-23.

Plaintiffs have diligently sought discovery on each of these issues (and related topics, including profitability methodologies) throughout the fact discovery period in this case, which

ended in September 2007. Through various means of discovery, Plaintiffs made specific inquiries that should have revealed, at a minimum, Ms. Lawson's identity and the specific issues she identified concerning mutual fund profitability and reporting to the Board of Trustees, along with the documents she and others generated in connection with those issues.

For example, Plaintiffs served Defendants with the following interrogatory:

> Interrogatory No. 8. Identify whether Defendants undertook, sponsored or paid for any studies or analyses during the relevant time period for the Funds that examined cost allocation methodologies, changes to cost allocation methodology, or the impact of cost allocation methodology changes on fund profitability analyses; specify whether Defendants provided any such studies or analyses to the Trustees; and identify the location of any such documents or studies.

In response, Defendants briefly discussed only the cost-allocation assessments conducted by Fidelity's independent auditors, PricewaterhouseCoopers ("PwC"), and how PwC interacts with the Board of Trustees. Their response did not state anything about Ms. Lawson or the issues she had identified. The fund profitability assessments and analyses conducted by Ms. Lawson at the Board Support Group level, however, are responsive to this interrogatory.

As part of their first set of requests for production, Plaintiffs also specifically asked for the following documents:

> Request No. 20. All documents relating to any calculation, review, cost benefit analysis, compilation, presentation, or summarization (including financial statements) which reflect the costs incurred and income received by the Defendants or any of their affiliates in providing management, investment advisory, administrative, distribution or any other services to any of the Funds. This request includes any calculation, review or analysis of the profitability of providing such services as well as any backup materials or data used to create any documents responsive to this request.

> Request No 21. All documents relating to any calculation, review, cost benefit analysis, compilation, presentation or summarization (including financial statements) which reflect the costs incurred and income received by the Defendants or any of their affiliates in providing management, investment advisory, administrative, distribution, or other services to any of the funds in the Fund Complex, other than the Funds, or any other person or client. This request

6

>includes any calculation, review, or analysis of the profitability of providing such services as well as any backup materials or data used to create any documents responsive to this request.

In response to these two similar requests, Defendants agreed to produce several specific categories of documents, including "any internal fund profitability reports from Jan. 1, 2000 that were not given to the Board." Again these requests should have captured documents concerning Ms. Lawson's work and activities.

Plaintiffs' first set of requests for production also included the following:

>Request No. 74. All documents relating to any legal, accounting, financial, compliance, or other audit (both internal and external), including any opinion letters of professionals such as attorneys or accountants, of the Defendants where any fees, compensation, or other benefits received by the Defendants or their affiliates were involved in any way.

In response, Defendants specifically agreed to produce documents concerning audits discussing the calculation of fund profitability or the allocation of costs for purposes of calculating fund profitability.

Seeking discovery related to outside investigations of Defendants, Plaintiffs also issued the following request:

>Request No. 75. All documents relating to any examination or investigation of the Defendants or any of their affiliates or any of the funds in the Fund Complex by the [SEC], [NASD], or any state securities commission, whether pursuant to a routine or for-cause inspection, including but not limited to internal documents of the Defendants and correspondence or other documents from the SEC, the NASD, or any state securities commission.

After discussion, the parties agreed that, in response to this request, Defendants would provide a list of all non-routine investigations of Defendants. Plaintiffs would then identify those investigations from the list for which they sought additional information. Although it is unclear whether Lawson's complaints to regulators triggered an investigation by the time Defendants'

list was first generated, Defendants have an obligation to supplement their disclosures pursuant to Fed. R. Civ. P. 26(e).

The correspondence between the parties concerning discovery further establishes the specific requests by Plaintiffs that should have prompted Defendants' production of the discoverable information concerning Ms. Lawson and her work at Fidelity. For example, in a letter between counsel dated February 8, 2007, Plaintiffs specifically identified the type of information they were seeking concerning fund profitability. The letter stated, in relevant part:

> With respect to profitability related information, you are correct that we do not want reams of data runs. What we will need are documents related to the cost allocation methodologies, including any reports or other documents reflecting the methodologies and/or changes in the methodologies (e.g., templates or forms sent to cost centers to record methodologies or statistical information) as well as documents relating to audits of the methodologies.

