# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CYNTHIA A. BENNETT, GUY E. MILLER,
NANCY HAUGEN, MICHAEL F.
MAGNAN, KAREN L. MAGNAN,
PRESLEY C. PHILLIPS, ANDREA M.
PHILLIPS, and CINDY SCHURGIN, for the
use and benefit of THE FIDELITY
MAGELLAN FUND, FIDELITY
CONTRAFUND, FIDELITY GROWTH &
INCOME PORTFOLIO I FUND, FIDELITY
BLUE CHIP GROWTH FUND, and
FIDELITY LOW-PRICED STOCK FUND,

                  Plaintiffs,

vs.

FIDELITY MANAGEMENT & RESEARCH
COMPANY and FMR CO., INC.,

                  Defendants.

CIVIL NO. 1:04-cv-11651-MLW
(Lead Case)

CIVIL NO. 1:04-cv-11756-MLW
(Consolidated Case)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO TAKE ADDITIONAL FACT DISCOVERY

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 2

    A.    The Calculation of Fund Profitability at Fidelity.................................. 2

    B.    Jackie Lawson and Her Whistleblower Complaint............................... 4

    C.    Fidelity Produced Voluminous Information About Fund
          Profitability to Plaintiffs .................................................................... 6

ARGUMENT ................................................................................................................... 7

II.    Plaintiffs' Request for the Additional Discovery Should Be Denied as
        Untimely Because Fact Discovery Is Closed.................................................... 7

III.   Plaintiffs Fail to Demonstrate Good Cause to Re-Open Fact Discovery........................ 8

    A.    Plaintiffs Cannot Show the Requisite Diligence................................... 9

          1.    Plaintiffs Did Not Avail Themselves of Numerous
                 Opportunities to Discover the Information They Now Seek. .................... 9

          2.    The Discovery Requests on Which Plaintiffs Rely in Their
                 Motion Do Not Demonstrate Due Diligence. .......................... 11

    B.    The Additional Discovery Being Sought by Plaintiffs Is Irrelevant.................... 18

CONCLUSION................................................................................................................ 21

Fidelity Management & Research Company ("FMR") and FMR Co., Inc. (together with FMR, "Fidelity" or "Defendants") oppose Plaintiffs' Motion for Leave to Take Additional Discovery ("Plaintiffs' Motion").

## PRELIMINARY STATEMENT

Plaintiffs commenced this case four years ago.  Under the Court's prior orders, Plaintiffs had almost two full years to complete fact discovery.  Six months after the close of fact discovery, Plaintiffs move the Court to re-open fact discovery in order to serve new document requests and to take an additional deposition.  The Court should not grant Plaintiffs' request to seek discovery that they should have pursued years ago.  Allowing additional discovery at this point would likely delay resolution of the case, which is carefully scheduled to have expert discovery completed and any summary judgment motion briefed by December 12, 2008.

There is also no basis to re-open fact discovery.  The discovery Plaintiffs belatedly seek centers around Jackie Lawson, a disgruntled former Fidelity employee who has filed a so-called "whistleblower" complaint that includes allegations that Fidelity used flawed cost-allocation methodologies in calculating the profitability of individual mutual funds.  Ms. Lawson, however, played only a minor role in the Fund Profitability analysis, being just one of more than 60 employees who are involved in that process, and occupying a relatively junior position in one of the numerous business units that "roll up" into the overall Fund Profitability analysis.

During the two-year fact discovery period, Plaintiffs failed to pursue discovery relating to Ms. Lawson or her criticisms despite numerous opportunities to do so.  For example, Defendants produced many documents demonstrating that Ms. Lawson played a role in the Fund Profitability analysis, but Plaintiffs never asked about her or explored her role.  Moreover, Plaintiffs' discovery regarding Fund Profitability—which included numerous document requests, interrogatories, and depositions—focused almost exclusively on obtaining technical

documentation and other information necessary for their experts to understand Fidelity's Fund Profitability analysis procedures and conclusions, and Plaintiffs never pursued discovery relating to the information they now seek.

Plaintiffs' lack of diligence in pursuing the information they now seek is most obvious in their failure to follow up on discovery called for by a non-party subpoena they served on PricewaterhouseCoopers ("PwC"). PwC, the outside auditing firm for the Fidelity mutual funds, reviewed Ms. Lawson's criticisms regarding the calculation of Fund Profitability, and Plaintiffs' subpoena on PwC called for numerous documents relating to the issues Ms. Lawson raised. However, Plaintiffs never collected PwC's complete production of documents because they refused to pay for PwC's costs of copying the requested documents despite originally agreeing to do so. Thus, Plaintiffs' own indifference is the only reason they did not obtain documents relating to Ms. Lawson's criticisms many months ago.

