# EXHIBIT A

# PART 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JACKIE HOSANG LAWSON,

Plaintiff,

vs.

FMR LLC, dba FIDELITY INVESTMENTS;
FMR CORP., dba FIDELITY INVESTMENTS;
and FIDELITY BROKERAGE SERVICES, LLC,
dba FIDELITY INVESTMENTS,

Defendants.

Case No.

## COMPLAINT and DEMAND FOR JURY TRIAL

## INTRODUCTION

This action is brought against FMR Corp., its successor, FMR LLC, and their

subsidiary, Fidelity Brokerage Services, LLC.   These Defendants operate under the trade

name and are referred to herein as "Fidelity Investments."  The action is brought under

Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley

Act of 2002, 18 U.S.C. § 1514A(a)(1) and Massachusetts common law prohibiting

wrongful discharge against public policy.

Fidelity Investments holds itself out as the world's largest mutual fund company,

investing billions in the assets of others.  Fidelity Investments simultaneously guards

against scrutiny of its business practices, requiring its employees to sign confidentiality

agreements purporting to preclude all disclosures of Fidelity Investments' internal

information, without exception for disclosures to government agencies, and claiming that

the federal government has no jurisdiction to investigate claims of retaliation filed by

- 1 -

employee whistleblowers who report suspected wrongdoing to their supervisors or to the Securities and Exchange Commission or other government agencies.

This action involves retaliation taken against a long-term, exemplary employee, Jackie Hosang Lawson, a Senior Director of Finance at Fidelity Investments, after she expressed concerns regarding matters that she reasonably believed constituted a violation of rules or regulations of the Security and Exchange Commission or Federal law relating to fraud against shareholders of Fidelity mutual funds. While still employed by Fidelity Investments, Ms. Lawson brought her concerns to her managers, to Fidelity Investments' then-General Counsel, to other in-house attorneys, and eventually to the Securities and Exchange Commission. Fidelity Investments responded by embarking on a campaign to discredit, harass and intimidate Ms. Lawson.

Ms. Lawson filed claims regarding the retaliation with the Occupational Safety and Health Administration ("OSHA"), the federal agency within the Department of Labor charged with enforcing the whistleblower protections of the Sarbanes-Oxley Act. In response, Fidelity Investments took no actions to stop the retaliation, and instead claimed that its employees are not protected by the Sarbanes-Oxley whistleblower provisions. When the federal agency advised Fidelity Investments that it was proceeding to investigate Ms. Lawson's factual allegations, Ms. Lawson's supervisors escalated their harassment of her while Fidelity Investments simultaneously attempted to derail the federal agency's efforts to investigate Ms. Lawson's claims. Denied access to the prompt protection the law requires, and subjected to unendurable working conditions, Ms. Lawson eventually was compelled to resign her position at Fidelity Investments.

One year after filing her initial complaint with the federal agency, and two months after learning of Fidelity Investments' contacts with the Department of Labor to stop its investigation, Ms. Lawson gave notice of her intent to proceed to federal court on her Sarbanes-Oxley whistleblower complaint. Still determined to avoid public scrutiny of its actions, Fidelity Investments responded to the notice by demanding that Ms. Lawson abide by a confidentiality agreement that FMR Corp. required of its employees. While Ms. Lawson disputes Fidelity Investments' claims of confidentiality concerning the matters which Ms. Lawson reasonably believed constituted violations of the rules and regulations of the Securities and Exchange Commission or violation of Federal law relating to fraud against shareholders, Fidelity Investments' pre-filing demand suggests that it will force Ms. Lawson to incur the costs of defending against a motion to seal the record if these allegations are incorporated herein. Accordingly, in response to Fidelity Investments' demand, Ms. Lawson has limited her allegations herein regarding the alleged wrongdoing to the facts concerning the reporting of these matters and the resultant retaliation. The full allegations are set forth in the Complaints and attachments thereto filed with OSHA (which Ms. Lawson contends are a matter of public record), and for purposes of notice to the Defendants, are incorporated herein.

This action in federal court is of import not only to Ms. Lawson, but to other Fidelity Investments employees and to the millions of Americans with money invested in Fidelity Mutual Funds. Ms. Lawson's reputation within Fidelity Investments was of a person with great integrity and dedication. She raised her concerns only through proper channels, including to her supervisors and other managers with authority to address these matters, Fidelity's Office of General Counsel, and the Securities and Exchange

Commission. Her supervisors' gross mistreatment of Ms. Lawson once she raised concerns regarding potential fraud on shareholders was clearly evident to her co-workers. Ms. Lawson brings this suit not only to address her own injury, but also to obtain a declaration that Fidelity Investments is an employer covered by Sarbanes-Oxley's anti-retaliation provisions, so that Fidelity Investments' supervisors cannot continue to intimidate employees by asserting that they have no protection from retaliation for reporting potential violations of rules and regulations of the Securities and Exchange Commission or Federal law relating to shareholders.

