# EXHIBIT A

# PART 2

# SEGAL, ROITMAN & COLEMAN

DONALD J. SIEGEL
PAUL F. KELLY
IRA SILLS
MARY THOMAS SULLIVAN*
SHELLEY B. KROLL
BURTON E. ROSENTHAL
ANNE R. SILLS
KATHRYN S. SHEA
INDIRA TALWANI**
ELIZABETH ARIENTI SLOANE
MICHAEL J. DOHENY
STEPHANIE R. PRATT-MITRA
GREGORY A. GEIMAN
NICOLE HORBERG DECTER

COUNSELLORS AT LAW
11 BEACON STREET
SUITE 500
BOSTON, MASSACHUSETTS 02108
www.segalroitman.com

ROBERT M. SEGAL (1915-1999)

OF COUNSEL
RICHARD W. COLEMAN
HAROLD B. ROITMAN
JOSEPH P. McKENNA, JR.
PAUL S. HOROVITZ

* Also Admitted to the
New Hampshire Bar

**Also Admitted to
the California Bar

November 9, 2007

<u>Via Overnight Mail</u>
Marthe B. Kent
OSHA Area Director
U.S. Department of Labor
Occupational Safety & Health Administration
JFK Federal Building, Room E340
Boston, Massachusetts 02203

  Re: Jackie Hosang Lawson and Fidelity Investments

Dear Ms. Kent:

  As you know, this firm represents Jackie Hosang Lawson, a Senior Director of Finance in Fidelity Brokerage Services LLC ("FBC") at Fidelity Investments. Please accept this letter on behalf of Ms. Lawson as a fourth complaint of Discrimination under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, title VIII of the Sarbanes-Oxley Act of 2002. This complaint is against Fidelity Investments itself, as well as Ms. Lawson's supervisors, Senior Director Claire Cadogan and Vice President Betsy Connolly.

  Ms. Lawson has reported conduct which she reasonably believes constitutes a violation of Federal law relating to fraud against Fidelity's Mutual Fund shareholders to her supervisors, and to other Fidelity executives with the authority to investigate and terminate the misconduct, as detailed in Ms. Lawson's first and third complaints (dated December 20, 2006, and September 14, 2007, respectively, and incorporated herein by reference). Ms. Lawson has also engaged in the protected activity of filing these prior complaints of discrimination, as well as a complaint dated April 24, 2007, with your agency. (A copy of a Summary of Allegations is enclosed).

  After Ms. Lawson filed the first two complaints, Fidelity Human Resource Solutions encouraged her to take a six to twelve month sabbatical from Fidelity. On July 2, 2007, Betsy Connolly made a similar offer. Ms. Lawson responded to both Human

Marthe B. Kent
November 9, 2007
Page 2 of 4

Resources and Ms. Connolly that she loved her job, enjoyed working with her staff, and had no intention of voluntarily vacating her post. Ms. Connolly told Ms. Lawson that it was impossible for her to continue working at Fidelity because of the claims Ms. Lawson had made with OSHA and the SEC. Ms. Connolly also said that it would be better for Ms. Lawson to leave Fidelity before OSHA made a ruling as to whether Fidelity was a covered employer under the Whistleblower act of Sarbanes Oxley.

Starting Tuesday, September 11, 2007, after your office had advised both parties that OSHA had made an initial coverage determination and would be proceeding to investigate the merits of Ms. Lawson's claims, abusive behavior by Claire Cadogan and Betsy Connolly escalated. The behavior of these two Fidelity executives made it impossible for Ms. Lawson to perform her job duties, and made her working life extremely unbearable. The behavior during the nine days starting September 11 included the following:

- Verbal abuse by Ms. Cadogan during their weekly scheduled one on one meeting.
- Ms. Lawson's work efforts and management of her staff were sabotaged. One staff member assigned by Ms. Cadogan to assist Ms. Lawson on making a Transfer Agent deliverable for FMR was reassigned to do other work for Ms. Cadogan. Ms. Connolly then falsely accused Ms. Lawson of not meeting the FMR deadline.
- On Friday, September 14, 2007 Ms. Connolly yelled at and berated Ms. Lawson in front of her staff and others regarding Transfer Agent deliverables due that same day to FMR. Ms. Connolly's behavior was disruptive to Ms. Lawson and Ms. Lawson's staff members were visibly upset and scared by Ms. Connolly's demeanor.
- Unrealistic numbers of projects with equally unrealistic deadlines were assigned to Ms. Lawson and her staff.
- When Ms. Lawson committed to meeting unrealistic project deadlines by planning to work on the weekends, the project deadlines were changed to earlier dates by Ms. Cadogan.
- Ms. Connolly issued Ms. Lawson a document on Tuesday, September 18, 2007, that was dated for September 21, 2007, where Ms. Connolly fabricated that she has been expressing concerns about the Board Support getting its work done. This document was titled "Memo to Jackie Lawson Personnel File."
- The last sentence of the above document to Ms. Lawson from Ms. Connolly address Ms. Lawson's numerous requests for a dedicated resource to fill a position in her group that had been vacant since April 2007. The sentence read "I have told Jackie that if she still feels she needs a dedicated resource for the transfer agent work, or any other work, she can give me a detailed project plan to support the request and I will reconsider my decision." After handing Ms. Lawson said document, Ms. Connolly then verbally told Ms. Lawson, "As to the last sentence, if you give me a detailed project plan, I will take it and consider it, but I will not be receptive to it, so do not bother writing it." When she observed

Marthe B. Kent
November 9, 2007
Page 3 of 4

Ms. Lawson taking notes, she got visible upset and yelled at Ms. Lawson. Ms.
Cadogan was also in attendance at this meeting.

- Ms. Connolly accused Ms. Lawson of insubordination when she refused to agree
to delay the review of "Guidance" Fund Profitability methodology until 2008 as
suggested by Ms. Connolly and Ms. Cadogan.

- On Thursday, September 20, Ms. Lawson was required to attend four impromptu
meetings with little advance notice. During these meetings, she was verbally
abused and yelled at by both Ms. Cadogan and Ms. Connolly.

- On Thursday, September 20, Ms. Connolly physically threw a status report
document at Ms. Lawson, yelling at her to fill in dates for projects that should
have been provided by Ms. Connolly and Ms. Cadogan.

- Also on Thursday, September 20, after a grueling half hour meeting with Ms.
Cadogan and Ms. Connolly in which the verbal abuse was particularly harsh and
Ms. Lawson was in tears, she told both Ms. Cadogan and Ms. Connolly that she
was mentally exhausted by the barrage of unfair accusations from both of them.
She told them that they were treating her as an animal and not as an experienced
respected manager and human being. She also told them that she could not
possible take any more abuse from either of them. When she got up to leave Ms.
Connolly's office, Ms. Connolly yelled at Ms. Lawson saying that if Ms. Lawson
left the office Ms. Connolly would charge her for gross insubordination. Ms.
Lawson sat down again at which time Ms. Connolly asked her to print a copy of
her schedule for that afternoon. Ms. Connolly then escorted Ms. Lawson back to
her office at 12:00 noon so that she could print the schedule and give it to Ms.
Connolly.

- When Ms. Lawson returned to her office after lunch, her marked up calendar was
on her chair. Ms. Connolly had rearranged, cancelled and rescheduled some of
her meetings, an action in Ms. Lawson's experience that is unheard of at Fidelity
Investments.

- At the fourth meeting on Thursday afternoon, Ms. Connolly dictated that going
forward she wanted an hour by hour accounting of every work day from Ms.
Lawson and her staff. Ms. Connolly had asked the previous day for Ms. Lawson
and her staff to estimate the hours that it would take for them to complete various
projects. Ms. Connolly and Ms. Cadogan reduced the estimated hours and then
told Ms. Lawson that she and her staff would be held accountable if they could
not complete the work in the hours that Ms. Connolly and Ms. Cadogan had
allocated for the projects. Ms. Cadogan and Ms. Connolly ignored the fact that
the project dates and times coincided with regular production work in the
department, production work that they refused to factor into the work schedule.
Based on her experience managing the group for three years, Ms. Lawson knew
the impossibility and absurdity of the mandate that she and her staff were given
by Ms. Cadogan and Ms. Connolly.

- Ms. Lawson's staff voiced concerns to Ms. Lawson that Ms. Cadogan and Ms.
Connolly were making these unrealistic work demands that impacted them, solely
because they wanted to get rid of Ms. Lawson.

Marthe B. Kent
November 9, 2007
Page 4 of 4

We contend that this behavior was generally calculated to assure that Ms. Lawson would leave Fidelity's employment, and was particularly timed to assure that she would not be present at the worksite when OSHA finally started its investigations, and that these actions amount to constructive discharge. Given the unbearable and impossible demands, and the undue pressure placed on her staff, Ms. Lawson had no choice but to leave her employment. The escalation of the abuse following notice of the OSHA ruling is not coincidental.

On September 21, 2007, Ms. Lawson submitted a letter of resignation giving one months notice. (A copy of this letter is enclosed). Although she was paid for the additional month, she was immediately relieved of all job responsibilities. She was also directed not to return to work after that date, was required to turn in her badge, and her computer access was turned off.

Ms. Lawson charges Fidelity, Ms. Cadogan and Ms. Connolly with retaliation for her protected activities. Ms. Lawson seeks all relief necessary to make her whole, including back wages and front pay, litigation costs, expert witness fees and reasonable attorney's fees.

