UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESELY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>                    Plaintiffs,<br><br>          v.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>                    Defendants. | No. 04-cv-11651-MLW<br>(Lead case)<br><br>No. 04-cv-11756-MLW<br>(Consolidated case) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      RELIEF REQUESTED ..................................................................................................1

II.     INTRODUCTION .......................................................................................................1

III.    UNDISPUTED MATERIAL FACTS ........................................................................3

        A.      The Parties And Mutual Funds At Issue .......................................................3

        B.      Fidelity's Management Services And Compensation.....................................4

        C.      Fidelity's Management Fee Structure ...........................................................6

                1.      Fidelity's Basic Fee – Group Fee Component ...............................7

                2.      Fidelity's Basic Fee – Individual Fund Fee Component .............8

        D..     Economies Of Scale And Management Fees In General.........................9

        E.      Economies Of Scale And Management Fees For Fidelity Mutual Funds .............10

        F.      Economies Of Scale And The Services Provided By Fidelity.............................11

        G.      Fidelity's Largest, Most Profitable Funds Are Unfairly Forced To Subsidize Its Newer, Unprofitable Funds.....................................................14

IV.     ARGUMENT .............................................................................................................15

        A.      The Standard For Summary Judgment .................................................15

        B.      Section 36(b) Of The ICA Establishes A Clear Fiduciary Duty Between Defendants And Each Of The Funds With Respect To The Management Fees Being Charged By Fidelity And The Sharing Of Economies Of Scale Within Each Fund ...........................................................................................16

                1.      The legal and historical context of the mutual fund market and advisory fee agreements ...........................................................17

                        a.      Funds are captives of their advisers...............................17

                        b.      The structure of fee agreements and economies of scale...............19

                2.      The Investment Company Act of 1940.........................................19

                3.      The 1970 Amendments to the ICA ........................................20

                        a.      Congress' intent in enacting a fiduciary duty standard.................21

                        b.      The common law fiduciary duty standard applied to investment advisers under § 36(b)...................................22

        i.  Duty of Loyalty ............................................................................... 23

        ii.  Duty of Impartiality ....................................................................... 24

        iii. Duty of Disclosure ........................................................................ 25

    4.    The investment adviser's fiduciary duty is owed separately and independently to each individual fund it manages.................................... 26

    5.    In fulfilling its fiduciary duties, an investment adviser must ensure that economies of scale benefits realized within a mutual fund are equitably shared with the mutual fund's investors .................................................... 28

C.    Defendants Violate Their Fiduciary Duties To The Funds Through Their Management Fee Structure And Business Practices ............................................. 30

    1.    By focusing on the entire Fidelity mutual fund complex, rather than the individual funds within the complex, Defendants' management fee structure breaches the fiduciary duties owed to each of the individual Funds...................................................................................................... 31

    2.    Fidelity's provision of additional or enhanced services to customers as a justification for Defendants' management fees advances Fidelity's interests as an overall financial institution at the expense of its large Fund shareholders ...................................................................................... 34

    3.    Defendants' fee structure unfairly subsidizes Fidelity's smaller, unprofitable mutual funds at the expense of the larger, profitable Funds . 36

V.    <u>CONCLUSION</u> ............................................................................................................ 38

# I.   **RELIEF REQUESTED**

Plaintiffs have brought this action for Defendants' breach of their fiduciary duties in receiving compensation in the form of management fees as the investment adviser to five Fidelity mutual funds.  Plaintiffs request entry of summary judgment in their favor on the issue of liability alone, reserving for trial the issue of an appropriate damages award.  This motion is brought pursuant to Rule 56(c) and Rule 56(d)(1) and (2) of the Federal Rules of Civil Procedure.

# II.   **INTRODUCTION**

Plaintiffs are shareholders of five mutual funds formed, distributed, managed, and advised by the Fidelity Defendants, Fidelity Management & Research Company ("FMR Co.") and FMR Co., Inc. ("FMRC"), hereinafter "Defendants."  The five mutual funds at issue have been among Fidelity's largest and most profitable mutual funds.  From its management of just these five funds, Fidelity reaped hundreds of millions of dollars in management fees each year.  As these funds grew in size, the fees charged by Fidelity for its management services became gargantuan.  For the fiscal management year ending in July 2004, for example, Defendants collected more than $861 million in management fees from just these five funds.  Two years later, in 2006, Fidelity collected more than $1.13 billion in fees for the same management services to the same five funds.

Plaintiffs allege that Defendants breached the fiduciary duty that they owe to each of the five mutual funds under § 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b).  Section 36(b) states in relevant part:

> *[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature,* paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  *An action may be brought* under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers . . . *for breach of fiduciary duty in respect to such compensation or payments* paid by such registered investment company or by the security holders thereof to such investment adviser . . . .

1

(Emphasis added.)

The Fidelity Defendants are the "investment adviser" of each of the five "registered investment company[ies]" (mutual funds) at issue in this case. The United States Supreme Court, Congress, and the SEC have long recognized that fund investment advisers such as Defendants typically do not negotiate fee agreements by vying against each other to land advisory contracts. Rather, they create their own "clients" (*i.e.*, captive mutual funds) by forming, marketing, and managing the funds they advise. *See Burks v. Lasker*, 441 U.S. 471, 480-81 (1979); *Daily Income Fund v. Fox*, 464 U.S. 523, 536 (1984). As a consequence, "the 'relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.'" *Daily Income Fund*, 464 U.S. at 536 (quoting *Burks*, 441 U.S. at 481). The closest analogue to the manner in which mutual fund fees are set by Fidelity and its Board of Trustees (hereafter "Fund Trustees") for these funds is a no-bid contract.

The undisputed facts establish as a matter of law that Defendants breached their "fiduciary duty with regard to the receipt of compensation for services" that they separately owed to each of the five captive mutual funds at issue under § 36(b) by charging fees pursuant to a management fee structure that failed to account for, and properly share with investors, the economies-of-scale savings realized within each individual fund. In addition, Defendants' management fee structure exploited the economies within the five large captive funds to unfairly subsidize the artificially low fees set for Fidelity's smaller, unprofitable funds. Defendants' management fee structure improperly sacrificed the interests of the shareholders of the five large captive funds in favor of their own self-interest in growing the Fidelity business complex and thus breached their fiduciary duty pursuant to § 36(b). Plaintiffs therefore are entitled to summary judgment on the issue of Defendants' liability for breach of their fiduciary duty with respect to receipt of compensation for services for the time period beginning May 4, 2003, through the entry of judgment.

### III.   UNDISPUTED MATERIAL FACTS

### A.   The Parties And Mutual Funds At Issue

Plaintiffs own shares in the Fidelity Magellan Fund, Fidelity Contrafund, Fidelity Growth & Income Portfolio, Fidelity Blue Chip Growth Fund, and Fidelity Low-Priced Stock Fund (the "Funds").  Statement of Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary Judgment ("Undisputed Facts"), ¶ 1, filed herewith.  Each Fund is a separate open-end management investment company registered under the ICA.  *Id.* ¶ 2.  Each of the Funds is organized as a Massachusetts business trust, with its own board of trustees, advisory board, and executive officers.  *Id.* ¶ 3.  The five Funds have been among the largest mutual funds at Fidelity with each of the Funds having assets under management ("AUM") in excess of $20 billion as of December 31, 2003.  *Id.* ¶ 4.  In 2005, the Funds reported AUM in excess of the following amounts:  Contrafund ($60 billion); Magellan Fund ($56 billion); Low-Priced Stock Fund ($37 billion); Blue Chip Growth Fund ($22 billion); and Growth & Income Portfolio ($31 billion).  *Id.* ¶ 5.

The Funds are advised and managed by Defendants FMR Co. and FMRC.  *Id.* ¶ 6.  Defendant FMR Co., with its principal place of business in Boston, Massachusetts, is a registered investment adviser under the Investment Advisers Act of 1940 and is the investment adviser to the Funds.  *Id.* ¶ 7.  Defendant FMRC also has its principal place of business in Boston, Massachusetts, is a registered investment adviser under the Investment Advisers Act of 1940, and is an investment sub-adviser to the Funds.  *Id.* ¶ 8.  Defendants are privately held companies, and, along with other Fidelity entities, are subsidiaries of FMR Corp., the parent corporation of the entire Fidelity organization.  *Id.* ¶ 9.

Fidelity was founded in the 1940s when Edward Johnson II acquired a mutual fund known as the Fidelity Fund.  His son, Edward (Ned) Johnson 3d joined Fidelity in the 1950s and has been the chairman and CEO of Fidelity for decades.  *Id.* ¶ 10.  Ned Johnson's daughter, Abigail (Abby) Johnson, joined Fidelity in the 1980s, eventually becoming President of the investment adviser company, Defendant FMR Co., in May 2001.  *Id.* ¶ 11.  The Johnson family

owns almost half of Fidelity's closely held stock.  *Id.* ¶ 12.  Under the ICA, control of a company is presumed where one individual or group of individuals owns more than 25 percent of the voting stock of that company.   15 U.S.C. § 80a-2(a)(9).   Through their ownership of voting common stock and the execution of the shareholders' voting agreement, members of the Johnson family may be deemed to form a controlling group with respect to FMR Corp.  Undisputed Facts, ¶ 13.

> ### B.   Fidelity's Management Services And Compensation

Defendants' management of the Funds includes selecting stocks for the Funds to buy, sell or hold, and providing administrative and other services associated with such advice.  *Id.* ¶ 14. Defendants' management services are provided to each Fund pursuant to the terms of a management agreement purportedly negotiated each year, for each Fund, by Defendant FMR Co. and the Fund Trustees (on behalf of each Fund's investors).  *Id.* ¶ 15.  The management fees charged by Defendants pursuant to these annual management agreements are the subject of this action.  Defendants and other related Fidelity entities provide other administrative services (as distinct from management services) to the Funds through separate transfer agent agreements and service agent agreements entered into by Fidelity each year with each of the Funds.  *Id.* ¶ 16.

