# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO I FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>        Plaintiffs,<br><br>    vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>        Defendants. | CIVIL NO. 1:04-cv-11651-MLW (Lead Case)<br><br>CIVIL NO. 1:04-cv-11756-MLW (Consolidated Case) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Goodwin Procter LLP
    James S. Dittmar
    David J. Apfel
Exchange Place
53 State Street
Boston, MA 02109

Milbank, Tweed, Hadley & McCloy LLP
    James N. Benedict
    Sean M. Murphy
    Robert J. Liubicic
    Robert R. Miller
    Andrew W. Robertson
    Elizabeth M. Virga
    Tommaso Bencivenga
1 Chase Manhattan Plaza
New York, NY 10005-1413

*Attorneys for Defendants Fidelity Management*
*& Research Company and FMR Co., Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION AND STATEMENT OF THE CASE ............................................................ 1

SUMMARY OF MATERIAL FACTS ...................................................................................... 5

    A.    The Parties ............................................................................................................ 5

    B.    The Funds' Contracts with Fidelity ...................................................................... 5

           1.    The Management Agreement .................................................................... 5

           2.    Other Agreements ..................................................................................... 6

    C.    The Independent Trustees' Annual Approval of the Funds' Management
           Agreements ........................................................................................................... 7

           1.    The Independent Trustees' Backgrounds, Qualifications, and
                 Independence ........................................................................................... 7

           2.    The Board's Structure and Review Process ............................................... 9

           3.    Information Received and Considered by the Independent Trustees ........ 9

    D.    The Fees Paid by the Funds .................................................................................. 9

ARGUMENT ......................................................................................................................... 10

I.      PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED TO
      THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT THEY
      BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES
      RENDERED AND COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-
      LENGTH BARGAINING." ........................................................................................ 10

    A.    Fidelity Is Entitled to Summary Judgment if Plaintiffs Fail to Adduce
           Evidence Sufficient to Allow the Court to Find for Plaintiffs Under
           Section 36(b). ....................................................................................................... 10

    B.    The Applicable Standard Under Section 36(b) Is Whether the Challenged
           Fees Were "So Disproportionately Large" that They Bear "No Reasonable
           Relationship to the Services Provided and Could Not Have Been the
           Product of Arm's-Length Bargaining." ............................................................... 11

    C.    To Avoid Summary Judgment, Plaintiffs Must Adduce Evidence that
           Would Support a Finding of Disproportionality. ................................................ 14

II.   PLAINTIFFS CANNOT ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUNDS PAID EXCESSIVE FEES IN VIOLATION OF SECTION 36(B). ................................................................. 15

A.   The Independence and Conscientiousness of the Independent Trustees Is Beyond Dispute and Weighs Heavily in Favor of Summary Judgment. ............. 16

1.   The Independent Trustees Are Well-Qualified and Independent of Fidelity. ................................................................................................. 17

2.   The Independent Trustees Were Well-Informed. .................................... 18

3.   The Independent Trustees Exercised Care and Conscientiousness. ........ 18

B.   The Funds' Fees Are Among the Lowest in the Industry, and Plaintiffs' Comparisons to Non-Mutual Fund Fees Are Irrelevant. .................................... 19

1.   That the Funds' Fees Are Low Relative to the Fees Paid by Comparable Funds Weighs Heavily in Favor of Summary Judgment. ............................................................................................. 19

2.   Plaintiffs' Comparisons to Fees Paid by Non-Mutual Fund Products Are Irrelevant as a Matter of Law. ............................................ 20

C.   Plaintiffs' Evidence Regarding the Other Gartenberg Factors Does Not Support a Finding that the Funds' Fees Are Excessive. .................................... 24

1.   Plaintiffs Cannot Adduce Evidence Supporting a Finding that the Fees Are So Disproportionately Large that They Bear No Reasonable Relationship to the Nature and Quality of the Services Provided to the Funds. ............................................................................ 24

2.   Plaintiffs Have Not Met Their Burden of Proving that Fidelity Failed to Share Economies of Scale with the Funds. .............................. 25

3.   Fidelity's Profitability from Managing and Servicing the Funds Is Reasonable and Consistent with Industry Norms. .................................. 29

4.   Plaintiffs Have Failed to Identify, Much Less Quantify, Any Fall-Out Benefits. ........................................................................................... 31

III.   PLAINTIFFS' CLAIMS DO NOT MAKE ECONOMIC SENSE IN LIGHT OF COMPETITION IN THE MUTUAL FUND INDUSTRY. ........................................... 32

CONCLUSION .................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........................................................................... 12

Baker v. Am. Century Inv. Mgmt., Inc.,
No. 04-4039-CV-C-ODS ..................................................................... 25

Batra v. Inv. Research Corp.,
144 F.R.D. 97 (W.D. Mo. 1992) .......................................................... 26

Benak v. Alliance Capital Mgmt., L.P.,
No. Civ.A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ........................................... 28

Bromson v. Lehman Mgmt., Co.,
No. 84 Civ. 7795, 1986 WL 165 (S.D.N.Y. Mar. 13, 1986) .............................................. 26

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ........................................................................... 11

Eastman Kodak Co. v. Image Technical Svcs., Inc.,
504 U.S. 451 (1992) ..................................................................... 36, 38

Gallus v. Ameriprise Fin., Inc.,
497 F. Supp. 2d 974 (D. Minn. 2007),
appealed No. 07-2945 (8th Cir. argued Apr. 17, 2008) .......................................... passim

Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg I"),
694 F.2d 923, (2d Cir. 1982),
aff'g 528 F. Supp. 1038 (S.D.N.Y. 1981),
cert. denied, 461 U.S. 906 (1983 ............................................................ passim

Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg II"),
740 F.2d 190 (2d Cir. 1984),
aff'g 573 F. Supp. 1293 (S.D.N.Y. 1983) .................................................... passim

Green v. Fund Asset Mgmt., L.P.,
147 F. Supp. 2d 318 (D.N.J. 2001) ...................................................... 3, 18

Green v. Nuveen Advisory Corp.,
295 F.3d 738 (7th Cir. 2002) .............................................................. 36

In re AllianceBernstein Mut. Fund Excessive Fee Litig.,
No. 4 Civ. 4885, 2006 WL 1520222 (S.D.N.Y. May 31, 2006) ........................................ 25

In re Evergreen Mut. Funds Fee Litig.,
240 F.R.D. 115 (S.D.N.Y. 2007) .......................................................... 25

ING Principal Prot. Funds Derivative Litig.,
369 F. Supp. 2d 163 (D. Mass. 2005) ...................................................... 14

Jones v. Harris Assocs. L.P.,
No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007),
aff'd, 527 F.3d 627 (7th Cir. 2008), cert. filed No. 08-586 (Nov. 3, 2008) ................... passim

Kalish v. Franklin Advisers, Inc.,
    742 F. Supp. 1222 (S.D.N.Y. 1990),
    aff'd, 928 F.2d 590 (2d Cir.),
    cert. denied, 502 U.S. 818 (1991) ............................................................................... passim

Krinsk v. Fund Asset Mgmt., Inc.,
    875 F.2d 404 (S.D.N.Y.), aff'd 875 F.2d 404 (2d Cir.),
    cert. denied 493 U.S. 919 (1989) .................................................................................. passim

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ................................................................................................... 12, 38

Meyer v. Oppenheimer Mgmt. Corp.,
    715 F. Supp. 574 (S.D.N.Y. 1989),
    aff'd, 895 F.2d 861 (2d Cir. 1990) ...................................................................................... 14

Michelson v. Digital Fin. Servs.,
    167 F.3d 715 (1st Cir. 1999) ............................................................................................... 11

Migdal v. Rowe Price-Fleming Int'l, Inc.,
    248 F.3d 321 (4th Cir. 2001) ............................................................................................... 27

Schuyt v. Rowe Price Prime Reserve Fund, Inc.,
    663 F. Supp. 962 (S.D.N.Y.),
    aff'd, 835 F.2d 45 (2d Cir. 1987),
    cert. denied, 485 U.S. 1034 (1988) ............................................................................... passim

Strougo v. BEA Assocs.,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) ................................................................................. 26

Velez-Rivera v. Agosto-Alicea,
    437 F.3d 145 (1st Cir. 2006) .......................................................................................... 12, 16

Villanueva v. Wellesley Coll.,
    930 F.2d 124 (1st Cir. 1991) ............................................................................................... 11

Yameen v. Eaton Vance Distrib., Inc.,
    394 F. Supp. 2d 350 (D. Mass. 2005) ................................................................................. 14

## STATUTES

15 U.S.C. § 80a-2(a)(19) ........................................................................................................ 7

15 U.S.C. § 80a-35(b) ...................................................................................................... 1, 12

15 U.S.C. § 80a-35(b)(1) ....................................................................................................... 13

15 U.S.C. § 80a-35(b)(2) ................................................................................................. 15, 18

## OTHER AUTHORITIES

H.R. 9510, H.R. 9511, and S. 1659, 90th Cong., 1st Sess. (1967) ............................................ 17

H.R. Rep. No. 91-1382 (1970) ................................................................................................ 13

Mutual Fund Fees – Additional Disclosure Could Encourage Price Competition
    (June 2000) ............................................................................................................................. 4

N. Gregory Mankiw, Principles of Microeconomics 283 (3d ed. 2003) ................................... 28

S. Rep. No. 91-184 (1969), as reprinted in 1970 U.S.C.C.A.N. 4897 ....................................... 3

SEC, Division of Investment Management, Report on Mutual Fund Fees and
    Expenses § IV.B.1 (Dec. 2000) ........................................................................................... 30

**RULES**

Fed. R. Civ. P. 56(c) ............................................................................................................. 11

Fed. R. Civ. P. 56(e)(2) .................................................................................................... 11, 14

## INTRODUCTION AND STATEMENT OF THE CASE

This case involves an "excessive fee" claim under Section 36(b) of the Investment Company Act of 1940 (the "ICA").  Plaintiffs' claim must fail because it finds no support in the text or legislative history of Section 36(b) or the hundreds of cases that have been brought under the statute.  The mutual fund fees at issue were approved after diligent consideration by eminent, well-informed, and entirely independent trustees.  And the fees are concededly low compared with the fees paid by other, comparable funds in the highly competitive mutual fund business.

