# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER, NANCY HAUGEN, MICHAEL F. MAGNAN, KAREN L. MAGNAN, PRESLEY C. PHILLIPS, ANDREA M. PHILLIPS, and CINDY SCHURGIN, for the use and benefit of THE FIDELITY MAGELLAN FUND, FIDELITY CONTRAFUND, FIDELITY GROWTH & INCOME PORTFOLIO FUND, FIDELITY BLUE CHIP GROWTH FUND, and FIDELITY LOW-PRICED STOCK FUND,<br><br>Plaintiffs,<br><br>vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY and FMR CO., INC.,<br><br>Defendants. | No. 1:04-cv-11651-MLW<br>(Lead Case)<br><br>No. 1:04-cv-11756-MLW<br>(Consolidated Case) |

## DEFENDANTS' SUPPLEMENTAL BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Goodwin Procter LLP
  James S. Dittmar
  David J. Apfel
Exchange Place
53 State Street
Boston, MA 02109

Milbank, Tweed, Hadley & McCloy LLP
  James N. Benedict
  Sean M. Murphy
  Andrew W. Robertson
  Andrea G. Hood
1 Chase Manhattan Plaza
New York, NY 10005-1413

*Attorneys for Defendants Fidelity Management*
*& Research Company and FMR Co., Inc.*

# TABLE OF CONTENTS

Page

I.  RESPONSES TO THE COURT'S THREE QUESTIONS ............................................. 1

    A.  What is the relevance and scope of the transfer agent agreement(s) with regard to the provision of services to the Funds? .................................................... 1

    B.  What is the degree, if any, to which the Court is required, either on summary judgment or at trial, to consider the issues concerning each of the five Funds separately?...................................................................................... 2

    C.  Did any particular Fund's asset levels increase at the same time that Fidelity's complex-wide asset levels fell, and if so, did that result in a disproportionately large fee for the Fund that was unlawful under § 36(b)?......... 3

II. FIDELITY PROVIDES MANY SERVICES UNDER THE MANAGEMENT AGREEMENTS BEYOND INVESTMENT ADVISORY SERVICES. .......................... 4

    A.  Plaintiffs Previously Conceded that the Management Agreements Cover Certain Shareholder Services. ................................................................................ 4

    B.  The Undisputed Record Demonstrates that the Management Agreements Cover More than Investment Advisory Services. .................................................... 5

    C.  That the TA Agreements Cover Certain Transaction-Related Services Does Not Create a Genuine Dispute as to Whether the Management Agreements Cover Other Shareholder Services. .................................................... 6

    D.  Having Failed to Account for All Services, Plaintiffs Cannot Prove that the Funds' Fees Were Disproportionate to the Services Rendered........................ 9

III. PLAINTIFFS DO NOT RAISE A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO ANY OF THE *JONES* FACTORS. ............................................. 9

    A.  Plaintiffs' Institutional and Subadvised Fee Comparisons Are Inapt Under *Jones* Because of the Differences in Services........................................................ 9

    B.  It Is Undisputed that the Funds' Fee Rates Are Lower than the Fees Paid by Comparable Mutual Funds............................................................................. 13

    C.  Plaintiffs Do Not Meet Their Burden of Demonstrating that Economies of Scale Were Not Appropriately Shared with the Funds....................................... 16

        1.  Plaintiffs' Expert's Analysis Does Not Establish that Fidelity Failed to Share Economies of Scale Benefits with the Funds. ................ 17

2.      Plaintiffs' Challenge to the Group Fee Does Not Raise a Genuine
Dispute with Respect to Sharing............................................................. 19

D.      It Is Undisputed that Fidelity Incurs Significant Costs in Providing
Services to the Funds. ............................................................................ 21

E.      Plaintiffs Do Not Raise a Genuine Dispute that Fidelity's Profitability Is
Reasonable and Consistent with Industry Norms. ............................... 22

F.      It Is Undisputed that Fidelity Provides High Quality Services............. 24

1.      Plaintiffs Do Not Raise a Genuine Dispute Regarding the Quality
of Fidelity's Shareholder Services. ....................................... 25

2.      Plaintiffs Do Not Raise a Genuine Dispute Regarding the Funds'
Investment Performance. ....................................................... 26

G.      Plaintiffs Do Not Identify Disputed Facts Sufficient to Show that Fidelity
Receives Fall-Out Benefits from Managing the Funds....................... 28

H.      It Is Undisputed that Fidelity Handles an Enormous Number of
Shareholder Interactions. ...................................................................... 29

I.      There Is No Genuine Dispute that the Funds Were Overseen by an
Independent and Conscientious Board of Trustees............................. 30

1.      Plaintiffs' Arguments Regarding the Independent Trustees'
Workload Do Not Raise a Genuine Dispute of Material Fact. ............... 31

2.      Plaintiffs' Argument that the Independent Trustees Did Not
"Negotiate" Does Not Raise a Genuine Dispute of Material Fact.......... 33

3.      Plaintiffs' Criticisms of the Information Provided to the
Independent Trustees Do Not Raise a Genuine Dispute of Material
Fact...................................................................................... 34

IV.     PLAINTIFFS' EVIDENCE WOULD NOT ESTABLISH THAT THE FUNDS'
FEES WERE "SO DISPROPORTIONATELY LARGE." ........................... 38

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006).............................................................................................13, 27

*Baladevon, Inc. v. Abbott Labs., Inc.*,
    871 F. Supp. 89 (D. Mass. 1994) ..............................................................................................6

*Benak v. Alliance Capital Mgmt., L.P.*,
    No. 01-cv-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) .....................................................27

*City of Brockton Ret. Sys. v. The Shaw Group, Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008).....................................................................................40

*Fed. Deposit Ins. Corp. v. Singh*,
    977 F.2d 18 (1st Cir. 1992)........................................................................................................5

*Gallus v. Ameriprise Fin., Inc.*,
    497 F. Supp. 2d 974 (D. Minn. 2007),
    *reinstated by* 2010 WL 5137419 (D. Minn. Dec. 10, 2010)............................................ passim

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984)...............................15

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982), *aff'g* 528 F. Supp. 1038 (S.D.N.Y. 1981) ........................ passim

*In re Am. Mut. Funds Fee Litig.*,
    No. 04-cv-5594, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)...................................... passim

*In re Eaton Vance Mut. Funds Fee Litig.*,
    380 F. Supp. 2d 222 (S.D.N.Y. 2005), *aff'd sub nom.*
    *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) ................................................28

*Jones v. Harris Associates L.P.*,
    130 S. Ct. 1418 (2010) .................................................................................................... passim

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ...................15, 17, 24

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ......................... passim

*Melinas v. Divi Hotels Mktg., Inc.*,
    No. 80-cv-02152, 1995 WL 598963 (D. Mass. Aug. 7, 1995) ...........................................4, 10

*Meyer v. Oppenheimer Mgmt. Corp.*,
    707 F. Supp. 1394 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ........................23, 40

*Meyer v. Oppenheimer Mgmt. Corp.*,
    715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990) .................................15

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ................................................................................27

*Schuyt v. Rowe Price Prime Reserve Fund*,
    663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987) .................................... passim

*Strougo v. BEA Associates*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002)..........................................................................32, 33

## STATUTES

15 U.S.C. § 80a-15(c) ...............................................................................................33

15 U.S.C. § 80a-35(b) .............................................................................................2, 3

## OTHER AUTHORITIES

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897..............................1, 18, 21, 38

SEC, Division of Investment Management,
    Report on Mutual Fund Fees and Expenses (Dec. 2000)........................................................20

Defendants submit this memorandum in response to the Court's January 10, 2011 Order (Dkt. No. 251).  In addition to answering the three questions posed by the Court, this memorandum addresses the eight *Jones* factors in the same order as Plaintiffs' Supplemental Brief Regarding Summary Judgment (Dkt. No. 268) ("Pl. Br."), with references to the corresponding paragraph numbers in Plaintiffs' brief.

## I.   RESPONSES TO THE COURT'S THREE QUESTIONS

### A.   What is the relevance and scope of the transfer agent agreement(s) with regard to the provision of services to the Funds?

The Transfer Agency ("TA") Agreements of the five mutual funds at issue (the "Funds") cover a range of transactional services, but for purposes of summary judgment, these agreements are irrelevant.  Plaintiffs challenge the fees received by Fidelity under the Management Agreements only, *see* Pl. Br. at 5, and for summary judgment, the Court need not consider any of the services provided under the TA Agreements.  The undisputed record of the services provided under the Management Agreements, without more, establishes that Plaintiffs cannot meet their burden of proving that the Funds' management fees were "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1426 (2010).[1]

Plaintiffs repeatedly raise the TA Agreements in their brief to argue that the Management Agreements cover *only* investment advisory services, and that *all* of the Funds' shareholder services are provided under the TA Agreements.  *See, e.g.*, Pl. Br. ¶¶ 9, 91-96.  This assertion is belied by all of the relevant facts in the record and by Plaintiffs' prior admissions.  The record is

---

[1]   If Plaintiffs' case proceeds to trial, the services provided under the TA Agreements will be relevant to the Court's evaluation of the Funds' fees, as the legislative history makes clear that a court must consider "*all services rendered* to the fund or its shareholders and *all compensation and payments received*."  S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 (emphasis added).

clear that, while the TA Agreements cover some shareholder services, the Management

Agreements cover a different and equally substantial set of shareholder services.  *See* § II, *infra*.

    As discussed in detail below, Plaintiffs cannot possibly meet their burden of proving that

Fidelity's management fees are disproportionate to the services rendered because they ignore a

substantial portion of those services.  As Plaintiffs bear the burden of proof under Section 36(b),

this defect, standing alone, defeats their opposition to summary judgment.

> **B.      What is the degree, if any, to which the Court is required, either on
> summary judgment or at trial, to consider the issues concerning each
> of the five Funds separately?**

    Plaintiffs have the burden of proving a breach of fiduciary duty for *each* of the Funds

separately.  *See* 15 U.S.C. § 80a-35(b) (an adviser has a "fiduciary duty with respect to the

receipt of compensation . . . paid by *such* registered investment company") (emphasis added).[2]

    Defendants, however, agree with Plaintiffs that "many issues bearing on excessive

compensation are common to all five funds."  Pl. Br. at 1.  In fact, the vast majority (84%) of

Fidelity's costs of managing the Funds are shared across a large number of funds in the Fidelity

complex.  *See* Dittmar Ex.[3] 24, ¶ 29.  For example, none of the Funds has dedicated research

analysts; rather, Fidelity's equity analysts form a common pool of research capacity upon which

all of Fidelity's equity funds rely.  *See* Gerber Ex.[4] 13, at 76:3-11; Dittmar Ex. 3, at 20:2-15.

Similarly, all of the Funds utilize the same trading systems to buy and sell securities, and the

same infrastructure (telephone call centers, investor centers, website, information systems) is

---

[2]      The requirement of a fund-by-fund finding is critical in light of the fact that none of the Plaintiffs
currently owns any shares in the Low-Priced Stock Fund or the Growth & Income Fund.  Thus, Plaintiffs
lack standing to pursue claims on behalf of those two Funds, and this Court lacks subject matter
jurisdiction over those claims.  Fidelity is filing a separate motion to dismiss those claims.