In a subsequent letter dated April 20, 2007, Plaintiffs' counsel further specified the profitability information sought as:

> [O]ur experts need descriptions of, and the rationale for, any methodology changes, as well as any impact analyses performed regarding those methodology changes. . . . [We] also require for each year: (1) internal correspondence or memoranda, formal memoranda, and consultant or audit reports that discuss or compare allocation methodologies or changes thereto; (2) descriptions of the allocation methodology process, including documents or tools used in performing allocations, decision criteria for acceptance of necessary changes, the software used by Fidelity, and how changes to the process are tracked; . . . and (6) any correspondence to, from or among the fund trustees, their outside counsel, and any Fidelity person or entity that relates to fund profitability.

The foregoing discovery requests and correspondence between counsel clearly cover the documents and information generated by Ms. Lawson in her role as Head of the Board Support Group over the several years that she reviewed, analyzed, critiqued and tried to correct the problems she identified with the profitability methodologies and reporting within her Group. Additional responsive documents also would include the reports and information she conveyed

to senior management about her analysis and her serious concerns regarding the accuracy and reliability of the profitability information being reported to the Board of Trustees.

Despite Plaintiffs' specific discovery requests and the fact that Ms. Lawson's activities at Fidelity bear directly on the case at bar, Defendants have not produced any substantive documents concerning Ms. Lawson's work at Fidelity, her repeated efforts to correct fidelity's internal mutual fund profitability practices, or her complaints within Fidelity or to the SEC and OSHA that ultimately contended that securities fraud was being perpetrated on the Fidelity mutual fund shareholders.  Ms. Lawson served in a key supervisory position within Fidelity during the years at issue in this case and was responsible for overseeing and directing the practices and methodologies within Fidelity that are at the heart of Plaintiffs' claims.  Plaintiffs have been diligent in pursing discovery on all of these issues throughout the case.  Having just learned of Ms. Lawson and her work as Head of the Board Support Group (despite their previous discovery requests), Plaintiffs should be permitted the opportunity to depose Ms. Lawson and obtain relevant documents.

**IV.   Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant them leave to take additional discovery concerning Mr. Lawson and the substantive case issues discussed above.  Specifically, Plaintiffs request that they be permitted to take the deposition of Ms. Lawson and seek specific additional documents (including e-mails and electronically stored documents) concerning Ms. Lawson, her work and activities at Fidelity, the profitability and reporting issues she has raised, and the complaints she has made within Fidelity or filed with any regulatory authority or court.  Depending on Ms. Lawson's testimony and the additional

document discovery, Plaintiffs may require certain additional discovery to follow up on particular items or to address new issues that come to light.

Dated:  April 11, 2008                           By:        /s/ Matthew J. Tuttle
                Michelle H. Blauner BBO # 549049
                SHAPIRO HABER & URMY LLP
                Exchange Place
                53 State Street
                Boston, MA  02109
                (617) 439-3939

                Lynn Lincoln Sarko
                Michael D. Woerner
                Laura R. Gerber
                KELLER ROHRBACK L.L.P.
                1201 Third Avenue, Suite 3200
                Seattle, WA 98101-3052
                Telephone: (206) 623-1900

                Gary Gotto
                Ron Kilgard
                KELLER ROHRBACK P.L.C.
                National Bank Plaza
                3101 North Central Avenue, Suite 900
                Phoenix, AZ  85012
                Telephone: 602-248-0088

                **Attorneys for Plaintiffs Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin**

                Harry S. Miller, BBO# 346946
                Robert D. Friedman, BBO# 180240
                Matthew J. Tuttle, BBO# 562758
                Joshua Cook, BBO# 660346
                BURNS & LEVINSON LLP
                125 Summer Street
                Boston, MA  02110
                (617) 345-3000

                **Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller**

LOCAL RULE 7.1 CERTIFICATION

I certify that Plaintiffs' counsel conferred with Defendants' counsel on multiple occasions between April 4 and April 11, 2008, concerning the matters raised herein with no agreement between them having been reached.

    /s/ Matthew J. Tuttle

CERTIFICATE OF SERVICE

I hereby certify that, on the 11th day of April 2008, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

    /s/ Matthew J. Tuttle

01232936