Given Plaintiffs' lack of diligence, the need for finality in the orderly management of discovery in a large case, and the risk of delay in the disposition of the case, Plaintiffs' Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Calculation of Fund Profitability at Fidelity

Plaintiffs allege that the fees paid each year to Defendants by five of the Fidelity mutual funds (the "Funds") are excessive in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b). The fees at issue are paid pursuant to contracts between Defendants and the Funds that are approved annually by the Fidelity mutual fund Board of Trustees (the "Board"). One of many factors that the Board considers in approving the contracts is the profitability to Defendants of managing and servicing the Funds.

Calculating the profitability of individual funds is an enormous undertaking.  Fidelity manages and services over 300 mutual funds, and the vast majority of its costs of managing and servicing the Fidelity funds are joint and common across all of the funds in the complex, as well in many instances across fund and non-fund financial products.  Thus, many cost-allocation methodologies must be developed in order to allocate some portion of these joint-and-common costs to each individual Fidelity mutual fund.

The allocation of joint-and-common costs is a difficult exercise that requires a great deal of judgment.  Courts have recognized that cost-allocation in the mutual fund context "is an art rather than a science" and that there often is more than one reasonable way to allocate a particular cost.  Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 489 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989); see also Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 978 (S.D.N.Y. 1987) ("There are many acceptable ways to allocate common costs . . . .").

Fidelity has developed, over decades, an extremely sophisticated system to allocate costs to the Fidelity mutual funds for purposes of reporting profitability to the Board.  The various business units within Fidelity that contribute to the management and servicing of the Fidelity funds maintain separate processes by which they allocate their costs to the Fidelity funds based on thousands of drivers and allocation methodologies.  The business units' results are then consolidated into the overall Fund Profitability analysis.  The system is dynamic, and allocation methodologies are revised when appropriate in light of the evolution of Fidelity's business, technology improvements, and other factors.

More than sixty Fidelity employees participate in the Fund Profitability process, including finance personnel in each of the business units and at the corporate level.  These

3

employees manage the collection, analysis, and allocation of cost data and continually analyze the allocated costs and the underlying allocation methodologies. In addition, the Funds' independent registered accounting firm, PwC, performs various roles in connection with the Fund Profitability analysis. Most importantly, PwC annually reviews the underlying cost-allocation methodologies to ensure that they are reasonable and delivers an opinion to that effect to the Board.

The Board also is involved in oversight of Fidelity's analysis of Fund Profitability, including reviewing the cost-allocation methodologies and approving any significant changes to those methodologies. Marie Knowles, the Chair of the Board's Audit Committee, spearheads these Board efforts.

### B.    Jackie Lawson and Her Whistleblower Complaint

The discovery now being sought by Plaintiffs relates to a whistleblower complaint filed against Fidelity pursuant to Section 806 of Sarbanes-Oxley, 18 U.S.C. § 1514A(a)(1), on March 20, 2008. The plaintiff in that action is Jackie Lawson, a former employee of Fidelity Brokerage Services LLC ("FBS"). Plaintiffs seek to depose Ms. Lawson and request production of all documents "concerning Ms. Lawson, her work and activities at Fidelity, the profitability and reporting issues she has raised, and the complaints she has made within Fidelity or filed with any regulatory authority or court" (the "Additional Discovery"). (Pls.' Br. at 2.)

The business unit in which Ms. Lawson works, FBS, is but one of the numerous Fidelity business units that feed data into the overall Fund Profitability analysis. Plaintiffs inaccurately describe Ms. Lawson as (1) the "Head of Board Support"; (2) "in charge of a critical function within Fidelity of supplying profitability and other financial information to the Board of Trustees"; and (3) "in a key supervisory position within Fidelity . . . responsible for overseeing and directing the practices and methodologies within Fidelity that are at the heart of Plaintiffs'

4

claims." (Pls.' Br. at 1, 9.)  In reality, it is the Chief Financial Officer of FMR (JS Wynant) who is in charge of the Fund Profitability analysis and oversees the process of rolling up all of the business unit profitability results into the combined results that are presented to the Board. Ms. Lawson, on the other hand, is one of dozens of lower-level employees who each participate in some small part of the overall Fund Profitability analysis.

Even within the business unit in which she worked, Ms. Lawson was not the Head of Board Support[1] or in charge of that unit's Fund Profitability results.  In fact, responsibility for the Fund Profitability analysis within FBS is lodged with individuals who occupy multiple managerial positions above Ms. Lawson—with her direct supervisor, then with the Head of Shared Services within FBS, and ultimately with the Chief Financial Officer of FBS (who has responsibility for, and must attest to, the accuracy of the Fund Profitability results for FBS).