## VENUE

1.      Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b). This is a civil action wherein jurisdiction is not founded solely on diversity of citizenship and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.

## JURISDICTION

2.      Jurisdiction over Plaintiff's federal claim is proper in the District of Massachusetts under 28 U.S.C. § 1331 and 18 U.S.C. § 1514A(b)(1)(B) because Plaintiff filed a complaint with the Secretary of Labor under 18 U.S.C. § 1514(b)(1)(A), and the Secretary of Labor has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of the Plaintiff. Jurisdiction over Plaintiff's state claim is proper under 28 U.S.C. § 1367(a).

## PARTIES

3.      Defendant FMR LLC is a limited liability company organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts

in the general character of "parent company." Its principal office in Massachusetts is at 82 Devonshire Street, Boston, MA 02109. FMR LLC is the survivor and merger of Defendant FMR Corp. FMR LLC conducts business under the name "Fidelity Investments."

4.      Defendant FMR Corp. is a Delaware corporation and, until recently, was registered to do business in the Commonwealth of Massachusetts in the general character of "parent company of Fidelity subsidiaries" and with its principal offices in Massachusetts located at 82 Devonshire Street, Boston, MA 02109. FMR Corp. conducted business under the name "Fidelity Investments" until its merger into FMR LLC. FMR Corp. is no longer registered to do business in the Commonwealth of Massachusetts.

5.      Defendant Fidelity Brokerage Services, LLC is a limited liability company organized under the laws of Delaware, and registered to do business in the Commonwealth of Massachusetts in the general character of investments. Its principal office in Massachusetts is at 82 Devonshire Street, Boston, MA 02109. Fidelity Brokerage Services, LLC conducts business under the name "Fidelity Investments." Fidelity Brokerage Services, LLC's sole member is Fidelity Global Brokerage Group, Inc., a Massachusetts corporation, with a business in the general character of "investments" and a principal office in Massachusetts at 82 Devonshire Street, Boston, MA 02109. Fidelity Global Brokerage Group, Inc., is a wholly owned subsidiary of FMR Corp. and/or FMR LLC.

6.      Plaintiff Jackie Hosang Lawson is a former employee of FMR Corp. and/or its subsidiary Fidelity Brokerage Services, LLC. Ms. Lawson is a resident of Brookline, Massachusetts.

**ALLEGATIONS REGARDING THE APPLICABILITY OF THE SARBANES-OXLEY WHISTLEBLOWER PROVISIONS TO THESE DEFENDANTS**

7.      The Fidelity family of mutual funds are investment companies under the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1) and are required to file reports under section 15(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78o(d). The Fidelity mutual funds, however, have no employees. They have been and are currently overseen by a single Fidelity Mutual Funds Board of Trustees.

8.      Fidelity Management & Research Co. is a Massachusetts corporation with a principal office in Massachusetts at 82 Devonshire Street, Boston, MA 02109. Fidelity Management & Research Co. is a wholly owned subsidiary of FMR Corp. and/or FMR LLC. Fidelity Management & Research Co. is a registered investment advisor under 15 U.S.C. § 80b-2(a)(11) and serves as the registered investment advisor to Fidelity Mutual Funds. By law, Fidelity Management & Research Co. may only provide services through a written contract that specifies the services to be performed and the fees to be paid and that is approved by the Fidelity Mutual Funds Board of Trustees.

9.      On information and belief, in order to comply with federal law, the Fidelity Mutual Funds Board of Trustees reviews and approves the Investment Advisory Contracts and other contracts and/or subcontracts with Fidelity Management & Research Co., FMR Corp., FMR LLC and/or other companies owned in whole or in part by FMR Corp. and/or FMR LLC.

10.    Prior to approving these contracts and/or subcontracts, the Fidelity Mutual Funds Board of Trustees reviews financial data and methodologies to determine fund profitability provided to it by FMR Corp. or FMR LLC and/or their subsidiaries, including Fidelity Management & Research Co., Fidelity Global Brokerage Group, Inc., and Fidelity Brokerage Services, LLC.

11.    Plaintiff's whistle-blowing activities relate to the accuracy of the information on fund profitability provided to the Fidelity Mutual Funds Board of Trustees.

12.    FMR Corp., FMR LLC and/or their subsidiaries, including Fidelity Management & Research Co., Fidelity Global Brokerage Group, Inc., and Fidelity Brokerage Services, LLC. are contractors and/or subcontractors of the Fidelity mutual funds. As contractors and/or subcontractors of companies required to file reports under section 15(d) of the Securities Exchange Act, Defendants are prohibited under 18 U.S.C. § 1514A from taking actions against their employees for whistle-blowing activity relating to potential fraud against the shareholders of Fidelity mutual funds.