Sincerely,

Indira Talwani

Cc    (w/encl.):
      Kristine Rubino
      David Bergers, Esq.
          District Administrator
          Securities and Exchange Commission
      Jackie Hosang Lawson

L:\Talwani\individualclients\Lawson\oshacomplaint4.doc

EV903466670US

# SEGAL, ROITMAN & COLEMAN

COUNSELLORS AT LAW
11 BEACON STREET
SUITE 500
BOSTON, MASSACHUSETTS 02108
www.segalroitman.com

DONALD J. SIEGEL
PAUL F. KELLY
IRA SILLS
MARY THOMAS SULLIVAN*
SHELLEY B. KROLL
BURTON E. ROSENTHAL
ANNE R. SILLS
KATHRYN S. SHEA
INDIRA TALWANI**
ELIZABETH ARIENTI SLOANE
MICHAEL J. DOHENY
STEPHANIE R. PRATT-MITRA
GREGORY A. GEIMAN
NICOLE HORBERG DECTER***

ROBERT M. SEGAL (1915–1999)

OF COUNSEL
RICHARD W. COLEMAN
HAROLD B. ROITMAN
JOSEPH P. MCKENNA, JR.
PAUL S. HOROVITZ

———

\* Also Admitted to the
New Hampshire Bar

\*\*Also Admitted to
the California Bar

\*\*\*Also Admitted to
the New York Bar

December 20, 2007

By Facsimile (202) 693-5555 and Mail
Steven J. Mandel
Associate Solicitor
Office of the Solicitor
Division of Fair Labor Standards
200 Constitution Avenue, N.W.
Room N2716
Washington, D.C. 20210

Re: Jackie Hosang Lawson and Fidelity Investments, Case Nos. 1-0210-07-0005

Dear Mr. Mandel:

Thank you for the opportunity to respond to Eugene Scalia's ex parte letters of September 13, 2007, and November 1, 2007 concerning the claim under Section 806 of the Sarbanes-Oxley Act of 2002 filed last December by my client, Jackie Hosang Lawson, against Fidelity Investments.[1]

---

[1] Mr. Scalia has previously objected to the use of the term Fidelity Investments to refer to the respondent in this case, asserting that Fidelity Investments is "a trade name and not an actual corporate entity." The so-called "trade name," however, is the umbrella term under which FMR Corp., and its subsidiaries, including FMR Co. and FBS operate. Indeed Mr. Scalia's letter here refers to "the corporate family" of "FMR Corp. and its subsidiaries," including FMR Co. and FBS. Letter from Eugene Scalia to Nilgun Tolek, September 13, 2007, at 2-3. As discussed below in Part IIIB, the corporate family of FMR Corp. and its subsidiaries operates for employment purposes as an integrated employer.

Steven J. Mandel
December 20, 2007
Page 2 of 26

I.    The Impact of Fidelity Investments' Claims

     Buried in the ex parte letters are two critical admissions. First, Fidelity Investments concedes that the Fidelity Mutual Funds are public companies required to file reports under section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. 78o(d), Letter from Eugene Scalia to Nilgun Tolek, September 13, 2007, at 2-4.[2] Second, Fidelity Investments admits that FMR Co., as the investment advisor to the Fidelity Mutual Funds, may only provide these services through a written contract that specifies the services to be performed and the fees to be paid and is approved by the Fidelity Board of Trustees. Letter from Eugene Scalia to Nilgun Tolek, September 13, 2007, at 2.

     Based on these admissions, there can be little dispute that both the Fidelity Mutual Funds and their contractor, FMR Co., are covered by the whistleblower provisions set forth in Section 806 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "the Act"), 18 U.S.C. § 1514A. Subsection (a) of that statutory provision specifically provides in relevant part that "[n]o company . . . that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any . . . contractor [or] subcontractor . . . of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee [as a whistleblower relating to fraud against shareholders]." (Emphasis added).

     Faced with this starting point, Fidelity Investments raises two principal arguments against coverage here. First, Fidelity Investments argues that a contractor such as FMR Co. is only prohibited from discriminating against the mutual funds' employees, and is not prohibited from discriminating against its own employees. Thus, under Fidelity Investments' construction, only the employees of the mutual funds are protected by Sarbanes-Oxley for whistleblowing activities.

     In making this argument, Fidelity Investments' lack of candor – particularly in an ex parte communication – is stunning. While Fidelity Investments would limit protection to the employees of the Fidelity mutual funds, it neglects to mention that the Fidelity

---

[2]    See also id. at 1-2 (explaining that "[a] 'mutual fund' is . . . an 'investment company,'" that "when someone 'buys' a mutual fund she actually buys shares of the 'investment company'").

Steven J. Mandel
December 20, 2007
Page 3 of 26

mutual funds have no employees.[3]  Thus, under Fidelity Investments' interpretation of the statute, the group of employees who are protected when they engage in whistleblowing activities is a null set.  As demonstrated in Part II below, Congress avoided this result by including "contractors" and "subcontractors" in the list of entities prohibited from discriminating.[4]

Fidelity Investments' second argument similarly lacks meaningful disclosure.  Fidelity Investments would have the Department of Labor believe that Ms. Lawson's nominal employer, FBS, has no ties to the Fidelity Mutual Funds or to FMR Co., and that even if FMR Co. as a contractor, is prohibited from discriminating against its own employees, Ms. Lawson's employer, FBS may still discriminate against its employees.  Fidelity Investments neglects to mention, however, that approximately half of the hundreds of millions of dollars paid as fees by the Fidelity mutual funds to FMR Co., under their management contract with FMR Co., are passed on to FBS for its

---

[3] This arrangement is not atypical.  As one author recently explained,

> Each mutual fund is a separate legal entity--typically either a corporation or a business trust. [] Unlike a typical corporation, however, a mutual fund is normally externally managed. [] "A mutual fund is a 'mere shell,' a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund." [] Instead of having its own employees, a mutual fund retains third-party service providers to manage the fund's investment portfolio, market and sell the fund shares to investors, execute shareholder transactions, maintain shareholder records, etc. []

William K. Sjostrom, Jr., Tapping the Reservoir: Mutual Fund Litigation under Section 36(A) of the Investment Company Act of 1940, 54 Kan. L. Rev. 251, 255-256 (2005).  The article cites Robert A. Robertson, Fund Governance: Legal Duties of Investment Company Directors § 2.02 (2001); Philip H. Newman, Legal Considerations in Forming a Mutual Fund, SJ095 ALI-ABA 22, 22 (2003); Inv. Co. Inst., 2004 Mutual Fund Fact Book 1 (44th ed. 2004), available at http://www.ici.org/pdf/2004_factbook.pdf, at 2, 7-8; Task Force on Fund Dir's Guidebook (2002-2003), Am. Bar Ass'n, Fund Director's Guidebook, 59 Bus. Law. 201, 207 (2003); Tannenbaum v. Zeller, 552 F.2d 402, 405 (2d Cir. 1977), cited in Burks v. Lasker, 441 U.S. 471, 480-81 (1979); Zell v. InterCapital Income Sec., Inc., 675 F.2d 1041, 1046 (9th Cir. 1982) ("The fund is a shell.").

[4] As demonstrated below, even if Congress had not included "contractors" and "subcontractors," courts and agencies applying established principals of labor and employment law would find that Fidelity Investments which assumes all employer functions for the Mutual Funds and which is controlled by Edward Johnson III, who also serves as Chairman of the Fidelity Boards, is an integrated employer with the Funds.  See Part IIIC below.  Congress avoided any need for this analysis, however, by explicitly prohibiting contractors and subcontractors from discriminating against an employee.

Steven J. Mandel
December 20, 2007
Page 4 of 26

subcontractor role in assisting Fidelity mutual fund investors. Under the statute, subcontractors are covered employers just like contractors. 18 U.S.C. § 1514A.[5]

Notably, the function of the Board Support Group of FBS, which Ms. Lawson headed until the retaliatory actions here, is to ensure that the Board of Trustees of the Fidelity Mutual Funds are provided accurate information about the profits that Fidelity Investments is making in providing services to investors in the Mutual Funds. This information is used by the Boards to determine the compensation that Fidelity Investments receives from the Funds, pursuant to the written contracts which the law requires. If profits from Fund operations are too high, the Boards have a responsibility to the shareholders of the Funds to seek a reduction in Fidelity Investment's fees. Thus while Fidelity Investments admits that the Board of Trustees of the Funds must represent the interest of the shareholders of the mutual funds, and while it admits that the Board of Trustees must approve the written contract with FMR Co. that specifies the services to be performed and the fees to be paid, it neglects to mention that Ms. Lawson's whistleblowing activities related directly to the disclosures by FMR Co. to the Board of Trustees regarding the profitability to Fidelity Investments of the services and fees provided to mutual fund shareholders.

In other words, in Fidelity Investments' view, even those employees attempting to ensure the accuracy of the information relied upon by the Board of Trustees in approving written contracts required by law are not protected by the whistleblower provisions. Fidelity Investments advocates against coverage despite the fact that the Funds' Annual Reports to its shareholders contain numerous statements and assurances about the Board of Trustees' consideration of information regarding fund profitability. As demonstrated in Part IIIA below, this untenable result is easily avoided because FBS serves as a subcontractor to the Mutual Funds and thus is covered in its own right. Moreover, even if this was not so, as set forth in Part IIIB below, Ms. Lawson would be protected because Fidelity Investments must be considered an integrated employer.

Fidelity Investments' unusual step of contacting ex parte the Head of the Office of Whistleblower Protection in an attempt to stop OSHA's investigation of Ms. Lawson's claim is understandable once it is clear what is at stake. The Fidelity mutual funds are the largest group of mutual funds in the United States, with over $3 trillion of investors' assets, and Fidelity Investments makes its profits primarily from these funds. Fidelity seeks to ensure that there are no possible employees with whistleblower protection who

---

[5] For this reason, OSHA did not need to determine whether Fidelity Investments' "corporate family" are integrated employers, or if Fidelity Investments and its Mutual Funds are integrated employers. As discussed below, however, despite Fidelity Investments' creative use of the corporate form for what other companies would call divisions or departments – setting up "corporations" consisting entirely of single departments such as HR – the entire "corporate family" acts as an integrated employer, and thus, the integrated employer doctrine provides a second reason for finding that FBS is a covered employer.

Steven J. Mandel
December 20, 2007
Page 5 of 26

can come forward and report on fraud against the mutual fund investors. At the same time, in seeking to have its communications with the Department of Labor protected from disclosure under FOIA as a "trade secret," it hopes to ensure that the investing public does not learn that it is strenuously fighting against any whistleblower activities relating to the public's investments. The Department of Labor should easily reject this end run on the statutory provisions, however, based simply on the plain language of the statutory provision and the purposes of Sarbanes-Oxley which plainly cover employees of subcontractors operating pursuant to written agreements approved by the Board of the Mutual Funds as required by the securities laws.