In addition to managing and advising the Funds, Defendants currently manage and advise approximately 450 other (smaller) mutual funds as well as a variety of non-mutual fund portfolios within Fidelity, including separate accounts for institutional investors.   *Id.* ¶ 17. During the relevant time period, essentially all of Fidelity's hundreds of mutual funds were governed by a single board of trustees, comprised of approximately 14 individuals, who met periodically throughout the year to oversee each fund's activities.  *Id.* ¶ 18.

The five Funds pay Defendants hundreds of millions of dollars each year solely for management services.  *Id.* ¶ 19.  In 2005, Defendants reported collecting annual management fees from the five Funds' shareholders exceeding $1.11 billion.  *Id.* ¶ 20.  Similarly in 2006, Defendants reported collecting annual management fees in the following amounts, totaling over

$1.13 billion:   Fidelity Contrafund ($461 million); Fidelity Magellan Fund ($205 million);

Fidelity Growth & Income Fund ($143 million); Fidelity Blue Chip Growth Fund ($79 million);

and Fidelity Low-Priced Stock Fund ($250 million).  *Id.* ¶ 21.  Not surprisingly, these are among

the most profitable mutual funds to Fidelity in terms of management fees reaped.  *Id.* ¶ 22.

The management fees annually paid by the captive funds to Defendants are purportedly

negotiated each year at arm's length by the Defendant adviser (FMR Co. of whom Abby Johnson

was President) and the Fund Trustees (both Abby Johnson and Ned Johnson served as Trustees).

*Id.* ¶ 23.  That Abby Johnson does not recognize the conflict of interest that exists when she sat

on both sides of the negotiating table is striking:

> Q.  What's your understanding of whether or not there are conflicts of interest in
> having somebody be both a fund trustee and an officer of an investment advisor
> when negotiating over the fees charged to the mutual funds?
>
> A.  What are you asking me?
>
> Q.  Do you recognize whether there is a conflict of interest?
>
> A.  I don't believe there are conflicts.

Deposition of Abigail P. Johnson ("Johnson Depo.") at 35 (attached as <u>Exhibit J</u> to the Affidavit

of Matthew J. Tuttle ("Tuttle Affid."), filed herewith).

In fact, it was this very conflict of interest that led to passage of the 1940 Act.  Section

1(b)(2) provides in relevant part:

> [T]he national public interest and the interest of investors are adversely affected
> …. (2) when investment companies are organized, operated, managed, or their
> portfolio securities are selected, in the interest of directors, officers, investment
> advisers, depositors, or other affiliated persons thereof, in the interest of
> underwriters, brokers, or dealers, in the interest of special classes of their security
> holders, or in the interest of other investment companies or persons engaged in
> other lines of business, rather than in the interest of all classes of such companies'
> security holders.

15 U.S.C. § 80a-1(b)(2).

Defendants acknowledge and must admit that under § 36(b) they owe a separate fiduciary

duty to each and every one of the hundreds of captive Fidelity mutual funds.  Undisputed Facts, ¶

24.  Each of the funds is a separate legal entity and has its own shareholders and investors.  Thus,

when Defendants annually "negotiate" their fees with each of the 450 funds currently in the Fidelity complex within this conflicted setting, they nevertheless owe separately to each of the 450 funds the fiduciary duty set forth in § 36(b) and under Massachusetts' common law of trusts pursuant to the Declaration of Trust for each fund.  The fiduciary duty owed by the Defendants requires them to ensure that each fund is treated fairly, such that the interests of each and every fund are not sacrificed or compromised to benefit Fidelity itself, the underwriter, or anyone else, including shareholders of other Fidelity funds and prospective Fidelity customers.

### C.   Fidelity's Management Fee Structure

The basic management fee Fidelity charged to the Funds is the sum of two discrete components – a "group fee" and an "individual fund fee." *Id.* ¶ 25.  For four of the five Funds, a performance adjustment is applied to the basic fee to determine the ultimate management fee charged to the funds.[1]  *Id.* ¶ 26.  Fidelity explains how it charges its management fee (and thereby receives compensation) to the funds, such as the Magellan Fund, as follows:

> For the services of FMR under the management contract, the fund pays FMR a monthly management fee which has two components: a basic fee, which is the sum of a group fee rate and an individual fund fee rate, and a performance adjustment based on a comparison of the fund's performance to that of the S&P 500.
>
> ***The group fee rate is based on the monthly average net assets of all of the registered investment companies with which FMR has management contracts.***
>
> . . .
>
> The group fee rate is calculated on a cumulative basis pursuant to the graduated fee rate schedule . . . .  For example, the effective annual fee rate at $858 billion of group net assets -- the approximate level for March 2004 -- was 0.2752%, which is the weighted average of the respective fee rates for each level of group net assets up to $858 billion.
>
> The fund's individual fund fee rate is 0.30%.  Based on the average group net assets of the funds advised by FMR for March 2004, the fund's annual basic fee rate would be calculated as follows:

---

[1]   The Fidelity Growth & Income Portfolio is the only one of the five Funds not subject to a performance adjustment.  *Id.* ¶ 27.

|  | Group Fee Rate | | Individual Fund Fee Rate | | Basic Fee Rate |
|---|---|---|---|---|---|
| Magellan | 0.2752% | + | 0.30% | = | 0.5752% |

(Emphasis added.)  *Id.* ¶ 28.

### 1.    Fidelity's Basic Fee – Group Fee Component

The "group fee" portion of the basic fee (expressed in basis points) varies with the total mutual fund assets that Fidelity has under management, complex-wide. *Id.* ¶ 29. The group fee rate is set according to a sliding scale that establishes the fees (in basis points) to be charged at certain complex-wide asset levels. *Id.* ¶ 30. The more assets Fidelity has under management across its approximately 450 mutual funds, the smaller the group fee rate. *Id.* ¶ 31. Similarly, the fewer mutual fund assets Fidelity has under management complex-wide, the larger the group fee rate. *Id.* ¶ 32.

Because the group fee is based on all mutual fund assets under management, all of Fidelity's equity-based mutual fund customers pay the same group fee rate as part of their overall management fee regardless of the size or individual characteristics of their particular fund(s). *Id.* ¶ 33. With the application of the group fee, shareholders in Fidelity's largest funds do not realize any benefits (such as cost savings from economies of scale) beyond those also realized by shareholders in the rest of Fidelity's smaller mutual funds. *Id.* ¶ 34. For example, the assets within a single fund could be increasing dramatically (giving rise to fund-level economies of scale), yet the group fee rate paid by that fund will not decrease (and potentially could increase) unless the assets in Fidelity's overall mutual fund complex increase to certain levels. *Id.* ¶ 35. The group fee rate (in basis points) is charged to each and every fund without regard to how much it costs Fidelity to manage a particular fund or how big or how small the fund's assets under management are relative to other funds in the complex, or absolutely. *Id.* ¶ 36.

Despite the management fee negotiations purportedly conducted by the Fund Trustees annually, since at least 1999 that "negotiation" has resulted in the same group fee structure used to determine the group fee component charged to each of the Funds. *Id.* ¶ 37. No Fidelity personnel or Fund Trustees who were deposed could state when the group fee structure at

Fidelity was first implemented, nor could they recollect any time that there had been negotiations about lowering the existing breakpoints in the group fee schedule. *Id.* ¶ 38. For example, Fidelity's CFO, J.S. Wynant, did not recall ever having a conversation with any other personnel at Fidelity about the implementation of the group fee structure. *Id.* ¶ 39. The only changes to the group fee schedule in recent years has been to add additional breakpoints at the high end of the schedule as Fidelity has increased its firm-wide assets under management. *Id.* ¶ 40.

### 2.   Fidelity's Basic Fee – Individual Fund Fee Component

The so-called individual fund fee (expressed in basis points) applied to a particular fund is generally determined by the nature of the fund or the investment style or discipline it pursues, with funds of similar styles being grouped together and assigned the same individual fund fee rate. *Id.* ¶ 41. Fidelity's equity mutual funds typically are segmented by investment discipline into one of seven or eight fund groups. Each group is assigned an individual fund fee rate that varies between 15 to 60 basis points.[2] *Id.* ¶ 42. Being tied exclusively to investment discipline, the individual fund fee rate is unrelated to the level of assets under management in any particular fund. *Id.* ¶ 43.

During the relevant time period, and at least since the 1990s, the five Funds have been charged the following individual fund fee rates:  Magellan (30 bps); Contrafund (30 bps); Growth & Income Portfolio (20 bps); Low-Priced Stock (35 bps); and Blue Chip Growth (30 bps). *Id.* ¶ 44. Despite an explosive increase in Fidelity's complex-wide and fund-level assets under management over the past two decades, there has been no corresponding decrease to the rate at which the individual fund fee component is charged to each of the Funds at issue going back at least as far as 1995. *Id.* ¶ 45. In 1995, Fidelity offered 232 funds, including the five Funds at issue here, and had a total of $373.1 billion in complex-wide assets under management. *Id.* ¶ 46. In contrast, as of September 30, 2008, Fidelity offered 450 funds and had more than tripled its mutual fund AUM to $1.244 trillion. *Id.* ¶ 47.

---

[2]   The typical group designations for setting the individual fund fee are:  Balanced (15 bps); Income/Growth (20 bps); Growth (30 bps); Real Estate (30 bps); Research-Intensive Growth (35 bps); Small Cap Growth (45 bps); International/Global (45 bps); and International Small Cap (60 bps). *Id.* ¶ 42.