Plaintiffs do not dispute these decisive facts.  Instead, they disagree with the approach on certain subsidiary issues that went into the ultimate fee-setting decision.  But the issues they raise are legally irrelevant and, at most, amount to disagreements with reasonable business judgments.  Most importantly, none of the issues they raise comes close to demonstrating that "no reasonable relationship" exists between the fees and the services rendered, as required by the Gartenberg standard that courts have traditionally applied in evaluating claims under Section 36(b).  See Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg I"), 694 F.2d 923, 928 (2d Cir. 1982), aff'g 528 F. Supp. 1038 (S.D.N.Y. 1981), cert. denied, 461 U.S. 906 (1983). Accordingly, Plaintiffs can offer no evidence showing a genuine dispute over whether the fees are appropriate under Section 36(b), and summary judgment should be granted dismissing the action.

Section 36(b) imposes a "fiduciary duty with respect to the receipt of compensation" on investment advisers to mutual funds.  15 U.S.C. § 80a-35(b).  In order for a fee charged to a mutual fund to violate Section 36(b), the fee must be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Gartenberg I, 694 F.2d at 928.  In other words, there must be "a fundamental disconnect between what the Funds paid and what the services were worth."  Jones v. Harris

Assocs. L.P., No. 04 C 8305, 2007 WL 627640, at *9 (N.D. Ill. Feb. 27, 2007), aff'd, 527 F.3d

627 (7th Cir. 2008), cert. filed No. 08-586 (Nov. 3, 2008).

This action is part of a wave of nearly identical lawsuits commenced in 2003 and 2004 by

the same group of plaintiffs' counsel against twelve different mutual fund investment advisers.

See Appendix A.  Only two of these cases are still pending—this case against Fidelity, and an

action against the adviser to the Federated family of funds.  None of the other ten actions made it

to trial.  Summary judgment was granted in favor of defendants in two of the ten actions, and the

remaining eight were voluntarily dismissed by plaintiffs without any reported reduction in the

challenged fees.  See Appendix A (reflecting resolution of each action).  Plaintiffs' lack of

success in these actions is consistent with almost forty years of jurisprudence, as no court has

ever found a fee charged to a mutual fund to be excessive since Section 36(b) was added to the

ICA in 1970—an unsurprising result in view of the intensely competitive nature of the mutual

fund industry.  Only six such cases have gone to trial since 1970, and all six resulted in

judgments in favor of defendants.  Plaintiffs are clearly swimming against the judicial tide.

The undisputed factual record here makes this case particularly amenable to disposition

on summary judgment.  Significantly, the fees charged by Fidelity were negotiated and

unanimously approved by a super-majority of ten independent trustees who served on the funds'

Board of Trustees (the "Independent Trustees" or the "Trustees").  Under Section 36(b), such

approval is given substantial deference.  As the legislative history of the statute confirms,

Congress did "not intend[] to authorize [courts] to substitute [their] business judgment for that of

the mutual fund's board of directors in the area of management fees." S. Rep. No. 91-184 (1969),

as reprinted in 1970 U.S.C.C.A.N. 4897, 4902.  Consistent with this legislative intent, courts

have held that approval of the challenged fees by an independent, diligent, and fully informed

board is the single most important factor in evaluating a claim under Section 36(b) and "militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders."  <u>Green v. Fund Asset Mgmt., L.P.</u>, 147 F. Supp. 2d 318, 332 (D.N.J. 2001).

Here, there is no dispute that the Independent Trustees are independent of Fidelity.  The Independent Trustees nominate and select their own members, and they govern their own affairs. During the time frame at issue, the group has included some of the most qualified and distinguished professionals in the country, including the current Secretary of Defense, Robert Gates, and the CEOs or CFOs of a number of major U.S. corporations.  There is also no dispute that the Trustees received "best-in-class" informational materials in connection with their oversight of the Funds, that they were assisted by highly qualified independent legal counsel, and that they diligently and critically analyzed the information they received.  After careful consideration, the Trustees addressed the judgment calls challenged by Plaintiffs in this case, made reasonable business judgments on those and many other issues, and concluded that the fees paid by the funds were appropriate.  Under these circumstances, in order to find that the challenged fees were excessive, the Court would have to either substitute its business judgment for that of the Trustees or find that the Trustees failed in their duties.  There is absolutely no basis in the record for the Court to do so.

Far from attempting to demonstrate facts supporting the "no reasonable relationship" or "fundamental disconnect" standard, Plaintiffs concede that Fidelity's fees are lower than those of most other mutual funds.  As Plaintiffs' own expert conceded, "Fidelity has generally low fees in the industry."  Defendants' Statement of Undisputed Facts ("SUF") ¶ 37.  Likewise, the Complaint attaches a 2000 General Accounting Office report that puts Fidelity as among the

industry's "low cost providers."  See General Accounting Office, Mutual Fund Fees – Additional

Disclosure Could Encourage Price Competition 65 (June 2000).  One of the named Plaintiffs

herself even commented that the fees were low.  See SUF ¶ 37.

Faced with Trustees of unimpeachable qualifications and diligence, and concededly low

fees, Plaintiffs are forced to fall back on an effort to change the law.  Plaintiffs' Motion for

Partial Summary Judgment does not even cite Gartenberg, much less argue that its standards

have been met, and Plaintiffs' expert conceded at his deposition that Plaintiffs' quarrel is with

the fees charged by the entire mutual fund industry:  his position is that virtually all mutual fund

fees being charged today are excessive.  See SUF ¶ 58.  The genuineness of that dispute

collapses under its own weight.

Plaintiffs have the burden of proof under the statute, as well as the burden of showing

that there is a dispute of material fact in order to avoid summary judgment.  Despite conducting

nearly three years of fact and expert discovery, demanding production of hundreds of thousands

of documents, and deposing numerous Independent Trustees and members of Fidelity's senior

management, Plaintiffs cannot adduce any evidence that would provide a reasonable basis for the

Court to conclude that Fidelity's fees are "so disproportionately large" that they bear no

reasonable relationship to the services provided and could not have been the product of arm's-

length bargaining.  Plaintiffs cannot satisfy that burden by proffering disagreements over

particular factors unless, were those disagreements to be resolved in Plaintiffs' favor, the Court

could find a "fundamental disconnect" between Fidelity's fees and the services rendered.

Plaintiffs here cannot point to any factual dispute which would permit a finding that the fees

were so out of line with the services rendered that this Court could substitute its own business

judgment for that of the Independent Trustees.  Accordingly, Defendants are entitled to summary judgment.

## SUMMARY OF MATERIAL FACTS

### A.      The Parties

Plaintiffs are investors in five mutual funds managed and serviced by Fidelity:  Magellan, Contrafund, Growth & Income, Blue Chip Growth, and Low-Priced Stock (collectively, the "Funds").  See SUF ¶ 1.

Defendants Fidelity Management & Research Company and FMR Co., Inc. (collectively, "Defendants," and together with affiliated entities "Fidelity"), are registered investment advisers under the Investment Advisers Act of 1940.  See id. ¶ 2.  They serve as the investment adviser and subadviser, respectively, for the Funds.  See id.  Other Fidelity entities also provide services to the Funds and their shareholders.  See id.

### B.      The Funds' Contracts with Fidelity

Fidelity provides services to the Funds pursuant to separate agreements, which are negotiated and approved by the Funds' Board of Trustees on an annual basis.  See id. ¶ 11.

### 1.      The Management Agreement

The Funds' Management Agreements cover investment management services, compliance with statutory and regulatory requirements, and a broad array of shareholder and administrative services.  See id ¶ 12.  Investment management services include choosing which stocks and other investments to buy and sell, researching potential investments, executing trades on behalf of the fund, and a broad range of compliance and operational support.  See id. ¶ 13. Shareholder and administrative services include, among other things, the development, operation, and maintenance of Fidelity's telephone call centers, more than 100 walk-in investor centers, and an award-winning website.  By virtue of these services, shareholders in the Funds

can access their accounts and obtain information and investment guidance 24 hours a day, 365 days a year.  See id. ¶ 14.

In exchange for the services provided pursuant to the Management Agreements, the Funds pay Fidelity a management fee, which is expressed as a percentage of the Funds' assets under management.  See id. ¶ 15.  The basic management fee for each of the Funds is the sum of two components:  the "group fee" and a "fund-specific fee."  See id. ¶ 16.  The group fee is the same for all of the Funds and is calculated by a formula that includes breakpoints which cause the group fee rate to decline incrementally as overall Fidelity mutual fund assets under management increase.  See id. ¶ 17.  The fund-specific fee is a fixed rate that varies according to the fund's investment discipline.  See id. ¶ 18.

The management fees for four of the five Funds are also subject to performance adjustments.[1]  See id. ¶ 19. The performance adjustment is based on the fund's performance relative to its benchmark over a specified period of time.  See id.  If the fund outperforms its benchmark, the performance adjustment increases the management fee, and if the fund underperforms its benchmark, the performance adjustment reduces the management fee.  See id.

### 2.      Other Agreements

The Funds also enter into separate Transfer Agent and Pricing and Bookkeeping Agreements with Fidelity, which require Fidelity to provide specifically enumerated administrative and recordkeeping services to the Funds and/or their shareholders.  See id. ¶ 20. Finally, Distribution Agreements provide for Fidelity to market and sell shares of the Funds.  See id. ¶ 21.  Fidelity does not receive a fee for these services; instead, it is authorized to pay for

---

[1]      The management fee for Growth & Income is not subject to a performance adjustment.

them out of its management fee, past profits, or other resources pursuant to a distribution plan approved by the Board.  See id.