[3]      References in the form "Dittmar Ex." are to the exhibits to the accompanying Declaration of
James S. Dittmar, dated February 25, 2011.

[4]      References in the form "Gerber Ex." are to the exhibits to the Declaration of Laura R. Gerber in
Support of Plaintiffs' Supplemental Brief Regarding Summary Judgment (Dkt. No. 269).

utilized to provide shareholder services to all retail fund shareholders.  *See* Gerber Ex. 5, at

60:12-24; Dittmar Ex. 9, at 227:8-18.

Because of the predominance of joint-and-common costs and resources, several factors

do not need to be considered separately for each Fund by the Funds' Independent Trustees in the

first instance or by the Court now.  For example, the quality of shareholder services will be the

same for all of the five Funds because Fidelity provides the same services to each Fund, using

the same infrastructure, personnel, and systems.  Other factors cannot be meaningfully analyzed

for individual Funds in isolation.  For instance, the predominance of joint-and-common costs

means that Fidelity realizes economies of scale, if at all, when its overall assets increase, not due

to increases in the assets of individual funds.  *See* § III.C.2, *infra*.

> **C.**  **Did any particular Fund's asset levels increase at the same time that**
> **Fidelity's complex-wide asset levels fell, and if so, did that result in a**
> **disproportionately large fee for the Fund that was unlawful under**
> **§ 36(b)?**

No.  None of the Funds' assets increased at the same time that Fidelity's complex-wide

assets decreased during any of the eight years potentially at issue in this lawsuit.[5]  Since 2003,

whenever one of the five Funds' assets increased, Fidelity's complex-wide assets also increased,

resulting in a reduction in each Fund's management fee rate under the group fee schedule.

Accordingly, the flaw in the group fee that Plaintiffs purport to identify could not have led to a

disproportionate fee during the years at issue.  Notably, three of the Funds (Magellan, Growth &

Income, and Blue Chip Growth) lost substantial assets during the relevant period, but benefited

from fee reductions due to the growth in complex-wide assets and the resulting breakpoints in

---

[5]      Section 36(b)(3) provides that "[n]o award of damages shall be recoverable for any period prior
to one year before the action was instituted."  15 U.S.C. § 80a-35-b(3).  Here, Plaintiffs filed their action
in May 2004; therefore, they may not recover damages for any period prior to May 2003.

the group fee, a benefit that the Funds would not have obtained had the individual fund breakpoint structure preferred by Plaintiffs been adopted.

## II.     FIDELITY PROVIDES MANY SERVICES UNDER THE MANAGEMENT AGREEMENTS BEYOND INVESTMENT ADVISORY SERVICES.

Plaintiffs' effort to defeat summary judgment depends critically on their demonstrably false reading of the Management Agreements.  Plaintiffs now contend—for the first time—that the Management Agreements cover "*only*" investment advisory services, Pl. Br. at 3, ignoring the other "management" services provided under the Agreements and incorrectly arguing that ***all*** shareholder services are covered by the TA Agreements, *id.* ¶¶ 8-9, 91-96.  Plaintiffs' current contrivance cannot be reconciled with their prior concessions or the undisputed evidence.

### A.     Plaintiffs Previously Conceded that the Management Agreements Cover Certain Shareholder Services.

Plaintiffs previously conceded that under the Management Agreements, Fidelity is "contractually obligated" to provide "shareholder services."  Dittmar Ex. 35, ¶ 14.  Plaintiffs later agreed that the TA Agreements cover "at least a portion" (but not all) of the shareholder services.  Dittmar Ex. 36, at 9.  And, at oral argument, they stated that the TA Agreements cover "a lot" (but, again, not all) of the shareholder services.  Dittmar Ex. 37, at 83:21.

Now, apparently recognizing that their evidence on most of the relevant factors does not account for the shareholder services covered by the Management Agreements, Plaintiffs take the extreme position that all shareholder services are covered only by the TA Agreements.  Pl. Br. ¶¶ 8-9, 91-96.  Plaintiffs cannot create a genuine dispute of fact by disagreeing with their own prior statements.  *See Melinas v. Divi Hotels Mktg., Inc.*, No. 80-cv-02152, 1995 WL 598963, at *3 (D. Mass. Aug. 7, 1995) (Wolf, J.).

**B.    The Undisputed Record Demonstrates that the Management
Agreements Cover More than Investment Advisory Services.**

The plain language of the Management Agreements belies Plaintiffs' argument that these

agreements cover only "portfolio management, research, trading, and . . . compliance."  Pl. Br.

¶ 8.  Paragraph 1(a) of the Management Agreements, entitled "Investment Advisory Services,"

does require Fidelity to provide those services.  Gerber Ex. 25, ¶ 1(a).  Critically, however,

Paragraph 1(b) separately requires Fidelity to provide additional "Management Services," which

are defined as follows:

> The Adviser shall . . . perform various services for the [Fund],
> including but not limited to . . . preparing all *general shareholder
> communications* [and] conducting *shareholder relations* . . . [and]
> developing and implementing . . . management and *shareholder
> services designed to enhance the value or convenience of the
> [Fund] as an investment vehicle*.

*Id*. ¶ 1(b) (emphasis added).  Plaintiffs ignore the additional services required by Paragraph 1(b)

and essentially ask this Court to write that provision out of the contract.  Pl. Br. ¶¶ 8, 91.  The

law does not permit this.  *See Fed. Deposit Ins. Corp. v. Singh*, 977 F.2d 18, 22 (1st Cir. 1992)

(rejecting construction that "would render an express clause in the documents nugatory" because

courts must "give reasonable effect to each provision of an agreement wherever feasible").

The fact that the Management Agreements cover a broad array of shareholder services is

confirmed by the undisputed testimony of the parties to the contracts:  Fidelity and the Funds'

Independent Trustees.  For example, Lead Independent Trustee Ned Lautenbach testified that

"under the management fee Fidelity produces tools for how people plan their investment,

provides records, provides reports, provides websites, provides telephone banks, produces

reports, holds annual meetings, . . . . So it's a *very extensive set of support services*."  Dittmar Ex.

5, at 42:9-24.  Other Independent Trustees expressed the same understanding.  *See, e.g.*, Dittmar

Ex. 6, at 35:10-21 (former Lead Independent Trustee Marvin Mann testifying that "there are

*many* things that are provided for the mutual fund under the management contract . . . All of the customer support services, the documentation, the process of shareholder relations, shareholder support . . . ."); Dittmar Ex. 7, at 92:14-21, 93:23-94:17, 154:25-155:17 (Independent Trustee William McCoy testifying that the Management Agreements cover "a whole host of" shareholder services); Dittmar Ex. 4, at 116:6-23 (Independent Trustee Marie Knowles testifying that management fees cover "the web . . . investor centers and telephones").  Likewise, Abigail Johnson, a senior Fidelity executive and one of the minority of "Interested Trustees" on the Funds' Board, testified that the Management Agreements cover "[a]nything that would aid in the support of an improved shareholder experience."  Dittmar Ex. 2, at 58:22-59:20.  The contracting parties' "harmonious recital of what [the Agreements] mean[] is conclusive" and precludes Plaintiffs from creating a genuine dispute as to the scope of the Management Agreements. *Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89, 98-99 (D. Mass. 1994) (internal quotations omitted).

> **C.**  **That the TA Agreements Cover Certain Transaction-Related Services Does Not Create a Genuine Dispute as to Whether the Management Agreements Cover Other Shareholder Services.**

In an effort to contrive a disputed issue of fact regarding the scope of the Management Agreements, Plaintiffs rely on:  (i) the language of the TA Agreements, Gerber Ex. 37; (ii) a document used in training new Trustees, Gerber Ex. 38; and (iii) a Board presentation describing Fidelity's shareholder services, Gerber Ex. 43.  *See* Pl. Br. ¶¶ 92-96.  The TA Agreements and the training document establish only that *some* shareholder services are covered by the TA Agreements—specifically, those relating to transactions and transaction processing.  *See* Gerber Ex. 37, ¶ 3; Gerber Ex. 38, at 2.  This is undisputed and irrelevant.  The fact that the TA Agreements cover shareholder services A, B, and C does not mean that the Management Agreements do not cover shareholder services D, E, and F.  And the Board presentation on its

face provides no support for Plaintiffs.  *See* Gerber Ex. 43.  Their contention that the services

described in the presentation relate to the TA Agreements, as opposed to the Management

Agreements, *see* Pl. Br. ¶ 96, is sheer argument devoid of any record support (and untrue).[6]

The plain language of the TA Agreements makes clear that the Agreements cover a

*specifically enumerated set of administrative and record keeping services.  See* Gerber Ex. 37,

¶ 3; *see also* Dittmar Ex. 2, at 59:21-60:7 (Fidelity executive Johnson testifying that "[t]ransfer

agent services are fairly specifically defined as specific services around supporting shareholder

recordkeeping and they're fairly narrowly defined"); Dittmar Ex. 7, at 92:22-93:17 (Independent

Trustee McCoy testifying that "[t]he transfer agency agreement covers a number of *transaction-*

*oriented activities . . . .  It does not cover all activities of shareholder support of course, but*

*those that are focused on the transaction itself.*").  By contrast, Paragraph 1(b) of the

Management Agreements covers the general provision of shareholder services that "enhance the

value or convenience of the [Fund] as an investment vehicle."  Gerber Ex. 25, ¶ 1(b); *see also*

Dittmar Ex. 25, at 14 ("The management fee covers all shareholder services that are not

specifically enumerated in the transfer agent contract.").

---

[6]      Plaintiffs argue—with no record support—that this presentation was used "in familiarizing the Trustees with the services provided under the transfer agent contract."  Pl. Br. ¶ 96.  However, the word "transfer agent" does not even appear in the document, nor is there any other basis offered by Plaintiffs for asserting that this document had anything to do with the TA Agreements.  Plaintiffs cannot create a genuine dispute of fact by making arguments without record support.

      Moreover, Plaintiffs' argument that this presentation relates to TA services is contrary to their prior positions in this litigation.  Plaintiffs previously submitted *the same presentation* as support for their argument that the nature and quality of services provided by Fidelity was not commensurate with the amount of *management* fees paid by the Funds, contending that the customer satisfaction figures reflected on page 11 of Gerber Ex. 43 demonstrate that Fidelity's "services were not at the top, that they were mediocre services."  Jan. 7, 2011 Hearing Tr. at 103:13-14 (Dkt. No. 252).  However, after Defendants demonstrated at oral argument that the presentation actually shows that Fidelity's customer satisfaction ratings were *above* the industry average, *see id.* at 111:21-112:17, Plaintiffs now argue that the services discussed in the presentation relate to the TA Agreements and are irrelevant.  Pl. Br. ¶ 96.