Despite the allegations made in her complaint, Ms. Lawson did not "blow the whistle" on Fidelity.  Rather, Ms. Lawson raised concerns with respect to the Fund Profitability results provided to the Board just after she was passed over for a promotion.[2]  Her lawsuit claims that Fidelity was not responsive to her concerns and that her direct managers retaliated against her, leading to her resignation from Fidelity.  Fidelity emphatically denies that her claims were not properly considered.  The details of Ms. Lawson's criticisms were elevated to very senior management within Fidelity for careful analysis.  In addition, Fidelity reported Ms. Lawson's

---

[1]    Numerous business units have a Board Support Group, and each of those units has a "Head of Board Support."  Within FBS (where Ms. Lawson worked), the Head of Board Support was Mike Freeman until 2006, and then Claire Cadogan.

[2]    Ms. Lawson raised the issues about allocations being used in the Fund Profitability analysis in September 2006, barely a week after she learned that a co-worker had been selected for a promotion that Ms. Lawson wanted.  In a letter written at that time, Ms. Lawson stopped well short of alleging that the matters she raised amounted to fraud.  Rather, she wrote that the issues could well be "chalked up to miscommunications, differences in understandings or professional opinions, or simply mistakes . . . . "

concerns to both PwC and the Audit Committee of the Board.  Both PwC and the Board were satisfied that the cost-allocation methodologies criticized by Ms. Lawson are, in fact, appropriate.

### C. Fidelity Produced Voluminous Information About Fund Profitability to Plaintiffs

During the discovery process, Defendants produced tens of thousands of pages of documents relating to Fidelity's Fund Profitability analysis, including the annual and semi-annual Fund Profitability results that were provided to the Board; presentations by Fidelity senior management to the Board regarding the Fund Profitability analysis and results; meeting minutes reflecting the Board's and the Audit Committee's review and consideration of Fund Profitability issues; PwC's periodic reports to the Board; and back-up and supporting documentation from each of the Fidelity business units that contributes to the Fund Profitability analysis.  Defendants also responded to numerous interrogatories relating to the Fund Profitability analysis and particular cost-allocation methodologies.  In addition, Ms. Knowles, an independent trustee and Chair of the Board's Audit Committee, and JS Wynant, the Chief Financial Officer of FMR, who oversees the Fund Profitability process, submitted to full-day depositions.  Finally, Defendants agreed to allow Plaintiffs' cost-accounting expert to meet for several hours with two senior members of the group within Fidelity that is responsible for the Fund Profitability process to review the back-up and supporting documentation produced by Defendants in an informal question-and-answer session.

**ARGUMENT**

**II.    PLAINTIFFS' REQUEST FOR THE ADDITIONAL DISCOVERY
SHOULD BE DENIED AS UNTIMELY BECAUSE FACT DISCOVERY IS
CLOSED.**

Fact discovery in this case, which was filed in 2004, occurred over the course of roughly

two years and closed on September 30, 2007.  Needless to say, Plaintiffs had more than enough

time to discover this information previously.  Accordingly, Plaintiffs' request for the Additional

Discovery is untimely and should be denied.

Significantly, this Court has already rejected a similar untimely effort by Plaintiffs to take

a deposition of a witness knowledgeable about Fund Profitability.  Shortly after the close of fact

discovery six months ago, Plaintiffs moved to compel the deposition of Independent Trustee

Donald Kirk.  (See Mot. to Enlarge the Period for Disc. for the Limited Purpose of Conducting a

Half Day Dep. of Donald Kirk, Docket Entry No. 107.)  In that motion, Plaintiffs argued—just as

they do here—that they "diligently pursued discovery" about Mr. Kirk but were unable to

schedule his deposition prior to the end of fact discovery.  (Id. at 2-4.)  They further argued that

they needed to depose Mr. Kirk because of his "insight and information relating to Fidelity's

fund profitability process and methodology." (Id.)  After extensive briefing and oral argument,

this Court denied Plaintiffs' motion as "untimely." (See Dec. 12, 2007 Minute Order.)  This

result was hardly surprising in light of the fact that this Court had repeatedly expressed that

requests for discovery extensions would not be tolerated since this case has been pending since

2004 and the parties were given a lengthy discovery schedule.

Now, months after the Court's refusal to extend discovery in order for Plaintiffs to

explore Fund Profitability further, Plaintiffs seek again to re-open fact discovery to collect more

information about the same issue.  The time to have sought this information has passed.

Plaintiffs had ample opportunity to discover whatever information they now wish to seek from

Ms. Lawson, and they chose not to pursue it. Their lack of diligence should not burden and prejudice Fidelity.

To re-open discovery at this late date clearly would prolong disposition of this action. Plaintiffs' expert report has already been served, and that report contains criticisms of Fidelity's cost-allocation methodologies. Defendants' reports are due in June, and they anticipate using a cost-accounting expert who will opine that the cost-accounting employed by Fidelity to calculate Fund Profitability was reasonable in all respects. To the extent Plaintiffs wish to argue at trial that any of Ms. Lawson's criticisms of Fidelity's cost-allocation methodologies are relevant (and if Plaintiffs do not, there is no point to allowing the discovery in any event), Plaintiffs will have to amend their expert's report. Similarly, Fidelity will almost certainly have to amend one or more of its expert reports to show why those criticisms are unfounded. Moreover, amended expert reports and related expert deposition discovery cannot take place until after the discovery being sought regarding Ms. Lawson is completed, which will take some time. This delay would be compounded by Plaintiffs' likely effort, as they acknowledge, to seek yet another round of unidentified "additional discovery to follow up on particular items or to address new items that come to light." (Pls.' Br. at 10.)