13.    Defendants FMR Corp. or FMR LLC and their subsidiaries, including Fidelity Global Brokerage Group, Inc., Fidelity Brokerage Services, LLC and Fidelity Management Research Co., also are sufficiently related as an integrated employer to constitute a single entity for purposes of coverage and liability under Sarbanes-Oxley. Defendants are referred to collectively herein as "Fidelity Investments."

### ALLEGATIONS REGARDING MS. LAWSON'S EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.    On December 20, 2006, Ms. Lawson filed her first complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley

- 7 -

Act of 2002, 18 U.S.C. § 1514A with OSHA. The Complaint was docketed by OSHA as Case Number 1-0120-07-005.

15.    On or about February 26, 2007, Fidelity Investments submitted its response. The response sought dismissal of the complaint, claiming that employees of Fidelity Investments are not entitled to whistleblower protections because Fidelity Investments is privately held.

16.    On April 24, 2007, Ms. Lawson filed her second complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA. The Complaint was originally docketed by OSHA as Case Number 1-0120-07-0008, (but was later added to amended Case Number 1-0120-07-005).

17.    On August 27, 2007, the OSHA investigator assigned to Ms. Lawson's case advised both parties that OSHA was rejecting Fidelity Investments' claim that it was not subject to the Sarbanes Oxley whistleblower provisions and that OSHA intended to proceed to investigate the merits of Ms. Lawson's complaint.

18.    On or about September 15, 2007, Ms. Lawson filed her third complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA. The Complaint was originally docketed by OSHA as Case Number 1-0120-07-012 (but was later added to amended Case Number 1-0120-07-005).

19.    On November 9, 2007, Ms. Lawson filed her fourth complaint against Fidelity Investments under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA. The

- 8 -

Complaint was docketed as Case Number 1-0120-08-001 (but was later added to amended Case Number 1-0120-07-005). A copy of this complaint (but excluding its attachments) is attached hereto as Exhibit 1.

20.    On or about November 26, 2007, Ms. Lawson's counsel received notice from the Associate Solicitor, Division of Fair Labor Standards, United States Department of Labor, that Fidelity Investments had been in contact with his office regarding Ms. Lawson's Sarbanes-Oxley complaint. Ms. Lawson's counsel subsequently was provided copies of two letters submitted on Fidelity Investments behalf by its outside counsel in an effort to stop OSHA's investigation of Ms. Lawson's complaint. The first letter, dated September 13, 2007, was addressed to the head of the Office of the Whistleblower Protection Program at the Occupational Safety and Health Administration, and references an August 30, 2007 telephone conversation between Fidelity Investments' outside counsel and the head of the Office of the Whistleblower Protection Program. The second letter, dated November 1, 2008, was addressed to the head of the Office of the Whistleblower Protection Program at the Occupational Safety and Health Administration, the Associate Solicitor, Fair Labor Standards, Office of the Solicitor of Labor, and the Counsel for Whistleblower Programs, Office of the Solicitor of Labor, and referenced an October 19, 2007 meeting between the addressees and Fidelity Investments' outside counsel.

21.    On December 20, 2007, Ms. Lawson submitted to the Associate Solicitor, Division of Fair Labor Standards, United States Department of Labor, her response to Fidelity Investment's letters. Ms. Lawson's response is attached hereto as Exhibit 2 and incorporated by reference.

22.    On January 3, 2008, Ms. Lawson gave notice, pursuant to 29 C.F.R. §
1980.114(b) of her intention to file an action in the United States District Court for the
District of Massachusetts in her first two cases, Case No. 1-0120-07-005 and Case No. 1-
0120-07-008.   A copy of this notice is attached hereto as Exhibit 3.

23.    On January 28, 2008, Ms. Lawson received notice from OSHA
consolidating her four complaints under the original complaint number, and stating
further that the Complaint, as amended, was closed due to her election to proceed in
Federal Court.  A copy of this notice is attached hereto as Exhibit 4.

**ALLEGATIONS**
**CONCERNING MS. LAWSON'S EMPLOYMENT WITH FIDELITY**
**INVESTMENTS, HER PROTECTED ACTIVITY AND FIDELITY**
**INVESTMENTS' RETALIATION**

24.    Ms. Lawson began her employment with Fidelity Investments in 1993,
working as a contract employee in various positions until 1996 when she became a
regular Fidelity Investments full-time employee.   Throughout her employment, from
1993 through the termination of employment in 2007, Ms. Lawson received weekly or
monthly paychecks from FMR Corp.

25.    Ms. Lawson's career at Fidelity Investments was successful until the
events at issue here which began in 2005.  In 1999, she was promoted to the position of
Director of Finance, and in 2001 to the position of Senior Director of Finance.