II.    Sarbanes-Oxley's Whistleblower Provision Protects Employees of Contractors and Subcontractors of Mutual Funds Who Report Potential Fraud Against Mutual Fund Shareholders from Retaliation by Their Employer

    A.    The Plain Language of the Statutory Provision Establishes that These Employees Are Protected

The starting point in determining whether Sarbanes-Oxley applies to these circumstances is the text of the statute itself. Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739 (1989) (citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)). Section 806(a) of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A provides:

> [1] No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or [2] that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or [3] any officer, [4] employee, [5] contractor, [6] subcontractor, or [7] agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee [as a whistleblower relating to fraud against shareholders].

(Emphasis and numbering added). The subsection on its face thus simply prohibits discrimination against "an employee."

Fidelity Investments argues that the term "an employee" must be limited to mean an employee of a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)). The statute includes no such language, however, but instead provides the limitation on the class of employees protected to those who have engaged in a "lawful act":

> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [security laws or regulations of the Securities and Exchange Commission], or any

Steven J. Mandel
December 20, 2007
Page 6 of 26

provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

    (A)  a Federal regulatory or law enforcement agency;

    (B)  any Member of Congress or any committee of Congress; or

    (C)  a person with supervisory authority to investigate, discover, or terminate misconduct); or

(2) to file, or cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of [various securities laws], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A. The limitation Congress provided as to which employees are protected is thus based on the whistleblowing activity they engaged in, rather than the identity of the employer.

Nor does the structure or language of the paragraph support Fidelity Investments' suggestion that Congress intended the group of employees to be protected to be those employed by companies with certain registered securities or those who are required to file certain statements, and not employees of their contractors or subcontractors. Congress prohibited the various actors from discharging or otherwise discriminating against an employee in his or her terms and conditions of employment. An entity cannot discharge or otherwise discriminate in the terms and conditions of employment against another entity's employees. Moreover, if Congress was seeking to prohibit third parties from securing the discharge of the employee of the publicly traded company, it knew how to so legislate, by prohibiting the third party "from causing or attempting to cause" the publicly traded employer from discriminating against its employees. See e.g. Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-1(d) (making it unlawful for labor unions "to cause or attempt to cause an employer to discriminate against an individual in violation of this section"). It did not limit the protections of the Act in this way.

The statute also gives equal billing to the seven persons or entities who are prohibited from discriminating against an employee, as the terms and clauses identifying the persons or entities are separated by the word "or" rather than words like "acting on behalf of." Fidelity Investments itself argues that the terms of a list must be interpreted in light of one another, citing Gustafson v. Alloyd Co., Inc., 513 U.S. 561 (1995). In Gustafson, the Court explained that one word should not be given a meaning so broad that it is inconsistent with its accompanying words. Under Fidelity Investments' analysis, the last five terms are inconsistent with the first two terms (the first two, it claims, being the companies whose employees are covered, and the last five, being the possible actors who may act on behalf of the first two entities), thus violating the very rule of construction it cites. Instead, the structure of the sentence makes clear that all seven entities or persons are prohibited from discriminating in terms and conditions of

Steven J. Mandel
December 20, 2007
Page 7 of 26

employment against an employee who engages in whistleblowing activities relating to the fraud on the shareholders.

Fidelity Investments' contention that contractors or subcontractors cannot be covered unless they are acting as agents of the mutual fund, would also render the words "contractor" and "subcontractor" as surplusage. If what Congress was getting at was only covering agents acting on behalf of the publicly traded company in retaliating against employees of the publicly traded company, it could have used the single term "agent," to incorporate the requirement that the actions are on behalf of and at the direction of a principal. But Congress did not stop there, but explicitly included contractors and subcontractors as well, though these terms do not include an agency requirement. In interpreting a statute, effect should be given to all the words of a statute and no statutory language should be treated as surplusage. Duncan v. Walker, 533 U.S. 167, 174 (2001).

Fidelity Investment's strained interpretation is particularly troublesome in light of the fact that Fidelity Mutual Funds and most other mutual funds have no employees.[6] Ms. Lawson respectfully suggests that the more natural understanding of the statute, and one that gives meaning to all terms used by Congress, is that it protects whistleblowers seeking to prevent fraud against shareholders regardless of whether the publicly traded company act as a typical corporation with its own employees or as a shell corporation with no employees, acting through contracts with investment advisors, principle underwriters and other affiliates. This understanding is directly supported by the fact that when such services are provided to the mutual fund through third party providers, whether the provider is an investment advisor, the underwriter, or their affiliates, the third party provides the services through contracts approved by the mutual fund's board of directors. Fidelity concedes as much regarding the investment advisors, who can only provide advisory services to funds under written contracts that specify the services to be performed and the fees to be paid.[7] The principal underwriter, in turn, also provides

---

[6] Fidelity makes note that contractors may not have employees, but ignores the far more critical fact that mutual funds also may not have employees.

[7] Letter from Eugene Scalia to Nilgun Tolek, September 13, 2007, at 2; see also Section 2(a)(20)(B) of the Investment Company Act, 15 U.S.C. 80a-2(a)(20)(B) ("investment adviser" includes any person who provides investment advice to an investment company under a contract); Section 15 of the Investment Company Act, 15 U.S.C. § 80a-15 (requiring a no more than two year written contract approved by a majority of the disinterested directors of the Mutual Fund in order to serve as an investment advisor or as the principal underwriter to sell shares of the mutual fund).

Steven J. Mandel
December 20, 2007
Page 8 of 26

services by written contract,[8] as do affiliates of the investment advisor or principal underwriter also provide services by written contract.[9]  Indeed, as Fidelity Investments itself notes, as the investment advisor, FMR Co. is required to file 15(d) statements with the SEC by contract with the entity required to file such statements by law.   Letter from Eugene Scalia to Nilgun Tolek, September 13, 2007, at 3.  For Congress to have protected not only the employees of entities filing 15(d) statements, but also the employees of contractors who file such statements when it included the term "contractor" makes complete sense, while to suggest the opposite, that Congress sought to protect only employees of mutual funds, and not the employees of contractors when it was well aware of the fact that mutual funds typically act through contractors and used the word "contractor", would make no sense at all.

The far more logical limitation, and the one that gives meaning to all words in the statute, is that contractors or subcontractors, performing functions under written contracts approved by the Board of Trustees of the mutual fund stand in the stead of the mutual fund and are treated as if they are the publicly traded company when they are carrying out the business of the mutual fund as it relates to the mutual funds' shareholders.  If, for example, the legal or accounting department of a publicly traded corporation made false statements in SEC filings or to shareholders or to the Board of Directors, no one would dispute that an in-house lawyer or accountant in these departments blowing the whistle on the practice would be covered under Sarbanes-Oxley as a whistleblower.  Similarly, if the corporation elected not to have these accounting or legal services provided in-house, but contracted with a law firm or accounting firm, and that firm or accounting firm made the same false statements relating to the publicly traded corporation in SEC filings or in

---

[8] See Section 2(a)(29) of the Investment Company Act, 15 U.S.C. 80a-2(a)(29) ("principal underwriter" includes any underwriter who pursuant to contract has the right to purchase from the investment company, any such security for distribution); Section 15 of the Investment Company Act, 15 U.S.C. § 80a-15 (requiring a no more than two year written contract approved by a majority of the disinterested directors of the Mutual Fund in order to serve as the principal underwriter to sell shares of the mutual fund).

[9] See Sarah E. Cogan and Philip L. Kirstein, The ABCs of Mutual Funds 2007, Board Composition and The Role Of Fund Directors, Practicing Law Institute Corporate Law and Practice Course Handbook Series, 1612 PLI/Corp. 83, PLI Order No. 10859 (June 27, 2007) (available on Westlaw) (where performance of services such as custody, administration and transfer agency services are provided by affiliates of the investment advisor or principal underwriter, the SEC has taken no action under Section 17(d) of the Investment Company Act, 15 U.S.C. 80a-17(d), which prohibits funds from participating in certain joint transactions with affiliates, so long as these contracts are approved and reviewed by a majority of the independent directors of the fund in the manner required for advisory contracts under Sections 15(a) and 15(c) of the 1940 Act); see also William K. Sjostrom, Jr., Tapping the Reservoir: Mutual Fund Litigation under Section 36(A) of the Investment Company Act of 1940, 54 Kan. L. Rev. 251, 255-256 (2005) (Broad oversight of these various service providers is provided by the fund's board of directors).

Steven J. Mandel
December 20, 2007
Page 9 of 26

information provided to investors or to the Board of Trustees of the publicly traded corporation, certainly the lawyer or accountant at the law firm or accounting firm would also be covered. Indeed, any contrary reading would allow publicly traded companies to avoid Sarbanes-Oxley whistleblower protections simply by having those functions with a potential for fraud against the shareholders performed by outside contractors rather than through in-house departments. The point is, of course, critical in regard to mutual funds such as the Fidelity Funds, who in fact contract out all of the functions of the mutual fund company.

> B.    The Heading of the Section Cannot Limit the Plain Language of the Text

Seeking some theory to avoid the plain language of the statute, Fidelity Investments argues strenuously that Section 806 must be more narrowly construed based on the heading of that section. This argument can be quickly dispensed with for interpretive purposes, a heading is "of use only when [it] shed[s] light on some ambiguous word or phrase.'" Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 212 (1998) (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-529 (1947) (modifications in original)). Here, there is nothing ambiguous in the text of the statute itself.

The only possible ambiguity Fidelity Investments can point to is one created by the heading, but a heading cannot be used to create an ambiguity for it is "but a short-hand reference to the general subject matter involved." Trainmen, 331 U.S. at 529. As the court has explained, "Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text." Id. 528-29 (citations omitted, emphasis added).