**D.      Economies Of Scale And Management Fees In General**

The concept of economies of scale recognizes that the incremental cost of a unit of production decreases as the level of production increases.  In the mutual fund context, economies of scale exist where the incremental cost of managing fund assets decreases as the level of fund assets increases.  *Id.* ¶ 48.   As the fund increases in size (whether through additional contributions or through asset appreciation), the management fee collected by the manager as a percentage of total assets grows as well.  Economies of scale are realized where the cost of managing the total fund assets does not increase in proportion to the additional fees received.  *Id.* ¶ 49.

Within the mutual fund industry, economies of scale savings are typically accrued in management fees and shared with investors by establishing breakpoints within each fund's management fee schedule.  *Id.* ¶ 50.  As the fund's assets increase to reach each successive breakpoint level, the fund enjoys a corresponding discount or reduction in its management fee rate.   As assets under management in a particular fund grow in size, the breakpoints systematically lower the percentage fee paid by those fund investors for management services. *Id.* ¶ 51.  In the money management business, investment advisors (including Defendants) routinely offer their management services to non-captive institutional clients with breakpoints because of the economies of scale inherent in the management of such assets.  *Id.* ¶ 52.  For example, the breakpoints in Fidelity's management agreements for non-captive institutional accounts result in significant fee decreases, typically lowering management fees by applying breakpoints at asset levels of $25 million, $50 million, $100 million, and $200 million.[3]  *Id.* ¶ 53. The management fees charged by Fidelity to non-captive separate accounts, for example, can move in a range from 50 basis points at $25 million down to 20 basis points for assets above $200 million, or from 80 basis points at $25 million down to 25 basis points at $200 million,

---

[3]      In addition to having regular breakpoints, the management fees charged by Fidelity to non-mutual fund accounts are typically less than the management fees charged to mutual funds.  *Id.* ¶ 56.

depending on the applicable fee scale. *Id.* ¶ 54. These breakpoints reflect the economies of scale present in the management of the separate account portfolios. *Id.* ¶ 55.

With respect to the management of captive mutual funds, virtually all major mutual fund companies provide ***fund-specific*** management fee breakpoints, thereby sharing with fund investors, on a fund-by-fund basis, the cost savings they realize in managing a growing fund. *Id.* ¶ 57. But Fidelity does not set its management fees in accordance with this widespread mutual fund industry practice. To the contrary, Fidelity does not employ any system of breakpoints, or indeed any other mechanism, that shares economies of scale at the fund level.[4] *Id.* ¶ 58.

E.      **Economies Of Scale And Management Fees For Fidelity Mutual Funds**

Fidelity acknowledges that economies of scale exist in the management of mutual funds and has recognized that such economies must be considered on a fund-by-fund basis. *Id.* ¶ 61. Nevertheless, Fidelity has decided that it is "best" to focus on complex-wide (rather than fund-level) economies of scale in its efforts to supposedly pass on economy-of-scale savings to mutual fund investors. *Id.* ¶ 62. As one member of the Fund Trustees testified, "[w]e've come to the conclusion that the best way to look at economies of scale is at the complex level." *Id.* ¶ 63.

In 2006, Fidelity's Fund Trustees asked Fidelity whether a $50 billion fund had more economies of scale than a $5 billion fund, and if so, whether large funds should have fund-level breakpoints. In response, Fidelity stated, "FMR acknowledges that ***larger funds may have some additional economies of scale*** but ***Fidelity has made a business decision to have standard pricing and a group fee structure***, i.e., pricing does not vary based on the size of a fund." *Id.* ¶ 64. (Emphasis added.) Nevertheless, FMR Corp.'s former COO Robert Reynolds believes that a mutual fund management fee system with breakpoints on a fund-by-fund basis could be

---

[4]    It should be noted, however, that Fidelity does offer management fee breakpoints to virtually all of its non-mutual fund clients (including separate accounts and commingled investment pools) based on the AUM of the individual account. *Id.* ¶ 59. In addition, Fidelity offers its mutual funds fund-specific breakpoints, based on a fund's AUM, as part of the separate transfer agent and service agent (pricing and bookkeeping) agreements it enters into each year with each of its mutual funds. *Id.* ¶ 60.

developed by Fidelity, but only "[i]f we thought it made sense for the business and the fund shareholders." *Id.* ¶ 65.

### F.      Economies Of Scale And The Services Provided By Fidelity

Rather than sharing economies of scale savings with fund customers through the use of fund-level breakpoints, Defendants contend that "FMR shares economies of scale benefits with the funds and shareholders through (i) management fees which decrease as assets [across the entire Fidelity mutual fund complex] increase under the group fee structure and (ii) improved services and capabilities." *Id.* ¶ 66.  The "improved services and capabilities" that Defendants cite as passing on economies of scale include such things as Fidelity's "new investor centers, retirement income planning, web tools," telephone call centers, Internet sites, and trading services.  *Id.* ¶ 67.

The management agreements between Defendants and the Funds, however, do not require Defendants to provide any particular level or type of services to the Funds' investors – much less "improved services and capabilities."  The language of the various applicable management agreements provides only that Defendants shall be responsible for "[i]nvestigating the development of, and developing and implementing, appropriate management and shareholder services designed to enhance the value or convenience of the Portfolio as an investment vehicle," and that Defendants shall "[f]urnish such other services advisor determines to be necessary or useful to perform its obligations."  *Id.* ¶ 68.  With respect to the services to be provided, the management contracts at issue are the same from year to year and from fund to fund.  The Defendants have had no contractual obligation to provide any "improved," enhanced or additional services to the Funds from one year to the next.  *Id.* ¶ 69.

Not only are Defendants not contractually bound to provide such services, the "improved services" cited as sharing economies of scale savings actually are provided and paid for by FMR Corp., the Fidelity parent company, not by Defendants.  FMR Corp. pays for these services out of the overall profits it realizes through Fidelity's operations, including the profits generated

from the mutual fund management fees received by Defendants. *Id.* ¶ 70. FMR Corp. is not an advisor to the Funds, nor is it a party to the management contracts defining Defendants' obligations to the Funds. *Id.* ¶ 71. The decision of whether additional monies, or indeed any monies at all, are spent on services from year to year rests entirely with FMR Corp. *Id.* ¶ 72. The Fund Trustees have no contract with FMR Corp. and, therefore, no control over how FMR Corp. spends its money, the services on which monies may be spent, or whether monies will be spent on services in the first place. *Id.* ¶ 73. Moreover, Fidelity does not provide any services that particularly benefit the shareholders of larger funds over the shareholders of smaller funds. *Id.* ¶ 74.

The services that Fidelity has been adding or improving have grown the entire Fidelity business complex (including its non-mutual fund businesses) and expanded the Fidelity brand and name. *Id.* ¶ 75. For example, Fidelity spent more than $2 billion on technology in 2006 and was expected to spend over $3 billion on technology in 2007. *Id.* ¶ 76. Fidelity also has been opening between five and ten new public investor centers each year in the United States. *Id.* ¶ 77. In 2005 and 2006, Fidelity hired approximately 100 new research personnel. *Id.* ¶ 78. The additional services reach well beyond Fidelity's mutual fund business and are largely available to all of Fidelity's customers – including, for example, Fidelity's brokerage customers and 401(k) and 403(b) accounts -- as well as to members of the general public. *Id.* ¶ 79. If an investor in one of the five Funds does not avail himself of Fidelity's additional available services, he, of course, derives no benefit from them. *Id.* ¶ 80.

The increase in available services is designed and intended to increase Fidelity's standing as an overall financial services company and ultimately attract new customers of all types. *Id.* ¶ 81. In discussing Fidelity's expenditures on services, Fidelity's former COO Robert Reynolds said, "as a company there's a tremendous appetite to be on the leading edge, and we're always looking for new products, new services and better ways to service our clients." *Id.* ¶ 82. The former Chairman of the Independent Fund Trustees, Marvin Mann, confirmed this understanding of Fidelity's business model, saying that "resources were added to address the growth of the

business and tremendous additional investments in people and machines and electronic information technology equipment, communications equipment and systems and networks to support the tremendous growth and the tremendous increase in services that had to be provided over time to meet the needs of the investors." *Id.* ¶ 83.

Although Defendants claim that economy of scale benefits are passed on to the Fund shareholders through enhanced services, Fidelity has not conducted a survey or analysis to value the services provided to mutual fund shareholders in order to assess their worth in relation to the management fees being charged to each fund. *Id.* ¶ 84. For example, when Abby Johnson was asked at her deposition whether FMR Co. makes any effort to determine how much investment research a particular portfolio manager consumes, she answered that she was unaware of any efforts Fidelity had undertaken in that regard. *Id.* ¶ 85. In addition, no effort has been made to track costs or operating margins for Fidelity's fund management business. Fidelity's CFO was unable to state what the minimum anticipated rate of return (hurdle rate) was for new capital expenditures for the mutual fund business, offering instead that Fidelity preferred to analyze whether a new capital expenditure "added value" to the business. *Id.* ¶ 86.

Neither has Fidelity attempted to track the cost of an individual fund's actual use of particular services or resources at Fidelity. For example, no one has ever tracked the cost of usage by Magellan shareholders versus any other fund shareholders of things like the website, customer support centers, phone services, or other services. *Id.* ¶ 87. The fact that Fidelity does not look at the actual costs that it takes to run each Fund when setting the same fees, year after year, was explained bluntly by Abby Johnson as, "that's not the way we run the business." *Id.* ¶ 88. Similarly, Fidelity's CFO J.S. Wynant stated that there has never been a discussion at Fidelity identifying fixed or variable costs of running their mutual fund business. When asked at his deposition whether Fidelity's equity fund after-tax profit margins were acceptable to him as CFO, Wynant said, "I don't know what you mean by reasonable, acceptable. This is just an outcome. . . . we don't manage the business by fund, or by discipline." *Id.* ¶ 89.