### C.     The Independent Trustees' Annual Approval of the Funds' Management Agreements

The Funds' Management Agreements, and the fees paid pursuant to those Agreements, are negotiated and approved annually by the Funds' board of trustees (the "Board").[2]  During the relevant period, over 70% of the Board was comprised of members who were, by statutory definition, independent of Fidelity, far exceeding the ICA's requirement that 40% of board members be disinterested.  See 15 U.S.C. § 80a-2(a)(19) (defining "interested person" for purposes of the ICA); SUF ¶ 3.

### 1.     The Independent Trustees' Backgrounds, Qualifications, and Independence

The Independent Trustees are among the most preeminent individuals in their respective fields.  See SUF ¶ 6.  Since 2004, the year Plaintiffs brought this action, the Independent Trustees included the following individuals:

| Name | Background[3] |
|---|---|
| Ned Lautenbach (Lead Independent Trustee) | Former Senior Vice President of IBM Corp. |

---

[2]     The following discussion of the Independent Trustees' negotiation and approval of the Funds' Management Agreements relates to the period from 2003 to 2006.  As in any business, the Board's membership, structure, and process have evolved from year to year, but the focus here on the 2003–2006 period is consistent with the general scope of fact discovery and the time period that is potentially relevant to Plaintiffs' claims.

[3]     Many Independent Trustees also have served, or currently serve, on the boards of directors of Fortune 500 companies (including, for example, Comcast Corporation, Dow Chemical Company, and Revlon, Inc.), as well as various charitable organizations.  See SUF ¶ 5.

| Robert Gates (Former Lead Independent Trustee) | Current Secretary of Defense; former Director of the CIA; former President of Texas A&M University. |
|---|---|
| Marvin Mann (Former Lead Independent Trustee) | Former CEO and Chairman of Lexmark International; former senior executive of IBM. |
| Marie Knowles (Audit Committee Chair) | Former CFO of Atlantic Richfield Company. |
| J. Michael Cook | Former Chairman and CEO of Deloitte & Touche. |
| Ralph F. Cox | Former President of Greenhill Petroleum; former President and COO of Union Pacific Resources Co. |
| Dennis Dirks | Former COO of the Depository Trust & Clearing Corporation. |
| Albert Gamper | Former Chairman, CEO, and President of CIT Group, Inc. |
| George Heilmeier | Inventor of Liquid Crystal Display technology; former Chairman and CEO of Telcordia Technologies. |
| James Keys | Former Chairman, CEO, and President of Johnson Controls, Inc. |
| Donald Kirk | Former Governor of the American Stock Exchange; former Chairman of the Financial Accounting Standards Board. |
| William McCoy | Former Vice Chairman of the Board and President of BellSouth Corporation. |
| Cornelia Small | Former CIO and Director of Global Equity Investments of Scudder, Stevens and Clark. |
| William Stavropoulos | Former Chairman, CEO, and President of Dow Chemical. |
| Kenneth Wolfe | Chairman and former CEO of Hershey Foods Corp. |

See id. ¶ 4.

Independent Trustees are nominated by the Governance and Nominating Committee, which is comprised of two to three Independent Trustees; the trustees affiliated with Fidelity have no vote.  See id. ¶ 7.  Upon election, new Independent Trustees participate in an extensive training program.  See id. ¶ 9.

The Independent Trustees are advised by independent, experienced mutual fund lawyers from the firm of Debevoise & Plimpton LLP ("Debevoise").  See id. ¶ 10.  Debevoise advises the

Independent Trustees with respect to their fiduciary duties and their review and consideration of the Funds' Management Agreements.  See id.

### 2.      The Board's Structure and Review Process

The Board has eleven two-day, in-person meetings each year—one per month, excluding August.  See id. ¶ 23.  The Board allocates primary responsibility for certain issues to its Committees, all of which are composed entirely of Independent Trustees.  See id. ¶¶ 24-25.  For example, the Audit Committee, led by Marie Knowles, the former CFO of Atlantic Richfield, takes the lead on profitability and various accounting-related issues.  See id. ¶ 25.  Committees often meet between regular Board meetings, and they frequently request additional presentations or discussions with Fidelity personnel on particular issues.  See id. ¶ 26.  The Board has also created several Ad Hoc committees to perform in-depth reviews of other issues.  See id. ¶ 27.

### 3.      Information Received and Considered by the Independent Trustees

The Independent Trustees receive extensive materials relevant to their negotiation of the Funds' Management Agreements, including information relating to each of the Gartenberg factors.  See id. ¶¶ 30-49.

The Independent Trustees devote hundreds of hours to preparing for Board meetings and reviewing the materials provided by Fidelity, including engaging in a written question-and-answer process during which they request additional information from Fidelity.  See id. ¶¶ 28-29.

### D.      The Fees Paid by the Funds

The sum of all the fees paid by a fund to Fidelity, together with other fund-borne expenses such as Debevoise's legal fees, when divided by the total assets of the fund, is known as the fund's total expense ratio.  The following table summarizes the expense ratios for each of the Funds for each year from 2003 to 2007.

| Fund | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Magellan | 0.71% | 0.64% | 0.59% | 0.54% | 0.73% |
| Contrafund | 1.00% | 0.94% | 0.91% | 0.90% | 0.89% |
| Blue Chip Growth | 0.65% | 0.68% | 0.63% | 0.60% | 0.58% |
| Low-Priced Stock | 1.00% | 0.97% | 0.88% | 0.97% | 0.99% |
| Growth & Income | 0.71% | 0.70% | 0.69% | 0.68% | 0.68% |

See id. ¶ 22.

The Independent Trustees annually receive comparisons of the Funds' expense ratios to those of peer funds based on data obtained from third-party providers of industry data.  See id. ¶ 35.  The Funds' expense ratios generally ranked in the lowest quartile of their respective peer groups and were at all times below the median.  See id. ¶ 36.  An analysis prepared by Professor Glenn Hubbard, Dean of the Columbia Business School and former Chairman of the President's Council of Economic Advisors, confirms that the Funds' fees are low relative to comparable funds.  See id. ¶ 36.

## ARGUMENT

I.    **PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED AND COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-LENGTH BARGAINING."**

   A.    **Fidelity Is Entitled to Summary Judgment if Plaintiffs Fail to Adduce Evidence Sufficient to Allow the Court to Find for Plaintiffs Under Section 36(b).**

Summary judgment is mandated where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986); Villanueva v. Wellesley Coll., 930 F.2d 124, 127

(1st Cir. 1991).  Once the moving party has identified the portions of the record that it believes

demonstrate the absence of a genuine issue of fact, the burden shifts to the party opposing the

motion for summary judgment to "set out specific facts showing a genuine issue for trial."  Fed.

R. Civ. P. 56(e)(2); Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999).

A genuine issue of material fact exists only when the evidence is such that a reasonable

fact-finder could find for the non-moving party.  See Velez-Rivera v. Agosto-Alicea, 437 F.3d

145, 150 (1st Cir. 2006) ("In the summary judgment context, we have construed 'genuine' to

mean that the evidence about the fact is such that a reasonable jury could resolve the point in

favor of the nonmoving party.'") (internal quotations and citations omitted).  Accordingly, it is

not sufficient for the nonmovant to argue "some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Nor can the

nonmovant raise "[f]actual disputes that are irrelevant or unnecessary."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment.").

**B.      The Applicable Standard Under Section 36(b) Is Whether the Challenged Fees Were "So Disproportionately Large" that They Bear "No Reasonable Relationship to the Services Provided and Could Not Have Been the Product of Arm's-Length Bargaining."**

Section 36(b) imposes a fiduciary duty on investment advisers "with respect to the receipt

of compensation for services" provided to mutual funds and their shareholders.  15 U.S.C. § 80a-

35(b).[4]  The statute specifically assigns to the plaintiff "the burden of proving a breach of

---

[4]      The statue provides, in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security

fiduciary duty." 15 U.S.C. § 80a-35(b)(1); see also H.R. Rep. No. 91-1382 at 38 (1970) ("[The plaintiff has] the burden of proving by clear and convincing evidence that the defendant has committed a breach of fiduciary duty. This burden of proof is used in order to attempt to eliminate nuisance suits designed to harass defendants.").

Plaintiffs allege that Fidelity breached its fiduciary duty under Section 36(b) by charging "excessive fees" to manage and service the Funds. The legal standard that applies in "excessive fee" cases under Section 36(b) is:

> whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances . . . . To be guilty of a violation of § 36(b) . . . the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

Gartenberg I, 694 F.2d at 928 (emphasis added). The Gartenberg standard, first articulated by the Second Circuit, has been cited with approval in hundreds of cases and has provided the governing standard in all of the cases under Section 36(b) that have reached final judgment after trial.[5] In addition, two courts recently applied Gartenberg in granting defendants' motions for summary judgment in cases virtually identical to this one. See Gallus v. Ameriprise Fin., Inc., 497 F. Supp. 2d 974, 979 (D. Minn. 2007), appealed No. 07-2945 (8th Cir. argued Apr. 17,

---

> holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).

[5]     See Gartenberg I, 694 F.2d at 928-29; Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg II"), 740 F.2d 190 (2d Cir. 1984), aff'g 573 F. Supp. 1293 (S.D.N.Y. 1983); Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (S.D.N.Y.), aff'd 875 F.2d 404 (2d Cir.), cert. denied 493 U.S. 919 (1989); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y.), aff'd, 835 F.2d 45 (2d Cir. 1987), cert. denied, 485 U.S. 1034 (1988); Meyer v. Oppenheimer Mgmt. Corp., 715 F. Supp. 574 (S.D.N.Y. 1989), aff'd, 895 F.2d 861 (2d Cir. 1990); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir.), cert. denied, 502 U.S. 818 (1991).