Many shareholder services are covered by the Management Agreements. These include Fidelity's guidance tools and services that are designed to meet various investor planning needs, such as developing college and retirement savings plans. *See* Dittmar Ex. 5, at 42:9-24 (Lead Independent Trustee Lautenbach testifying that Management Agreements cover "tools for how people plan their investment"). Some of these tools are described in the record:

- Retirement Quick Check – Helps customers who are in the accumulation stage of their investment lifecycle determine if they are saving enough for retirement;

- Retirement Income Planner – Helps customers who are approaching retirement or are already retired determine how long their income will last by providing a detailed retirement income plan;

- Portfolio Review – Provides guidance on specific investment strategies for retirement or other goals for customers with complex investment needs; and

- MyPlan – An interactive tool that provides a quick and simple snapshot of how much a customer should save for retirement and a checklist that emphasizes obtaining maximum retirement benefits from employer-sponsored plans.

*See* Dittmar Ex. 14, at BFMR_00170538; Dittmar Ex. 23, at 36-37.

Plaintiffs further contend that the shareholder services covered by the TA Agreements are provided through Fidelity's call centers, investor centers, and website. Pl. Br. ¶¶ 94-96. This is true for some TA services, but it does not create a genuine dispute as to the scope of shareholder services under the Management Agreements. It merely makes the unremarkable point that Fidelity delivers much of the shareholder service covered by the Management Agreements, as well as the transaction-related service covered by the TA Agreements, through the same personnel, infrastructure, and systems. *See* Dittmar Ex. 5, at 42:25-43:14. That is, the same Fidelity employee, sitting in the same investor center or phone site, can both guide a shareholder through the Portfolio Review tool (a Management Agreement function) and execute his instructions to open a new account (a TA function).

The personnel, systems, and other infrastructure costs are then allocated between the Management Agreements and the TA Agreements so that each agreement bears only its appropriate costs. *See id.* at 42:25-44:22 (Lead Independent Trustee Lautenbach testifying, "[W]e go back and spend time as we do the profitability analysis of funds and allocate those costs between which belong to the transfer agents and which belong to the management contract."). There is no genuine dispute that, based on this allocation process, "Fidelity estimates that a *substantial portion* of investor center expenses are covered by the management fee, not the transfer agency fee." Dittmar Ex. 25, at 14 (emphasis added).

> **D.     Having Failed to Account for All Services, Plaintiffs Cannot Prove that the Funds' Fees Were Disproportionate to the Services Rendered.**

Plaintiffs' misreading of the Funds' Management Agreements is a fatal flaw that pervades their entire case. Most fundamentally, Plaintiffs cannot meet their burden of demonstrating that the fees are disproportionate to the value of the services provided where they compare the fees to only a subset of those services.

Furthermore, Plaintiffs' misinterpretation of the Management Agreements forms the linchpin for many of their arguments on the eight *Jones* factors, including comparisons of the Funds' fees to those paid by institutional clients, economies of scale, costs, profitability, and the quality of services rendered. *See* Pl. Br. ¶¶ 26-34, 53-63, 91. Accordingly, their analyses with respect to these individual factors are skewed and unreliable, as discussed below.

## III.     PLAINTIFFS DO NOT RAISE A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO ANY OF THE *JONES* FACTORS.

> **A.     Plaintiffs' Institutional and Subadvised Fee Comparisons Are Inapt Under *Jones* Because of the Differences in Services.**

*Jones* sets forth the standard that a plaintiff must meet to survive summary judgment based on institutional fee comparisons: *Plaintiffs have the burden* of showing that there is a

"large disparity" in the fees paid that "cannot be explained by the different services provided," in addition to "other evidence that the fee is outside the arm's-length range." *Jones*, 130 S. Ct. at 1429 n.8. Plaintiffs' comparisons of the Funds' fees to the fees paid by Fidelity's institutional and subadvised accounts, *see* Pl. Br. ¶¶ 14-39, fail to meet this burden because the "services rendered are sufficiently different" that the Court "must reject such a comparison." *Jones*, 130 S. Ct. at 1429. Laboring under the illusion that the Management Agreements do not cover shareholder services, *see* Pl. Br. ¶¶ 26-32, 34, Plaintiffs do not even attempt to account for the significant differences in services necessitated by the fact that Fidelity provides shareholder services to millions of the Funds' shareholders, whereas each institutional account represents a single client or a small number of clients. *See* Dittmar Ex. 12, at BFMR_00151579.

For purposes of this motion, Fidelity does not dispute Plaintiffs' contention that Fidelity's institutional clients pay lower fees than the Funds.[7] Pl. Br. ¶¶ 19-20. However, with respect to Plaintiffs' burden of proving that the services are similar, Plaintiffs have previously admitted that the Funds' shareholder servicing is different from servicing institutional accounts. *See* Dittmar Ex. 35, ¶ 56 (admitting that they "have never made the claim that services other than investment management services provided to these two types of clients were the same"). This admission alone should dispose of this point. As noted above, Plaintiffs cannot create a disputed issue of fact by talking out of both sides of their mouths. *Melinas*, 1995 WL 598963, at *3.

---

[7]     Defendants would vigorously dispute this issue at trial. For example, although *some* institutional accounts pay lower rates than the Funds, many institutional clients pay *higher* rates. Indeed, the Fidelity Low-Priced Stock Fund pays a fee rate of 0.63%, *see* Dittmar Ex. 13, at BFMR_00011133, but the standard fee rates for the most comparable "small company" institutional separate accounts range from 0.70% to 0.90%. *See* Gerber Ex. 40, at BFMR_00011574. Further, Plaintiffs' contention that institutional clients pay lower fees in *dollars* than the Funds, Pl. Br. ¶ 24, is meaningless because Plaintiffs have adduced no evidence of the *cost* of servicing the Funds compared to the *cost* of servicing institutional accounts. In other words, the "gross revenue" Fidelity receives from the Funds says nothing about the total costs it incurs in servicing them.

In any event, there can be no dispute that providing shareholder services to a Fund with millions of shareholders is a fundamentally different undertaking from providing shareholder services to an institutional account, which typically consists of just one investor or a small number of investors. *See* Dittmar Ex. 12, at BFMR_00151572-73, BFMR_00151579. The former requires an extensive infrastructure (call centers, branches, a website) that is unnecessary for the latter.[8] *Id.*; *see also, e.g.*, Dittmar Ex. 14, at BFMR_00170535, BFMR_00170543. Indeed, Plaintiffs concede the obvious point that the cost of providing shareholder services increases with the number of shareholders. *See* Pl. Br. ¶ 78; *see also Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 496 (S.D.N.Y. 1988) ("Although the per unit cost of providing management services directly to the Fund decreases as the Fund grows, the per unit cost of servicing Fund shareholders does not."), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

In listing services that they claim are comparable, Plaintiffs rely exclusively on services associated with investment management, Pl. Br. ¶¶ 27-29, 30(c)-(d), or account reporting and recordkeeping, *id.* ¶¶ 30(b), 33-34. Even if Plaintiffs have raised a genuine dispute as to the comparability of those services, that would not meet their burden of raising a genuine dispute as to *all* the services covered by the Management Agreements. Indeed, *Jones* cautioned that service differentials could render such comparisons inapt. *See Jones*, 130 S. Ct. at 1428-29.

With respect to differential costs associated with regulatory compliance, Plaintiffs assert that institutional accounts are subject to "more onerous" regulatory requirements than the Funds, but they cite no evidence supporting that claim. Pl. Br. ¶ 34. Rather, they rely on an excerpt

---

[8]     Plaintiffs' suggestion that Fidelity's fees for institutional accounts are "all-inclusive," Pl. Br. ¶ 18, fails to raise a genuine issue of fact because the question is what services are included in that "all-inclusive" fee and whether they are comparable to the services provided to the Funds' shareholders. There is nothing in the record suggesting that any institutional client has ever made use of Fidelity's call centers, branches, or website, which indeed would be surprising in light of Plaintiffs' acknowledgment that institutional clients have their own account executive and relationship manager. *Id.* ¶ 30(a).

from their expert's deposition stating that one statute (ERISA) is more burdensome than one

other statute (the 1940 Act) on one narrow issue (portfolio management).  *See id.*; Dittmar

Ex. 30, at 187:14-22.  The same expert testified he did not know which statutes and regulations

apply to mutual funds or institutional accounts.  *See id.* at 186:3-13, 187:23-188:8, 189:10-17,

190:14-191:4.  And while the expert conceded that he did not know whether the actual cost of

complying with regulations for mutual funds is greater or less than the compliance costs for

institutional accounts, he admitted that "no issuer of securities is subject to more detailed

regulation" than a mutual fund.[9]  *See id.* at 191:5-22.  The testimony of Fidelity's compliance

officer stands undisputed:  the number of regulations institutional accounts are subject to is "not

even close" to the number of regulations applicable to mutual funds.  Dittmar Ex. 11, at 83:18-

25.  These differences in regulatory burdens also render Plaintiffs' institutional fee comparisons

inapt under *Jones*.  *See Jones*, 130 S. Ct. at 1429 ("more burdensome regulatory and legal

obligations" among potential differences that could require rejection of the comparison).

      Plaintiffs further contend that Fidelity's subadvised funds pay lower fee rates than the

Funds, but they ignore the very definition of a subadvised fund.  *See* Pl. Br. ¶¶ 36-39.  A

subadvised fund is "managed by another management team or firm than where the assets are

held," and the fees for such funds are typically "layered" because they receive services from, and

pay fees to, two separate advisers.  *See* Definition of Sub-advised Fund, www.investopedia.com.

Fidelity provides only investment advisory services to those funds, and it does not provide

shareholder services comparable to those it provides to the Funds.  *See* Gerber Ex. 40, at

---

[9]      Although Plaintiffs' expert opines that the services provided under the Management Agreements
are comparable to the services Fidelity provides to its institutional clients, he admitted at deposition that
he did not know that the Management Agreements cover shareholder communications and many of the
shareholder services provided through Fidelity's website, investor centers, and phone centers.  Dittmar
Ex. 30, at 122:12-19, 159:3-6.

BFMR_00011560.  It stands to reason that the fees a subadvised fund pays to Fidelity for advisory services may be lower than the fees paid by the Funds for a broader set of services.

When an apples-to-apples comparison is made, including both Fidelity's subadvisory fee and the fees paid to the primary adviser for additional services, the overall fees paid by subadvised funds often are higher than the Funds' management fees.  For instance, while Fidelity's Income/Growth subadvised accounts pay Fidelity a fee of between 0.45% and 0.48%, they pay *total* management fees of between 0.72% and 0.75%, higher than the Fidelity Growth & Income Fund's management fee rate of 0.48%.  *See* Gerber Ex. 50, at BFMR_00173892.[10]

**B.      It Is Undisputed that the Funds' Fee Rates Are Lower than the Fees Paid by Comparable Mutual Funds.**

Plaintiffs also compare the Funds' fees to the fees paid by one other fund family (Vanguard)[11] and they compare three of the Funds' fees to one other fund each.  *See* Pl. Br. ¶¶ 40-48.  This evidence fails to raise a genuine issue of material fact.  It will always be possible to find a small number of funds, out of the 8,000 mutual funds in the industry, that have lower fees.  Far more probative is the undisputed fact that the Funds' fee rates are lower than the vast majority of their peer funds.