## III.    PLAINTIFFS FAIL TO DEMONSTRATE GOOD CAUSE TO RE-OPEN FACT DISCOVERY.

Plaintiffs seek to re-open fact discovery under Rule 16(b)(4) of the Federal Rules of Civil Procedure, which permits the Court to modify its scheduling order "for good cause." However, Plaintiffs cannot possibly meet the good cause standard.

In considering whether good cause exists under Rule 16(b)(4), courts focus primarily on whether the party seeking the additional discovery diligently pursued that discovery during the prescribed discovery period. See Steir v. Girls Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)

("[Rule 16(b)'s good cause standard] focuses on the diligence (or lack thereof) of the moving party . . . ."); see also Zimmermann v. Cambridge Credit Counseling Corp., 529 F. Supp. 2d 254, 265 (D. Mass. 2008); Berwind Prop. Group v. Envtl. Mgmt. Group, 233 F.R.D. 62, 66 (D. Mass. 2005); DAG Enters. v. Exxon Mobil Corp., 226 F.R.D. 95, 104-05 (D.D.C. 2005). "Indifference by the moving party seals off this avenue of relief irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause." Zimmermann, 529 F. Supp. 2d at 265 (quoting O'Connell v. Hyatt Hotels, 357 F.3d 152, 155 (1st Cir. 2004)) (internal quotations omitted); see also DAG Enters., 226 F.R.D. at 105 ("'If that party is not diligent, the inquiry should end.'") (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992)). The duty to diligently pursue discovery requires the discovering party to fully explore the responding party's responses and to seek additional information—if necessary, by motion to compel—if it believes the responses are inadequate or incomplete. See Steir, 383 F.3d at 13-14.

Under these standards, Plaintiffs fail to establish good cause to re-open fact discovery.

**A.    Plaintiffs Cannot Show the Requisite Diligence.**

**1.    Plaintiffs Did Not Avail Themselves of Numerous Opportunities to Discover the Information They Now Seek.**

Plaintiffs' argument that they did not know of Ms. Lawson's existence despite the fact that the discovery requests they made "should have revealed, at a minimum, Ms. Lawson's identity" (Pls.' Br. at 6) falls flat. In fact, despite Ms. Lawson's minor role in the overall Fund Profitability analysis, Defendants produced many emails sent to Ms. Lawson discussing Fund Profitability. For example, Defendants produced a September 2004 email to Ms. Lawson and others regarding the preparation of Fidelity's responses to follow-up questions from the Board in connection with a recent discussion of Fund Profitability. (BFMR_00209472-73; see also

9

BFMR_00165522-23; BFMR_00166217; BFMR_00166775; BFMR_00167363-64;

BFMR_00175680-81; BFMR_00202647; BFMR_00205335; BFMR_00209474;

BFMR_00209515-16; BFMR_00209546.)[3]  Fidelity also produced numerous "channel

submissions" for FBS, which represent that unit's contribution to the annual Fund Profitability

analysis and the work product of the group in which Ms. Lawson worked.  Thus, Plaintiffs

cannot claim they were unaware of Ms. Lawson's role in the process of preparing the Fund

Profitability analysis or of the work she generated.

     In addition, Plaintiffs deposed two witnesses who were knowledgeable about

Ms. Lawson's criticisms—including FMR's CFO, JS Wynant, and the Chair of the Board's

Audit Committee, Marie Knowles—yet they did not ask either of these witnesses a single

question at their full-day depositions that would have elicited the information they now seek.

For example, they asked no line of questions designed to identify systematically all of the

individuals involved in the Fund Profitability analysis and those individuals' respective roles.

Nor did they attempt to identify specific criticisms of cost-allocation methodologies or other

elements of the Fund Profitability analysis by individuals involved in the analysis.

     The most telling display of Plaintiffs' lack of diligence in pursuing discovery relating to

Ms. Lawson's claims relates to their failure to pursue the non-party subpoena they served on

PwC.[4]  When Ms. Lawson initially filed a complaint with OSHA, Fidelity asked PwC to evaluate

---

[3]    Because these and the other documents and deposition testimony cited herein include sensitive and highly confidential information, Defendants have not attached them as exhibits to this memorandum of law.  If, however, the Court believes that a review of these materials would inform its consideration of Plaintiffs' Motion, Defendants will provide copies to the Court under seal.