26.    Prior to August 2004, the three main companies within Fidelity Brokerage
Services, LLP (Personal Investments or "PI", National Financial or "NF", and Registered
Investment Advisors or "RIA") each performed its own fund profitability calculations
and each worked directly with FMR Co., and Fidelity Investments' outside auditor, PwC,
to report fund profitability to the Fidelity Mutual Funds Board of Trustees.

- 10 -

27.    In May 2004, Ms. Lawson was asked by her manager to review the current

models being used by two of these businesses (NF and RIA) for Fund Profitability

analysis. It is her further understanding that she was selected to perform this review

because the models were based on the principles of "Activity Based Costing," an area

where Ms. Lawson has considerable expertise. Ms. Lawson's performance review

through June 2004 reflects her efforts to understand and rectify issues in these Fund

Profitability models, and the willingness and support of the Chief Financial Officers for

NF and RIA to have her do so. Her merit review for the period July 1, 2003 through June

30, 2004 gives her an overall rating of "Exceeds Expectations." The Overall Comments

state that:

> "Jackie is a subject matter expert and viewed as such by everyone. She's
> committed to producing quality work and is passionate about doing the
> right thing for business and putting Fidelity first. She is forward thinking,
> innovative and always looking to learn and improve. She has
> demonstrated leadership with her staff and her finance peers. Jackie
> excels at fixing problems. She has recently demonstrated this yet again by
> taking it upon herself to understand [Fund Profitability], what was wrong
> with it and what's needed to be done to fix it. The NF and RIA businesses
> are thrilled and appreciative that she is leading this effort. Jackie has
> solicited help from CFIT and has developed a project plan which she will
> lead in order to fix FP."

28.    In August 2004, a new group called "Shared Services" was formed to

provide information for the NF, RIA and PI companies to the Board of Trustees of the

Fidelity Mutual Funds.

29.    Fidelity Investments first offered the Head of Board Support position to

another candidate who prior to the formation of the FBC Shared Services group held that

position for the PI company. On information and belief, this candidate declined because

she believed there were too many problems with the PI Fund Profitability model.

30.    In August 2004, Fidelity Investments appointed Ms. Lawson as Head of

the Board Support Group.

31.    One of Ms. Lawson's first tasks as Head of Board Support was to rebuild

the Fund Profitability models for NF and RIA.  Ms. Lawson's bonus review for the

period January 1, 2004 through December 31, 2004, gives her an overall rating of

"Exceeds Expectations" reflecting her work on these models.  The Overall Comments

given by her new manager state that:

> "Jackie is very well-respected among her peers and business partners, has
> an extremely strong work ethic, and can be depended on to get results.
> She has a lot of knowledge about Fidelity and finance, and shows her
> concern for both the firm and its people.  She is a strong manager who is
> well-liked and well-respected by the analysts in her group, and she puts a
> lot of work into developing her people and looking out for their best
> interests.  She is an excellent role model for analysts as well as directors in
> terms of management, leadership and commitment to achieving results.
> She is very focused on working collaboratively and building strong
> relationships with our business partners, whether it is business unit
> finance, FMR Co. finance or PWC.  Jackie is very comfortable presenting
> to Sr. Mgt.  I very much enjoy working with Jackie and look forward to
> continuing our strong relationship and helping her achieve success in
> 2005."

32.    Beginning Spring 2005, Ms. Lawson began raising concerns regarding

certain actions by the PI group.  The details regarding Ms. Lawson's initial concerns are

set forth in Ms. Lawson's Complaint filed with OSHA on December 20, 2006, as Case

Number 1-0120-07-005, and Part II of her reply of May 14, 2007, to Fidelity

Investments' redacted February 26, 2007 Response and are incorporated herein by

reference.  Ms. Lawson raised these concerns with her immediate manager, his manager

(the Senior Vice President for Shared Services, Harris Komishane), as well as then CFO

of PI Finance (Jean Raymond) and a PI Finance Vice President.

33.    Ms. Lawson succeeded in having these first concerns addressed by Fidelity Investments, and she received excellent verbal and written feedback concerning her work from FMR Co., PwC and the Chief Financial Officers for NF and CFO.  The "Overall Comments" in Ms. Lawson's merit review for the period July 1, 2004 through June 30, 2005 performance review by her manager reflect this assessment of Ms. Lawson's work:

> "In the past year Jackie has been placed in a new role managing Board Support for all of FBC.  Jackie had never before been in a role where she was required to perform analysis of the Board of Trustees, so being asked to manage a group of analysts who performed this work without having done it herself was a big challenge.  Jackie met this challenge by achieving excellent results for both FP and TA.  The feedback that we received from PwC and FMR Co. was that the analysis provided by her group was the best of any business unit, after having been the worst in the prior year, before our group existed.  A survey my manager conducted showed that all FBC b/u's [business units] and FMR Co. rated the work provided by Jackie's group in the Annual FP [Fund Profitability] cycle very highly. Jackie consistently put in an outstanding effort in all aspects of her role in the past year, working many long nights and weekends.  She has learned a significant amount about Fund Profitability and the Transfer Agent process, and has been an excellent manager of her group.  She has made significant improvements to the FP and TA processes for both RIA and NF, one of the key wins from having this work performed in Shared Services.
>
> Her commitment and effort are consistently at the highest level."