Here, section 806's heading of "Whistleblower Protection for Employees of Publicly Traded Companies" can only be viewed as short-hand, and cannot be used to write out the express provisions of the Act. As Fidelity Investments knows well, mutual funds are clearly covered by the whistleblower provisions yet typically have no employees. Yet this complicated structure–with the business conducted through contractors – would be far too ungainly to include in the title of a heading. Congress' use of the short-hand cannot serve to limit the actual text it chose to ensure the protection of investors that it was seeking.

> C.    The Implementing Regulations Correctly Cover Contractors and
>        Subcontractors of Mutual Funds and Protect Their Employees

The Secretary's implementing regulations summarize that "[t]he Act generally was designed to protect investors by ensuring corporate responsibility, enhancing public disclosure, and improving the quality and transparency of financial reporting and

Steven J. Mandel
December 20, 2007
Page 10 of 26

auditing. The whistleblower provisions were intended to protect employees who report fraudulent activity that can mislead innocent investors in publicly traded companies." Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 69 Fed.Reg. 52104 (August 24, 2004). Fidelity Investments points out that the Secretary of Labor announced that these regulations do not purport to interpret the Act. Instead, the announcement made clear that in the Secretary's view, the regulations "accurately reflect the statutory language." Id. at 52105-06.

Fidelity Investments acknowledges that the Department of Labor's regulations implementing Section 806 of the Sarbanes-Oxley Act appropriately define a "company" as "any company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) and any company required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d))," and a "company representative" as "any officer, employee, contractor, subcontractor, or agent of a company." Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 29 C.F.R. § 1980.101 (emphasis added).

Fidelity Investments also concedes that the regulations also define the term "employee" to include: "an individual presently or formerly working for a company or company representative" as well as "an individual whose employment could be affected by a company or company representative." 29 C.F.R. § 1980.101 (emphasis added). Fidelity Investments asserts, however, that the definitions of "employee" and "company representative" work together to broaden improperly the statutory definition of protected employees to provide protection to employees of contractors and subcontractors of publicly traded companies, while section 806(a)'s heading is more limited. The Secretary considered this exact argument prior to implementing the final rule. See 69 Fed.Reg. at 52105. The argument was rejected:

> OSHA believes that the definitions in this section accurately reflect the statutory language. Notwithstanding its caption, section 806(a) expressly provides that no publicly traded company, 'or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee. * * *' The statute thus protects the employees of publicly traded companies as well as the employees of contractors, subcontractors, and agents of those publicly traded companies. Accordingly, OSHA does not believe that its regulatory definitions broaden the class of employees that are protected under the plain language of Sarbanes-Oxley.

Id. at 52105-06 (emphasis added). The regulatory definition thus does not "trump" the language of the statute as Fidelity Investments claims, but rather, as the Secretary

Steven J. Mandel
December 20, 2007
Page 11 of 26

concluded after full consideration of this argument during the rulemaking process, simply reflects the plain statutory language.[10]

      D.    The Statute Must Also Be Interpreted Consistent With Congress' Purpose of Protecting Investors, Including Investors in Mutual Funds, by Protecting Whistleblowers

    As the Court explained in Gustafson, in determining the meaning of words in a statute, the words should be understood against the background of what Congress was attempting to accomplish. Gustafson, 513 U.S. at 575.

    Fidelity Investments argues that Congress' purpose was to protect employees of publicly-traded companies. But this supposed end, standing alone makes no sense. Why protect employees of publicly-traded companies rather than private? Why not protect employees of large companies, rather than small, as in the Family Medical Leave Act? The answer is simple. The primary end of Sarbanes Oxley was to protect investors; protection for whistleblowers was included as a necessary means of achieving this protection of investors.

    In 2002, in the wake of the Enron scandal, Congress enacted Sarbanes-Oxley "to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 705 (codified at 15 U.S.C. 7201, et. seq); see also Carnero v. Boston Scientific Corporation, 433 F.3d 1, 5 (1st Cir. 2006) (the Act "is composed of many separate statutes and statutory schemes aimed at achieving the Act's investor-protection goals"); Bechtel v. Competitive Technologies, Inc., 448 F.3d 469, 484 (2d Cir. 2006) (Straub, C.J., dissenting) ("Congress enacted [the Act] in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. Congress recognized that the problem was an intractable one and that a number of strong enforcement tools would be necessary-from new regulations and reporting requirements, to expanded oversight, to new criminal provisions").

---

[10] Consistent with the regulations, the OSHA Whistleblower Investigation Manual provides that "... an employee of an otherwise non-covered employer (e.g. a small accounting firm) that is a contractor of a covered company who provides information to the SEC regarding a violation of SEC regulations . . . would be protected from subsequent retaliation. OSHA Whistleblower Investigation Manual, Chapter 14, Section III, effective August 22, 2003, available at www.osha.gov/OshDoc/Directive_pdf/DIS_0-0_9.pdf

Steven J. Mandel
December 20, 2007
Page 12 of 26

Congress also was aware that much of the investment in this country was through mutual funds.[11] The legislation itself makes clear that Congress sought to protect these investors, as numerous provisions of Sarbanes Oxley (in addition to the whistleblower

---

[11] See e.g. *The Enron Collapse: Impact on Investors and Financial Market: Joint Hearing Before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises and the Subcommittee on Oversight and Investigations of the Committee on Financial Services, House Committee on Financial Services on H.R. 3763,* 107th Cong., 1st Sess. (Dec. 12, 2001), (available on Westlaw, 2001 WL 34078734 (A&PSAROX), Serial No. 107-51, Part 1) (Statement of Committee Chairman and bill sponsor Representative Michael Oxley ) ("Enron's collapse has drained the investment savings of investors across the country who put their retirement and other investments into mutual funds, pension funds, and other vehicles that invested in Enron"); *The Corporate and Auditing Accountability, Responsibility and Transparency Act of 2002, Hearings before the Committee on Financial Services,* 107th Cong., 2d Sess. (Mar. 13, 20, 2002, April 9, 2002) (available on Westlaw, 2002 WL 32054440 (A&PSAROX), Serial No. 107-60) (Statement of Rep. Rogers (Mich.) ("those families out there who are working very hard every day, they send their money into their mutual funds knowing that that is what they are going to retire on, and they are counting on all of us...")); *Debate, Senate Consideration, Amendment And Passage of S. 2763* (July 11, 2002), pp. S6636-6643 (available on Westlaw at 2002 WL 32054484 (A&PSAROX), SAROX-LH 41-G (remarks of Sen. Lieberman) ("The stakes are high. Over the last two decades we have witnessed an explosion in middle-class participation in the capital markets. A majority of Americans now have a direct stake in stock or mutual funds, usually, through their 401-k plans"); see also *GAO report, Hearings, Accounting Reform And Investor Protection Hearings Before The Committee On Banking, Housing, And Urban Affairs, United States Senate, On The Legislative History Of The Sarbanes-Oxley Act Of 2002: Accounting Reform And Investor Protection Issues Raised By Enron And Other Public Companies* (March 5, 2002, March 6, 2002, March 14, 2002, March 19, 2002, March 20, 2002, March 21, 2002), 107th Cong., 2d Sess., Vol. II, (available on Westlaw, 2002 WL 32968547 (A&PSAROX) ("[T]he dollars that households had invested in mutual funds, excluding money market funds, grew from $46 billion in 1980 to $3.3 trillion in 2000. Moreover, as of December 2001, the total dollars invested . . . in mutual funds was almost $7 trillion, about twice the amount on deposit at commercial banks").

Steven J. Mandel
December 20, 2007
Page 13 of 26

provision at issue here) apply to companies that are required to file such reports, and thus apply to mutual funds.[12]

"Congress also recognized that for *any* of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, . . . insiders are the only firsthand witnesses to the fraud." S.Rep. No. 107-146, at 10 (2002). Congress therefore made whistleblower protection central to the Act . . . ." Bechtel v. Competitive Technologies, Inc., 448 F.3d 469, 484 (2d Cir. 2006) (Straub, C.J., dissenting). The text that would eventually become Section 806 was first introduced by Senator Leahy. The Senate Report accompanying Senator Leahy's described the bill's overall purpose as "to protect whistleblowers who report fraud against retaliation by their employers." See, e.g., S. Rep. No. 107-146, at 2; see also 148 Cong. Rec. S6524, S6541 (July 10, 2002) (statement of Sen. Harkin) ("And workers who discover corporate fraud should be protected just as we protect government whistleblowers."). The report detailed further the potential of fraud hidden through layers of organizations and a corporate code of silence that extended to outside accounting firms, law firms, business consulting firms and investment advisors. See, e.g., S. Rep. No. 107-146, at 3-5 (discussing role of outside auditors in deceiving investors, and the attempted whistleblowing and the retaliation against whistleblowers at Enron's outside accounting firm and financial advisors); See also Corporate Fraud Accountability Act of 2002 (July 16, 2002), 148 Cong. Rec. at H4692 (statement of Congresswoman Roukema) (the Act "helps to close the loopholes that have allowed for continued offenses in America's corporate community").

It is against these purposes of Sarbanes-Oxley that Fidelity Investments' construction of the statute must be judged. Since Congress was seeking to protect investors, including investors in mutual funds, the inclusion of the terms "contractor" and "subcontractor" merely reflected the reality that only these entities would have employees such as Ms. Lawson who were firsthand witnesses to the potential fraud,

---

[12] See e.g. Section 2(a)(7) of the Act, 15 U.S.C. 7201 (defining "issuer" to include an issuer that is required to file reports under section 15(d)"); Section 302(a) of the Act, 15 U.S.C. § 7241 (SEC shall by rule require certain certifications of annual and quarterly reports by the officers or persons performing similar functions of companies filing reports under section 15(d)); Section 404 of the Act, 15 U.S.C. § 7362 (The Commission shall prescribe rules requiring management assessment of internal controls by companies filing reports under section 15(d)); Section 406 of the Act, 15 U.S.C. § 7264 (requiring the SEC to issue rules to require issuers required to file reports under 15(d) to disclose whether it has adopted code of ethics for senior financial officers or persons performing similar functions); Section 407 of the Act, 15 U.S.C. 7265 (requiring the SEC to issue rules to require issuers who are required to filed reports under 15(d) to disclose whether audit committee of issuer has at least one member who is a financial expert); Section 807(a) of the Act, 18 U.S.C. § 1348 (setting criminal penalties for defrauding any person in connection with any security of an issuer that is required to file reports under section 15(d) of the Act).