### G.   Fidelity's Largest, Most Profitable Funds Are Unfairly Forced To Subsidize Its Newer, Unprofitable Funds

New mutual funds initiated by Fidelity are consistently unprofitable to Defendants as investment advisers when they are first started and remain so until they grow to a particular size. *Id.* ¶ 90.  Despite the unprofitability of its new funds, Fidelity, through the group fee and individual fund fee, sets the management fees for its new funds on the same basis as, and in line with, its more established funds.  *Id.* ¶ 91.  All of Fidelity's equity funds are charged the same group fee rate, regardless of size, based on Fidelity's mutual fund assets under management.  *Id.* ¶ 92.  Similarly, Fidelity's equity funds are grouped together by investment discipline, regardless of their size or profitability, for purposes of setting the individual fund fee rate.  *Id.* ¶ 93.  As a result, Fidelity's smallest and least profitable funds are priced to the fund holders in the same manner and at the same level as Fidelity's largest, most profitable funds.  *Id.* ¶ 94.  For example, a fund like the Fidelity Tax Managed Stock Fund with $98 million in AUM in 2007 would pay the same individual fund fee of 30 basis points as a fund like Fidelity Contrafund, with AUM of over $81 billion.  Thus on an annual basis, shareholders in the Fidelity Tax Managed Stock Fund would pay approximately $294,000 for the individual fund fee, while Contrafund shareholders would pay upwards of $243 million.  *Id.* ¶ 95.

In fact, one of Fidelity's stated purposes for the individual fund fee component of the overall management fee is to "normalize" the fees that Fidelity charges customers for its newer, unprofitable funds.  *Id.* ¶ 96.  The Fund Trustees readily acknowledged this practice in pricing new mutual funds at Fidelity, noting that Defendants' management fee structure "allow[s] Fidelity to bring to market the new products at market rates, which we believe benefits all shareholders by drawing in more assets and further spreading assets across the complex."  *Id.* ¶ 97.  As another Trustee stated it, small funds are grouped with large funds for purposes of the individual fund fee because "you're going to have some funds that would be small enough it would be very difficult for you to price them at all."  *Id.* ¶ 98.

By lumping larger profitable funds with smaller unprofitable funds in setting the individual fund fee rate, Fidelity is able to offer management fees on par with its established

funds to its newer, unprofitable funds, thereby making the unprofitable funds more attractive to investors. *Id.* ¶ 99. As Fidelity's CFO J.S. Wynant testified, "Even though [the Focused Stock Fund] is a tiny fund, we price it exactly the same [as the larger funds] so, in effect, we say all shareholders benefit from the scale we have across the whole firm. We are not going to charge a customer more just because it's a small fund. . . . I think most of our competitors would have a much higher fee on their small new fund. We don't do that." *Id.* ¶ 100. Despite the fact that the newer, smaller funds are not profitable for Fidelity, according to Fidelity's CFO, no small fund has ever been terminated because it was losing money. *Id.* ¶ 101.

## IV.   ARGUMENT

### A.   The Standard For Summary Judgment

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986); *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir. 1991), *cert. denied*, 502 U.S. 861 (1991); *Desmond v. Fed. Deposit Ins. Corp.*, 798 F. Supp. 829, 830-31 (D. Mass. 1992). The moving party bears the initial burden of showing "the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (quoting *Celotex*, 477 U.S. at 323). Once this occurs, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." *Michelson v. Digital Fin. Servs.,* 167 F.3d 715, 720 (1st Cir. 1999). The nonmoving party, although entitled to all favorable inferences, "may not rest upon mere allegations; it must set forth specific facts demonstrating that there is a genuine issue for trial." *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988). If the nonmoving party fails to make such a showing, summary judgment should enter. *Celotex*, 477 U.S. at 322-23.

Rule 56 acknowledges the value of a motion for summary judgment even where that motion might not fully adjudicate the entire matter.

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.  The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys.  It should then issue an order specifying what facts – including items of damages or other relief – are not genuinely at issue.  The facts so specified must be treated as established in the action.

Fed. R. Civ. P. 56(d)(1).

Federal courts, including those in the First Circuit, have found liability for breach of fiduciary duty on summary judgment and have entered either full or partial judgment as warranted.  *See, e.g., Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C.*, 128 F.3d 10, 15-16 (1st Cir. 1997) (affirming award of damages on summary judgment for breach of fiduciary duty); *United States v. Kenealy*, 646 F.2d 699 (1st Cir. 1981) (same); *see also Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542 (6th Cir. 1999) (reversing district court's grant of summary judgment for defendant, granting summary judgment for plaintiff on breach of fiduciary duty claim under ERISA); *PFS Distrib. Co. v. Raduechel*, 491 F. Supp. 2d 1061 (S.D. Iowa 2007) (granting summary judgment on plaintiff's breach of fiduciary duty of loyalty claim); *Wolfchild v. United States*, 62 Fed. Cl. 521, (Fed. Cl. 2004) (granting partial summary judgment to plaintiff on breach of fiduciary duty claim).

**B.      Section 36(b) Of The ICA Establishes A Clear Fiduciary Duty Between Defendants And Each Of The Funds With Respect To The Management Fees Being Charged By Fidelity And The Sharing Of Economies Of Scale Within Each Fund**

As shown below, Defendants owe a separate fiduciary duty to each of the five Funds at issue with respect to the management fees charged to the Funds.  This fiduciary duty coincides with the fiduciary duty established under common law trust principles and incorporates a duty of loyalty, a duty of impartiality, and a duty of disclosure.  To properly fulfill their fiduciary duty, Defendants must ensure that benefits from economies of scale realized within a particular Fund are properly shared with the investors of that Fund.

1.      **The legal and historical context of the mutual fund market and advisory fee agreements**

Congress, the SEC, and the Supreme Court have identified two related structural phenomena that, in the absence of a regulatory response, are likely to lead to self-dealing between investment advisers and the mutual funds they control: (1) that the funds are effectively captives of their advisers; and (2) that the nature of the mutual fund business and the fund fee structure lead to economies of scale for the advisers.

a.      **Funds are captives of their advisers**

The first phenomena is that the entity that establishes the mutual fund, and frequently controls its board of directors, is the same entity that contracts with the board to provide investment management and other services to the fund for a fee. *See Daily Income Fund*, 464 U.S. at 536 ("Unlike most corporations, [a mutual fund] is typically created and managed by a pre-existing external organization known as an investment adviser. . . .  [The adviser] often selects affiliated persons to serve on the [fund's] board of directors . . . ."); *Burks*, 441 U.S. at 480-81 ("[M]utual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, called 'investment advisers,' that are separately owned and operated.") (quoting S. Rep. No. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897) (internal brackets and quotation marks omitted) [hereinafter Senate Report]. Such is the case at Fidelity, which has been under the control of the Johnson Family for more than half a century. Fund investment advisers, such as Fidelity, typically do not negotiate fee agreements by vying against each other to land advisory contracts. Rather, they create their own "clients" by forming, marketing, and managing the funds they advise. *See Burks*, 441 U.S. at 480-81; *Daily Income Fund*, 464 U.S. at 536. As a consequence, "the 'relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.'" *Daily Income Fund*, 464 U.S. at 536 (quoting *Burks*, 441 U.S. at 481).

In a 1966 report, the SEC elaborated on the effects of this "virtually complete merger of the funds' management with the advisory organizations." Securities and Exchange Comm'n, *Public Policy Implications of Investment Company Growth*, H.R. Rep. No. 89-2337, at 126-27

(1966) [hereinafter SEC Report] (available at www.sechistorical.org/collection/papers/ 1960/1966_InvestCoGrowth/). The Commission found that "[m]utual funds are unique among large purchasers of investment management services because neither cost considerations nor other competitive factors influence the funds' choice of their advisers." *Id.* at 126; *see also Burks*, 441 U.S. at 481 ("[A] mutual fund cannot, as a practical matter, sever its relationship with the adviser.") (quoting Senate Report at 5). "Mutual funds are formed by persons who hope to profit from providing management services to them," SEC Report at 127, and who "seldom, if ever, compete with [other investment advisers] for advisory contracts with mutual funds." *Id.* at 126.

Contrary to what one might suppose, the competition among mutual funds for shareholders does not result in fee-constraining market forces that substitute for those lacking between funds and advisers. "Cost reductions in the form of lower advisory fees or other cost considerations do not figure significantly in the battle for investor favor." *Id.* This is partly because the typical advisory fee "may not appear substantial" to shareholders in relation to investment value. *Id.*

Recent empirical studies confirm the continuing validity of the SEC's findings. *See* Donald C. Langevoort, *Private Litigation to Enforce Fiduciary Duties in Mutual Funds: Derivative Suits, Disinterested Directors and the Ideology of Investor Sovereignty*, 83 Wash. U.L.Q. 1017, 1033-36 (2005) (summarizing the recent studies and literature, which suggest that most mutual fund investors do not rationally process cost information in selecting funds); *see also* General Accounting Office, Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition, at 12, 63 (June 2000) (available at www.gao.gov/archive/2000/gg00126.pdf); Peter J. Wallison & Robert E. Litan, Competitive Equity: A Better Way to Organize Mutual Funds 87-92 (American Enterprise Institute Press 2007).

The Supreme Court bluntly characterized the net effect of the typical contractual investment advisory relationship between the fund adviser and the fund: "[T]he forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other

sectors of the American economy." *Burks*, 441 U.S. at 481 (quoting Senate Report at 5 (1969) (internal quotation marks omitted); *see also* Langevoort, *supra*, at 1032 ("Thinking about mutual funds by imagining them simply as a species of 'corporations' in a way that is directly informed by contemporary corporate law theory is completely misguided.").