2008); Jones, 2007 WL 627640, at *7.[6]  No plaintiff has ever succeeded in proving that the

challenged fees were excessive under Section 36(b).

   In enacting Section 36(b), Congress was explicit that "the court is not authorized 'to

substitute its business judgment for that of a mutual fund's board of directors in the area of

management fees.'"  Gartenberg I, 694 F.2d at 928 (quoting S. Rep. No. 91-184 (1969), as

reprinted in 1970 U.S.C.C.A.N. 4897); 15 U.S.C. § 80a-35(b)(2) (directing courts to give

"approval [of the challenged fee] by the board of directors . . . such consideration . . . as is

deemed appropriate under all the circumstances").  Nor did Congress intend for courts

considering claims under Section 36(b) to act as judicial rate-makers, applying a "cost-plus"

standard or evaluating fees for "reasonableness."  See S. Rep. No. 91-184 (1970) reprinted in

1970 U.S.C.C.A.N. 4897, 4902 ("Nothing in the bill is intended to . . . suggest that a 'cost-plus'

type of contract would be required.  It is not intended to introduce general concepts of rate

regulation as applied to public utilities.").  Accordingly, the question before the Court is not

whether the Trustees negotiated the best deal possible, see Gallus, 497 F. Supp. 2d at 984

("[W]hether the fees could have been lower is not the question the Court is required to address

under the applicable standard."), but rather "whether the fee schedule represents a charge within

the range of what would have been negotiated at arm's-length in the light of all of the

surrounding circumstances."  Gartenberg I, 694 F.2d at 928 (emphasis added); Jones, 2007 WL

627640, at *8 ("[T]he only question we need consider is whether [the fund's directors] could

have agreed to the fee schedule in the advisory contracts after engaging in good-faith

bargaining.").

---

[6]    Although not expressly adopted by the First Circuit, several courts within this District
have applied the Gartenberg standard in addressing Section 36(b) claims.  See, e.g., Yameen v.

In short, Plaintiffs have assumed a substantial burden.  They may not prevail by arguing that various decisions made by the Independent Trustees in the course of evaluating the Funds' fees were wrong—even if the Trustees' decisions resulted in higher fees than the decisions Plaintiffs would have made had the judgments been entrusted to them.  Rather, they must show that "there is a <u>fundamental disconnect</u> between what the Funds paid and what the services were worth."  <u>Jones</u>, 2007 WL 627640, at *9 (emphasis added).

> C.      **To Avoid Summary Judgment, Plaintiffs Must Adduce Evidence that Would Support a Finding of Disproportionality.**

Just as Plaintiffs have the ultimate burden of proof under the statute, in order to avoid summary judgment, they have the burden of demonstrating that there is a dispute of material fact requiring a trial.  <u>See</u> Fed. R. Civ. P. 56(e)(2).  To satisfy this burden, Plaintiffs must identify specific factual issues that, if resolved in their favor, would establish a violation of Section 36(b).  <u>See</u> <u>Velez-Rivera</u>, 437 F.3d at 150.  Merely proffering some disagreement over particular facts or the weight assigned to those facts by the Independent Trustees in approving the Funds' fees is not enough.  Rather, to avoid summary judgment, Plaintiffs must identify specific facts that would provide a reasonable basis for the Court to conclude that the Funds' fees are "so disproportionately large" that they "bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  <u>Gartenberg I</u>, 694 F.2d at 928.  Plaintiffs cannot do so.

---

<u>Eaton Vance Distrib., Inc.</u>, 394 F. Supp. 2d 350, 355 (D. Mass. 2005); <u>ING Principal Prot. Funds Derivative Litig.</u>, 369 F. Supp. 2d 163, 168 (D. Mass. 2005).

**II.    PLAINTIFFS CANNOT ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUNDS PAID EXCESSIVE FEES IN VIOLATION OF SECTION 36(B).**

In applying the <u>Gartenberg</u> "so disproportionately large" standard, courts routinely review and analyze six factors:  (1) the independence and conscientiousness of the fund's directors; (2) the nature and quality of the investment adviser's services; (3) the fees charged to comparable mutual funds; (4) the profitability of the fund to the adviser; (5) whether the adviser realized economies of scale[7] in managing the fund and, if so, whether those economies were equitably shared with fund shareholders; and (6) fall-out benefits,[8] or indirect profits, to the adviser from its relationship with the fund.  <u>See</u> <u>Gartenberg I</u>, 694 F.2d at 928-29; <u>Krinsk</u>, 875 F.2d at 409.  These factors, commonly called the "<u>Gartenberg</u> factors," were drawn directly from the legislative history of Section 36(b).[9]

Nothing in Plaintiffs' evidence relating to the <u>Gartenberg</u> factors creates a material issue of fact under the governing "so disproportionately large" standard.  First, as to the factor deemed the most important, the independence and conscientiousness of the Independent Trustees, there is simply no material dispute of fact.  Second, as to the fees themselves, they are <u>concededly</u> low

---

[7]    Economies of scale occur when the average cost of producing a good or service decreases as the level of output increases.  In other words, economies of scale exist where it costs less to produce each unit as the number of units produced increases.

[8]    Fall-out benefits are indirect profits that flow to the investment adviser as a result of its relationship with the fund.  <u>See</u> <u>Gallus</u>, 497 F. Supp. 2d at 979 n.7.  In order to qualify as a fall-out benefit, the profits must meet a strict "but for" test, such that the profits "would not have occurred <u>but for</u> the existence of the Fund[s]."  <u>Krinsk</u>, 715 F. Supp. at 495 (emphasis added); <u>see also</u> <u>Gartenberg II</u>, 573 F. Supp. at 1313.

[9]    The companion bills introduced in the House and Senate in 1967 (H.R. 9510, H.R. 9511, and S. 1659, 90th Cong., 1st Sess. (1967)) included the following list of factors to be considered by courts in evaluating mutual fund fees:  "The nature and extent of the services provided, the quality of the services provided, the extent to which the adviser's compensation takes into account economies of scale, benefits other than compensation received in any fashion by the adviser, and any other relevant circumstances."

compared to the fees paid by comparable mutual funds.  Finally, we review each of the remaining Gartenberg factors and demonstrate that neither alone nor taken together do they support a ruling that there is a material issue of fact as to whether the Funds' fees are disproportionately large.

> **A.**  **The Independence and Conscientiousness of the Independent Trustees Is Beyond Dispute and Weighs Heavily in Favor of Summary Judgment.**

Section 36(b) explicitly directs courts to give appropriate consideration to approval of the challenged compensation by the fund's board of trustees.  15 U.S.C. § 80a-35(b)(2).  Similarly, the statute's legislative history makes clear that Congress did "not intend[] to authorize [courts] to substitute [their] business judgment for that of the mutual fund's board of directors in the area of management fees."  S. Rep. No. 91-184 (1969), as reprinted in 1970 U.S.C.C.A.N. 4897, 4902.

Mindful of clear Congressional intent, courts have routinely held that the approval of the challenged fees by an independent, diligent, and fully informed board is the single most important factor in evaluating a claim under Section 36(b).  See Krinsk, 875 F.2d at 412 (citing Gartenberg I, 694 F.2d at 930); Kalish 742 F. Supp. at 1241.  Indeed, "undisputed approval [by the board] militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders," Green v. Fund Asset Mgmt., L.P., 147 F. Supp. 2d 318, 332 (D.N.J. 2001), and should be "weighed heavily" by the Court.  Schuyt, 663 F. Supp. at 998; see also Krinsk, 715 F. Supp. at 501 (holding that courts "will not ignore a responsible decision by the Trustees, including a majority of the [Independent] Trustees, to continue the fee structure as it stands").

Importantly, as emphasized in a recent decision granting summary judgment in favor of the defendant adviser in an action nearly identical to this one, Plaintiffs may not establish an

issue of material fact merely by second-guessing the emphasis the Trustees placed on certain factors or the conclusions reached by the Trustees.  See Gallus, 497 F. Supp. 2d at 983 ("While the Board may have placed greater emphasis on fees charged to peer mutual funds than Plaintiffs would have liked, such evidence does not create a genuine issue of material fact that the process was not an arm's-length one.").  Nor may Plaintiffs establish an issue of material fact by alleging that the information considered by the Trustees was misleading or that the Trustees should have considered different information.  See id. at 981-83.  Rather, Plaintiffs must show some defect that is so fundamental that the resulting fees could not have been the product of arm's-length bargaining.  See id. at 981 (granting summary judgment in favor of defendants where "Plaintiffs fail[ed] to show how any . . . failings in the data [considered by the Board] create[d] a genuine issue of material fact regarding whether the board negotiations the fees at arm's length"); id. at 983 ("[W]hile Plaintiffs contend that the information Defendants provided the Board was misleading, Plaintiffs fail to describe how these alleged deficiencies affected the results of the Board's fee-negotiation process."); see also Jones, 527 F.3d at 635 (affirming summary judgment in favor of defendants where "Plaintiffs [did] not contend that [the adviser] pulled the wool over the eyes of the disinterested trustees or otherwise hindered their ability to negotiate a favorable price for advisory services.").

Plaintiffs here cannot adduce any such evidence.

### 1.    The Independent Trustees Are Well-Qualified and Independent of Fidelity.

The Independent Trustees are preeminent individuals with significant qualifications and experience.  They include current and former senior executives of leading corporations, an accomplished scientist, and the current Secretary of Defense.  See SUF ¶ 4  Geoffrey Bobroff, who has consulted for mutual fund boards of directors and investment advisers for more than 40

years, found the Independent Trustees to be "among the most qualified [he has] ever encountered

. . . ." id. ¶ 6.  There is no hint of cronyism on the Board, and none of the Independent Trustees

has a business or personal relationship with Fidelity's owners or management.  See id. ¶ 8.  In

short, Plaintiffs cannot adduce any evidence that would call into question the Independent

Trustees' qualifications or their independence.