---

[10]      The cited document is a chart that compares the management fee rates paid by the Funds, categorized by their investment strategy, to the fee rates paid by Fidelity's subadvised funds and institutional accounts in the same investment strategy category.  The column titled "Third-Party 1940 Act Funds Sub-Advised by FMR" identifies the fee rates paid by Fidelity's subadvised funds.  The sub-column titled "FMR Effective Sub-Advisory Fee (bp)" identifies the fee rate those subadvised funds pay to Fidelity *just* for investment advisory services, and the sub-column titled "Fund Total Mgmt Fee (bp)" identifies the *total* management fees those subadvised funds pay (*i.e.*, Fidelity's fee plus the fee paid to the funds' primary adviser).

[11]      Plaintiffs' comparisons to Vanguard do not create a genuine issue of material fact.  *See* Pl. Br. ¶¶ 40-46.  It is immaterial that *one* competitor has some funds with lower fee rates than the Funds, and that is particularly so where that competitor is Vanguard.  *See Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338, 345 (2d Cir. 2006) (that a fund pays higher fees than a Vanguard fund "raises little suspicion" given that Vanguard is "known for its emphasis on keeping costs low").

Plaintiffs' comparisons of the fees paid by three of the Funds (Magellan, Contrafund, and Blue Chip Growth) to the fees paid by just *one* other fund in the Funds' Lipper peer group, Pl. Br. ¶ 48, does not raise a dispute of material fact.  In making these comparisons, Plaintiffs rely on a chart that the Court previously challenged as potentially being "materially incomplete." Jan. 7, 2011 Hearing Tr. at 84:20-86:21 (Dkt. No. 252).  As explained at oral argument, this chart (which Plaintiffs created, *id.* at 84:20-22) falsely suggests that Magellan paid the highest fees of all "competitive funds with greater than $10B" in assets in 2004.  *See id.* at 53:11-56:3.  The chart creates this misimpression because it excludes the five funds (out of twelve) with assets greater than $10 billion that paid higher fee rates than Magellan, and includes only the seven funds that paid lower fee rates.  *Compare* Gerber Ex. 28, *with* Dittmar Ex. 15.

In any event, Plaintiffs' comparisons of some of the Funds' fees to the fees paid by *one* other comparable fund (with one comparator fund used twice), Pl. Br. ¶ 48, presents such a small comparative universe as to be immaterial on its face.  Moreover, the undisputed record is that the Funds' fees are low relative to those paid by the vast majority of peer funds.  Indeed, each Fund's management fee rate was lower than 75% or more of the funds in its "mapped group" of similar funds.  *See* Dittmar Ex. 16.  Even when compared to more limited peer groups including only other large funds, the Funds' management fees rates were low.  For example, Magellan and Contrafund's management fee rates were lower than 116 of 156 (over 74% of) funds in their asset-sized peer groups.  *See* Dittmar Ex. 17, at BFMR_00020993, -98; Dittmar Ex. 18, at BFMR_00020970, -75.  Further, Plaintiffs' own expert conceded that Fidelity's fees are "generally low in the industry."  Dittmar Ex. 28, at 203:15-17.

Plaintiffs' dollar comparisons are also inapt and fail to raise a genuine issue of material fact.  *See* Pl. Br. ¶¶ 12, 48.  No court has ever compared fees by comparing the total dollars paid

rather than the fee rates.[12]  Rather, all seven Section 36(b) cases to go to trial used fee rates or

total expense ratios to make compensation comparisons.[13]  Furthermore, *Jones* articulated the

test under Section 36(b) as focusing on fee rates, not the dollar amount of fees paid.  *See Jones*,

130 S. Ct. at 1425 ("[T]he test is essentially whether the *fee schedule* represents a charge within

the range of what would have been negotiated at arm's-length in the light of all of the

surrounding circumstances.") (quoting *Gartenberg*, 694 F.2d at 928) (emphasis added).

　　　　This is for good reason:  It makes no sense to consider an adviser's gross revenues

without also considering the magnitude of its costs.  Here, Plaintiffs concede that the cost of

providing shareholder services increases with fund assets, and that these Funds are among

Fidelity's "largest."  *See* Pl. Br. at 1, ¶ 78; *see also Krinsk*, 715 F. Supp. at 496 (noting that per

unit cost of servicing shareholders does not decrease as fund assets increase).  Thus, while the

Funds have significant fees in dollars, they also incur significant costs servicing millions of

shareholders.  *See* § III.D, *infra*.  Comparing the Funds' total fees in dollars to the total fees in

dollars paid by other funds without considering their respective costs is as meaningless as

---

[12]　　　Plaintiffs claim that in *Gartenberg*, the Second Circuit considered the total dollars paid.  Pl. Br. at 1.  However, *Gartenberg* recognized exactly why fee revenue in dollars must be viewed in the context of the size of the fund and the number of shareholders in the fund.  The Second Circuit did not use the total dollars paid to *compare* the funds' fees to the fees paid by peer funds—the Second Circuit only discussed the total dollars paid by the fund in the context of examining the fund's profit margin.  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 930-31 (2d Cir. 1982), *aff'g* 528 F. Supp. 1038 (S.D.N.Y. 1981).  Moreover, the court explained, on the same pages cited by Plaintiffs, that "the substantial increase in the Manager's fee, from $1,578,476 in 1977 to $39,369,587 for the year ending June 1981, *resulted from the tremendous increase in the size of the Fund*, from $428 million to over $19 billion during the same period," and that "[t]his increase *multiplied the number of customers, daily transactions and other activities* which the Manager and the Merrill Lynch organization handled as part of the service for the fee, *thereby increasing costs proportionately*."  *Id.* at 930 (emphasis added).

[13]　　　*See In re Am. Mut. Funds Fee Litig.*, No. 04-cv-5594, 2009 WL 5215755, at *25-*28, *52 (C.D. Cal. Dec. 28, 2009) ("*Am. Funds*"); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1249 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574, 576 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Krinsk*, 715 F. Supp. at 496-97; *Schuyt v. Rowe Price Prime Reserve Fund*, 663 F. Supp. 962, 988 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984); *Gartenberg*, 528 F. Supp. at 1048-49.

comparing the total tuition dollars paid to UMass Amherst to the total tuition dollars paid to UMass Dartmouth.[14]

Plaintiffs' comparison of the Funds' fees in dollars to one other smaller Fidelity equity fund (the Fidelity Trend Fund) fails for similar reasons.  *See* Pl. Br. ¶¶ 49-52.  Using the average account size for equity funds ($11,500)[15] and Plaintiffs' total asset figures, in 2007, the Fidelity Trend Fund had roughly 96,000 shareholders, while Contrafund had *7 million* shareholders.  Plaintiffs concede that more shareholders means more shareholder services to be delivered and hence more cost.  *See id.* ¶ 78.  The comparison is inapt.

On this record, Plaintiffs cannot prevail on this factor at trial.  Identifying a small handful of funds with lower fees does not change the fact that the Funds' fees are below industry averages for similar funds.  *See Am. Funds*, 2009 WL 5215755, at *53, ¶¶77-78 (evidence that "Defendants' fees were lower than industry averages for comparable funds as measured by independent third parties Lipper and Morningstar" supports a finding that fees were not disproportionate); *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 977 (D. Minn. 2007) (granting summary judgment where fees were "at or below the median of funds in their peer group"), *reinstated by* 2010 WL 5137419 (D. Minn. Dec. 10, 2010).

### C.    Plaintiffs Do Not Meet Their Burden of Demonstrating that Economies of Scale Were Not Appropriately Shared with the Funds.

Plaintiffs contend, based on their expert's analysis, that Fidelity retained approximately $3.2 billion in economies of scale benefits.  *See* Pl. Br. ¶¶ 62-63.  Plaintiffs' analysis is flawed for various reasons, including because their expert considered only the costs of providing

---

[14]    Similarly, Plaintiffs' argument that the Funds' fees in total dollars are "unprecedented,"  Pl. Br. at 4, is meaningless without also considering the total assets, the number of shareholders, and the extent of services provided.  Plaintiffs' argument is the same as suggesting that the total tuition dollars paid to Arizona State University are "unprecedented" while disregarding that it is the country's largest university.

[15]    *See* Dittmar Ex. 19, at BFMR_00015108.

investment advisory services, and he failed to consider the costs of providing the shareholder services that are covered by the Management Agreements.  *See* Dittmar Ex. 30, at 371:8-25; *see also Krinsk*, 715 F. Supp. at 496; *Am. Funds*, 2009 WL 5215755, at *28, ¶242.

However, the Court does not need to reach that issue because Plaintiffs' own evidence reveals that Fidelity shared almost $1.9 billion of economies of scale with the Funds, or at least 37% of all scale economies realized.  Courts have held this level of sharing does not support a finding of disproportionality.  Moreover, $1.9 billion represents the *minimum* amount of sharing by Fidelity, as Plaintiffs' analyses do not account for all the methods of sharing.  Plaintiffs bear the burden of proof on the level of sharing, and the most that can be concluded from their evidence is that Fidelity shared at least 37%—and perhaps all—of the scale economies realized.

1.     **Plaintiffs' Expert's Analysis Does Not Establish that Fidelity Failed to Share Economies of Scale Benefits with the Funds.**

Economies of scale are decreases in the per-unit costs of producing a good or service that result from increases in the level of production.  *See Am. Funds*, 2009 WL 5215755, at *51, ¶63. Where the adviser has increased profits due to the cost reductions achieved by economies of scale, the question under Section 36(b) is whether those increased profits were appropriately shared with fund shareholders.  Economies of scale profits or benefits can be shared in a variety of ways, such as by reducing fees under a breakpoint schedule, or by plowing the additional profits back into the funds via enhanced services.  *See id.* at *52, ¶70.  Thus, it is meaningless under Section 36(b) to prove that economies of scale exist; Plaintiffs must also prove that they were not appropriately shared with fund shareholders.  *See id.* at *51, ¶¶64, 69 (plaintiffs must prove both that economies of scale were realized and that benefits were not adequately shared); *Kalish*, 742 F. Supp. at 1228 (framing the issue as "whether economies of scale were realized by the adviser-manager *and shared with the shareholders*") (emphasis added).

No case has ever held that the adviser must pass on *all* the benefits of economies of scale. Such a rule would dis-incent mutual fund advisers from creating efficiencies or reducing costs as assets increase. Rather, the benefits of scale are to be *shared* between the adviser and the fund. *See* S. Rep. No. 91-184, at 4901 ("[T]his bill recognizes that investors should share equitably . . . in the economies available as a result of the [fund] growth."). Thus, for the economies of scale factor to weigh in favor of a violation of Section 36(b), Plaintiffs must prove that the amount of sharing was so inadequate that it could not have been the product of arm's-length bargaining. *See Gallus*, 497 F. Supp. 2d at 982 (granting summary judgment where plaintiffs failed to establish that "the amounts shared [fell] outside the range that could have been negotiated at arm's length").