[4]    Notably, despite the fact that documents produced to Plaintiffs in early 2006 identified PwC as the Funds' independent auditor, Plaintiffs did not serve this subpoena until August 22, 2007, nearly eighteen months after Plaintiffs received the documents and a mere five weeks before the close of fact discovery.

whether Ms. Lawson's criticisms of Fidelity's Fund Profitability analysis had merit.  After

reviewing the criticisms, PwC confirmed that the cost-allocation methodologies used by Fidelity

are reasonable.

As a result of its review of Ms. Lawson's criticisms, PwC had a great deal of information

relevant to the discovery Plaintiffs now seek, including Ms. Lawson's original complaint filed

with OSHA, which detailed her criticisms of Fund Profitability.  After an initial production of

documents, however, Plaintiffs never collected the remaining documents from PwC, some of

which related directly to Ms. Lawson's criticisms.  Why?  Plaintiffs refused to reimburse PwC (a

non-party) for the copying costs it incurred, which Plaintiffs had agreed to do in connection with

the negotiation over the scope of the subpoena.[5]  Plaintiffs' refusal to pay a bill for copying

charges is inexcusable and shows a significant lack of diligence on their part.  Moreover, a Rule

30(b)(6) deposition of PwC would have provided an opportunity to depose a witness with

detailed knowledge of the issues about which Plaintiffs now seek discovery, but Plaintiffs could

not be bothered to take the deposition despite having noticed it—another failure to discover

information regarding Ms. Lawson that resulted solely from Plaintiffs' own inaction.

**2.    The Discovery Requests on Which Plaintiffs Rely in Their
Motion Do Not Demonstrate Due Diligence.**

Plaintiffs argue that they "have good cause for seeking additional discovery at this stage

[because they] just learned of Ms. Lawson's concerns despite their earlier discovery efforts."

(Pls.' Br. at 2.)  In support of this argument, Plaintiffs discuss various discovery requests that

they claim should have revealed the specific issues Ms. Lawson raised with respect to Fund

---

[5]    It is also worth noting that even the documents that were produced by PwC disclose the existence of Ms. Lawson and her involvement in the calculation of Fund Profitability.  (See PWC-FMR-006070.)

Profitability.  (Id. at 6-9.)  However, these discovery requests do not support Plaintiffs' claim that they diligently pursued Lawson-related discovery.

In fact, the only discovery requests Plaintiffs can point to that even remotely touch on the issues relating to Ms. Lawson are the overbroad, "kitchen sink" document requests Plaintiffs made at the outset of the litigation.  Defendants appropriately objected to these requests, which sought literally millions of pages of irrelevant documents.  During the parties' subsequent good faith negotiations, Plaintiffs focused on a much narrower set of Fund Profitability documents that had nothing to do with the discovery they now belatedly seek.  Plaintiffs never once expressed even a general interest in documents related to Ms. Lawson's criticisms.[6]

Each of the discovery requests relied on by Plaintiffs (and the subsequent negotiation of the scope of those requests) is discussed below.

### a.    Plaintiffs' Interrogatory No. 8

Plaintiffs first argue that Defendants should have specifically identified Ms. Lawson and the issues she raised in their response to Interrogatory No. 8 in Plaintiffs' First Set of Interrogatories.  (Id. at 6.)  Interrogatory No. 8 asked Defendants to:

> [i]dentify whether [they] undertook, sponsored, or paid for any studies or analyses during the relevant time period for the Funds that examined cost allocation methodologies, changes to cost allocation methodologies, or the impact of cost allocation methodology changes on fund profitability analyses; specify whether [they] provided any such studies or analyses to the Trustees; and identify the location of any such documents or studies.

---

[6]    Notably, Plaintiffs amended their Rule 26(a) initial disclosures to add to their list of witnesses who would be likely to have discoverable information about their claims Jonathan Zang, a former Fidelity employee who had recently spoken to Plaintiffs' counsel about a whistleblower complaint he filed against Fidelity.  Yet, even with knowledge of Mr. Zang's complaint, Plaintiffs never made a general request for documents relating to such whistleblower claims.

(Pls.' 1st Set of Interrogs. at 5.)

Interrogatory No. 8, as worded, encompasses the year-round work performed by the more than sixty Fidelity employees, including Ms. Lawson, who are involved in preparing Fund Profitability results. These employees, as part of their job, continually evaluate cost-allocation methodologies that contribute to the Fund Profitability analysis. Even assuming that it were possible to collect this information for the seven-year period specified in Interrogatory No. 8, it would have consumed countless hours, involving interviews of many dozens of Fidelity employees. Literally read, this question would have called for descriptions of hundreds of methodological changes and refinements over the seven-year period. Not surprisingly, rather than spending hundreds of hours attempting to collect this information, Defendants objected to Interrogatory No. 8 as overbroad and unduly burdensome. Notwithstanding and without waiving that objection, Defendants offered a general description of how methodologies are evaluated and changed. (See Defs.' Resp. and Objections to Pls.' 1st Set of Interrogs. at 13.)[7] On the face of Defendants' response, it is clear Defendants did not identify any specific analyses of methodologies or methodology changes.