34.    In raising her concerns of the PI Fund Profitability methodologies previously used by the PI finance group, however, Ms. Lawson incurred the hostility and subsequent retaliatory actions of PI Finance.   Despite the Overall Comments given by her manager, she was given an Overall Rating of "Proficient," rather than "Exceed Expectations" or "Outstanding."  On information and belief, this lower rating was based on the unwarranted negative feedback from the CFO for PI Finance, Jean Raymond.

35.     From June 2005 through October 2005, Ms. Lawson's Group reviewed additional PI fund profitability methodologies, and Ms. Lawson raised additional concerns to her managers (including Harris Komishane), to the then PI Finance CFO (Jean Raymond), to PwC and to FMR Co. These concerns are detailed in Ms. Lawson's Complaint filed with OSHA on December 20, 2006, as Case Number 1-0120-07-005, and in Part II of her reply of May 14, 2007, to Fidelity Investments' redacted February 26, 2007 Response, and are incorporated herein by reference.

36.     In October 2005, Ms. Lawson was asked by Harris Komishane to give up day to day management of the Board Support Group and to complete instead a long-term project.  In February 2006, however, Ms. Lawson's immediate manager brought Ms. Lawson back into the Fund Profitability group because he needed her assistance to complete the annual 2006 Fund Profitability cycle.

37.     In May 2006, Ms. Lawson resumed her review of Fund Profitability methodologies.  Ms. Lawson became aware that during her absence from the Board Support Group, PI Finance had succeeded in obtaining her manager's authorization to have the Board Support Group implement certain methodologies out of cycle.  Ms. Lawson raised concerns regarding the implementation and use of these methodologies to her manager, to Harris Komishane, to PwC and to a PI finance sub-committee formed to review all the PI methodologies.

38.     From May 2006 through September 2006, the Board Support Group and the PI Finance subcommittee met bi-weekly to review the PI fund profitability methodologies.  As Ms. Lawson continued to raise her concerns regarding these

methodologies, her manager supported her, but PI Finance management responded with hostility and began a course of action to prevent her concerns from being addressed.

39.    In July 2006, Ms. Lawson received only a below average raise. In her oral review, her manager gave no explanation for the below average raise. Despite Fidelity Investments' policies mandating a written merit review, no such review was given to Ms. Lawson at the time.

40.    In September 2006, Ms. Lawson's manager was notified that he would be transferred to another position. Once the manager was so notified, he turned responsibilities for the review of PI Fund Profitability to a PI Finance Director (Claire Cadogan), who approved the implementation of the methodologies over Ms. Lawson's objections. Ms. Lawson's manager left the group in October, 2006, prior to completing Ms. Lawson's merit review.

41.    When Ms. Lawson learned that her manager was being transferred, Ms. Lawson requested that she be considered for the position to be vacated by her manager. In response, the Senior Vice President for Shared Services Harris Komishane told Ms. Lawson that she had done a great job over the past two years, and had made tremendous improvements in the Board support group. He said that her performance was at a superior level and that her analytical skills were outstanding. Nonetheless, Claire Cadogan, who had overruled Ms. Lawson's concerns regarding PI Fund Profitability, who had no Board Support experience, and who had significantly less management experience, was placed in the position instead. Ms. Lawson was told by her manager that she was to train the PI Finance Director (Claire Cadogan) because Ms. Cadogan had no Board Support experience.

42.    On September 21, 2006, Harris Komishane advised Ms. Lawson that Claire Cadogan would become the Director of the Board Support Group.  When Ms. Lawson pointed out conflicts of interest with the independence and governance of the Board Support group, Mr. Komishane told Ms. Lawson that Ms. Lawson was highly compensated.  Ms. Lawson understood this statement as an implied threat that Ms. Lawson would lose that compensation if she raised further questions about this conflict of interest.

43.    On information and belief, PI Finance insisted on placing Ms. Cadogan in her position as Director of Board Support to cover up Fund Profitability issues.  The action was also taken in retaliation for Ms. Lawson's raising of concerns regarding the PI Finance methodology.