Steven J. Mandel
December 20, 2007
Page 14 of 26

while the mutual funds themselves had no employees, and thus no one who could serve the critical insider role.

Fidelity Investments argues that a statement by Senator Sarbanes that the Act applies exclusively to public companies should limit the whistleblower provision. But while much of the Act applies only to public companies (including mutual funds), the whistleblower provision explicitly includes entities other than the public company, namely the contractors, subcontractors and agents. A statement of a legislator, even the bill sponsor, cannot trump the language of the statute. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished").

Fidelity also cites language by the sponsor of the whistleblower provision, Senator Leahy, as well as a sentence from the accompanying Senate Report which states that the bill provides protection for employees of public companies as evidence that only those employees are covered. But the statement only confirms that direct employees of publicly-traded companies are protected – and these undoubtedly are the largest group impacted by the statute -- but the statements don't mandate that other employees who report the potential fraud of investors are therefore excluded from coverage. Instead, the notion that contractors, subcontractors and agents are only prohibited from discriminating against the employees of publicly traded companies and not their own employees is directly contradicted by the same report, which states that one of the bill's purposes was "to protect whistleblowers who report fraud against retaliation by their employers." S.Rep. No. 107-146, 107th Cong., 2d Sess., at 2 (emphasis added). If, as Fidelity Investments claims, the statute does not protect employees of contractors, subcontractors and agents of publicly traded employers from discrimination against their own employees, this sentence would make no sense. On the other hand, if as is apparent from the plain reading of the statute, the Act also protects employees of these other entities from the discriminatory acts at the hands of their employers, the language is entirely clear.

E.     Section 807 is Consistent with Other Anti-Retaliation Statutes that Prohibit Actions by Contractors and Subcontractors

Other anti-retaliation provisions administered by OSHA are also instructive in confirming that Congress intended for the terms "contractor" and "subcontractor" to have meaning, and not to be written out of the statute as Fidelity Investments suggests, and that employees who are covered are defined by their whistleblowing activity, not something else. Several of these statutes are far broader, prohibiting retaliation against whistleblowers by any person, but others are similar to Sarbanes-Oxley in limiting the restrictions against retaliation to certain employers, and their "contractors" or "subcontractors." Thus the Energy Reorganization Act (ERA), 42 USC § 5851, prohibits retaliation against employees in connection with reports of violations of that Act or the

Steven J. Mandel
December 20, 2007
Page 15 of 26

Atomic Energy Act of 1954, and defines employers to include licensees or applicants for licensees under the Atomic Energy Act, and "a contractor or subcontractor of such a licensee or applicant." 42 U.S.C. § 5851(a)(2)(C). The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR21), 49 USC Section 42121, prohibits retaliation against employees providing air safety information by an air carrier "or contractor or subcontractor of an air carrier." 49 U.S.C. § 42121(a). The Pipeline Safety Improvement of 2002 (PSIA), 49 USC Section 60129, prohibits retaliation against employees providing pipeline safety information by a person owning or operating a pipeline facility, or "a contractor or subcontractor of such a person." 49 U.S.C. § 60129(a)(2)(B). In each case, Congress was aware that the covered employers may entrust some of the responsibilities at issue in the safety statute to contractors and subcontractors, and that those contractors and subcontractors performing these safety functions also must not be permitted to retaliate against whistleblowers. It is easy to understand that it does not matter whether nuclear energy safety, or air carrier safety or pipeline safety is undertaken by the licensee or carrier or owner directly, or by their contractors or subcontractors – in all cases, safety is paramount, and retaliation against whistleblowers is prohibited. In using the same language, Congress clearly took the same position regarding fraud against investors. It does not matter whether the mutual fund engages in fraud directly, or if the mutual fund has chosen to operate without employees, and instead the fraud against the investors is perpetrated by the contractors or subcontracts who conduct the business of the fund. In all cases, the statutory purpose – here, fraud against investors – is paramount and retaliation against whistleblowers is prohibited.

Fidelity Investments attempts to avoid this result by arguing that the purpose of section 806 is limited to public companies, whereas ERA is directed at companies in the nuclear industry. Fidelity Investments misses the critical point, however, for the purpose of each of these whistleblower statutes is not to ensure the protection of employees as employees but employees as whistleblowers, in order to further the larger purpose of the overall statute, whether it is to further airline or nuclear safety or to protect the investing public. Where the public company operates through contractors, employees of those contractors must be covered for the whistleblower provisions to have any meaning. Congress recognized this point in other statutes enforced by OSHA, and has similarly done so here.

F.    Case Law

Although it is undisputed that Sarbanes-Oxley's whistleblower provisions apply to mutual funds, the statute is young, and as yet, there are no reported decisions concerning mutual funds, let alone determining whether their contractors or subcontractors are covered. Fidelity Investments' representations about the one pending case – Zang v. Fidelity Management and Research Co., 2007-SOX-27 (ALJ October 4, 2007) – are once again remarkable in their omission and lack of candor. While Fidelity Investment notes that the administrative law judge has allowed discovery as to the question of whether the trustees of the Fidelity mutual funds were personally involved in

decisions about the complainant's employment (see Letter from Eugene Scalia to Nilgun Tolek, November 1, 2007), at 8, n.3), Fidelity Investments neglects to report on the other coverage arguments raised by the complainant. The Administrative Law Judge also allowed discovery "in order to establish whether Fidelity [Investments] is a contractor to the [Fidelity mutual] funds and the nature of the responsibilities that Fidelity [Investments] assumed as a contractor," finding that these facts "may be important in determining whether or not Fidelity [Investments] is a contractor of Fidelity Funds under Section 806 of the Act." Zang, at 11.

Other cases addressing the coverage issue outside of the mutual fund context have not wrestled with either: (1) the fact that the publicly traded employer may have no employees at all; and (2) the explicit role for contractors, operating pursuant to written contracts under the security laws in conducting the business of the mutual funds. All of the cases cited by Fidelity Investments are distinguishable on these grounds.

To the extent that guidance is nonetheless sought from the developing case law, several points emerge. First, several cases that have wrestled with the more difficult question of whether employees of subsidiaries are covered have acknowledged that under the statutory language and Department of Labor regulations, protection may be afforded to others who may not be the direct employees of the publicly traded company. See e.g. Carnero v. Boston Scientific Corp., 433 F.3d 1, 5 (1st Cir.), cert. denied, 126 S.Ct. 2973 (2006) (although the complaining individual must "ordinarily be" an employee of a publicly-traded company, where the employee was employed by a subsidiary, and the subsidiary of the publicly traded company may be an agent of the publicly-traded company, the complainant would be treated as if he were an employee of the publicly-traded company for purposes of Sarbanes Oxley's whistleblower provision); Gonzalez v. Colonial Bank, 2004-SOX-39 (ALJ Aug. 20, 2004) (Gonzalez III) (ALJ concluded that Congress intended to provide whistleblower protection to employees of subsidiaries of publicly traded companies).

The Administrative Law Judge's decision in Morefield v. Exelon Servs. Inc., 2004-SOX-2 (ALJ Jan. 28, 2004) is particularly thoughtful on the purposes of the Act, and the potential for evasion if the Act is narrowly construed. The claimant had rested his claim on the statutory language listing agents and contractors of publicly traded corporations as covered entities, and argued that the subsidiaries should be considered agents of the publicly traded company for accounting and financial reporting purposes. The judge acknowledged that it was not inappropriate to view the subsidiary as an agent, but he focused instead on how financial information is handled in reality in a corporation:

Subsidiaries like Excelon Services are an integral part of the publicly traded company, inseparable from it for purposes of evaluating the integrity of its financial information, and they must be treated as such. Thus, Congress insisted, for example, that subsidiaries be subject to internal accounting controls and that material information relating to the consolidated subsidiaries be conveyed to officials certifying annual or quarterly reports . . . .

Steven J. Mandel
December 20, 2007
Page 17 of 26

Thus, the structure, language and purpose of Sarbanes-Oxley afford a bit more protection than Excelon would allow, encompassing the employees of its subsidiaries. The publicly traded entity is not a free-floating apex. When its value and performance is based, in part, on the value and performance of component entities within its organization, the statute ensures that those entities are subject to internal controls applicable throughout the corporate structure, that they are subject to the oversight responsibility of the audit committee, and that the officers who sign the financials are aware of material information relating to the subsidiaries. A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries. In this context, the law recognizes as an obstacle no internal corporate barriers to the remedies Congress deemed necessary. It imposed reforms upon the publicly traded company, and through it, to its entire corporate organization.

Under these circumstances, the scope of Sarbanes-Oxley whistleblower protection tracks the flow of financial and accounting information throughout the corporate structure and remains as permeable to the internal "corporate veils" as the financial information itself.