> **b.**     **The structure of fee agreements and economies of scale**

The second structural phenomenon of the industry that leads to self-dealing between the fund and the adviser is that the fee structure (typically calculated as a percentage of the mutual fund's assets) encourages the fund adviser to profit from and take advantage of economies of scale without sharing those economies with the fund. *See* SEC Report at 89.

> [T]he SEC commenced a four-year legislative program in 1966 to address what it perceived as excessive sales loads and management fees stemming from an apparent lack of price competition and economies of scale in the industry. The SEC's efforts resulted in the 1970 amendments to the Investment Company Act, which strengthened independent director requirements and imposed a fiduciary duty with respect to management compensation.

A. Joseph Warburton, *Should Mutual Funds Be Corporations? A Legal & Econometric Analysis*, 33 Iowa J. Corp. L. 745, 747 n.3 (2008). As the SEC, itself, has explained:

> Beyond a certain point increases in an investment company's assets do not lead to commensurate increases in the cost of furnishing it with investment advice and other managerial services. Hence, there are considerable economies of size [or scale] to investment company managers. In large measure these economies reflect the fact that the management of a small security portfolio requires much the same general economic and market forecasting, analyses of various industry groups and evaluations of particular securities—the basic elements of the investment advisory process—as does the management of a large one.

SEC Report at 10-11; *see also id*. at 94-96.

> **2.**     **The Investment Company Act of 1940**

When Congress enacted the ICA in 1940, the goal was to compensate for the structural problems described above by, *inter alia*, limiting the number of adviser affiliates who could serve on a fund's board of directors and requiring that fees for investment advice and other services be governed by a written contract approved by the board and shareholders. *Daily Income Fund*, 464 U.S. at 536-37. The ICA also imposed on the adviser a duty of disclosure to the board and to third parties, including the government, *see* ICA § 34(b), 15 U.S.C. § 80a-33(b),

and prohibited breaches of fiduciary duty involving "gross abuse[s] of trust," *see Daily Income Fund*, 464 U.S. at 541 n.12 (summarizing § 36 of the original Act).  *See also Moses v. Burgin*, 445 F.2d 369, 376 (1st Cir. 1971) (explaining the import of the investment adviser's duty of full disclosure because "self-dealing is not the exception but, so far as management is concerned, the order of the day"), *cert. denied,* 404 U.S. 994 (1971).

Nevertheless, first the SEC, and then Congress, determined that the original Act was not constraining advisory fees adequately to protect investors.  The Supreme Court has summarized the relevant history:

> In the years following passage of the Act, investment companies enjoyed enormous growth, prompting a number of studies of the effectiveness of the Act in protecting investors.  One such report, commissioned by the SEC, found that investment advisers often charged mutual funds higher fees than those charged the advisers' other clients and further determined that the structure of the industry, even as regulated by the Act, had proved resistant to efforts to moderate adviser compensation.  Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., at 28-30, 34, 66-67 (1962).  Specifically, the study concluded that the unaffiliated directors mandated by the Act were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser."  *Id.* at 34.  A subsequent report, authored by the SEC itself, noted that investment advisers were generally compensated on the basis of a fixed percentage of the fund's assets, rather than on services rendered or actual expenses.  [SEC Report at 89.]  The Commission determined that, as a fund's assets grew, this form of payment could produce unreasonable fees in light of the economies of scale realized in managing a larger portfolio.  *Id.* at 94, 102.

*Daily Income Fund*, 464 U.S. at 537.

### 3.  The 1970 Amendments to the ICA

As a result of its findings, the SEC submitted a series of legislative proposals that ultimately led Congress to overhaul the ICA in 1970.  The lynchpin of the 1970 legislation was the strengthening of § 36, the provision that formerly prohibited only "gross abuse[s] of trust" by the adviser.  *See id*. at 541 n.12.  Congress revised § 36 for two principal reasons.  First, lawmakers agreed with the SEC that "lawsuits by security holders challenging the reasonableness of advisory fees had been largely ineffective" under the gross-abuse-of-trust standard.  *Id*. at 537; *see also id*. at 540 n.12.  Second, Congress concurred with the SEC that "approval of adviser contracts by shareholders and independent directors could not alone provide

complete protection of the interests of security holders with respect to adviser compensation." *Id.* at 538 (citing SEC Report at 128-31, 144, 146-47). Indeed, such approvals under the original Act had, perversely, frustrated effective court challenges to advisory fees because "the courts had relied on the approval of adviser contracts by security holders or unaffiliated directors to uphold the fees." *Id.* at 540 (citing SEC Report at 132-43).

The new § 36(b) -- the statute under which Plaintiffs sue -- now imposes on the fund's adviser "a fiduciary duty with respect to the receipt of compensation for services." 15 U.S.C. § 80a-35(b). To prevail under § 36(b), the plaintiff need not establish "personal misconduct" on the adviser's part. ICA § 36(b)(1), 15 U.S.C. § 80a-35(b)(1). Shareholders are entitled to rescission of fee agreements that are made or performed in violation of the ICA. *See* ICA § 47(b), 15 U.S.C. § 80a-46(b).

### a. Congress' intent in enacting a fiduciary duty standard

Congress, in specifically adopting the common law term "fiduciary duty" in the 1940 Act, incorporated into the federal statutory scheme the pre-existing common law of trust principles embodied by the term "fiduciary duty." *See Jones v. Harris Assocs.*, 527 F.3d 627, 632 (7th Cir. May 19, 2008) (noting that the relationship between the investment adviser and the fund should be governed by the traditional rules of fiduciary duty as found in the law of trusts). The Supreme Court has stated that this fiduciary duty has been imposed on fund advisers for the purpose of ensuring that the funds are charged "reasonable adviser fees" and to effectively regulate the transactions that take place between advisers and investment companies, in order to act as independent checks on "excessive fees." *Daily Income Fund*, 464 U.S. at 539-40.

The Supreme Court has repeatedly held that "where Congress uses terms that have accumulated settled meaning under either equity or common law, a court must infer, unless the statute dictates otherwise, that Congress means to incorporate the established meanings of these terms." *National Labor Relations Bd. v. Amax Coal Co.*, 453 U.S. 322, 329 (1981); *see also Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (applying the "ordinary trust law understanding of fiduciary" in the ERISA context); *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322

(1992) (applying the well-established principle of referring to the common law definition of 'employee' because the term was not defined in the Copyright Act).  By 1970, when the ICA was amended, the term "fiduciary duty" was well-established, and the legal obligations imposed by it quite clear, both from its origins in trust law and from the extant legal analysis in cases involving various conflicted corporate transactions.  For example, the established Delaware law of fiduciary duty at the time of the 1970 amendments provided a clear picture of the law and what Congress intended when it placed fund advisers under the federal fiduciary umbrella.  In *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939), the fiduciary relationship between a corporation and its officers was defined by the court as requiring "undivided" and unselfish loyalty to the corporation, such that there would be "no conflict between duty and self-interest."

> **b.      The common law fiduciary duty standard applied to investment advisers under § 36(b)**

Congress, in statutorily imposing fiduciary duties on investment advisers with respect to their receipt of compensation, required that courts examine the fiduciary duties that exist under the common law and apply them to the relationship between the fund adviser and the shareholders of the fund.  The Supreme Court has recognized that ICA claims touching on corporate governance should look to state law where the issue is not specifically addressed by the ICA or its rules.  *Burks*, 441 U.S. at 478 ("[I]n this field, congressional legislation is generally enacted against the background of existing state law.").  Therefore, in examining Defendants' duties and conduct towards each Fund (which are organized as Massachusetts business trusts), one must consider the law of fiduciary duty as it arises under Massachusetts state common law and law of trusts.[5]  The fiduciary duties under the common law that apply to the receipt of compensation by fund advisers include the duty of loyalty, the duty of impartiality, and the duty of disclosure.

---

[5]      See for example, § 802(f), Uniform Trust Code (2005).

### i. **Duty of Loyalty**

First and foremost is the duty of loyalty, which is universally viewed as the hallmark of agency status.   Justice Cardozo, in *Meinhard v. Salmon,* 164 N.E. 545, 546 (N.Y. 1928), described the fiduciary relationship as follows:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A [fiduciary] is held to something stricter than the morals of the marketplace.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.  As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of an undivided loyalty . . . .  Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

The Supreme Court expressly adopted *Meinhard's* fiduciary standard in interpreting the scope of congressionally imposed fiduciary duties.  *See Amax Coal*, 453 U.S. at 329-30.

The fiduciary duty of utmost good faith and absolute loyalty is well developed in Massachusetts law.  *See, e.g., Gagnon v. Coombs*, 654 N.E. 2d 54, 61 (Mass. App. Ct. 1995) (holding that the fiduciary duty obligated the fiduciary to act *solely* in the beneficiary's interests, even at the expense of the fiduciary's own interests); s*ee also Fidelity Mgmt. & Research Co. v. Ostrander*, 1 Mass. L. Rep. 397, No. 90-2142-B, 1993 Mass. Super. LEXIS 336, at *14 (Mass. Super. Ct. 1983) (holding that a former employee violated the common law fiduciary duty of loyalty to her employer (Fidelity) by accepting compensation in the form of an investment opportunity in return for investments she made on behalf of Fidelity, and, even though Fidelity suffered no monetary damages, finding the appropriate remedy to be disgorgement of improper profits).