**2.      The Independent Trustees Were Well-Informed.**

There can be no genuine dispute that the Independent Trustees were well-informed in

connection with their consideration of the Funds' contracts.  Fidelity provides the Trustees with a

wealth of information about the services it provides to the Funds, including information

regarding each of the Gartenberg factors.  See id. ¶¶ 30-49.  In the unrebutted opinion of Mr.

Bobroff, who has seen the materials provided to more than 40 mutual fund boards of directors,

the information given to the Board is "comprehensive, fairly and clearly presented," and "among

the best [he has] ever seen in the mutual fund industry."  See id. ¶ 30.

**3.      The Independent Trustees Exercised Care and Conscientiousness.**

Finally, Plaintiffs cannot raise a question of fact as to the proportionately of Fidelity's

fees by arguing that the Independent Trustees failed to exercise care and conscientiousness in

approving the Funds' contracts with Fidelity.  For example, Audit Committee Chair Marie

Knowles testified that she spends hundreds of hours each year preparing for and participating in

the Board's eleven in-person meetings, as well as interim meetings in Committee or with Fidelity

management.  See id. ¶¶ 26, 28.  Advised by highly qualified independent counsel, the

Independent Trustees have actively questioned Fidelity and requested additional information

when they needed it, including through the formal "Q&A" process in advance of each Board

meeting.  See id. ¶ 29.  There simply can be no serious question whether the Trustees exercised

care and conscientiousness.  See, e.g., Schuyt, 663 F. Supp. at 984 ("The evidence indicates that the independent directors not only carefully analyzed and debated the information they were given, but also actively questioned the Adviser and requested additional information when they needed it."); Kalish, 742 F. Supp. at 1247-49 (holding that the independent directors acted with due care and conscientiousness by, among other things, participating in multiple meetings, discussing relevant issues, and commissioning third-party studies).

        **B.**        **The Funds' Fees Are Among the Lowest in the Industry, and Plaintiffs' Comparisons to Non-Mutual Fund Fees Are Irrelevant.**

                **1.**        **That the Funds' Fees Are Low Relative to the Fees Paid by Comparable Funds Weighs Heavily in Favor of Summary Judgment.**

It is undisputed that the Funds' fees are low compared to the fees paid by similar mutual funds.  For example, as shown to the Board annually in analyses based on data received from independent third-party experts, the Funds' fees generally have been in the lowest quartile of their respective peer groups and have at all times been well below the median.  See SUF ¶¶ 35-36.  Likewise, Professor Hubbard, Dean of the Columbia Business School, has submitted an analysis based on independent data similarly showing that the Funds' fees are at the low end of the range of fees paid by comparable funds.  See id. ¶ 36.  Plaintiffs have not disputed the accuracy of these analyses, and their own experts have conceded that the Funds' fees are among the lowest in the industry.  See id. ¶ 37.

To demonstrate that the Funds' fees were "disproportionate" to the services provided, Plaintiffs would have to prove that the fees were very high and the services very low.  Where it is undisputed that the fees are low, the burden of demonstrating a disproportionately low level of services becomes unsustainable.  Indeed, in its recent decision affirming summary judgment in favor of defendants, the Seventh Circuit relied heavily on the fact that the challenged fees fell

19

within the range of fees paid by comparable mutual funds.  See Jones v. Harris Assocs. L.P., 527

F.3d 627 (7th Cir. 2008).  The court reasoned that the increasingly intense competition between

mutual funds for investors' assets operates as a "powerful" protection against excessive fees and

makes unreasonable the conclusion that fees that are consistent with the prevailing market rate

are somehow excessive.  Id. at 631-32 ("Holding down costs is vital in competition, when

investors are seeking maximum return net of expenses—and as management fees are a

substantial component of administrative costs, mutual funds have a powerful reason to keep them

low unless higher fees are associated with higher return on investment.").[10]

Any ruling on this record that the Funds' fees are "excessive" would necessarily connote

that fees across the mutual fund industry are excessive.  Plaintiffs cannot adduce any evidence

that would support such a finding.

### 2.    Plaintiffs' Comparisons to Fees Paid by Non-Mutual Fund Products Are Irrelevant as a Matter of Law.

Unable to dispute that the Funds' fees are low relative to those paid by other mutual

funds, Plaintiffs focus instead on how the fees charged to the Funds compare with fees paid to

Fidelity or its affiliates by non-mutual fund ("institutional") clients, such as pension funds.[11]  See

Consolidated Amended Complaint (Nov. 3, 2005), Ex.[12] 51 at ¶¶ 75-89.  Plaintiffs' comparison

---

[10]    The court acknowledged that prior courts had given less consideration to comparative fees, but it decided that greater emphasis on this factor is appropriate today in light of the growth and development of the mutual fund industry since Section 36(b) was enacted some thirty-five years earlier.  Id. at 632 ("Gartenberg . . . relies too little on markets."); see also id. at 631-35.

[11]    Unlike a mutual fund which typically pools the investments of thousands or even millions of individual shareholders, a separate account is a professionally managed portfolio of securities directly owned by a single large investor.  See SUF ¶ 53.  The investment managers of institutional products such as separate accounts are also not subject to the extensive regulatory requirements and reporting obligations imposed on mutual funds.

[12]    References in the form of "Ex. __" refer to the documents attached to the Declaration of James S. Dittmar in Support of Defendants' Motion for Summary Judgment, dated February 6, 2009.

of mutual fund and institutional account fees is fatally flawed as a matter of law and cannot raise

an issue of fact sufficient to defeat summary judgment.

Institutional clients are typically entities such as pension funds, endowments, insurance

companies, and foundations, which invest millions of dollars all at once with an adviser.[13]  See

SUF ¶ 50.  In contrast with the many thousands of shareholders that Fidelity must service for

each of the Funds, institutional accounts typically have a single investor—e.g., the endowment or

the actual pension fund itself.  See id. ¶ 53.  As a result, the service and distribution costs for

mutual funds are dramatically higher than those for non-mutual fund products.  See id. ¶ 55.  For

example, Fidelity incurs significant costs in providing 24/7 telephone service, 100-plus walk-in

investor centers, and an award-winning website for use by mutual fund shareholders.  See id.  In

addition, mutual fund managers are also subject to numerous, costly regulatory burdens that are

largely inapplicable to institutional accounts, such as obligations under the ICA, Securities

Exchange Act of 1934, Securities Act of 1933, Sarbanes Oxley, SEC rules and regulations, and

other statutes.  See id. ¶ 54.  Indeed, Plaintiffs' experts concede these many differences exist.[14]

Given the differences between the two types of products, courts applying Gartenberg

have held that comparisons between mutual fund fees and institutional products are legally

irrelevant.  In Gartenberg I, the plaintiffs sought to compare the fees charged to a money market

---

[13]     For example, the minimum required investment for a Fidelity separate account is $25
million.  See SUF ¶ 50.

[14]     See SUF ¶ 56 (listing several differences, including the prospectus requirement, "daily
valuation," "different reporting requirements, different SEC-driven filing requirements," and
"different client-service responsibilities").  Plaintiffs' expert further concedes that "no issuer of
securities is subject to more detailed regulation than a mutual fund" and that the management fee
covers the Funds' increased cost of regulatory compliance.  See id. ¶ 54.  Plaintiffs argue that the
costly shareholder services provided to mutual fund shareholders are not covered by the Funds'
Management Agreements.  But this is based on their expert's failure to read the agreement,
which expressly requires Fidelity to provide shareholder reporting and other "shareholder
relations."  See id. ¶¶ 12-14.

mutual fund with those charged to the adviser's institutional clients.  The district court rejected

the comparison, and instead limited its analysis to the fees charged to similar money market

mutual funds.  See Gartenberg I, 528 F. Supp. at 1048.  This approach was supported by the

legislative history of Section 36(b), which reflects the intent of Congress that mutual fund fees be

evaluated in light of "industry practice" and "industry level of management fees."  Id. at 1046

(emphasis added).

The Gartenberg plaintiffs' reliance on institutional account fees was again rejected on

appeal.  The Court of Appeals explained:

> Appellants' argument that the lower fees charged by investment
> advisers to large pension funds should be used as a criterion for
> determining fair advisory fees for money market funds must also
> be rejected.  The nature and extent of the services required by each
> type of fund differ sharply.

Gartenberg I, 694 F.2d at 930 n.3.