Plaintiffs rely primarily on their expert's analysis, which purports to show that Fidelity realized approximately $5.1 billion in economies of scale benefits, of which it shared approximately $1.9 billion (or 37%) with the Funds and retained approximately $3.2 billion (or 63%). *See* Pl. Br. ¶¶ 62-63; Gerber Ex. 18, at 27; Dittmar Ex. 30, at 389:15-390:6. This analysis breaks down on a Fund-by-Fund basis as follows:

| Fund | EOS Realized ($M) | EOS Retained ($M) | EOS Shared ($M) | % Shared |
|------|------------------:|------------------:|----------------:|---------:|
| Contrafund | $1,275 | $804 | $471 | 36.9% |
| Magellan | $1,614 | $1,033 | $581 | 36.0% |
| Low-Priced Stock | $876 | $562 | $314 | 35.8% |
| Growth & Income | $763 | $456 | $307 | 40.2% |
| Blue Chip Growth | $569 | $352 | $217 | 38.1% |
| **TOTAL** | $5,097 | $3,207 | $1,890 | 37.1% |

*See* Gerber Ex. 18, at 27.

Even assuming Plaintiffs' evidence is true, it does not meet Plaintiffs' burden with respect to economies of scale.  Sharing 37% of the overall economies of scale is consistent with the range other courts have found to be appropriate.[16]  *See Gallus*, 497 F. Supp. 2d at 981-82 (17% shared); *Am. Funds*, 2009 WL 5215755, at *52, ¶72 (40% shared).

In any event, Plaintiffs' expert's analysis is incomplete because he concededly accounted for only the sharing that was done via breakpoints, and not for sharing via service enhancements. *See* Dittmar Ex. 30, at 106:15-20, 378:4-11, 389:15-390:6.  Plaintiffs' expert did not question that Fidelity enhanced services over the years in question, *see* Dittmar Ex. 9, at 194:5-195:20 (Fidelity executive testifying that Fidelity spends over $2 billion per year on technology investments), and he conceded that an adviser can share economies of scale "by deliver[ing] more services," but he made no effort to account for Fidelity's service enhancements in his analysis of sharing.  Dittmar Ex. 30, at 393:2-12.  On this record, Plaintiffs cannot show that Fidelity failed to share *any* economies of scale with the Funds, much less that the extent of sharing was so insufficient as to fall outside the range of arm's-length bargaining.

### 2.    Plaintiffs' Challenge to the Group Fee Does Not Raise a Genuine Dispute with Respect to Sharing.

Plaintiffs' remaining "facts" concerning economies of scale challenge the group fee structure.  *See* Pl. Br. ¶¶ 64-66.  These "facts" do not raise a genuine dispute with respect to sharing of economies of scale.

First, Plaintiffs' theory of group fee harm—that one Fund's assets could increase when group assets decrease—did not happen during the time period at issue.  *See* § I.C, *supra*.

---

[16]    The same is true for Plaintiffs' expert's alternative analysis, under which Fidelity shared 24.4% of the overall economies of scale realized, and the level of sharing ranged from 21.9% for Growth & Income to 33.2% for Blue Chip Growth.  *See* Pl. Br. ¶ 63; Gerber Ex. 18, at 27.

Second, the relevant issue is the extent to which economies of scale were shared, not the *method* by which they were shared.  No court has ever prescribed the methods by which economies of scale must be shared.  Any such finding would be contrary to *Jones*, which holds that Section 36(b) is sharply focused on the amount of compensation, not its structure.  *See Jones*, 130 S. Ct. at 1430.

Third, Plaintiffs' challenge to the group fee merely seeks to re-litigate issues that were considered at length by the Funds' Independent Trustees.  This is forbidden by *Jones*.  *See id.* ("§ 36(b) does not call for judicial second-guessing of informed board decisions.").  The Trustees have deliberated extensively about the group fee since at least 1994, and they have concluded, on several occasions, that the group fee was the most appropriate means to handle economies of scale because the vast majority of Fidelity's costs are joint-and-common across multiple funds, and thus any cost savings attributable to economies of scale were achieved across the complex, not by any individual fund.  *See* Dittmar Ex. 31 (summarizing Trustees' consideration of group fee since 1994); Gerber Ex. 7, at 240:22-241:7.  The Trustees specifically analyzed whether large funds, including the Funds at issue here, adequately share in the benefits of economies of scale, and they considered, but rejected, the possibility of adding individual fund breakpoints for larger funds.  *See* Dittmar Ex. 31.  Section 36(b) does not permit Plaintiffs to second-guess this considered business judgment.  *See Jones*, 130 S. Ct. at 1430.

Finally, the group fee and the Trustees' business judgment are consistent with judicial decisions, legislative history, and other authority recognizing that economies of scale are realized, and can be considered, on a complex-wide basis.  *See Am. Funds*, 2009 WL 5215755, at *52, ¶72 ("[I]t is appropriate to consider sharing of economies of scale across the entire complex"); SEC, Division of Investment Management, Report on Mutual Fund Fees and

Expenses § IV.B.1 (Dec. 2000) ("These results suggest that, in certain instances, economies of scale may be realized primarily at the fund family level and only to a lesser extent or not at all at the fund level."); S. Rep. No. 91-184, at 4910 (courts may consider "services rendered by such investment advisers to other funds in such complex and compensation or payments made by such other funds for such services").

> **D.**    **It Is Undisputed that Fidelity Incurs Significant Costs in Providing Services to the Funds.**

Plaintiffs address this factor by identifying a handful of costs that they contend "remain fairly constant." *See* Pl. Br. ¶¶ 69-78. These assertions do not give rise to a genuine fact dispute because they do not address the amount of Fidelity's costs, and they fail to consider Fidelity's costs of providing shareholder services under the Management Agreements.

The unrefuted record demonstrates that Fidelity's expenses incurred in the management of the Funds are significant by any standard.[17] Fidelity's overall costs amounted to $3.9 billion in 2003, $4.5 billion in 2004, $4.9 billion in 2005, and $5.9 billion in 2006. Dittmar Ex. 27, at App. 3. Based on the cost-allocation methodologies employed by Fidelity and the Board to estimate fund-specific costs, Fidelity's costs of managing and servicing each of the five Funds ranged from $135 million to $315 million per year from 2003 to 2006. *See id.* While Plaintiffs disagree with those allocation methodologies, they offer no evidence as to what the appropriate allocation of costs to the Funds would be under any other methodology. *See* Pl. Br. ¶¶ 147-150.

Fidelity's significant costs are inconsistent with a finding of disproportionality and undermine Plaintiffs' arguments regarding the dollar amount of the Funds' fees. *See* Pl. Br.

---

[17]    The cost data cited in this section reflects (1) Fidelity's overall costs of managing all of the mutual funds in the Fidelity complex and (2) Fidelity's overall costs of managing each of the five Funds at issue based on the annual fund profitability process. These cost figures reflect the costs associated with all of the services provided by Fidelity to the Funds, including under the Management Agreements and under the TA Agreements. The summary judgment record does not include complex- or fund-level cost data relating specifically to services covered by the Management Agreements.

¶¶ 12, 48.  Indeed, as discussed below, Fidelity's profit margins are in line with those of other advisers.  *See* § III.E, *infra*.  Thus, to the extent Fidelity's revenues in dollars were higher than those of other advisers, Fidelity's costs in dollars were also higher by a commensurate amount.

Instead of contesting that Fidelity incurs significant costs, Plaintiffs contend that Fidelity's costs of providing investment advisory services to the Funds "remain fairly constant" as the Funds increase in size.  Pl. Br. ¶ 69; *see also id.* ¶¶ 70-77.  Even if true,[18] the evidence of the alleged constancy of costs relates only to the costs of providing investment advisory services and does not account for the costs of providing shareholder services.  *See id.* ¶¶ 70-77; Dittmar Ex. 30, at 117:4-22, 122:12-19, 159:3-16.  Plaintiffs concede that shareholder servicing costs increase with fund size, *see* Pl. Br. ¶ 78; Dittmar Ex. 30, at 279:7-280:24, but they improperly ignore those costs.  *See* § II, *supra*.  In any event, even if costs were constant, that would not assist Plaintiffs in meeting their burden regarding whether those costs were high.

**E.  Plaintiffs Do Not Raise a Genuine Dispute that Fidelity's Profitability Is Reasonable and Consistent with Industry Norms.**

Plaintiffs do not create a genuine issue of material fact with respect to Fidelity's profitability, *see* Pl. Br. ¶¶ 79-82, because their profitability calculations consider only the costs of providing investment advisory services.  They ignore the substantial costs Fidelity incurs in providing shareholder services under the Management Agreements.  Furthermore, even if the Court were to assume that Plaintiffs' inflated margins were real, they fall within the range courts have found acceptable under Section 36(b).  Plaintiffs' evidence regarding profitability thus does not assist them in meeting their burden of proof.

---

[18]   At trial, Defendants would dispute this fact and present evidence that the costs of providing advisory services increase when fund assets increase.  *See, e.g.*, Dittmar Ex. 27, at App. 3.

Plaintiffs' only evidence with respect to Fidelity's profitability is the purported pre-tax "investment management" margin calculated by one of their experts. *See* Pl. Br. ¶¶ 80, 82. This evidence is meaningless because, as Plaintiffs themselves explain, the margin was "calculated by taking investment management revenue minus *investment management cost*." Pl. Br. ¶ 80 (emphasis added). Thus, this margin calculation expressly fails to account for the costs incurred in connection with the shareholder services provided under the Management Agreements. It is self-evident that including all of the Funds' management fee revenue, but only a subset of the management fee costs, produces a margin that is inflated.

In addition, Plaintiffs proffer no rationale for considering Fidelity's profitability only on a pre-tax basis. *See* Pl. Br. ¶¶ 80-82. They do not contend that Fidelity does not pay its taxes, nor do they contend that tax expenses are any less real than Fidelity's other expenses. Again, excluding these costs from the margin calculation only serves to inflate the resulting margin.

Even if considered, however, Plaintiffs' pre-tax "investment management margins" do not support a finding of disproportionality and thus are not material to an analysis of the profitability factor. Plaintiffs' proffered margins of 52% to 86%, *see* Pl. Br. ¶ 80, fall within the same range as pre-tax margins found to be reasonable by prior courts. *See Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (up to 89% pre-tax), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Schuyt*, 663 F. Supp. at 978 (up to 77% pre-tax); *Am. Funds*, 2009 WL 5215755, at *50, ¶58 (up to 52% pre-tax).

Finally, if the Court disregards—as it must—Plaintiffs' inflated margins and looks to measures of profitability that include all management fee costs, those margins confirm that the profitability factor does not support a finding of disproportionality. Fidelity's overall profitability is below average relative to mutual fund investment advisers for which profitability

data is available.  *See* Dittmar Ex. 23, at 38; *see also Am. Funds*, 2009 WL 5215755, at *50, ¶61

(overall margins below the industry average weigh against a finding of disproportionality).