To the extent Plaintiffs believed that Interrogatory No. 8 required more detailed disclosure, they should have requested additional information from Defendants and, if necessary, moved to compel a more detailed response.[8] Having failed to do so during the discovery period,

---

[7]    Plaintiffs mischaracterize Defendants' response to Interrogatory No. 8 as "briefly discuss[ing] only the cost-allocation assessments conducted by [PwC] and how PwC interacts with the Board of Trustees." (Pls.' Br. at 6.) This characterization is completely at odds with Defendants' response, which specifically addresses the work performed by Fidelity. (Defs.' Resp. and Objections to Pls.' 1st Set of Interrogs. at 13 ("Fidelity, in conjunction with the Funds' Board of Trustees and [PwC], continually examines and assesses the cost-allocation methodologies used in connection with the calculation of Fund Profitability . . . .").)

[8]    Notably, Plaintiffs did seek additional information with respect to several of their interrogatories, both in correspondence with Defendants' counsel (see Oct. 10, 2007 Letter from L. Gerber; Oct. 16, 2007

(continued . . .)

Plaintiffs cannot now re-open fact discovery to obtain additional discovery on these issues.  See

Steir, 383 F.3d at 13-14; see also Ritzmann v. Nalu Kai, Inc., 523 F. Supp. 2d 564, 568 (S.D.

Tex. 2007) ("[W]here a discovering party fails to move the court to compel an answer, the party

waives its right to that discovery.") (citing Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d

384, 389 (5th Cir. 1989)).

### b.    Document Requests Nos. 20 and 21

Plaintiffs next argue that Requests Nos. 20 and 21 in their First Request for Production of

Documents "should have captured documents concerning Ms. Lawson's work and activities."

(Pls.' Br. at 6-7.)  These Requests sought, for the period 1995 to the present:

> [a]ll documents relating to any calculation, review, cost benefit
> analysis, compilation, presentation, or summarization (including
> financial statements) which reflect the costs incurred and income
> received by the Defendants or any of their affiliates in providing
> management, investment advisory, administrative, distribution, or
> any other services to any of the [five] Funds [at issue in this
> litigation, including] any calculation, review or analysis of the
> profitability of providing such services as well as any backup
> materials or data used to create any documents responsive to this
> request.

(Pls.' 1st Req. for Produc. of Docs. at 13.)[9]

Read literally, Requests Nos. 20 and 21 would have required production of millions of

pages of documents relating to Fidelity's Fund Profitability process and results for the more than

300 Fidelity mutual funds for a period spanning more than ten years.  Defendants objected to

these blunderbuss requests as overbroad and unduly burdensome because such a production

---

Letter from S. Murphy) and in the deposition of JS Wynant (see Wynant Tr. at 110:14-115:16), but they
never sought additional information with respect to Interrogatory No. 8.

[9]    Whereas Request No. 20 was limited to the five Funds at issue in this litigation, Request No. 21
sought the same types of documents for all of the more than 300 mutual funds managed and operated by
Fidelity.  (Pls.' 1st Req. for Produc. of Docs. at 13-14.)

would have required Fidelity's business personnel and outside counsel to spend thousands of hours collecting and reviewing responsive documents, the overwhelming majority of which would have been entirely irrelevant to Plaintiffs' claims.

### c.    Letters Discussing Fund Profitability Documents

Given the over-breadth of Plaintiffs' document requests, the parties began negotiating a more realistic scope of production with respect to Fund Profitability material.  In their brief, Plaintiffs point to some of the correspondence reflecting those negotiations in an attempt to demonstrate that they had requested documents that would have disclosed the information they now seek from Ms. Lawson.  In doing so, however, Plaintiffs ignore significant elements of those negotiations, and, in fact, the complete set of negotiations on these issues demonstrates that the agreements reached between the parties on the scope of discovery did not include the discovery Plaintiffs now seek.

For example, Plaintiffs point to a February 8, 2007 letter requesting production of some broad categories of Fund Profitability-related materials.  (See Pls.' Br. at 8.)  Absent from their brief, however, is the fact that Plaintiffs' counsel subsequently agreed to defer those requests until after reviewing the Fund Profitability materials provided to the Board and other materials Fidelity had agreed to produce.  (See Feb. 9, 2007 Letter from S. Murphy at 1 ("After discussing the issues with you today, I understand that you have agreed to defer the requests for additional fund profitability materials identified in your letter until Plaintiffs have completed their review of those materials Defendants have agreed to produce.").)