44.    On September 29, 2006, Ms. Lawson's attorney wrote to Fidelity Investments then-General Counsel Lena Goldberg, reporting Ms. Lawson's earlier concerns regarding the practices by PI Finance, and her concerns regarding the future independence of the Board Support Group following the assignment of Claire Cadogan, the former PI Finance Director, to head the Board Support Group.  Through her attorney, Ms. Lawson also requested a transfer out of the Board Support Group.  That request was denied.

45.    On October 9, 2006, the former PI Finance Director Claire Cadogan formally assumed the title of Director of Board Support Group and Ms. Lawson was officially removed as the Head of the Board Support Group.   Despite the change of title and removal of authority, Ms. Lawson continued to have full work responsibility for supervising the Board Support Group.

46.     Ms. Lawson expressed to her new supervisor her grave concerns regarding the Fund Profitability methodology that was implemented, and provided documentation detailing the problem.  Instead of reviewing the documentation, Claire Cadogan and other Fidelity Investments' managers continued their campaign to discredit Ms. Lawson.

47.     This campaign was evident to Ms. Lawson's staff who reported to Ms. Lawson that her new manager came to the Board Support group "gunning" for Ms. Lawson.   PI Finance Vice President Tim Rooney also yelled at Ms. Lawson regarding Ms. Lawson's continuing concerns with the PI Fund Profitability methodologies.

48.     On December 7, 2006, Ms. Lawson's attorney again wrote to Fidelity Investments' attorneys regarding the ongoing operations and independence of the Board Support Group, to report Ms. Lawson's supervisors' unwarranted attempts to discredit Ms. Lawson, and to request again Ms. Lawson's immediate transfer out of her current position – where she could no longer support the methodologies being used -- to an alternative position at Fidelity Investments.

49.     On December 11, 2006, after Fidelity Investments' attorneys received this letter, Ms. Lawson was provided copies of her most recent performance reviews.  Among the documents provided was a purported merit review for the July 1, 2005 through June 30, 2006 period by her former manager.  The review had not been prepared in the normal course of business and had not previously been provided to Ms. Lawson, but instead was prepared months late, and without consulting with Ms. Lawson.

50.     This review contained inaccurate statements regarding Ms. Lawson's performance.  These inaccurate statements were made in retaliation for her raising concerns and in an effort to falsely discredit her.

- 17 -

51.     On December 18, 2006, Ms. Lawson's supervisors retaliated against Ms. Lawson for raising concerns regarding the PI Finance methodologies by giving her a reduced bonus compensation.

52.     On December 20, 2006, Ms. Lawson, through her attorney, advised Fidelity Investments' then-General Counsel that Ms. Lawson had filed a retaliation claim with OSHA by providing a facsimile copy.  On January 5, 2008, Ms. Lawson also advised the Securities and Exchange Commission of the filing by providing a copy of Sarbanes-Oxley complaint filed with OSHA and the earlier letters to Fidelity Investments' counsel by mail and facsimile.  On February 16, 2007, Ms. Lawson orally provided the Securities and Exchange Commission further information regarding the matters relating to potential fraud against Fidelity Mutual Fund shareholders.

53.     On information and belief, on or about January 8, 2007, OSHA notified Fidelity Investments and the individuals named in Ms. Lawson's complaint, including Harris Komishane, Claire Cadogan, Jean Raymond and Tim Rooney, of the pending complaint.

54.     During the week of January 8, 2007, Ms. Lawson contacted the Vice President of Board Support and Business Analysis at FMR Co. regarding the PI Fund Profitability methodology.  Ms. Lawson took this action because she reasonably believed that the methodology resulted in inaccurate numbers being presented to the Fidelity Mutual Fund Board of Trustees, her attempts to have her supervisors and the General Counsel's office address the matter had failed, and because the Vice President of Board Support and Board Analysis at FMR Co. was in a position to prevent the inaccurate reporting.

55.     When Claire Cadogan learned that Ms. Lawson had contacted FMR Co.,
she harshly berated Ms. Lawson for doing so, and also responded by increasing Ms.
Lawson's workload and unfairly criticizing her performance.

56.     On January 22, 2007, FMR Co. scheduled a meeting to review the PI Fund
Profitability methodology question.  The meeting attendees (by phone or in person)
included: Ms. Lawson; Ms. Lawson's manager Claire Cadogan (who had approved the
continuing use of the methodology over Ms. Lawson's concerns); Ms. Lawson's prior
manager (who had approved the methodology during the period when Ms. Lawson was
not involved in the day-to-day operations of the group); their manager, Senior Vice
President for Shared Services Harris Komishane; the former PI Finance CFO Jean
Raymond (who had originally requested the PI methodology, and (who by then served as
Executive Vice President and Chief Financial Officer); the CFO for FMR Co.; the Vice
President for Board Support and Business Analysis at FMR Co., external auditors from
PwC; and Fidelity Investments' legal counsel.