Id. at 506 (footnote omitted). The judge also rejected the employer's argument that the employee of a subsidiary must "pierce the corporate veil" in order to be covered by Sarbanes-Oxley:

Nothing in the Act persuades me that Congress intended to wall off from the whistleblower protection Sarbanes-Oxley vast segments of corporate America that reside under the umbrella of publicly traded companies. Exelon Services, for example, is a subsidiary of Exelon Enterprises, which is a subsidiary of Exelon Corporation. Yet, Exelon Services is but one of several subsidiaries of Exelon Enterprises, and Exelon Enterprises is but one of several subsidiaries of Exelon Corporation. If Exelon's interpretation . . . were accepted, not a single whistleblower in Exelon Corporation's vast network of non-publicly traded corporate subsidiaries would be entitled to Sarbanes-Oxley whistleblower coverage, and a precedent like that would apply equally to many, if not most, of the large publicly traded companies. Such a result would not further the objectives of the Act, but would serve only to stifle or discourage the free flow of potentially crucial information emanating out of countless subsidiaries throughout the economy. To limit whistleblower coverage exclusively to those in the know, and their contractors or agents, at the level of the corporate parent is not compatible

Id. at 7. The concerns identified by the judge as to the potential evasion of the whistleblower where publicly-traded corporations operate partially through subsidiaries is even greater here, where the publicly-traded corporation has no employees and operates entirely through contractors and subcontractors, and the financial reporting of the contractors and subcontractors to the Board of the Mutual Fund is mandated by law. The

Steven J. Mandel
December 20, 2007
Page 18 of 26

issue in the case at hand, however, is also far simpler than in the cases involving corporate subsidiaries, for while Congress <u>did not mention subsidiaries</u> in the statute, it did directly provide that contractors and subcontractors of publicly-traded corporations are covered by Sarbanes-Oxley.[13]

III.    <u>Ms. Lawson's Employer is Covered Under Sarbanes-Oxley's Whistleblower Provisions</u>

      A.    <u>FBS is a Subcontractor to the Mutual Funds Under Sarbanes-Oxley's Whistleblower Provisions</u>

      While Fidelity Investments implies that Ms. Lawson's nominal employer, FBS, has no ties to the Fidelity Mutual Funds, this simply is not true. Instead, FBS provides various services to Fidelity mutual fund investors pursuant to the management contract between FMR Co. and the Mutual Funds, which sets forth services to be provided and fees to be paid and is approved on an annual basis by the Board of the Mutual Funds. Indeed, as noted above, <u>approximately half of the hundreds of millions of dollars paid as fees by the Fidelity mutual funds to FMR Co., under their management contract with FMR Co., are passed on to FBS for its subcontractor role in assisting Fidelity mutual fund investors.</u>

      Indeed, it is this highly regulated subcontractor role that led to Ms. Lawson's whistleblowing. The issues raise by Ms. Lawson included: (1) ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████; (2) ██████████████████ ███████████████; (3) ████████████████████████████████

---

[13] In contrast to the serious claims of the misleading financial reporting raised by the subsidiary's vice-president in <u>Exelon</u>, the cases cited by Fidelity Investments have generally involved the most tenuous ties between the purported contractor or agent and the publicly traded company, and the whistleblowing did not involve any fraud against shareholders under the security laws. See <u>e.g.</u> <u>Minkina v. Affiliated Physician's Group</u>, 2005 SOX-19 (ALJ Feb. 22, 2005) (dismissing Sarbanes Oxley complaint filed pro se by doctor against her privately-held employer in which she alleged that she had been discriminated against for reports that she made to her employer and OSHA regarding a ventilation problem in her workplace). These cases have not wrestled with the plain language of the statute, the Act's purpose of protecting investors and the fact that the only meaningful potential whistleblowers for mutual funds such as Fidelity Investments are employees of the contractors and subcontractors.

Steven J. Mandel
December 20, 2007
Page 19 of 26



and (4)

These issues – relating directly to potential fraud against shareholders in the mutual fund – underscore the unique subcontractor relationship of FSB to the mutual funds, and confirm that FBS is a covered employer for purposes of Section 806 of the Act.

B.    Fidelity Investments Is Also an Integrated Employer

Though compelled to admit that FMR Co. has a contractual relationship with the mutual funds, Fidelity studiously avoid portraying the real nature of the relationship between FMR Co. and the other companies that make up Fidelity Investments. As a practical matter, however, the Fidelity Investments "corporate family" is all part of an inseparable, integrated enterprise and thus should be considered an integrated employer.

Federal courts and the National Labor Relations Board have used the integrated employer test to determine whether two firms are sufficiently related so as to constitute a single firm for purposes of coverage or liability. The test looks at labor relations and economic realities rather than corporate formalities.

In determining whether to treat separate legal entities as a single employer under the integrated enterprise/single employer doctrine, courts examine the following four factors: (1) centralized control of labor or employment decisions; (2) the interrelation of operations; (3) common management; and (4) common ownership or financial control. See Pearson v. Component Tech Corp., 247 F.3d 471, 486 (3d Cir. 2001). None of the factors is conclusive, and all four need not be met in every case. See Armbruster v. Quinn, 711 F.2d 1332, 1337-38 (6th Cir. 1983). Of the four, the centralized control of labor operations is the most important. See Bristol v. Bd. of Cy. Comm'rs of Cy of Clear Creek, 312 F.3d 1213, 1220 (10th Cir. 2002); Romano v. U-Haul Int'l, 233 F.3d 655, 666 (1st Cir. 2000). Instead, a single employer determination "ultimately depends on all the 'circumstances of the case.'" Pearson, 247 F.3d at 486.

1.    Centralized control of employment decisions

Fidelity Investments has centralized control of employment decisions. Every business unit, division and organization within Fidelity Investments utilizes one Corporate Human Resources organization, led by Executive Vice President Ellen Wilson,

Steven J. Mandel
December 20, 2007
Page 20 of 26

who reports directly to Executive Vice President John Remondi,[14] who in turn reports directly to Edward C. Johnson 3d. Mr. Johnson serves as the President, CEO, Chairman and a Director of FMR Corp., the Chairman and a Director of FMR Co., and Chairman of the Fidelity Mutual Fund Board of Trustees. Decisions on hiring, firing, promoting and awarding bonuses and any other substantial changes to terms and conditions of employment are approved through this single HR Department.

The Human Resources Department maintains a single on-line handbook for employees of all Fidelity units. The HR Department also administers Fidelity's anti-discrimination policies for all corporate entities. Each benefit plan or program (including Dental Plan, Employee Assistance Program, Fitness Reimbursement Program, Health Care Access Plan, Health Care TaxSaver Accounts, Medical Coverage, Auto & Homeowner's Insurance, Business Travel Accident Insurance, Disability Plans, Life Insurance, Long-Term Care Insurance, Profit Sharing Plan / 401(k), Pension Plan (terminated as of May 31, 2007), Retiree Health Reimbursement Plan, Commuter Benefit Program, Relocation Services, Dependent Care TaxSaver account, and Tuition Reimbursement Program, disability coverage, health management center rewards program) serves all entities of Fidelity. Indeed, the HR Department does not distinguish between the employees of the parent company and its subsidiary, referring to all as "Fidelity Associates." Most recently, Fidelity has set up "on-site" employee health and wellness centers at 245 Summer Street, Boston, and 500 Salem Street, Smithfield, RI, for all of its employees.

Employees from one of the Fidelity entities frequently and with relative ease move from one entity to the next. Fidelity maintains an internal hiring website -- https://jobs.fidelity.com – which when accessed in June 2007 when OSHA asked about the interrelationship -- listed 1317 jobs "at Fidelity." When this website is accessed internally, the overall list of Fidelity jobs includes the posting date, job title and geographical location. Only if one clicks on a particular job, is information available as to the particular business unit. Employees are considered Fidelity employees and are encouraged to apply through this internal hiring system for positions throughout Fidelity. Ms. Lawson moved easily from one Fidelity unit to another, beginning her Fidelity employment with Fidelity Trust Co., moving from there to Fidelity Technology Co.

The Human Resources Department maintains a single personnel file for each Fidelity employee as he or she moves from unit to unit within Fidelity Investments. This personnel file contains the employee's confidentiality agreement which concerns confidentiality obligations throughout an individual's employment at Fidelity

---

[14] The names of the incumbents in these positions below Mr. Johnson are current as of the time of Ms. Lawson's constructive discharge. Fidelity Investments, however, constantly is moving its employees and organization around, and there apparently has been a major reorganization since Ms. Lawson's employment ended. [add Globe cites] The ease in which employees move around and operations are reorganized, however, only confirms the integrated nature of the operation.

Steven J. Mandel
December 20, 2007
Page 21 of 26

Investments and not just the initial business unit where the employee first begins working. Employees hire dates for all purposes are based on their date of hire at any one of the Fidelity units.

The centralized control of labor relations is also underscored by Fidelity Investment's inclusion in its initial response to Ms. Lawson's complaint a review of her work by an FMR Co. representative. Fidelity's Response at 7 and Exhibit 7 thereto.

    2.    <u>Interrelation of Operations</u>

That Fidelity Investments' operations are interrelated is clear from how it holds itself out on its website, www. Fidelity.com. Its "corporate fact sheet" describes "Fidelity" as "the largest mutual fund company in the United States and . . . one of the world's largest providers of financial services for more than 23 million individuals." It describes how "[t]he firm serves retail customers by phone and through its 119 Investor Centers around the country," that "in Q3 2007, Fidelity handled an average of more than 240,000 phone calls per business day from retail and institutional clients" and that "Fidelity's Web sites handle an average of about 2.4 million contacts a day in Q3 2007."

The service offered by FMR Co., FMR Corp. and FBS are essential to the conduct and operation of the other's business. FMR Co. manages the investments of the Fidelity Mutual Funds. FBS distributes the Fidelity Mutual Funds to customers. Its Fidelity Personal Investments unit "serves as Fidelity's direct interface with investors." Three other units of FBS -- National Financial, Fidelity Registered Investment Advisor Group and Fidelity Capital Markets Services -- provide brokerage platform services to financial intermediaries. FMR Corp. manages both FMR Co. and FBS, providing for example, legal and executive management services to both.

Clicking "Individual Investor" on the Fidelity Investments website links one to a page that explains that "Through <u>Fidelity Brokerage Services,</u> individual investors can take advantage of our broad assortment of trading and cash management . . ." Clicking Fidelity Brokerage Services in turn links one to a page entitled "Trading at Fidelity" with no mention that the trading is through FBS. <u>Id.</u> The various links on that page explain the entire range of services available through FBS without mentioning FBS at all. Nowhere is FBS described as a separate corporation.

National Financial's web page also refers to itself as "A Fidelity Investments Company" with no mention of FBS at all. Registered Investment Advisors similarly references Fidelity on its website, but not FBS.

Fidelity's website explains further that "Headquartered in Boston, Fidelity employs over 44,000 people with ten regional operations centers across the United States and Canada: Cincinnati, OH; Covington, KY.; Dallas, TX; Marlborough, MA; North Carolina; Merrimack, NH; New York/New Jersey; Salt Lake City, UT; Smithfield, RI; Jacksonville, FL and Toronto, Canada."