Under Massachusetts trust law, the duties owed by a trustee to a trust and its beneficiaries are considered fiduciary in nature and comparable to the fiduciary duties owed by corporate directors and shareholders.  *Murphy v. Murphy*, 21 Mass. L. Rep. 572, No. 2004-3937-BLS2, 2006 Mass. Super. LEXIS 530, at *38 (Mass. Super. Ct. 2006).   Under Massachusetts law, a fiduciary owes a primary duty to protect the trust, and no self interest can be allowed to conflict with the obligation.   "A trustee must exercise good faith and act solely in the interests of the

beneficiaries in administering the trust and must lay aside self-interest. . . .  There can be no divided loyalty." *Spinner v. Nutt*, 417 Mass. 549, 552 (1994) (quoting *Boston Safe Dep. & Trust Co. v. Lewis*, 317 Mass. 137, 140 (1944)).  Nor can the trustee "derive any personal advantage at the expense of the trust, or put himself in a position antagonistic to the beneficiaries of the trust." *Anderson v. Bean*, 272 Mass. 432, 448 (1930).

The rule of undivided loyalty for investment advisers was also made clear in *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811 (2d Cir. 1976), where the court stated that "Congress, in imposing a fiduciary obligation on investment advisers, plainly intended that their conduct be governed by the traditional rule of undivided loyalty implicit in the fiduciary bond."  This duty of loyalty is breached where there is any transaction affected by a conflict between the trustee's fiduciary duties and personal interests, and such transactions are voidable by a beneficiary who is affected by the transaction.  Uniform Trust Code, § 802(b).  Once a trustee acting for a trust has engaged in a voidable transaction, no further proof is required, and the transaction is void subject to the "no further inquiry rule" -- whether the trustee acts in good faith, or pays a fair consideration is immaterial.  *See* Restatement (Third) of Trusts § 170, cmt. b (2003).

### ii.  <u>Duty of Impartiality</u>

While the duty of loyalty and the sole interest rule seek to prevent conflicts, the duty of impartiality arises "when the trust terms create a conflict that abridges the sole interest rule." Charles E. Rounds Jr. & Charles E. Rounds, III, Loring: A Trustee's Handbook § 6.2.5 (2008) [hereinafter Loring] (quoting John H. Langbein, *Questioning the Trust Law Duty of Loyalty: Sole Interest or Best Interest?* 114 Yale L.J. 929, 939 (2005)).  The duty of impartiality requires "the trustee must treat the beneficiaries equitably in light of the purposes and terms of the trust."  *Id.* (quoting Uniform Trust Code, § 803 cmt.); *see also Fogelin v. Nordblom*, 402 Mass. 218, 222 (1988) ("It is axiomatic that the [] trustees stood in a fiduciary relationship to all of the beneficiaries of the trust and, therefore, had a duty not to favor one class of shareholders over another.").  It is not permissible for a trustee to ignore the interests of some beneficiaries merely

as a result of oversight or neglect, or because a particular beneficiary has more access to the trustee. Loring at § 6.2.5; *see also* Restatement (Third) of Trusts § 79 (2003).

Defendants owed a duty of loyalty to each of the Funds individually. As fiduciaries, Defendants also had a duty as between the various trusts (funds) within the complex to not favor the shareholders of some funds over the shareholders of the other funds. Neutrality is the order of the day in order to fulfill the duty of impartiality. Under Massachusetts law, a fiduciary who served simultaneously as such to a number of related entities "created inevitable conflicts of interest between [its] fiduciary duties" to the different entities. *Demoulas v. Demoulas Super Mkts., Inc.,* 424 Mass. 501, 542-43 (1997). "A fiduciary who places himself or herself in such a situation does not thereby gain the option of choosing which company to favor." *Id.* at 543.

### iii. <u>Duty of Disclosure</u>

Whenever a fiduciary engages in a conflict-of-interest transaction, the fiduciary has the burden of proving full disclosure to the beneficiary of the nature of the conflict, as well as the *fairness* of the transaction to the beneficiary. *Puritan Med. Ctr., Inc. v. Cashman*, 413 Mass. 167, 172 (1992). The burden of proof is shifted to the fiduciary because the very existence of a conflict of interest creates a *prima facie* breach of the duty of loyalty. *See generally Kahn v. Lynch Communication Sys., Inc.*, 638 A.2d 1110 (Del. 1994) (holding that the burden of proving the fairness of the transaction is on the fiduciary); *Murphy*, 21 Mass L. Rep. 572, 2006 Mass. Super. LEXIS 530, at *40 (citing *Demoulas*, 424 Mass. at 532-33). In describing the agent's duty of disclosure in conflict-of-interest transactions, the Second Restatement of Agency states as follows:

> Before dealing with the principal on his own account, [] an agent has a duty, not only to make no misstatements of fact, but also to disclose to the principal all relevant facts fully and completely. A fact is relevant if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction. Hence, the disclosure must include not only the fact that the agent is acting on his own account (see § 389), but also all other facts which he should realize have or are likely to have a bearing on the desirability of the transaction from the viewpoint of the principal.

Restatement (Second) of Agency § 390, cmt. a (1958).

Under the ICA, this duty of disclosure is more strict than at common law. The First Circuit acknowledged more than thirty-five years ago that the ICA "imposes a ***more fundamental and pervasive requirement***" than even the state common law fiduciary duty of disclosure "because of the structure of investment trusts, [where] self-dealing is not the exception but, so far as management is concerned, the order of the day" and that their ordinary business was tinged with self-interest and benefited management at "least as much as fund shareholders." *Moses*, 445 F.2d at 376 (emphasis added). The *Moses* court opined that notwithstanding the duty of disclosure owed to corporate directors in the corporate law setting, in the investment company setting, an investment company has a "duty of full disclosure of information to these unaffiliated directors in every area where there [is] even a possible conflict of interest between their interests and the interests of the fund." *Id.* In *Moses*, the court concluded that the defendants (including Defendant FMR Co.) were aware of an area of conflict between their personal interests and the interests of the mutual fund, yet they did not disclose the conflict to the unaffiliated directors or submit it to them for consideration. *Id.* at 378.

In *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858, Fed. Sec. L. Rep. (CCH) P93, 954 (N.D. Cal. Aug. 14, 2006), the court observed that claims for breach of fiduciary duty under § 36(b) need not necessarily be limited to excessive fees. The court envisioned circumstances in which an investment adviser could breach its fiduciary duty by "charging for its services, even if those services were performed competently and for a reasonable cost." *Siemers*, 2006 U.S. Dist. LEXIS 60858, at *52. The court further noted that "[f]iduciary duties often include duties of candor and fair dealing. . . . [The fiduciary duty under § 36(b)] requires, at the least, that [the investment adviser] not charge the fund extra without providing additional value." *Id.* at *52-53.

### 4. The investment adviser's fiduciary duty is owed separately and independently to each individual fund it manages

An investment adviser's fiduciary duty under § 36(b) runs to the individual registered investment company it serves. The language of § 36(b), stating that the "investment adviser of a

registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company," clearly contemplates that the adviser's fiduciary duty is owed on a fund-by-fund basis, regardless of whether the adviser serves one fund or a whole complex of related mutual funds.  15 U.S.C. § 80a-35(b).

The wording of the statute is consistent with the actual structure of the mutual funds and the adviser-fund relationship.  Each of the five Funds at issue in this case is a separate investment company, each with its own charter, business structure, executive officers, trustees, and beneficiaries (investors).  Each investment company is separately organized as a business trust under Massachusetts law.  Defendants, as the investment adviser, have a separate management contract with each investment company.  The investment adviser is required to negotiate each management contract separately with the board of trustees overseeing each particular management company.  *See* 15 U.S.C. § 80a-15(a).  The fact that the same individuals sit on each of the boards of trustees overseeing many funds in a complex – hundreds of funds in Fidelity's case – does not change the fact that both the trustees and the adviser owe a separate and distinct fiduciary duty to each fund, individually.  The Fund Trustees sit as the board of trustees for each fund individually as a matter of law, regardless of the fact that the same individuals may sit on the boards of all of the Fidelity funds.  American Bar Assoc., Fund Director's Guidebook 13 (3d ed. 2006) (recognizing that directors may serve on more than one board within a fund complex, and that "[a]lthough there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis").

The legislative history of § 36(b) shows that the statute's drafters envisioned that the fiduciary duty of § 36(b) would run between the fund adviser and a fund, not the fund complex.  For example, the Senate Committee on Banking and Currency, in its Report on Senate Bill 2224, which was enacted as the 1970 amendments to the ICA, stated:

> [The] committee believes that the investment adviser should be a fiduciary of ***the fund*** in such matters as the handling of the fund's assets and investments.  Therefore, we have added a new section 36(b) to the Investment Company Act to

27

specify that the adviser has a fiduciary duty with respect to compensation for services or other payments paid *by the fund or its shareholders to the adviser* or to affiliated persons of the adviser.

Senate Report at 6 (emphasis added).

Similarly, the Conference Report on Investment Company Act Amendments of 1970, which represented the final agreed-upon legislation of the 1970 Amendments, makes clear that the legislators understood that the fiduciary duty of § 36(b) runs between an individual fund and its adviser.  In the Conference Report, Senator Sparkman stated:

> This section places a specific fiduciary duty in respect to management fee compensation on the mutual fund's investment adviser.  This is in accordance with the belief that the investment adviser should be a fiduciary in its relationship with the mutual fund in the handling of assets and investments. . . .  Either the Securities and Exchange Commission or any mutual fund shareholder may sue in order to have a determination made as to whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the management fee.

116 Cong. Rec. S39124, S39125 (daily ed. Nov. 30, 1970) (statement of Sen. Sparkman), *reprinted in* 4 Federal Securities Laws Legislative History 1933-1982, at 4386 (1983).