Since Gartenberg I, numerous other courts have refused to use institutional account fees

to assess mutual fund fees under Section 36(b), explaining that Plaintiffs' proposed comparison

fails because it seeks to equate entirely different clients, different products, and different

services.  Most recently, in Gallus, one of the recent wave of copycat cases, the court granted

summary judgment rejecting plaintiffs' proposed comparison, stating that "[s]ince Gartenberg,

courts have held that other mutual funds provide the relevant comparison for measuring fees—

not non-mutual fund institutional clients" and further holding that "even if comparing mutual

fund fees to non-mutual fund fees is relevant, Plaintiffs have not demonstrated that the services

provided to the different types of funds are comparable."  497 F. Supp. 2d at 982 (emphasis

added).  Likewise, in Jones, where the Seventh Circuit upheld the district court's grant of

summary judgment to the adviser, the court noted that the often lower fees paid by institutional

clients simply "do[] not imply that [the adviser] must be charging too much to the [mutual]

funds.  <u>Different clients call for different commitments of time</u>."  <u>Jones</u>, 527 F.3d at 634

(emphasis added).[15]

Finally, it is undisputed that Fidelity regularly provided the Board with materials laying

out the pricing differences between the Funds and institutional accounts, and the reasons for

those differences.  <u>See</u> SUF ¶ 51.  The Trustees testified about their awareness of institutional

account fees and the reasons why those fees are not an appropriate basis for comparison with the

fees received from the Funds.[16]  The <u>Gallus</u> court recently observed in similar circumstances that

the adviser had "provided the Board with a report showing that the services provided to the

---

[15]     <u>See also</u> <u>In re Evergreen Mut. Funds Fee Litig.</u>, 240 F.R.D. 115, 122 (S.D.N.Y. 2007)
(denying plaintiffs' motion to amend complaint and stating that "as has already been observed,
. . . comparisons [to institutional account fees] are not necessarily informative when assessing
whether [mutual fund] fees are disproportionate to the services rendered"); <u>Baker v. Am.
Century Inv. Mgmt., Inc.</u>, No. 04-4039-CV-C-ODS, Order on Defendants' Motion in Limine at 1
(W.D. Mo. July 17, 2006) (holding that evidence concerning institutional account fees "is
irrelevant to Plaintiffs' claims involving mutual fund fees under Section 36(b) of the Investment
Company Act."), Ex. 52; <u>In re AllianceBernstein Mut. Fund Excessive Fee Litig.</u>, No. 4 Civ.
4885, 2006 WL 1520222, at *2 (S.D.N.Y. May 31, 2006) (dismissing Section 36(b) claim based
on "fee discrepancies for institutional and retail clients" because "the fee differential reflects,
among other things, different services provided to such clients, and different liabilities
assumed"); <u>Strougo v. BEA Assocs.</u>, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (holding that the
"relevant comparison must be to other mutual funds, not to non-mutual fund institutional
clients"); <u>Schuyt</u>, 663 F. Supp. at 974 n.38 (rejecting plaintiffs' attempt to compare a money
market mutual fund's fees with the fees charged by the same adviser to its institutional clients
because "the types of services provided by the Adviser to the Fund and [institutional] clients
differ[ed] substantially"); <u>Batra v. Inv. Research Corp.</u>, 144 F.R.D. 97, 98-99 (W.D. Mo. 1992)
(permitting discovery of evidence concerning institutional account fees, but noting that such
information would not be admissible at trial since "advisory fees from dissimilar clients such as
pension funds are not relevant for comparative purposes"); <u>Kalish v. Franklin Advisers, Inc.</u>, 742
F. Supp. 1222, 1237 (S.D.N.Y. 1990) (to the extent comparative fees are probative in a Section
36(b) case, "a mutual fund adviser-manager must be compared with members of an appropriate
universe:  adviser-managers of similar funds"); <u>Bromson v. Lehman Mgmt., Co.</u>, No. 84 Civ.
7795, 1986 WL 165 at *2 (S.D.N.Y. Mar. 13, 1986) (refusing to allow discovery regarding the
fee schedule for the adviser's non-mutual fund accounts "due to the immateriality of such
information to the [Section 36(b)] case").

[16]     <u>See</u> SUF ¶ 57.

Funds were different than those provided to the institutional clients."[17]  <u>Gallus</u>, 497 F. Supp. 2d

at 982.

> **C.** **Plaintiffs' Evidence Regarding the Other <u>Gartenberg</u> Factors Does Not Support a Finding that the Funds' Fees Are Excessive.**
>
> **1.** **Plaintiffs Cannot Adduce Evidence Supporting a Finding that the Fees Are So Disproportionately Large that They Bear No Reasonable Relationship to the Nature and Quality of the Services Provided to the Funds.**

It is undisputed that Fidelity provides high quality shareholder services.  In addition to an

award-winning website that Mr. Bobroff opined "is probably the best and most complete in the

industry," Fidelity operates an extensive network of call centers and investor centers, all of

which are a means of providing services to fund shareholders.  <u>See</u> SUF ¶ 14.  The named

Plaintiffs themselves admitted using these services frequently and considering them "good."  <u>See</u>

<u>id.</u> ¶ 34.

The investment performance of two of the Funds, Contrafund and Low-Priced Stock, was

exceptional during the relevant period.  <u>See id.</u> ¶ 32.  Indeed, the managers of both Funds have

been named "manager of the year" by Morningstar, Inc., a third-party provider of mutual fund

industry data.  <u>See id.</u>  The remaining three Funds' performance has been mixed, with periods of

both outperformance and underperformance.  <u>See id.</u> ¶ 33.  Section 36(b), however, does not

serve as a vehicle by which mutual fund shareholders can obtain a refund of fees if their fund

performance is "below average."  <u>See</u> <u>Migdal v. Rowe Price-Fleming Int'l, Inc.</u>, 248 F.3d 321,

327 (4th Cir. 2001) ("While performance may be marginally helpful in evaluating the services

---

[17]      Even if Plaintiffs were able to show that the services received by Fidelity's institutional clients were similar to those received by the Funds (they are not), it is undisputed that some institutional clients pay a <u>higher</u> fee rate than the Funds.  <u>See</u> SUF ¶ 52.  At least two courts have held that, even if institutional account fees were relevant, summary judgment is appropriate where the mutual fund fees at issue are within a range including some higher institutional client fees.  <u>See</u> <u>Jones</u>, 2007 WL 627640 at *8; <u>Gallus</u>, 497 F. Supp. 2d at 982 (same).

which a fund offers, allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive."); <u>Benak v. Alliance Capital Mgmt., L.P.</u>, No. Civ.A. 01-5734, 2004 WL 1459249, at *7 (D.N.J. Feb. 9, 2004) ("[P]laintiff[s] [cannot] utilize § 36(b) in hindsight as a vehicle to challenge an investment adviser's performance regarding a particular aspect of the overall services provided.").  In any event, four of five Funds have a fee structure that includes a performance adjustment that automatically reduces the fee when the Funds underperform their benchmarks over set periods of time.  <u>See</u> <u>Gallus</u>, 497 F. Supp. 2d at 980 (finding no material issue of fact with respect to nature and quality of the services where funds at issue were subject to a performance adjustment).

Significantly, the Independent Trustees actively monitored the performance of the Funds as part of their fee deliberations, and Plaintiffs have not challenged the adequacy of that oversight.  <u>See</u> SUF ¶ 31; <u>Gallus</u>, 497 F. Supp. 2d at 980 (holding that, in order to create a disputed issue of material fact, Plaintiffs must do more than characterize undisputed performance of the funds as "poor," but must instead allege that the performance figures were incorrect or that Defendants improperly reported them).

## 2. Plaintiffs Have Not Met Their Burden of Proving that Fidelity Failed to Share Economies of Scale with the Funds.

Economies of scale occur when the "long run average total cost falls as the quantity of output increases."  N. Gregory Mankiw, <u>Principles of Microeconomics</u> 283 (3d ed. 2003).  In other words, economies of scale exist when it costs less to produce each unit as the number of units produced increases.  For example, if a widget manufacturer spends $1,000,000 to build a factory, the cost of producing one widget would be $1,000,000, but the cost of producing 1,000,000 widgets would be $1 per widget.

Courts have uniformly held that the plaintiff in a Section 36(b) case bears the burden of proving that the particular adviser realized economies of scale, and no plaintiff has ever met that burden.[18]  The Court, however, does not need to decide whether Fidelity realized economies of scale because it is undisputed that Fidelity substantially shared with the Funds' shareholders what would have been the benefits of economies of scale if any were in fact realized.  See, e.g., Kalish, 742 F. Supp. at 1228 (framing the issue was "whether economies of scale were realized by the adviser-manager and shared with the shareholders") (emphasis added).[19]

Fidelity has shared the benefits of economies of scale, assuming any were realized, with the Funds and their shareholders in at least two ways.  First, the group fee schedule includes breakpoints, which cause the Funds' management fees to decrease as assets increase.  See Gartenberg I, 528 F. Supp. at 1054 (a fee scheduled that "diminishes progressively" "clearly . . . takes account of economies of scale").  Second, Fidelity has made significant investments in additions and enhancements to the services provided to the Funds and their shareholders.  See SEC, Division of Investment Management, Report on Mutual Fund Fees and Expenses § IV.B.1 (Dec. 2000) (acknowledging that fund advisers can share economies of scale by "provid[ing] additional services under the advisory contract"), www.sec.gov/news/studies/feestudy.htm; American Bar Association, Federal Regulation of Securities Committee, Fund Director's

---

[18]    Plaintiffs here cannot satisfy the burden of showing that Fidelity realized economies of scale.  Indeed, as discussed in Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs' experts' analyses of economies of scale suffer from the same defects as those found in previous cases under Section 36(b) and, therefore, are legally deficient.  See Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, § IV.A.

[19]    Section 36(b) does not require Fidelity to pass on all the benefits of economies of scale (assuming these could be measured) to the Funds; rather, those benefits are to be shared equitably between Fidelity and the Funds and their shareholders.  See S. Rep. No. 91-184 at 15 (1969), as reprinted in 1970 U.S.C.C.A.N. 4897, 4901 ("[T]his bill recognizes that investors should share equitably . . . in the economies available as a result of the growth and general acceptance of mutual funds.") (emphasis added).

Guidebook 35 (3d ed. 2006) (noting that economies of scale can be shared "through reinvestment of profits to enhance services").  For example, Fidelity has developed guidance tools that help fund shareholders set and achieve their investment goals, and has invested approximately $2 billion annually in technology since 2000.  See SUF ¶ 42.  Plaintiffs' experts concede that both breakpoints and service enhancements are appropriate means of sharing the benefits of economies of scale with the Funds and their shareholders.  See id. ¶ 43.

Plaintiffs cannot meet their burden of demonstrating that economies of scale have not been shared because they have not analyzed the extent to which Fidelity shared economies of scale through service enhancements.  Indeed, Plaintiffs' experts did not account for service enhancements in their analyses even though they agree that service enhancements are an appropriate means of sharing economies of scale.  See id. ¶ 43.