Furthermore, the estimated post-tax margins for the Funds, based on all the revenue received and

all the costs incurred by Fidelity, ranged from 15.9% to 34.1% in 2004.[19]  *See* Gerber Ex. 41, at

BFMR_00020780-81.  These individual fund margins are lower than and well within the range

of post-tax profitability levels in prior cases where courts have rejected Section 36(b) claims.[20]

*See Schuyt*, 663 F. Supp. at 978 (up to 38.6% post-tax); *Gartenberg*, 694 F.2d at 928 (up to

38.4% post-tax); *Kalish*, 742 F. Supp. at 1250 (up to 35% post-tax).

**F.     It Is Undisputed that Fidelity Provides High Quality Services.**

Plaintiffs have not met their burden of raising a genuine issue of material fact with

respect to the quality of the services provided to the Funds, *see* Pl. Br. ¶¶ 83-103, because

Plaintiffs, once again, ignore shareholder services provided under Paragraph 1(b) of the

Management Agreements and therefore fail to consider the complete package of services.  *Id.*

¶¶ 91-96.  Further, Plaintiffs' arguments about the purportedly "poor" investment performance of

certain Funds fail to raise a genuine issue of material fact because Plaintiffs adduce *no* evidence

of how the Funds' performance compared to the performance of peer funds and, instead, point

only to the Funds' cumulative returns during a limited and patently skewed time period that

coincides with the low point in the recent historic recession.  *Id.* ¶¶ 85-86.

---

[19]     The difference between the profit margins when *all* costs covered by the Management
Agreements are included and the profit margins when *only* investment advisory costs are included
underscores just how expensive the shareholder services covered by the Management Agreements are.

[20]     Although Plaintiffs criticize the cost-allocation process Fidelity and the Trustees used to estimate
the individual Fund margins, *see* Pl. Br. ¶¶ 147-157, they do not offer any evidence that the supposed
errors would have a material impact on the Funds' margins.  Indeed, their purported cost-accounting
expert conceded that he has not calculated an alternative margin based on the complete set of services
provided to the Funds or the total costs to Fidelity of providing those services.  *See* Dittmar Ex. 29, at
116:24-117:8; *see also id.* 228:18-23 (conceding he has not determined whether Fidelity's reported profit
margins are over- or understated).

1.      **Plaintiffs Do Not Raise a Genuine Dispute Regarding the
        Quality of Fidelity's Shareholder Services.**

Plaintiffs primarily argue that shareholder services are *all* provided under the TA

Agreements and should not be considered.  *See id.* ¶¶ 91-96.  They are wrong.  *See* § II, *supra*.

Plaintiffs also argue that shareholder services should be disregarded because they are

provided by FMR Corp., the parent company of the investment adviser defendants.  *See id.*

¶¶ 97-100.  However, the Management Agreements themselves provide that "[Fidelity] shall

perform (*or arrange for the performance by its **affiliates** of*) the management and administrative

services necessary for the operation of the Fund."  Gerber Ex. 25, ¶ 1(b) (emphasis added).

Moreover, as *Gartenberg* recognized, ignoring certain services because they are provided by a

distinct, but related, corporate entity would exalt form over substance.  *Gartenberg*, 528 F. Supp.

at 1052 (rejecting plaintiffs' argument that shareholder services provided by the adviser's

brokerage affiliate should not be considered and holding that it is "entirely proper for the

fiduciary to consider the totality of the values placed at the disposal of the shareholders in

appraising the fairness of the compensation, or else form would be substituted for substance").

The only evidence Plaintiffs cite as support for their contention that Fidelity's

shareholder services are not high quality is testimony by *one* named Plaintiff that he had a

problem with the website more than "ten years ago," and testimony by another named Plaintiff

that he does not choose to make use of the services.  *See* Pl. Br. ¶ 89.  Evidence of two

shareholders' experience (out of many millions) does not create a genuine issue of material fact

with respect to the overall quality of Fidelity's shareholder services, especially given the record

evidence that Fidelity's services were above average compared to the industry according to

customer satisfaction surveys.  *See* Dittmar Ex. 14, at BFMR_00170532.  Further, other named

Plaintiffs testified that they used Fidelity's services, considered them "good" and "helpful," and

were "generally happy" with them.  Dittmar Ex. 1, at 78:18-25; Dittmar Ex. 8, at 84:24-85:3.[21]

> ### 2.   Plaintiffs Do Not Raise a Genuine Dispute Regarding the Funds' Investment Performance.

Plaintiffs also fail to raise a genuine issue of material fact regarding the quality of the Funds' services based on the Funds' investment performance.  Pl. Br. ¶¶ 84-88.  Plaintiffs argue that each of the Funds had "poor" performance by claiming that, for four of the five Funds, a $10,000 investment made at year-end 2003 would be worth less than $10,000 on March 31, 2009.  *See* Pl. Br. ¶¶ 85-86.  But this time period has no particular relevance to this litigation, and as shown in the below chart of the S&P 500's returns, its end date corresponds to the near bottom of the worst equity market in generations.  Almost any equity fund would appear to have had poor absolute performance during this time period.

**S&P 500 (December 29, 2003 – December 28, 2009)[22]**



---

[21]     Plaintiffs' argument that Fidelity should have tracked usage of shareholder services on a fund-by-fund basis, *see* Pl. Br. ¶ 102, is immaterial.  It would not make sense for Fidelity to do this because many shareholders are invested in multiple funds.  Additionally, Plaintiffs' claim that the Trustees never received information about the Funds' use of these services or their value to the Funds, *see* Pl. Br. ¶¶ 101, 103, is belied by the very documents Plaintiffs rely upon.  *See* Gerber Ex. 43.

[22]     Source:  www.finance.yahoo.com/echarts.

There can be no dispute that two of the Funds (Contrafund and Low-Priced Stock) have had exceptional performance, in both absolute and comparative terms, with their portfolio managers being recognized as top performers by Morningstar. *See* Gerber Ex. 41, at BFMR_00020780-81 (showing that Contrafund's and Low-Priced Stock's performance ranked in the highest quartile of their Lipper peers); Dittmar Exs. 33-34. However, even to the extent certain of the Funds experienced some disappointing performance, it is well established that underperformance alone is insufficient to establish disproportionality under Section 36(b). *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327-28 (4th Cir. 2001) ("[A]llegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive."); *Amron*, 464 F.3d at 344 (same); *Benak v. Alliance Capital Mgmt., L.P.*, No. 01-cv-5734, 2004 WL 1459249, at *9 (D.N.J. Feb. 9, 2004) (same). Half of all funds have below average performance at any given time.

Plaintiffs also disregard that four of the five Funds have performance adjustments, which reduce Fidelity's management fees during periods of underperformance.[23] *See* Dittmar Ex. 20, at BFMR_00295116. Indeed, performance adjustments reduced Fidelity's management fees for Blue Chip Growth and Magellan by tens of millions of dollars during years where there was underperformance. *See id.*; *see also Gallus*, 497 F. Supp. 2d at 980 (granting summary judgment in favor of adviser where plaintiffs did "not address the fact that the Funds' fees were subject to [performance adjustments] that reduced fees if performance was in fact 'poor'").

---

[23]    The one exception, Growth & Income, has a flat rate that is at least 10 basis points lower than the individual fund fee rates for the other Funds at issue. *See* Dittmar Ex. 13, at BFMR_00011128.

### G.     Plaintiffs Do Not Identify Disputed Facts Sufficient to Show that Fidelity Receives Fall-Out Benefits from Managing the Funds.

With respect to fall-out benefits, Plaintiffs rely on evidence that Fidelity uses its profits from the Funds to "subsidize" new, small, and unprofitable mutual funds.  Pl. Br. ¶¶ 105-117. This evidence does not raise a genuine issue of material fact with respect to the fall-out benefits factor because Plaintiffs do not cite any evidence that the smaller, unprofitable funds generate profits that Fidelity would not have realized "but for" its management of the Funds, much less demonstrate that any such profits contribute to a finding of disproportionality.  *See* Pl. Br. ¶ 104 ("'Fall-out benefits' are profits to the adviser that 'would not have occurred *but for* the existence of the Fund.'") (quoting *Krinsk*, 715 F. Supp. at 495) (emphasis added).

Plaintiffs previously conceded that Fidelity does *not* realize profits from its potential fall-out businesses.  *See* Dittmar Ex. 35, ¶¶ 48-49.  Nevertheless, they now contend that Fidelity enjoys a fall-out benefit because it "'leverage[s]' the strength and value of the Funds to add dozens of new (and unprofitable) mutual funds to the Fidelity complex annually."  Pl. Br. ¶¶ 105, 116.  Even if the Court were to consider Plaintiffs' new version of the facts, these facts do not establish that Fidelity realized fall-out benefits.

First, as the Court noted at oral argument, Plaintiffs' subsidization argument fails because how Fidelity chooses to use its profits is entirely irrelevant absent a showing that the fee is disproportionate to the services provided.  *See* Jan. 7, 2011 Hearing Tr. at 106:18-21 ("[I]f the compensation from the large funds is not disproportionate, within the meaning of the statute, how they use their money, I think, is up to them.") (Dkt. No. 252); *accord Am. Funds*, 2009 WL 5215755, *47, ¶40 ("[T]he fairness of the fee must be assessed in relation to the services rendered, not to the use to which the fee was put.") (internal quotations omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005) (Section 36(b)

"addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds."), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007).

Second, Plaintiffs misunderstand the concept of "fall-out benefits." Fall-out benefits are indirect *profits* that the adviser obtains as a result of managing the funds. Plaintiffs do not offer any evidence of profits, but instead rely on losses incurred by Fidelity. *See* Pl. Br. ¶¶ 107-108.

Finally, Plaintiffs fail to cite any evidence that would enable them to make the required showing that Fidelity would not be able to launch new funds at a loss "but for" its relationship with the Funds. *See Krinsk*, 715 F. Supp. at 495. Nor do they quantify the amount of the purported fall-out benefits as required to carry their burden. *See Gartenberg*, 694 F.2d at 932.

## H.     It Is Undisputed that Fidelity Handles an Enormous Number of Shareholder Interactions.

Plaintiffs do not rely on the volume of orders factor to defeat summary judgment. *See* Pl. Br. ¶ 118. However, this factor supports a grant of summary judgment because Fidelity handles a huge volume of shareholder interactions pursuant to the Management Agreements.

As of March 2006, Fidelity's retail division handled more than 35 million customer interactions per month, not including in-person interactions at investor centers. *See* Dittmar Ex. 14, at BFMR_00170527. A substantial portion of these shareholder interactions relate to shareholder services that are covered by the Management Agreements. *See* § II, *supra*. Handling this enormous volume of interactions requires Fidelity to maintain, and incur the expense associated with, significant customer service personnel, systems, and infrastructure, which weighs against a finding that the Funds' management fees are disproportionate to the services provided. *See Gartenberg*, 694 F.2d at 933.

Plaintiffs seek to avoid this fact by contending that the volume of orders factor should be limited to the processing of purchase and redemption orders, which is covered by the TA Agreements.  *See* Pl. Br. ¶ 119.  However, there is no legal basis for Plaintiffs' narrow view of this factor.  To the contrary, *Jones* mandates a flexible inquiry under which "all relevant circumstances [must] be taken into account."  *Jones*, 130 S. Ct. at 1427.  Moreover, although some prior courts focused primarily on purchase and redemption orders of the money market funds at issue in those cases, they did not rule out consideration of other shareholder interactions and, in fact, considered the full range of shareholder inquiries handled by the adviser.  *See, e.g.*, *Gartenberg*, 694 F.2d at 930-32 (noting that "[t]he services rendered to shareholders by the Merrill Lynch organization . . . greatly exceeded those that could be furnished by the [fund's transfer agent]"); *Schuyt*, 663 F. Supp. at 975-76 (considering shareholder inquiries of all types).