After Plaintiffs reviewed the Fund Profitability materials initially produced by Defendants, the parties began to discuss the scope of Defendants' production of back-up and supporting materials related to Fund Profitability.  Throughout these discussions, Plaintiffs emphasized that they did not want a "data dump" of Fund Profitability materials similar to what

15

they had received in similar litigations against other mutual fund complexes, and they repeatedly

explained their need for back-up and supporting materials in terms of acquiring documentation

necessary for their experts to understand Fidelity's Fund Profitability analysis and the cost-

allocation methodologies used in that analysis.  (See, e.g., Apr. 20, 2007 Letter from N. Fields at

3 ("In short, we need sufficient documentation to allow Plaintiffs' experts to follow the expense

dollars from cost center to cost pools and, ultimately, to products and clients.").)  Consistent with

this stated purpose, Plaintiffs focused their specific requests for back-up and supporting materials

on documentation that explained the technical details of Fidelity's Fund Profitability analysis and

the underlying cost-allocation methodologies.  For example, on April 20, 2007, Plaintiffs

requested, inter alia:

> (1) explanations of all acronyms used; (2) listings of cost center
> numbers (and other numbers referenced in the flowcharts), names,
> and descriptions; (3) documents that explain the mapping of cost
> centers to functional areas; (4) documents that explain the mapping
> of functional areas to business units and expense pools; (5) listings
> of fund numbers and corresponding names; (6) listings of driver
> numbers and corresponding formulas; and (7) descriptions and
> explanations of all statistics used.

(Id. at 4.)

The parties subsequently conferred on the scope of documents Plaintiffs sought in that

letter.  Defendants' counsel reiterated that the request was still too broad, calling for millions of

pages of largely irrelevant material.  Plaintiffs responded that they needed "back-up" profitability

material that they could provide to their cost-accounting expert, and that the materials needed to

explain how costs moved through Fidelity's accounting systems from entry in the general ledger

to allocation to individual funds.  In response, Defendants agreed to produce voluminous back-

up and supporting materials that provided this level of detail for each year from 2000 to 2006.

Plaintiffs agreed to review these documents to determine if they needed any additional

information for their cost-accounting expert.  These materials comprise tens of thousands of pages, and their collection, review, and production required hundreds of hours of work by Fidelity business personnel and outside counsel.

The back-up materials were produced on June 22, 2007, and Plaintiffs (and their expert) reviewed these materials to determine if they needed any additional materials.  (See, e.g., July 18, 2007 Letter from N. Fields at 1; Aug. 17, 2007 Letter from N. Fields at 1-2.)  Plaintiffs raised questions about the contents of the documents produced and inquired about the existence of additional categories of documents and information.  (See, e.g., Aug. 17, 2007 Letter from N. Fields at 3 ("In addition to the business unit reports described above, it appears that we do not have documentation related to corporate allocations . . . .  Please provide backup documentation related to these corporate allocations, including methodologies used and allocated expense dollars . . . ."); Aug. 27, 2007 Letter from S. Murphy (responding to various inquiries from Plaintiffs' counsel).)  Importantly, Plaintiffs' requests focused almost exclusively on the technical aspects of the Fund Profitability analysis, as it was Plaintiffs' goal to provide their expert with a working understanding of the analysis.

In sum, after their initial blunderbuss requests that sought millions of pages of Fund Profitability material (to which Defendants had no choice but to object on a number of legitimate grounds), Plaintiffs never requested production of documents and information relating to the types of issues about which they now seek discovery, and Defendants never agreed to produce them.

### d.    Document Requests No. 74 and 75

Finally, Plaintiffs argue that Defendants should have produced documents relating to Ms. Lawson and the issues she raised pursuant to Requests Nos. 74 and 75 in Plaintiffs' First Set of Requests for Production of Documents.  (Pls.' Br. at 7-8.)  This argument fails, however,

17

because documents relating to Ms. Lawson and the issues she raised are not responsive to either of those requests.

Request No. 74 sought production of documents relating to "legal, accounting, financial, compliance, or other audit[s]." (Pls.' 1st Req. for Produc. of Docs. at 28.) But Ms. Lawson's activities in connection with Fidelity's Fund Profitability analysis and the underlying cost-allocation methodologies are not responsive to this Request, and Plaintiffs offer no explanation for why Defendants should have interpreted Request No. 74 to encompass documents relating to Ms. Lawson or the issues she raised.