57.     Ms. Lawson presented her concerns at the meeting.  When attempts were
made by managers to delay review of the issue until later in the year, Ms. Lawson
informed the attendees that she had filed a complaint with OSHA and that the SEC was
also aware of her complaint.  FMR Co. concluded the meeting with a mandate for a
committee to be formed which was to include Ms. Lawson and PwC.

58.     Following the meeting, however, Ms. Lawson's manager Claire Cadogan
announced that she was the chair of the Committee.  Ms. Cadogan then excluded Ms.
Lawson from all meetings of the committee.  On January 26, 2007, four days after the
meeting with FMR Co., Claire Cadogan gave Ms. Lawson a document entitled

- 19 -

Performance Expectations in which Ms. Cadogan made the unfair criticism of Ms. Lawson a part of her employment record.

59.     On January 29, Claire Cadogan retaliated against Ms. Lawson further by denying approval for Ms. Lawson's legitimate expense report.

60.     Meanwhile, in January 2007, Claire Cadogan had asked Ms. Lawson to research a different issue. Ms. Cadogan informed Ms. Lawson that she and Harris Komishane had been aware of this issue since October 2006, and had been working with FMR Co. on the issue. Ms. Lawson determined that the issue was of concern, that the matter had not yet been brought to the attention of the Fidelity Mutual Fund Board, and that it had arisen in another Fidelity Company outside of Ms. Lawson's area of responsibility (and not part of Fidelity Brokerage Services, LLC). Nonetheless, in March 2007 and April 2007, Claire Cadogan and Harris Komishane in a chain of e-mails tried to implicate Ms. Lawson in the potential fraud.

61.     Ms. Lawson is informed and believes that on or about May 9, 2007, OSHA notified Fidelity Investments, Claire Cadogan and Harris Komishane of the second OSHA complaint.

62.     On May 10, 2007, Ms. Lawson notified FIDELITY in-house counsel and the Fidelity Investments' Chief Financial Officer of Ms. Lawson's concerns regarding the matter that she had learned of when her managers attempted to implicate her in it. Claire Cadogan was extremely upset when she found out that Ms. Lawson had reported the matter to Fidelity Investments legal counsel.

63.     On May 17, 2007 Ms. Lawson was issued in writing an "oral warning" from the Senior Vice President for Shared Services Harris Komishane for purportedly

violating Fidelity Investments' policy regarding Insubordination. The "Oral Warning –
Policy Violation" was given in retaliation for Ms. Lawson informing the Fidelity
Investments legal counsel on May 10 regarding the matters in which her managers had
attempted to implicate her and for filing the second Sarbanes-Oxley complaint with
OSHA.

      64.    In June 2007, Fidelity Investments assigned a new Vice President, Betsy
Connolly, into a newly created, temporary position over Claire Cadogan. Ms. Lawson
provided this Vice President with copies of the material Ms. Lawson had prepared
regarding her ongoing concerns. Ms. Lawson also advised Betsy Connolly of her
pending Sarbanes-Oxley claims and her submissions to the SEC.

      65.    On July 2, 2007, Ms. Lawson was advised by Vice President Betsy
Connolly that Ms. Lawson should take a six to twelve months sabbatical from Fidelity
Investments. Ms. Connolly advised Ms. Lawson that it was impossible for her to
continue working at Fidelity Investments because of the claims she had made to OSHA
and the SEC. Ms. Connolly advised Ms. Lawson that Ms. Connolly had been asked to
give Ms. Lawson her annual review, but had declined, because in her view, the review
was not consistent with Ms. Lawson's work performance that Ms. Connolly had
observed, and because Ms. Connolly had not been present during most of the year
covered by the evaluation.

      66.    On July 2, 2007, Ms. Lawson also learned that she would not be receiving
an annual salary increase. Every other member of her team received an annual salary
increase.

67.     On July 17, 2007, Claire Cadogan and Harris Komishane informed Ms. Lawson that her performance was being rated at the lowest possible level ("Needs Improvement"). This was the first time in 11 years that Ms. Lawson had received such an evaluation. In giving this evaluation and in denying a salary increase, Ms. Lawson's managers ignored all objective evidence of her successful performance, and instead retaliated against her for bringing forward the issues concerning potential fraud against Fidelity Investments mutual fund shareholders.

68.     On August 16, 2007, Ms. Lawson submitted her response to her 2007 Annual Merit Review to Claire Cadogan, Harris Komishane, Fidelity Investments Human Resources and Fidelity Investments in-house counsel. In that response, Ms. Lawson alleged that the negative evaluations in her 2007 Annual Merit Review were given in retaliation for her protected activity under Sarbanes-Oxley. The protected activity is further detailed in Ms. Lawson's third Complaint and attachments thereto, docketed by OSHA as Case Number 1-0120-07-012, and incorporated herein by reference.