Steven J. Mandel
December 20, 2007
Page 22 of 26

At these various sites, employees of FBS share common office space, storage space, and business equipment with other entities of Fidelity Investments in various locations such as: Covington, Kentucky; West Lake, Texas; Salt Lake City, Utah; Jacksonville, Florida and North Carolina. FMR Corp. is located at both 82 Devonshire and at 245 Summer Street in Boston. Other Fidelity Investment groups such as the technology group for FBS are also located at 245 Summer Street.

In Covington, employees for both the Enterprise Processing Service (EPS), that rolls up to FEO, and employees of the Operations Service Group (OSG), which rolls up to FBS, coexists on the same floor in the same building locations. The two groups work in cubicles that are located side by side.

During Ms. Lawson's fourteen years working at Fidelity, she has been located in seven different Fidelity offices in Boston: 82 Devonshire Street; 99 High Street; 265 Franklin Street; 100 Summer Street 26th floor; World Trade Center; 100 Summer Street, 22nd Floor; and World Trade Tower – West Towers. Most if not all of these moves involved moving into space formerly occupied by another Fidelity unit, with another Fidelity unit taking over the space vacated by Ms. Lawson's unit. For each move, employees only brought their personal items and work files. The office furniture, file cabinets and other equipment remained at the location for common usage by the different Fidelity units.

Fidelity has one real estate group, FREC, that coordinates the moves to various locations for all the Fidelity companies. FREC manages all the real estate needs related to all the employee locations for all the Fidelity companies.

That the operations are fully integrated is underscored by the fact that all payroll is paid by the parent company, FMR Corp. The FBS budget is prepared by the FBS, but approved and administered by FMR Corp. FMR Corp pays FBS' expenses. Employees are also given Fidelity "Performance Shares" as part of their compensation package, without regard to their nominal employer.

In addition, the same in-house legal staff serves both the parent and the subsidiary corporations. In addition, there is a single "Ethics Office" for all Fidelity employees.

The Retail organization in FBS provides general services (e.g. ads on TV and newspapers) for the Fidelity Investments Mutual Funds. Enterprise Processing Solutions (EPS), which is part of Fidelity Enterprise Operations, and not FBS, provides marketing kits for FBS and other Fidelity organization such as FESCO (the 401K business). Other Fidelity groups supporting FBS that are part of Fidelity Enterprise Operations include Fidelity Supply Management and Fidelity Pricing & Cash Management Services.

That these operations are fully integrated is evidenced by Ms. Lawson's own experience. While, as Fidelity has pointed out in its initial response to Ms. Lawson's complaint, ""the majority of her work [is performed] for FBS" (see Response, at 2, n.1 (emphasis added)), it implicitly concedes that at least a minority of her work is performed

Steven J. Mandel
December 20, 2007
Page 23 of 26

for other Fidelity companies. Respondents also detail the comments of an FMR Co. representative who "interacted with Lawson frequently," and who explained that "Jackie and her team provide information to . . . FMR Co. to include in consolidated fund profitability reporting to the Fidelity funds' Board," that FMR Co.'s representative and Ms. Lawson "collaborate on solving problems and presenting information related to FBC's fund profitability results," and that Ms. Lawson "was very responsive in solving issues (raised by FMR)." Id. at 7 and Exhibit 7 thereto.

In sum, while Fidelity has created a separate corporate form for what in other companies is typically a department or division, the various subsidiaries all work together in a complete integration of operations.

3.    Common Management

Approval of major employment decisions for all subsidiaries is made at FMR Corp. For example, the CFO of Fidelity who works within FMR Corp. (most recently, Clare Richer) has responsibility for approval of promotions at the Vice President level and above for all finance groups across the different Fidelity corporate entities. Ms. Richer reported to John Remondi who reports to Edward C. Johnson 3d.

Overall budgets and organizational structures are approved by FMR Corp. Work hours are set by the common Human Resources Department.

Each unit at Fidelity has parallel reporting structures that ultimately rolls up to Edward C. Johnson 3d. For example, Ms. Lawson, a Director II, Finance in FBS reported to Clair Cadogan, also Director II Finance in FBS, who reported to Harris Komishane, Senior Vice President Finance in FBS, who reported to Tim Moran, Executive Vice President and CFO for FBS, who reported to Ellyn McColgan, President Distribution and Operations, who reported to Edward C. Johnson. Sarah Biller, Director, Finance in FMR Co. reported to Robin Cannon, Vice President Finance – Board Support in FMR Co., who reported to Js Wynant, CFO for FMR Co. who reported to Dwight Churchill, President, Investment Services, who reported to Edward C. Johnson 3d.

4.    Common Ownership or Financial Control

Both FMR Co. and FBS are wholly owned subsidiaries of FMR Corp. FMR Corp. describes FBS as the "Retail" organization within Fidelity Investments, and FMR Co. as "the Investment Advisor to Fidelity's family of mutual funds." Both subsidiaries are consolidated on FMR Corp.'s financial statements.

In sum, though the parent and its different subsidiaries are separately incorporated, they form an integrated employer for employment law purposes.

Steven J. Mandel
December 20, 2007
Page 24 of 26

C.    The Fidelity Mutual Funds and Fidelity Investments May Also Be
      Considered an Integrated Employer

The Fidelity Mutual Funds contract out their business such that they have no
direct employees. Since contractors and subcontractors are covered by Sarbanes-Oxley's
whistleblower provisions, no more complex analysis is necessary. Even without the
contractor/subcontractor language, the Fidelity Mutual Funds and Fidelity Investments
should be considered integrated employers.

Notably, while Mr. Scalia's letter seeks to preempt the investigation engaged in
by OSHA by arguing against a finding that the Fidelity Mutual Funds and Fidelity
Investments are integrated employers, it fails to candidly report on the Administrative
Law Judge's decision in the Zang case allowing discovery on this very issue. In addition
to the permitted discovery mentioned in Mr. Scalia's letter, and that discussed above, the
Administrative Law Judge also allowed discovery "regarding any integration of
operations between Respondents Fidelity and [two of the mutual funds]; the role, if any,
the Fidelity Funds play in employment matters regarding employees of Fidelity . . .; and
any overlap in management between Fidelity and the Funds." Zang v. Fidelity
Management and Research Co., 2007-SOX-27 (ALJ October 4, 2007).

Mr. Scalia also points to two cases he litigated in the United States Court of
Appeal for the District of Columbia which he contends demonstrates the "distinctness
between mutual funds and advisors." In the first of the two cases, the Court explained
that Congress has recognized "the potential for abuse inherent in the structure of the
[funds]" arising from the conflict of interests between advisers and shareholders," that the
Securities and Exchange Commission had found "a serious breakdown in management
controls," and that it had proposed the rules to "provide for greater fund board
independence." Chamber of Commerce of the United States of America v. Securities and
Exchange Commission, 412 F.3d 133, 136 (D.C. Cir. 2005). The SEC adopted the Rule
that the Board have at least 75% of its Directors, including its chairman, be independent
of the investment companies, and it justified the independent chairman requirement on
the ground that "'a fund board is in a better position to protect the interests of the fund,
and to fulfill the board's obligations under the [Investment Company Act and the SEC's]
Exemptive Rules, when its chairman does not have conflicts of interest inherent in the
role of an executive of the fund advisor.'" Id. quoting Investment Company Governance,
Final Rule, 69 Fed.Reg. 46,378 (Aug. 2, 2004).

Mr. Scalia successfully challenged this rule of the Securities and Exchange
Commission on the ground that the SEC had not properly considered costs of the
conditions it was imposing and thus had violated the Administrative Procedure Act. Id.
at 144; see also Chamber of Commerce of the United States of America v. Securities and
Exchange Commission, 443 F.3d 890, 908 (D.C. Cir. 2006). But this victory offers no
support to Fidelity here, for the rule stricken based on the APA violation, the Board of
Fidelity's Mutual Funds has continued to be chaired by a very interested Chairman,
Edward C. Johnson 3d, who is also the President, CEO, Chairman and a Director of FMR
Corp. as well as the Chairman and a Director of FMR Co., and whose family is a 49%

Steven J. Mandel
December 20, 2007
Page 25 of 26

owner of Fidelity Investments. While the result may not violate any current SEC rules, it leaves wide open the potential for the Funds and Fidelity Investments acting as integrated employers. That is in fact the case here.

1.    Centralized control of employment decisions

Fidelity Mutual Funds have no employees, and have contracted out those functions normally undertaken by a corporation's employees to Fidelity Investments. As set forth above, employment decisions at Fidelity Investments are centralized, rolling up to Mr. Johnson. Mr. Johnson serves as both the Chairman of the Fidelity Mutual Funds Board and as President, CEO, Chairman and a Director of FMR Corp., thus establishing centralized control of employment decisions.

2.    Interrelation of Operations

The business operations of the Fidelity Mutual Funds are contracted out to Fidelity Investments.  Again, the interrelationship is vividly illustrated on the Fidelity website, where Fidelity Investments describes itself as "the largest mutual fund company in the United States . . . ."

3.    Common Management

Although the Fidelity Mutual Funds have a separate Board of Trustees, the Chairman of that Board is also the Chairman and a Director of FMR Corp.

4.    Common Ownership

While the Fidelity Funds are owned by their respective shareholders (and Fidelity is privately owned), this factor should be of little import given the strength of the other three factors.

IV.    Conclusion

Ms. Lawson attempted here what Congress hoped for in passing Sarbanes-Oxley. As an insider with information concerning possible fraud against the shareholders of Fidelity Investments, she attempted to bring her concerns to her superiors, Fidelity's General Counsel and to the Securities and Exchange Commission. She had an unblemished record of over a decade of service to Fidelity Investments when she took these steps. When Fidelity Investments began retaliating she sought help from OSHA. A year later, however, she has been forced out of her position, and Fidelity Investments has successfully avoided any substantive investigation of her claim.