While Congress did not articulate the scope of the fiduciary duty standard in the text of § 36(b), the legislative history indicates that Congress envisioned the courts looking to the best practices of the industry when evaluating a fund adviser's advisory fees.  The Senate Committee on Banking and Currency, in its report on S. 2224, stated that for the purposes of setting advisory fees, "the best industry practice will provide a guide."  Senate Report at 6.  Further, the Senate Report viewed favorably the practice of advisers in the mutual fund industry scaling down their fee at higher asset levels.  *Id.*

     **5.**     **In fulfilling its fiduciary duties, an investment adviser must ensure that economies of scale benefits realized within a mutual fund are equitably shared with the mutual fund's investors**

The legislative history of § 36(b) and case law reviewing that history indicate that a primary concern of legislators in enacting § 36(b) was that economies of scale or economies of size existing within a fund were not being shared with the fund's shareholders.  In *Fogel v. Chestnutt*, 668 F.2d 100, 111 (2d. Cir. 1981), *cert. denied*, 459 U.S. 828 (1982), Judge Friendly wrote:

The problem to which § 36(b) was addressed was that with which the SEC had dealt in pages 125-49, 154 of its Report on Public Policy Implications of Investment Company Growth (PPI), H.R.Rep.No. 2337, 89th Cong., 2d Sess. (1966) [SEC Report].  This was that advisers' fees, generally stated as a percentage of the market value of the managed assets, which had been altogether reasonable when a fund was launched, may have become unreasonably high when the fund grew to enormous size.

The SEC Report's findings regarding economies of scale expressed the SEC's concern that such economies were accruing to the fund adviser but not being shared with a fund's shareholders.  "It is generally recognized, however, that increases in the assets of a fund do not lead to a commensurate increase in the cost of furnishing it with investment advice and other managerial services."  SEC Report at 94.  The SEC further observed that the existence of economies of size reflected "the fact that management of both large and small security portfolios requires much the same general economic and market forecasting, analyses of various industry groups and evaluations of particular securities."  *Id.* at 95.  In particular, the SEC Report stated that over the years advisory fee rates had remained largely static despite dramatic increases in fund size.  *Id.* at 125-26.  The SEC viewed this as a problem, suggesting that there were inadequate restraints on mutual fund advisers' compensation.  *Id.*

The legislators' general concern regarding economies of scale accruing at the fund level was later echoed in the Senate Report in 1969.  "[T]his bill recognizes that investors should share equitably, as they do in other areas, in the economies available as a result of growth and general acceptance of mutual funds."  Senate Report at 4.  The same report later stated:

It is noted, however, that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently, there has been a desirable tendency on the part of some fund managers to reduce their effective charges **as the fund grows** in size.

*Id.* at 6 (emphasis added).

One of the key observations of the SEC in its 1966 report to Congress was that, between 1953 and 1962, the mutual fund industry was not properly sharing economies of scale with fund shareholders by reducing advisory fee rates.  The industry had claimed instead that that it was passing on savings through other expense items, such as custodial, stock transfer, dividend

disbursing, printing, legal, and auditing costs.  SEC Report at 100.  The SEC found this an inadequate means of sharing the economies of scale that were accruing to the fund advisers, and concluded that mutual fund shareholders needed additional protection.  *Id.* at vii, 143-47.

The structure of the ICA, which charges independent trustees with negotiating yearly, arm's-length management contracts with the investment adviser on behalf of a fund's investors, 15 U.S.C. § 80a-15, supports the premise that economies of scale must be shared on a fund-by-fund basis.  As the representatives of a fund's investors, the independent trustees must negotiate a yearly management contract that reflects the bargaining power that the particular mutual fund and its investors bring to the table.  Obviously, a large fund enjoying certain economies of scale (and a heightened level of profitability due to size) should have more bargaining power in the negotiation of its own management agreement with its investment adviser.  Such a fund is in a position to negotiate fee breakpoints in order to recover for its shareholders a portion of the cost savings being realized due to the fund's large size.  This dynamic is particularly applicable in the case of the five Funds, being the largest of Fidelity's funds, which have generated the highest profit margins among Fidelity mutual funds and delivered more than a billion dollars in annual management fees to Defendants.  Unless the large-fund investors are given some consideration for economies of scale on a fund-by-fund basis, their bargaining leverage is being squandered and the management fees they are being charged are excessive by definition -- all of which § 36(b) was designed to redress.

### C.     Defendants Violate Their Fiduciary Duties To The Funds Through Their Management Fee Structure And Business Practices

Defendants owe a fiduciary duty separately and individually to each of the Fidelity mutual funds they advise, including the five large Funds at issue here.  The duties of loyalty, impartiality and disclosure, which define the adviser's fiduciary obligation, require Defendants to operate in the utmost good faith with respect to each Fund.  In the context of § 36(b), Defendants must meet these fiduciary standards in connection with the management fees charged

to the Funds, including Defendants' obligation to properly share cost savings derived from economies of scale in their management of an individual Fund as that Fund grows in size.

Fidelity's management fee structure breaches Defendants' fiduciary duties to the Funds because it is designed to benefit the Fidelity mutual fund complex as a whole, without regard for whether the fee charged to any particular fund is appropriate. The duties of loyalty and impartiality require Defendants to consider the particular attributes of a single Fund (including such things as the Fund's size, profitability, and the presence of fund-level economies of scale) in setting that Fund's management fees. Defendants, however, utterly fail to account for any of the individualized characteristics of the Funds in setting their management fees.

1. **By focusing on the entire Fidelity mutual fund complex, rather than the individual funds within the complex, Defendants' management fee structure breaches the fiduciary duties owed to each of the individual Funds**

The duties of loyalty and impartiality, discussed above, require Defendants to protect the interests of each individual Fund and to avoid sacrificing the interests of one fund for another when their interests collide. Because the group fee and the individual fund fee focus exclusively on the Fidelity mutual fund complex and large groupings of Fidelity funds, rather than on the attributes or economies of any particular fund, Defendants' management fee structure abandons the interests of the individual Funds in favor of a blanket approach uniformly applicable to hundreds of Fidelity funds.

As set forth above, the group fee is calculated based on all of the mutual fund assets under management at Fidelity and thus gives no consideration to the particular attributes of any particular fund. The same group fee rate, in basis points, is paid by each Fidelity equity fund, regardless of each fund's size, investment approach, number of investors, economies of scale, or profitability. Similarly, the individual fund fee assigns a uniform fee (in basis points) to various large groups of funds, based on the general investment discipline of each group, rather than on the characteristics or attributes of any particular fund.

The Fidelity management fee structure particularly fails to recognize (much less appropriately share) the economies of scale and resulting cost savings realized at the individual fund level.  As established above, the 1970 amendments to the ICA were enacted in significant part to ensure that economies of scale realized in a growing fund would be shared with the investors of that fund.  Fidelity's group fee and individual fund fee structure does not account for any fund-specific economies or characteristics, and Defendants have no other mechanism in place for passing on economies-of-scale savings from their management of a particular fund to that fund's shareholders.  Defendants' decision to employ this fee structure without any means of passing on fund-level economies of scale (such as through fund-specific breakpoints) breaches their duty of loyalty to each of the five Funds.[6]

Defendants' internal materials provided to the Fund Trustees suggest that fund-level economies of scale are shared with Fidelity's largest funds (including the five Funds at issue here) through Defendants' use of the group fee.  This claim, however, is palpably false because the group fee is not tied to the growth of, or economies in, any individual fund -- the group fee is based on all of the mutual fund assets under management within the Fidelity complex.  Even though the assets in a single fund might be increasing significantly (and thereby generating significant economies of scale for Defendants), the group fee rate charged to all of the funds will not abate unless Fidelity's total complex assets under management increase.  The growth or decline of assets in an individual fund has no direct correlation to whether the management fee rate for that particular fund will increase or decrease from year to year.

Furthermore, any claim that Defendants share complex-level economies of scale through the group fee is belied by the complete lack of analysis by Defendants or any other Fidelity entity of whether the group fee breakpoints actually capture or reflect the economies that might

---

[6]    Defendants have eschewed the wide-spread industry practice of sharing economies of scale on a fund-by-fund basis through breakpoints within the fee schedule for a specific fund, based on the size of that particular fund, a practice which reduces the management fee in basis points as the fund grows in size.  Defendants have failed to institute any such fund-specific breakpoint adjustments with respect to their management fees even though Fidelity uses similar breakpoint systems in the transfer agent agreements and service agent agreements it enters each year with each of the Funds.

be realized at the complex level. The group fee structure has been in place at least since 1999 and perhaps much longer. Undisputed Facts, ¶¶ 37-38. The Fidelity personnel and Fund Trustees involved in negotiating Defendants' management contracts each year, however, cannot explain how (or even whether) the specific group fee breakpoints actually correspond to complex-wide economies of scale. *See id.* ¶¶ 38-39; Deposition of Ned C. Lautenbach ("Lautenbach Depo.") at 90-94 (attached as <u>Exhibit M</u> to the Tuttle Affid.); Deposition of William O. McCoy ("McCoy Depo.") at 112-21 (attached as <u>Exhibit S</u> to the Tuttle Affid.). There is no indication that an economies of scale analysis was conducted to help establish the group fee schedule when it was first implemented, nor has such an analysis concerning the schedule been done in subsequent years as annual management contracts have been negotiated and additional breakpoint levels have been added to the schedule to account for higher asset levels across the complex. *See* Undisputed Facts, ¶¶ 37-40; Lautenbach Depo. at 90-94; McCoy Depo. at 112-21; Deposition of William Stavropoulos ("Stavropoulos Depo.") at 103-06 (attached as <u>Exhibit O</u> to the Tuttle Affid."). The most recent breakpoints were added in substantially the same proportionate relationship as previous breakpoints without any consideration of or inquiry into the economies of scale they supposedly represented. *See* Undisputed Facts, ¶ 40; Stavropoulos Depo. at 103-06. With no consideration of how the group fee breakpoints might correspond or relate to economies of scale, or whether cost savings actually were being shared with the Funds, Defendants cannot claim to have satisfied their fiduciary obligations by employing the group fee.