At the same time, Plaintiffs' own calculations show that Fidelity shared more than $1.8 billion in supposed economies of scale with the Funds through management fee reductions resulting from breakpoints in the group fee schedule.  See id. (acknowledging that Fidelity shared $1.8 billion in economies of scale through the group fee).  Plaintiffs cannot adduce any fact or expert testimony suggesting that $1.8 billion in shared economies of scale was insufficient, nor do they identify what would be an appropriate amount of sharing.  Most importantly, Plaintiffs cannot show that $1.8 billion in shared economies of scale falls outside the range that could have been negotiated at arm's-length.  See Gallus, 497 F. Supp. 2d at 982 ("Plaintiffs do not establish why the existing breakpoints so inadequately shared the cost savings, such that the fee schedules could not have been the product of arm's length bargaining.  Plaintiffs' experts do not identify what amount of cost savings would have been appropriate, or why the amounts shared fall outside the range that could have been negotiated at arm's length.").

In short, economies of scale is a moot issue.  Plaintiffs have conceded both that Fidelity shared $1.8 billion of economies of scale benefits through breakpoints in the group fee, and that Fidelity's significant investments in service enhancements are an additional form of sharing.  On this record, Plaintiffs cannot show that Fidelity failed to share <u>any</u> economies of scale with the Funds, much less that the extent of sharing was so insufficient as to raise a material issue of fact with respect to the proportionality of the fees received and to the services rendered.

In any event, the Independent Trustees carefully considered both whether Fidelity realized economies of scale in managing the Funds and how the Funds shared in the benefits of any such economies.  Professor Hubbard has concluded that the materials received by the Board with respect to economies of scale were relevant, appropriate, and sufficient for purposes of the Trustees' consideration of the issue.  <u>See</u> SUF ¶ 40.  Similarly, Mr. Bobroff stated that the materials provided to the Board were "among the best and most comprehensive efforts [he has] seen by any investment adviser to deal with economies of scale" and "more than sufficient to allow the Board to make a reasonable business decision regarding the existence of economies of scale and, if so, whether they are being shared with fund investors."  <u>Id.</u>  Moreover, Plaintiffs' expert conceded that the Board received a regression analysis of economies of scale that was similar to the analyses he performed in his report.  <u>See</u> <u>id.</u>.  Plaintiffs cannot adduce any evidence demonstrating that the Court should disregard the Independent Trustees' consideration of economies of scale.  Thus, there is no basis on this record to disregard the Trustees' considered business judgment that the Funds adequately shared in any benefits of economies of scale that Fidelity may have realized.

3.     **Fidelity's Profitability from Managing and Servicing the Funds Is Reasonable and Consistent with Industry Norms.**

Plaintiffs cannot establish a violation of Section 36(b) by alleging that Fidelity "just plain made too much money" from its relationship with the Funds.  <u>Kalish</u>, 742 F. Supp. at 1237; <u>see also</u> <u>Krinsk</u>, 875 F.2d at 410 (holding that high profitability alone does not support a finding that the advisory fee is excessive); <u>Gartenberg II</u>, 573 F. Supp. at 1316 ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b) . . . ."); S. Rep. No. 91-184 (1969) <u>as reprinted in</u> 1970 U.S.C.C.A.N. 4897, 4902 ("Nothing in the bill is intended to . . . suggest that a 'cost-plus' type of contract would be required.  It is not intended to introduce general concepts of rate regulation as applied to public utilities.").  In any event, the undisputed factual record would not support such a claim.  Indeed, the profitability of the Funds to Fidelity was consistent with industry norms according to Mr. Bobroff's unrebutted expert report.  <u>See</u> SUF ¶ 45.  Moreover, the Funds' profit margins fall within the range of margins for funds in prior cases where courts have rejected claims under Section 36(b).  <u>See, e.g.</u>, <u>Schuyt</u>, 663 F. Supp. at 978-79 (rejecting claims under Section 36(b) where funds had issue had pre-tax margins of up to 77.3% and post-tax margins of up to 38.6%); <u>Kalish</u>, 742 F. Supp. at 1250 (post-tax margins of up to 35%); <u>Krinsk</u>, 715 F. Supp. at 494 (margins of up to 33%).  Finally, Fidelity's overall profitability is at the low end of the industry according to an analysis of reported profit margins of publicly traded investment advisers.  <u>See</u> SUF ¶ 47.

Although Plaintiffs quibble with the cost-allocation methodologies that Fidelity used in calculating the profitability of the Funds,[20] there is no dispute that the Independent Trustees, led

---

[20]     Courts have recognized that there is inherent uncertainty in calculations of individual fund profitability because of the need to allocate costs that are joint-and-common to multiple funds.  For example, the court explained in <u>Krinsk</u>:

by Marie Knowles, the Chair of the Audit Committee and the former CFO of Atlantic Richfield,

carefully reviewed and approved Fidelity's cost-allocation methodologies.  See id. ¶ 25.

Additionally, an independent accounting firm retained by the Independent Trustees,

PricewaterhouseCoopers ("PwC"), has annually reviewed the methodologies used by Fidelity

and found that they are reasonable.  See id. ¶ 44; see also Schuyt, 663 F. Supp. at 978 n.49

(finding that cost allocation methodologies reviewed by PwC were "reasonable").

While Plaintiffs challenge the process by which Fidelity's fund profitability was

calculated, they do not identify other methods that would have led to a materially different result.

Indeed, Plaintiffs' cost-accounting expert has not calculated an alternative profit margin for any

of the Funds.  See SUF ¶ 46.[21]  Moreover, while Plaintiffs claim to have identified certain errors

in Fidelity's cost-allocation process, they have not calculated the impact, if any, of the purported

---

> Calculation and allocation of costs against different product lines
> or . . . among different segments of the same product, is an art
> rather than a science.  Little certainty exists in this field where
> different, albeit rational, methodologies lead to widely disparate
> results . . . .  Hence, the court must be satisfied with a common
> sense range of figures within which the Fund's profitability to
> [defendant investment adviser] most likely falls.

Krinsk, 715 F. Supp. at 489; see also Schuyt, 663 F. Supp. at 978 n.48 ("[A]ll full-cost
accounting systems are subject to significant variation in results depending on how the individual
creating the system chooses to allocate common costs.").

[21]     Another of Plaintiffs' experts presents an analysis that purports to show the profit margin
for one of the Funds, Magellan, using an alternative cost-allocation methodology.  See Rebuttal
Expert Report of Steve Pomerantz, Ex. 35 at 3.  The expert's analysis is improper, however,
because it fails to take into account all of the expenses associated with Fidelity's management of
Magellan.  See Expert Report of Russell Peppet, Ex. 32 at 21-22; see also Deposition of Steve
Pomerantz, Ex. 47 at 117-18; Deposition of James Lamb, Ex. 40 at 188-89.  Moreover, Fidelity
and the Independent Trustees looked at exactly the same alternative cost-allocation methodology
and found that, when all costs are taken into account, using the alternative methodology does not
materially affect Magellan's margin, and that margin remains within the range of margins for
funds in prior cases where courts have found no violation of Section 36(b).  See "Summary of
Economies of Scale Discussions," Presentation to the Board of Trustees, Ex. 14
BFMR_00153935.

errors on the reported profit margins.  Because Plaintiffs cannot show that using different methodologies would meaningfully affect the profitability of the Funds, their quibbling over the Board-approved and PwC-endorsed cost-allocation methodologies does not begin to raise an issue of material fact with respect to the proportionality of the fees received and the services rendered or the Independent Trustees' approval of the fees.

### 4. Plaintiffs Have Failed to Identify, Much Less Quantify, Any Fall-Out Benefits.

"Fall-out" benefits are revenues the adviser "would not have occurred but for the existence of the Fund[s]."  Krinsk, 715 F. Supp. at 495 (emphasis added); see also Gartenberg II, 573 F. Supp. at 1313.  The burden is on Plaintiffs to quantify the fall-out benefits and show that they "are so substantial that they rendered the advisory fee so disproportionately large as to amount to a breach of fiduciary duty . . . ."  Krinsk, 715 F. Supp. at 495 (internal quotations and citation omitted); see also Gartenberg I, 694 F.2d at 923; Gartenberg II, 573 F. Supp. at 1313.

Plaintiffs cannot adduce any evidence with respect to fall-out benefits to Fidelity from its relationship with the Funds.  Indeed, their experts have not offered any opinions on fall-out benefits.  Moreover, Fidelity annually provided the Board a memorandum discussing various "potential fall-out benefits."  See, e.g., SUF ¶ 48.  While there is no evidence that any of these potential benefits qualify as actual fall-out benefits under Gartenberg, it is undisputed that the Trustees considered them as part of the annual approval of the fees.  In any event, according to the annual memorandum to the Board, in the aggregate the lines of business listed as potential fall-out benefits do not generate profits to Fidelity.  See id. ¶ 49. Thus, consideration of fall-out benefits cannot support a finding that the Funds' fees were disproportionate relative to the services rendered.

III.   **PLAINTIFFS' CLAIMS DO NOT MAKE ECONOMIC SENSE IN LIGHT OF COMPETITION IN THE MUTUAL FUND INDUSTRY.**

Because the Funds' fees are low relative to the fees paid by comparable mutual funds, see § II.B.1, Plaintiffs' claim that the Funds' fees are excessive is in essence a challenge to the level of fees charged across the mutual fund industry.  Indeed, Plaintiffs' expert demonstrated the extreme nature of Plaintiffs' position by conceding at his deposition that he believes virtually all mutual fund fees to be excessive.  See SUF ¶ 58.  In addition to being inconsistent with Section 36(b),[22] Plaintiffs' challenge to the industry level of fees does not make economic sense given the competitive forces at work in the mutual fund industry.  This is a separate and entirely independent grounds for summary judgment in favor of Defendants.  See Eastman Kodak Co. v. Image Technical Svcs., Inc., 504 U.S. 451, 468-69 (1992) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.")