## I.  There Is No Genuine Dispute that the Funds Were Overseen by an Independent and Conscientious Board of Trustees.

Plaintiffs do not contest the impeccable qualifications of the Independent Trustees, who included the current Secretary of Defense, as well as current and former CEOs and CFOs of major corporations such as Dow Chemical, Deloitte & Touche, and Atlantic Richfield Company.  *See* Dittmar Ex. 32.  Nor do they contest that, during the years at issue, the Independent Trustees comprised a super-majority of the Funds' Board of Trustees.  *See* Dittmar Ex. 23, at 14.

Instead, Plaintiffs contend that the Independent Trustees were responsible for overseeing too many funds, Pl. Br. ¶¶ 122-127; that the Trustees did not "actually negotiate" the Funds' management agreements, *id.* ¶¶ 128-138; and that Fidelity should have provided different information to the Board, *id.* ¶¶ 139-165.  Plaintiffs' criticisms of the Board process fail to raise a genuine issue of material fact because they are contradicted by the record evidence, are an effort to second-guess the Board's business judgments, or are exactly the types of arguments

prior cases have rejected. The Court, however, does not need to resolve the issues raised by Plaintiffs: Even if every one of their criticisms of the Board process had merit, that would not be enough to defeat summary judgment because Plaintiffs' evidence regarding the other factors does not satisfy their burden of proving that the fees themselves were disproportionate to the services provided by Fidelity, as required by Section 36(b). *See Jones*, 130 S. Ct. at 1430.

1.     **Plaintiffs' Arguments Regarding the Independent Trustees' Workload Do Not Raise a Genuine Dispute of Material Fact.**

Plaintiffs take issue with the fact that, during most of the period at issue, the Independent Trustees sat as a unitary Board that oversaw 300 or more Fidelity mutual funds. *See* Pl. Br. ¶¶ 122-127. Plaintiffs ask how the Board could possibly have been conscientious given the sheer volume of funds it had to oversee. *Id.* The answer is the undisputed fact that most of the issues the Trustees consider are joint-and-common to all or to large sub-sets of the funds. As noted above, the vast majority (84%) of Fidelity's costs of managing its retail mutual funds are shared across a large number of funds in the Fidelity complex, and the same personnel, infrastructure, and systems are used to provide services to all of Fidelity's retail mutual funds and their shareholders. *See* Dittmar Ex. 24, ¶ 29. As Plaintiffs acknowledge, "many issues bearing on excessive compensation are common to all five Funds." Pl. Br. at 1. Just as the Court's analysis of many issues necessarily cuts across all the Funds, so too does the Trustees' consideration of those same issues. For instance, there is no reason for the Court or the Trustees to separately evaluate the quality of Fidelity's shareholder services for each individual Fund given that those services, and the infrastructure and personnel used to provide them, support each of the Funds.

Nor is there any reason to separately consider Fidelity's research and trading systems for each Fund because the same resources are employed in managing all of the Funds.[24]

In short, the mere number of funds is meaningless in the absence of evidence that the number and complexity of issues were beyond the reach of this undisputedly talented, hard-working, and well-advised group of Independent Trustees.[25]  Plaintiffs submit no such evidence.

Plaintiffs argue that the Trustees were not conscientious because they purportedly spent only a few minutes each year *approving* each of the Funds' contracts.  Pl. Br. ¶ 127.  This argument is contradicted by the undisputed evidence.[26]  The Trustees' undisputed testimony is that they devote *hundreds of hours* each year to their Board service.  *See* Dittmar Ex. 4, at 17:21-18:17 (Independent Trustee Knowles testifying that she devotes 600-700 hours per year to her Board services, including attending 11 in-person meeting a year and reviewing approximately 1,000 pages of informational materials each month); Dittmar Ex. 7, at 79:3-25 (former Independent Trustee McCoy testifying he devoted 500-700 hours each year); Dittmar Ex. 6, at 106:4-18 (former Lead Independent Trustee Mann; at least 400-500 hours per year); Dittmar Ex. 10, at 100:12-101:2 (Independent Trustee Stavropoulos; 300-400 hours per year).[27]  Plaintiffs

---

[24]   The undisputed record also makes clear the efficiencies built into the Board's committee structure, which enables groups of Trustees to focus on particular issues before they are presented to the full Board.  *See, e.g.*, Dittmar Ex. 21, at BFMR_00050174-77; Dittmar Ex. 6, at 106:19-110:16.

[25]   The Independent Trustees are advised by their own counsel from Debevoise & Plimpton LLP and by PricewaterhouseCoopers LLP.  Dittmar Ex. 23, at 16-17; Dittmar Ex. 26, at 10-11.

[26]   The court's decision in *Strougo v. BEA Associates*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002), does not support Plaintiffs' argument that their "minutes per fund" calculations raise a genuine issue of material fact.  The *Strougo* court *granted* summary judgment *in favor of defendants*, and the decision contains no suggestion that the amount of time the board spent reviewing the fund's contracts would support a Section 36(b) claim.

[27]   Plaintiffs misstate the record in arguing that the Trustees' compensation is in return for "eleven in-person meetings," Pl. Br. ¶ 125, in light of the undisputed record that the Trustees spend hundreds of hours a year on their Board service.  The purported comparison between the Trustees' compensation and that earned by trustees of other funds, *id.* ¶ 126, is also irrelevant in the absence of evidence that the qualifications and hours of service of those other trustees are comparable.

contrive their "minutes per contract" calculations by considering only the Trustees' attendance at the June and July Board meetings, at which the Management Agreements are voted upon by the Trustees. *See* Pl. Br. ¶ 127. However, the Trustees' undisputed testimony is that all of the hundreds of hours they spend throughout the year relate to their assessment of the Funds' fees. *See* Dittmar Ex. 4, at 261:12-262:8 (Independent Trustee Knowles testifying, "The [15(c)] package is merely a final data package that augments all of the multiple conversations and presentations and discussions that we've had throughout the entire year")[28]; Dittmar Ex. 6, at 106:19-110:20 (former Lead Independent Trustee Mann testifying that Plaintiffs' "minutes per contract" calculation is "misleading" in light of the Trustees' fee-review process).

### 2. Plaintiffs' Argument that the Independent Trustees Did Not "Negotiate" Does Not Raise a Genuine Dispute of Material Fact.

Plaintiffs claim that the Trustees "never actually 'negotiated' the fees received by Fidelity." Pl. Br. ¶¶ 128-129. This argument misses the mark. Even if it were true (and it is not), it would not matter because "it has long been established that there is no requirement to actually negotiate the fees at arm's length. Rather the standard is 'whether the fee schedule represents a charge within the range of what *would have been* negotiated at arm's length in light of all the surrounding circumstances.'" *Strougo*, 188 F. Supp. 2d at 384 (emphasis in original). *See also* Jan. 7, 2011 Hearing Tr. at 38:9-12 ("[I]t's essentially an objective test. So when they say it couldn't have resulted from arm's-length bargaining, they're not asking me to find whether it did or not.") (Dkt. No. 252).

---

[28]     The "15(c) process" is the process by which mutual fund boards comply with their obligation under the Investment Company Act of 1940 to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of" the funds' contracts with their investment advisers. 15 U.S.C. § 80a-15(c).

Plaintiffs similarly contend that the Independent Trustees just "blindly accepted" the group fee structure. Pl. Br. ¶¶ 130-138. But Plaintiffs offer no record support for this claim. In fact, the undisputed record is that the Trustees repeatedly considered the group fee structure since at least 1994. *See* Dittmar Ex. 31. As part of their consideration of the group fee, the Trustees analyzed the same issues Plaintiffs raise, such as whether the group fee is appropriate for Fidelity's larger funds. *See id.* at 3-4. The facts Plaintiffs cite as support for their "blind acceptance" theory at most show that two Fidelity executives and one Independent Trustee could not recall the details of the original implementation of the group fee. *See* Pl. Br. ¶¶ 131-132. That evidence does not create a genuine dispute that the Independent Trustees actively considered the group fee throughout the period at issue.[29]

### 3. Plaintiffs' Criticisms of the Information Provided to the Independent Trustees Do Not Raise a Genuine Dispute of Material Fact.

Plaintiffs devote the remainder of their Board process arguments to criticisms of the information provided to the Independent Trustees regarding a handful of the many issues that bear on the Trustees' consideration and approval of the Funds' fees. *See* Pl. Br. ¶¶ 139-165. In some instances, Plaintiffs contend that the Trustees never received information, *see, e.g.*, *id.* ¶¶ 140, 144, 165, but these claims are belied by undisputed evidence demonstrating that the Trustees did, in fact, receive the information. In other instances, Plaintiffs contend that Fidelity "manipulated" the information, *see, e.g.*, *id.* ¶ 161, but these arguments reflect at most a hindsight challenge to reasonable business judgments regarding how the information should be

---

[29] The argument that the Trustees do not review the contracts misstates the very testimony on which it relies. Pl. Br. ¶ 128. The testimony states that the contracts *are* reviewed—not by the Trustees, but by their counsel. Gerber Ex. 7, at 179:19-22.

presented. Plaintiffs' contentions do not create genuine dispute as to whether the Trustees were conscientious and well-informed about the issues material to their assessment of the Funds' fees.

### a.      Fund-Level Costs and Economies of Scale

Plaintiffs contend that the Board received no analyses of fund-level economies of scale or fund-level costs. *Id.* ¶¶ 140, 144. Not only does this argument ignore the fact that the vast majority of Fidelity's costs are shared across funds, and therefore are not specific to any particular fund, *see* Dittmar Ex. 24, ¶ 29, it also is belied by the record. Indeed, Plaintiffs' own expert conceded that the Board received a regression analysis that "provide[s] insight about [economies of scale for] every particular fund in the complex." *See* Dittmar Ex. 30, at 308:4-21, 311:22-312:5. Moreover, there can be no dispute that Fidelity annually prepared and provided the Trustees with reports showing the estimated costs and profitability of each individual Fund. *See* Dittmar Ex. 26, at 8-11; Gerber Ex. 5, at 60:25-61:7 ("There is a fund-by-fund profitability analysis that involves rough allocations.").[30]

Plaintiffs argue that the methodologies Fidelity used to allocate joint-and-common costs to individual funds were inappropriate and artificially depressed profit margins. *See* Pl. Br. ¶¶ 151-157. This argument amounts to nothing more than a disagreement with business judgments about how to allocate joint-and-common costs. *See* Dittmar Ex. 26, at 8-11. As courts have acknowledged, cost-allocation is more of an art than a science. *Krinsk,* 715 F. Supp. at 489; *Schuyt,* 663 F. Supp. at 977-78. But even if Plaintiffs' criticisms had merit (and they do

---

[30]      Where the same infrastructure serves all retail shareholders (many of whom own many funds) it is hard to improve on the answer given in response to Plaintiffs' insistence that Fidelity isolate the "direct" (as opposed to allocated) costs of each fund: "I don't think that would make any sense at all." Gerber Ex. 5, at 61:8-17.

not[31]), there is no evidence that the purported methodology defects had any *material* impact on fund-by-fund profitability estimates or of what the profit margins *should* have been. *See* Dittmar Ex. 29, at 116:24-117:8, 228:18-23 (Plaintiffs' cost-accounting expert conceding that he had not calculated an alternative margin or determined whether Fidelity's profitability was over- or understated); *see also* Dittmar Ex. 27, at 1-10 (expert witness Russell Peppet analyzing purported defects and concluding they were immaterial). In the absence of evidence that these alleged defects "moved the needle" on the profit margins, the alleged existence of allocation errors cannot defeat summary judgment. *See Gallus*, 497 F. Supp. 2d at 980-81.