Request No. 75 sought production of documents relating to "any examination or investigation of the Defendants or any of their affiliates or any of the funds in the Fund Complex by the [SEC], [NASD], or any state securities commission." (Id. at 28-29.) However, Ms. Lawson's criticisms never gave rise to any investigation of Defendants by the SEC, the NASD, or any state securities commission, and in fact, none of those regulators ever conducted an investigation into the issues addressed by her.[10]

### B.    The Additional Discovery Being Sought by Plaintiffs Is Irrelevant.

Plaintiffs also argue that they have good cause for seeking the Additional Discovery more than six months after the close of fact discovery because the discovery "is essential if [they] are to have a fair opportunity to present their claims against Defendants in this Court." (Pls.' Br. at 2.) But Plaintiffs' purported need for the Additional Discovery, and any prejudice that may result to them if the request is denied, are irrelevant to this Court's consideration of whether

---

[10]    In March 2008, six months after the conclusion of fact discovery and only after Ms. Lawson's whistleblower complaint was reported in the Boston Globe, the SEC requested that Fidelity meet with the Staff to explain Ms. Lawson's allegations in that suit. There has been no indication that the Staff intends to pursue the matter.

good cause exists under Rule 16(b)(4) since Plaintiffs have failed to demonstrate that they diligently pursued the Additional Discovery during the discovery period. See Zimmermann, 529 F. Supp. 2d at 265 ("Indifference by the moving party seals off this avenue of relief irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause.") (quoting O'Connell, 357 F.3d at 155) (emphasis added; internal quotations omitted); DAG Enters., 226 F.R.D. at 111 (potential prejudice to moving party is "not a traditional factor that a court must consider in evaluating an attempt to extend discovery and modify a Scheduling Order").

In any event, Plaintiffs' argument that discovery regarding Ms. Lawson and the issues she had raised is "essential" to their claims is baseless. Ms. Lawson was only one of the more than sixty Fidelity employees who are involved in preparing Fund Profitability information and evaluating the cost-allocation methodologies underlying the Fund Profitability analysis. She occupied a middle-management position in just one of the several Fidelity business units that participates in the Fund Profitability process. She expressed concerns with respect to only a few of the thousands of methodologies and drivers that have been used to allocate costs within the Fund Profitability analysis. Even assuming that her criticisms had merit—and they do not— Ms. Lawson's critiques of the cost-allocation methodologies do not have a material impact on the overall fund-level profit margins reported to the Board that are the subject of this lawsuit.

Although Plaintiffs' brief makes much of Ms. Lawson's characterization of Defendants' Fund Profitability analysis as fraudulent (see, e.g., Pls.' Br. at 1-2), the fact that Ms. Lawson disagreed with certain of the cost-allocation methodologies used by Defendants is hardly indicative of fraud. As courts have observed, allocation of costs in the mutual fund context "is an art rather than a science," Krinsk, 715 F. Supp. at 489, and "[t]here are many acceptable ways

19

to allocate common costs . . . ."  <u>Schuyt</u>, 663 F. Supp. at 978.  In point of fact, several

individuals—including senior Fidelity finance personnel, PwC, and Ms. Knowles in her capacity

as Chair of the Audit Committee—reviewed the issues raised by Ms. Lawson and determined

that the existing methodologies are appropriate notwithstanding Ms. Lawson's concerns.

Moreover, Ms. Lawson's characterization of Defendants' use of those methodologies as

fraudulent must be viewed skeptically given that such a characterization is essential to her claims

seeking personal financial compensation based on alleged retaliation under Section 806 of

Sarbanes-Oxley, 18 U.S.C. § 1514A(a)(1), and she did not raise these issues until after she was

passed over for a promotion.

Finally, Plaintiffs' argument that discovery regarding Ms. Lawson and the issues she

raised is essential to their claims is undermined by the expert disclosures they made shortly after

filing this Motion.  Plaintiffs' cost-accounting expert did not produce a report and evidently will

not offer testimony on these subjects in this litigation.  The report produced by Plaintiffs'

purported financial and economic expert—the only report produced by Plaintiffs—discusses

issues related to Fidelity's Fund Profitability analysis and the underlying cost-allocation

methodologies only briefly, and that discussion focuses exclusively on the allocation of

"management" costs incurred by FMR and FMR Co., Inc.  By contrast, Ms. Lawson's criticisms

relate to FBS, which plays no role in Fidelity's "management" function or the allocation of

"management" costs.  Accordingly, any argument that discovery regarding Ms. Lawson is

"essential" to Plaintiffs' claims is disingenuous.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Dated:  April 29, 2008

Respectfully submitted,

GOODWIN PROCTER LLP
/s/ James S. Dittmar
   James S. Dittmar (BBO# 126320)
   David J. Apfel (BBO# 551139)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: 617-570-1000

MILBANK, TWEED, HADLEY &
M<sup>C</sup>CLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Andrew W. Robertson
1 Chase Manhattan Plaza
New York, NY  10005-1413
T: (212) 530-5000
F: (212) 530-5219

*Attorneys for Defendants Fidelity Management*
   *& Research Company and FMR Co., Inc.*

## CERTIFICATE OF SERVICE

I, James S. Dittmar, hereby certify that on April 25, 2008, this document filed through the

ECF system will be sent electronically to the registered participants as identified on the Notice of

Electronic Filing (NEF).

      /s/ James S. Dittmar
      James S. Dittmar (BBO# 126320)