69.     On August 27, 2007, the OSHA investigator assigned to Ms. Lawson's case advised both parties that OSHA was rejecting Fidelity Investments' claim that it was not subject to the Sarbanes Oxley whistleblower provisions and that OSHA intended to proceed to investigate the merits of Ms. Lawson's complaint.

70.     After Fidelity Investments was advised by OSHA that it would be investigating Ms. Lawson's claims, Ms. Cadogan's abusive behavior toward Ms. Lawson escalated. Ms. Connolly joined Ms. Cadogan in this abusive behavior toward Ms. Lawson. This abusive behavior towards Ms. Lawson is detailed in her complaint of November 9, 2007, which is attached hereto as Exhibit 1 and incorporated herein by

reference. The conduct resulted in working conditions that became so intolerable that Ms. Lawson felt compelled to resign.

71.    On September 21, 2007, Ms. Lawson gave notice that she could no longer continue working in her current position due to the extreme harassment that she was being forced to endure. She tendered her resignation, effective October 19, 2007. A copy of Ms. Lawson's letter is attached hereto as Exhibit 5, and incorporated herein.

72.    Fidelity Investments did not allow her to continue in her position through October 19, 2007, however, and instead, Ms. Lawson was removed from her position, effective immediately on September 21, 2007.

### COUNT I - RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A

73.    The allegations of paragraphs of 1-72 are incorporated herein by reference.

74.    Defendants are contractors and/or subcontractors of companies that are required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 780(d)) within the meaning of 18 U.S.C. § 1514A.

75.    Plaintiff is an employee of the Defendants within the meaning of 18 U.S.C. § 1514A.

76.    The information Plaintiff provided to the Fidelity managers, in-house counsel and the SEC (detailed above) regarded conduct which Ms. Lawson reasonably believed constitutes violations of rules or regulations of the Securities or Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

- 23 -

77.     The Fidelity managers to whom Ms. Lawson provided such information (detailed above) each had supervisor authority over Ms. Lawson and/or had authority to investigate, discover, or terminate misconduct.

78.     In providing this information to Fidelity managers, in-house counsel and the SEC, Ms. Lawson engaged in protected conduct.

79.     The Complaints Ms. Lawson filed with OSHA (detailed above) related to an alleged violation of rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.  In filing these complaints with OSHA, Ms. Lawson engaged in protected conduct.

80.     Ms. Lawson's managers responsible for the discriminatory actions and/or harassing conduct were aware of Ms. Lawson's protected conduct.

81.     Ms. Lawson's protected conduct constituted contributing factors in Fidelity Investments' discrimination of and harassment towards Ms. Lawson.

82.     Fidelity Investments, through its managers Harris Komishane, Betsy Connolly, Claire Cadogan, Jean Raymond and Tim Rooney, engaged in discrimination, harassment and constructive discharge of Plaintiff because of and in retaliation for her lawful and protected acts of providing this information to managers and government agencies and/or for filing her Complaints with under 18 U.S.C. § 1514A.

**COUNT II – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

83.     The allegations of paragraphs of 1-82 are incorporated herein by reference.

84.     Plaintiff was an employee at will at Fidelity Investments.

85.    Plaintiff was subjected to working conditions that were so intolerable that she felt compelled to resign.

86.    Plaintiff's reasonable decision to resign because of unendurable working conditions constitutes a constructive discharge under Massachusetts law.

87.    Fidelity Investments' action in not allowing her to continue in her position through the date of resignation Ms. Lawson had offered, and the removal from her position one month earlier, also constitutes a discharge.

88.    Plaintiff was constructively and/or otherwise discharged because she provided information to Fidelity managers who had supervisor authority over Ms. Lawson and/or had authority to investigate, discover, or terminate misconduct and/or to the SEC, regarding conduct that Plaintiff reasonably believed constitutes violations of rules or regulations of the Securities or Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

89.    Plaintiff's discharge and/or constructive discharge contradicted well-defined public policies of the Commonwealth of Massachusetts.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the court grant the following relief:

(1) A declaration that Fidelity Investments, as a contractor and/or subcontractor to the Fidelity Mutual Funds, is a covered employer under 18 U.S.C. § 1514A;

(2) Permanent injunctive relief directing Defendants to reinstate Ms. Lawson at her prior level of Senior Director;

(3) Back pay, with interest;

(4) Emotional distress damages;

(5) Punitive damages; and

(6) Compensation for special damages, including litigation costs, expert witness

fees and reasonable attorney fees.

## **JURY TRIAL DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO

TRIABLE.

Respectfully submitted,
**JACKIE HOSANG LAWSON**

By her attorney,


   /s/ Indira Talwani
Indira Talwani
**SEGAL ROITMAN, LLP**
111 Devonshire Street
5th Floor
Boston, MA  02109
(617) 742-0208

Dated:  March 20, 2008