Steven J. Mandel
December 20, 2007
Page 26 of 26

At this juncture, on her behalf, I respectfully request that OSHA continue its investigation of her claim and afford her the protection promised by Congress.

Sincerely,

Indira Talwani

Cc:  Jackie Hosang Lawson
     Eugene Scalia, Esq.
     Carol Horowitz, OSHA
     Kristin Rubino, OSHA

# SEGAL ROITMAN, LLP

COUNSELLORS AT LAW
111 DEVONSHIRE STREET
FIFTH FLOOR
BOSTON, MASSACHUSETTS 02109
www.segalroitman.com

DONALD J. SIEGEL
PAUL F. KELLY
IRA SILLS
MARY THOMAS SULLIVAN*
SHELLEY B. KROLL
BURTON E. ROSENTHAL
ANNE R. SILLS
KATHRYN S. SHEA
INDIRA TALWANI**
ELIZABETH ARIENTI SLOANE
MICHAEL J. DOHENY
STEPHANIE R. PRATT-MITRA
GREGORY A. GEIMAN
NICOLE HORBERG DECTER***
LOUIS A. MANDARINI, III
JAMES A.W. SHAW

ROBERT M. SEGAL (1915-1999)

RICHARD W. COLEMAN (RETIRED)
HAROLD B. ROITMAN (RETIRED)

JOSEPH P. MCKENNA, JR., OF COUNSEL

* Also Admitted to the
New Hampshire Bar

**Also Admitted to
the California Bar

***Also Admitted to
the New York Bar

January 3, 2008

By U.S. Mail and Facsimile
Chief Administrative Law Judge John M. Vittone
U.S. Department of Labor
Suite 400 North
800 K Street, NW
Washington, DC 20001-8002
Facsimile: (202) 693-7365

Re: Jackie Hosang Lawson and Fidelity Investments, Fidelity Brokerage Services, LLC, Harris Komishane, Jean Raymond, Dick Lyons, Claire Cadogan and Tim Rooney, OSHA Case No. 1-0120-07-005

Jackie Hosang Lawson and Fidelity Investments, Fidelity Brokerage Services, LLC, Harris Komishane and Claire Cadogan, OSHA Case No. 1-0120-07-008

Dear Chief Judge Vittone:

Please accept this letter and the attached certificate of service as the fifteen day notice, pursuant to 29 C.F.R. § 1980.114(b), of my client Jackie Hosang Lawson's intention to file an action in the United States District Court for the District of Massachusetts in the above captioned matters.

Case Number 1-0120-07-005 was filed with the OSHA Area Director in Boston, Massachusetts on December 20, 2006, and Case Number 1-0120-07-008 was filed with the OSHA Area Director in Boston, Massachusetts on April 24, 2007. On February 26, 2007, a response was filed to the first complaint. To my knowledge, no response has been filed to the second complaint. The Assistant Secretary or his delegate has not yet issued written findings in either matter pursuant to 29 C.F.R. § 1980.105. As the matters have now been pending well over 180 days, Ms. Lawson intends to seek *de novo* review in the District Court.

Sincerely,

Indira Talwani

Cc: Jackie Hosang Lawson

<u>CERTIFICATE OF SERVICE</u>

I, Indira Talwani, certify that on January 3, 2008, I served the above Notice of Intention to File an Action in Federal District Court by first class mail, postage pre-paid, and by facsimile:

on Respondents Fidelity Brokerage Services, LLC, Harris Komishane, Claire Cadogan, Jean Raymond, Dick Lyons, and Tim Rooney, through their counsel of record:

>   Eugene Scalia, Esq.
>   Gibson, Dunn & Crutcher, LLP
>   1050 Connecticut Avenue, N.W.
>   Washington, D.C. 20036-5306
>   Facsimile: (202) 530-9606

on the Assistant Secretary of Labor for Occupational Safety and Health:

>   Edwin G. Foulke, Jr., Esq.
>   Assistant Secretary of Labor for Occupational Safety and Health
>   Occupational Safety & Health Administration
>   200 Constitution Avenue, NW
>   Washington, D.C. 20210

on the Associate Solicitor, Division of Fair Labor Standards:

>   Steven J. Mandel, Esq.
>   Associate Solicitor
>   Office of the Solicitor
>   U.S. Department of Labor
>   Division of Fair Labor Standards
>   200 Constitution Avenue, N.W.
>   Room N2716
>   Washington, D.C. 20210
>   Facsimile: (202) 693-5689

on the OSHA Area Director:

>   Marthe B. Kent
>   OSHA Area Director
>   U.S. Department of Labor
>   JFK Federal Building, Room E340
>   Boston, MA 02203
>   Facsimile: (617) 565-9827

-1-

on the Regional Supervisory Investigator:

        Carole Horowitz
        OSHA Regional Supervisory Investigator
        U.S. Department of Labor
        JFK Federal Building, Room E340
        Boston, MA 02203
        Facsimile: (617) 565-9827

and on the assigned investigator:

        Kristen Rubino
        Discrimination Investigator
        U.S. Department of Labor
        Occupational Safety and Health Administration
        380 Westminster Street
        Room 543
        Providence, RI 02930
        Facsimile: (401) 528-4663

Indira Talwani

L:\\ITalwani\5848-06415 Lawson\vittone.doc

-2-

**U.S. Department of Labor**

Occupational Safety and Health Administration
J.F.K. Federal Building, Room E340
Boston, MA 02203
Telephone  (617) 565-9860
Fax        (617) 565-9827



Reply to the Attention of:  /OSHA/BOS/EPTS

January 28, 2008

Indira Talwani
Segal Roitman, LLP
111 Devonshire Street
Fifth Floor
Boston, MA 02109

RE:  Fidelity Investments; Claire Cadogan; Betsy Connolly; Harris Komishane; Dick Lyons, Jean Raymond; Tim Rooney / Lawson / Case Nos. 1-0120-07-005; 1-0120-07-008; 1-0120-07-012; 1-0120-08-001

Dear Ms. Talwani:

On December 20, 2006, April 24, 2007, September 17, 2007 and November 9, 2007, respectively, you filed the above referenced complaints under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A (SOX), on behalf of your client Jackie Hosang Lawson. Over 180 days have passed since you filed your original complaint and second complaint. Under the Act, if the Secretary has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of the complainant, the complainant may bring a *de novo* action in Federal District Court.

You have notified this Office by letter dated January 3, 2008 that you intend to file case numbers 1-0120-07-005 and 1-0120-07-008 in Federal Court. In accordance with our usual practice, we have consolidated the four complaints, as the three later complaints reasonably relate back to the original. As a result, the case number for the original complaint – 1-0120-07-005 – has been retained and amended by the three additional allegations. Because you have elected to proceed with your case in Federal Court, rather than before the Secretary of Labor, the complaint, as amended, is hereby closed.



Occupational
Safety and Health
Administration

www.osha.gov

If at any time you have questions or require further information regarding employee or employer rights and responsibilities under the SOX or any other whistleblower statute administered by OSHA, please contact this office.

Sincerely,

Marthe B. Kent
Regional Administrator

cc:

     Eugene Scalia, Esq., Attorney for Respondent (Certified Mail)
Chief Administrative Law Judge, USDOL
Deputy Director, Division of Enforcement, Securities Exchange Commission
Associate Solicitor, Fair Labor Standards, USDOL

To:    Harris Komishane, Betsy Connolly, Claire Cadogan
From:  Jackie Hosang Lawson
Date:  September 21, 2007
CC:    Susan McSwain, Linda Stephenson, Ellen Wilson, MaryEllen Walsh, Beth Webster

Fidelity Investments through their actions in the past year has made it untenable for me to continue working in my current job capacity as manager of the Board Support Group for the Fidelity Brokerage Company finance organization supporting The Fidelity Mutual Fund Board of Trustees.

I have dedicated over 11 years of service to Fidelity Investments and have always operated at the highest level of integrity.

In a September 29, 2006 letter, I brought to Fidelity's General Counsel's attention practices that I believe to be potentially harmful to the Fidelity Mutual Fund Shareholders. I also raised my strong concern that I would no longer be able to maintain the independence of the Board Support group I supervise going forward.

Despite my plea, Fidelity took no steps to protect the independence of the Board Support Group, and instead, allowed management to engage in extremely abusive behaviors, including intimidation and harassment.

On December 20, 2006 I was left with no recourse but to file a claim with OSHA under the "Whistle Blower" provisions of Sarbanes Oxley.

In January 2007, Fidelity responded to my OSHA claim depicting me as an embittered employee with no potential for advancement. As surprised as I was by that character defamation (prior to September 2006, I have always received exemplary performance reviews), I was absolutely astounded by Fidelity Investment's claim that it is not a covered employer under Sarbanes Oxley and that Whistleblowers at Fidelity therefore have no protection under federal law. While OSHA has finally rejected this claim, Fidelity's litigation tactic has delayed for months any investigation of the merits of my claim. Fidelity has used this additional time to make unreasonable work demands and to create highly subjective negative evaluations of my work, in a belated attempt to discredit my work record.

Since January 2007, I have brought additional matters to Fidelity's attention that I believe constitute securities fraud against Fidelity's mutual fund shareholders. Fidelity again has discounted my concerns and has also denied my request to speak directly with The Fidelity Mutual Fund Board of Trustees about these issues. I am currently in a predicament where I can no longer honestly stand behind the financials that are presented to the Fidelity Mutual Fund Board of Trustees.

In the past week, after I advised Fidelity that I had brought these further matters to OSHA's attention, abusive behavior has escalated and has been extended to my staff. I cannot in all conscience subject my staff to the abusive behavior I have experienced in the past year.

Whatever my disagreement with Fidelity, I do not believe my staff should suffer the consequences.

The extremity of the emotional abuse by Claire Cadogan and Betsy Connolly in the past week has become so intolerable, that it is not humanly possible to continue to work in such a toxic environment.

Hereby, I am tendering my resignation effective October 19, 2007.

I reserve the right to pursue any recourse available in law or equity to rectify the wrongs and compensate me for my pain and suffering.

*Jackie HoSang Lawson*