Defendants' management fee structure, and their mechanical application of that structure to the Funds year after year, ignores the extraordinary size, profitability and economies within each of the five Funds, individually, in breach of Defendants' fiduciary duty. Despite their obligation to negotiate a management fee each year for each of the funds they advise, Defendants essentially applied the same management fee formula for years to calculate the fee to be paid not only by each of the five Funds but by each of the hundreds of funds in the Fidelity complex. Rote application of the same management fee formula, without any consideration of the

individual characteristics and interests of an individual fund violates Defendants' fiduciary duties, particularly here, in the case of the Funds, where the size and profitability of the Funds gives them a particular value and bargaining leverage that must be separately recognized and valued in the management fee negotiation process.

        **2.**      **Fidelity's provision of additional or enhanced services to customers as a justification for Defendants' management fees advances Fidelity's interests as an overall financial institution at the expense of its large Fund shareholders**

Defendants attempt to justify their management fees and the uniformity of their management fee structure by claiming that the enhanced services Fidelity offers as an institution provide value to Defendants' mutual fund customers and, more specifically, share economies of scale with the large Funds. Like its management fee structure, however, the services Defendants offer to the Fund shareholders are uniform in nature and provide no particular or measurable individual benefit to the Funds at issue. Rather than providing any Fund-specific benefit, Fidelity's "enhanced" services are more accurately designed as advertising points intended to attract more complex-wide assets from the investing public at large.

Services such as Fidelity's new investor centers, retirement income planning, web tools, telephone call centers, Internet sites, and trading services are available to shareholders in all of Fidelity's 450 funds, regardless of the fund's size, number of shareholders, or profitability. No one Fidelity fund benefits from or has more access to these services than any other. In fact, these same services are largely available to many of Fidelity's non-mutual fund customers and members of the general public who walk into a Fidelity investor center or log on to Fidelity's websites, regardless of whether they own any Fidelity product. While providing such services surely promotes Fidelity as a financial services company and mutual fund complex, the availability of such services does nothing to share fund-level economies of scale with any particular fund. And Fidelity has made no effort to demonstrate that they do.

Defendants cannot credibly claim that they share economies-of-scale savings with the Funds by providing "enhanced" services when neither Defendants nor the Fund Trustees have

conducted an assessment or analysis of the worth of the service enhancements and the value, if any, which inures to the benefit of the shareholders of any particular mutual fund.  If Fidelity's services were intended to properly return cost savings to the Fund shareholders, Fidelity would have to determine the value of the provided services to shareholders and ensure that the Fund investors were receiving a benefit in proportion to the cost savings to which they would otherwise be entitled.[7]  No analysis or survey has been conducted to value the services provided to mutual fund shareholders in order to assess their worth in relation to the management fees being charged to each fund.

In addition, there is no requirement under the yearly management agreements between Defendants and the Funds, negotiated by the Fund Trustees, that Defendants provide *any* particular level or type of services to the Funds' investors.  Not only do the management agreements contain no detail about the services to be provided, the vague language concerning services is the same from year to year and from fund to fund.  The Defendants have had no contractual obligation to provide any increased, enhanced or additional services to the Funds from one year to the next.

Moreover, the services cited by Defendants as justifying their fee structure and as sharing economies of scale are actually provided by and paid for by FMR Corp., the Fidelity parent company, out of the overall profits it realizes from Fidelity's operations, including the profits generated from the mutual fund management fees realized by Defendants.  The decision of whether additional monies, or indeed any monies at all, are spent on services from year to year rests entirely within FMR Corp., which is not a party to the management contracts.  The Fund Trustees have no control over whether and how FMR Corp. might spend its corporate funds.

---

[7]     The fact that so many non-mutual fund entities and customers and, indeed, the general public may avail themselves of Fidelity's services is proof that the Fund investors cannot be receiving back their proportionate share of the value being taken from their Funds through management fees.  Rather than receiving some commensurate value in the form of improved services to the Funds, the Funds are subsidizing Fidelity's entire operations by generating revenues that expand the services that benefit all aspects of Fidelity's businesses and corporate well being, advancing the interests and profits of Fidelity.  To the extent the Fund investors receive any benefit in return, it is merely coincidental and most certainly disproportionate to the cost they bear.

In sum, there is no identifiable (much less enforceable) system in place whereby Defendants can claim to reasonably share economies of scale benefits with the Funds through "enhanced" services. Any increase in the amount or quality of services from year to year is merely the result of the Fidelity parent company deciding to spend its revenues to grow its own overall business. Rather than providing a direct benefit to the Funds through a lower management fee or a series of fund-level breakpoints, Defendants reap an inflated management fee, which FMR Corp. then spends to increase its own infrastructure, other businesses, and corporate reach. This purely self-interested corporate expansion is designed to increase Fidelity's own standing as an overall financial services company and to attract new customers of all types. The expansion of Fidelity's own business interests, at the expense of benefits that should accrue directly to the Funds in the form of lower fees, breaches Defendants' fiduciary obligations under § 36(b).

### 3. Defendants' fee structure unfairly subsidizes Fidelity's smaller, unprofitable mutual funds at the expense of the larger, profitable Funds

Defendants' management fee structure further breaches their fiduciary duty to each Fund by creating an artificial management fee pricing system in which the large profits earned by Fidelity from its largest and most profitable funds are used to subsidize (or artificially depress) the management fees paid by Fidelity's smaller and unprofitable mutual funds. Defendants readily acknowledge that its newer mutual funds are consistently unprofitable to Defendants as investment advisers when the funds are first started, and remain so until they grow to a particular size. Despite the unprofitability of new funds, Defendants' management fee structure sets the fees for new funds on the same basis as, and exactly in line with, Fidelity's most established and most profitable funds, thus giving Fidelity a significant pricing advantage in offering its smallest, unprofitable funds to investors.

As set forth above, the group fee rate and individual fund fee rate are set for all equity funds without regard for a fund's size, profitability, history, number of shareholders, or economies. The result is that small, start-up funds, which otherwise would not be able to stand

on their own, are intentionally grouped with Fidelity's largest funds, enabling Fidelity to offer the small funds at significantly more attractive rates. Defendants pursue this pricing strategy at the expense of the large Funds even though Fidelity's CFO acknowledged the contrary industry practice, namely that "most of [Fidelity's] competitors would have a much higher fee on their small new fund."

By Fidelity's own admission, the purpose of grouping the largest funds with the smallest funds is to normalize the fees charged by Defendants to customers of Fidelity's newer, unprofitable funds. Through this practice, Defendants have clearly put their loyalty to Fidelity's expansive business ahead of the fiduciary duties they owe to each individual Fund. The lower fees enjoyed by the small fund investors come directly at the expense of the investors in Fidelity's largest funds, including the five Funds at issue here. The interests of the shareholders in the larger fund have thereby been compromised by Defendants' breach of their fiduciary duties.

Defendants have tried to justify their inequitable imposition of the individual fund fee by claiming that shareholders in the largest funds benefit from having other mutual funds available within the Fidelity complex. This supposed benefit, however, is a charade. Because Fidelity's smaller mutual funds are available to virtually any investor, shareholders in the five Funds receive no benefit that is not available to all Fidelity mutual fund investors, Fidelity's non-mutual fund customers, and, indeed, to members of the general public. The large Fund shareholders receive no unique benefit despite the fact that it is the outsized profits from the Funds that allows Fidelity to expand its own business by continuously offering more and more unprofitable small funds to anyone who walks through the door of a Fidelity customer center. Defendants fail in their fiduciary duties by imposing a fee structure that takes unfair advantage of the Funds' shareholders for purposes of Fidelity's own aggrandizement.

Although using excessive compensation from the larger funds to open new funds at a loss is a regular practice of Defendants' business, Defendants have never disclosed this dynamic or the effects of this "subsidization" to the Fidelity fund shareholders, including the investors in the

37

five Funds.  As established above, Defendants must discharge their duty of full disclosure to the Funds, particularly where the interests of the Funds are sacrificed to support the expansion of the Fidelity complex.  In their descriptions of the group fee and individual fund fee, Defendants do not disclose their pricing strategies for the smaller funds or how the smaller funds intentionally are packaged together with the larger, more profitable funds in order to "normalize" management fees across the whole complex, at the expense of the larger, more profitable funds.

Defendants' management fee structure and their pricing strategies and practices violate the fiduciary duties of loyalty, impartiality, and full disclosure that Defendants owe to each of the Funds.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment; that summary judgment enter in Plaintiffs' favor on the issue of liability with respect to the claims set forth in the Consolidated Complaint Under Investment Act of 1940; and that the issue of an appropriate award of damages be set for trial.

Respectfully submitted,

Dated:  December 11, 2008

By:_____/s/ Matthew J. Tuttle_____
Harry S. Miller, BBO# 346946
Robert D. Friedman, BBO# 180240
Matthew J. Tuttle, BBO# 562758
Joshua Cook, BBO# 660346
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA  02110
(617) 345-3000

**Attorneys for Plaintiffs Cynthia A. Bennett and Guy E. Miller**

Lynn Lincoln Sarko
Michael D. Woerner
Laura R. Gerber
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900

Gary Gotto
Ron Kilgard
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ  85012
Telephone: 602-248-0088

Michelle H. Blauner, BBO # 549049
SHAPIRO HABER & URMY LLP
Exchange Place
53 State Street
Boston, MA  02109
(617) 439-3939

**Attorneys for Plaintiffs Nancy Haugen,
Michael F. Magnan, Karen L. Magnan,
Presley C. Phillips, Andrea M. Phillips,
and Cindy Schurgin**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 11th day of December 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_____/s/ Matthew J. Tuttle_____

01304377

39