As observed by the Seventh Circuit in Jones and discussed at length in the report of Professor Hubbard, the mutual fund industry bears the hallmarks of a competitive market.  See Jones, 527 F.3d at 633-34; SUF ¶ 59.  Thousands of mutual funds compete with one another— and with other types of investment products—for investors' assets.  See SUF ¶ 59.  The number of mutual funds has increased substantially over recent decades, reflecting the low barriers to entry and expansion within the industry.  See id. ¶ 60.  Mutual fund shares are redeemable on demand, thus enabling many investors to move from one fund to another with relative ease.  See

---

[22]     See S. Rep. No. 91-184 (1969), as reprinted in 1970 U.S.C.C.A.N. 4897, 4902 ("[Section 36(b)] should not be taken as reflecting any finding by the committee that the present industry level of management fees or that the fee of any particular adviser is too high."); see also H.R. Rep. No. 91-1382 (1970) ("[T]he enactment of [Section 36(b)] was not intended to provide a basis . . . to undertake a general revision of the practices and structures of the investment company industry."); Green v. Nuveen Advisory Corp., 295 F.3d 738, 743 (7th Cir. 2002) (Section 36(b) was not intended "to fundamentally revise the system").

id. ¶ 61.  Mutual fund prospectuses and other public filings fully disclose fund fees, as well as a wealth of other information that may be relevant to potential investors.  See id.  Additional information, including analyst commentary and recommendations, is widely available on the internet, in the popular and financial press, through specialized providers (such as Morningstar), and from financial advisers and retirement plan consultants.

Basic economic theory teaches that this combination—many investment options, the ability of investors to substitute, and full disclosure—gives rise to competitive forces that constrain the ability of investment advisers to charge excessive fees.  See Hubbard Report, Ex. 30 at ¶¶ 58-61.  Faced with the prospect of paying an excessive fee, rational investors will transfer their investments to another mutual fund (or other investment option) that charges a lower fee.  The loss of investors and assets decreases the adviser's compensation and its profits and, over the long run, requires the adviser to either reduce its fees or go out of business.  Of course, factors other than fee levels impact investors' selection of funds, including investment performance and the nature and quality of the shareholder services provided, but the point remains that competition between mutual funds on the combination of fees and other product attributes will prevent investment advisers from sustaining economically excessive fees.

The influence of competition on mutual fund fees is more than mere economic theory: Fidelity's actions demonstrate the practical impact of competitive considerations on mutual fund fees.  For example, in 2004 and 2005, Fidelity engaged in a protracted and well-publicized "price war" with Vanguard, during which both complexes significantly reduced the fees charged to certain of their mutual funds.  See SUF ¶ 62.

Plaintiffs' expert concedes that the mutual fund industry is "intensely competitive" and that at least some advisers, including Fidelity, compete on fees.  See id. ¶ 63.  He contends,

however, that this competition is "muted" when it comes to fees. <u>See</u> Deposition of Stewart Brown, Ex. 37 at 203-04. He bases this proposition on the fact that certain investors may be unaware of the fees charged by mutual funds and/or may face certain switching costs that could limit their willingness to move from one fund to another. <u>See</u> Rebuttal Report of Stewart Brown, Ex. 29 at 20-24. Plaintiffs' expert admits, however, that he and many other investors are aware of mutual fund fees and select funds, at least in part, based on the level of fees charged. <u>See</u> SUF ¶ 64. Critically, he has not analyzed the size of this group of fee-sensitive investors or made any showing that the decisions of this group would be insufficient to constrain mutual fund fee levels. <u>See</u> Deposition of Stewart Brown, Ex. 37 at 204-06 (conceding that some investors care about fees but that he does not know how many would need to be fee-sensitive in order to constrain prices); <u>see also</u> <u>Jones</u>, 527 F.3d at 634 ("It won't do to reply that most investors are unsophisticated and don't compare prices. The sophisticated investors who do shop create a competitive pressure that protects the rest."); Rebuttal Report of Glenn Hubbard, Ex. 33 at ¶¶ 58-60.[23]

Given that competitive forces within the mutual fund market constrain the ability of investment advisers to sustain economically excessive fee levels, Plaintiffs' claim that the Funds' fees are excessive notwithstanding that they are below the prevailing market rate does not make economic sense. In light of this fact—standing alone or, especially, combined with Plaintiffs' failure to adduce any evidence providing a reasonable basis to conclude that the Funds' fees are excessive—summary judgment is appropriate. <u>See</u> <u>Eastman Kodak</u>, 504 U.S. at 468-69;

---

[23]     Notably, Plaintiffs' expert conceded that, as between him and Fidelity's expert Professor Hubbard, Professor Hubbard is more qualified to analyze competition. <u>See</u> Deposition of Stewart Brown, Ex. 37 at 182-83 ("I asked myself, how can I analyze competition one on one with Glenn Hubbard? No, I wouldn't even try . . . . I am an economist. I understand these

Matsushita, 475 U.S. at 587 ("[I]f the factual context renders [the nonmovant's] claim

implausible—if the claim is one that simply makes no economic sense—[the nonmovant] must

come forward with more persuasive evidence to support [its] claim than would otherwise be

necessary.").

## **CONCLUSION**

For the foregoing reasons, Fidelity's motion for summary judgment should be granted.

Dated:  February 6, 2009

Respectfully submitted,

GOODWIN PROCTER LLP
/s/ James S. Dittmar
   James S. Dittmar (BBO# 126320)
   David J. Apfel (BBO# 551136)
Exchange Place
53 State Street
Boston, MA 02109
Tel:  (617) 570-1000
Fax:  (617) 523-1231

MILBANK, TWEED, HADLEY & McCLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert J. Liubicic
   Robert R. Miller
   Andrew W. Robertson
   Elizabeth M. Virga
   Tommaso Bencivenga
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel:  (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for Defendants Fidelity Management &*
   *Research Company and FMR Co., Inc.*

---

concepts.  But I live in the finance world.  He lives in the—he lives in this world.  He teaches
this stuff.").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 6, 2009.

<u>/s/ James S. Dittmar</u>

**Appendix A – Other Section 36(b) Cases Brought by the Same Group of Plaintiffs' Counsel**

| Fund Complex | Case | Venue | Date Filed | Plaintiffs' Firm(s) | Case Status |
|---|---|---|---|---|---|
| **AIM/ INVESCO** | Hunt v. INVESCO Funds Group, Inc., No. 04-2555 | S.D. Tex. | 07/07/04 | Keller Rohrback Johnson Pope Richardson Patrick | Voluntarily dismissed with prejudice (01/25/07) |
| **American Century** | Baker v. Am. Century Inv. Mgmt., Inc., No. 04-4039 | W.D. Mo. | 03/04/04 | Johnson Pope Popham Law Richardson Patrick | Voluntarily dismissed with prejudice (07/31/06) |
| **Ameriprise** | Gallus v. Ameriprise Fin., Inc., No. 04-4498 | D. Minn. | 10/14/04 | Keller Rohrback Johnson Pope Richardson Patrick Chestnut & Cambronne | Summary judgment for Defendants (07/10/07); Notice of appeal to 8th Cir. (08/22/07); Oral arguments heard (04/17/08) |
| **Federated** | In re Federated, No. 04-352 | W.D. Pa. | 05/10/04 | Keller Rohrback Apperson Crump Malakoff Doyle Richardson Patrick | Pending |
| **Fidelity** | Bennett v. Fidelity Mgmt. & Research Co., No. 04-11651 | D. Mass. | 07/23/04 | Keller Rohrback Shapiro Haber Johnson Pope (withdrawn) Richardson Patrick (withdrawn) Tom Grady (withdrawn) | Pending |
| **Franklin** | Strigliabotti v. Franklin Resources, Inc., No. 04-883 | N.D. Cal. | 03/04/04 | Keller Rohrback Gotto Lovitt & Hannan | Voluntarily dismissed (08/09/07) |
| **Janus** | Sins v. Janus Capital Mgmt. LLC, No. 04-1647 | D. Colo. | 08/11/04 | Hill & Robbins Johnson Pope Korein Tillery | Voluntarily dismissed with prejudice (05/01/07) |

| Fund Complex | Case | Venue | Date Filed | Plaintiffs' Firm(s) | Case Status |
|---|---|---|---|---|---|
| **MFS** | Dumond v. Mass. Fin. Servs. Co., No. 04-11458 | D. Mass. | 06/23/04 | Keller Rohrback<br>Johnson Pope<br>Shapiro Haber | Voluntarily dismissed with prejudice (11/20/07) |
| **Neuberger** | Krueger v. Neuberger Berman Mgmt., Inc. | S.D.N.Y. | 02/03/05 | Popham Law<br>Johnson Pope<br>Richardson, Patrick | Voluntarily dismissed with prejudice (05/20/05) |
| **Oakmark** | Jones v. Harris Assocs., L.P., No. 04-8305 | N.D. Ill. | 12/28/04 | Popham Law<br>Johnson, Pope<br>Richardson Patrick | Summary judgment for Defendants (02/27/07); Judgment affirmed by 7th Cir. (05/19/08); Petition for cert. filed (11/03/08) |
| **Putnam** | Vaughn v. Putnam Inv. Mgmt. LLC, No. 04-10988 | D. Mass. | 05/17/04 | Robins, Kaplan<br>Tom Grady | Voluntarily dismissed with prejudice (3/28/08) |
| **Waddell & Reed** | Williams v. Waddell & Reed Inv. Mgmt. Co., No. 04-2561 | D. Kan. | 3/22/04 | Popham Law<br>Brown & Dunn<br>White Allinder | Voluntarily dismissed with prejudice (9/25/06) |