### b.  Institutional Fee Comparisons

Plaintiffs claim that the Board never received "direct comparisons" of the Funds' fee rates and institutional accounts' fee rates, and only ever received a memo with the standard rack rates. Pl. Br. ¶ 158, 160. The record evidence is to the contrary. The Trustees, in fact, received direct comparisons. *See* Gerber Ex. 50, at BFMR_00173882, BFMR_00173892.[32] Plaintiffs merely contend that it should have been presented in a different format and assume the Trustees did not know, for example, that the Growth & Income Fund was in the "Income/Growth" category. *See* Pl. Br. ¶ 163. As for Plaintiffs' claim that the Board was never told that some institutional clients pay fee rates different from the "rack rate," *see id.* ¶ 159, Plaintiffs' own

---

[31]     Plaintiffs' contentions that Fidelity simply allocates its costs based on assets under management, Pl. Br. ¶¶ 147-150, are contrary to undisputed record evidence. *See, e.g.*, Dittmar Ex. 27, at 21-22 & App. 4 (summarizing use of 13 different drivers to allocate fund expenses).

[32]     As explained in note 10, *supra*, the cited document is a chart that compares the management fee rates for Fidelity mutual funds, grouped by investment strategy, with the fee rates paid by Fidelity's subadvised funds and institutional clients in the same investment strategy category. *See* Gerber Ex. 50, at BFMR_00173892  The first column, entitled "Fidelity Funds," provides the effective management fee rates and average assets under management for Fidelity mutual funds. The second column, entitled "Third-Party 1940 Act Funds Sub-Advised by FMR," provides fee and asset information for Fidelity's subadvised funds. The third column, entitled "FMTC Products – Standard Pricing Schedule," identifies the effective fee rates, at various asset levels, for Fidelity's institutional separate accounts and commingled pools under Fidelity's standard pricing schedule.

exhibit shows that the Board was told that 27% of institutional accounts pay fee rates that are different from the rack rate. *See* Gerber Ex. 40, at BFMR_00011574 ("Approximately 73% of FMTC's assets are priced in accordance with the standard pricing schedule described above.").

Plaintiffs fault the Trustees for not believing "that fee comparator information for [institutional accounts] was important." Pl. Br. ¶ 164. However, it is not for Plaintiffs to fault the Trustees' business judgment that the services provided to institutional accounts and mutual funds were not sufficiently similar to render a comparison "very pertinent." Moreover, that business judgment is fully consistent with the Supreme Court's instruction in *Jones* that courts "must be wary of" comparisons between two products where differences in the services received render the comparison is "inapt." *Jones*, 130 S. Ct. at 1428.

### c.       Dollar Amount of Fees

Plaintiffs' final contention is that the Trustees never "reviewed or approved [the] dollar amounts of fees" and that Fidelity failed to disclose the "compensation in dollars." Pl. Br. ¶ 165. This argument finds no support in the record. In fact, in the very testimony Plaintiffs cite, Abigail Johnson testified that the Trustees reviewed the total dollars paid to Fidelity. Gerber Ex. 5, at 78:5-9 ("Q. Going into the next year's contract renewal, do [the Trustees] ever look back to see how many dollars ended up being the fee paid to FMR for managing Magellan? A. Yes."). Additionally, far from being "undisclosed," the total dollars paid by the Funds are *publicly disclosed* in *two* places: the Funds' SAIs and Annual Reports. *See, e.g.*, Dittmar Ex. 22, at BFMR_00090790; Gerber Ex. 30. In any event, the total dollars paid by each Fund is merely the product of the Funds' assets multiplied by the fee rates. To credit Plaintiffs' argument that the Trustees were unaware of the dollar amount of fees paid, the Court would have to conclude that the Trustees are incapable of performing simple multiplication.

**IV.     PLAINTIFFS' EVIDENCE WOULD NOT ESTABLISH THAT THE FUNDS' FEES WERE "SO DISPROPORTIONATELY LARGE."**

The evidence proffered by Plaintiffs would not enable them to carry their burden at trial of proving that the Funds' fees were "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S. Ct. at 1426. As discussed in detail in Section III, *supra*, many of Plaintiffs' "facts" are purely conclusory or directly contradicted by the record—including the very record cites on which Plaintiffs rely—and many of their facts are not material to the specific *Jones* factor they purport to address or to the overall issue of disproportionality.

Moreover, Plaintiffs' effort to defeat summary judgment hinges a single issue of fact that is not genuinely in dispute: whether the Management Agreements cover shareholder services. The plain language of the Management Agreements, and the undisputed testimony of the parties who negotiated those contracts, establish that the contracts do, in fact, cover shareholder services. Plaintiffs' arguments to the contrary do not create a genuine dispute.

Resolving this single issue in Defendants' favor eliminates many of Plaintiffs' other purported factual disputes, but more importantly, it exposes a critical defect in Plaintiffs' proof. The core inquiry under *Jones* is the proportionality of the fees paid to the services rendered. This requires consideration of *all* of the services rendered in exchange for the challenged fees. *See* S. Rep. No. 91-184, at 4910 (Section 36(b) requires a court to consider "*all services rendered* to the fund") (emphasis added). Plaintiffs cannot establish disproportionality based on evidence that considers only a subset of the services provided. This is a fatal flaw, and the Court need go no further to conclude that Plaintiffs cannot meet their burden of proof at trial.

But even if the Court resolves all of the factual disputes in Plaintiffs' favor, they still cannot meet their burden of proving that the Funds' fees are disproportionate to the services

rendered.  The "so disproportionately large" standard sets a very high bar.  *Am. Funds*, 2009 WL 5215755, at *2 (*Gartenberg* "establishes a very low threshold for the mutual fund companies and a very high hurdle for a plaintiff").  It is not enough for Plaintiffs to raise questions on the margins—they must establish a fundamental disconnect between the fees paid and the services rendered.  *See Jones*, 130 S. Ct. at 1430 (Section 36(b) "does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining").  Plaintiffs' evidence, even assuming their version of it was accurate, would not meet this high standard.

Plaintiffs devote most of their submission to purported factual issues surrounding institutional fee comparisons and supposed Board process deficiencies, both of which are insufficient as a matter of law to establish disproportionality.  *See id.* at 1428-29 n.8 (even apt institutional fee comparisons will not "doom any fund to trial" in the absence of "other evidence" of disproportionality); *id.* at 1429-30 (board process defects go only to the amount of deference given to the board approval).  Thus, even resolving all of the disputes on these two factors in Plaintiffs' favor would not enable them to prevail at trial without more.

Plaintiffs' proffered evidence regarding the other factors, even if assumed to be true, does not establish disproportionality:

- On two of the factors—the volume of orders and Fidelity's costs of providing services—Plaintiffs offer no evidence at all.  *See* Pl. Br. ¶ 118 (claiming volume of orders is "irrelevant"); *id.* ¶¶ 69-78 (claiming costs are "static" without providing the amount of costs or refuting that Fidelity's costs were enormous).

- On fall-out benefits, Plaintiffs point to one alleged benefit (offering new funds at a loss), which they concede was "unprofitable" and therefore would not qualify as a fall-out *benefit*.  *Id.* ¶ 105.  In any event, Plaintiffs make no attempt to meet their burden of establishing "but for" causation or quantifying the alleged benefit.

- On the nature and quality of services, Plaintiffs show that four of the Funds had negative returns during an artificially selected time period that coincided with one of the worst stock market downturns in history.  *See Am. Funds*, 2009 WL 5215755, at *48, ¶47 (plaintiffs did not meet their burden by relying on poor performance during

a period of "widespread economic turmoil"). In addition, out of the many millions of Fund shareholders, Plaintiffs identify only one who complained about Fidelity's website. *Id.* at *18, ¶150 (no Section 36(b) violation where "[p]laintiff failed to present evidence that any significant number of shareholders in the Funds were dissatisfied with the services provided").

- On comparative fees, Plaintiffs argue that the Funds had higher fees than one fund complex, and they identify three funds that had lower fees. Plaintiffs offer no evidence about how the Funds' fees compared to any meaningful set of comparable funds, as every court analyzing this factor has done. *See, e.g.*, *id.* at *53, ¶ 77; *Gallus*, 497 F. Supp. 2d at 982-83.

- On profitability, even the inflated, pre-tax investment management margins calculated by Plaintiffs' expert, Pl. Br. ¶ 80, are within the same range found to be reasonable by prior courts. *See Meyer*, 707 F. Supp. at 1401; *Schuyt*, 663 F. Supp. at 978; *Am. Funds*, 2009 WL 5215755, at *50, ¶58.

- On economies of scale, Plaintiffs' expert calculated that 37% of all economies of scale were shared through breakpoints in the group fee. This does not support a finding of disproportionality. *See Gallus*, 497 F. Supp. 2d at 981-82 (17% shared); *Am. Funds*, 2009 WL 5215755, at *52, ¶72 (40% shared). Moreover, Plaintiffs' evidence fails to address other forms of sharing, such as service enhancements, so this represents the *minimum* level of sharing, and they have presented no evidence on the total amount of sharing.

Thus, even assuming Plaintiffs' version of the facts, they would not meet their burden of proof on *any* of these individual factors. Accordingly, they cannot meet their burden of proving that the Funds' fees are "so disproportionately large" in the aggregate. *See City of Brockton Ret. Sys. v. The Shaw Group, Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (a collection of insufficient allegations will not establish an element of the claim in the aggregate because "zero plus zero plus zero" equals zero). Summary judgment should issue for Defendants.

Dated:  February 25, 2011

Respectfully submitted,

GOODWIN PROCTER LLP

/s/ James S. Dittmar
   James S. Dittmar (BBO# 126320)
   David J. Apfel (BBO# 551139)
Exchange Place
53 State Street
Boston, MA 02109
Tel:  (617) 570-1000
Fax:  (617) 523-1231

MILBANK, TWEED, HADLEY & McCLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Andrew W. Robertson
   Andrea G. Hood
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel:  (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for Defendants Fidelity Management &*
*Research Company and FMR Co., Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 25, 2011.


/s/ James S. Dittmar